1
2
Michelle R. Matheson #019568
Emily Armstrong #030082
**MATHESON & MATHESON, P.L.C.**
3
15300 North 90th Street, Suite 550
Scottsdale, Arizona 85260
4
(480) 889-8951
mmatheson@mathesonlegal.com
5
6
Todd Feltus #019076
Molly Rogers #028212
7
**KERCSMAR & FELTUS PLLC**
7150 East Camelback Road, Suite 285
8
Scottsdale, Arizona 85251
(480) 421-1001
9
tfeltus@kflawaz.com
cmr@kflawaz.com
10
11
Attorneys for Plaintiff and Counter-Defendants
12

**IN THE UNITED STATES DISTRICT COURT**

13

**FOR THE DISTRICT OF ARIZONA**

14
15
Kim Cramton,                           Case No. 2:17-cv-04663-PHX-DWL
16
            Plaintiff,                 **PLAINTIFF/**
17                                     **COUNTER-DEFENDANTS'**
    vs.                                **MOTION FOR SUMMARY**
18                                     **JUDGMENT**
    Grabbagreen Franchising, LLC, Eat Clean
19  Operations, LLC, Eat Clean Holdings,
    LLC, Kelli Newman, and Keely Newman,
20
21          Defendants.
22
23  And Related Counterclaim
24
25
26
27
28

Pursuant to Rule 56, Fed. R. Civ. P., Plaintiff/Counter-Defendants Kim Cramton and Laura McCormack ("Plaintiffs") request summary judgment in their favor: (1) on Counts IV and V of Plaintiffs' Complaint; (2) that Defendants are an "integrated enterprise" for purposes of Plaintiffs' ADA claims; and (3) on the Counterclaim. This Motion is supported by the below Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITES

## I.    INTRODUCTION

This action involves the deceptive and malicious behavior of Keely Newman and Kelli Newman towards Kim Cramton related to the Grabbagreen restaurant business.  At bottom, the Complaint relates to the Newmans' abusive behavior towards Cramton, the failure to provide any accommodation when Cramton suffered a brain aneurysm, and then misleading Cramton regarding the sale of Grabbagreen so that she would not share in the proceeds from the sale.  This motion addresses some of the underlying issues of which a reasonable juror could only reach one conclusion.

Cramton is moving for summary judgment on three issues related to her affirmative claims.  First, under the undisputed evidence, Cramton is owed at least $23,017.12 under a promissory note owed by Eat Clean Operations, LLC.  After being served the Complaint, the Newmans made a series of accounting adjustments to penalize Cramton from a tax standpoint.  But the end result from the Newmans' manipulations is that ECO now owes Cramton $66,527 under the note.  Second, the undisputed evidence demonstrates that Cramton was never paid any regular wages in 2017.  So, she is entitled to summary judgment for defendants' violation of Arizona's minimum wage statute.  Third, according to the undisputed evidence, the various entities that comprise the Grabbagreen business (ECH, ECO, and GGF) are an integrated enterprise under the Americans with Disabilities Act ("ADA").

Cramton is also moving for summary judgment on all of the counterclaims. Discovery has proven that these claims are completely at odds with the pleading and only

1

asserted for purposes of maliciously imposing additional litigation costs against Cramton.[1] Defendants claim that a release involving a non-defendant, Gulf Girl Squared, releases all claims.  But that release was limited to issues outside of the Complaint as the Newmans both testified.  Moreover, ECH, ECO, and GGF are not included as part of the released entities.  In addition, Defendants claim that Cramton's actions resulted in a $1 million decrease in the sales price of Grabbagreen to Kahala Brands.  The undisputed evidence is that Kahala's unwillingness to pay the Newmans' asking price had to do with the companies' financial performance and nothing to do with Cramton.

## II.   FACTUAL BACKGROUND

### A.   Formation of Company

In 2013, Keely Newman and her childhood friend Kelley Bird formed Gulf Girl Squared, Inc. ("GGS") to open a "retail fast food healthy restaurant" concept known as "Grabbagreen."  (30(b)(6) Deposition of GGS, Exhibit 2, at 13:23-14:17.)  The original shareholders were Keely Newman and her now spouse Kelli Newman, and Kelley Bird and her then-spouse Chris Bird.  (*Id.* at 13:23-14:7.)  GGS opened three restaurants in the Phoenix, Arizona area in 2013 and 2014.  (*Id.* at 22:23-25.)  On September 22, 2014, Keely Newman formed GGF to franchise the Grabbagreen concept. (Keely Newman Deposition, Exhibit 3, at 55:2-25, 75:16-76:4; AZ GGF website, Exhibit 4.) [2]

### B.   Employment of Kim Cramton

Kim Cramton has extensive experience in the franchising industry with Cold Stone Creamery, Subway, and Wendys.  (Cramton Declaration, Exhibit 6, ¶ 2.)  On September 29, 2014, Keely Newman hired Cramton as Regional Manager of Operations, and then VP of Operations, for GGS.  (Ex. 2, at 25:11-22; 27:1-3; 33:16-34:18; Ex. 3, at 77:16-78:23.)

---

[1]  In fact, just two weeks ago, Kelli Newman filed an entirely new state court action against Cramton, asserting claims that are clearly compulsory counterclaims under Rule 13. *See* Complaint, attached as Exhibit 1.

[2]  GGF was originally formed as Grabbagreen Franchising, Inc., and converted to Grabbagreen Franchising, LLC.  (Statement of Conversion, Exhibit 5.)

Cramton oversaw operations of the three GGS owned Grabbagreen stores in this role. (Plaintiff's Responses to First Set of Interrogatories, Exhibit 7, at 3, Response to NUI #1.)

By 2016, Cramton's position had changed to Executive VP of Operations and Franchise Development for entity GGF.[3]  (Ex. 7, at 4-5; Ex. 3, at 85:16-86:5.)  Cramton was now charged with franchising the Grabbagreen concept, and GGS hired a new Regional Manager to operate the GGS stores.  (Ex. 7, at 5.)  During her tenure with Defendants, Cramton sold almost 100 Grabbagreen franchise stores across the country. (Separation Announcement, Exhibit 9; Ex. 3, at 202:18-203:2.)

In 2016, Cramton and Keely Newman also partnered together to purchase a fourth Grabbagreen store in Phoenix from Krowne Enterprises.  (Ex. 2, at 55:23--57:6; AZ Website Krowne, Exhibit 10; Kelli Newman deposition, Exhibit 11, at 150:24-151:1.) Cramton's job duties in 2016-17 included working in and overseeing operations for that store.  (Ex. 6, ¶ 15.)  The employees at the ECO store ultimately reported to GGF management.  (Ex. 7, at 5; Ex. 6, ¶¶ 9-12.)

## C.    Corporate Changes

In late 2016, the Defendant entities underwent corporate changes.  On October 7, 2016, the Birds sold their interest in GGS to Keely Newman and Cramton.  (Shareholder Sale Agreement, Exhibit 12; Ex. 2, at 45:1-10.)  On October 24, 2016, Keely Newman formed Eat Clean Operations ("ECO") to acquire ownership of the fourth Grabbagreen store from Krowne.  (Ex. 2, at 56:5-57:1; ECO AZ Website, Exhibit 13.)

The Newmans also formed another new entity: Eat Clean Holdings ("ECH"). (ECH Operating Agreement, Exhibit 14.)  In November, 2016, Defendants made Cramton a minority owner in ECH, awarding her an 18.6% interest, with Keely Newman owning the remaining interest.  (Exhibit 14, at Exhibit A.)  ECH did not have any employees but was simply the parent company to GGF and ECO.  (Ex. 2, at 21:6-21; Ex. 11, at 151:20-

---

[3] Cramton was also receiving W-2 wages from GGF by that point.  (2016 W-2, Exhibit 8.)

152:6; Teresa Mills Deposition, Exhibit 15, at 49:23-24.)

### D. Common Ownership, Control, and Function

These entities—ECH as the parent company to Grabbagreen Franchising LLC ("GGF") (the franchising arm) and ECO (the store owned by Cramton and Keely Newman)—were the integrated enterprise that employed Plaintiff in 2017. According to Kelli Newman, the Chief Administrative Officer, all three entities were under "common control." (Ex. 2, at 20:23-22:9.) According to Kelli Newman, this means there was a "common ownership of 50 percent or more," and "the same five or fewer individuals owning at least 80 percent of the total voting interests in each entity." (Ex. 2, at 20:23-22:9.) These three companies also had common payroll. (Ex. 15, at 42:13-22, 43:8-45:9, 48:18-49:24; Ex. 2, at 75:25-76:23.) The entities also offered the same insurance plan for their employees.[4] (Ex. 2, at 54:17-55:19; Ex. 15, at 116:3-118:7; 11/25/16 email, Exhibit 16.) Kelli Newman understood the employees of these entities would be aggregated under the Affordable Care Act. (Ex. 2, at 55:7-15.)

The companies frequently commingled and shifted funds from one entity to the other. (5/24/17 email, Exhibit 17; Ex. 15, at 88:12-94:10.) These three entities also shared employees. (*See* Ex. 6, ¶¶ 9-12, 17-19.) They also had one office space, which is where the central operations were conducted of all three organizations. (Ex. 6, ¶¶ 9, 12.) All hiring and firing, payroll, purchasing, and contracting ran through centralized management. (Ex. 6, ¶¶ 12-13.)

### E. Number of Employees in Integrated Enterprise

For at least the first 26 weeks in 2017, GGF had at least 6 employees. (Ex. 3, at 110-114; Subsidiary Employee List, Exhibit 18.) ECO had at least 10 employees on 24 of those weeks. (*See* Ex. 6, at ¶¶ 17-19; Summary Chart of ECO Employees and supporting

---

[4] Eat Clean Holdings did not technically have any payroll or insurance offerings as it does not have any employees. (Ex. 15, at 49:23-24.) It is a shell company that serves as the parent company to Eat Clean Operations and Grabbagreen Franchising. (Ex. 2, at 21:6-21; Ex. 11, at 151:20-152:6.)

Payroll Summaries, Exhibit 19.)  As a result, the combined organizations had at least 15 employees for 20 weeks in 2017.

**F.      Promissory Note**

On October 27, 2016, ECO executed a Promissory Note in favor of Cramton for $66,527.   (Promissory Note, Exhibit 20.)   The Note was in exchange for ECO's acquisition of Cramton's assets in Krowne Enterprises, and represented funds Cramton had advanced to Krowne in connection with opening the fourth Grabbagreen store.  (Ex. 11, at 174:11-175:9; Ex. 15, at 133:1-34:17.)  Under the Note, ECO "promises pay to the order of Kim Cramton (the 'Lender')" $66,527.00. (Ex. 20.)

**G.      Agreement to Withhold Wages and Payments under the Note**

On December 31, 2016, Keely Newman and Cramton signed a consent agreeing that GGF would discontinue paying wages to them because of cash flow issues within the company.  (Consent, Exhibit 21; Ex. 3, at 120, 273:9-23, 274:19.)  Instead, they elected to receive repayments on their promissory notes from ECO since it would not constitute income.  (Letter from K. Newman, 9/25/17, Exhibit 22; Ex. 3, at 120, 273:9-23, 274:19.) Kelli Newman confirmed this: "Kim also elected to receive loan repayments in lieu of certain compensation to avoid paying income tax on those amounts."  (Ex. 22, at 1.)

In 2017, Cramton did not receive any wages from Defendants. (Ex. 6, ¶ 24.)  She did not draw a salary from Grabbagreen.  (Ex. 3, at 118:12-120:9.)  Mills confirmed Cramton did not receive payroll every two weeks.  (Ex. 15, at 128:3-29:3, 137:25-138:23; *see also* Exhibit 51, confirming "unpaid officer wages.")

**H.      Payments under the Note**

Consistent with the consent, Grabbagreen began making payments to Cramton under the Promissory Note.  (Ex. 3, at 273:19-276:12; Ex. 15, at 139:2-149:23.)  A series of emails and accounting entries demonstrate these payments:

- 2/6/17, Keely Newman: "Teresa [Mills] we are expecting a $19,500 wire tomorrow from chi.  Please roll over 10k as loan to eco and make loan payment to me and Kim of 5k each."  (Email at Exhibit 23; Ex. 15, at 139-140.)

5

- 2/21/17, Keely Newman: "Teresa this is for marival Heidi settlement.  Please make 5k Loan payment to me and Kim from eco."  (Email at Exhibit 24; Ex. 15, at 141-42.)

- 4/8/17, Teresa Mills: "You can each just transfer $5k from GFL and I will make it a loan to ECO."  (Email at Exhibit 25; Ex. 15, at 142-44.)

- 4/26/17, Keely Newman: "Teresa, please make payment to me and kim towards our note for $1250 each."  (Email at Exhibit 26; Ex. 15, at 144-145.)

- 5/11/17, Teresa Mills: "Kim: You may roll $433.49 from GFL's account for an ECO loan payment.  This brings your loan balance to $50,000."  (Email at Exhibit 27; Ex. 15, at 145-46.)

- 5/23/17, Teresa Mills: "Keely & Kim: Please transfer the following amounts to your personal accounts from GFL as payments on the ECO loan:  Kim - $2,500[,] Keely - $2,571.32."  (Email at Exhibit 28; Ex. 15, at 146-48.)

- 6/8/17, Keely Newman: "Teresa please prepare loan payment of 2500 each for me and kim to roll over today."  (Email at Exhibit 29; Ex. 15, at 148-49.)

The corresponding transaction journal entries appear on a summary of payments to Kim Cramton attached as Exhibit 30.[5]  (*See also* Ex. 15, at 139-149.)

Defendants accounted for these payments as a pay down on Cramton's Note balance.  ECH's November 30, 2017 balance sheet reflected a balance of approximately $23,000 on the Note.  (Ex. 3, at 281:2-22; Ex. 15, at 183:6-18.)[6]  On September 19, 2017, Mills confirmed this balance to Cramton. (Exhibit 31, Text Messages between K. Cramton and T. Mills; Ex. 6, ¶¶ 32-33.) With a slight discrepancy, the approximate $23,000 balance represents the original Note balance, $66,257, minus all of the Note payments set forth in the ledger and above-emails.  (Ex. 30; Ex. 20.)

## I.     Confidentiality, Proprietary Rights and Non-Competition Agreement

[5]   The monthly payments on Exhibit 30 for $1,016 were for Cramton's health insurance, and $548.10 was to reimburse her for payments on her car lease.  Other payments were a paydown of the Note.  $66,257 minus all of the note payments on this exhibit ($45,183.49 = sum of $5,000, $800, $4,200, $1,000, $5,000, $1,250, $433.49, $2,500, $2,500, $2,500, $20,000), results in a Note balance of $21,343.51.   (Ex. 30.)

[6]   ECO assigned the Note to ECH.  (Ex. 15, at 105:24-108:18).  After this lawsuit was filed, that assignment was reversed.  (*Id.*)  Defendants' agents have testified that ECO, conveniently, does not have the assets to pay this Note.  (*Id.*)

In 2017, Keely Newman requested that all GGF employees sign a "Confidentiality, Proprietary Rights and Non-Competition Agreement for Key Employees." (the "Agreement"). (*See* Exhibit 32, 4/18/17 emails.)   Cramton, along with all the other employees, signed it and backdated it to October of 2016, per Newman's instruction.  (*Id.*)

Under the agreement, the employees agreed that "during the Non-Competition Period, I will not . . . be employed or engaged by . . any business engaged in or planning to engage in any business activity . . . within the Restricted Field in the Business Territory." (Agreement, Exhibit 33, at CRA000478).  "Restricted Field" means "**healthy fast food + juice**."  (*Id.* at CRA000476.) (emphasis added)  The "Business Territory" includes a step-down provision, and means the greatest of the following that a court will enforce: (1) locations where the Company has restaurants or franchisees or where it has definite plans in which to expand (i.e. nationwide); (2) a 5 mile radius from the locations where the employee provided services; (3) 3 miles; or (4) one and a half (1.5) miles).  (*Id.* at CRA000475.) The "Non-Competition Period" similarly includes a step-down provision: 12 months; 9 months; or 6 months.  (*Id.* at CRA000476.)

**J.    Sale of GGS and Release**

On September 14, 2017, GGS sold all its three stores to Black & Furr, LLC, an unrelated third-party.  (Ex. 2, at 82:1-83:5; Release, Exhibit 34.)  In connection with the sale, Cramton received a return on her investment into GGS (Ex. 2, at 89:18-90:6.)  and the Newmans asked Cramton to sign a release.  (*Id.* at 84:24-89:23.)  The Release is between Cramton, Keely Newman, and GGS.  (Ex. 34, at CRA000464.)  Notably, ECO, ECH, and GGF are not parties to the Release.  (*Id.*)  The Release defines GGS as the "Corporation" and provides:

> [E]ach Party, for themselves and their respective heirs, executors, beneficiaries, administrators, representatives, servants, successors, assigns, attorneys, agents affiliates, directors, officers, and employees hereby fully and forever release, acquit, and discharge each and every other Party, and their respective heirs, executors, beneficiaries, administrators, representatives, successors, assigns,

insurers, attorneys, agents affiliates, past and present shareholders, past and present directors, past and present officers, past and present employees, servants, from any and all . . . "Claims" . . . . relating in any manner, directly or indirectly to any matter relating to the Corporation, each Party's past and current ownership of common stock or any other interest in the Corporation, each Party's employment with the Corporation or otherwise related in any way to the Dispute.

(*Id.*)  Dispute is not defined under the Release.  (*Id.*) Keely Newman drafted the release.  (Ex. 2, at 84:24-88:2.)  She and Kelli Newman both testified that the Release was signed in connection with the sale of GGS assets to Black & Furr.  (Ex. 3, at 254:4-11; Ex. 2, at 89:18-90:6.)

Defendants claim that Cramton's claims in this lawsuit are barred by the Release. Cramton, however, did not sue GGS.  (Doc. 88.)[7]  She did not sue GGS or anyone related to the sale of assets to Black & Furr.  (Docket Entry No. 88.)  Kelli Newman has testified that the Release did not cover Cramton's claims under the Promissory Note.  (Ex. 2, at 114:8-12).

### K.    Sale of ECH, ECO, and GGF to Kahala

In August of 2017, Defendants began discussions to sell ECH, ECO, and GGF to MTY Food Group, Inc., d/b/a "Kahala."  (Email, Exhibit 37; Press Release, Exhibit 38.) Kahala originally proposed a purchase price of $3.25M.  (Ex. 3, at 249.)  On September 25, 2017, Cramton separated from Defendants.[8]  (Ex. 6, ¶ 36.)  As of November 20, 2017, Kahala hired Plaintiff to franchise their "Blimpie" concept.  (Ex. 6, ¶ 44.)  Blimpie is not in the business of "healthy fast food + juice."  (Ex. 6, ¶ 44; Exhibit 43, 4/13/17 Email from

---

[7] Defendants claim that even though ECO, ECH, and GGF are not Parties to the Release, they are "affiliates" covered by the language of the release.  This is contradicted by Defendants' Franchise Disclosure Document, the governing and public document relied upon by franchisees.  It removed GGS at the end of 2016 as a part of the corporate changes.  (*Compare* Excerpt of 11/2016 Franchise Disclosure Document, Exhibit 35, which includes GGS as an "affiliate" with 2017 Franchise Disclosure Document, with Excerpt of prior FDD, Exhibit 36, which states GGF does "not have any parents, predecessors, or affiliates," other than ECH.)

[8] Cramton's constructive discharge on that date, which attached to her claims for disability discrimination, retaliation, and failure to accommodate, are not a part of this Motion because constructive discharge is a question of fact.  A summary of Cramton's claims are in Plaintiff's Complaint.  (Doc. 88.)

8

K. Newman.)  Cramton was screened off of any discussions related to the Kahala purchase because of her prior employment with Grabbagreen.   (Ex. 6, ¶¶ 45-46; J. Wuycheck Deposition, Exhibit 39, at 57:17-58:25, 77:15-18, 87:11-88:18, 91:6-92:21, 114:14-115:4; J. Smit Deposition, Exhibit 40, at 24:22-25:11; Exhibit 41, KAH000153-155; Exhibit 44, KAH000204.)

On February 19, 2018, Defendants sold ECH, ECO, and GGF to Kahala for $2,675,000.  (Ex. 38.)  Kahala's officer testified that it reduced what it would pay because the three GGS stores were not included in the purchase.[9]  (Ex. 40, at 26:22-27:24, 37:23-39:25.)  The reduction had nothing to do with anything Cramton said or did.  (Ex. 40, at 37:23-39:25.)  There is no evidence that Cramton disparaged Defendants or discussed Defendants with Kahala.  (Ex. 40, at 25:1-11, 32:19-33:1.)

**L.     Accounting Reversal and Liberties**

On December 20, 2017, Keely Newman was served in this lawsuit.  (Service Information, Exhibit 42.)  The next day, at 7:15 a.m., Newman instructed Grabbagreen's accountant Teresa Mills to re-classify $25,000 of the Promissory Note payments to Kim Cramton as "wages." (Ex. 15, at 158:4-25, 162, 174-179, 183.)  Grabbagreen's accountant does not know what the $25,000 was tied to.  (*Id.* at 158:4-25, 162.)  Mills then issued "paychecks" to Cramton for that amount.  (*Id.* at 157:5-161:5.)  This "accounting" was intended to revert Cramton's Promissory Note balance to its original balance.  (*Id.* at 179:16-20.)[10]

**III.    LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material

---

[9]  They were not included in the sale because they sold to Black & Furr, LLC.

[10]  The accounting liberties continued.  On December 31, 2018, Mills reclassified payments to Cramton that were for her health insurance and car payments as "distributions" on the instruction of Keely Newman.  (Ex. 15, at 158-159.)   The remaining Note payments (over $25,000) were also reclassified as "distributions" to Cramton.  (*Id.* at 183:6-22.)  This resulted in a tax liability to Cramton where no wages or distributions were ever made to her in 2017.

fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and must "come forward with 'specific facts showing that there is a *genuine* issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e), amended 2010). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The non-moving party's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48.

## IV.   ARGUMENT

### A.   Summary judgment is proper on Plaintiffs' claim for breach of promissory note because it is undisputed that a balance remains on the Note.

As stated above, on October 27, 2016, ECO executed a Promissory Note in favor of Cramton for $66,527.  (Ex. 20.)  Under the Note, ECO "promises pay to the order of Kim Cramton" $66,527.00 plus interest at 3.5% per year.  (*Id.*)

It is undisputed that this entire amount has not been paid.  (Ex. 6, ¶¶ 33-35.)  A series of emails cited above confirm that various payments were made on the Note throughout 2017, resulting in a balance of approximately $23,000.

On December 21, 2017, Keely Newman instructed Grabbagreen's accountant to reverse the Note Payments, and re-characterize them as "wages" ($25,000), and "distributions" (the remaining balance).  As a result, Defendants' position is that the balance of the Promissory Note reverts back to its original balance.  (Ex. 15, at 179.).

Regardless of whether this Court accepts the original balance ($66,527) or resulting

balance ($23,017.12) on the Promissory Note, it is undisputed that the Note remains unpaid.  Thus, summary judgment for Plaintiffs on liability is appropriate, as it is undisputed the full balance of the Note has not been satisfied.

The emails and corresponding accounting entries also make it abundantly clear that Defendants were making payments on the "loan"/"Note" throughout 2017, such that the balance is approximately $23,017.12.  The parties went to great pains in this regard to enter into a formal "consent" to document their agreement that Cramton and Newman did not receive any wages from GGF.  Defendants' after-the-fact and jerry-rigged accounting in an effort to create "wages" is not sufficient to create a genuine issue of fact.  The contemporaneous accounting entries, emails, and consent, and Kelli Newman's confirmation via letter make clear that this was the arrangement and that Summary Judgment for Plaintiff is appropriate for $23,017.12 plus costs and attorneys' fees.

**B.    Summary judgment is proper on Plaintiffs' minimum wage claim because Cramton received no regular wages in 2017.**

Under A.R.S. § 23-363, "employers shall pay employees no less than the minimum wage, which [is] $10 on and after January 1, 2017."  "Employee" means "any person who is or was employed by an employer but does not include any person who is employed by a parent or a sibling, or who is employed performing babysitting services in the employer's home on a casual basis."  A.R.S. § 23-362.  Cramton was an employee[11] and does not fit within any of the statutory exceptions.

On December 31, 2016, Keely Newman and Kim Cramton signed a GGF "consent" agreeing not to be paid wages going forward.  They abided by that consent.  Grabbagreen's accountant, Newman, and Cramton have all confirmed that Cramton did not receive regular payroll.  The only "wages" Cramton received were fabricated after this lawsuit was filed in an effort to avoid the minimum wage claim.

Even if this Court believes that the arbitrary $25,000 in "wages" assigned to Cramton in December of 2017 was actually wages, Plaintiff is still entitled to summary

---

[11] Cramton received W-2 wages from Defendants in prior years. (*See e.g.*, Ex. 8.)

judgment as a matter of law.  Under A.R.S. § 23-351, "each employer in this state shall designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to the employees."  It is undisputed that wages were not paid to Cramton every two weeks as required.  (Ex. 15, at 137:25-138:4; Ex. 6, ¶¶ 22-30.)

In 2017, Cramton regularly worked 60-80 hour weeks, with the exception of April and May, when she underwent treatment for her disability.  (Ex. 6, ¶¶ 25-29.)  Her estimates result in approximately $18,883 in unpaid minimum wages.[12]

Under A.R.S. § 23-364, "employers shall maintain payroll records showing the hours worked for each day worked, and the wages . . . paid to all employees."  "Failure to do so shall raise a rebuttable presumption that the employer did not pay the required minimum wage rate."  Here, Defendants wholly failed to maintain any records regarding the hours that Kim Cramton worked in 2017.  Thus, Defendants are presumed liable on Cramton's minimum wage claim.

Finally, under A.R.S. § 23-364, any employer who fails to pay the wages "shall be required to pay the employee the balance of the wages . . . , including interest thereon, **and an additional amount equal to twice the underpaid wages**."  Cramton is thus entitled to a total of $56,499, plus her costs and attorneys' fees.[13]  *See* A.R.S. § 23-364.

---

[12]  This represents $18,833 in wages.  Plaintiff estimates that for 14 weeks between January 1, 2017 and April 10, 2017, when her brain aneurysms were discovered, that she worked at least 60 hours per week (14 *60 = 840).  She estimates she worked approximately 25 hours during the week of April 10, 2017; 32 hours per week between April 17, 2017 and May 12, 2017 (4 weeks * 32); 15 hours during the week of May 15, 2017 because I had major surgery on May 16, 2017; 40 hours during the week of May 22, 2017; and 50 hours per week for the weeks of May 29, 2017 (during which week she worked the entire weekend opening a Grabbagreen store), through August 28, 2017 (50 * 14 weeks).  She estimates she worked approximately 60 hours a week during the 2 weeks between September 4 and September 18, 2017.  She estimates she worked approximately 15 hours during the last week of her employment because she was supposed to be on vacation.  (Ex. 6, ¶¶ 25-29).

[13]  Additionally, "any employer who violates recordkeeping, posting, or other requirements that the commission may establish under this article shall be subject to a civil penalty of at least $250 dollars for a first violation, and at least $1000 dollars for each subsequent or willful violation and may, . . . be subject to special monitoring and

C.    Defendants ECH, ECO, and GGF are an "Integrated Enterprise" under the ADA.

Under the ADA, the term "employer" means "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."  42 U.S.C.S. § 12111.  If an employer does not have the minimum number of employees to meet the statutory requirement, it is still covered if it is part of an "integrated enterprise" that, overall, meets the requirement. *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 929 (9th Cir. 2003); EEOC Compliance Manual, § 915.003, *available at* https://www.eeoc.gov/policy/docs/threshold.html#2-III-B-1-a-iii-(a). An integrated enterprise is one in which the operations of two or more employers are considered so intertwined that they can be considered the single employer of the employee.  *Anderson*, 336 F.3d at 929; EEOC Manual, supra.

The Ninth Circuit employs a four-factor test to determine whether two or more entities operate as an integrated enterprise: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 815 (9th Cir. 2002); *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006) (case law under Title VII regarding whether an entity, or integrated enterprise, constitutes an "employer," is applicable under the ADA, because of the same statutory definitions).[14]

 "The integrated employer test advances the anti-discrimination purpose behind Title VII by preventing employers from artificially dividing themselves into organizations with fewer than 15 employees in order to escape liability." *Rhodes v. Sutter Health*, 2012

---

inspections."

[14] According to the EEOC, the factors considered in determining whether separate entities should be treated as an integrated enterprise are: (1) the degree of interrelation between the operations, including sharing of policies, services, payroll, insurance, office space, and personnel; (2) the degree to which the entities share common management; (3) whether the entities have common officers and boards of directors; (4) whether there is a centralized source of authority for development of personnel policy including whether there are inter-company transfers of personnel; and 5) the degree of common ownership or financial control over the entities.  (EEOC Compliance Manual, § 915.003, supra.)

U.S. Dist. LEXIS 71354, at *12 (E.D. Cal. May 21, 2012) (citing *E.E.O.C. v. Falls Vill. Ret. Cmty., Ltd.*, No. 5:05 CV 1973, 2007 U.S. Dist. LEXIS 16094, at *8 (N.D. Ohio Mar. 7, 2007) ("Application of the integrated enterprise test to satisfy the fifteen employee requirement is likely more commonplace because of the principle that the term 'employer' should be liberally construed to effect the remedial purposes of the anti-discrimination laws. In those circumstances, application of the integrated enterprise test prevents employers from using legal fictions to avoid . . . liability.").

In this case, the integrated enterprise of ECH as the parent company to ECO and GGF satisfies every element of the test. As stated above, these three entities were under "common control." In the words of Kelli Newman, "the same five or fewer individuals owning at least 80 percent of the total voting interests in each entity." (Ex. 2, at 22:7-9.) These three companies also had: (1) common payroll; (2) common insurance; (3) common employees; (4) common office space; (5) and common, centralized management. Given the liberal statutory construction, since this integrated enterprise employed at least 15 employees during 20 weeks in 2017, as outlined above, summary judgment is appropriate.

### D.   Counterclaimants cannot establish any breach of the Confidentiality and Non-Compete Agreement or Operating Agreements (Count I).

Counterclaimants allege that Cramton has violated a Confidentiality, Proprietary Rights and Non-Competition Agreement (the "Agreement") executed with Grabbagreen, Inc., and Grabbagreen Franchising, Inc. ("Grabbagreen").[15] Counterclaimants assert that Cramton failed to return Grabbagreen's confidential information after her constructive discharge, has "misappropriated and disclosed" that information, and has "engaged in prohibited employment with a competitor." (*See* Doc. 95, at ¶¶ 11-12, 22.) Not only is the non-compete provision of the Agreement unenforceable, but there is no evidence that Cramton has violated any part of the Agreement.

---

[15] Neither of these entities is a party to this lawsuit, and neither existed as of 2017. GGS was formerly known as Grabbagreen, Inc. and Grabbagreen Franchising, LLC was previously Grabbagreen Franchising, Inc. But this further highlights the intermingling of corporations, names, and an integrated enterprise theory.

14

Arizona law does not look favorably upon restrictive covenants.  *See Valley Med. Specialists v. Farber*, 194 Ariz. 363, 367, 982 P.2d 1277, 1281 (1999).  Restrictive covenants are strictly construed against the employer.  *Amex Distrib. Co., Inc. v. Mascari*, 150 Ariz. 510, 514, 724 P.2d 596, 600 (App. 1986).  A restrictive covenant is reasonable, and will be enforceable, only if the employer shows: (1) the restraint is no greater than necessary to protect the employer's legitimate interest; and (2) that interest is not in contravention of public policy or outweighed by the burden on the employee. *Lessner Dental Labs., Inc. v. Kidney*, 16 Ariz. App. 159, 161, 492 P.2d 39, 41 (App. 1971).  The burden is on the employer to prove the extent of its protectable interests. *See Compass Bank v. Hartley,* 430 F.Supp.2d 973, 979 (D. Ariz. 2006).  Critically, an employer cannot restrict an employee from using the general "know how" acquired on the job. "One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience." *See Amex* at 516 (internal quotation omitted). As another court put it, "absent a special and enforceable duty, an alert salesperson is not required to undergo a prefrontal lobotomy." *Id.* at 517.

Here, the Agreement prohibits Cramton from engaging in any business activity that involves her "accessing, using, referring to, or drawing upon [her] knowledge of [Grabbagreen's] Confidential Information or customer relationships." (*See* Ex. 33, CRA000475-480, at CRA000478.)  This is an impermissibly broad restriction that restrains Cramton's ability to use her salesperson "know how."  Cramton's job was selling franchises.  She spent her Grabbagreen employment fostering and building client relationships. (Ex. 6, at ¶¶ 20-21.) This clause not only bars Cramton from actually <u>using</u> Grabbagreen's "Confidential Information" and calling on Grabbagreen's <u>actual</u> customers, but even drawing on the general knowledge developed during her employment.

Moreover, there is no evidence that Cramton has violated any portion of the Agreement.  Cramton's position at Kahala after her departure from Grabbagreen was director of franchise development for Blimpie's. (Ex. 6, at ¶ 44.)  According to the Senior

15

Vice President of Development at Kahala, who personally oversees the Blimpie's and Grabbagreen brands, Blimpie's and Grabbagreen are not competitors. (*See* Ex. 39, at 117:5-118:8.) Upon leaving Grabbagreen, Cramton returned her laptop, cell phone, office key, company credit cards, and company training book.   (Exhibit 45, CRA000489, CRA000490.) Because Cramton believed that her Grabbagreen devices should be returned as she obtained them, Cramton made a backup of her key files and then "wiped" her phone and laptop before returning them to Grabbagreen.  (Ex. 6, at ¶¶ 36-41.)  The backup of Cramton's hard drive was turned over to Grabbagreen during this action, along with the other Grabbagreen-related documents Cramton could locate. (Ex. 6, at ¶ 41-42; Exhibit 46, Signed Receipt, 9/13/18; Exhibit 47, Plaintiffs' MIDP Responses.)  Any "Confidential Information" Cramton may have had has been returned.  Cramton has no other "Confidential Information" in her possession.  (Ex. 6, at ¶ 43.)

Cramton has also not disseminated any "Confidential Information" to Kahala Brands or otherwise violated the Agreement through her Kahala employment. Representatives of Kahala testified that they were "careful" to ensure that Cramton did not provide Kahala with any documents or information about Grabbagreen.  (Ex. 39, at 57:17-58:25, 77:15-18, 87:11-88:18, 91:6-92:21, 114:14-115:4; Ex. 40, at 24:22-25:11; Ex. 41; Ex. 44.)

But these issues are largely academic.  Any possible issues associated with Cramton's post-Grabbagreen employment became irrelevant when, during this litigation, Kahala acquired the Grabbagreen brand.  (Exhibit 48, CRA000471-472.)   In effect, Cramton was "rehired" by Grabbagreen in November 2017, creating a "no harm, no foul" situation.  (*See* Ex. 40, at 25:12-26:5.)    In other words, even if Cramton *had* taken Grabbagreen information to benefit Kahala, those assets would have been conveyed to Kahala anyway.

Counterclaimants have not produced any evidence: (i) identifying the Confidential Information supposedly provided to Cramton during her employment; (ii) establishing that

the Confidential Information at issue was in fact "not generally known about the Company or its business" or protected from disclosure by Counterclaimants; (iii) supporting Counterclaimants' allegation that Cramton has not returned Confidential Information to Grabbagreen; (iv) showing that Cramton disseminated Confidential Information to Kahala or any other third parties; (v) suggesting that Cramton's role at Kahala violated her non-compete; (vi) showing that Cramton solicited employees or customers; (vii) establishing that the terms of the Agreement are reasonable and narrowly tailored to Grabbagreen's protectable interest;[16] or (viii) otherwise proving that Cramton violated the Confidentiality Agreement in any way. Counterclaimants also have not produced any evidence of damages incurred as a result of this alleged misconduct.

Counterclaimants also assert that Cramton has "breached her fiduciary and other duties as set forth in Counterclaimants' operating agreements." (*See* Doc. 95, at ¶¶ 13, 22.) But Counterclaimants have not even identified the provisions of the operating agreements that Cramton supposedly breached—much less furnished evidence of this breach and resultant damages. Cramton is only a member of one of the counterclaiming entities, Eat Clean Holdings, LLC, and that entity's operating agreement expressly states that its members <u>do not have</u> any fiduciary duties. (*See* Ex. 14, at CRA000040.)

In short, no issue of material fact remains and no reasonable jury could find that Cramton has breached the Agreement. The court should enter summary judgment for Counter-Defendants on Count 1 of the Counterclaim.

### E. Counterclaimants have no viable claim for breach of the GGS Release (Counts III and V).

For Counts III and V of the Amended Counterclaim to survive, a jury would have to conclude that a 5-page contract between Cramton, Keely Newman and Gulf Girl

---

[16] For example, the Agreement restricts Cramton from using Grabbagreen's Confidential Information for 15 months. (*See* Ex. 33, at CRA000477.) The Agreement also prohibits Cramton from competing anywhere that Grabbagreen has restaurant locations. (*Id.* at CRA000475.) Counterclaimants have not disclosed any evidence supporting the reasonableness of these terms.

Squared, Inc. documenting Cramton's sale of her membership interest in GGS for less than $10,000 functioned as a release of *any and all present or future claims* that she might have *against the Newmans, ECO, ECH, GFL*.  As set forth below, any entity other than GGS lacks standing to sue for breach of the release, and there is no evidence of a breach.

      1.    <u>Counterclaimants have no standing to sue because they are not parties to the Release or third-party beneficiaries.</u>

As an initial matter, Counterclaimants Kelli Newman, ECO, ECH and GFL are not parties to the Confidential Settlement Agreement and Release ("Release") and they are not third-party beneficiaries of the Release, so there is no way they can sue for breach.  (*See* Ex. 34.)  To be a third-party beneficiary, "an intention to benefit that person must be indicated in the contract itself. The contemplated benefit must be both intentional and direct and it must definitely appear that the parties intend to recognize the third party as the **primary party in interest**." *Norton v. First Fed. Sav.*, 128 Ariz. 176, 178, 624 P.2d 854, 856 (1981) (internal citations omitted) (granting summary judgment on breach of contract claims).  It is not enough that a contract actually benefits a certain group or that its unstated "purpose" was to benefit a certain group.  *See id.*

Gulf Girl Squared, Inc. ("GGS") owned three Grabbagreen franchises. In September 2017, it sold those stores, "substantially all of its assets," to a third party unaffiliated with this lawsuit. (*See* Ex. 34, at CRA000464-465.)  To facilitate that sale, GGS and its two members entered into the Release, which documents Cramton's receipt of a lump sum payment of $9,474.00 for her shares in GGS and the "mutual relinquishment of legal rights with respect to any and all disputes and differences that have arisen or may arise between the Parties in relation to the Corporation." (*Id.* at CRA000464.)  Put simply, the "Parties desire[d] and intend[ed] to eliminate or resolve any possible dispute between and among them in connection" with the sale and Gulf Girl Squared, Inc. (*Id.*)  Setting aside momentarily that this Release cannot possibly waive Cramton's claims for a membership interest and back wages *against entirely different*

18

*legal entities*, Counterclaimants Kelli Newman, ECO, ECH and GFL are not parties to the Release, and there is no way that they can sue for breach of this contract.

The GGS Release includes a mutual release of any "affiliates, directors, officers, and employees" of Gulf Girl Squared, Inc. and requires Cramton to "indemnify, defend and hold harmless . .  any released party."  (Ex. 34, at CRA000464-465.)   But this boilerplate contractual language does not elevate Kelli Newman, GFL, ECO and ECH to a "primary party in interest" under the contract.[17] There is no evidence in the contract that the parties intended for *unnamed and entirely separate legal entities* to be able to use Cramton's sale of a membership interest in GGS for less than $10,000 to strip Cramton of any and all claims, including future claims, she might have against her employers.[18]  That interpretation is untenable.  And given that the contract must be construed against the drafter, *see Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 400, 682 P.2d 388, 405 (1984), no reasonable jury could reach that conclusion. Accordingly, Kelli Newman, GFL, ECO and EC lack standing to bring Count III of the Counterclaim.

2.    Plaintiffs have also not breached the Release.

Counterclaimants assert that Cramton has breached the GGS Release by filing the Complaint in this action, disparaging Counterclaimants, "wrongfully interfer[ing]" with their business and business expectancies, and failing to keep the GGS Release confidential.  (*See* Dkt. 95, at ¶¶ 15-18, 33-36, 46-50.)   None of these claims are actionable.  As discussed below, the alleged breaches are outside the scope of the Release and entirely unsupported by the evidence.

First, Cramton did not breach the Release by filing this action because the claims in

---

[17]    Kelli Newman, GFL, ECO and ECH are also not "affiliates, directors, officers, and employees" of Gulf Girl Squared, Inc.

[18]    There is no reason for the court to look to extrinsic evidence on this issue.  But neither Kelli Newman nor Keely Newman could identify any statement they made to Cramton indicating that the release would apply to claims other than those related to GGS. (Ex. 2, at 93:24-104:6; Ex. 3, at 260:7-263:8.)

Plaintiff's Complaint are entirely outside the scope of the Release.  Cramton is asserting claims against ECO, ECH, GFL and the Newmans for failing to accommodate her medical condition under the ADA, failing to pay her wages in connection with her employment by ECO, ECH and GFL, and failing to distribute her share of the sale proceeds of ECH.  (*See* Dkt. 88.) Cramton also has a claim against ECO for breach of a promissory note.  (*Id.*) Cramton did not name GGS as a defendant in any of these claims for good reason; none of these claims have anything to do with Gulf Girl Squared, Inc. or Cramton's sale of her shares in GGS.

Second, Counterclaimants have not produced any evidence that Cramton "wrongfully interfered" with their business and business expectancies or how that interference caused damages to Counterclaimants.  Even if these evidentiary burdens had been met, such interference would not violate the narrow scope of the GGS Release.

Third, Counterclaimants have not provided any evidence that Cramton has breached the confidentiality provision of the GGS Release.  There is no evidence that Cramton has divulged "any matters relating to the Corporation, any of the disputes between the Parties, [or] the fact and terms of [the] Settlement Agreement."  (*See* Ex. 34, at CRA000465-466.)  There is also no evidence that Counterclaimants have been harmed by the alleged violation.

And fourth, there is no evidence that Cramton has violated the non-disparagement clause in the Release.  The Release prohibits the parties from making "any negative or disparaging comments . . . about each other, the Corporation or Grabbagreen."  (*Id.*, at CRA000466.) There is no evidence that Cramton has disparaged Keely Newman, Gulf Girl Squared, Inc. or Grabbagreen to anyone after the date of the Release (September 14, 2017) or that the disparagement was the proximate cause of damages to Counterclaimants.  (*See, e.g.*, Exhibit 49, D. Mavros Deposition, at 81:8-90:18.)

Because Counterclaimants cannot demonstrate a breach of the GGS Release, no reasonable jury could find in favor of Counterclaimants on Counts III and V of the

Counterclaim.  Accordingly, the Court should enter summary judgment on these claims.

**F.     Counts I, III, and V fail because Counterclaimants have no actionable claim for breach of the implied covenant of good faith and fair dealing.**

Counterclaimants' claims for breach of the implied covenant of good faith and fair dealing in the Agreement and GGS Release can also be resolved now because no issues of material fact remain and the claims are not viable.

Counterclaimants allege that Cramton violated the implied covenant of good faith and fair dealing inherent in the Agreement because she: (1) breached the agreement; and (2) entered into the ECH Operating Agreement "even though prior to entering into the agreement, Plaintiff already held contempt for Keely Newman and no longer wanted to work with her." (*See* Doc. 95, at ¶ 23; Exhibit 50, Defendants' Final Supplemental Disclosure (1/4/19), at 36.)  Counterclaimants allege that Cramton violated the implied covenant in the GGS Release by: (1) breaching the release; (2) disclosing Kelli Newman's medical condition in violation of her "right of privacy"; and (3) disparaging Counterclaimants. (*See* Doc. 95, at ¶¶ 36, 50; Ex. 50, at 36.) These allegations are simply not actionable as implied-covenant claims.

First, Counterclaimants' implied-covenant claims are simply a re-hashing of the breach of contract claims.  Breach of the express terms of the contracts cannot form the basis of an implied-covenant claim.  Although a breach of contract claim and an implied covenant claim may arise out of the same facts, the latter ***must*** be distinguished from the former, or the claims are merely duplicative. As stated by California's Court of Appeals in dismissing a breach of the implied covenant claim:

> If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

*Careau & Co. v. Security Pacific Business Credit, Inc*., 272 Cal. Rptr. 387, 400 (App. 1990); *accord Trinity Hotel Investors v. Sunstone OP Props., LLC*, 2009 WL 303330, *11

(C.D. Cal. 2009) The California approach is consistent with Arizona's recognition that a claim for breach of the implied covenant of good faith and fair dealing seeks the same remedy as breach of contract. *See Rawlings v. Apodaca*, 151 Ariz. 149, 158, 726 P.2d 565, 574 (1986); *see also Nelson v. Phoenix Resort Corp.,* 181 Ariz. 188, 197, 888 P.2d 1375, 1384 (App. 1994) (absent tortious bad faith, plaintiff cannot maintain claims for both breach of contract and breach of the implied covenant of good faith arising from express contract terms because "damages for both claims would be the same"); *Southwest Sav. and Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 553, 557, 838 P.2d 1314, 1318 (App. 1992).[19]

Further, Cramton's alleged "bad faith" is simply not actionable.  There is no legal cause of action in Arizona for disliking your boss or a fellow member in your limited liability company or failing to tell that person of your true feelings.  Even armed with this knowledge, Newman would have no basis to strip Cramton of her membership rights.

Similarly, there is no "right of privacy" inherent in the parties' business contracts that would prohibit Cramton from truthfully informing friends or colleagues of Newman's medical condition.[20]  While Arizona generally recognizes the tort of invasion of privacy, as set forth in the Restatement of Torts § 652A, Counterclaimants have not provided any evidence to support the elements of such a claim—in particular, there is no evidence in this case that disclosure of Newman's condition was the proximate cause of any damages.

---

[19] Arizona and California are not alone in this position; courts throughout the country have recognized that a duplicative implied-covenant claim should be dismissed. *See Twentieth Century Fox Film Co. v. Marvel Enterprises, Inc.*, 155 F.Supp.2d 1, 17 (S.D.N.Y. 2001) (applying California law); *Shibata v. Lim*, 133 F.Supp.2d 1311 (M.D. Fla. 2000) (applying Florida law); *Cohn v. Taco Bell Corp.*, 1994 WL 13771 at *3-4 (N.D. Ill. Jan. 10, 1994) (applying Illinois law, and collecting cases). Indeed, courts that have allowed a duplicative breach of the implied covenant claim to go forward have ended up setting aside the resulting judgment. *See Linkage Corp. v. Trustees of Boston Univ.*, 679 N.E.2d 191, 205 (Mass. 1997).

[20] Claims for invasion of privacy involving medical information nearly always involve medical professionals divulging patient information. *See, e.g. Barber v. Time, Inc.*, 348 Mo. 1199, 1207, 159 S.W.2d 291, 295 (1942).

Case 2:17-cv-04663-DWL   Document 142   Filed 03/01/19   Page 24 of 27

*See* Restatement (Second) of Torts § 652A (1977) (requiring "resultant harm"); *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 279-80, 947 P.2d 846, 853-54 (App. 1997).

And finally, Counterclaimants have failed to disclose any evidence that would support common-law defamation. To prevail on such a claim—even disguised as an implied covenant claim—Counterclaimants must prove that the allegedly disparaging statements are false, that Cramton knew the statements were false, and that the statements tended to harm Counterclaimants' reputation. *See Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 579, 343 P.3d 438, 449 (App. 2015). No such proof has been offered. Moreover, Cramton's opinions on the Newmans are just that; non-actionable opinions. *See Burns v. Davis*, 196 Ariz. 155, 165, 993 P.2d 1119, 1129 (App. 1999).

Counterclaimants implied-covenant claims are either superfluous, unsupported, or not actionable. For this reason, the Court should enter judgment in Counter-Defendants' favor on the implied-covenant counterclaims at Counts I, III and V.

**G.    Count II of the Counterclaims fails due to the economic loss rule and lack of evidence.**

Counterclaimants have asserted a claim for common law unfair competition that asserts Cramton's actions "comprise business conduct that is contrary to honest practices in commercial matters." (*See* Doc. 95, at 27.) Presumably, this is a reference to Cramton working for Kahala and allegedly sharing Counterclaimants' confidential information with Kahala. In any event, this claim is entirely duplicative of Counterclaimants' contract claims, and it fails as a matter of law under the economic loss rule.

"The principal function of the economic loss doctrine. . . is to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain." *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.,* 223 Ariz. 320, 327, ¶ 38, 223 P.3d 664, 671 (2010); *see also Highland Stud Int'l v. Baffert,* CIV. A. 00–261–JMH, 2002 WL 34403141, at *4 (E.D. Ky. May 16, 2002) ("[A] primary underlying rationale for the

economic loss doctrine is to ward against tort–based end–runs of contract law.").

Here, the economic loss rule bars Counterclaimants from seeking to assert through tort what it has already contracted for.  Also, again, Counterclaimants have failed to disclose any evidence establishing legally wrongful conduct by Cramton or resulting damages to Counterclaimants.  For these reasons, the Court should enter judgment in Counter-Defendants' favor on Count II of the Counterclaim.

**H.  Counterclaimants have no evidence to support Count IV.**

Finally, Counterclaimants have asserted that Cramton wrongfully interfered with Counterclaimants' attempts to sell the assets of GFL, ECO and ECH through her alleged disparagement, "sharing of proprietary information," unfair competition, breach of her fiduciary duties, and degrading of the asset value and goodwill associated with GFL, ECO, ECH and the Grabbagreen brand.  (*Id.* at ¶¶ 39-44.)  Counterclaimants claim they lost over $1 million in damages in lost sale proceeds due to Cramton's interference.  But Counterclaimants have not produced any evidence that Due North or Kahala reduced their purchase price based on any actions by Cramton.  On the contrary, Keely Newman testified that the Due North deal did not go through because Due North had to arbitrate a dispute with its partner and the Newmans did not want to hold up the deal waiting for that arbitration to conclude.  (*See* Ex. 3, at 228:5-234:3.)  There is no evidence of any interference by Cramton, who would have greatly benefited from the deal as an 18.6% member of ECH. And two Kahala witnesses testified that there was no interference by Cramton in the Grabbagreen deal, that she was not involved, and that Kahala decided the purchase price for Grabbagreen without input from Cramton.  (Ex. 40, at 15:15-20:11, 24:22-25:11, 37:21-39:25.)  In fact, Kahala ended up paying less for Grabbagreen because its first LOI inadvertently included revenues for the Gulf Girl Squared stores that had already been sold.  (*Id.* at 26:11-27:23.)  A reasonable juror cannot conclude that Cramton interfered with any business expectancy.  Because there is no dispute as to the material facts, the Court should enter summary judgment in Plaintiffs' favor on Count IV of the

Counterclaim.

## V.    CONCLUSION

There is no issue of material fact remaining on Counts IV and V of Plaintiffs' Complaint or the Counterclaim. There is also no disputing that Defendants qualify as an "integrated enterprise" for purposes of Cramton's ADA claims. Accordingly, Plaintiffs ask that the Court enter summary judgment on these claims and issues.

DATED this 1st day of March 2019.

KERCSMAR & FELTUS PLLC


By *s/ Molly Rogers*
Todd Feltus
Molly Rogers
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251


MATHESON & MATHESON, PLC

Michelle R. Matheson
Emily Armstrong
15300 North 90th Street, Suite 550
Scottsdale, Arizona 85260

*Attorneys for Plaintiff and Counter-Defendants*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2019, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon the following:

Jay A. Zweig
Melissa R. Costello
Julie Birk
**BRYAN CAVE LEIGHTON PAISNER LLP**
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
jay.zweig@bclplaw.com
melissa.costello@bclplaw.com
julie.birk@bclplaw.com
*Attorneys for Defendants/Counterclaimants*

Robert A. Royal
Erin A. Hertzog
**TIFFANY & BOSCO, P.A.**
Third Floor, Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
rar@tblaw.com
eah@tblaw.com
*Attorneys for Defendant/Counterclaimants*


*s/ Mary Ann Bautista*

26