Robert A. Royal (SBN 010434)
Amy D. Sells (SBN 024157)
Erin A. Hertzog (SBN 030770)
Jack R. Vrablik (SBN 034352)

**TB** **TIFFANY & BOSCO**
P.A.

Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:  (602) 255-0103
E-Mail: rroyal@tblaw.com; ads@tblaw.com; eah@tblaw.com; jrv@tblaw.com
*Counsel for Defendants/Counterclaimants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton,<br><br>          Plaintiff,<br><br>     vs.<br><br>Grabbagreen Franchising, LLC, Eat Clean Operations, LLC, Eat Clean Holdings, LLC, Kelli Newman and Keely Newman,<br><br>          Defendants.<br><hr>Grabbagreen Franchising, LLC, Eat Clean Operations, LLC, Eat Clean Holdings, LLC, Gulf Girl Squared, Inc., Kelli Newman and Keely Newman,<br><br>          Counterclaimants,<br><br>     vs.<br><br>Kim Cramton and Laura McCormack,<br><br>          Counterdefendants. | Case No. 2:17-cv-04663-PHX-DWL<br><br>**DEFENDANTS' REFILED MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Oral Argument Requested |

**Introduction**

Grabbagreen Franchising, LLC ("GFL"), Eat Clean Operations, LLC ("ECO"), Eat Clean Holdings, LLC ("ECH," together with GFL and ECO, the "Corporate Defendants"), Kelli Newman ("Kelli") and Keely Newman ("Keely") move for summary judgment on Kim Cramton's ("Cramton") Counts I-IV and VI-X.

This case arises from Kim Cramton's short-lived ownership and employment relationship with certain affiliate entities that comprise the Grabbagreen Brand.  Though Cramton initially enjoyed lucrative compensation, the Grabbagreen Brand soon encountered cash flow issues, substantially reducing Cramton's compensation.  Though a sale of the Grabbagreen Brand was on the horizon, Cramton's patience grew thin.  Rather than continue to bear the risks and burdens that accompany business ownership, Cramton resigned from her employment with Gulf Girl Squared, Inc. ("GGS"), an entity that is not a defendant in this action.  Days later, she hastily resigned from her remaining two positions as employee of GFL and Manager of ECH, and took a salaried job with Defendants' competitor.  But Cramton soon learned that her untimely resignations triggered a provision in the ECH Operating Agreement that allowed Keely to purchase Cramton's ECH membership for $1.  The Grabbagreen Brand sold six months after Cramton's resignation.

In an attempt to shift the blame for her self-imposed losses to Defendants, and unjustly reap the benefits of the Grabbagreen Brand sale, Cramton filed this suit, alleging contrived claims of abuse, retaliation, and constructive discharge—allegations which are remarkably absent from Cramton's attorney-authored letter of resignation.  Indeed, contrary to her current allegations of an intolerable work environment, Cramton offered in her letter of resignation to continue working for GFL for 30 days for a fee of $42,000. (Ex. 24.)  When asked to explain this overt contradiction, Cramton testified that she was willing to subject herself to the supposedly unbearable conditions… for money.  (Ex. 32 282:22-283:18.)  Cramton is likewise pursuing this baseless suit in hopes of economic gain.  This Motion demonstrates that Cramton's claims are meritless as a matter of law.  As such, summary judgment in Defendants favor is warranted.

## I.      Factual Background.

Corporate Defendants are affiliate entities organized to franchise healthy brands, such as the Grabbagreen Brand, whose assets included Grabbagreen franchise operations (GFL) and one restaurant for training franchisees (ECO). (Ex. 1 at G015053.)  GFL and ECO are subsidiaries of ECH, a holding company. (Ex. 4 at 30:4-6; 42:6-8.)  Cramton was employed by GFL and another affiliated entity that is not a defendant in this action, Gulf Girl Squared, Inc. ("GGS"), a franchisee (Ex. 3 at CRA1021; Ex. 4 at 31:18-32:2.)  Cramton was awarded an ownership interest in ECH and made a party to the ECH Operating Agreement. (Ex. 5.)   Under the Operating Agreement, Cramton's interest in ECH was subject to buyback if she resigned from her employment with either GGS or GFL within 5 years (Ex. 5 at § 9.3(b).)  Cramton worked in Arizona and reported to Keely, who lived and worked in California and Florida. (Ex. 6B at 193:4-18; Ex. 7B at 8:10-10:15; Ex. 33.)  Kelli is Keely's spouse, who occasionally performed limited legal and administrative services for Corporate Defendants and formerly held an ownership interest in ECH. (*Id.* and Ex. 5.)

In the fall of 2016, Keely determined it was necessary to sell the Arizona-based Grabbagreen Brand because an immediate family member was diagnosed with terminal cancer and given a poor prognosis, which Keely disclosed to Cramton in confidence. (Ex. 6A at 124:24-125:3; Ex. 7A at 81:5-10; Ex. 8.)  Beginning in January 2017, Keely pursued possible suitors and kept Cramton advised of those contacts. (Ex. 87; Ex. 88.)  Negotiations with one such suitor, Due North Holdings, LLC ("Due North") resulted in an Asset Purchase Agreement ("APA") to purchase the Grabbagreen Brand, which both Keely and Cramton approved in June 2017. (Ex. 15; Ex. 57; Ex. 12.)  In connection with the Due North deal and *after* the events that gave rise to Cramton's purported ADA claim, Keely negotiated a lucrative two-year employment contract for Cramton as a condition to the sale. (Ex. 13.) In May 2017 and September 2017 Cramton made written representations and warranties to Due North that she was not on leave of absence, did not require a leave of absence, and no potential employment law claims existed. (Ex. 56; Ex. 82.)  Cramton also

assured Keely that these representations and warranties were accurate as of May 2017. (Ex. 15.)  Yet, Cramton now alleges ADA claims arising in April 2017. (Doc. 88 at ¶¶ 87, 95, 104.)  The APA and related contracts with Due North were partially executed and in escrow pending Due North's preparation to close. (Ex. 6B at 231:17-232:4.)

The Due North deal was still pending as of August 2017, when a second potential buyer, Kahala Brands, Ltd. ("Kahala") and Keely initiated discussions for the sale of the Grabbagreen Brand. (Ex. 16.) Because of her family member's terminal cancer diagnosis and the delayed Due North closing, Keely considered Kahala's inquiries, but only on the same terms as the Due North deal, including the same employment contract for Cramton. (Ex. 17; Ex. 18.)  On September 18, 2017, Kahala representatives informed Keely that it would not agree to acquire the Grabbagreen Brand under the terms of the Due North deal. (Ex. 6B at 242:12-245:1; Ex. 19 at 15:15-17:1; Ex. 20 at 52:11-53:19.)  Keely conveyed this news to Cramton that same day, adding that "we can go back to them in a couple of days and see if they are interested in any further terms." (Ex. 6B at 245:20-246:1.)

Cramton decided to resign on September 19, 2017, and worked with her attorney to prepare her resignation letter. (Ex. 21; Ex. 55.) That same day, Cramton informed Defendants' consultant, Dana Mavros, that the deal had fallen through and although there were other interested parties, Cramton "didn't see the company selling any time soon…." (Ex. 22 at 155:9-13.) Cramton notified Defendants of her resignation on September 24, 2017, via a letter dated September 22, 2017, indicating that she was resigning from her employment with GFL, as well as from her position as Manager of ECH. (Ex. 23; Ex. 24.) Notably, the letter from Cramton's attorney did not assert any employment claims against Defendants, including no allegation that Cramton was being abused or constructively discharged. (Ex. 24.)  Contrary to the wild allegations of abuse in this action, Cramton even offered to continue working for GFL for 30 days. (Ex. 24.)

On October 30, 2017, Keely exercised her rights under § 9.3(b) of the ECH Operating Agreement entitled "Resignation of Employment Within First Five Years of Effective Date," which permits Keely to purchase Cramton's interest in ECH for $1. (Ex.

5.) Cramton began working at Kahala, Defendants' competitor and potential suitor, on November 20, 2017. (Ex. 25) This Complaint followed on December 15, 2017, alleging among other things, unsubstantiated employment and fraud claims. (Doc. 88.) Kahala ultimately purchased the Grabbagreen Brand in March 2018. (Ex. 26; Ex. 27.)

## II.     Threshold issues merit summary judgment on all or some claims.

### A.      Cramton released all claims against Defendants.

On September 14, 2017, Cramton and her spouse, Laura McCormack, who were represented by counsel, executed a *Confidential Settlement Agreement and Release* (the "Release") with Keely and non-defendant, GGS. (Ex. 29.)  In the Release, Cramton agreed to forever release GGS and its "affiliates" from all claims relating "directly **or indirectly** to any matter relating to [GGS]….", including all employment claims. (Ex. 29 at IA.)  The parties previously defined "affiliates" in multiple documents—which were prepared, reviewed, and/or otherwise approved by Cramton—to include each of the Defendants.  (Ex. 1; Ex. 5.)  Cramton filed this lawsuit in violation of the Release, asserting claims against GGS affiliates, which relate directly or indirectly to GGS.  Accordingly, Defendants are entitled to summary judgment on all claims and recovery against Cramton and McCormack of all costs and attorneys' fees incurred to defend and dismiss this case.

Cramton's claims against Corporate Defendants "relate to" GGS—and in fact, are truly direct claims against GGS—and are therefore barred by the Release.  Of the three Corporate Defendants (ECH and its subsidiaries, ECO and GFL), Cramton was only employed by GFL.  Cramton was also employed by GGS, but the business of GFL and GGS was distinct, as were Cramton's duties with each entity.  (Ex. 53; Ex 54; Ex. 6B 183:18-24; 192:7-18; Ex. 3; Ex. 4 at 31:18-32:2; 76:4-8.) GFL was the franchisor; GGS was a franchisee that owned and operated three Grabbagreen franchised stores. (Ex. 1.) Cramton's GFL-related duties involved sales of Grabbagreen franchises, which did not require her in-store presence, and which Cramton frequently carried out from home. (Ex. 6B at 192:11-14.) Cramton's GGS-related duties, on the other hand, required Cramton to be on-site at GGS stores as their executive manager. (Ex. 6B at 182:7-183:1; Ex. 32 at

125:25-126:7.)  Cramton's ADA/ACRA claims (Counts I-III) are founded upon her allegation that Corporate Defendants denied her request to work from home. (Doc. 88 at ¶¶ 89, 91, 97, 100, 106, 108.)  Such an argument could only pertain to GGS, not GFL (or Corporate Defendants), because Cramton regularly worked from home as part of her employment with GFL.  Through these claims, Cramton has improperly attempted to evade the Release by masking GGS-related claims as allegations against the Corporate Defendants.  Counts I-III fail because they are truly claims against GGS that are barred by the Release.  *See also* Section III below regarding Counts I-III.

**B.**   **Keely had an absolute right to buy back Cramton's interests on September 14, 2017, *before* the events alleged under tort Counts IX-X.**

Cramton resigned from GGS on September 14, 2017 and the parties documented her resignation via the Release. (Ex. 29.)  The GGS resignation triggered Keely's right to buy back Cramton's membership interest in ECH under § 9.3(b) of the ECH Operating Agreement, which provides that if Cramton resigns from ECH or "any of its subsidiaries or Affiliates" (*i.e.,* GGS) then Keely may purchase Cramton's interest in ECH for $1.  (Ex. 5.)  Four days later, Cramton's September 18, 2017 call with Keely that forms the basis of her tort claims (Counts IX-X) occurred, which Cramton alleges resulted in her September 24, 2017 resignation from GFL. (Ex. 6B at 244:9-245:1, 245:20-24.)   The damages Cramton contends arise from her purportedly induced resignation from GFL is her loss of the ECH membership interests due to Keely's buyback right under § 9.3(b). (Ex. 30 at 29:24-27, 31:2-5, 31:17-19.)   Indeed, this entire concocted lawsuit is Cramton's veiled attempt to avoid the application of § 9.3(b).  That Cramton's resignation from GFL would be a second trigger under § 9.3(b) also entitling Keely to buy back Cramton's membership interest in ECH is inconsequential.  Cramton's resignation from GGS several days prior to the events alleged in Counts IX-X means that Cramton could not possibly suffer any damages in relation to her resignation from GFL as a matter of law, regardless of her reason for resigning from GFL.  Therefore, summary judgment on tort Counts IX-X is appropriate. *See* also Section VI(B) below regarding Counts IX-X.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      Kelli is neither an employer nor proper community property defendant.**

Cramton sued Kelli as a purported employer in connection with her Arizona Minimum Wage Act ("AMWA") claim (Count IV), despite the fact that GGS and GFL employed and paid her.  Because the AMWA requires the existence of an employment relationship, and Kelli was never Cramton's employer, Count IV fails against Kelli.

Cramton alleges that Kelli was her employer under A.R.S § 23-363(b) by virtue of her role as attorney for Corporate Defendants and as the former owner of ECH.  (Doc. 88 at ¶¶ 14-15.)  Courts have rejected employer liability in both circumstances. *See Arias v. Raimondo*, 860 F.3d 1185, 1190 (9th Cir. 2017) (corporate counsel); *Patel v. Wargo*, 803 F.2d 632 (11th Cir.1986) (corporate president).  Furthermore, Kelli only had some ownership in ECH for *one* of the ten months for which Cramton is seeking wages.  (Ex. 5 at 44-45; *see* Doc. 88 ¶¶ 112-113.)

Kelli also does not qualify as an "employer" under the Ninth Circuit's "economic reality" test, which considers whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *See Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir.1999).  Cramton testified that:  she did not report to Kelli (Ex. 32 at 173:6-14, 176:17); rather, she reported to Keely (*id.*); she only had "interactions" with Kelli on legal issues (*id.*); and she did not know whether Kelli determined her wages (Ex. 32 at 176:19-22).  Indeed, Cramton was second in command to Keely (Ex. 33), Kelli was subordinate to Cramton (*id.*), and Cramton controlled Kelli's method of payment (Ex. 34).  Thus, Kelli is entitled to summary judgment on Count IV.

Cramton's assertion that Kelli has community property liability fails. (Ex. 35.)  The Amended Complaint is devoid of any allegation of community property liability and community liability is not presumed under the law for the claims at issue here. (Doc. 88, generally.) *See Garrett v. Shannon,* 13 Ariz.App. 332, 333 (1970).  Therefore, as a matter of law, Kelli is not a community property defendant in this case.  Even assuming this Court

1   disagrees, Kelli should nevertheless be dismissed in that capacity because she and Keely
2   executed a comprehensive Separate Property Agreement providing that pre- and post-
3   marital property shall be separate, regardless of the state they reside in and irrespective of
4   the community property rules concerning comingling and improvements. (Ex. 36.)  *See*
5   *Elia v. Pifer,* 194 Ariz. 74, 84, ¶ 51 (App.1998).

6       Undersigned counsel discussed with Cramton's counsel the Separate Property
7   Agreement at a meet and confer on October 26, 2018, later disclosing the Agreement twice.
8   (Ex. 35; Ex. 36; Ex. 52 at ¶¶ 5, 7, 9.)  Despite this and the lack of a reasonable basis to
9   persist, Cramton refuses to dismiss Kelli as a community property defendant. (Ex. 35, Ex.
10  52 at ¶ 12.)  Because Cramton failed to allege community property liability and because
11  Kelli is irrefutably an improper community property defendant, Kelli is entitled to
12  summary judgment.

13      **D.    Cramton was not constructively discharged under Counts I-III and VI.**

14      Cramton alleges constructive discharge with respect to her ADA/ACRA claims
15  (Counts I-III) and her breach of contract claim (Count VI).[1]  (Doc. 88 at ¶ 78.)  However,
16  the real reason Cramton resigned was not intolerable conditions, discrimination, and
17  harassment.  Rather, she resigned because the negotiations to sell ECH's assets to Kahala
18  "fell through" on September 18, 2017 and as a result, Cramton did not want to wait any
19  longer for a deal with one of five other interested suitors to mature. (Ex. 22 at 157:2-18;
20  Ex. 32 at 151:20-23, 263:24-25.)

21      Cramton's allegation of constructive discharge fails as a matter of law because she
22  indisputably failed to give the requisite 15-day statutory notice in order to maintain a claim
23  absent extreme and outrageous conduct. *See* A.R.S. § 23-1502.  Even in the case of extreme
24  conduct, however, the failure to complain "may be compelling evidence that [s]he, or a
25  reasonable person in [her] situation, would not actually have found conditions ...
26  unbearable." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998).

27
28  ---
[1] For the reasons set forth in Section V below, this Court need not even reach the issue of whether Cramton was constructively discharged for purposes of Count VI because that claim fails as a matter of law on other grounds.

It is undisputed that Cramton did not provide Defendants with any advance notice of her intent to resign prior to submitting her letter of resignation dated September 22, 2017. (Ex 24; Ex. 81.)  It is likewise undisputed that Cramton did not include any mention of abuse or constructive discharge in her resignation letter or file a Charge of Discrimination against Defendants until four months after she resigned. (Ex 38.)  Given her lack of notice, Cramton must demonstrate that Defendants engaged in sufficiently extreme and outrageous conduct.  This Circuit has "set the bar high for a claim of constructive discharge" by requiring that working conditions deteriorate "to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Cramton's discovery identifies no such evidence.

Cramton testified to: (1) abusive behaviors over the telephone, such as name-calling, berating, or yelling (Ex. 32 at 128:25-130:24); (2) unfair work burdens such as asking Cramton via phone, in e-mails and/or text messages to cancel her vacation and/or unfairly criticizing her or blaming her for company-related issues (*id.* at 133:8-135:13; 145:14-148:15); and (3) crossing personal boundaries such as insisting on staying at Cramton's house during Keely's three work trips to Arizona, forcing Cramton to watch Fox News instead of CNN, and/or calling her at the hospital to confirm if she would be working the next day (*id.* at 136:13-137:6; 144:7-11; 150:20-151:6).  Despite Cramton's exaggerated allegations of intolerable abuse, she offered in her resignation letter to continue working for 30 days, albeit for an exorbitant fee. (*Id.* at 283:6-10; Ex. 24.)

None of this conduct qualifies as sufficiently intolerable conditions to create a triable issue of material fact with regard to constructive discharge.  *See, e.g., Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1160 (D. Ariz. 2016), *aff'd,* 705 F. App'x 539 (9th Cir. 2017) (granting summary judgment for employer on issue of constructive discharge finding supervisor's offensive racial comments and belittling treatment not sufficiently egregious). Indeed, "[E]mployers have the right to unfairly and harshly criticize their employees, to

1  embarrass them in front of other employees, and to threaten to terminate or demote the

2  employee." *Thompson v. Tracor Flight Sys., Inc.*, 86 Cal. App. 4th 1156, 1171 (2001).

3      Because Cramton's allegations of abuse, even if taken as true, involve behavior that

4  is insufficient as a matter of law to support constructive discharge, Corporate Defendants

5  and Keely are entitled to summary judgment on Cramton's ADA/ACRA claims (Counts I-

6  III) and her breach of contract claim (Count VI).

7  **III.   The ADA and ACRA claims against Corporate Defendants.  [Counts I-III.]**

8      **A.   Corporate Defendants lack the requisite 15 employees.**

9      Corporate Defendants are not covered employers under the Americans with

10 Disabilities Act ("ADA") or the Arizona Civil Rights Act ("ACRA") because they do not

11 employ "15 or more employees for each working day in each of 20 or more calendar weeks

12 in the current or preceding calendar year." 42 U.S.C.A. § 12111(5); A.R.S.  § 41-1461.

13 Cramton cannot prove otherwise to sustain her ADA/ACRA claims. *See Arbaugh v. Y&H

14 Corp.*, 546 U.S. 500 (2006).  Thus, Counts I-III fail as a matter of law.

15     At all relevant times, each of the three Corporate Defendants employed less than 15

16 employees.  ECH, as a holding company, of course had zero employees. (Ex. 4 at 49:23-

17 25.)  Likewise, GFL, the franchising entity, operated no stores and, at all material times,

18 employed less than 10 employees. (Ex. 84.)  ECO operated only one store, starting in early

19 2017, and thereafter employed no more than 10 to 12 employees at a given time during the

20 relevant period. (Ex. 83.)  Accordingly, not one of the Corporate Defendants can be held

21 liable under the ADA/ACRA.

22     **B.   Cramton's aneurysm does not qualify as a protectable disability.**

23     In order for Cramton's aneurysm to qualify as a protectable disability, it must be an

24 impairment that substantially limits one or more major life activities.  42 U.S.C.S. § 12102;

25 A.R.S. § 41-1461. Nothing in the record supports that Cramton's condition substantially

26 limited her in any form.  In fact, the opposite is true considering that Cramton did not even

27 have a single symptom at the time she was diagnosed and her doctor's recommendation

28 not to work for the following week was primarily related to her car accident. (Ex. 32 at

118:17-23.)  At most, Cramton had a few episodic headaches between April and May 2017, which were treatable with over the counter pain relievers. (Ex. 68. at 2, 19, 21, 25, and 45.) Moreover, she was fully recovered from her condition within just a few months. (*Id.* at 266:8-20.)  As a result, Cramton's condition was not protected under either the ADA or ACRA. *Crock v. Sears, Roebuck & Co,* 261 F.Supp.2d 1101 (Iowa 2003) (employee's mere assertion that her brain injury impacted her ability to see, walk, breathe, learn, and work was not sufficient to show that employee was disabled within meaning of the ADA; negative impact of injury on employee's activities did not support inference of substantial limitation.)

### C.   There are no material adverse employment actions or evidence of differential treatment on the basis of Cramton's disability.

Cramton cannot prevail on Counts I-III because there is no evidence of actions or conduct by Defendants that would qualify as a material adverse employment action as required for disability discrimination or retaliation under the ADA and ACRA.  To the contrary, Cramton was treated favorably insofar as Defendants conditioned the sale of the Grabbagreen Brand in June *and* August 2017 on Cramton receiving a lucrative job offer. (Ex. 13; Ex. 32 at 287:1-13.)   Furthermore, Cramton alleges that the only actions that occurred after she disclosed her aneurysm were (1) being constructively discharged, (2) having to cancel her vacation to attend a store opening, and (3) increased negative treatment from Keely.  Cramton cannot prove she was constructively discharged. *See* Section II(D) above.  This is particularly true in the context of Counts I-III considering that Cramton was fully recovered from her alleged disability at least four months before she resigned. (Ex. 32 at 266:8-20.)  The other reasons do not qualify as a material adverse action for purposes of discrimination or retaliation.  *See Moore v. Marriott Int'l, Inc.*, No. CV-12-00770-PHX-BSB, 2014 WL 5581046, at *8 (D. Ariz. Oct. 31, 2014) (For the purposes of a disability discrimination claim, an adverse employment action is one which "materially affects the compensation, terms, conditions, or privileges of employment.") citing *Davis v. Team*

- 10 -

1  *Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.2008).  For all the foregoing reasons, Corporate

2  Defendants are entitled to summary judgment on Cramton's ADA and ACRA claims.[2]

3  **IV.     The Arizona Minimum Wage Act claim against Defendants.  [Count IV.]**

4          Cramton has no right to receive minimum wage from ECH or ECO because she was

5  never an employee of either entity, just as she was not an employee of Kelli.  *See* Section

6  II(C) above.  ECH, a holding company, had no employees.  *U.S. Fire Ins. Co. v. Miller*,

7  381 F.3d 385, 389 (5th Cir. 2004) ("as an intermediate holding company, ELI technically

8  possessed no employees of its own, making it impossible for Dyson to have been employed

9  by ELI"); *Williams v. Asbury Auto. Grp., Inc.*, 998 F. Supp. 2d 769, 782 (E.D. Ark. 2014)

10  (holding company is not an employer).  Business partners, particularly those in closely held

11  companies  such  as  ECH,  do  not  qualify  as  employees.  *See, generally, Wheeler v.*

12  *Hurdman*, 825 F.2d 257, 277 (10th Cir.1987), *cert. denied*,108 S.Ct. 503 (1987) (general

13  partner of an accounting firm was not an "employee" in FLSA action); *see also Graves v.*

14  *Women's Prof. Rodeo Ass'n, Inc.*, 907 F.2d 71, 72–73 (8th Cir.1990) (members of

15  corporation not employees because they did not receive compensation for services).  Thus,

16  ECH and ECO are entitled to summary judgment on Count IV because Cramton is not an

17  employee of either entity.

18          Cramton was an employee of GFL, but her AMWA claim still fails as a matter of

19  law because she received wages far in excess of the statutory minimum rate for all hours

20  worked in each of the workweeks during the relevant time period.  In 2016, GFL paid

21  Cramton $176,537.45 in gross W2 wages. (Ex. 53.)  At roughly $3,400 per workweek,

22  Cramton would have needed to work over 422 hours a week for her average weekly pay to

23  qualify as less than $8.05 per hour, the applicable rate.  Similarly, for the 38 weeks that she

24  was employed in 2017, GFL paid Cramton $25,000 in wages.  (Ex. 54.)  Even at a lower

25  amount of roughly $657 per workweek, Cramton still would have needed to work more

26  than 82 hours per week for GFL alone before she would dip below the minimum wage.

27
28  [2] Depending upon the Court's disposition of these claims, Corporate Defendants reserve
     their right to file a Rule 12(b)(1) motion to dismiss Counts I and III on the basis that
     Cramton is time-barred from seeking relief under the ACRA.

This would have been impossible given that she also worked at least 20 hours per week for GGS during this time period and she spent significant time in her role as an owner of three companies (ECH, GGS, and Revel).  More importantly, Cramton alleged that she worked 40 hours per workweek for purposes of her minimum wage claim and therefore, she has unequivocally received the required minimum wage rate. (*See* Doc. 88 ¶¶ 32-33.) Accordingly, Defendants are entitled to summary judgment on Count IV.

## V.     Breach of the ECH Operating Agreement against ECH and Keely.  [Count VI.]

Cramton's breach of contract claim fails as a matter of law because the express, unambiguous terms of the Operating Agreement, including specifically §§ 9.3(a) and 9.2, make it clear that there is no buy out obligation imposed upon any party under any circumstances.  Cramton's allegations in Count VI to the contrary misrepresent to this Court the express provisions of the Operating Agreement.  Whether Cramton resigned or was constructively discharged is of no moment to this Court because either way, there is no obligation on any party to acquire her interests.  The alleged breach is, at best, a fiction. Under § 9.3(a), if Cramton's employment had been terminated without cause (which it was not), then she would be treated as though she experienced a disability, and § 9.2 would apply to Cramton's ownership interest.  (Ex. 5 at § 9.3(a).)  Section 9.2 gives Keely and ECH the right, but not the obligation, to purchase Cramton's ownership interest and, should they decline to do so, then Cramton would retain her ownership interest. (Ex. 5 at § 9.2(e), "If [Keely]… and the Company do not exercise the right to purchase, then [Cramton] may retain [her] Units ….").

Section 9.2 contemplates an *option*, not an *obligation*, for Keely and ECH to buy out Cramton in the event Cramton is terminated without cause.  (Ex. 5 at § 9.2.)  Cramton was not terminated without cause or constructively discharged and therefore, §§ 9.3(a) and 9.2 do not apply.  *See* Section II(D) above.  Even if they were triggered, neither Keely nor ECH chose, or would choose, to buy Cramton out under the terms of § 9.2.  Thus, the plain language in the Operating Agreement makes it clear that Cramton's only remedy would be to retain her ownership interest in ECH.  (Ex. 5 at § 9.2(e).)

Notwithstanding §§ 9.3(a) and 9.2's clear and unambiguous terms, Cramton misstated in the Amended Complaint that the Operating Agreement requires a mandatory buyout.  (*See* Doc. 88 at ¶ 126, "The Operating Agreement provides that in the event of a termination of employment without cause, Keely Newman **will buy out** the terminated member for the fair market value of Eat Clean Holdings.")  This allegation is false.  Based upon this misrepresentation of §§ 9.3(a) and 9.2, Cramton improperly alleges that ECH breached the Operating Agreement by not buying out Cramton at fair market value. (*See* Doc. 88 at ¶ 128.)  Such a breach is an impossibility under §§ 9.3(a) and 9.2.

Undersigned counsel alerted Cramton's counsel of this error on multiple occasions so that the improper claim could be dismissed and the parties could avoid incurring expenses in connection with it.  (Ex. 42.)  To date, Cramton's counsel has refused to dismiss the claim without any justification.  (*Id.*)  Indeed, Cramton testified repeatedly that she has never read Article 9 of the Operating Agreement.  (Ex. 32 at 254:4-8, 257:9-11, 258:19-22, 259:6-8.)  Thus, it appears that Cramton's counsel manufactured this baseless breach of contract claim.  Defendants reserve their right to seek sanctions for fees and costs incurred in defending against this claim.

Summary judgment on Count VI is appropriate because it fails as a matter of law.  Thus, the Court need not reach the issue of whether Cramton was "terminated without cause" or constructively discharged under § 9.3(a), so as to invoke § 9.2.  Moreover, as set forth in Section II(D) above, Cramton was not constructively discharged in any event.

## VI.   Contractual bad faith and tort claims against ECH & Keely.  [Counts VII-X.]

### A.   The economic loss rule limits Cramton's tort damages to those she seeks under the Operating Agreement.  [Counts VIII-X.]

The economic loss rule limits "a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property."  *Martin v. Weed Inc.*, 2018 WL 2431837, at *6 (D. Ariz. 2018) (*quoting Flagstaff Affordable Hous. Ltd. v. Design All., Inc.*, 223 Ariz. 320, 323 (2010).  "Where the policy underlying contract law (to uphold contracting parties' expectations) outweighs

the policy underlying tort law (to promote the safety of people and property), the economic loss rule bars tort claims." *Id.*  The economic loss rule has been applied to preclude contract-related fraud and misrepresentation claims.  *See Cook v. Orkin Exterminating Co.,* 227 Ariz. 331, 332, ¶ 4, 335 n. 6, ¶ 20 (App.2011); *see also Ader v Bella Vista Townhomes LLC*, 2017 WL 2494467, at *3 (2017) (applying economic loss rule to bar negligent misrepresentation claim arising out of the operating agreement).

Cramton's tort claims against ECH and Keely (Counts VIII-X) all request an award of purely economic contract damages—specifically, the value of Cramton's membership interest in ECH as determined under the Operating Agreement at Articles 10 and 11.[3]  (Ex. 30 at 29:24-27, 31:2-5, 31:17-19.)  Thus, Cramton's tort damages sound in contract and there is no basis to impose tort liability in addition to the contractual remedies that the parties anticipated and bargained for under the Operating Agreement.

The economic loss rule should apply to bar Cramton from asserting purely economic loss claims for fraud, negligent misrepresentation, and tortious breach of the implied covenant of good faith and fair dealing against ECH and Keely.  Even to the extent the merits of Cramton's tort claims are considered, her recovery on those claims is barred because the contract damages she seeks under the Operating Agreement—a mandatory buyout of her interest under §§ 9.3(a) and 9.2—is nonexistent.  *See* Section V. Furthermore, each of Cramton's tort claims fails as a matter of law for the reasons below.

### B.    Negligent misrepresentation and fraud.  [Counts IX-X.]

Cramton's negligent misrepresentation and fraud claims against ECH and Keely are based on Keely's alleged oral representation to Cramton on September 18, 2017, that "Kahala was no longer interested in acquiring Eat Clean Holdings."  (Doc. 88 at ¶¶ 147 and 153.)  Unable to get her story straight, elsewhere in the Amended Complaint, Cramton characterizes the representation differently, alleging that Keely told Cramton that "Kahala had rejected the offer [to acquire ECH's assets] and that there would be no further offers

---

[3] Cramton improperly claims that she is entitled to this remedy under § 9.2 of the Operating Agreement; however, she is not.  *See* Section V above.

coming from Kahala."  (Doc. 88 at ¶¶ 65 and 70.)  At deposition, Cramton again changed her story and expanded upon the allegations pled, and testified that there would be no future sale of ECH.  Specifically, Cramton testified that Keely told her that "the Kahala deal fell through."  (Ex. 32 at 283:21-284:13, 286:14-25.)  Cramton then asked Keely "if there was any chance there would be any deal" in the future, meaning with Kahala or Due North, and if there was "going to be any more offers" in the future.  *See id.*  According to Cramton, Keely responded "no."  *See id.*

1. **Keely's present-tense representation—that Kahala rejected the deal then before it—is true and Cramton cannot meet her burden to sustain a negligent misrepresentation or fraud claim.**

Keely does not dispute that on September 18, 2017, Keely told Cramton that on a call earlier that day, Kahala had rejected the offer to sell ECH's assets on the same terms of the Due North deal.  *See* Section I, factual background. (Ex. 6B at 244:9-245:1, 245:20-24.)  Cramton's only evidence that the statement was false when made is her opinion, which is insufficient to overcome summary judgment.  In fact, participants to the call confirm Keely's representation was true.

The evidence demonstrates the truth of Keely's representation.  ECH had negotiated a sale of its assets to Due North, but the deal had not closed.  (Ex. 73; Ex. 19.)  Keely, having pressing issues concerning a family member's terminal cancer diagnosis, initiated discussions concerning Kahala's potential purchase of ECH's assets.  (Ex. 16; Ex. 17.)  Keely considered Kahala's inquiries, but only on the same terms as the Due North deal, with Kahala effectively stepping into Due North's position under the existing contracts.  (Ex. 20 at 23:18-25:16, 40:19-41:24; Ex. 19 at 9:23-11:17.)

On September 18, 2017, Keely, John Wuycheck (Kahala's Senior Vice President of Development), Jeff Smit (Kahala's Chief Operating Officer), and Adams Price (ECH's representative and broker) had a short phone call to discuss Kahala's review of the offer to sell ECH's assets on the same terms as the Due North deal.  (Ex. 6B at 242:12-245:1.; Ex. 66.)  Kalaha representatives informed Keely on that call that it would not agree to acquire ECH's assets under the terms of the Due North deal. (Ex. 6B at 242:12-245:1; Ex. 19 at

- 15 -

15:15-17:1; Ex. 20 at 52:11-53:9.[4]  Following the call, Keely provided truthful information to Cramton regarding the status of the potential sale to Kahala:  Kahala would not agree to acquire based on the terms of the Due North deal. (Ex. 6B at 245:20-24.)  It is undisputed that Keely never again discussed or negotiated the Due North terms with Kahala.  (Ex. 43; Ex. 6B at 243:2-244:24; 247:11-250:5.)

No matter how Cramton characterizes Keely's representation—"Kahala was no longer interested in acquiring [ECH]," "Kahala had rejected the offer [to acquire ECH]," or "the Kahala deal fell through"—the representation was true when Keely made it on September 18, 2017.  Cramton has not presented clear and convincing evidence, or any contradictory evidence from any of the witnesses on the call or other documents, to show that Keely's statement was false.  As such, ECH and Keely are entitled to summary judgment on Cramton's negligent misrepresentation and fraud claim.

### 2. Keely made no representation about future deals and even if she had, such representation could not sustain a negligent misrepresentation or fraud claim.

Keely did not make the second part of the alleged representation, *i.e.*, that Kahala would not make future offers to acquire ECH's assets, or that there would be no "deal" in the future with Kahala, Due North, or any other party. (Ex. 32 at 286:14-25.)  If Cramton mistakenly arrived at this conclusion based upon Keely's statement that Kahala had rejected her offer to sell on the table as of September 18, 2017, it is not sufficient to raise an issue of material fact as to the truth of Keely's statement.

Indeed, Keely told Cramton just the opposite of what Cramton is claiming was false. She told Cramton that Kahala was not willing to purchase ECH's assets on the Due North deal terms, but "we can go back to them in a couple of days and see if they are interested in any further terms."  (Ex. 6B at 245:20-24.)  That is what happened.  After waiting the two days recommended by Adams Price, Keely asked Adams Price on September 20, 2017

---

[4] On February 6, 2019, undersigned counsel was given an attorneys-eyes-only review of Kahala documents, which revealed evidence bolstering Defendants' fraud defense.  Kahala has not produced these documents due to a protracted discovery dispute, which Defendants believe is nearly resolved.  Defendants will timely supplement this Motion accordingly.

to go back to Kahala with new terms, which Adams Price did on September 21, 2017. (Ex. 44; Ex. 45; Ex. 66. )  Unbeknownst to Keely, on September 19, 2017 Cramton decided to resign and she was working with her attorney to prepare her resignation letter. (Ex. 21.) Indeed, that same day, Cramton informed Defendants' consultant, Dana Mavros, that the deal had fallen through, "there were other people looking at it, but nothing was moving," and Cramton "didn't see the company selling any time soon…." (Ex. 22 at 157:2-18.) Cramton notified Defendants of her resignation by sending her letter to Kelli on September 24, 2017. (Ex. 23; Ex. 24.)  Wuycheck of Kahala responded to Adams Price's inquiry on September 28, 2017. (Ex. 43; Ex. 66.)  Six months later, Kahala purchased substantially all of ECH's assets on newly negotiated terms, closing in March 2018.  (Ex. 26.)

Nevertheless, even assuming *arguendo* that Keely told Cramton that ECH would not make or accept future offers to sell or acquire ECH (with Kahala, Due North, or otherwise), it cannot form the basis of a negligent misrepresentation or fraud claim for the following numerous reasons.

### a. The negligent misrepresentation claim fails as a matter of law because there is no duty owed.

It is axiomatic that the defendant must first owe a duty to the plaintiff for an action based on negligent misrepresentation to lie. *Van Buren v. Pima County Community College Dist. Bd.*, 113 Ariz. 85, 87 (1976).  In this case, neither ECH nor Keely owed any duty to Cramton and as such, Count IX fails.  Negligent misrepresentation "is [a cause of action] governed by the principles of the law of negligence." *Id.*  Therefore, "there must be a duty owed and a breach of that duty before one may be charged with negligent violation if that duty." *Id.* (quoting *West v. Soto*, 85 Ariz. 255 (1959)).  The existence of a duty is a legal conclusion for the court to determine.  *See Gipson v. Kasey*, 214 Ariz. 141, 143 ¶ 11 (2007). Duty is based on either common law special relationships or relationships created by public policy.  *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565 ¶ 14 (2018).  Special relationships may arise from contracts.  *See id.*

The contract underlying this claim is the Operating Agreement that gave Cramton

her membership interest in ECH, the value of which she claims to have been denied.  *See* Ex. 30 at 29:24-27, 31:2-5, 31:17-19. ("As a result of this negligent misrepresentation, Cramton has been damaged in the amount of the value of her membership interest…."). The Operating Agreement is devoid of any provision creating a special relationship duty for Keely or ECH to buy out Cramton when her employment terminated.  *See* Section V. Further, on its face the Operating Agreement expressly disclaims fiduciary duties among the parties.  *See* Ex. 5 at § 16.11 (the "Members agree that there shall be no applicable fiduciary duties or obligations for the Members [or] the Managers."); *see also Butler Law Firm, PLC v. Higgins*, 243 Ariz. 456, ¶ 23 (2018) (LLC members do not owe each other fiduciary duties unless they are expressly included in the LLC operating agreement.) Consequently, summary judgment on Cramton's negligent misrepresentation claim is appropriate because it fails as a matter of law for lack of duty.

### b.  The negligent misrepresentation claim fails as a matter of law because it is premised upon future conduct.

"[N]o claim of relief for negligent misrepresentation can be premised upon a promise of future conduct." *McAlister v. Citibank (Arizona),* 171 Ariz. 207, 215 (App.1992).  Cramton's negligent misrepresentation claim is based exclusively upon a statement concerning future events and not a fact—*i.e.*, that there would be no "deal" in the future with Kahala, Due North, or any other party for the sale of ECH's assets.  Because the alleged statement relates to future conduct, the allegations in the Amended Complaint cannot support a claim for negligent misrepresentation as a matter of law.  ECH and Keely are entitled to summary judgment on negligent mispresenation.

### c.  Cramton cannot establish Keely's fraudulent intent to deceive.

Fraud cannot be predicated upon unfulfilled promises, expressions of intention, or statements concerning the future, without evidence that such were made with the present intent not to perform.  *See Spudnuts v. Lane,* 131 Ariz. 424, 426 (App.1982).  The party alleging fraud bears the burden of establishing the intent to deceive.  *McAlister*, 171 Ariz. at 214, *citing*, *Waddell v. White,* 56 Ariz. 420, 427 (1940).  "Unless the plaintiff can prove

that the defendant intended to deceive the plaintiff at the time the representation was made, the claim cannot stand." *McAlister*, 171 Ariz. at 214.  The underlying policy is that "a promise to perform in the future is not a representation which can be shown to be true or false at the time it was made, and therefore, a person has no right to rely, in a legal sense, on a representation of a fact not in existence." *Denbo v. Badger,* 18 Ariz.App. 426, 428 (1972).

Even assuming *arguendo* that Keely made the alleged statement concerning the future—*i.e.,* that no future deals would be made for the acquisition of ECH's assets—Cramton has not presented any evidence of Keely's present fraudulent intent.  Fraud may not "be established by doubtful, vague, speculative, or inconclusive evidence." *Enyart v. Transamerica Inc. Co.*, 195 Ariz. 71, 77 (App. 1998); *see also Rice v. Tissaw*, 57 Ariz. 230 (1941) (Fraud is never presumed and cannot be found to exist on a mere suspicion as to the possibility thereof.)  Fraud must be proven by clear and convincing evidence.  *Rhoads v. Harvey Publ'ns, Inc.*, 145 Ariz. 142, 146 (App. 1984).  The clear and convincing standard requires evidence showing that the truth of Cramton's allegations is "highly probable." *See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

Cramton has produced no evidence, much less clear and convincing evidence, that on September 18, 2017, Keely knew that Kahala would acquire ECH's assets in the future, but intentionally deceived Cramton by telling her that no future deals would be made for the acquisition of ECH.  Nor can Cramton proffer any evidence that Keely had knowledge of the falsity of the purported representation when she allegedly made it.  Keely could not have known whether Kahala or some other party would make an offer in the future or if the Due North deal would eventually close.

Intent not to perform "must be established independent of a showing of the defendant's failure to perform." *McAlister*, 171 Ariz. at 214.  That is, the fraud lies *not* in ECH's ultimate sale to Kahala, but in Keely lying at the time she supposedly made the representation that no future deals would be made with Kahala for the purchase of ECH.  Thus, if for example Keely did not believe that there would be a future deal with Kahala

1   when she made the statement, but circumstances changed afterwards, then there was no

2   fraud; the statement was made in good faith.  This is exactly what happened. (Ex. 46.)  Still

3   reeling from the fact that Kahala would not step into the Due North deal, Keely emailed

4   Wuycheck on September 22, 2017, asking him "touch base" with Adams Price and Jeff

5   Smit to "determine [if there] is an interest level in moving forward with Grabbagreen."

6   (Ex. 45; Ex. 66.).

7        To overcome summary judgment, Cramton cannot merely rest on her allegations

8   without providing significant, probative supporting evidence.  *See Anderson v. Liberty*

9   *Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Cramton has not and cannot present any material

10  evidence of Keely's present fraudulent intent when making the alleged statement

11  concerning the future because no such intent existed.  Keely and ECH have provided

12  material evidence to the contrary and are entitled to summary judgment on this ground.

13  Absent an intent to deceive, Cramton is not entitled to the punitive damages she seeks in

14  connection with this claim.  *See Rowe v. Bankers Life & Cas. Co.*, 2008 WL 5156077, at

15  *9 (D. Ariz. Dec. 9, 2008) ("An intent to deceive is roughly equivalent to the requirement

16  of an evil mind for punitive damages purposes)."

17            **d.  Cramton's alleged reliance was not justified.**

18       Cramton's fraud and negligent misrepresentation claims also fail because her

19  reliance on Keely's alleged statement that there would be no future deals for the acquisition

20  of ECH, particularly with Kahala, was not reasonable or justified.  *See Echols v. Beauty*

21  *Built Homes, Inc.*, 132 Ariz. 498, 500 (1982) (To establish fraud, plaintiffs must establish

22  a right to rely on the alleged false statement or that reliance was reasonable.); *see also St.*

23  *Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 316 (1987) (For

24  negligent misrepresentation reliance must be "justified").

25       The undisputed facts leave no room for a reasonable difference of opinion as to

26  whether Cramton's reliance on Keely's alleged statement was reasonable.   It is

27  unreasonable for Cramton to rely upon Keely's purported ability to predict whether a future

28  deal with a third party would materialize and/or consummate.  Also, Cramton knew that

the terminal cancer diagnosis for Keely's immediate family member had not changed (and could not change short of the discovery of a cure for cancer) and therefore, Keely still needed to sell the business quickly.  Thus, it would be unreasonable for Cramton to rely on Keely's alleged representation that there would be no future deals for the sale of ECH. Also, Cramton spoke to Keely via phone on September 20, 2017, and exchanged multiple text messages with Keely after September 18, 2017, when Keely allegedly made the false representation. (Ex. 51 at Row 26; Ex. 74.)  Thus, Cramton could have, but failed to, confirm with Keely her plans to sell ECH prior to making the drastic and hasty decision to resign.  (Ex. 21.)

Further, Keely was not Cramton's only source of information pertaining to the Kahala deal.  Cramton's friend of 15 years, Wuycheck, was leading the negotiations for Kahala. (Ex. 20 at 10:16-20, 14:11-15:12 .)  Cramton's company phone records reflect that she had four calls with Wuycheck on his personal cell phone *during* the Kahala negotiations and *before* her resignation. (Ex. 49 at Rows 325, 423; Ex. 50 at Rows 347, 362; Ex. 48 at Row 46.)  One such conversation occurred on September 22, 2017 *after* Cramton decided to resign, but *before* she submitted her resignation. (Ex. 48 at Row 46.) Thus, Cramton had multiple opportunities after Keely's alleged representation to investigate the status of the Kahala deal through Wuycheck.  Indeed, Cramton had greater access to the Kahala decision makers than Keely did, and she could have simply asked Wuycheck if the deal was still alive when she spoke to him on September 22, 2017. (Ex. 48 at Row 46.)  Cramton also communicated several times weekly with the company accountant (Teresa Mills), and franchise counsel for Corporate Defendants (Antonia Scholtz of Cheng Cohen), both before and after Keely made the alleged representation. (Ex. 24; Ex. 51 at Rows 21, 23.)  Yet, rather than conduct any further diligence, Cramton hastily decided to resign the day after Keely made the representation. (Ex. 22 at 152:7-153:21; Ex. 21.)  Cramton held her resignation letter until after she spoke to Wuycheck, and then she resigned anyway. (Ex. 23 at Row 46.) Thus, Cramton's reliance upon Keely's alleged false statement was unreasonable and unjustified.  For all the foregoing reasons,

ECH and Keely are entitled to summary judgment on Cramton's negligent misrepresentation and fraud claims.

### C.    Breach of Duty of Good Faith & Fair Dealing. [Count VII.]

To overcome summary judgment on this cause of action, Cramton must raise issues of fact concerning whether Keely and ECH exercised their express discretion under the Operating Agreement in a way inconsistent with Cramton's reasonable expectations, or acted in a way not expressly excluded by the Operating Agreement, but which nevertheless bore adversely upon Cramton's reasonably expected benefits of the bargain.  *See Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424 ¶ 14 (App. 2002).

Cramton alleged three breaches of the covenant of good faith under the Operating Agreement.  Not one of them relates to an express provision in the Operating Agreement or a benefit that flows from the Operating Agreement:

- Cramton had a reasonable expectation that ECH and Keely would provide her with "truthful information regarding the prospective sale of [ECH] so that Cramton could adequately protect her membership interest." (Doc. 88 at ¶ 133.)

- ECH and Keely Breached the implied covenant by making the material misrepresentation to Cramton that "Kahala had declined to make an offer to purchase [ECH]." (Doc. 88 at ¶ 134.)

- ECH and Keely Breached the implied covenant by "creating such an abusive working environment that any reasonable person in Cramton's position would have been compelled to resign." (Doc. 88 at ¶ 135.)

The first two grounds relate to the sale of ECH.  However, the Operating Agreement does not contemplate any type of sale of ECH, *e.g.*, it does not contain sale procedures, or address the parties' respective obligations in the event of a sale, or the distribution of sale proceeds. (Ex. 5.)  To determine reasonable expectations, "the relevant inquiry always will focus on the contract itself, to determine what the parties *did* agree to."  *Rawlings v. Apodaca*, 151 Ariz. 149, 154 (1986) (emphasis added).  Therefore, Cramton cannot reasonably expect benefits arising under the Operating Agreement relating to Keely and ECH's obligations in the event of a sale of ECH, when no such benefit ever existed.

Cramton's assertion that she expected Keely and ECH to provide "truthful information" (Doc. 88 at ¶ 133) and refrain from making "material misrepresentation[s]" to her as a member of ECH (Doc. 88 at ¶ 134) is tantamount to a breach of fiduciary duty claim, which Cramton has not pled and cannot plead as a matter of existing Arizona law. *See Higgins*, 243 Ariz. at ¶ 23.  In addition, Cramton's assertions that Keely and ECH made material misrepresentations in connection with the prospective sale of ECH is already encompassed in her fraudulent misrepresentation and fraud causes of action, both of which fail for the reasons discussed in Section VI(B) above.  Therefore, Cramton's first two bases for breach of the good faith covenant fail as a matter of law.

Cramton's third ground for breach of the good faith covenant suffers similar flaws. She asserts that "ECH and Keely" created an "abusive working environment" leading to Cramton's constructive discharge.  (Doc. 88 at ¶ 135.)  This assertion is an impossibility because ECH and Keely are not Cramton's employers.  (Ex. 4 at 49:23-24.)  Rather, she was employed by GFL and non-defendant, GGS. (Ex. 53; Ex. 54; Ex. 3; Ex. 4 at 31:18-32:2.)  Moreover, the Operating Agreement is not an employment agreement through which Cramton can derive expectations regarding employment conditions.  Any claims concerning Cramton's employment are encompassed in her employment causes of action (Counts I-IV), which fail for the reasons set forth in Sections III and IV above. Accordingly, Cramton's third ground for breach of the good faith covenant also fails as a matter of law.

Notably, Cramton has **not** alleged that ECH and Keely breached the implied covenant of good faith and fair dealing with respect to §§ 9.3(a) and 9.2.  Even if Cramton attempts to now argue that she had an expectation under § 9.2 that Keely and/or ECH would buy her out, the argument would fail because such an expectation contradicts the express terms of § 9.2, which make the buyout optional, not mandatory.  *See Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 772 (D. Ariz. 2012) (An implied covenant of good faith and fair dealing cannot directly contradict an express contract term).  Keely and ECH's election not to buy out Cramton's interest is within the risks Cramton expressly assumed

under § 9.2.  *See Sw. Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 558-559 (App. 1992) ("A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach.")

Summary judgment is required because this claim is improperly asserted and it fails as a matter of law.  Consequently, this Court need not reach Cramton's claim for tortious breach of the implied covenant of good faith and fair dealing, which is based upon these same three grounds.  Nonetheless, as set forth below, that claim fails as a matter of law.

**D.     Tortious breach of the implied covenant of good faith. [Count VIII.]**

This cause of action fails as a matter of law because the Operating Agreement does not create the required "special relationship" among the parties.  *Burkons v. Ticor Title Ins. Co. of California*, 168 Ariz. 345, 355 (1991).  A special relationship between parties to a contract is characterized either by a fiduciary relationship, elements of public interest (*e.g.*, unequal bargaining positions), or adhesion, none of which apply in this case.  *Id.*[5]

First, as set forth in Section VI(B)(2)(a) above, the Operating Agreement expressly disclaims fiduciary duties among the parties.  (Ex. 5 at § 16.11.)  Second, there is nothing in the evidence to suggest that Cramton was not bargaining on equal terms with ECH and Keely.  As with all other agreements Cramton entered into as part of her professional relationship with Defendants, Cramton was represented by independent counsel when she entered into the Operating Agreement and had repeated discussions with Grabbagreen's corporate counsel, Juliet Peters, about the Defendants. (Ex. 32 at 227:23-228:1.)  Indeed, Cramton had, through counsel, negotiated numerous other agreements arising out of her relationship with Defendants. (Ex. 32 at 228:11-20; Ex. 57; Ex. 67; Ex. 60; Ex. 58.)  As such, the Operating Agreement was negotiated at arms-length by sophisticated

---

[5] Although the contractual "special relationship" test under *Burkons* relates to claims for tortious breach of the implied good faith covenant, the same analysis should apply to the question of whether a "special relationship" arising under contract gives rise to a duty under a negligent misrepresentation claim.  *See* Section VI(B)(2)(a) above. This test bars both the negligent misrepresentation and tortious bad faith claims for lack of a special relationship.

professionals, Cramton had multiple sophisticated advisors, and she and her attorney were accustomed to negotiating similar agreements with Defendants.  (Ex. 32 at 228:11-20; Ex. 57; Ex. 67.)  Third, for these same reasons, the Operating Agreement is not a contract of adhesion. *See Broemmer  v. Abortion Services of Phoenix, Ltd.,* 173 Ariz. 148, 150-151 (1992) (Defining an adhesion contract as a standardized form offered to consumers of goods and services on a take-it or leave-it basis and under conditions that consumers cannot obtain product or services except by acquiescing in form contract.)  Accordingly, summary judgment is appropriate on Cramton's tort claim for breach of the implied covenant of good faith and fair dealing because there is no special relationship between the parties.

### E.   Cramton is not entitled to punitive damages. [Counts VIII and X.]

It is well settled under Arizona law that the award of punitive damages is justified only by "conduct involving some element of outrage similar to that usually found in crime." *Rawlings v. Apodaca*, 151 Ariz. 149, 163 (1986).  Something more than the commission of a tort is required before a defendant can be held liable for punitive damages. *See Gurule v. Ilinois Mut. Life and Cas. Co.*, 152 Ariz. 600, 602 (1987).  The requisite "something more," or "evil mind," is established by clear and convincing evidence that the defendant's conduct was motivated by spite, actual malice, or intent to defraud.  *See id.* (quoting *Rawlings,* 151 Ariz. at 162-163); *see Linthicum v. Nationwide Life Insurance Co.*, 150 Ariz. 326, 332 (1986) (burden of proof for punitive damages is by clear and convincing evidence of the defendant's evil mind).  A plaintiff must always prove "outwardly aggravated, outrageous, malicious, or fraudulent conduct." *Linthicum,* 150 Ariz. at 331.

Cramton seeks punitive damages in connection with her claims for fraud and tortious breach of the implied covenant of good faith and fair dealing against ECH and Keely (Counts VIII and X).  (Doc. 88 at ¶¶ 144, 162.)  Both claims fail as a matter of law.  Even assuming either claim could succeed, Cramton has not and cannot provide clear and convincing evidence that Keely on behalf of ECH acted with an evil mind, intending to injure Cramton by making the alleged representations underlying Cramton's Counts VIII and X.  Thus, as a matter of law, Cramton is not entitled to punitive damages.

1  **VII.    Conclusion.**

2          Corporate Defendants request summary judgment on Counts I, II, and III;

3  Defendants request summary judgment on Count IV; Keely and ECH request summary

4  judgment on Counts VI-X; Kelli requests an order dismissing her from this suit in the

5  capacity of a community property defendant as well as a defendant under Count IV; and

6  Defendants request an award of their attorneys' fees and costs under the Operating

7  Agreement, GGS Release, A.R.S. § 12-341.01, and any other appropriate relief.

8          RESPECTFULLY SUBMITTED this 1st day of March, 2019.

9  **TB  TIFFANY & BOSCO**
                    P.A.
10

11                          By: /s/ Robert A. Royal
                                Robert A. Royal
12                              Amy D. Sells
                                Erin A. Hertzog
13                              Jack R. Vrablik
                                2525 E. Camelback Road, Suite 700
14                              Phoenix, Arizona 85016-4237
                                *Counsel for Defendants/Counterclaimants*
15

16

17                          **CERTIFICATE OF SERVICE**

18          I hereby certify that on March 1, 2019, I electronically filed the foregoing document

19  and any attachments using the CM/ECF system which will send a notice of electronic filing

20  to all parties as listed on the Notice of Electronic Filing.

21
                            By: */s/ Louis A. Lofredo*
22

23

24

25

26

27

28