Robert A. Royal (SBN 010434)
Amy D. Sells (SBN 024157)
Erin A. Hertzog (SBN 030770)
Jack R. Vrablik (SBN 034352)

**TB TIFFANY & BOSCO** P.A.

Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Telephone: (602) 255-6000
Facsimile:  (602) 255-0103
E-Mail: rroyal@tblaw.com; ads@tblaw.com; eah@tblaw.com; jrv@tblaw.com
*Counsel for Defendants/Counterclaimants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton,<br><br>  Plaintiff,<br>vs.<br><br>Grabbagreen Franchising, LLC, Eat Clean Operations, LLC, Eat Clean Holdings, LLC, Kelli Newman and Keely Newman,<br><br>  Defendants. | Case No. 2:17-cv-04663-PHX-DWL<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Grabbagreen Franchising, LLC, Eat Clean Operations, LLC, Eat Clean Holdings, LLC, Gulf Girl Squared, Inc., Kelli Newman and Keely Newman,<br><br>  Counterclaimants,<br>vs.<br><br>Kim Cramton and Laura McCormack,<br><br>  Counterdefendants. | |

The Response tells an outlandish and unsupported story, and is thoroughly deficient insofar as it cites to "evidence" that is not attached as exhibits, it distorts the substance of evidence that *is* attached, and it abandons legal arguments midstream without fully developing them. The evidence demonstrates that Cramton impulsively resigned as an employee of GFL[1] and Manager of ECH, and took a salaried job with Defendants' competitor. She then filed this lawsuit, asserting contrived claims against Defendants in an attempt to recover from her self-imposed losses. Cramton's Response fails to raise a genuine issue of material fact with respect to her claims that are addressed in the Motion. Summary judgment on Counts I-IV and VI-X is warranted.

**I.     Threshold issues merit summary judgment.**

    **A.     Cramton released Counts I-III against Corporate Defendants.**

GGS entered into the Release with Cramton because Cramton wished to resign from GGS and wanted GGS to buy back her shares. (Doc. 158 at Ex. AV at 89:18-23; 95:16-23.) In the Release, Cramton agreed to forever release GGS and its "affiliates" from all claims relating "directly **or indirectly** to any matter relating to [GGS]….", including all employment claims. (Doc. 143 at Ex. 29 at CRA000464, I(A).) Cramton argues that "affiliate" should be given its ordinary meaning, which includes a "sibling corporation." (Doc. 159 at 24:17-25:3.[2]) Defendants agree. A "sibling" is a brother or sister, and a "brother-sister corporation" is "two or more corporations controlled by the same, or substantially the same, owners." Black's Law Dictionary (10th ed. 2014). GGS and Corporate Defendants are sibling corporations and thus, "affiliates" under the Release. (Doc. 143 at Ex. 5 at CRA000045, at Ex. 56 at G011550.)[3]  As GGS affiliates, Corporate Defendants are also third-party beneficiaries of the Release. *See Klamath Water Users*

---

[1] Capitalized terms herein have the meaning ascribed to them in Defendants' Refiled Motion for Partial Summary Judgment, Doc. 143.

[2] Page citations correspond to the page number the Court stamped at the top margin of the document upon filing.

[3] *But cf. Frank v. U.S. West*, 3 F.3d 1357, 1362 (10th Cir. 1993) (common ownership alone is never sufficient to establish integrated enterprise); *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir.1997) (evidence of common management and ownership alone were insufficient to establish single employer status.).

*Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir.2000).

The parties also previously defined "affiliate" in multiple documents to include each of the Corporate Defendants. (Doc. 158 at 14:8-12, citing Ex. A, X-Z, AA-AC.) Cramton claims that GFL is not a GGS affiliate because according to an excerpt in GFL's April 2017 Franchise Disclosure Document ("FDD"), GFL does not have any "affiliates required to be disclosed in Item 1." (Doc. 159 at 25:16-20, citing Ex. 52 at G019575.) However, GGS "was not required to be disclosed" in that section of the FDD, and the same FDD identifies GGS as a GFL affiliate two pages later. (*Id* at Ex. 52 at G019577.)  Thus, Corporate Defendants are GGS affiliates under the Release, benefitting from release of claims.[4]

### B. Kelli is neither an employer nor proper community property defendant.

Cramton sued Kelli in connection with her minimum wage claim (Count IV), alleging that Kelli was her employer under A.R.S § 23-362(b):  as Corporate Defendants' attorney and as ECH's former owner. (Doc. 88 at ¶¶ 14-15.) Cramton's Response fails to demonstrate how Kelli's alleged conduct in these capacities qualifies her as Cramton's "employer."  Therefore, Kelli should be dismissed from Count IV.

What is most troubling is that the few "facts" Cramton cites in her Response are distortions of the record, that vary in degree of falsity, which were manufactured to create the semblance of an argument.  For instance, Cramton contends that "Kelli meets the statutory definition of employer" because:

> She was the General Counsel and Chief Administrative Officer for ECH and [GFL].[5] She performed the functions of those titles, including drafting and negotiating legal agreements for the companies' sale. (Ex. 1, pp. 137:13-18, 50:24-51:13).[6]  She represented the corporate Defendants on their employment issues, including drafting Cramton's employment agreement, responding to EEOC discrimination complaints, and participated in the

---

[4] Cramton also argues that although the ECH Operating Agreement defines GGS as its "Affiliate," she should not be bound by that definition because "Cramton did not sign that document and she was not even aware of that defined term." (Doc. 159 at 25:15-17.) Yet, Cramton's Counts VI-VIII are founded upon the ECH Operating Agreement. (Doc. 88.) Cramton is bound by the entire ECH Operating Agreement, not just those terms she perceives as beneficial to her claims.

[5] At all relevant times, Kelli held a full-time position as the GC of IPC Healthcare and then, Assistant GC of Molina Healthcare in California. (Doc. 143 at Ex. 7B at 10:4-21.)

[6] No such pages are included in Exhibit 1.

- 2 -

> hiring of Cramton. (Ex. 24, pp. 48:1-10, 173:11-14)[7]; (Ex. 15)[8].

Doc. 159 at 9:3-8.

> Kelli held various positions as officer and owner of the corporate Defendants. (Ex. 7) (Kelli as President and sole owner of ECH)[9]; (Kelli as President of GGF)[10]; (Promissory Note, Ex. 10) (Kelli as President of ECO)[11]. When Kelli formed ECH in 2016, it was her company. (Ex. 1, p. 149:22-25)[12].... Throughout 2017, Kelli was active in negotiating contracts and the operations of the Defendants' entities. (*See* Exhibit 14, pp. 1, 3[13]; Exhibit 15[14]; Exhibits 19[15].)

Doc. 159 at 2:22-26, 3:6-8.

This analysis reveals that Kelli was not an owner or officer of Corporate Defendants during the time period relevant to Cramton's wage claims (*see* fn. 9-12) and Cramton is relying upon evidence that relates strictly to the released entity GGS, in violation of the GGS Release (*see* fn. 7, 13, and 15). This pattern of unsupported statements and mischaracterized evidence permeates the Response.

Even with these evidentiary fallacies, Cramton's arguments fail. Her allegations that Kelli, as CAO of ECH and GFL, was Cramton's employer, fail because Cramton has

---

[7] No such pages are included in Exhibit 24. The referenced pages are from Cramton's deposition regarding an alleged 2014 interview (years before Cramton's 2017 wage claim accrued) with Kelli and others for a position with *GGS* (the released entity), *not* the Defendants; and where Cramton states she interacted with Kelli from time to time on legal issues, including a discrimination charge (not multiple charges), which also related to *GGS*.

[8] Exhibit 15 is an e-mail from Kelli to Cramton dated April 6, 2017, attaching Cramton's employment agreement to be executed in connection with Due North's purchase of the Grabbagreen Brand, which never occurred, but was prepared solely for Cramton's benefit (contrary to Cramton's allegations of abuse).

[9] Exhibit 7 is the ECH Operating Agreement, which provides that Kelli was only President for *ten days* from October 26, 2016 to November 5, 2016, and sole owner *36 days*, all of which predates Cramton's wage claim, *i.e.*, January to September 2017. (Doc. 143 at Ex. 5 at CRA000043-45.)

[10] This statement is unsupported. Kelli was President of GFL for 10 days, and ceased being President of GFL prior to Cramton's 2017 wage claim. (Doc. 143 at Ex. 5 at CRA000045)

[11] Kelli ceased being President of ECO on November 5, 2016, which predates Cramton's wage claim, *i.e.*, January to September 2017. Also, since Cramton was not an employee of ECO it is irrelevant whether Kelli was President. (Doc. 143 at 12:4-5; Doc. 158 at Ex. CH.)

[12] While this may technically be true, *see* footnote 9.

[13] Exhibit 14 are text messages in which Kelli references the single EEOC charge that was filed against GGS (the released entity).

[14] *See* footnote 8.

[15] Exhibit 19 is an August 15, 2017 e-mail from Kelli to Cramton forwarding *GGS*-related documents for her execution.

1 not identified any conduct by Kelli done in the capacity of CAO that qualifies Kelli as an
2 employer under the law.  The cases Cramton relies upon for the proposition that a corporate
3 officer may be deemed an employer under wage claims involve facts not present here, in
4 which the corporate officer hired and fired employees, assigned work, posted work
5 schedules, and paid wages.  (Doc. 159 at 8:15-28.)  Cramton has not cited to any evidence
6 that Kelli engaged in any such conduct.  The only conduct that Cramton mentions in her
7 Response are Kelli's acts done in her capacity as corporate counsel. (Doc. 159 at 9:4-9.)
8 However, she does not cite to any case law that finds that corporate counsel may be deemed
9 an employer under wage claims.  Indeed, the Ninth Circuit has rejected such an argument.
10 *See Arias v. Raimondo*, 860 F.3d 1185, 1190 (9th Cir. 2017).

11       Kelli also does not qualify as an "employer" under the Ninth Circuit's "economic
12 reality" test. *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir.1999).  Cramton ignores
13 this four-factor test and she does not dispute that:  she did not report to Kelli (Doc. 143 at
14 Ex. 32 at 173:6-14, 176:17); rather, she reported to Keely (*id.*); she only had "interactions"
15 with Kelli on legal issues (*id.*); she did not know whether Kelli determined her wages (*id.*
16 at 176:19-22); and Cramton was second in command to Keely (Doc. 143 at Ex. 33).
17 Cramton cites only to her self-serving Declaration to refute that Kelli was subordinate to
18 her and that she controlled Kelli's pay.  (Doc. 159 at 9:9-10.)  However, "a conclusory,
19 self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to
20 create a genuine issue of material fact." *Hexcel Corp. v. Ineos Polymers, Inc*., 681 F.3d
21 1055, 1063 (9th Cir. 2012).  Thus, Kelli is entitled to summary judgment on Count IV.

22       Cramton's assertion that Kelli has community property liability also fails.  Cramton
23 does not dispute that the Amended Complaint is devoid of any allegation of community
24 property liability.  (Doc. 159 at 9:12-21.)  Nor does she dispute that community liability is
25 not presumed under the law for the claims at issue here. (*Id.*) *Garrett v. Shannon,* 13 Ariz.
26 App. 332, 333 (1970).  Therefore, Kelli must be dismissed from this case as an improper
27 community property defendant.  Moreover, the Separate Property Agreement that Kelli and
28 Keely executed (Doc. 143 at Ex. 36) is enforceable notwithstanding that it is not recorded.

A.R.S. § 33-413 is inapplicable. Cramton is not a "creditor" of Kelli's and Cramton has not produced evidence to the contrary; nor can she claim lack of notice of the agreement. Kelli's signing a third-party document as "spouse with regard to community property" is of no consequence because there is no "community property" in the first instance.

### C. Cramton was not constructively discharged under Counts I-III and VI.

Cramton alleges constructive discharge with respect to her ADA/ACRA claims and her breach of contract claim. (Doc. 88 at ¶ 78.) For the ACRA claim, it is undisputed that Cramton did not provide Defendants with the required 15-day statutory notice of her intent to resign. (Doc. 143 at Ex 24; Ex. 81.) Absent such notice, Cramton's constructive discharge claim under the ACRA fails because there is no evidence of extreme and outrageous conduct. *See* A.R.S. § 23-1502. Cramton contends that the 15-day notice requirement does not apply to her ACRA claim because she was not notified of the statute via employment posters. (Doc. 159 at 11:11-13.) Cramton's only evidence is an immaterial e-mail that concerns an irrelevant time period (*i.e.*, four months after GGS sold the stores and Cramton resigned) and relates only to stores once owned by GGS, *not* Defendants, thus violating the GGS Release. (*Id* at Ex. 62; Doc. 158 at Ex. U.)

Cramton must demonstrate that Defendants engaged in sufficiently extreme and outrageous conduct. However, Cramton made critical admissions in her Response, limiting the window of potential extreme and outrageous conduct to five days, from September 14, 2017 (when she signed the GGS Release) and September 19, 2017 (when she decided to resign). She states: "Cramton's claims related to her constructive discharge…arose after September 14, 2017." (Doc. 159 at 23:26-28.) She further states that "although she was **unhappy**, she **was not even contemplating resigning**—from any company—as of September 14, 2017." (*Id* at 26:9, fn. 11, citing Ex. 24, at 251:19-252:19 (emphasis added).) If Cramton did not even ponder resigning prior to September 14, then her working conditions clearly had not become sufficiently extreme and outrageous. Only evidence of extreme and outrageous conduct occurring between September 14 and 19 is relevant. Because none exists, Cramton was not constructively discharged, and summary judgment

- 5 -

on Counts I-III and VI is proper.[16]

Cramton complains of conduct which, even if true, is insufficient to support constructive discharge, such as being belittled and cursed at, being screamed at about issues over which she had no control, and insufficient/interrupted vacations. (Doc. 159 at 5:18-6:4.) *See Civil Rights Div. v. Vernick Plumbing*, 132 Ariz. 84, 86–87 (App.1982) (no constructive discharge where supervisor screamed at employee); *Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1161 (D.Ariz.2016) (belittling, non-discriminatory comments do not create factual dispute); *Reyes v. Revlon Consumer Products*, 2013 WL 12250530, at *7 (D.Ariz.2013) (rejecting constructive discharge claim based on plaintiff's right to take earned vacation); *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir.2016) (denial of vacation is not an adverse employment action). She cites to **no** case law demonstrating that such conduct creates a material issue of fact. (Doc. 159 at 10:20-11:4.)

Moreover, since Cramton offered in her resignation letter to continue working for 30 days, her claim fails. (*Id.* at 283:6-10; Ex. 24.) *See, e.g., French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 877–78 (D.Minn.1997) ("The only logical conclusion that the Court can draw from [plaintiff's] wish to return to [employer] is that the working conditions there were in fact not intolerable."). Because Cramton's allegations of abuse are insufficient to support constructive discharge, summary judgment on Counts I-III and VI is appropriate.

**II.    The ADA and ACRA claims against Corporate Defendants.  [Counts I-III.]**

   **A.    Corporate Defendants lack the requisite 15 employees.**

Corporate Defendants are not covered employers under the ADA or ACRA because they do not employ 15 or more employees. *See* 42 U.S.C. § 12111(5); A.R.S. § 41-1461. Cramton attempts to overcome this by arguing that Corporate Defendants are an integrated enterprise. She also moved for summary judgment on this issue, acknowledging that absent a threshold finding of an integrated enterprise, Counts I-III fail. (Doc. 142 at 14:1-15:16.)

---

[16] Contrary to Cramton's contention, summary judgment is appropriate on a constructive discharge claim where, as here, there is insufficient evidence that working conditions were so "difficult or unpleasant" or "intolerable" that a reasonable person would have been compelled to quit. *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989).

The Response states, without any facts or analysis, that Corporate Defendants shared employees, had inter-company loans, and were intermingled. (Doc. 159 at 11:20-23.) These bare assertions fail to demonstrate that each of the four integrated employer factors are present to an "uncommon degree." For the reasons set forth in Defendants' Response to Plaintiff's Motion for Summary Judgment at Section I (Doc. 158 at pp. 3-9) which is incorporated herein, Cramton cannot satisfy the high burden of proof required to show integration of the entities. Consequently, Counts I-III fail.

### B. Cramton's aneurysm does not qualify as a protectable disability.

In order for Cramton's aneurysm to qualify as a protectable disability, it must be an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102; A.R.S. § 41-1461. The very evidence Cramton cites to reveals that she only temporarily experienced these impairments immediately following her surgery, and the impairments subsided before she resigned. She testified: "I had trouble with my vision. Immediately following my surgery, is what I'm referring to…. I was -- couldn't concentrate. I couldn't keep focused. I couldn't drive. That was right after my surgery." (Doc. 159 at Ex. 24 at 265:6-7, 9-12.) She further testified that these lingering effects of the surgery "got less and less over weeks and a month or so, two months" and fully subsided by the time she resigned. (Doc. 143 at Ex. 23 at 266:8-20.)

Cramton's own neurosurgeon confirms that the May 2017 procedure he performed effectively cured her. (Doc. 159 at Ex. 23 at ¶ 26.) His declaration is remarkably silent as to whether the aneurysms substantially limited one or more of Cramton's major life activities from April to September 2017. (*Id.*) At best, he states "I'm not aware of all of Ms. Cramton's symptoms following the procedure." (*Id.* at ¶ 20.)[17] There is **no** evidence that Cramton communicated these impairments to Defendants or requested any accommodation from her new employer, Kahala, and Cramton did not provide a doctor's

---

[17] Defendants object to the Declaration of Andrew Ducruet, MD (Doc. 159 at Ex. 23) to the extent that his statements exceed his first-hand knowledge of Cramton's medical condition and treatment as her treating physician. Testimony beyond these bounds is improper expert opinion testimony and should be disregarded by this Court.

- 7 -

note to any of the Defendants, despite attaching them to her Response brief as if she had. Cramton's temporary impairments following her surgery do not rise to a substantial limitation upon major life activities to qualify as a protectable disability.

Cramton has not cited to any cases in which an aneurysm was deemed a disability under the ADA. Indeed, courts have found that a brain aneurysm does not qualify as a disability. *See Tyma v. City of Grand Island*, 91 F. App'x 522 (8th Cir. 2004); *Vincent v. Four M Paper Corp.*, 589 N.W.2d 55 (Iowa 1999). Furthermore, Cramton's asserted temporary impairments do not match the severity found in the cases she relies upon as examples of disabilities. (Doc. 159 at 12:7-13.) As a result, Cramton's condition was not protected under the ADA or ACRA.

### C. There are no material adverse employment actions.

In her Response, Cramton asserts that constructive discharge is an adverse action. (Doc. 159 at 12:23-24.) First, Cramton cannot prove she was constructively discharged. *See* Section I(C) above. Second, Cramton's Response fails to demonstrate that the adverse employment action (the constructive discharge) was causally linked to the protected activity (her request for accommodation). (Doc. 88 at ¶¶ 78, 99.) *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000). The temporal proximity between the accommodation request (April/May 2017) and the constructive discharge (September 2017) is not sufficient evidence of causality. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (temporal proximity must be "very close."), *citing Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3–month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (7th Cir. 1992) (4–month period insufficient).

Cramton also argues that "Defendants' failure to pay Cramton any wages in 2017 constitutes an adverse employment action." (Doc. 159 at 13:1-3.) However, a causal connection is not possible if the adverse action predates the alleged protected activity. *See Cohen v. Fred Meyer, Inc*. 686 F.2d 793, 797 (9th Cir.1982). In December 2016, Cramton elected to forego regular wages in 2017. (Doc. 158 at Ex. L.) This election predates the alleged protected activity, *i.e.*, Cramton's April 2017 request for a reasonable

accommodation. (Doc. 88 at ¶¶ 50 and 99.) Moreover, GFL, the only Defendant from which Cramton was entitled to receive wages, *did* pay Cramton wages in 2017. For the foregoing reasons, summary judgment on Cramton's ADA and ACRA claims is proper.

**III.    The Arizona Minimum Wage Act claim against Defendants.[18]   [Count IV.]**

Cramton has no right to receive minimum wage from ECH or ECO because she was never an employee of either entity, just as she was not an employee of Kelli. Cramton argues in a footnote: "ECH is the parent company to [GFL] and ECO. It was also part of an 'integrated enterprise' with ECO." (Doc. 159 at 9:11, fn. 1.) The mere fact that ECH is the parent company of employer GFL, does not alone make ECH an "employer." Cramton cites no authority otherwise. Even assuming Corporate Defendants were an integrated enterprise under the ADA/ACRA (which they were not), that is irrelevant to whether ECH and ECO were "employers" under AMWA. Thus, because ECH, ECO, and Kelli are not Cramton's employers, they are entitled to summary judgment on Count IV.

Cramton was an employee of GFL, but her AMWA claim fails because she received wages in excess of the statutory minimum rate for all hours worked during the relevant time period. (Doc. 143 at 12:18-13:6.) Cramton merely states that she did not receive a regular bi-weekly payroll, and she never received a "paycheck" from GFL until 3 months following her departure.[19] (Doc. 159 at 9:23-10:8.) GFL had no obligation to pay Cramton every two weeks under A.R.S. § 23–351. She and Keely agreed to forgo their standard wage accruals from GFL in 2017 and pay themselves only when funds became available via commissions on franchise sales. (Doc. 142 at 6:11-18, citing Ex. 21; Doc. 158 at Ex. M at 273:9-23; Ex. B at 138:13-23.) As such, Cramton waived her right to bi-weekly payroll. *Orfaly v. Tucson Symphony Socy.*, 99 P.3d 1030, 1033-34 (Ariz. App. 2004). Agreements to alter when wage payments become due and payable are legally permissible. *Id.* Accordingly, GFL is entitled to summary judgment on Count IV.

---

[18] (*See also* Doc. 158 at § II, AMWA Claim [Count IV], 9:14-11:20.)

[19] Cramton's assertion that she received a "paycheck" from GFL after her resignation is false. GFL did not make any payments to Cramton after her resignation. (Doc. 158 at § II(A); Ex. N.)

- 9 -

**IV.   Breach of the ECH Operating Agreement against ECH and Keely. [Count VI.]**

Keely exercised her rights under § 9.3(b) of the Operating Agreement, which permits her to purchase Cramton's interest in ECH for $1 if Cramton voluntarily resigns within five years. (Doc. 143 at Ex. 5.[20]) According to Cramton, Keely's election to exercise her rights under § 9.3(**b**) somehow obligated Keely to pay Cramton fair market value for her interest under §§ 9.3(**a**) and 9.2. (Doc. 159 at 13:14-16 ("[o]nce Keely *chose* to buy out Cramton's units in ECH, she had to pay fair market value.").) Cramton's argument offends fundamental contract law: it ignores the express language of the Operating Agreement and Keely's clear election to exercise her rights for $1 under § 9.3(b). Accordingly, summary judgment on Count VI is appropriate.

**V.   Contractual bad faith and tort claims against ECH & Keely. [Counts VII-X.]**

    **A.   The economic loss rule. [Counts VIII-X.]**

The economic loss rule (ELR) has been applied to preclude contract-related fraud and misrepresentation claims. *See Cook v. Orkin Exterminating Co.,* 227 Ariz. 331, 332, ¶ 4, 335 n. 6, ¶ 20 (App.2011); *see also Ader v Bella Vista Townhomes LLC*, 2017 WL 2494467, at *3 (2017). But, as Cramton notes, the ELR has also been held not to apply to fraud and negligent misrepresentation claims. (Doc. 159 at 19:23-28.) Thus, there does not appear to be an absolute rule concerning the ELR's application to such claims. However, this Court recently found that the ELR "depends less on whether tort claims would be duplicative and more on whether allowing tort claims would subvert the parties' allocation of risk and choice of remedies as evidenced by a detailed contract." *Kenneth Eisen & Associates, Ltd. v. CoxCom, Inc.*, WL 669770 *2-3 (D. Ariz. 2019). Cramton's tort claims against ECH and Keely all request seek purely economic contract damages— the value of Cramton's membership interest in ECH as determined under the Operating Agreement. (Doc. 143 at Ex. 30 at 29:24-27, 31:2-5, 31:17-19.) Thus, Cramton's tort damages sound in contract and there is no basis to impose tort liability in addition to the

---

[20] *See also* Doc. 159 at Ex. 6. The $1 check was preceded by a detailed e-mail from Keely to Cramton, notifying Cramton of her election to exercise § 9.3(b). Per the Court's Order, the e-mail is not attached to this Reply; however, Defendants will bring it to oral argument and welcome the opportunity to provide it to the Court.

- 10 -

1  contractual remedies that the parties anticipated and bargained for under the Operating
2  Agreement.  The economic loss rule should apply to bar Counts VIII-X.

### B.	The negligent misrepresentation claim fails for lack of duty. [Count IX.]

In *Van Buren v. Pima County Community College Dist. Bd.*, 113 Ariz. 85, 87 (1976), the Arizona Supreme Court held that before a negligent misrepresentation action may lie, the defendant must first owe a duty to the plaintiff.  The Ninth Circuit and Arizona District Court have adopted *Van Buren*'s holding.  *See, e.g., Ranasinghe v. Popolizio*, 688 Fed.Appx. 469, 470 (9th Cir. 2017); *State Farm Fire & Cas. Co. v. Amazon.com Inc.,* 2018 WL 1536390, at *3 (D. Ariz. 2018).  Neither ECH nor Keely owed any duty to Cramton. Duty is based on common law special relationships.  *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565 ¶ 14 (2018).  Special relationships may arise from contracts.  *See id.*  The contract here, the Operating Agreement, is devoid of any provision creating a special relationship duty, and it expressly disclaims fiduciary duties among the parties. (Doc. 143 at Ex. 5 at § 16.11.)

Cramton ignores *Van Buren* and the Operating Agreement and simply contends, without any support, that Keely owed a fiduciary duty to Cramton.  (Doc. 159 at 17:11-14.)  She also states that a fiduciary duty is not an element of negligent misrepresentation. (*Id.* at 17:19.)   However, the law of negligence supplies the governing principles for negligent misrepresentation claims.  *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 333 ¶ 30 (App. 2014). "Thus, there must be 'a duty owed and a breach of that duty before one may be charged with the negligent violation of that duty.'" *Id.* (quoting *West v. Soto*, 85 Ariz. 255 (1959)).  There is no such duty here.

### C.	Even assuming Cramton's version of the facts to be true, summary judgment on her negligent misrepresentation and fraud claims is still warranted.  [Counts IX-X.]

Cramton's negligent misrepresentation and fraud claims are based on Keely's alleged oral representation to Cramton on September 18, 2017, which representation has two components:  a present-tense statement, and a statement concerning future events. Cramton has characterized the representation as follows:  "Kahala was no longer interested in acquiring Eat Clean Holdings."  (Doc. 88 at ¶¶ 147 and 153); "Kahala had rejected the

offer [to acquire ECH's assets] and that there would be no further offers coming from Kahala." (Doc. 88 at ¶¶ 65 and 70); Keely "told me that the deal with Kahala fell through." (Doc. 143 at Ex. 32 at 151:20-23); "Keely told me that the deal fell through. And that I asked if anybody – if, if there was any – going to be any more offers. And she said no." (*Id* at Ex. 32 at 284:11-13; 286:14-25.)

No matter how Cramton characterizes the present-tense statement, the representation was true when Keely made it. *See* Doc. 143 at § VI(B)(1), 16:16-17:5. Cramton has not presented clear and convincing contradictory evidence, from any of the witnesses on the call or other documents, to show Keely's statement was false. Summary judgment on the present-tense component of the alleged representation is warranted.

With respect to the statement concerning future events, even assuming *arguendo* that Keely made the statement, it cannot form the basis of a negligent misrepresentation or fraud claim. First, a claim of relief for negligent misrepresentation cannot be premised upon a promise of future conduct. *See McAlister v. Citibank (Arizona),* 171 Ariz. 207, 215 (App.1992). Second, although a fraud claim can be based upon unfulfilled promises or expressions of future events, the plaintiff must demonstrate that the statement was made with the present intent not to perform. *Id.* at 214. Cramton cannot satisfy this burden with clear and convincing evidence. Third, with respect to the common element of reasonable and justified reliance Cramton's purported reliance upon this alleged statement of future events was unreasonable. Cramton ignores and thus concedes the first point in her Response. The second and third points are addressed below.

**1. Cramton cannot establish Keely's fraudulent intent to deceive.**

"Unless the plaintiff can prove that the defendant intended to deceive the plaintiff at the time the representation was made, the claim cannot stand." *Id*. Cramton argues that "Newman's intent to deceive is evidenced by the actual status of the Kahala deal." (Doc. 159 at 18:15.) However, the status of the Kahala deal (*i.e.,* that **new** discussions commenced subsequent to Keely's alleged representation that the deal "fell through") cannot support a present intent to deceive. The present intent not to perform "must be

established independent of a showing of the defendant's failure to perform." *McAlister*, 171 Ariz. at 215  The fraud lies *not* in ECH's subsequent discussions with and ultimate sale to Kahala, but in Keely lying at the time she *supposedly* made the representation that the Kahala deal fell through.  If, when Keely made the statement, she did not know whether discussions would continue or an offer would be made by Kahala, but circumstances changed afterwards, then there was no fraud; the statement was made in good faith.  That is what happened here.

Cramton has produced no evidence that on September 18, 2017 Keely knew that Kahala would later make an offer, but intentionally deceived Cramton by telling her that there would be no further offers.  Adams Price, Grabbagreen's broker who was on the September 18th call, stated that he understood the deal to be dead at the conclusion of the call and no steps for future actions were mentioned.  (Doc. 143 at Ex. 66 at ¶¶ 10-11.)  Cramton cites to evidence that as of September 19, *Kahala* expected further discussions with Keely, and on September 20, Keely asked Adams Price to go back to Kahala with new terms.  (Doc. 159 at 18:15-21.)  This fails to demonstrate that the truth of Cramton's allegations is "highly probable." *See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).  It underscores that Keely did not attempt to initiate further discussions with Kahala until two days after she made the alleged representation.  (Doc. 143 at Ex. 66 at ¶ 12.)  Summary judgment should be entered on the fraud count as to the representation of future events.

**2. Cramton's alleged reliance was not justified.**

Cramton's reliance is unreasonable because she could have investigated the status of the Kahala deal through Kahala's lead negotiator when they spoke two days before she resigned. (Doc. 143 at Ex. 48 at Row 46.)  Rather than respond to the argument that her fraud and negligent misrepresentation claims fail for lack of reasonable or justified reliance, Cramton merely states that this Court cannot resolve this issue on summary judgment.  (Doc. 159 at 18:26-19:4.)  As stated in the Motion, reliance is **not** always a question of fact—it becomes a question of law and loses its triable character if the undisputed facts leave no room for a reasonable difference of opinion. (Doc. 143 at 21:25-

26.)  *See Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009).  Thus, the Motion at VI(B)(2)(d), all of which Cramton ignored, should be deemed uncontested.  For all the foregoing reasons, summary judgment on Counts IX and X is proper.

### D. Breach of Duty of Good Faith & Fair Dealing. [Count VII.]

Cramton asserts that "ECH and Keely" breached the good faith covenant in the ECH Operating Agreement by creating an "abusive working environment" leading to Cramton's constructive discharge.  (Doc. 88 at ¶ 135.)  However, the ECH Operating Agreement is not an employment agreement through which Cramton can derive expectations regarding employment conditions.  Moreover, ECH and Keely are not Cramton's employers.  (Doc. 143 at Ex. 4 at 49:23-24.)  In her Response Cramton baldly asserts that this claim is directed to her employment contract as well as the Operating Agreement.  (Doc. 159: 16:5-6.)  That is false. (Doc. 88 at ¶¶ 132, 135.)  Cramton also asserts that ECH is "part of Cramton's integrated employer"; however, an integrated employer analysis is irrelevant to this claim.  Accordingly, this ground for breach of the good faith covenant fails.

Cramton alleged two other grounds relating to the sale of ECH:  that she expected Keely and ECH to provide "truthful information" (Doc. 88 at ¶ 133) and refrain from making "material misrepresentation[s]" to her as a member of ECH.  (*Id.* at ¶ 134.)  In her Response, Cramton identifies various provisions in the Operating Agreement that have some relation to a sale, partial sale, liquidation, or winding up of the company.  (Doc. 159 at 15:14-22.)  Her analysis stops there.  Cramton fails to demonstrate how ECH and Keely breached the good faith covenant under the ECH Operating Agreement.  Therefore, summary judgment on these grounds is appropriate as well.

### E. Tortious breach of the implied covenant of good faith. [Count VIII.]

Count VIII fails because the Operating Agreement does not create a "special relationship" among the parties.  *Burkons v. Ticor Title Ins. Co. of California*, 168 Ariz. 345, 355 (1991).  Cramton asserts that she and Keely had a special relationship by virtue of fiduciary duties that Keely owed Cramton as a manager of ECH.  (Doc. 159 at 19:9-11.) This argument fails under the Operating Agreement, which expressly disclaims fiduciary

1  duties among Keely and Cramton as managers. (Doc 143 at Ex. 5 at § 16.11.) Cramton
2  also attempts to argue that she had a special relationship with ECH as her employer. (Doc.
3  159 at 19:11-13.) This, too, is false. ECH and Keely were not Cramton's employers. (Doc.
4  143 at Ex. 4 at 49:23-24.) Rather, she was employed by GFL and GGS. (*Id* at Ex. 53; Ex.
5  54; Ex. 3; Ex. 4 at 31:18-32:2.) Summary judgment is appropriate on Count VIII.

      **F.**      **Cramton is not entitled to punitive damages. [Counts VIII and X.]**

7  Cramton seeks punitive damages in connection with Counts VIII and X, both of
8  which fail. (Doc. 88 at ¶¶ 144, 162.) Even if either claim could succeed, Cramton has not
9  provided clear and convincing evidence that Keely on behalf of ECH acted with an evil
10 mind, intending to injure Cramton by making the alleged representations underlying
11 Counts VIII and X. Thus, Cramton is not entitled to punitive damages. Cramton does not
12 cite to **any** evidence to support her argument that "Keely's abuse of Cramton and false
13 statements regarding the Kahala deal were intended to get Cramton to resign, allowing the
14 Newmans to potentially pocket her half-million-dollar interest in the company." (Doc. 159
15 at 20:15-17; 21:4-8 (similar statements also unsupported by any evidence).) Rather, in an
16 attempt to demonstrate Keely's evil mind, Cramton cites to a string of events that occurred
17 **after** Cramton's resignation, which relate almost exclusively to Kelli's conduct (not
18 Keely's), and bear no relationship to Counts VIII or X. (*Id.* at 21:13-22:1.) This evidence
19 is irrelevant, both temporally and substantively.

**VI.**    **Conclusion.**

21 Corporate Defendants request summary judgment on Counts I-III; Defendants
22 request summary judgment on Count IV; Keely and ECH request summary judgment on
23 Counts VI-X; Kelli requests an order dismissing her from this suit in the capacity of a
24 community property defendant as well as a defendant under Count IV; and Defendants
25 request an award of their attorneys' fees and costs under the Operating Agreement, GGS
26 Release, A.R.S. § 12-341.01, and any other appropriate relief.

1   RESPECTFULLY SUBMITTED this 16th day of April, 2019.

2                               **TB** TIFFANY & BOSCO
                                      P.A.

4                           By: /s/ Robert A. Royal
                                Robert A. Royal
5                               Amy D. Sells
                                Erin A. Hertzog
6                               Jack R. Vrablik
                                2525 E. Camelback Road, Suite 700
7                               Phoenix, Arizona 85016-4237
8                               *Counsel for Defendants/Counterclaimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2019, I electronically filed the foregoing document and any attachments using the CM/ECF system which will send a notice of electronic filing to all parties as listed on the Notice of Electronic Filing.

By: /s/ *Kevin M. Morrow*