**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton, | No. CV-17-04663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grabbagreen Franchising LLC, et al., | |
| Defendants. | |

      The parties have filed a series of interrelated motions in this hotly contested employment action. (Docs. 142, 143, 200, 206, 220, and 229.) The motions recently became fully briefed, and the Court hereby rules as follows.

## BACKGROUND

I.    <u>The Parties, Claims, And Essential Facts[1]</u>

      From September 2014 through September 2017, Plaintiff Kim Cramton ("Cramton") was affiliated in various capacities with a trio of related entities, Grabbagreen Franchising, LLC ("GFL"), Eat Clean Operations, LLC ("ECO"), and Eat Clean Holdings, LLC ("ECH") (collectively, the "Corporate Defendants"). The business purpose of the Corporate Defendants, which were owned and/or operated by Keely Newman ("Keely") and her spouse, attorney Kelli Newman ("Kelli"), was to oversee the "Grabbagreen" restaurant franchise, which features healthy fast food and juice. For ease of reference, the

---

[1]     The Background section of the order is simply intended to give a broad overview of the issues and claims in this case. To the extent material disputes of fact exist, they will be addressed in further detail in the Discussion section.

Corporate Defendants, Keely, and Kelli will be referred to collectively as "Defendants."

On September 25, 2017, Cramton stopped working for Defendants. At the time of her departure, Cramton held an 18.6% ownership interest in ECH. However, in October 2017, Keely purported to exercise a contractual provision that permitted her to repurchase Cramton's ownership interest for $1 if Cramton voluntarily resigned. Later, in November 2017, Cramton began working for Kahala Brands Ltd. ("Kahala"), where her role was to promote the franchising of the "Blimpie" line of sandwich shops.

Cramton filed this lawsuit in December 2017. The operative 10-count complaint (Doc. 88) raises claims that can be grouped into the following four categories:

▪ **ADA Claims (Counts 1-3)**: Cramton contends she became disabled in April 2017, after being diagnosed with a brain aneurysm, yet the Corporate Defendants refused her request for an accommodation, retaliated against her, and subjected her to emotional abuse. Cramton thus contends her seeming resignation on September 25, 2017 was actually a constructive discharge.

▪ **Minimum Wage Claim (Count 4)**: Cramton contends she didn't receive any wages for her work for Defendants throughout 2017, in violation of Arizona's minimum wage statute. Nevertheless, in late 2017, Cramton received a W-2 statement stating GFL had paid her $25,000 in wages in 2017. Cramton contends the $25,000 didn't constitute wages (instead, it represented the partial repayment of a loan) and that Defendants improperly issued the W-2 in an attempt to evade liability on her wage claim.

▪ **Contract Claim (Count 5)**: Cramton contends she loaned over $66,000 to ECO in October 2016, to help fund the acquisition of a Grabbagreen franchise location, but has only received partial repayment on the note.

▪ **Tort And Contract Claims (Count 6-10)**: These claims all arise, in one form or another, from a phone call on September 18, 2017 during which Keely allegedly told Cramton that a planned sale of Grabbagreen to Kahala had fallen through and that Kahala would not be making any future offers. Cramton departed soon after receiving this information. In fact, Kahala ended up acquiring Grabbagreen in March 2018 for $2.675

million, and Cramton contends that Keely's statement during the phone call was false because Keely knew at the time that Kahala remained interested in an acquisition. Cramton thus seeks, under a variety of tort and contract theories, the portion of the Kahala acquisition proceeds she would have received if she hadn't left the company in September 2017.

Defendants deny these allegations and assert an array of counterclaims against Cramton. (Doc. 95.) In a nutshell, Defendants contend that Cramton violated a confidentiality and non-compete agreement, and engaged in unfair competition, by joining Kahala, an alleged competitor in the restaurant franchise industry; violated a contractual release of claims by bringing this lawsuit; and wrongfully interfered with their efforts to sell Grabbagreen to Kahala, causing the ultimate sale price to be at least $1 million lower than it should have been. Defendants' overarching theory is that Cramton impulsively resigned in September 2017, didn't realize she was forfeiting her 18.6% ownership interest by doing so, and concocted this lawsuit in an effort to recoup the $500,000 or so she would have earned from the Kahala acquisition if she'd stuck around instead of resigning. (*See, e.g.,* Doc. 143 at 5; Doc. 172 at 1.)

One of the key issues in this case is what, exactly, Cramton knew about Kahala's acquisition plans when she resigned. In addition to disputing Cramton's characterization of what Keely said during the fateful phone call on September 18, 2017—according to Defendants, Keely merely told Cramton that Kahala had declined to accept a particular offer and didn't say the overall deal was dead—Defendants contend that Cramton had friends within Grabbagreen and Kahala who were secretly feeding her information about Kahala's plans. (This theory, if true, would undermine Cramton's suggestion that she detrimentally relied on Keely's purported statement.) In Defendants' view, the evidence of these communications should have been found on Cramton's company-issued computer and cell phone. Unfortunately, around the time of her departure, Cramton brought both devices to a third-party data vendor in an attempt to have them "wiped." Much ink has been spilled over what consequences, if any, should flow from that decision.

## II. Relevant Procedural Background

On December 13, 2018, Defendants deposed Cramton. (Doc. 107.) Afterward, Defendants filed a motion seeking authorization to conduct three additional hours of examination. (*Id.*)

On December 28, 2018, the Court issued an order denying Defendants' request. (Doc. 108.)

On February 22, 2019, Defendants filed a motion for reconsideration, arguing, *inter alia*, that Cramton had submitted declarations following her deposition that contradicted her deposition testimony and her MIDP disclosures. (Doc. 136.)

On March 1, 2019, Cramton filed a motion for partial summary judgment. (Doc. 142.) It seeks summary judgment on Count 4 (the minimum wage claim), on Count 5 (the breach-of-contract claim pertaining to the promissory note), on whether the Corporate Defendants comprise an "integrated enterprise" for purposes of Counts 1-3 (the ADA claims), and on all of Defendants' counterclaims, which Cramton contends were "only asserted for purposes of maliciously imposing additional litigation costs against [her]." (*Id.* at 2-3.) This motion appeared to become fully briefed on April 16, 2019. (Docs. 158, 171.)

Separately, on March 1, 2019, Defendants filed their own motion for summary judgment. (Doc. 143.) It seeks summary judgment on all of Cramton's claims except Count 5 (the breach-of-contract claim pertaining to the promissory note). This motion also appeared to become fully briefed on April 16, 2019. (Docs. 159, 172.)

On April 30, 2019, the Court issued an order granting Defendants' motion for reconsideration and authorizing Defendants to re-depose Cramton for three hours on certain topics. (Doc. 175.)

On May 21, 2019, the renewed deposition took place. (Doc. 184 at 1.)

On June 3, 2019, and seemingly in response to the testimony she had provided during the renewed deposition, Cramton filed a motion to withdraw her "request for summary judgment with respect to the amount of damages ($56,499) claimed in support of her minimum wage claim." (Doc. 184.) This unopposed request was later granted. (Doc.

203 at 1.)

On June 20, 2019, Defendants notified the Court of their desire to file a sanctions motion against Cramton based upon her alleged spoliation of evidence. (Doc. 197.) The following day, after holding a hearing, the Court authorized Defendants to file such a motion. (Doc. 195.)

On July 12, 2019, Defendants filed a motion to supplement their summary judgment motion, as well as their response to Cramton's summary judgment motion, to include certain admissions Cramton had made during her renewed deposition. (Doc. 200.) That motion became fully briefed on July 22, 2019. (Docs. 202, 205.)

On July 22, 2019, Defendants filed their sanctions motion. (Doc. 206.) Among other things, it seeks dismissal of most of the counts in Cramton's complaint. (*Id.* at 19.) That motion appeared to become fully briefed on August 30, 2019. (Docs. 216, 221.)

On July 28, 2019, Cramton submitted an errata sheet concerning the testimony she had provided during her renewed deposition. (Doc. 220-1.)

On August 30, 2019, Kelli (who, by this point, had begun representing herself pro se, *see* Doc. 178) filed a motion to strike Cramton's errata sheet under the theory that the proposed changes were not mere errata, but substantive changes intended to bolster her litigation position. (Doc. 220.) That motion became fully briefed on September 19, 2019. (Docs. 225, 228.) And during oral argument, the remaining Defendants joined Kelli's motion.

On November 1, 2019, Cramton filed a motion for leave to file a surreply to Defendants' sanctions motion. (Doc. 229.) That motion became fully briefed on November 15, 2019. (Docs. 230, 231, 232.)

On December 10, 2019, the Court issued a tentative ruling addressing the parties' six pending motions. (Doc. 238.)

On December 16, 2019, the Court heard oral argument on the motions. (Doc. 241.)

On December 20, 2019, Cramton submitted a supplemental brief concerning one of her ADA claims. (Doc. 243.)

**DISCUSSION**

Before addressing the parties' cross-motions for summary judgment, the Court will resolve the other pending motions. This approach is necessary because the resolution of those motions may narrow, or moot, the summary judgment arguments.

I.    Defendants' Motion To Supplement The Record (Doc. 200)

As noted, Cramton's initial deposition took place on December 13, 2018, but the Court later authorized Defendants to pursue three additional hours of deposition time. (Doc. 175.) The renewed deposition took place on May 21, 2019, and Defendants then moved to supplement their motion for summary judgment, as well as their response to Cramton's motion for summary judgment, with certain testimony from the May 21 deposition. (Doc. 200.) Cramton opposes the motion on the ground that Defendants are attempting "to supplement the summary judgment record with unrelated information that was within their custody and control at the time the summary judgment briefing was filed." (Doc. 202.) Cramton also argues "there is no need to supplement the summary judgment record with respect to the number of hours worked claimed because Ms. Cramton already moved to withdraw that portion of her summary judgment record. (Doc. #184). That motion was unopposed by the Grabbagreen defendants." (*Id.*)

Defendants' motion will be granted. Cramton has not demonstrated that the information Defendants seek to add to the record was available to them at the time of the initial summary judgment briefing and the Court can decide for itself whether the newly added information is relevant to its analysis.

II.   Defendants' Motion For Sanctions (Doc. 206)

Defendants move for sanctions due to Cramton's alleged failure to preserve and produce certain electronically stored information ("ESI")—specifically, text messages and voicemails—pertaining to four witnesses: (1) John Wuycheck, a current employee of Kahala; (2) Jeff Farnell, a former employee of GFL; (3) Todd Cable, another former employee of GFL; and (4) Adrienne Savone, Cramton's niece. (Doc. 206.)

…

## A. **Underlying Facts**

### 1. Cramton's anticipation of litigation

On multiple occasions between April 2017 and September 2017, Cramton consulted with attorneys about matters related to her employment. On April 17, 2017, Cramton spoke with an attorney, Grabbagreen's outside counsel Juliet Peters, about how to request FMLA leave from Defendants. (Doc. 199-1 at 29-30.) In response, Ms. Peters advised Cramton to "[i]nsulate yourself" by obtaining a doctor's note and further advised Cramton to speak with a different attorney, Catherine Pearson. (Doc. 199-1 at 29-30.) That same day, Cramton spoke with Ms. Pearson, who provided advice concerning how to submit a reasonable accommodation request to Defendants. (Doc. 199-1 at 27.) Cramton later thanked Ms. Peters for referring her to Ms. Pearson, stating: "She's awesome. . . . She gave me some great advice and sent me an email indicating what I might want to say to Keely." (Doc. 199-1 at 30.)

Next, on June 16, 2017, Cramton told her therapist that, because she was "unsure of whether [her] partner/boss will distribute her %," she "is hiring an employment lawyer." (Doc. 199-1 at 42.) And on June 23, 2017, Cramton consulted with a third attorney, Shelley DiGiacomo, and was told to "make notes" of calls with Keely because such notes "may be useful to a litigator in the future." (Doc. 199-1 at 36.)

On September 19, 2017, Cramton corresponded with Ms. DiGiacomo about how to submit a demand to Defendants for repayment of an overdue note and how to obtain one month's worth of severance pay upon resigning. (Doc. 199-1 at 9.) Following this discussion, Cramton texted her spouse that "I spoke with my attorney today and I am going to quit." (Doc. 199-1 at 10.) Finally, on September 22, 2017, Ms. DiGiacomo drafted Cramton's resignation letter, which Defendants received on September 24, 2017 and which stated that "Ms. Cramton is resigning her position [with GFL] and its related entities effective September 25, 2017." (Doc. 199-1 at 12.)

### 2. The company-issued cell phone and computer

While she was employed by Defendants, Cramton used a company-issued cell

phone and company-issued computer. (Doc. 199-1 at 74.) On September 24, 2017—the same day she submitted her resignation letter—Cramton purchased a new cell phone and went to the Verizon store to set it up. (Doc. 199-1 at 75-81.) Cramton also brought her company-issued cell phone to the store. (*Id.*) While there, Cramton arranged for a store employee to transfer all of the data, pictures, contacts, text messages, and e-mails from the old phone to the new phone. (*Id.* at 80-81.)

On September 25, 2017, the day after receiving Cramton's resignation letter, Defendants sent a response to Ms. DiGiacomo. (Doc. 19-1 at 14-15.) Among other things, this letter included a "demand that [Cramton] immediately return all Grabbagreen property of any nature whatsoever to Grabbagreen, including . . . the computer [and] cell phone . . . . [A]ll data on the cell phone or sent using that company device belongs to Grabbagreen." (*Id.* at 14.)

On September 26, 2017, Cramton contacted Carl Wilson, a representative of a company called P.C. Guru, to explain that "I've left Grabbagreen so I . . . need to reset the Mac[intosh computer] I had before I turn it in." (Doc. 199-1 at 24.)

On September 27, 2017, Cramton met with Mr. Wilson. The invoice from that meeting states that Cramton paid $350 for Mr. Wilson to "move data" from her company-issued computer and to "clean up and erase" her company-issued cell phone. (Doc. 199-1 at 101.) In her declaration (and during her deposition), Cramton explained that she only asked Mr. Wilson to save the emails between herself and Keely that were contained on the computer, without requesting a backup of the entire hard drive, but Mr. Wilson ended up making a complete backup copy (which she didn't realize until later). (Doc. 199-1 at 39 ¶¶ 10-11; Doc. 216-1 at 45-46.)

That same day, Ms. DiGiacomo sent a response letter to Defendants. (Doc. 199-1 at 98.) Among other things, this letter promised that Cramton would return her company-issued cell phone and computer by September 29, 2017. (*Id.*)

        3.   The ESI-related demands and correspondence

On April 20, 2018, Defendants provided Cramton with their initial disclosure

pursuant to the Court's mandatory initial disclosure pilot program ("MIDP"). (Doc. 216-1 at 60-82.) Defendants' disclosure identified 23 witnesses as "likely to have discoverable information relevant to any party's claims and defenses." (*Id.* at 61-67.) Among the named individuals were Wuycheck, who was expected to possess information concerning "[h]is conversations with Kim Cramton on September 22, 2017 and at other times related to Kahala's Grabbagreen acquisition" (*id.* at 62), and Farnell and Cable, former GFL employees who were expected to possess information concerning "Cramton's work schedule and her HR role" (*id.* at 66). Defendants' MIDP disclosure did not, in contrast, identify Savone as a person who likely possessed discoverable information. In addition, Defendants' MIDP disclosure did not specifically state that the text messages on Cramton's cell phone needed to be preserved.

On May 2, 2018, Cramton's counsel provided Defendants' counsel with a draft ESI agreement. (Doc. 216-1 at 85-97.) Among other things, this draft agreement provided that Cramton "do[es] not have a significant volume of ESI relevant to this dispute," that "[t]he bulk of Ms. Cramton's relevant email correspondence is either in the possession and control of Defendants (her former employer) or non-party Kahala Brands (her current employer)," that Cramton "has preserved on a hard drive her email correspondence [with Keely]," and that Cramton "agrees to turn over this hard drive" but "[a]ll remaining production of documents by [Cramton] will proceed through the typical (non-ESI) procedures." (*Id.* at 92.) It appears that Defendants never responded to this email, so the draft ESI agreement was never finalized.

On June 19, 2018, Cramton offered to provide Defendants with all of the emails involving Keely that she had saved from her company-issued computer. (Doc. 216-1 at 99 ["[T]he hard drive is simply a [sic] imaged copy of all of Kim Cramton's emails with Keely . . . . We have repeatedly offered to [produce the hard drive], but you have not accepted that offer."].)

On June 20, 2018, Defendants responded by stating that Cramton "has not produced anything related to the hard drive that [she] copied and then returned wiped. We are

requesting that [Cramton] have a forensic person take possession of the hard drive copy she made and run a directory of all files on the hard drive.  Once we have a copy of the directory files, then we can discuss with you what should be produced."  (Doc. 216-1 at 103.)

On August 8, 2018, Defendants served Cramton with a request for production ("RFP") seeking all communications with Wuycheck, Cable, or Farnell "related to Defendants or [Cramton] or the Grabbagreen business . . . from January 2, 2016 to the present."  (Doc. 216-1 at 120.)  At some unspecified point after receiving this RFP, Cramton contends she "produced the texts in her phone with these individuals she could locate, regardless of relevance."  (Doc. 216 at 6.  *See also* Doc. 199-1 at 40 ¶ 14 [Cramton's declaration of January 4, 2019, stating "I have produced every text message that I have in my personal phone from the recipients that Defendants requested."].)  The parties' briefs do not identify, with precision, how many such texts were produced or the date on which the production occurred.

On September 12, 2018, Cramton's counsel informed Defendants' counsel that "there are many more files on the hard drive that we previously thought, due to the fact that backups were performed that Ms. Cramton did not request or anticipate.  I personally didn't realize that these backups were on the hard drive before we sent it to our vendor for imaging."  (Doc. 216-1 at 110.)  Given the volume of documents contained on the hard drive, Cramton's counsel offered to immediately "turn over the entire hard drive to [Defendants]," as opposed to reviewing the hard drive and then only producing the subset of documents deemed discoverable by Cramton's counsel.  (*Id.*)  The following day, the complete hard drive was produced to Defendants.  (Doc. 142-7 at 2 [delivery receipt].)

On November 7, 2018, Defendants served Cramton with an RFP seeking all communications with Savone "related to Defendants or [Cramton] or the Grabbagreen business . . . from January 2, 2016 to the present."  (Doc. 216-1 at 124-25.)  Cramton contends she responded to this request by "produc[ing] every text message . . . in [her] personal phone" with Savone.  (Doc. 199-1 at 40 ¶ 14.)

That same day, Defendants served a Rule 45 subpoena on Savone seeking all of her communications "concerning or relating to Keely Newman, Kell[i] Newman, Kim Cramton, [Cramton's spouse], and/or the Grabbagreen companies . . . from January 1, 2016 to the present." (Doc. 216-1 at 127-32.) In response, Savone apparently "produced some texts with Cramton and [Cramton's spouse]." (Doc. 216 at 5.)

Finally, on November 7, 2018, Defendants also served a Rule 45 subpoena on Farnell seeking, *inter alia*, all "text messages . . . you had with Kim Cramton from April 1, 2017 to the present date." (Doc. 216-1 at 133-39.) On December 5, 2018, Farnell responded to the subpoena by stating that "I have searched my personal email account and text messages between the dates of December 1, 2016 and today" and "I have no communications with [Cramton] . . . regarding the relationship between [Cramton] and Keely or the lawsuit between [Keely and Cramton]." (Doc. 216-1 at 141-42.)

### 4.   The depositions

As noted, Defendants' motion for sanctions focuses on Cramton's alleged failure to preserve ESI pertaining to four witnesses: Wuycheck, Farnell, Cable, and Savone.

Defendants did not depose three of those witnesses. They never noticed the depositions of Cable and Savone. As for Farnell, although Defendants initially noticed his deposition for December 2018, they informed Cramton a few days beforehand that they wished to "temporarily vacat[e] the deposition[] of . . . Farnell until we can get the document production issues resolved" (Doc. 216-1 at 162) and never rescheduled it.

Wuycheck testified during his deposition that he received a text message from Cramton on September 22, 2017. (Doc. 199-1 at 85-86.) In Defendants' view, this was a critical text message because of its timing—it was sent four days after the disputed phone call between Keely and Cramton and two days before Cramton submitted her resignation letter. (Doc. 206 at 10-11; *see also* Doc. 220 at 3-4 [Defendants' argument that "Cramton could not reasonably or justifiably rely on a statement purportedly made by Keely Newman on the September 18, 2017 call given Cramton's demonstrated ability to get information directly from other sources, specifically her direct back channel communications with

Kahala's lead contact Wuycheck"].)

On May 20, 2019, Defendants disclosed the text message logs for Cramton's company-issued cell phone. (Doc. 216-2 at 3.) Cramton contends (Doc. 216 at 9-10)—and Defendants initially didn't dispute[2]—that these logs show that Cramton and Wuycheck engaged in a single, two-minute-long phone call on September 22, 2017 but didn't exchange any text messages on that date.

On May 21, 2019, Cramton sat for her renewed deposition. During this session, Cramton initially denied ever communicating via text with Wuycheck. (Doc. 199-1 at 84 ["I don't think I even had individual text messages with John Wuycheck."].) However, after being shown Wuycheck's deposition transcript, Cramton stated that she did recall texting Wuycheck on September 22, 2017, and further stated that the text merely stated that "I wanted to talk to him." (Doc. 199-1 at 88.)

On June 11, 2019, Cramton's counsel informed Defendants' counsel via email that Cramton's deposition testimony on this point was inaccurate. (Doc. 216-4 at 2 ["Ms. Cramton believes, after further reflection, that her communication with Mr. Wuycheck on the date in question was by voicemail, not by text message."].) And in an errata sheet submitted on July 28, 2019—which is the subject of a motion to strike that is addressed in Part IV below—Cramton sought to change her deposition testimony on this point to reflect that "I believe it was a call not a text." (Doc. 220-1 at 2.)

B.    **Analysis**

Defendants seek sanctions against Cramton pursuant to Rules 37(e)(1) and (e)(2) of the Federal Rules of Civil Procedure. (Doc. 206 at 2.)

Rule 37(e) was "completely rewritten" in 2015 to "provide[] a nationally uniform standard for when courts can give an adverse inference instruction, or impose equally or more severe sanctions, to remedy the loss of ESI." *See generally* S. Gensler, 1 Federal

---

[2]    In their reply, Defendants didn't dispute the factual accuracy of Cramton's characterization of the phone records—they simply argued it would be unfair to allow Cramton to change her sworn testimony "based on her and her attorneys['] review of AT&T records." (Doc. 221 at 8.) However, in later filings and during oral argument, Defendants sought to develop different arguments. *See* Part II.B.1.a below.

Rules of Civil Procedure, Rules and Commentary, Rule 37, at 1070 (2018).  The text of Rule 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

*Id.*

A party seeking sanctions under Rule 37(e) has a threshold duty to show that the ESI at issue was, in fact, lost or destroyed.  *Id.*, advisory committee note to 2015 amendment ("The new rule applies only . . . when [ESI] is lost.").  If such a showing has been made, the court then must determine whether "(1) [the opposing party] failed to preserve . . . ESI 'that should have been preserved' in anticipation or conduct of litigation; (2) the information was lost because [the opposing party] failed to take reasonable steps to preserve it; (3) the ESI cannot be restored or replaced through additional discovery; and (4) the [party seeking sanctions] was prejudiced by the loss." *Fed. Trade Comm'n v. DirecTV, Inc.*, 2016 WL 7386133, *3 (N.D. Cal. 2016).

### 1.    Threshold issue: was any ESI lost?

Although Defendants place heavy emphasis on the fact that Cramton arranged to have her company-issued computer and cell phone "wiped" before returning them, Rule 37(e) doesn't authorize sanctions against litigants who attempt, without success, to delete ESI.  *See* Gensler, *supra*, at 1071 ("The requirement that information be lost means that Rule 37(e) does not address cases where intentional spoliators fail to achieve their intended

purpose."). Here, Mr. Wilson (the computer technician from P.C. Guru) made a backup of Cramton's hard drive, even though she hadn't requested one, and Cramton produced that hard drive to Defendants after it was discovered midway through this case. Moreover, the evidence shows that Cramton attempted to transfer the complete contents of her company-issued cell phone onto her new cell phone, and Cramton stated in her declaration that she has produced all of the texts with Wuycheck, Farnell, Cable, and Savone that were saved onto her new phone.[3] Thus, unless Defendants can show that some text messages were lost during the hard drive backup process and/or that Cramton's claims about her efforts to retrieve and produce text messages from her phone are inaccurate, Rule 37(e) sanctions are unavailable.

### a. Defendants' evolving theories

The process of assessing how much (if any) ESI is missing has been complicated by the fact that Defendants' theories and allegations on this issue have changed over time. In their motion, although Defendants complained generally about the loss of "relevant evidence" (Doc. 206 at 6-8), they ultimately focused on Cramton's communications with four witnesses—Wuycheck, Farnell, Cable, and Savone—and purported to identify a specific number of missing ESI communications pertaining to each witness (*id.* at 10-15). Defendants also explained they were relying primarily on two techniques—"independent forensic analysis[4] and a painstaking review of cell phone records" (*id.* at i)—to prove these communications were missing.

As discussed in Part II.B.1.b below, Defendants' initial efforts to prove the existence

---

[3] Cramton similarly testified during her renewed deposition that she didn't delete any texts from Farnell, Cable, or Savone at any point in 2017. (Doc. 216-1 at 50-52.) However, Cramton later submitted an errata sheet—which is the subject of a motion to strike—stating that she may have deleted some text messages from Farnell and Cable unrelated to the case. (Doc. 216-1 at 58.)

[4] Defendants retained an expert, John Forames, to conduct a forensic examination of the backup hard drive from Cramton's work-issued computer. Although Mr. Forames was able to recover certain other forms of ESI from the backup drive, he was unable to recover any text messages from between December 2, 2016 and April 5, 2017, or from after August 12, 2017. (Doc. 199-1 at 105 ¶ 12.) As for the period between April 6, 2017 and August 12, 2017, Mr. Forames was apparently able to recover 329 text messages between Cramton and Farnell. (Doc. 206 at 11 n.4.)

of missing ESI largely fell flat because Cramton was able, upon receipt of Defendants' motion, to belatedly locate and produce many of the allegedly missing text messages. As a result, Defendants argued for the first time, in a footnote in their reply brief, that they could actually prove the existence of missing text messages in a different way—by proffering a declaration from Kelli (who acknowledged during oral argument that she is not a computer expert) to establish that certain types of text messages sent on an iPhone never show up in the monthly call logs. (Doc. 221 at 10 n.5, citing Doc. 221-1 at 62 ¶¶ 31-32.)[5] Additionally, although Defendants didn't include a request for an evidentiary hearing in their motion, they made such a request in their reply (Doc. 221 at 2) and renewed that request during oral argument.

The Court will not consider the new arguments raised for the first time in Defendants' reply and will decline to hold an evidentiary hearing. It is hornbook law "that issues cannot be raised for the first time in a reply brief." *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007). Moreover, in this case, the Court specifically instructed Defendants, during a pre-motion hearing (Doc. 195), that their motion should focus "very specifically" on what ESI was allegedly deleted. After Defendants filed their motion, which appeared to identify with precision the universe of allegedly missing ESI, Cramton expended substantial time and resources responding to those arguments and showing that much of the missing material wasn't, in fact, missing. It would be improper under these circumstances to allow Defendants to belatedly raise new claims and theories in their reply to Cramton's response. As one court put it: "Barring extraordinary circumstances, both the opposing party and the court are entitled to rely on the movant's opening brief as a conclusive statement of its position on the claims targeted by the motion. Both efficiency, and fairness to one's adversary, militate in favor of requiring a movant's opening brief to

---

[5]     Defendants also filed later briefs, in support of different motions, elaborating upon this theory. (Doc. 228 at 2 n.1 ["Text messages identified in cell phone records like the AT&T records in this case, only capture and list SMS and MMS text messages. Several key parties have iPhones or used the iMessage app including Cramton, Wuycheck, Farnell and Juliet Peters. AT&T records do not contain logs of iMessages which are text messages in blue bubbles."].)

identify with certainty *all* the arguments and evidence which the movant believes supports his position." *International-Matex Tank Terminals-Illinois v. Chemical Bank*, 2009 WL 2423756, *7 (S.D. Ill. 2009).

This is, in some respects, an unsatisfying outcome because it remains possible that key ESI may be missing. Additionally, Cramton is not blameless in this affair because her decision to attempt to wipe her company-issued devices was the catalyst for all of the spoliation-related litigation that has ensued. Nevertheless, the Court does not have the time or resources to allow Defendants to keep advancing new claims and theories in successive briefs and hearings until one eventually prevails. It was incumbent upon Defendants (particularly under the procedural circumstances of this case) to raise all of their best arguments in their initial motion and the Court will accordingly limit its consideration to the arguments contained therein.

b.    **The allegedly missing ESI**

▪ <u>Wuycheck</u>. Defendants' motion asserts there is one missing Wuycheck text message, which was sent on September 22, 2017. (Doc. 206 at 10-11.) The sole evidence identified in the motion to prove the existence of this missing message is Wuycheck's and Cramton's deposition testimony. (*Id.*)

This argument is unavailing. Although Wuycheck stated during his deposition that he texted with Cramton on September 22, 2017, and although Cramton initially gave similar testimony during her deposition, the phone records state the only communication between Wuycheck and Cramton on that date was a phone call. Accordingly, Cramton has now corrected her deposition testimony to reflect that the September 22, 2017 communication with Wuycheck wasn't a text. The Court thus concludes that Wuycheck and Cramton likely misspoke during their depositions when describing the September 22, 2017 communication as a text, that the communication was likely a phone call, and that Defendants therefore haven't proved that any ESI related to Wuycheck has been lost.

▪ <u>Farnell</u>. Defendants' motion contends there are 738 missing Farnell text messages and three missing Farnell voicemail messages. (Doc. 206 at 14-15.) The motion uses two

different methods to calculate these figures. First, Defendants rely on extrapolation—they contend that because their forensic expert was able to recover 329 Farnell text messages from Cramton's backup hard drive, which spanned a roughly four-month period in mid-2017, this shows that Cramton and Farnell "averaged 82 texts per month" and that the duo therefore probably exchanged 738 additional text messages during "the remaining 9 months in the relevant period of this lawsuit." (*Id.* at 14 n.4.)[6] Second, Defendants also contend the phone records from Cramton's company-issued cell phone show she exchanged eight text messages with Farnell between August 18, 2017 and September 24, 2017, which have never been produced, and that the phone records from the personal cell phone Cramton obtained after leaving the company show that she deleted three voicemails from Farnell between September 25, 2017 and December 14, 2017, which also haven't been produced. (Doc. 206-1 at 28.)[7]

In her response, Cramton argues that Defendants' extrapolation theory is "completely speculative" and that they have identified, at most, eight text messages that weren't originally produced. (Doc. 216 at 11-12.) She further contends she was able to locate seven of those messages after receiving Defendants' motion, which are enclosed as exhibits to her response (Doc. 216-4 at 14-48), and argues the only reason she had trouble identifying them earlier was because they are group texts with multiple recipients (including, on one occasion, Keely). (Doc. 216 at 11.) As for the three missing voicemails, Cramton acknowledges she hasn't been able to recover them but contends that "voicemails often must be deleted by the user to keep the mailbox from filling up" and that the three voicemails at issue were "received long before [Cramton] was ever on notice that she might have an obligation to preserve such messages." (Doc. 216 at 12 n.11.)

---

[6] It should be noted that the summary chart provided as an attachment to Defendants' motion states that 305 text messages with Farnell were recovered from Cramton's backup hard drive. (Doc. 206-1 at 28.) Defendants don't explain the seeming discrepancy between this figure and the 329 figure discussed in their motion.

[7] Although the exhibit to Defendants' motion also identifies two voicemail messages from Farnell that were allegedly destroyed by Cramton's spouse (Doc. 206-1 at 28), Defendants do not develop any argument or cite any authority suggesting that a party may be sanctioned under Rule 37(e) based on the conduct of a third party.

The Court agrees with Cramton that Defendants' extrapolation theory is too speculative to prove the existence of any missing text messages. Also, Defendants' summary of the phone records revealed the existence of only eight missing text messages, and seven of those messages have now been located and produced. Accordingly, Defendants have only proved the existence of one lost Farnell text message (dated August 29, 2017) and three lost Farnell voicemail messages.

▪ Cable. Defendants' motion contends there are 32 missing Cable text messages. (Doc. 206 at 15.) They derive this figure through subtraction—specifically, they contend that Cramton's phone records show she exchanged 58 texts with Cable from May 3, 2017 through September 24, 2017, but she only produced 26 such messages during discovery, so the remaining 32 must have been improperly deleted. (*Id.*)

In her response, Cramton argues that three of the "missing" text messages were group texts involving herself, Farnell, and Cable that have now been located and produced; that Defendants already had six of the "missing" text messages (which are Bates stamped) at the time they filed their motion; that she was able to locate an additional 14 texts involving Cable after Defendants filed their motion; and that "[o]f the remaining nine texts that Cramton could not locate, seven come from a series of texts between 8:46am and 8:58am on June 28, 2017" and the "two remaining texts [were on] 8:44pm and 9:06pm on July 26, 2017." (Doc. 216 at 14.)

The Court thus concludes that Defendants have only proved the existence of nine lost Cable text messages, all of which were sent in June or July 2017.

▪ Savone: Defendants' motion contends there are 444 missing Savone text messages. (Doc. 206 at 16-18.) To support this figure, Defendants rely on a pair of summary charts attached as Exhibits AA and BB to their motion (Doc. 206-1 at 39-69), which purportedly show that although Cramton produced an unspecified number of her text messages with Savone, "at least 444 text messages with Savone are missing from *within* the text strings [Cramton] produced." (Doc. 206 at 16-17, emphasis in original.)

In her response, Cramton argues the summary charts are "a defendant-prepared

document for which no underlying AT&T documents or any other evidentiary support has been produced," that the chart appearing at Exhibit AA reflects the existence of only 270 missing text messages, not 444, and that Defendants assured her "that Exhibit BB is merely a breakdown of [Exhibit] AA by month." (Doc. 216 at 14 & n.4.) Cramton further contends that, of the 270 messages identified in Exhibit AA, only 41 were sent between her phone number and Savone's number. (*Id.*) Cramton also contends she wasn't required to preserve those 41 messages because they were from February and March 2017 (well before litigation was anticipated) and that she also wasn't required to produce those text messages in response to Defendants' RFP, because it only sought the Cramton/Savone text messages that touched upon certain subject areas and many of the 41 text messages didn't address those subjects. (*Id.* at 14-15.) Finally, Cramton contends that, notwithstanding all of that, she was able to locate 34 of the 41 purportedly missing messages after receiving Defendants' motion and none of them has any relevance to this litigation. (*Id.* at 15.)

In their reply, Defendants begin by noting that Cramton only analyzed the missing text messages identified in their first summary chart, Exhibit AA (*see* Doc. 206-1 at 39-46), and ignored their second summary chart, Exhibit BB (*see* Doc. 206-1 at 47-69). (Doc. 221 at 9.) Thus, although Defendants don't dispute Cramton's contention that Exhibit AA only reveals the existence of 41 missing text messages and that 34 of those text messages had now been recovered, they contend these figures are "deliberately misleading" because they are "based on the reading of only one exhibit." (*Id.*)[8] In a different brief, Defendants calculate the total number of missing Savone texts (*i.e.,* the seven in Exhibit AA that Cramton still hasn't been able to identify, plus all of the texts identified as "missing" in Exhibit BB) as around 187. (Doc. 228 at 3.) Finally, and more broadly, Defendants argue that Cramton violated the discovery rules by "silently" withholding or redacting some of the Savone text messages on relevance grounds without disclosing that she was doing so.

---

[8]     In a different brief, submitted weeks after the briefing on the sanctions motion was completed, Defendants belatedly attempted to dispute Cramton's contention that their first summary chart only identified 41 missing Savone texts. (Doc. 228 at 3.) The Court will not consider this argument because of its untimeliness.

(Doc. 221 at 9.)

The omissions in both parties' briefs concerning the Savone text messages create an odd record. On the one hand, Cramton has persuasively demonstrated (and Defendants don't seem to seriously dispute) that the number of purportedly missing text messages identified in Exhibit AA is overstated and that this chart reveals, at most, the existence of only seven missing messages. On the other hand, even though Exhibit BB may be marred by some of the same errors of overinclusion that Defendants made when creating Exhibit AA, Cramton didn't address Exhibit BB in her response. Accordingly, the Court will simply accept, for present purposes, that Exhibit BB is accurate.[9] Thus, the Court will assume that Defendants have proved the existence of a total of 187 missing Savone text messages.

### 2. Duty to preserve

To summarize, Defendants have not proved the existence of any lost Wuycheck text messages but have proved the existence of one lost Farnell text message, three lost Farnell voicemails, and nine lost Cable text messages. Additionally, the Court assumes that 187 Savone text messages are missing. Thus, the next step under Rule 37(e) is to determine whether Cramton had a duty to preserve those materials. *Id.* (sanctions available if the lost ESI "should have been preserved in the anticipation or conduct of litigation").

### a. **The reasonable foreseeability of litigation**

As the Ninth Circuit has explained, parties "engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citation omitted). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party

---

[9] The Court disagrees with Defendants' assertion that Cramton engaged in discovery-related misconduct by declining to produce text messages with Savone that she concluded, after review, were irrelevant. Defendants' position seems to be that, under the MIDP, Cramton was automatically required to produce all non-privileged text messages with relevant witnesses, irrespective of their relevance. (Doc. 221 at 9.) But the applicable provision of the MIDP only compels the production of information a party "believe[s] may be relevant to any party's claims or defenses." D. Ariz. G.O. 17-08(B)(3).

in the same factual circumstances would have reasonably foreseen litigation." *Waymo LLC v. Uber Techs., Inc.*, 2018 WL 646701, *14 (N.D. Cal. 2018) (quotation omitted).

As discussed in Part II.A.1 above, litigation was clearly on Cramton's mind at the time she submitted her resignation letter on September 24, 2017. By that time, she had been consulting with several different attorneys about possible litigation against Defendants and had even been told by one of those attorneys to start documenting her interactions with Keely because her notes might have future value "to a litigator." Accordingly, Cramton had a duty to take reasonable steps to preserve ESI pertaining to her potential claims against Defendants by mid-September 2017. Thus, she cannot avoid liability for the loss of the three Farnell voicemails (which she received between September 25, 2017 and December 2017) solely on the ground that litigation wasn't reasonably anticipated at the time she received and deleted them.

The Court reaches the same conclusion regarding the missing Cable text messages, which were sent on June 28, 2017 and July 26, 2017, and the missing Farnell text message, which was sent on August 29, 2017. All of those communications occurred after Cramton had been advised by Ms. DiGiacomo on June 23, 2017 to start documenting her interactions with Keely. Accordingly, Cramton cannot avoid liability for the loss of the Cable and Farnell text messages solely on the ground that litigation wasn't reasonably anticipated at the time those messages were sent, received, and/or lost.

The analysis concerning the missing Savone text messages is more nuanced. On the one hand, all seven of the missing messages identified in Exhibit AA were exchanged in February or March 2017, and the first six pages of Exhibit BB (Doc. 206-1 at 48-53) identify text messages sent between December 2016 and early March 2017. This was before litigation was reasonably anticipated by Cramton—indeed, the first interactions proffered by Defendants to show that Cramton was gearing up for litigation (her discussions with Ms. Peters and Ms. Pearson about how to submit FMLA and reasonable accommodation requests) didn't occur until April 2017. Thus, Defendants cannot seek sanctions against Cramton under Rule 37(e) based on those missing texts. *See* Fed. R. Civ.

P. 37(e), advisory committee note to 2015 amendment ("The rule does not apply when information is lost before a duty to preserve arises.").

On the other hand, the remaining pages of Exhibit BB (Doc. 206-1 at 54-69) purport to identify text messages exchanged by Cramton and Savone between mid-March 2017 and September 2017. Litigation may have been reasonably anticipated by Cramton at the time of some or all of those communications.

### b. The reasonable foreseeability that communications with Farnell, Cable, and Savone might be relevant

The duty-to-preserve analysis as to Farnell, Cable, and Savone also has a different dimension. It's not enough that litigation was generally being anticipated by Cramton at the time those communications took place and were lost. Instead, the Court also must assess whether Cramton should have reasonably anticipated that her communications with those particular individuals might be relevant to the anticipated litigation. *See* Fed. R. Civ. P. 37(e), advisory committee note to 2015 amendment ("Courts should consider the extent to which a party was on notice that litigation was likely *and that the information would be relevant*. . . . [T]he scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.") (emphasis added).

The Court concludes it wasn't reasonably foreseeable to Cramton in June and July 2017 that her text messages with Cable might be relevant in a future lawsuit. None of Cramton's affirmative claims against Defendants have anything to do with Cable—he was merely a co-worker and had no involvement in responding to her medical-related needs and issues, choosing whether to pay her wages, or structuring her promissory note with ECO. Additionally, the text messages at issue were sent months before the Kahala deal even became an issue. Tellingly, Defendants didn't even bother to notice Cable's deposition in this case, and their sole argument why Cable might have relevant information is that the GFL office in which Cramton and Cable both worked was small and Cramton didn't have many other co-workers. (Doc. 206 at 15.)

Similarly, it wouldn't have been reasonably foreseeable to Cramton during the later stages of 2017 or early 2018 that her communications with Savone might be relevant. Savone wasn't affiliated with Grabbagreen in any capacity—she is Cramton's niece—and Defendants didn't list Savone as a potential witness in their initial MIDP disclosure, which was prepared in April 2018. (Doc. 216-1 at 60-82.)

In contrast, it should have been foreseeable to Cramton that her communications with Farnell might be relevant in a future lawsuit. Those communications took place later than the Cable communications (the Farnell text message was sent on August 29, 2017 and the three voicemails were sent between September 25, 2017 and December 2017), at a time when the prospects for litigation were far more imminent. Additionally, Defendants have submitted evidence that Cramton's spouse may have referred to Farnell as Cramton's "mole" within Grabbagreen. (Doc. 206-1 at 30.) This distinguishes Farnell from Cable, who was a mere co-worker.

### 3. Reasonable steps to preserve

Because Defendants have demonstrated the loss of one Farnell text message and three Farnell voicemail messages, and the Court has further determined that Cramton had a duty to preserve those materials, the next step under Rule 37(e) is to assess whether the loss occurred "because [Cramton] failed to take reasonable steps to preserve [them]." *Id*.

The answer to this question is yes. This isn't a case where the materials were lost due to reasons outside Cramton's control. *Id.*, advisory committee note to 2015 amendment ("[T]he rule . . . is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve. For example, . . . information the party has preserved may be destroyed by events outside the party's control—the computer room may be flooded, a 'cloud' service may fail, a malign software attack may disrupt a storage system, and so on."). To the contrary, although Cramton did take steps to preserve text messages that might be relevant to this case—she asked the employee at the Verizon store to transfer all of the text messages from her old phone to her new phone—it is unclear why the August 29, 2017 text with Farnell was lost despite this transfer effort. The most likely explanation

1    is that she deleted this particular text message at some point, which is inconsistent with a

2    reasonable attempt to preserve data.

3        Similarly, with respect to the three Farnell voicemails, Cramton seems to

4    acknowledge she purposefully deleted them, and her proffered justification for doing so—

5    that she received them "long before [she] was ever on notice that she might have an

6    obligation to preserve such messages" (Doc. 216 at 12 n.2)—is unpersuasive in light of the

7    Court's earlier conclusion that Cramton reasonably should have known by mid-September

8    2017 that her communications with Farnell might be relevant to a future lawsuit.

9                    4.    Replaceability

10       The next question under Rule 37(e) is whether the lost discovery "can[] be restored

11   or replaced through additional discovery." *Id.*

12       None of the missing Farnell materials can be restored or replaced.  As noted,

13   Defendants issued a Rule 45 subpoena to Farnell, but he responded by stating that he didn't

14   have any responsive text messages with Cramton.  Thus, there doesn't appear to be any

15   way to recover the missing message.  And as for the missing voicemails, Farnell wouldn't

16   have any way of producing them (voicemails don't remain on the sender's phone) and

17   Cramton acknowledged in her response that she "cannot recover the three voicemails."

18   (Doc. 216 at 12.)

19                    5.    Prejudice

20       Under Rule 37(e)(1), the next inquiry—in a case where ESI was lost, even though

21   it should have been preserved, and cannot be replaced—is to assess whether the opposing

22   party suffered "prejudice . . . from the loss of the information." *Id.*  The advisory committee

23   notes to the 2015 amendment recognize that this "may be a difficult task," that it

24   "necessarily [requires] an evaluation of the information's importance in the litigation," and

25   that "[t]he rule leaves judges with discretion to determine how best to assess prejudice in

26   particular cases." *Id*.

27       Defendants contend the loss of Farnell-related ESI was prejudicial because "it is

28   highly likely that the missing texts and voicemail messages discuss Defendant's [sic]

confidential business activities, which [Cramton] provided to Kahala" and/or because "it is likely that [Cramton's] text messages with Farnell: 1) disclose who she was working for at any given time and; 2) her true reasons for resigning (*i.e.,* [Cramton] was not abused, but was tired of the burden of being an owner and wanted a regular salary)." (Doc. 206 at 15.)

There are a variety of problems with this argument. The first is timing. The sole missing Farnell text message was sent on August 29, 2017. This was several weeks before the Kahala issues arose, nearly a month before Cramton resigned, and about two months before Cramton started working for Kahala. It doesn't make sense that a text message sent on this date would reveal that Cramton was secretly feeding confidential information to Kahala or reveal Cramton's "true reasons" for resigning. Conversely, although it's theoretically possible the three missing Farnell voicemails (all of which were sent after Cramton resigned) might touch upon these topics, there's no reason to suspect they would touch upon the number of hours Cramton was working for Defendants before she resigned.

The second problem with Defendants' argument is the identity of the sender. The text message was sent by Farnell (Doc. 216 at 12) and all three voicemails were similarly left by Farnell. It's illogical to presume that a text message or voicemail *from Farnell to Cramton* would reveal Cramton's true reasons for resigning or show that Cramton was otherwise engaging in misconduct.

The third problem with Defendants' argument is that, although they may have believed at the time they filed their sanctions motion that a large volume of Farnell text messages were missing, nearly all of the purportedly missing messages have now been located, produced, and attached as an exhibit to Cramton's motion. These messages reveal that Cramton and Farnell's text communications addressed innocuous subjects such as where they were going to lunch. Given Defendants' failure to demonstrate that any of the produced Farnell messages contain damaging information concerning Cramton's "true" reasons for resigning, the Court is unwilling to assume that a single missing message, sent by Farnell several weeks before the key events in this case occurred, was somehow the

long-lost smoking gun.

### 6. Intent to deprive

As noted, sanctions are available under Rule 37(e)(1) only upon a finding of prejudice (which the Court has declined to make here). Alternatively, a court may impose sanctions under Rule 37(e)(2) "upon a finding that the [sanctioned] party acted with the intent to deprive another party of the information's use in the litigation." *Id.* In that scenario, Rule 37(e)(2)(A) provides that the court may "presume that the lost information was unfavorable to the party." *Id.*

The Court will decline to impose sanctions under Rule 37(e)(2) because Cramton did not act with the intent to deprive Defendants of information. Although Defendants initially accused Cramton of purposefully destroying large volumes of ESI—conduct that might support a finding of intent to deprive—most of the purportedly missing ESI still exists and has now been produced (if belatedly). Additionally, Cramton told the employee at the Verizon store to transfer all of the text messages from her old phone onto her new phone. Such conduct is inconsistent with an intent to deprive. Finally, although Cramton hasn't provided a particularly good explanation for why she failed to preserve and produce the one Farnell text message and the three Farnell voicemails, it's unlikely (for the reasons discussed in Part II.B.5 above) that any of these particular materials contained relevant information, and the Court will not infer malicious intent from the loss of a handful of likely-irrelevant bits of ESI in a case where a massive amount of ESI has been produced.

### 7. Conclusion

Cramton's decision to wipe her company-issued cell phone and computer before returning them to Defendants was unfortunate. She knew that litigation was imminent at the time and it's understandable why Defendants would view her conduct with deep skepticism. Indeed, the Court shared that skepticism when the spoliation issue first arose. Nevertheless, the parties' briefing reveals that relatively little ESI was actually lost, that Cramton didn't have a duty to preserve much of the missing material, and that Defendants suffered little if any prejudice from the loss of the remaining material. Accordingly,

Defendants' motion for sanctions under Rule 37(e) will be denied.

III.     Cramton's Motion For Leave To File A Sur-Reply (Doc. 229)

On November 1, 2019—more than two months after Defendants filed a reply in support of their motion for sanctions—Cramton filed a motion for leave to file a sur-reply. (Doc. 229.)  Cramton contends that leave should be granted because (1) she recently discovered more of the allegedly missing text messages and (2) Defendants' reply improperly seeks to raise new arguments and evidence that weren't set forth in the original sanctions motion.  (*Id.*)  Alternatively, Cramton moves to strike the purportedly new evidence and arguments.  (*Id.*)  Defendants oppose the motion, arguing that it is a thinly veiled attempt to reopen discovery and that their reply permissibly responded to the arguments contained in Cramton's response.  (Doc. 230.)

Cramton's motion will be denied as moot.  As discussed above, the Court has already concluded that Defendants are not entitled to sanctions under Rule 37(e).  It's thus unnecessary for Cramton to file a sur-reply intended to identify additional reasons why the sanctions motion should be denied.

IV.     Motion To Strike Changes To Cramton's Deposition Testimony (Doc. 220)

As an attachment to her response to Defendants' motion for sanctions, Cramton provided an "errata sheet" in which she identified seven changes or corrections to the testimony from her second deposition.  (Doc. 216-1 at 58.)  For each change/correction, the errata sheet provides (1) the page/line number of the testimony at issue, (2) the specific change/correction, and (3) the reason for the change/correction.  (*Id.*)

Kelli now moves to strike the errata sheet under Rule 30(e).  (Doc. 220.)  Kelli's argument, in a nutshell, is that the errata sheet purports to make substantive changes to the answers Cramton provided during her deposition, yet the Ninth Circuit's decision in *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217 (9th Cir. 2005), establishes that Rule 30(e) only allows a deponent to correct "typographical errors or actual errors in transcription, such a dropping a 'not,'" and forbids "any change that would alter the substance of sworn deposition testimony."  (*Id.* at 8-9, citation omitted).

Kelli's argument is unavailing. The starting point for the analysis is, of course, the text of Rule 30(e). It provides:

> (1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
>> (A) to review the transcript or recording; and
>>
>> (B) if there are changes in form *or substance*, to sign a statement listing the changes and the reasons for making them.

*Id.* (emphasis added). This language does not support Kelli's position—it makes clear that a party is permitted to make changes to a deposition transcript not just in "form," but also in "substance." *Shinde v. Nithyananda Found.*, 2015 WL 12746703, *5 (C.D. Cal. 2015) ("The plain language of Rule 30(e) places no limitation on the types of changes a deponent can make.").

*Hambleton Brothers* is not the contrary. There, the defendants filed a motion for summary judgment several weeks after the plaintiff had been deposed. 397 F.3d at 1223-24. The following month, the plaintiff submitted an errata sheet that identified various changes to its deposition testimony. *Id.* at 1224. These corrections were "extensive," yet the plaintiff "omitted any statement in the deposition errata explaining the corrections." *Id.* at 1224-25. Moreover, "the 'corrections' were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact . . . and to avoid a summary judgment ruling." *Id.* at 1225. The district court struck the errata sheet and the Ninth Circuit affirmed, holding that (1) the errata sheet was untimely under Rule 30(e)(1), because it was submitted more than 30 days after the plaintiff had been given access to the deposition transcript, (2) the plaintiff also failed to comply with Rule 30(e)(1)(B)'s requirement that an errata sheet provide a list of reasons for the changes, and (3) the district court therefore "did not abuse its discretion in striking the deposition errata because Hambleton . . . failed to comply with the *procedural dictates* of FRCP 30(e)." *Id.* at 1225-26 (emphasis added). Additionally, the court observed that although Rule 30(e) authorizes corrections in "substance," "this permission does not properly include changes offered

solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment ruling." *Id.* at 1225.

In the Court's view, there are two key takeaways from *Hambleton Brothers*. The first is that the Ninth Circuit's discussion of what type of substantive changes are permissible under Rule 30(e) was arguably dicta—the ultimate holding was that the district court hadn't abused its discretion by striking the errata sheet because the plaintiff failed to comply with two different "procedural dictates" of Rule 30(e): the 30-day submission window and the requirement that a list of reasons be provided. *Id.* at 1225-26. Neither of those procedural issues, however, is present here—it is undisputed that Cramton submitted her errata sheet within the 30-day window and it is undisputed that Cramton provided reasons for each of the changes.

Second, the Court doesn't interpret the remaining discussion of Rule 30(e) in *Hambleton Brothers* as enacting a hard-and-fast prohibition against any sort of substantive change to deposition testimony. The Ninth Circuit stated that a party cannot make substantive changes that are offered "*solely* . . . in a tactical attempt to avoid an unfavorable summary judgment" and accepted the district court's factual determination that, under the unique circumstances of that case (which included the plaintiff's failure to provide any explanation for the "extensive" changes), the proposed changes constituted a "'sham' correction." *Id.* at 1225.

The circumstances of this case are far different. First, Cramton has offered plausible reasons why she belatedly realized that some of the testimony she provided during the May 21 deposition was inaccurate—among other things, she subsequently reviewed phone records that suggested her communication with Wuycheck on September 22, 2017 was via phone, not via text. In contrast, the plaintiff in *Hambleton Brothers* didn't even attempt to explain why the changes were being made. Second, Cramton's changes are relatively modest in scope. In contrast, the changes in *Hambleton Brothers* were "extensive." And third, some of the changes set forth in the errata sheet actually hurt Cramton's litigation position. For example, although she testified during her deposition that she has never

deleted any text messages from Farnell or Cable (a blanket statement that would be helpful in avoiding spoliation sanctions), the errata sheet clarifies that she may have deleted some messages from Farnell and Cable that related to personal issues.  (Doc. 216-1 at 58.)  In contrast, the changes in *Hambleton Brothers* were offered "solely" to create issues of fact that would undermine a pending summary judgment motion.

For these reasons, the Court concludes that Cramton's errata sheet isn't a "sham" offered "solely" for tactical reasons, but instead constitutes a permissible effort under Rule 30(e)(1)(B) to make changes in "form or substance."  *Cf. W. Alliance Bank v. Jefferson*, 2015 WL 4932654, *2 (D. Ariz. 2015) (accepting errata sheet, even though it altered the substance of deposition testimony concerning a key issue, because the deponent timely submitted the errata sheet, explained that the change was justified by his subsequent review of underlying documents, and these circumstances showed "that the change in the deposition testimony is considered to have been made for a legitimate purpose").  Thus, Kelli's motion to strike will be denied.[10]

V.    Cross-Motions For Summary Judgment (Docs. 142 and 143)

A.    **Legal Standard**

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce

---

[10]    Although the errata sheet will not be stricken, Cramton concedes in her response to the motion to strike that the "original answer to deposition question[s] remains part of [the] record and can be read at trial."  (Doc. 225 at 4, citation omitted.)

evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B. **"Threshold Issues"**

Defendants contend that four "[t]hreshold issues merit summary judgment on all or some claims." (Doc. 143 at 4.) These alleged threshold issues are (1) "Cramton released all claims against Defendants"; (2) "Keely had an absolute right to buy back Cramton's interests on September 14, 2017, before the events alleged under tort Counts IX-X"; (3) "Kelli is neither an employer nor proper community property defendant"; and (4) "Cramton was not constructively discharged under Counts I-III and VI." (*Id.* at 4-9, emphasis omitted.)

Most of these are not, in fact, threshold issues. Instead, they merely constitute additional reasons why, in Defendants' view, some of Cramton's claims should be rejected. Accordingly, the Court will address the first, second, and fourth arguments in the context of the specific counts to which they relate.

The potential exception is the second argument—Kelli's contention that she is not a "proper community property defendant" because (1) the amended complaint doesn't

allege community property liability, (2) under *Garrett v. Shannon*, 476 P.2d 538 (Ariz. Ct. App. 1970), "community liability is not presumed under the law for the claims at issue here," and (3) in any event, Kelli and Keely executed a separate property agreement in May 2014. (Doc. 143 at 6-7.) In her response, Cramton doesn't address the first or second arguments but contends the third argument is unavailing because (1) the separate property agreement isn't part of the summary judgment record, (2) the separate property agreement was never recorded, and (3) Kelli signed two documents in 2017 in which she identified herself as a "community property" spouse. (Doc. 159 at 8.)

The Court agrees with Defendants that Kelli is not a proper community property defendant in this case. The amended complaint doesn't even allege community property liability as to Kelli—she is only named as a defendant in Count IV (and, as discussed below, the Court will grant her request for summary judgment on that count). Under Arizona law, "[a] creditor must join both spouses as defendants before the creditor may obtain and execute a judgment against the community." *Flexmaster Aluminum Awning Co. v. Hirschberg*, 839 P.2d 1128, 1133 (Ariz. Ct. App. 1992).[11] Thus, it is unnecessary to decide whether the types of claims at issue in this case would ordinarily give rise to community property liability or whether the May 2014 separate property agreement between Kelli and Keely (which, contrary to Cramton's claim, is part of the summary judgment record, *see* Doc. 143-4 at 128-33) would otherwise be sufficient to extinguish such liability—because Kelli isn't properly named as community property defendant in the amended complaint, those issues are academic.[12]

---

[11] *See also Eng v. Stein*, 599 P.2d 796, 798-99 (Ariz. 1979) (vacating judgment entered about spouses, where only the husband was named as a defendant in the complaint, and emphasizing "'[t]hat an in personam judgment may not be rendered against one who has never been a party to the litigation would seem so obvious that citation of authority should be unnecessary'") (citation omitted); *Spindle Inc. v. Voigt*, 2014 WL 12856439, *6 (D. Ariz. 2014) ("Under Arizona community property law, if a plaintiff does not join a spouse to an action on an obligation or debt, then the plaintiff may not recover from the community estate.") (citing A.R.S. § 25-215); *Alves v. Emerald Correctional Mgmt. LLC*, 2011 WL 5289771, *1 (D. Ariz. 2011) (same).

[12] During oral argument, Kelli asked that a final judgment be entered in her favor under Rule 54(b). The Court will deny Kelli's request (which Cramton opposes) because, having taken "into account judicial administrative interests as well as the equities involved," *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980), there is a risk that entering a

- 32 -

C.    **Counts One, Two, and Three (ADA/ACRA Claims)**

Defendants move for summary judgment on Counts One, Two, and Three of Cramton's amended complaint, the ADA/ACRA claims, on four grounds: (1) Cramton released those claims pursuant to a "Mutual Releases" provision executed on September 14, 2017; (2) "Defendants lack the requisite 15 employees"; (3) "Cramton's aneurysm does not qualify as a protectable disability"; and (4) "[t]here are no material adverse employment actions or evidence of differential treatment on the basis of Cramton's disability."  (Doc. 143 at 9-11.)  Cramton, meanwhile, affirmatively moves for summary judgment on whether the Corporate Defendants comprise an "integrated enterprise" for purposes of Counts One, Two, and Three.  (Doc. 142 at 13-14.)

As discussed below, although the Court disagrees with Defendants' argument concerning the "Mutual Releases" provision, it agrees with Defendants that Cramton has not established a causal link between the alleged acts of disability-related discrimination, retaliation, and lack of accommodation and her resignation in September 2017. Accordingly, the Court will grant summary judgment to Defendants on Counts One, Two, and Three without resolving the parties' other arguments.

1.    The "Mutual Releases" Provision

On September 14, 2017, Cramton signed a document entitled "Confidential Settlement Agreement and Release."  (Doc. 143-4 at 62-68.)  The other parties to the agreement were Keely and a company called Gulf Girl Squared, Inc. ("GGS"), which is not one of the three named Corporate Defendants in this case.

As relevant here, the GGS Release contained a "Mutual Releases" provision that provides as follows:

> Mutual Releases.  Upon execution of this Settlement Agreement, subject to the terms, exceptions, and reservations set forth herein, each Party, for themselves and their respective heirs, executors, beneficiaries, administrators, representatives, servants, successors, assigns, attorneys, agents, affiliates, directors, officers, and employees hereby fully and forever release, acquit, and discharge each and every other Party, and their respective heirs, executors, beneficiaries, administrators, representatives, successors,

Rule 54(b) judgment now would result in overlapping appeals and undue prejudice to Cramton.

assigns, insurers, attorneys, agents, affiliates, past and present shareholders, past and present directors, past and present officers, past and present employees, servants, from any and all damages, judgments, debts, sums of money, accounts, rights, claims, demands, obligations, suits, proceedings, warranties, covenants, liabilities, agreements, proofs of claim, promises, actions, or causes of action of any nature whatsoever, in law or in equity, whether known or unknown, whether presently existing or which may arise hereafter, whether or not well founded in fact or law, and whether sounding in tort or contract or on any other bases ("*Claims*"), that such Party ever had, now has, or hereafter can, shall, or may have, either for themselves or on behalf of others, relating in any manner, directly or indirectly to any matter relating to the Corporation, each Party's past and-current ownership of common stock or any other interest in the Corporation, each Party's employment with the Corporation or otherwise related in any way to the Dispute (as to each Party, a "*Release*"). It is expressly understood and agreed that each Release includes and shall constitute full, adequate, and complete consideration for the release of all claims and injuries, the nature, extent, and amount of which are not, and despite reasonable diligence could not now be known to the Parties and that the intent and agreement of the Parties is that any and all such claims and damages are and shall be released by virtue of the foregoing provisions of this Settlement Agreement.

(*Id.* at 62-63.) The GGS release also contained a "Reliance by Non-Parties" provision that provides as follows:

> Reliance by Non-Parties. Except as otherwise provided herein, this Settlement Agreement is made for the sole benefit of the Parties and their respective heirs, executors, beneficiaries, administrators, representatives, successors, assigns, insurers, attorneys, agents, affiliates, past and present shareholders, past and present directors, past and present officers, past and present employees, servants, and no other person or entity shall be entitled to rely upon or enforce any provision of this Settlement Agreement.

(*Id.* at 66.)

Defendants argue that Counts One, Two, and Three[13] are barred by the "Mutual Releases" provision because they are "claims against GGS affiliates, which relate directly or indirectly to GGS." (Doc. 143 at 4.) They further claim that "Cramton's ADA/ACRA claims (Counts I-III) are founded upon her allegation that Corporate Defendants denied her request to work from home," and "[s]uch an argument could only pertain to GGS, not GFL (or Corporate Defendants), because Cramton regularly worked from home as part of her

---

[13] Although the heading in Defendants' motion suggests they are seeking dismissal of all of Cramton's claims based on the mutual release, the accompanying text clarifies that they are only seeking the dismissal of Counts One, Two, and Three on this basis. (*Compare* Doc. 143 at 5 ["Cramton released all claims against Defendants"]) *with id.* at 6 ["Counts I-III fail because they are truly claims against GGS that are barred by the Release."].) Defendants also repeat this clarification in their reply. (Doc. 172 at 1 ["Cramton released Counts I-III against Corporate Defendants"].)

employment with GFL." (Doc. 143 at 5.)  In response, Cramton argues these claims are not barred by the "Mutual Releases" provision because (1) the amended complaint does not assert any claims against GGS; (2) her claims do not "fall within the scope" of the "Mutual Releases" provision; and (3) "Defendants are not released parties" and therefore have no ability to enforce the terms of the GGS release.  (Doc. 159 at 21-24.)

Defendants are not entitled to summary judgment on Counts One, Two, and Three based on the GGS release.  Even assuming that each Corporate Defendant in this case might qualify as an "affiliate" of GGS—meaning that each Corporate Defendant could share in GGS's immunity from future claims—the "Mutual Releases" provision doesn't cover every conceivable type of future lawsuit by Cramton against GGS and its affiliates. Instead, it prohibits only future lawsuits that "relat[e] in any manner, directly or indirectly to any matter relating to [GGS], each Party's past and current ownership of common stock or any other interest in [GGS], each Party's employment with [GGS] or otherwise related in any way to the Dispute."  (Doc. 143-4 at 62-63.)  But Counts One, Two, and Three are disability-related claims concerning Cramton's purported employment by the three Corporate Defendants named in the complaint, not GGS.  Defendants have failed to show how those claims are "directly or indirectly" related to GGS, to Cramton's former ownership of stock in GGS, to Cramton's former employment by GGS, or to "the Dispute" (a term that is undefined in the GGS release but presumably relates to how much money Cramton was entitled to receive when the three Grabbagreen franchises owned by GGS were sold).[14]

## 2.  Causal Link

As noted, the amended complaint asserts three claims under the ADA/ACRA. Count One is a claim for "Disability Discrimination"—Cramton alleges that, after she became disabled in April 2017, the Corporate Defendants harassed her and forced her to work while symptomatic, acts of discrimination that ultimately caused her constructive

---

[14]    Because the Court rules on this ground, Cramton's testimony regarding a document stating that GGS was an "affiliate" of GFL (Doc. 201 at 44, 58, 62), which the Court has allowed Defendants to add to the record, does not change the Court's conclusion.

discharge. (Doc. 88 ¶¶ 85-92.) Count Two is a claim for "Retaliation"—Cramton alleges that she made an accommodation request after becoming disabled, that the Corporate Defendants retaliated against her for making this request by harassing her and forcing her to work while under disabling conditions, and that these acts of retaliation caused her constructive discharge. (*Id.* ¶¶ 93-101.) Finally, Count Three is a claim for "Failure to Accommodate"—Cramton alleges that she made two accommodation requests after becoming disabled ("a short leave of absence with non-stressful interactions, and, later, to work from home"), that the Corporate Defendants denied these requests, and that "[a]s a result of the Corporate Defendants' failure to accommodate, Cramton ultimately lost her job and related wages, lost her ownership interest and her right to a payout in the event of a buyout, and lost her benefits." (*Id.* ¶¶ 102-110.)

It is helpful to begin with this summary of the amended complaint because it shows that, although Counts One, Two, and Three assert different theories of liability under the ADA and ACRA, all three claims fundamentally turn on the allegation that the Corporate Defendants' improper response to Cramton's disability (whether that response took the form of discrimination, retaliation, or a lack of accommodation) was a causal factor that led Cramton to stop working for the Corporate Defendants in September 2017 (and, in turn, caused her to miss out on the Kahala payout). Given this backdrop, the Corporate Defendants argued in their summary judgment motion that "Cramton cannot prevail on Counts I-III because there is no evidence of actions or conduct by Defendants that would qualify as a material adverse employment action as required by disability discrimination or retaliation under the ADA and ACRA. . . . This is particularly true in the context of Counts I-III considering that Cramton was fully recovered from her alleged disability at least four months before she resigned." (Doc. 143 at 10.) Notably, in her response, Cramton didn't dispute that, as a legal matter, she needed to show a causal link between her disability (or the Corporate Defendants' response to it) and her resignation. (Doc. 159 at 11-12.) She also didn't suggest that Counts One, Two, and Three needed to be analyzed separately. (*Id.*) Instead, she argued that summary judgment should be denied across the board

- 36 -

1  because she had been subjected to two different adverse employment actions as a result of

2  her disability: (1) a constructive discharge in September 2017 and (2) Defendants' failure

3  to pay her wages throughout 2017.  (*Id.*)

4      Cramton's argument lacks merit because the causal link—the "because of"—is

5  missing.  To prevail on a disability discrimination claim under the ADA, "a plaintiff must

6  prove that he is a qualified individual with a disability who suffered an adverse

7  employment action because of his disability." *Sanders v. Arneson Prod., Inc.*, 91 F.3d

8  1351, 1353 (9th Cir. 1996).[15]  Similarly, "[t]o establish a prima facie case of retaliation

9  under the ADA, an employee must show that: (1) he or she engaged in a protected activity;

10  (2) suffered an adverse employment action; and (3) there was a causal link between the

11  two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).  Finally, "[t]o

12  establish a prima facie case for failure to accommodate under the ADA, [a plaintiff] must

13  show that '(1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified

14  individual able to perform the essential functions of the job with reasonable

15  accommodation; and (3) [s]he suffered an adverse employment action because of [her]

16  disability.'" *Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237 (9th Cir.

17  2012) (citation omitted).  *See also Marquez v. Glendale Union High Sch. Dist.*, 2018 WL

18  4899603, *21 (D. Ariz. 2018) (to succeed on claim based on retaliation for requesting an

19  accommodation, "[p]laintiff must establish a link between her alleged request for a

20  reasonable accommodation and her termination").  Thus, Counts One, Two, and Three each

21  require Cramton to prove she suffered an adverse employment action "because of"

22  disability-related misconduct.[16]

23  
---
24  [15]      In the Ninth Circuit, "ADA discrimination claims under Title I must be evaluated
    under a but-for causation standard." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir.
25  2019).

26  [16]      "Because there is limited Arizona case law regarding discrimination under ACRA
    and ACRA is modeled after federal discrimination statues, Arizona courts look to federal
27  law analyzing discrimination claims as persuasive authority." *Downey v. Gen. Mills, Inc.*,
    2005 WL 3312766, *6 n.5 (D. Ariz. 2005). *See also Coleman v. City of Tucson*, 2008 WL
    5134346, *5 (D. Ariz. 2008) ("ACRA is modeled after and virtually identical to the
28  ADA.").  Thus, with the exception of one distinction that is discussed in Part V.F below,
    the Court analyzes the ADA and ACRA claims together.

No reasonable juror could conclude that the requisite "because of" link exists with respect to the two adverse employment actions identified in Cramton's response. First, it is true that a constructive discharge can constitute an adverse employment action for ADA purposes. *See, e.g., Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes."); *Soga v. Kleinhans*, 2016 WL 4192411, *10 (E.D. Cal. 2016) ("A plaintiff can also establish adverse employment action by showing she was constructively discharged."). However, "constructive discharge occurs when the working conditions deteriorate, *as a result of discrimination*, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (citation omitted) (emphasis added). "In order to survive summary judgment on a constructive discharge claim, a plaintiff 'must show there are triable issues of fact as to whether 'a reasonable person in [his] position would have felt that [he] was forced to quit *because of* intolerable *and discriminatory* working conditions.'" *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005) (citation omitted) (emphasis added). Although "[t]he determination whether conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact, . . . to establish that he was constructively discharged, a plaintiff must at least show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989) (citations and internal quotation marks omitted).

Thus, even assuming that Cramton's aneurysms constitute a protectable disability (which the Court need not decide), and even further assuming that Cramton's departure on September 25, 2017 was a constructive discharge (an assumption that is dubious, as discussed in Part V.F below), Cramton has failed to identify any evidence showing her

discharge was *because of* disability discrimination, *because of* retaliation flowing from her earlier request for a disability-related accommodation, or *because of* the Corporate Defendants' failure to provide such an accommodation. Cramton contends that "[e]ven before [her] medical issues arose, the relationship between her and Keely was 'toxic.'" (Doc. 159 at 4-6.) Although Cramton further contends that Keely's treatment of her "worsened" after her diagnosis (which she received in April 2017), she does not cite any evidence, direct or circumstantial, connecting that worsening treatment to her medical diagnosis or to any accommodation request. (*Id.*) Indeed, Cramton admitted during her deposition that she was "[n]ot contemplating resigning" on September 14, 2017, and it was only the events occurring after that date that led her to depart. (Doc. 173-1 at 96.) There is no evidence that any disability-related misconduct occurred during this 11-day period. To the contrary, Cramton contends the events during this period that caused her to resign were (1) Keely's disputed statement on September 18, 2017 concerning the status of the Kahala deal and (2) Keely's "ramped up . . . abusive behavior" and "emotional harassment" during "the days after the call," which consisted of strongly worded and intemperate criticisms of Cramton's work performance. (Doc. 159 at 5-6.) There is no nexus between this behavior and Cramton's medical condition.

Cramton also provides no evidence (nor even contends) that Keely treated her any differently from anyone else because of her aneurysms. *Marziano v. Cty. of Marin*, 2010 WL 3895528, *7 (N.D. Cal. 2010) ("Evidence that similarly situated employees are treated more favorably is one way to establish intentional discrimination . . . ."). Cramton relies on the fact that constructive discharge is often a factual question for the jury, but here she has failed to present any aggravating factors, such as a pattern of discriminatory treatment, to support her claim.

Next, as for Cramton's contention that the Corporate Defendants' failure to pay her wages throughout 2017 constitutes an adverse employment action, this argument overlooks that the non-payment began in December 2016, several months before Cramton's medical condition arose. As the Corporate Defendants correctly point out in their reply, "a causal

connection is not possible if the adverse action predates the alleged protected activity."
(Doc. 172 at 9, citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982)).

Finally, during oral argument, Cramton's counsel argued for the first time that "it would be inappropriate to lump in the dismissal of Count Three with the dismissal of the other separate ADA claims" because failure-to-accommodate claims are analytically distinct from discrimination and retaliation claims and because a plaintiff asserting a failure-to-accommodate claim isn't required to prove an adverse action: "I understood their motion to say there's no adverse action. And that's not a requirement of a failure to accommodate claim."

This argument fails for two reasons. First, although Cramton is correct that, in general, a failure-to-accommodate claim is analytically distinct from a discrimination or retaliation claim,[17] the Ninth Circuit has held that a plaintiff asserting a failure-to-accommodate claim under the ADA still must prove she was subjected to an adverse employment action. *See, e.g., Samper,* 675 F.3d at 1237 ("To establish a prima facie case for failure to accommodate under the ADA, [a plaintiff] must show that . . . [s]he suffered an adverse employment action because of [her] disability.'") (citation omitted); *Allen v. Pac. Bell,* 348 F.3d 1113, 1114 (9th Cir. 2003) (same). *See also Exby-Stolley v. Bd. of Cty. Comm'rs, Weld Cty., Colo.*, 906 F.3d 900, 914 (10th Cir. 2018) (identifying the Ninth Circuit as one of "several other circuits [that] have explicitly required an adverse employment action in failure-to-accommodate cases"). Cramton's argument to the contrary appears to be based on an inaccurate view of the law.[18]

---

[17]    *Dunlap v. Liberty Natural Prods., Inc.,* 878 F.3d 794, 798 (9th Cir. 2017) ("We have recognized that a failure-to-accommodate claim 'is analytically distinct from a claim of disparate treatment or impact under the ADA.'").

[18]    After oral argument, the Court solicited supplemental briefing from Cramton concerning her position that an adverse action isn't required in a failure-to-accommodate case. (Doc. 242.) The cases cited in Cramton's resulting brief (Doc. 243) are mostly unpublished district court orders. To the extent those orders conflict with *Samper* and *Allen,* the Court obviously must apply follow binding Ninth Circuit law. Finally, *United States EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103 (9th Cir. 2010), is distinguishable because the plaintiff in that case asserted he had been deprived of specific "benefits and privileges of employment" (*i.e.,* understanding and participating in mandatory departmental meetings) and specific "job training" opportunities (*i.e.,* the opportunity to participate in an online Excel training program available to co-workers) due

Second, and more important, even if it might be theoretically possible for a plaintiff to prevail on a failure-to-accommodate claim under the ADA without showing she was subjected to an adverse action, that has never been Cramton's theory of liability in this case. Count Three of the amended complaint doesn't seek nominal damages based on an unfulfilled accommodation request in mid-2017—to the contrary, it expressly tethers the alleged accommodation failure to Cramton's departure in September 2017 and only seeks, as damages, the wages, benefits, and share of the proceeds from the Kahala deal that Cramton would have earned if she'd kept working for the Corporate Defendants through 2018. (Doc. 88 ¶ 110.) Similarly, in her MIDP disclosures, in response to the question requiring her to "[p]rovide a computation of each category of damages claimed by you," Cramton only identified the following two categories of compensatory damages that might be relevant to her ADA claims: (1) "[l]ost future wages and benefits as a result of Defendants' constructive discharge of Cramton" and (2) "[l]ost ownership interest in the Corporate Defendants as a result of Defendants' constructive discharge of Cramton, approximately $511,500." (Doc. 143-4 at 74-75.) Thus, Cramton cannot survive summary judgment on Count Three by belatedly asserting a new theory of liability (a standalone failure to accommodate, unconnected to her resignation in September 2017) that wasn't identified in her amended complaint, in her MIDP disclosures, or in her written response to Defendants' summary judgment motion.

D.    **Count Four (Minimum Wage Claim)**

The parties cross-move for summary judgment on Count Four, Cramton's minimum wage claim against all five Defendants.

Cramton contends that she, Keely, and GFL signed a written "consent" agreement

_____

to his employer's failure to provide a reasonable accommodation for his deafness. In other words, the plaintiff in that case *did* attempt to show he had been subjected to various adverse actions as a result of the accommodation failure. *Cf. Exby-Stolley*, 906 F.3d at 911 ("[O]nce we recognize that to require an adverse employment action is simply to require that the discrimination be 'in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment,' it is evident that the requirement applies to every discrimination claim under the ADA, including those based on failure to make reasonable accommodations.") (citation omitted).

on December 31, 2016 under which she prospectively agreed not to receive any wages from GFL. (Doc. 142 at 11-12.) Cramton further contends that, although she stopped receiving wages after executing this document, Defendants' accountant later issued a W-2 stating that she received $25,000 in wages in 2017. (*Id.*) Cramton contends this document is a sham, because it attempts to retroactively recharacterize loan repayment proceeds as wages, and argues she is entitled to summary judgment against "Defendants" regardless of the W-2's accuracy because (1) she was entitled to more than $25,000 in wages in 2017 and (2) she didn't receive a wage payment every two weeks, as Arizona law requires. (*Id.*)

Defendants, meanwhile, argue that (1) ECH, ECO, and Kelli are not liable for Cramton's minimum wage claim because they were not Cramton's employers and (2) the claim against the remaining two Defendants, GFL and Keely, "fails as a matter of law because [Cramton] received wages far in excess of the statutory minimum rate for all hours worked in each of the workweeks during the relevant time period." (Doc. 143 at 6, 11-12.)

### 1.   Employer

In her motion, Cramton broadly asserts that "Defendants" were her employers because she "received W-2 wages from Defendants in prior years." (Doc. 142 at 11 & n.11.) But to support that statement, Cramton cites a W-2 from 2016, which identifies only one employer: GFL. (Doc. 142-2 at 32.) Similarly, in her reply brief, Cramton refers to her "employment agreement as a [GFL] employee." (Doc. 171 at 3.)

Nonetheless, Cramton argues in her response to Defendants' motion that ECH, ECO, and Kelli were also her "employers." (Doc. 159 at 8 n.1.) As for the two corporate entities, Cramton contends (in a footnote) that they should be considered her employers because ECH was GFL's parent company and because ECO formed part of an "integrated enterprise" with the other entities. (*Id.*) Separately, Cramton contends that Kelli was an employer because "[s]he was the General Counsel and Chief Administrative Officer for ECH and [GFL]," "performed the functions of those titles, including drafting and negotiating legal agreements for the companies' sale," and "represented the corporate Defendants on their employment issues, including drafting Cramton's employment

agreement, responding to EEOC discrimination complaints, and participated in the hiring of Cramton." (*Id.* at 7-8.)

Under A.R.S. § 23-363(A)(1), "[e]mployers shall pay employees no less than the minimum wage, which shall be not less than $10 on or after January 1, 2017." The term "employer" is defined, in relevant part, as "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee." A.R.S. § 23-362(B).

The parties do not cite any cases interpreting the meaning of "employer" under A.R.S. § 23-362. Thus, the Court will look to case law interpreting the meaning of "employer" under the FLSA because the two statutes define the term in similar ways.[19] "Two or more employers may jointly employ someone for purposes of the FLSA." *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983). The Ninth Circuit employs the "economic reality" test to determine whether an individual or entity constitutes an "employer," considering "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991) (citation omitted). "Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (citation omitted).

Cramton has presented very little evidence bearing upon these factors. Indeed, she has presented no evidence at all regarding whether ECO and ECH had the power to hire

---

[19]    29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."). Cramton has provided no explanation for why she thinks the "integrated enterprise" test under the ADA should be used to determine whether an individual or entity constitutes an employer under A.R.S. § 23-362. Indeed, in other portions of her response to Defendants' motion, Cramton seems to acknowledge that the FLSA is the proper federal analogue. (Doc. 159 at 7 ["Arizona has adopted the same employer definition as the Fair Labor Standards Act . . . ."].)

and fire her, supervised and controlled her work schedule or conditions of employment, determined her rate and method of payment, or maintained employment records. Accordingly, ECO and ECH are entitled to summary judgment on Count Four.

As for Kelli, Cramton vaguely asserts that she "represented the corporate Defendants on their employment issues" (Doc. 159 at 8), but the only evidence Cramton properly attaches[20] is an email from Kelli to Cramton about an "employment agreement." (Doc. 159-1 at 147). Not only is this email devoid of any context, but it suggests Kelli was merely acting as the attorney for the entity that served as Cramton's actual employer. (*Id.* ["As always, I must remind you that I represent the company only and I do not represent you individually."].) Although Cramton has cited a handful of cases in which certain high-level corporate officers were considered "employers" under the FLSA, she has not cited any cases where a corporation's attorney was considered an "employer." *See generally Diaz v. Longcore*, 751 Fed. App'x 755, 758-59 (6th Cir. 2018) (acknowledging that "FLSA 'employer' [may extend] liability to individuals who are chief corporate officers of the business, have a significant ownership interest in the business, control significant aspects of the business's day-to-day functions, and determine employee salaries and make hiring decisions," but distinguishing those roles from an attorney who merely "act[s] on behalf of [a corporate employer] with respect to a legal matter," even if "that legal matter was a lawsuit over an employment dispute"). Thus, Kelli is also entitled to summary judgment on Count Four.

### 2. Wages

Defendants argue that Cramton was paid $25,000 in wages for the 38 weeks she was employed in 2017. (Doc. 143 at 11.) In support of this claim, Defendants cite a W-2 from

---

[20] Cramton contends that pages 50-51 and 137 of Kelli's deposition transcript, which were allegedly submitted as part of "Ex. 1" to her response, further support her claim that Kelli was acting as an employer (Doc. 159 at 8), but those pages are not included in the deposition excerpts that Cramton actually enclosed as Exhibit 1. (Doc. 159-1 at 1-39.) Thus, the Court cannot consider the purported contents of those pages. Similarly, Cramton contends that pages 48 and 173 of her deposition transcript, which were allegedly submitted as part of "Ex. 24" to her response, support her position (Doc. 159 at 8), but those pages are not included in the deposition excerpts that Cramton actually enclosed as Exhibit 24. (Doc. 173-1 at 73-100.)

GFL showing that Cramton earned wages of $25,000.  (Doc. 143-4 at 191.)

Cramton disagrees, arguing that she and Keely "signed a [GFL] 'consent' agreeing not to be paid wages going forward," and therefore "[t]he only wages Cramton received were fabricated after this lawsuit was filed in an effort to avoid the minimum wage claim." (Doc. 142 at 11; Doc. 142-6 at 5; Doc. 142-1 at 62-63, 78-79.)  She further contends that "Defendants cannot show any ties between the supposed wages and Cramton's work" (Doc. 171 at 6) and cites deposition testimony in which Defendants' accountant stated she did not know why Keely decided that $25,000 was the amount Cramton should be paid in W-2 wages (Doc. 142-3 at 89-90, 93-94).  Cramton also cites text messages in which Keely told the accountant that the W-2 and pay stubs were not matching up.  (Doc. 171 at 6, citing Doc. 173-2 at 67.)

The Court will decline to grant summary judgment to Cramton, GFL, or Keely on the minimum wage claim.  On the one hand, Defendants cite a W-2 showing that Cramton received $25,000 in wages in 2017.  Because Cramton no longer has any valid evidence in the record showing how many hours she worked for GFL in 2017[21]—and thus cannot establish she was entitled to *more* than $25,000 in wages—GFL and Keely would be entitled to summary judgment on Count Four if the $25,000 indeed constituted wages. Cramton, however, has created a genuine issue of fact concerning the nature of the $25,000. The term "wages" is defined as "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation."  A.R.S. § 23-350(7).  And under A.R.S. § 23-364(D), an employer's failure to "maintain payroll records showing the hours worked for each day

---

[21]    Cramton initially submitted a declaration that purported to set forth estimates of how many hours she worked in 2017.  (Doc. 142-2 at 5 ¶¶ 26-29.)  However, Cramton later acknowledged that her declaration was inaccurate because it included some hours she had worked for an entity that is not a defendant in this case.  (Doc. 184.)  Defendants' motion to supplement the summary judgment record added the portion of the deposition testimony in which Cramton stated she didn't know how she had apportioned her time between the two entities.  That testimony does not change the Court's conclusion on this claim, given that it appears undisputed she worked at least some hours for GFL.

worked, and the wages . . . paid to all employees for a period of four years . . . shall raise a rebuttable presumption that the employer did not pay the required minimum wage rate." GFL and Keely may be able to overcome this presumption, but at the moment there remains a question of fact regarding whether the $25,000 was provided to Cramton "in return for labor or services." A.R.S. § 23-350(7).[22]

E.    **Count Five (Breach Of Promissory Note)**

Cramton moves for summary judgment on Count Five, her claim against ECO for breach of the promissory note. (Doc. 142 at 10-11.)

The promissory note was executed on October 27, 2016. (Doc. 142-6 at 2-3.) Under its terms, ECO owed Cramton $66,527.00 plus 3.5% annualized interest until the note was fully paid. (*Id.* at 2.) The promissory note doesn't specify a date by which it must be paid off, but it does provide that Cramton may declare the remaining amount immediately due or "exercise . . . the rights and remedies given to [her] under applicable law" if ECO "becomes insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy, reorganization, or creditor composition." (*Id.*) The amount paid on the promissory note is in dispute, but there is no dispute that the full amount remains unpaid. (Doc. 142-2 at 5 ¶¶ 33-35.)

Defendants contend there has been no breach because "Cramton and Keely agreed that ECO would only make payments on the note[] if and only if the store ever generated sufficient cash flow to do so (a circumstance that never transpired)." (Doc. 158 at 11-12.) However, Defendants do not purport to identify a specific paragraph within the promissory note containing such an agreement—they simply provide a non-specific citation to the note

---

[22]    Cramton also contends she is "entitled to summary judgment as a matter of law" because "[i]t is undisputed that wages were not paid to [her] every two weeks as required." (Doc. 142 at 12, citing Doc. 142-2 at 4 ¶ 24; Doc. 142-3 at 76-77.) Although it is true that "Arizona law requires payroll to occur at least twice a month," *Piccioli v. City of Phoenix*, 439 P.3d 830, 835 (Ariz. Ct. App. 2019), Cramton has not brought a claim under the applicable statute. *See* A.R.S. § 23-351(A) ("Each employer in this state shall designate two or more days in each month, not more than sixteen days apart, as fixed paydays for payment of wages to the employees."). The amended complaint does not mention A.R.S. § 23-351(A), *see* Doc. 88 at 12-13, and a claim under that statute is separate from a claim for failure to pay the minimum wage under A.R.S. § 23-363(A)(1). A violation of the former is not necessarily a violation of the latter.

itself (Doc. 158 at 12, citing Doc. 158-1 at 303-04)—and the Court hasn't been able to identify any language within the note suggesting that payment to Cramton would only become due if and when the store achieved a certain level of success. Defendants also argue in a footnote that "the note's default provision identifying ECO's insolvency as an event of default was never triggered because ECO was presumed insolvent when the parties executed the note." (*Id.* at 12 n.7.)

In her reply, Cramton argues that ECO admitted to insolvency in its response, making payment under the note immediately due under the terms of the agreement. (Doc. 171 at 7.) Cramton also argues that Kelli's September 25, 2017 letter, in which she stated that Cramton "will be paid as previously understood by the parties, i.e., at the time of a sale of the business," means that payment was due when ECO was sold to Kahala in February 2018. (*Id.*, citing Doc. 142-6 at 8.)

The parties' arguments somewhat miss the mark. Under Arizona law, "[a] promise or order is 'payable on demand' if it . . . [d]oes not state any time of payment." A.R.S. § 47-3108(A)(2). A promise or order is only "'payable at a definite time' if it is payable on elapse of a definite period of time after sight or acceptance or at a fixed date or dates or at a time or times readily ascertainable at the time the promise or order is issued." A.R.S. § 47-3108(B). The promissory note at issue here does not state a time of payment and does not indicate that it is payable on elapse of a definite period of time, at a fixed date, or upon the contingency Defendants claim. Accordingly, under Arizona law, the promissory note was payable on demand. Cramton made that demand in her resignation letter dated September 22, 2017. (Doc. 173-1 at 188.) Because ECO has failed to fully repay the promissory note, the Court grants summary judgment to Cramton on her claim for breach of the note.[23]

F.    **Count Six (Breach Of The Operating Agreement)**

Section 9.3(b) of the ECH Operating Agreement provided that if Cramton "voluntarily tender[ed] resignation of employment for any reason within the first five years

---

[23]    This ruling is only with respect to liability. The damages remain disputed.

of the Effective Date hereof with the Company or any of its subsidiaries or Affiliates, . . . Keely Newman . . . shall have the right but not the obligation to purchase from [Cramton], and [Cramton] shall be obligated to sell to Keely Newman . . . , all or any portion of the Units then owned by [Cramton] for $1.00." (Doc. 159-1 at 98.) Accordingly, following Cramton's departure on September 25, 2017, Keely purported to exercise her rights under Section 9.3(b) of the Operating Agreement to purchase Cramton's 18.6% ownership interest in ECH for $1.

In Count Six of the amended complaint, Cramton argues that ECH and Keely violated the Operating Agreement through this maneuver. Specifically, Cramton contends that (1) because she was constructively discharged, her departure was effectively a termination without cause, (2) Section 9.3(b) of the Operating Agreement was therefore inapplicable, because it only deals with voluntary resignations, (3) Keely and ECH instead were required to comply with Sections 9.2 and 10.1 of the Operating Agreement, which deal with the repurchase of shares held by an employee who has been terminated without cause, and (4) under those provisions, Keely was required to pay "fair market value" for her shares, not $1. (Doc. 88 at 13-14.)

Defendants move for summary judgment on Count Six on the grounds that (1) Cramton was not constructively discharged and (2) "the express, unambiguous terms of the Operating Agreement . . . make it clear that there is no buy out obligation imposed upon any party under any circumstances." (Doc. 143 at 7-9, 12-13.) In response, Cramton argues she was constructively discharged and, because of this, "[u]nder the terms of the ECH Operating Agreement, once Keely chose to buy out Cramton's units in ECH, she had to pay fair market value." (Doc. 159 at 4-6, 9-10, 12-14, emphasis omitted.)

Defendants are entitled to summary judgment on Count Six because no reasonable juror could find that Cramton was constructively discharged. As an initial matter, because Count Six is a breach of contract claim brought under Arizona law, the question whether Cramton was constructively discharged is governed by Arizona's constructive discharge statute. *See* A.R.S. § 23-1502(A) ("In any action under the statutes of this state or under

common law, constructive discharge may only be established by . . . .").[24]  Under that statute, an individual bringing a constructive discharge claim for "objectively difficult or unpleasant working conditions" must provide at least 15 days' notice to the employer of her intended resignation.  *Id.* § 23-1502(A)(1).  The 15-day notice requirement is inapplicable only where (1) the individual has "[e]vidence of outrageous conduct by the employer or a managing agent of the employer, including sexual assault, threats of violence directed at the employee, a continuous pattern of discriminatory harassment by the employer or by a managing agent of the employer or other similar kinds of conduct" or (2) "the employer fails to provide written notice to its employees of the requirements of" the constructive discharge statute.  *Id.* § 23-1502(A)(2), (E).

Here, Cramton acknowledges she didn't provide 15 days' notice before resigning but contends that both exceptions are satisfied.  This argument is unavailing.  First, the evidence proffered by Cramton, even when viewed in the light most favorable to her, does not show she was subjected to "outrageous conduct" that was akin to "sexual assault," "threats of violence," or a "continuous pattern of discriminatory harassment."  There has been no suggestion that Cramton was exposed to sexual assault or other forms of physical violence while working for Defendants and, as discussed in Part V.C above, Cramton has not shown any nexus between her departure and her medical condition.

Tellingly, Cramton admitted she "was not even contemplating resigning" on September 14, 2017 (Doc. 173-1 at 96), and the conduct to which she was exposed during the ensuing 11-day period—intemperate, belittling comments and interruptions during vacation—falls far short of establishing "outrageous conduct" for purposes of the constructive-discharge statute.  *See, e.g., Civil Rights Div. of Ariz. Dept. of Law v. Vernick Plumbing and Heating Co.*, 643 P.2d 1054, 1056–57 (Ariz. Ct. App. 1982) (finding no constructive discharge when employee was screamed at by her supervisor, perceived a "great deal of tension in the air," had her desk given to a new employee, and received no

---

[24]     In contrast, A.R.S. § 23-1502 does not control whether Cramton was constructively discharged for purposes of the ADA claims asserted in Counts One, Two, and Three.

further assignments). *Cf. Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) ("We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable."). Additionally, Cramton offered in her resignation letter to continue working for Defendants for another 30 days if they paid her a consulting fee. (Doc. 173-1 at 188.) This offer is impossible to reconcile with the notion that Cramton was being exposed to "outrageous" conditions akin to sexual assault that would cause any reasonable person to immediately quit. *French v. Eagle Nursing Home, Inc.*, 973 F. Supp. 870, 877-78 (D. Minn. 1997) ("Even more damaging to French's constructive discharge claim is her request to return to work at Eagle on a part-time or on-call basis after her suspension and subsequent termination. It strains credulity that French would wish to return voluntarily to a work environment that was so intolerable that she was compelled to resign.").

Second, Cramton has also failed to create a triable issue of fact as to whether Defendants failed to post the written notices required by A.R.S. § 23-1502(E). Although Cramton asserts that the required "posters were missing at two of the Grabbagreen corporate stores" (Doc. 159 at 10), the document that Cramton provides in support of this assertion tells a different story. That document is a January 30, 2018 email from a GFL employee (Farnell) to Keely. (Doc. 173-2 at 74.) The title of the email is "labor law posters." (*Id.*) In the body of the email, Farnell reports that although he "recall[s] them [the labor law posters] being in place when ownership was transferred," some of the posters were not in place when he conducted an inspection of three former Grabbagreen locations in January 2018. (*Id.*) Farnell's email, in other words, suggests the required posters *were* in place during Cramton's period of employment and were only removed by the stores' new owners after she resigned.

In sum, Cramton was not constructively discharged under A.R.S. § 23-1502. Thus, she cannot argue that Keely and ECH breached the Operating Agreement by repurchasing

her shares under Section 9.3 (which addresses the repurchase of shares from employees who have voluntarily resigned) instead of repurchasing her shares under Section 9.2 (which addresses the repurchase of shares from employees who have been terminated without cause).

### G.    Count Seven (Violation Of The Implied Covenant)

Count Seven of the amended complaint also arises from the Operating Agreement. In this count, Cramton contends the Operating Agreement contains an implied covenant of good faith and fair dealing which Keely and ECH violated in various ways, including by failing to "provide her with truthful information regarding the prospective sale of [ECH] so that Cramton could adequately protect her membership interest," "by making the material misrepresentation to Cramton that . . . Kahala had declined to make an offer to purchase [ECH]," and "by creating such an abusive working environment that any reasonable person in Cramton's position would have been compelled to resign." (Doc. 88 ¶¶ 131-37.)

Defendants argue they are entitled to summary judgment on Count Seven because none of these theories "relates to an express provision in the Operating Agreement or a benefit that flows from the Operating Agreement." (Doc. 143 at 22-24.) In response, Cramton argues that (1) the Operating Agreement contains provisions contemplating the sale of the company and (2) her claim is "directed to both the implied covenant inherent in Cramton's employment contract and the Operating Agreement." (Doc. 159 at 14-15.)

As an initial matter, the Court rejects Cramton's argument that Count Seven may be based on an implied covenant arising from her employment contract. Count Seven of the amended complaint doesn't mention her employment contract—it only mentions the Operating Agreement (Doc. 88 ¶¶ 131-37)[25]—and Cramton didn't include her employment contract as an exhibit to her response. Accordingly, the Court will consider Cramton's implied-covenant claim only as it relates to the Operating Agreement.

---

[25]    Additionally, although paragraph 131 of the amended complaint incorporates by reference all of the earlier paragraphs in the amended complaint, the term "employment contract" doesn't appear in any of the earlier paragraphs.

On the merits, "Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id. See also Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986) ("The essence of th[e] duty [of good faith and fair dealing] is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship."). A party also may breach the implied covenant by "exercis[ing] discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain." *Beaudry v. Ins. Co. of the W.*, 50 P.3d 836, 841 (Ariz. Ct. App. 2002) (citation omitted).

As noted, Count Seven is premised on allegations that Keely (1) provided Cramton with false information about (or failed to provide Cramton with truthful information about) the status of the Kahala deal and/or (2) created an abusive working relationship. The latter allegation cannot give rise to liability under an implied-duty theory because the Operating Agreement does not contain any provisions governing Cramton's conditions of employment. Thus, it cannot give rise to any reasonable expectations concerning such conditions. *11333 Inc. v. Certain Underwrtiers at Lloyd's, London*, 261 F. Supp. 3d 1003, 1024 (D. Ariz. 2017) ("The implied covenant of good faith and fair dealing is not a vehicle for creating contractual terms that the parties did not otherwise agree to; it protects the existing terms from subversion.").

The allegations concerning the Kahala deal present a closer call. As discussed in Part V.F above, Sections 9.2 and 9.3 of the ECH Operating Agreement create two different sets of procedures for repurchasing the shares of a member who has separated from the company. Section 9.2, which applies when a member is terminated without cause, gives Keely the right to repurchase the member's shares at a fair market price and allows the member to retain the shares if this option isn't exercised. Section 9.3, in contrast, essentially requires a member who has voluntarily resigned to surrender her shares to Keely

for $1. From Cramton's perspective, one of the benefits that arguably flowed from these provisions was reassurance that she would profit from any increase in the value of her 18.6% ownership interest so long as she didn't voluntarily resign—if she left under other circumstances outside her control, she'd either get bought out by Keely at a fair market price or be allowed to keep the shares. Thus, contrary to Defendants' argument, Count Seven—which can be construed as alleging that Keely duped Cramton into voluntarily resigning by giving her false information about the status of the Kahala deal—arguably does "relate[] to an express provision in the Operating Agreement or a benefit that flows from the Operating Agreement." (Doc. 143 at 22.)[26]

The Court reiterates that the validity of Count Seven presents a close call. Neither party has cited an Arizona case with remotely similar facts and the parties' briefing on Count Seven is superficial. Ultimately, because Defendants are the movants and bear the burden of establishing an entitlement to summary judgment, their motion as to Count Seven will be denied.

## H.    **Count Eight (Tortious Breach Of The Implied Covenant)**

Count Eight of the amended complaint is similar to, and builds upon, Count Seven. Here, Cramton alleges that, because she had a "special relationship" with Keely by virtue of her possession of a membership interest in ECH, the alleged breach of the implied covenant described in Count Seven was also "tortious." (Doc. 88 ¶¶ 138-45.)

Defendants move for summary judgment on Count Eight on two grounds: (1) it is barred by the economic loss rule ("ELR"), and (2) the Operating Agreement "does not create the required 'special relationship' among the parties." (Doc. 143 at 13-14, 24-25.) In response, Cramton argues that (1) because Arizona courts have ruled that the ELR doesn't apply to claims for fraud or negligent misrepresentation, the Court should infer that

---

[26]    Defendants' contention that "Cramton has **not** alleged that ECH and Keely breached the implied covenant . . . with respect to §§ 9.3(a) and 9.2" (Doc. 143 at 23) is inaccurate. Although Count Seven doesn't contain any express references to Sections 9.2 and 9.3 of the Operating Agreement, it also doesn't disclaim any reliance on them. (Doc. 88 ¶¶ 131-37.) Additionally, Count Seven contains a paragraph incorporating by reference all of the earlier paragraphs in the amended complaint (*id.* ¶ 131) and some of those earlier paragraphs refer to Sections 9.2 and 9.3 (*see, e.g., id.* ¶¶ 82-83).

the "same logic" precludes its application to claims for tortious breach of the implied covenant, and (2) a "special relationship" arose both because Keely owed fiduciary duties to her and because she was an employee of ECH. (Doc. 159 at 18-19.)

The Court need not decide whether the ELR applies in this scenario because Cramton has failed to establish the existence of the necessary "special relationship." *Burkons v. Ticor Title Ins. Co. of Cal.*, 813 P.2d 710, 720 (Ariz. 1991) ("[T]he remedy for breach of this implied covenant is ordinarily by action on the contract, but in certain circumstances, the breach of the implied covenant may provide the basis for imposing tort damages. These principles are not confined to insurance contracts but apply to contracts in which there is a special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility."). Although Cramton contends that Keely owed fiduciary duties to her under the Operating Agreement, the document says the exact opposite—it contains a clause (Section 16.11) providing that, except for circumstances not present here, "[t]he Members agree that there shall be no applicable fiduciary duties or obligations for the Members, Managers or the Advisory Managers of the Company." (Doc. 143-2 at 62.)[27] And as for Cramton's contention that she was an employee of ECH, this claim is inaccurate, as discussed in Section V.D.1 above.[28]

…

…

---

[27] Although Cramton has cited Arizona cases suggesting that a manager who possesses "significant ownership and control" over a company may owe fiduciary duties to the company and its members (Doc. 159 at 16), those cases didn't involve an operating agreement (such as the Operating Agreement in this case) in which the members expressly disclaimed the existence of any fiduciary duties.

[28] Additionally, the Court is skeptical of Cramton's claim that all employee/employer relationships qualify as "special relationships" for purposes of a claim for tortious breach of the implied covenant. The only case Cramton cites in support of this claim, *Bogue v. Better-Bilt Aluminum Co.*, 875 P.2d 1327 (Ariz. Ct. App. 1994), addressed an entirely different issue—whether employees and employers have the sort of "special relationship" that would require the employer, under general principles of negligence law, to "take affirmative precaution for the aid or protection of another." *Id.* at 1339. *Burkons*, in contrast, identified three specific types of "special relationships" that must exist to support a claim for tortious breach of the implied covenant ("there [must be] special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility"), and this list doesn't include employee/employer relationships. 813 P.2d at 720.

**I.    Counts Nine and Ten (Negligent Misrepresentation and Fraud)**

In Counts Nine and Ten of the amended complaint, Cramton asserts claims for negligent misrepresentation and fraud.  (Doc. 88 ¶¶ 146-62.)  Both claims arise from the conversation on September 18, 2017 during which Keely allegedly told Cramton "that Kahala was no longer interested in acquiring [ECH]."  (*Id.* ¶¶ 147, 153.)  Cramton contends she detrimentally relied on this inaccurate statement by resigning (and, in Count Ten, further contends that Keely knew the statement was inaccurate and acted with the intent of duping Cramton into resigning).

Defendants seek summary judgment on Counts Nine and Ten for a host of reasons, some of which apply to both claims and some of which are claim-specific.

a.    Arguments that apply to both Count Nine and Count Ten

Defendants raise five summary judgment arguments that apply equally to Counts Nine and Ten: (1) "Keely's present-tense representation—that Kahala rejected the deal then before it—is true"; (2) "Keely made no representation about future deals"; (3) "Cramton's alleged reliance was not justified"; (4) Counts Nine and Ten are barred by the ELR; and (5) because Cramton's resignation from GGS on September 14, 2017 gave Keely the option, under Section 9.3 of the Operating Agreement, to repurchase Cramton's shares for $1, Cramton cannot have been damaged by any subsequent misrepresentations.  (Doc. 143 at 5, 13-17, 20-22.)

The first two arguments are easily rejected.  Counts Nine and Ten are based not only on Keely's statement on September 18, 2017 that the Kahala had rejected a particular offer (which Keely acknowledges she made, *see* Doc. 143 at 15), but also on Keely's alleged statement during the same conversation that the overall deal had fallen through and there would be no future offers.  (*See* Doc. 143-4 at 114 [Cramton testifying that "Keely told me that the deal fell through.  And that I asked if anybody—if, if there was any—going to be any more offers.  And she said no."]; *id.* at 115 [Cramton testifying that Keely told her "there was [not] any chance there would be any deal"]; Doc. 173-1 at 130 ¶ 13 [Cramton stating in her declaration: "Keely Newman's statements to me on September 18, 2017 were

not limited to the statement that 'Kahala had rejected the offer to sell ECH's assets on the same terms of the Due North deal.' She told me that the potential deal with Kahala had fallen through and no additional offers would be made. I understood this to mean that all negotiations with Kahala were done, not ongoing."].) Although Defendants contend that "Keely told Cramton just the opposite of what Cramton is claiming" (Doc. 143 at 16), the evidence they cite in support of this assertion is Keely's deposition testimony. (Doc. 143-2 at 90-91.) The Court obviously cannot accept Keely's disputed testimony on this point, and reject Cramton's, for purposes of summary judgment. There is a genuine issue of fact regarding whether Keely made a representation to Cramton about Kahala's continued interest in a deal.

The third argument—that Cramton's alleged reliance on this statement was unjustified—also requires little discussion. Although Defendants identify several reasons (including Cramton's knowledge that Keely was interested in a quick deal and Cramton's potential ability to obtain information about the status of the deal from Wuycheck and others) why a fact-finder might ultimately conclude that Cramton's reliance was unreasonable, this is a quintessential jury question. *See, e.g., Lerner v. DMB Realty, LLC*, 322 P.3d 909, 914 (Ariz. Ct. App. 2014) ("Questions about materiality and reasonable reliance . . . usually are for the jury . . . ."); *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cty.*, 96 P.3d 530, 535 (Ariz. Ct. App. 2004) ("Questions of . . . reasonable reliance[] are fact-intensive inquiries.").

Defendants' fourth argument is that Counts Nine and Ten must fail because "[t]he economic loss rule has been applied [by Arizona courts] to preclude contract-related fraud and misrepresentation claims." (Doc. 143 at 13-14.) However, in her response, Cramton identifies three cases in which courts applying Arizona law concluded the ELR didn't bar claims for fraud and/or negligent misrepresentation. (Doc. 159 at 18.)[29] As a result,

---

[29] Those three cases are *Sitevoice, LLC v. Gyrus Logic, Inc.*, 2014 WL 4722329 (D. Ariz. 2014), *KD & KD Enterprises, LLC v. Touch Automation, LLC*, 2006 WL 3808257 (D. Ariz. 2006), and *Aventis Techs. Corp. v. JP Morgan Chase Bank*, 2004 WL 5137578 (D. Ariz. 2004).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants are forced to acknowledge in their reply that "there does not appear to be an absolute rule concerning the ELR's application to such claims," but they nevertheless argue that, for policy reasons, the rule should apply here. (Doc. 172 at 10-11.)

Defendants have not established that Counts Nine and Ten are barred by the ELR. The principal case on which Defendants rely is *Cook v. Orkin Exterminating Co.*, 258 P.3d 149 (Ariz. Ct. App. 2011). There, the plaintiffs were homeowners who had entered into a contract with a termite extermination company. *Id.* at 150. Under the contract, the company "expressly disclaimed" any obligation "to repair damage to the home caused by an infestation" and instead "promis[ed] only to apply any necessary additional treatment to the Cooks' house if a termite infestation was found during the relevant time period." *Id.* Nevertheless, the plaintiffs sought to argue the company "was liable for misrepresentation and fraud because it . . . promised them that it would repair any damage to their home and furnishings resulting from new termite activity, thereby inducing them to enter the Agreement, which they otherwise would not have done." *Id.* at 152. The Arizona Court of Appeals concluded the ELR barred those claims because the plaintiffs were essentially "seeking remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement." *Id.* at 153. In reaching this conclusion, the court rejected the plaintiffs' request to adopt a blanket rule that the ELR can never be applied to claims for fraud or misrepresentation. *Id.* at 153 n.6.

This case is easily distinguishable from *Cook*. Cramton isn't arguing that Defendants induced her to enter into the Operating Agreement by making oral promises that contradict the written terms of the Operating Agreement. Nor is she attempting to alter the terms of the Operating Agreement by seeking a different remedy for a breach than the bargained-for remedy set forth in the Operating Agreement. Instead, Cramton's theory is that, well after the Operating Agreement was executed, Keely duped her into resigning, which in turn caused her to forfeit benefits that otherwise would have been available to her under the Operating Agreement. There is no policy reason to apply the ELR in this scenario because Cramton isn't seeking to upset the "contractual allocations" of "accident

deterrence and loss-spreading" that are specified in the Operating Agreement. *Cook*, 258 P.3d at 153.[30]

Defendants' final reason why Counts Nine and Ten both fail is that Cramton's resignation from GGS on September 14, 2017 (*i.e.,* four days before the fateful phone call on September 18, 2017) gave Keely the option to repurchase Cramton's shares for $1. (Doc. 143 at 5.) In response, Cramton argues that (1) she didn't actually resign from GGS—the release merely states that she sold her membership interest in GGS back to Defendants and then released GGS for any related liability—and (2) Defendants never disclosed this resignation theory in their MIDP disclosures. (Doc. 159 at 24-25.) Notably, Defendants do not address these arguments in their reply. (Doc. 172.)

It is unclear whether Defendants have abandoned this argument but they are not, in any event, entitled to summary judgment based upon it. The sole piece of evidence identified in their motion as proof that Cramton resigned from GGS is Exhibit 29, the "Mutual Releases" document (Doc. 143-4 at 62-68), but that agreement does not say anything about resignation.

Thus, Defendants have not identified any valid reason why they are entitled to summary judgment on both Counts Nine and Ten.

b.  <u>Arguments that apply only to Count Nine</u>

Defendants move for summary judgment on Count Nine, the negligent misrepresentation claim, on two additional grounds: (1) there was no duty owed and (2) such a claim cannot be premised on a promise of future conduct. (Doc. 143 at 17-18.)

Neither argument is availing. First, although Defendants point to Arizona cases

---

[30] The other case cited by Defendants, *Ader v. Bella Vista Townhomes LLC,* 2017 WL 2494467 (Ariz. Super. 2017), is an unpublished order from an Arizona trial court. It is unclear how much persuasive value such a decision should have here. *Westlands Water Dist. v. Amoco Chemical Co.*, 953 F.2d 1109, 1111 (9th Cir. 1991) ("In a diversity case, where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it. . . . The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis.") (brackets, citations, and internal quotation marks omitted). In any event, the portion of the *Ader* decision addressing the ELR is quite short (*id.* at *3) and, although *Ader* did appear to involve some sort of "operating agreement," the case otherwise appears to have involved much different facts and allegations than are present here.

decided in 1959 and 1976 in support of their argument that a plaintiff asserting a negligent misrepresentation claim must first establish the existence of a legally recognized duty (Doc. 143 at 17), this overlooks that Arizona subsequently "recognized the tort of negligent misrepresentation as defined by Restatement (Second) of Torts § 552(1) (1977)." *Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 944 (Ariz. Ct. App. 2000). And Restatement § 552(1) defines the tort as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id*. Thus, "[t]he elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage." *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014). Cramton is not, in other words, required to establish the independent existence of some duty owed to her by Keely—so long as the challenged false statement was made in the course of "a business transaction," as it was here, her claim may proceed.

Second, Defendants are correct that, as a legal matter, "[a] promise of future conduct is not a statement of fact capable of supporting a claim of negligent misrepresentation." *McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992). Nevertheless, Keely's alleged false statements during the September 18, 2017 phone call could be interpreted by a fact-finder as statements of present fact, as opposed to a promise of future conduct. On this point, it is important to be specific. Cramton testified at one point during her deposition that "Keely told me that the deal fell through. And that I asked if anybody—if, if there was any—going to be any more offers. And she said no." (Doc. 143-4 at 114.) The Court tends to agree with Defendants that this particular snippet of testimony concerned a future event—whether Kahala would be making a future offer—

and thus cannot provide the foundation for a negligent misrepresentation claim. However, Cramton testified that Keely also stated "there was [not] any chance there would be any deal" with Kahala. (*Id.* at 115.) A fact-finder could view this as a statement of present fact—Kahala's existing interest, at the time the statement was made, in continuing the negotiations.

Thus, Defendants are not entitled to summary judgment on Count Nine.

c.    Arguments that apply only to Count Ten

Defendants move for summary judgment on Count Ten, the fraud count, on the additional ground that Cramton hasn't identified any evidence that Keely *knew* at the time of her challenged statement on September 18, 2017 that a future deal with Kahala remained possible, so "Cramton cannot establish Keely's fraudulent intent to deceive." (Doc. 143 at 18-20.)

In response, Cramton points to, *inter alia*, (1) a September 19, 2017 email written by Kahala's lead negotiator, which summarized his interaction with Keely the previous day as follows: "[W]e also communicated to Keely yesterday that we would not be stepping into the [True North] deal, she didn't seem shocked but *wanted to confer with her advisor before letting us know if she wants to continue with us*" (Doc. 173-2 at 150, italics added); and (2) a September 20, 2017 email from Keely in which she instructed an associate to "provide a verbal response to Kahala making the following points . . . I would agree to $3.5 [million] cash . . . .   Remind them of the opportunity to pick up a brand for a good price early in the healthy food life cycle and in the brand life cycle . . . ." (Doc. 143-4 at 168.) Cramton contends these emails show that "Keely knew the deal with Kahala was never dead," so her misrepresentation on this point must have "reflect[ed] intentional deception." (Doc. 159 at 17.)

This is another instance where genuine issues of fact preclude summary judgment. As discussed above, Keely allegedly told Cramton on September 18, 2017 that "there was [not] any chance there would be any deal" with Kahala. Yet a reasonable factfinder could conclude, based on the emails proffered by Cramton, that Keely *did* believe at the time that

there *was* a chance of a future deal—the Kahala negotiator was under the impression, during his meeting with Keely on September 18, 2017, that Keely might "want[] to continue with us" and Keely authorized a counteroffer to Kahala within 48 hours of when she allegedly told Cramton there was no possibility of a deal. Questions of intent are quintessential jury questions and Defendants are not entitled to summary judgment on this record.

### J. **Counterclaim One (Breach of Contract)**

In Counterclaim One, the Corporate Defendants allege that Cramton breached (1) certain provisions of the parties' Confidentiality and Non-Competition Agreement, (2) a particular provision of the ECH Operating Agreement governing the return of confidential information, and (3) the implied covenant of good faith and fair dealing arising from an unspecified contract or contracts. (Doc. 95 at 24 ¶¶ 21-25.)

In her summary judgment motion, Cramton argues the Corporate Defendants cannot prevail on this claim because (1) the non-compete provision of the Confidentiality and Non-Competition Agreement is unenforceable; (2) the Corporate Defendants have no evidence she violated any part of the agreements at issue; and (3) the Corporate Defendants do not have any evidence of damages incurred as a result of any alleged breach. (Doc. 142 at 14-17.) In their response, the Corporate Defendants don't address the first argument (enforceability), barely address the third argument (damages), and respond to the second argument by contending that Cramton breached the agreements in three ways: (1) failing to "surrender company documents and tangible property following her resignation, including the data contained on her company cellphone and laptop"; (2) providing assistance to Dana Mavros, who was the Corporate Defendants' consultant, when Mavros was attempting to hire ECO employee Laura McCormack (who is also Cramton's spouse); and (3) violating the non-compete provision by working for Kahala. (Doc. 158 at 13-16.)

### 1. Elements

"[A] breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d

204, 210 (Ariz. 1986) (citation omitted).  To succeed on a breach of contract claim, a plaintiff must prove three elements: (1) the existence of the contract, (2) its breach, and (3) resulting damages.  *Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013).

## 2.    Theory One: Failing To Surrender Company Property

As noted, one of the Corporate Defendants' theories is that Cramton failed to surrender certain company documents and property upon her resignation.  The relevant provision of the Confidentiality and Non-Competition Agreement provides as follows:

> Returning the Company Documents and Tangible Property.  Upon request of the Company and, in any event, upon termination of my Relationship with the Company, I will promptly surrender and deliver to the Company (and will not keep in my possession or deliver to anyone else) and agree not to use any Confidential Information, records, data, notes, reports, proposals, lists, correspondence, computer code, specifications, drawings, blueprints, sketches, flow diagrams, materials, equipment, devices or any other documents or property (including photocopies or other reproductions of any of the aforesaid items) of the Company. I also agree to disclose any and all passwords used for Company business.

(Doc. 158-1 at 295.)  Similarly, the ECH Operating Agreement contains a clause providing in relevant part as follows:

> Affirmative Covenants. . . .  In the event any Member is no longer a member of the Company, such member shall neither take nor retain, without prior written authorization from the Company, any other Confidential Information, or copies thereof, of any kind belonging to the company.

(Doc. 158-2 at 32.)

Because Cramton moved for summary judgment on that ground that the Corporate Defendants can't prove any damages associated with this theory, it was incumbent upon the Corporate Defendants to identify some damage-related evidence in their response. They failed to do so—although their response *asserts* they "incurred considerable expense in attempting to recover deleted information," they cite no *evidence* in support of this statement.  (Doc. 158 at 15.)  Thus, Cramton is entitled to summary judgment on this portion of Counterclaim One.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of

materials in the record . . . ."); Fed. R. Civ. P. 56(e)(1) ("If a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). *See also Hastings v. Bank of Am. NA*, 2014 WL 11514488, *4 (D. Ariz. 2014) (where "Plaintiff present[ed] no evidence of any costs incurred," "Defendants [were] . . . entitled to summary judgment on their breach of contract claim because Plaintiff [could not] show that she was damaged by any breach that might have occurred").[31]

### 3. Theory Two: Soliciting McCormack

The Confidentiality and Non-Competition Agreement also contains a provision that prohibits the solicitation of the Corporate Defendants' employees. It provides as follows:

> Non-Solicitation of Employees. I acknowledge the character of the Company's business and the substantial amount of time, money and effort that the Company has spent and will spend in recruiting, developing and retaining competent employees and contractors, and I agree that I will not during the Employee Non-Solicitation Period in the Business Territory, alone or with others, directly or indirectly, solicit for employment, hire, or engagement, or assist any other entity or person in soliciting for employment, hiring, or engagement any employee or contractor who is or who is hereafter employed or engaged by the Company or whose employment or engagement ended within the six (6) month period immediately preceding the solicitation, hire or engagement prohibited by this provision. The Employee Non-Solicitation Period shall be tolled while I am in breach hereof.

(Doc. 158-1 at 296.)

The Corporate Defendants argue Cramton breached this provision by "assist[ing] third party Dana Mavros ([the Corporate Defendants'] consultant) with soliciting ECO employee Laura McCormack (Cramton's spouse)." (Doc. 158 at 15.) But the only

---

[31]     It should be acknowledged that the Corporate Defendants stated, in the last sentence of the section of their response concerning the damages issue, that they "intend to file a spoliation motion." (Doc. 158 at 15.) However, the Corporate Defendants did not make a request under Rule 56(d) for more time to obtain damages evidence to support their counterclaim. Thus, even though the Corporate Defendants did end up filing a spoliation motion on July 22, 2019 (Doc. 206)—more than three months after they filed their response to Cramton's summary judgment motion (Doc. 158)—the Court need not consider the materials submitted as part of the spoliation briefing for summary judgment purposes. Moreover, it is unclear whether the spoliation motion contains an itemization of the costs allegedly incurred by the Corporate Defendants when attempting to recover deleted data. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); 2 Gensler, *supra*, at 160 ("The court has no duty to search the record to identify the facts that might . . . defeat summary judgment.").

evidence the Corporate Defendants proffer to support this assertion is a single page containing 12 short text messages. (Doc. 158-3 at 33.) Although it is possible to infer that the individuals exchanging those text messages were Mavros and Cramton (one of the participants is using a phone number described as "Dana's Super Secret Number" and the other participant identifies herself at one point as "Kim"), it is unclear what the parties were discussing. The one message in which Mavros states "I wanted to follow up with you and Laura regarding following up with my business" is too vague to constitute proof that Cramton assisted Mavros in ultimately hiring McCormack.[32]

The Corporate Defendants' second theory also fails for the independent reason that they have not proffered any evidence showing they suffered damages—although they assert the alleged solicitation attempt "damag[ed] Corporate Counterclaimants" (Doc. 158 at 16), no supporting evidence is identified.

### 3. Theory Three: Violating Non-Compete By Working At Kahala

The Confidentiality and Non-Competition Agreement contains a "Non-Competition" clause that provides as follows:

> Non-Competition. I acknowledge that the Company does business throughout the Business Territory and further acknowledge the substantial amount of time, money and effort that the Company has spent and will spend in building its products, services, employee and customer relationships and development of strategically important information, and agree during the Non-Competition Period, I will not, alone or with others, directly or indirectly, acquire an ownership interest in, manage, operate, be employed or engaged by, consult for or otherwise be associated with any business engaged in or planning to engage in any business activity (whether or not for compensation) within the Restricted Field in the Business Territory, to the extent my ownership, management, operation, employment, engagement, consultancy or association involves me accessing, using, referring to, or drawing upon my knowledge of the Company's Confidential Information or customer relationships. The Non-Competition Period shall be tolled while I am in breach hereof.

(Doc. 158-1 at 296.) "Restricted Field" is defined as "the business of creating, manufacturing, producing and marketing healthy fast food + juice." (*Id.* at 294.) "Business

---

[32] The Corporate Defendants also cite an email in which McCormack states she is resigning from Grabbagreen (Doc. 158-3 at 35) and a contractor agreement between McCormack and an LLC that appears to be affiliated with Mavros (*id.* at 37-49). Although these documents suggest that McCormack ended up working for Mavros, they do not shed any light on whether Cramton helped solicit McCormack to make the switch.

Territory" is defined as:

> locations where Company has restaurants or franchisees or where it has definite plans in which to expand, unless a court determines that geographic scope is unenforceable under applicable law because it is too broad, in which case the Business Territory shall be confined to a 5 mile radius from the locations where I actually provided services for Company or about which I know confidential information. If a court determines that a 5 mile radius is unenforceable under applicable law because it is too far, the Business Territory shall be the greatest distance that the court determines is reasonable under the circumstances: three (3) miles; or one and a half (1.5) miles.

(*Id.* at 293.)

Cramton argues that (1) this provision is unenforceable and (2) in any event, she has not breached it. (Doc. 142 at 14; Doc. 171 at 11.) In response, the Corporate Defendants do not address the enforceability argument but contend that Cramton breached the provision by "working at [Kahala] as Director of Franchise Development, selling all Kahala Brand concepts, including Grabbagreen competitors." (Doc. 158 at 15-16.) Further, they claim she breached the provision by "[taking] the lead on franchising the Grabbagreen Brand for Kahala" "after Kahala acquired the Grabbagreen Brand." (*Id.*) As such, they argue, "[d]uring the non-compete period, Cramton began doing the same work for Kahala that she had done for GFL, requiring her to rely upon her knowledge of GFL's Confidential Information." (*Id.*) Their only argument about damages is that Cramton's conduct "damage[ed] Corporate [Defendants] by, among other things, interfering with the Kahala deal . . . resulting in a dramatically reduced purchase price." (*Id.*)

This claim fails for an array of reasons. First, the Corporate Defendants did not respond to Cramton's argument that the non-compete clause is unenforceable. The usual rule is that "[t]he burden is on the employer to prove the extent of its protectable interests, and if it cannot, the entire [non-compete] covenant will be deemed unenforceable." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 979 (D. Ariz. 2006). The Corporate Defendants' failure to address this issue suggests they have abandoned it. *See, e.g., Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("[Plaintiff] abandoned her other two claims by not raising them in opposition to the [defendant's] motion for summary judgment."); *Bolbol v. City of Daly City*, 754 F. Supp. 2d 1095, 1115 (N.D. Cal. 2010)

- 65 -

("[P]laintiff fails to address this issue in her opposition brief and apparently concedes that she may not proceed on this claim. Accordingly, the court grants summary judgment in favor of defendants as to this claim.").

Second, even assuming the provision is theoretically enforceable, it only prohibits Cramton from "directly or indirectly, acquir[ing] an ownership interest in, manag[ing], operat[ing], be[ing] employed or engaged by, consult[ing] for or otherwise be[ing] associated with any business engaged in or planning to engage in any business activity (whether or not for compensation) *within the Restricted Field in the Business Territory*." (Doc. 158-1 at 296, emphasis added.) The Corporate Defendants have failed to present any evidence that Kahala was "engaged in or planning to engage in any business activity . . . within the Restricted Field in the Business Territory." The Corporate Defendants list some brands controlled by Kahala that are allegedly "competitive with Grabbagreen" (Doc. 158 at 16), but their only evidence pertaining to those brands is a hearsay printout of a website and that printout does not, in any event, establish that those brands were engaging in business activity within the Restricted Field and/or were located in the Business Territory.

Third, the Corporate Defendants also fail to present any evidence showing that any work Cramton did for Kahala "involve[d] [her] accessing, using, referring to, or drawing upon [her] knowledge of the Company's Confidential Information or customer relationships." (Doc. 158-1 at 296.)

Fourth, the Corporate Defendants present no evidence of damages associated with Cramton's alleged breach of the non-compete provision. The only injury they allege in connection with this provision is "interfer[ence] with the Kahala deal . . . resulting in a dramatically reduced purchase price" (Doc. 158 at 16), but as will be discussed in Part V.M below, the Corporate Defendants have no evidence Cramton interfered with the Kahala deal. And, to the extent the claim is based on Cramton making efforts to franchise the Grabbagreen brand for Kahala *after* Kahala acquired Grabbagreen, it is unclear how the Corporate Defendants could have been damaged by such post-acquisition conduct.

4.    <u>Implied Covenant</u>

As noted, the Corporate Defendants' answer seems to allege that Counterclaim One is based not only on certain specific clauses within the Confidentiality and Non-Compete Agreement and the ECH Operating Agreement, but also upon "the implied covenant of good faith and fair dealing." (Doc. 95 at 24 ¶ 23.) In her summary judgment motion, Cramton identifies an array of reasons why any such claim must fail,[33] and the Corporate Defendants do not address these arguments in their response. Thus, the Court concludes the Corporate Defendants have abandoned their implied-covenant claim, at least as it pertains to Counterclaim One. *Jenkins,* 398 F.3d at 1095 n.4; *Bolbol,* 754 F. Supp. 2d at 1115.

K.    **Counterclaim Two (Unfair Competition)**

In Counterclaim Two, the Corporate Defendants assert a claim for unfair competition. (Doc. 95 at 25 ¶¶ 26-31.) The gist of this claim is that the "actions" of Cramton described in their answer "comprise business conduct that is contrary to honest practices in commercial matters." (*Id.* ¶ 27.)

Cramton moves for summary judgment on Counterclaim Two on the grounds that (1) the ELR bars the Corporate Defendants "from seeking to assert through tort what they have already contracted for" and (2) "[the Corporate Defendants] have failed to disclose any evidence establishing legally wrongful conduct by Cramton or resulting damages." (Doc. 142 at 23-24.)

In response, the Corporate Defendants focus solely on whether the claim is barred by the ELR. (Doc. 158 at 20-21.) Specifically, they contend that the claim "arises out of Cramton's misuse of confidential information acquired during the course of her relationship with [the Corporate Defendants] to advance a rival business interest," that this

---

[33]    Specifically, Cramton argues that (1) the "implied-covenant claims are simply a re-hashing of the breach of contract claims"; (2) "Cramton's alleged 'bad faith' is simply not actionable"; (3) "there is no 'right or privacy' inherent in the parties' business contracts that would prohibit Cramton from truthfully informing friends or colleagues of Newman's medical condition"; and (4) "[the Corporate Defendants] have failed to disclose any evidence that would support common-law defamation." (Doc. 142 at 21-23.)

particular contingency wasn't the subject of discussion when the Operating Agreement was being negotiated, and that there is thus "no risk of undermining the policy concerns of contract law by allowing [this] tort claim against Cramton." (*Id.*)

The Court need not decide whether Counterclaim Two is barred by the ELR because the Corporate Defendants have provided no evidence supporting this claim and no explanation of the basis for this claim. To the extent Arizona even recognizes a cause of action for unfair competition,[34] "[t]he general purpose of the doctrine is to prevent business conduct that is 'contrary to honest practice in industrial or commercial matters.'" *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998) (citation omitted). As such, "[t]he doctrine encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and misappropriation." *Id.* Here, the Corporate Defendants do not seem to be arguing that Cramton is liable for trademark infringement, false advertising, palming off, or misappropriation. Their response does not include any explanation concerning why Cramton might be liable for unfair competition and does not provide any evidence in support of any theory of liability for this claim. It is not the Court's job to manufacture the claim for the Corporate Defendants.

Additionally, the Corporate Defendants' sole theory of damages related to this claim—that Cramton's alleged misuse of confidential information "dimish[ed] the sale value of [the Corporate Defendants'] assets" (Doc. 158 at 21)—is marred by a total absence of evidentiary support. *See* Part V.M *infra*.

Accordingly, the Court grants summary judgment to Cramton on Counterclaim Two.

### L.     **Counterclaims Three and Five (GGS Release)**

Cramton moves for summary judgment on Counterclaims Three and Five, to the extent those claims are premised on alleged breaches of express provisions within the GGS Release, on the grounds that (1) "the alleged breaches are outside the scope of the Release

---

[34] *See Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 547 (Ariz. 2014) ("[W]e do not decide here whether Arizona common law recognizes a claim for unfair competition . . . .").

and entirely unsupported by the evidence" and (2) Defendants cannot show associated damages. (Doc. 142 at 19-21.) Cramton also argues that Counterclaim Three fails because "Kelli Newman, ECO, ECH, and GFL are not parties to the [GGS release] and they are not third-party beneficiaries of the [GGS] Release, so there is no way they can sue for breach." (*Id.* at 18-19.)

In their response (Doc. 158 at 16-20), Defendants seem to contend that Counterclaims Three and Five are premised on breaches of (1) the "Mutual Releases" provision of the GGS Release (discussed above) and (2) the "Non-Disparagement" provision of the GGS Release, which provides as follows:

> The Parties agree not to make any negative or disparaging comments, whether written or oral, in any form whatsoever (whether via social media, the internet, or otherwise), about each other, the Corporation or Grabbagreen to the public, any member of the public, the press, actual or potential business partners or associates, or any others. This prohibition includes, but is not limited to, statements regarding the claims, demands, allegations, assertions, arguments, and outcome of the any dispute between or among the Parties, as well as any statements regarding the Parties' business conduct, business practices, quality of goods or services, Grabbagreen or work performed.

(Doc. 143-4 at 64.)

With this understanding in mind, Counterclaims Three and Five fail for two reasons.[35] First, this Court has already found (*see* Part V.C.1 above) that Cramton did not violate the "Mutual Releases" provision by suing Defendants in this case. Second, Defendants do not provide any evidence of damages associated with the alleged breach of the "Non-Disparagement" provision. In conclusory fashion, they assert in their response that Cramton's breach of this provision "damag[ed] Keely and Kelli's reputations," but they provide no support for this proposition and no evidence of any damages that have resulted. (Doc. 158 at 20.)[36]

Cramton also moves for summary judgment on Counterclaims Three and Five, to the extent those claims are premised on the implied covenant of good faith and fair dealing,

---

[35] The Court need not decide whether ECO, ECH, and GFL have standing to bring such a claim.

[36] Defendants also do not explain how damage to *Kelli's* reputation would constitute a breach of the "Non-Disparagement" provision, given that Kelli was not a party to the GGS Release.

for the same reasons she sought summary judgment on the implied-covenant theory undergirding Counterclaim One. (Doc. 142 at 21-23.) Because the Corporate Defendants do not address those arguments in their response, the Court construes their silence as abandonment and thus grants summary judgment to Cramton to the extent Counterclaims Three and Five are premised on breach of the implied covenant of good faith and fair dealing. *Jenkins*, 398 F.3d at 1095 n.4; *Bolbol*, 754 F. Supp. 2d at 1115.

## M. Counterclaim Four (Wrongful Interference)

In Counterclaim Four, the Corporate Defendants assert a claim for wrongful interference with business expectations. (Doc. 95 at 26-27 ¶¶ 38-44.) The theory underlying this claim is that Cramton engaged in various forms of misconduct—including disparaging them and sharing proprietary information with Kahala—that reduced the ultimate sale price to Kahala by at least $1 million. (*Id.* ¶¶ 42-43.)

Cramton moves for summary judgment on Counterclaim Four on the grounds that (1) the Corporate Defendants "have not produced any evidence that Due North or Kahala reduced their purchase price based on any actions by Cramton"; and (2) "[t]here is no evidence of any interference by Cramton." (Doc. 142 at 24.)[37] In support of these arguments, Cramton proffers direct evidence (both from herself and from two Kahala representatives) that she didn't interfere with the Kahala/Grabbagreen deal and that Kahala formulated its purchase price for Grabbagreen without her input.

In response, the Corporate Defendants argue that a collection of circumstantial evidence "raises obvious questions as to whether there was a causal relationship between Cramton's breach of confidentiality and the substantial reduction in Kahala's purchase price." (Doc. 158 at 21-25.) The proffered circumstantial evidence includes:

---

[37] The elements of intentional interference with a business relationship are: "(1) [t]he existence of valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bureau of Maricopa Cty., Inc.*, 637 P.2d 733, 739-40 (Ariz. 1981) (citations omitted). Thus, Cramton's summary judgment arguments concern the third and fourth elements.

Cramton's resignation; her longstanding friendship with Kahala's lead negotiator, Wuycheck; Cramton informing Wuycheck of her resignation less than 24 hours after submitting her resignation to Keely; her inflammatory pre-litigation claims against [the Corporate Defendants]; her immediate employment with Grabbagreen's competitor and suitor, Kahala; her calls and meetings with Wuycheck during discussions and then negotiations with Kahala, both before and after she resigned; the fact that Wuycheck and Kahala never disclosed to Grabbagreen that it hired Cramton; Cramton's documented hostility and retaliatory spirit toward Keely and Kelli; Cramton's regular contact with a Grabbagreen insider (described by her spouse as her inside "mole") for months following her resignation; Kahala's substantially reduced LOI, which was submitted 10 days after Cramton began working for Kahala; followed by this lawsuit, which was filed two weeks later.

(*Id.* at 24-25, citation omitted.) The Corporate Defendants do not, however, present any direct evidence demonstrating interference.

In light of the plethora of direct evidence of *non*-interference presented by Cramton, and the weakness of the circumstantial evidence proffered by the Corporate Defendants, no factfinder could reasonably conclude that Cramton interfered with the Kahala deal. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992) (at summary judgment, court "must treat . . . direct evidence as if it were true" but is "entitled to consider the plausibility and reasonableness of inferences arising from . . . circumstantial evidence"); *Travers v. Sullivan*, 801 F. Supp. 394, 397-98 (E.D. Wash. 1992) ("[W]hen the only evidence offered in opposition to the motion for summary judgment is circumstantial evidence, then the court may inquire into the plausibility of inferences drawn from that evidence.").

Indeed, Cramton stated in her declaration that, "[b]ecause [she] previously worked at Grabbagreen, [she] was screened off of any discussions regarding Grabagreen, and was not privy to any of the negotiations between Kahala and Grabbagreen." (Doc. 142-2 at 6 ¶ 46.) Wuycheck, Kahala's Senior Vice President of Development, similarly testified in his deposition that he and Cramton "always ha[d] been very careful" and "early on established rules that [they] weren't going to talk about Grabbagreen." (Doc. 142-6 at 63-64.) He further testified that he didn't recall discussing Grabbagreen with Cramton between the time of Kahala's first offer and the lowered second offer. (*Id.* at 66.) He also testified about various contemporaneous emails he had sent Cramton in which he expressly

indicated that he didn't want her to disclose any information about Grabbagreen that hadn't already been disclosed through the purchase process. (*Id.* at 68, 71-72.) And Jeff Smit, Kahala's Chief Operating Officer, testified he was not aware of Cramton having any communications with the negotiation team about the Grabbagreen acquisition. (*Id.* at 83-84.) Smit further testified that the $500,000 reduction in price was not "influenced in any way, shape or form by Kim Cramton" and that, instead, Kahala lowered the purchase price because, "through due diligence, [Kahala] discovered that three out of the four corporate stores were sold," which reduced the value of the company and the price Kahala was willing to pay. (*Id.* at 85-86, 91.)

Given all of this, the mere fact that Cramton was engaging in conversations with Wuycheck and working for Kahala while the deal was being negotiated doesn't, without more, create a genuine issue of fact regarding whether Cramton interfered with the deal. To conclude otherwise would subvert Rule 56 by allowing a party to avoid summary judgment based on mere speculation and conjecture. *Cf. Owens v. Lighthouse Counseling Ctr., Inc.,* 2009 WL 1204359, *11 (M.D. Ala. 2009) (granting summary judgment on tortious interference claim, where a third party submitted a declaration averring that the defendant did not do "anything that contributed to my decision regarding [the plaintiff's] discharge," because the plaintiff's testimony "that 'she feels' like [the defendant] interfered with her employment" was "conjecture or speculation [that cannot] satisfy the plaintiff's burden to offer sufficient facts to defeat a defendant's properly supported summary judgment motion"). *See generally Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) ("[A] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.' Summary judgment may be granted if 'the evidence is merely colorable . . . or is not significantly probative.'") (citations omitted).

The Court, thus, grants summary judgment to Cramton on Counterclaim Four.

\*\*\*

- 72 -

Accordingly, **IT IS ORDERED** that:

(1)     Defendants' motion to supplement the record (Doc. 200) is **granted**;

(2)     Defendants' motion for sanctions (Doc. 206) is **denied**;

(3)     Cramton's motion for leave to file a sur-reply (Doc. 229) is **denied as moot**;

(4)     Kelli's motion to strike changes to Cramton's deposition testimony (Doc. 220) is **denied**;

(5)     Cramton's motion for summary judgment (Doc. 142) is **granted in part and denied in part**;

(6)     Defendants' motion for summary judgment (Doc. 143) is **granted in part and denied in part**;

(7)     Based on the aforementioned rulings, the following claims and counterclaims, or portions thereof, are no longer pending: all claims against Kelli pursued under a community property theory; Counts One, Two, and Three; Count Four (as to ECO, ECH, and Kelli); Count Five (as to liability); Counts Six and Eight; and Counterclaims One, Two, Three, Four, and Five; and

(8)     Based on the aforementioned rulings, the following claims (or portions thereof) remain pending: Count Four (as to Keely and GFL); Count Five (as to damages); and Counts Seven, Nine, and Ten.

Dated this 23rd day of December, 2019.

_____
Dominic W. Lanza
United States District Judge