**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kim Cramton, | Case No. 2:17-cv-04663-PHX-DWL |
| Plaintiff, | |
| vs. | **JOINT FINAL PRETRIAL ORDER** |
| Grabbagreen Franchising, LLC, Eat Clean Holdings, LLC and Keely Newman, | |
| Defendants. | |

Following is the Joint Proposed Final Pretrial Order to be considered at the Final Pretrial Conference in this case set for **May 27, 2020, at 1:00 p.m**.

**A.    TRIAL COUNSEL**

Plaintiff:

| | |
|---|---|
| Todd Feltus | Michelle R. Matheson |
| Molly Rogers | Emily D. Armstrong |
| **KERCSMAR & FELTUS PLLC** | **MATHESON & MATHESON, P.L.C.** |
| 7150 E. Camelback Road, Suite 285 | 15300 North 90th Street, Suite 550 |
| Scottsdale, Arizona 85251 | Scottsdale, Arizona 85260 |
| Tele: (480) 421-1001 | Tele: (480) 889-8951 |
| tfeltus@kflawaz.com | mmatheson@mathesonlegal.com |
| cmr@kflawaz.com | earmstrong@mathesonlegal.com |

Defendants:

| Larry J. Cohen<br>Erin A. Hertzog<br>**CRONUS LAW, PLLC**<br>2601 East Thomas Road, Suite 235<br>Phoenix, Arizona 85016<br>Tele: (480) 467-3188<br>lcohen@cronuslaw.com<br>eah@cronuslaw.com | Kelli Newman (*pro hac vice*)<br>**NEWMAN LAW, LLC**<br>119 Tanglewood Drive<br>Glen Ellyn, Illinois 60137<br>Tele: (630) 403-6040<br>kelli@lawnewman.com<br><br>*Counsel for Defendants Eat Clean Holdings, LLC and Keely Newman only* |
|---|---|

**B.  STATEMENT OF JURISDICTION**

1.     Jurisdiction in this case is based on 28 U.S.C. 1367.

2.     Jurisdiction is not disputed.

**C.   STIPULATIONS AND UNDISPUTED FACTS AND LAW**

1.     **The following material facts are admitted by the parties and require no proof**:

a.  Keely Newman ("Keely") is a founder of non-defendant Gulf Girl Squared, Inc. ("GGS").

b.  In April 2013, GGS opened its first restaurant using the "Grabbagreen" trade name at 15688 N. Hayden Rd., #L129 Scottsdale AZ 85260 ("GG1").

c.  In December 2013, GGS opened its second restaurant using the "Grabbagreen" trade name at 7366 E. Shea Scottsdale, AZ 85260 ("GG2").

d.  In December 2014, GGS opened its third restaurant using the "Grabbagreen" trade name at 50 W. Jefferson, Suite 120 Phoenix, AZ 85003 ("GG3").

e.  Kim Cramton ("Cramton") began working as the Regional Manager of GGS on September 29, 2014.

f.  At all relevant times, GGS was a franchisee of Grabbagreen Franchising, LLC ("GFL").

1

g.   On October 24, 2016, Eat Clean Operations, LLC ("ECO") was formed as a wholly-owned subsidiary of Eat Clean Holdings, LLC ("ECH").

h.   ECH was not a parent company to GGS.

**GFL**

i.   At all relevant times, GFL was an Arizona limited liability company.

j.   GFL was formed to franchise the Grabbagreen restaurant concept.

k.   As a franchisor, GFL could not sell franchises until it had its first Franchise Disclosure Document ("FDD").

l.   GFL filed its first FDD April 3, 2015 ("First FDD").

m.   At all relevant times, Cramton was employed by GFL.

**ECH**

n.   ECH was formed in Arizona on October 13, 2016 and at all relevant times was an Arizona limited liability company.

o.   ECH acquired GFL and became the sole member owning 100% of GFL on October 27, 2016.

p.   ECH had an operating agreement titled the ECH Restated Operating Agreement dated November 28, 2016 (the "Operating Agreement").

q.   Cramton had no involvement in any capacity with ECO or ECH in 2014 or 2015 because neither entity existed until October 2016.

2.   **The following material facts, although not admitted, will not be contested at trial by evidence to the contrary**:

a.   "Grabbagreen" is a brand name.

b.   "Grabbagreen" is not the legal name of any entity that employed Cramton during the relevant period of this lawsuit.

**Krowne / ECO**

c. In 2016, S&H Arizona I, LLC ("S&H") was a franchisee of GFL building out its first location at 4727 E. Bell Rd. Phoenix, AZ 85032 ("GG51").

d. Cramton and Keely formed Krowne Enterprises, LLC ("Krowne") for the purpose of taking over the GG51 location from S&H, completing the buildout and operating GG51 as a franchisee of GFL.

e. Keely owned 51% of Krowne and Cramton owned 49% of Krowne.

f. After Krowne took over GG51, Keely paid $94,381 for the remaining construction and build out expenses, purchase equipment and open GG51.

g. After Krowne took over GG51, Cramton paid $66,527 for the remaining construction and build out expenses, purchase equipment and open GG51.

h. ECO did not exist at the time that Cramton paid $66,527 in buildout expenses for the buildout of GG51 or at the time Krowne opened GG51 for business.

i. Cramton did not deposit $66,527 into ECO's bank account.

**GGS**

j. At all relevant times, Cramton was employed by GGS and by GFL. The extent to which Cramton was employed by GGS and GFL is disputed by the parties

**GFL**

k. GFL sold its first franchise on May 29, 2015.

**Kahala**

l. On August 15, 2017, Keely, in her capacity as a member of ECH with the authority provided to her as the majority member under § 5.1(h) of the Operating Agreement, provided a written offer to Kahala to sell the Grabbagreen brand to Kahala on the same terms as the Due North Deal.

m. August 22, 2017, Wuycheck sent an email to Keely confirming that Kahala was willing to consider the Due North Deal terms without exclusivity.

3

n.  on September 24, 2017 Cramton sent a letter dated September 22, 2017 to GFL stating in the regarding line "Resignation" and stating that Cramton "is resigning her position" with GFL "and its related entities effective September 25, 2017" (the "Resignation Letter").

**Due North Deal**

o.  A subsidiary of Due North Holdings, LLC ("Due North") fully negotiated and agreed to purchase the Grabbagreen brand from ECH ("Due North Deal").

p.  The closing date of the Due North Deal was initially scheduled for the beginning of June 2017 but was delayed by Due North pending the resolution of its business issues.

q.  The closing date for the Due North Deal was rescheduled a few times in June and July 2017.

r.  On August 14, 2017, GFL amended its 2017 FDD to disclose to potential franchisees that the Due North Deal was pending.

3.  **The following issues of law are uncontested and stipulated to by the parties:**

a.  To the extent applicable to this case, A.R.S. § 23-363(A) states: "employers shall pay employees no less than the minimum wage, which [is]: 1. $10 on and after January 1, 2017."   The   minimum   wage   for   2016   in   Arizona   was   $8.05. https://www.azica.gov/content/commission-announces-arizona-minimum-wage-will-remain-805-cy-2016

b.  To the extent applicable to this case, A.R.S. § 23-362(A) states that an ""employee" means any person who is or was employed by an employer but does not include any person who is employed by a parent or a sibling, or who is employed performing babysitting services in the employer's home on a casual basis."

To the extent applicable to this case, A.R.S. § 23-362(B) states that an ""employer"

includes any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee, but does not include the state of Arizona, the United States, or a small business."  The Ninth Circuit's "economic reality" test applies to determine whether an individual or entity constitutes an "employer," considering "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991).  Also, it is imperative that she actually exercised one or more of the four control factors listed in this test; mere ability to exercise control is insufficient. *See* Joint Employer Status Under the Fair Labor Standards Act (Final Rule), 85 FR 2820-01 (Jan.16, 2020) (p. 2821 stating "the other person must actually exercise . . . one or more of the four control factors") *available at* https://www.govinfo.gov/content/pkg/FR-2020-01-16/pdf/2019-28343.pdf

c.  A.R.S. § 23-362(D) states: ""Employ" includes to suffer or permit to work: whether a person is an independent contractor or an employee shall be determined according to the standards of the federal fair labor standards act, but the burden of proof shall be upon the party for whom the work is performed to show independent contractor status by clear and convincing evidence."

d.  A.R.S. § 23-362(E) states: ""Wage" means monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities."

e.  On-call time is compensable only when the employee is unable to use the time for her own purposes.  If the employee can stay home, watch TV, go out to eat, visit family, the time the employee is on-call is not compensable.  A.A.C. R20-5-1202(22); 29 C.F.R. § 785-17; *McAllister v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994).

Plaintiff disagrees that this issue of law is relevant as Plaintiff was never "on call."  This was not a doctors' office.  Plaintiff was only working when she was working.

f.   In Arizona, every contract contains an implied covenant of good faith and fair dealing that requires that contracting parties "refrain from any action which would impair the benefits which the other had the right to expect from the contract or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 585, 589 (1986).

g.   Arizona recognizes the tort of negligent misrepresentation as defined by RESTATEMENT (SECOND) OF TORTS § 552, which provides, in relevant part:

**552. Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered:

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Liability for negligent misrepresentation is narrow in scope because it is premised on the reasonable expectations of a foreseeable user supplied in connection with commercial transactions.  RESTATEMENT (SECOND) OF TORTS § 552 comment a.  *St. Joseph's Hospital and Medical Center v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312 (1987).

h.   Fraud requires (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be

6

acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Services Holding Co., Inc. v. Transamerica Ins.*, 180 Ariz. 198, 208, 883 P.2d 435, 445 (App. 1994).  Fraud is "never presumed," nor "can it be found to exist on a mere suspicion as to the possibilities thereof."  *Services Holding Co., Inc. v. Transamerica Ins.*, 180 Ariz. 198, 208, 883 P.2d 435, 445 (App. 1994); *see also*, *Rice v. Tissaw*, 57 Ariz. 230 (1940).  Each of its elements must be proved by clear and convincing evidence.  *Lehman v. Whitehead*, 403 P.2d 8, 10 (Ariz. App. 1965)("A failure to prove any one of the elements by proof which is clear and convincing would be fatal to any case sounding in fraud.").  Thus, "[f]raud may never be established by doubtful, vague, speculative, or inconclusive evidence, and always the proof must be sufficient to overcome the initial presumption in favor of honesty."  *In re McDonnell's Estate*, 179 P.2d 238, 241 (Ariz. 1947).

**D.     CONTESTED ISSUES AND LAW**

1.     The following are the material issues of fact to be tried and decided:

**a. Did Cramton receive minimum wage by reason of her employment from GFL in 2016.**

Plaintiff:  Plaintiff contends she did not receive minimum wages from GFL or its authorized agent Keely Newman from December 11, 2016 through her separation on September 24, 2017.  Plaintiff contends the payments she received from Defendants during this time were a pay down on her promissory note as well as payments for her car and insurance.  Plaintiff contends none of the payments were minimum wages.

Defendants' Contentions (GFL and Keely):   Nothing under this factual issue pertains to 2017 so Cramton's statement above is inapplicable here aside from the period of December 12, 2016 to December 31, 2016.  No Defendant had a promissory note with Cramton.   Specifically, GFL had no promissory note with Cramton to pay down.  Therefore, no monetary compensation paid by GFL to Cramton related to a payment for

any reason other than her labor and services to GFL.   In 2016, GFL paid Cramton $176,537.45[1] in taxable wages for her part time employment with GFL.  That amount alone is substantially in excess of the Arizona minimum wage requirements in 2016 without even considering distributions from ECH for service payments as provided under the Operating Agreement. Indeed, Cramton was paid so much money, she was in the top 5% of all earners in Arizona in 2016 based on publicly available statistics and yet, she baselessly claims that none of the payments were minimum wages.

Cramton had shoulder rotator cuff surgery in December 2016.  GFL paid an additional amount in non-taxable wages of $4,350 to her health savings account ("HSA") for Cramton to apply toward the deductible and other out of pocket expenses of her shoulder surgery shown in box 12 of her 2016 W-2.  Cramton also received $8,949 from GFL for her to contribute to her individual SEP retirement account and other payments in December of more than $9,500.  At more than $3,400 per workweek, Cramton would have needed to work more than 422 hours for her average weekly pay to qualify as less than $8.05 per hour.  This is not possible especially considering that Cramton also worked part time for GGS, Krowne and RevSolar.  Cramton received no W-2 from Keely in 2016 or any other year because Keely was not Cramton's employer and Cramton was not Keely's employee at any relevant time in this case.  The foregoing should end the inquiry in relation to 2016.

Cramton's working time was divided between GFL, non-defendant GGS and non-defendant Krowne.  Krowne operated GG51 through December 31, 2016.  RevSolar is an unrelated business owned by Cramton during both 2016 and 2017 with respect to which Cramton spent time working and received taxable income as activity at RevSolar picked up in 2016.  At all relevant times, Cramton understood that reclassifying income as non-

---

[1] Cramton's gross wages in 2016 were $180,887.45.  Cramton's taxable wages were $176,537.45.  The difference is the pre-tax health insurance premium subsidies paid by GFL for Cramton.

taxable principal repayments on a loan was one way she could try to avoid state and federal income tax obligations on her income from RevSolar.

On approximately November 19, 2016, GGS experienced a cash flow crisis that continued for several months. GGS had to borrow funds to make payroll. Cramton's daily priorities by December 2016 primarily involved her efforts at GGS stores to improve sales. Cramton was a 25% owner of GGS in December 2016.[2] Time spent as a shareholder of GGS addressing its cash flow crisis is time spent as an owner of GGS and is not compensable by GFL. A.R.S. § 23-362 defines "wages" for purposes of the Arizona Minimum Wage Act (§§ 23-362 – 23-365) to include all monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities. This definition includes employer paid health insurance premiums, employer monthly payments for her car, and employer paid tax gross ups – all are forms of monetary compensation due an employee by reason of employment and Cramton has cited no basis whatsoever to claim otherwise. Monetary compensation means cash or its equivalent due to employee by reason of employment. A.C.C. R20-1202. Cramton has never alleged or explained in her mandatory initial disclosure ("MIDP") responses how $180,887.45 in gross wages fails to meet the minimum wage laws in Arizona for GFL. *See*, Dkt. 294, Ex. 1, at 33:9-15; Dkt. 175, at 2:28-3:10. In relation to December 2016 specifically, Cramton has also never alleged or explained how the payments GFL made to her in December fail to meet applicable minimum wage requirements especially considering that her claimed damages for December 2016 are only $1,288 (160 hours x $8.05) and the payments she received exceeded $9,500. All of the monetary compensation she received was paid by GFL by reason of Cramton's employment. In addition, courts have rejected minimum wage claims by officers where their salary, when averaged across their total time worked,

---

[2] From October 7, 2016 through September 14, 2017, Cramton owned 25% of GGS and Keely owned 75% of GGS.

1
2
3
4
5
6
7
8
9

still payed them above minimum wage.  *See*, *Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999), *citing*, *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986).  With an average workweek of more than $3,400 in pay, Cramton received more than the minimum wage.  Further, parties may legally contract around the default payment requirements of A.R.S. § 23-351.  *Orfaly v. Tucson Symphony Socy.*, 99 P.2d 1033-34 (Ariz. App. 2004).  Such an agreement to alter when wage payments become due and payable is legally permissible.  *Id*.  It is inconsequential whether Cramton received pay every two weeks or she agreed to vary the timing.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Cramton arrived at her purported 160 hours of unpaid work by improperly including her time:  (i) worked at GGS, (ii) worked at Krowne, (iii) worked for RevSolar, (iv) spent driving to and from Las Vegas (approximately 10 hour drive time round trip), (v) spent in Las Vegas, (vi) spent off of work for shoulder rotator cuff surgery, (vii) spent at home recovering from that surgery, (viii) spent at physical therapy appointments for her shoulder after her time off to recover, (ix) spent in personal activities, including without limitation, getting a haircut, poker games once per week, car shopping, sitting at a car dealership to buy a new car, hanging out with family showing off the new car, eating dinner, serving as "baby watchers" for Adrianne Savone's baby, laying around at 2pm watching the food channel and visiting Adrianne Savone, for a few examples, and (x) off during the holidays. In addition, for the month of December, GFL had no franchise sales close, GFL had no work on its FDD, and GFL had no discovery days with any potential franchisees.  With all of the time in December 2016 that Cramton spent in activities that are non-compensable by GFL, Cramton's claim under Count IV is without merit and she is not entitled to any additional minimum wages and suffered no compensable damages under A.R.S. § 23-363 ("Arizona Minimum Wage Act"), multiple damages or is entitled to attorneys' fees in 2016.

27
28

In her first deposition, Cramton falsely testified under oath that she was not, or did not know, that she was an employee of GGS at all relevant times to hide her inflated hours

10

under Count IV.  In her second deposition, Cramton admitted she was an employee of GGS in 2017 admitting "I don't know if I could say it was more than 50 or less than 50" percent of her time spent in GGS in 2017.  Cramton admitted she included GGS hours in her calculation in the Complaint. Cramton's credibility is easily attacked given that her employment and several other facts about the structure of the entities is set out plain as day in GFL's franchise disclosure document ("FDD").  GFL issued a total of 10 FDDs from April 3, 2015 through April 17, 2017.  All 10 of GFL's FDDs state in the "Business Experience" section that Cramton's title at the respective time was "Vice President of Operations" for GGS.  All 10 of GFL's FDDs state in the "Business Experience" section that Cramton's title at the respective time was "Vice President of Franchise Development" for GFL.  All 10 of GFL's FDDs state that GGS, GFL and ECH were affiliates at all relevant times to this lawsuit.  In 2015, 2016 and 2017, Cramton certified under penalty of law that she read and understood all of the FDDs and certified the accuracy of the content of all of the FDDs.  In 2017, Cramton completed only two funded sales with new franchisees of GFL in 2017.  Cramton did not report to work after September 15, 2017 at GFL and has not returned to work at GFL or any of its related entities through the present.

   **b.  Did Cramton receive minimum wage by reason of her employment from GFL in 2017.**

   Plaintiff: Plaintiff contends she did not receive minimum wages from GFL or Keely Newman from December 11, 2016 through her separation on September 24, 2017.  Plaintiff contends the payments she received from Defendants during this time were a pay down on her promissory note as well as payments for her car and insurance.  Plaintiff contends none of the payments were minimum wages.

   Defendants' Contentions (GFL and Keely):  Cramton was not an employee of Keely.  Nothing under this factual issue pertains to 2016 so Cramton's statement above in relation to 2016 is inapplicable here.  No Defendant had a promissory note with Cramton.

11

1
2   Specifically, GFL had no promissory note with Cramton to pay down.  Therefore, no
3   monetary compensation paid by GFL to Cramton related to anything but her labor and
4   services to GFL.  At all times, Cramton was a part time employee of GFL and a part time
5   employee of GGS.  In 2017, Cramton made payments to herself by accessing the GFL bank
6   accounts to transfer payments to her own bank account.  The total payments made to, or on
7   behalf of, Cramton totaled $70,140.89.  Of that amount, Cramton was paid $25,000 by
8   GFL by reason of her employment as wages for her part time labor and reported on her
9   2017 W-2 Form.  Cramton did not receive a W-2 from Keely in 2017 because Keely was
10  not her employer.  A.R.S. § 23-362 defines "wages" for purposes of the Arizona Minimum
11  Wage Act (§§ 23-362 – 23-365) to include all monetary compensation due to an employee by
12  reason of employment, including an employee's commissions, but not tips or gratuities.  This
13  definition includes employer paid health insurance premiums, employer monthly payments for
14  her car, and employer paid tax gross ups – all are forms of monetary compensation due an
15  employee by reason of employment and Cramton has cited no basis whatsoever to claim
16  otherwise.[3]  These additional wages under the Arizona Minimum Wage Act include the
17  monthly payments of $1,016 (a total of $9,144 in 2017) in GFL paid health insurance premium
18  payments, monthly payments of $548.10 (a total of $4,932.90 in 2017) in GFL payments for
19  Cramton's car and $10,880.50 in GFL paid gross ups for Cramton employment related tax
20  liabilities, including federal withholding, Arizona withholding, and the employee portion of
21  Social Security and Medicare taxes.  The total of these additional wage payments for purposes
22  of the Arizona Minimum Wage Act is an additional $24,957.40.  All of these additional
23  monetary payments were made to Cramton by reason of her employment with GFL.  In
24  addition, any award of damages under Counts VII, IX and X (no damages should be awarded)
25  would entitle GFL to include the full cash value of Cramton's equity compensation as wages
26
27         [3] The Arizona  Minimum Wage Act was enacted by Arizona voters who approved an
28  initiative in the November 2006 election.  As an initiative approved by the voters, the law cannot
    be amended by the Legislature except to further its purpose.

under the Arizona Minimum Wage Act in 2017 as well.  To allow damages under Count IV (which the Court should not), on the one hand, and then also allow any recovery under Count VII, IX or X (which the Court should not), on the other hand, would result in a quadruple recovery on minimum wages paid to Cramton.  There are no facts or law that allow such multiple or duplicative recovery.

Cramton would have needed to work well over 82 hours per week for GFL alone before she would dip below the minimum wage in 2017.  This is impossible because Cramton worked part time for GGS and spent significant time as a shareholder of GGS in responding to its cash flow crisis and in selling GGS to Black & Furr, LLC.  Further, time spent as a member of GFL or a member of the board of managers for GFL in budgeting and in selling the Grabbagreen brand is not compensable by GFL as if Cramton was working for the company as an employee.  Worse, the written evidence in this case shows she worked for GGS more than 50% of her time in 2017.  Cramton's total claim of damages under Count IV is for $14,400 for 2017 based on a claim she worked 40 hours per week and her damages calculation stated in her MIDP which is less than the $25,000 in wages reported on Cramton's W-2 without even adding the rest of the monetary compensation Cramton was paid (an additional $24,957.40).  Cramton then changed her purported damages calculation after fact discovery closed by saying she worked 60-80 hours per week for a total of $18,883 in damages.  This undisclosed claim for damages should be barred by Rule 37 as described below and Defendants were prejudiced by the fact they were unable to conduct full discovery such as obtaining Cramton's credit card statements to show all of her non-compensable activities improperly included in the hours she claims she was working for GFL or Keely.  Even this dubious amount is below the wages reported on her Form W-2 and is less than the additional monetary compensation Cramton received from GFL.  Cramton suffered no compensable damages under Count IV.

The $25,000 paid by GFL to Cramton in 2017 and reported on her Form W-2 were

13

the commissions Cramton received for her labor in making sales to two new franchisees for which GFL received the applicable franchise fee.  The first new franchisee sale Cramton was paid on in 2017 was made to Green Leap LLC owned and managed by Troy Payne located in Texas.  This franchisee entered into a Franchise Agreement to purchase one franchise with GFL on April 6, 2017 and paid the franchise fee to GFL.  This sale resulted in a payment to Cramton of $5,000 which was transferred from the GFL bank account to Cramton's bank account 4 days later on April 10, 2017.  This payment to Cramton directly ties to the franchise sale to Green Leap LLC and is a commission payment for her labor in making this sale.  The second sale Cramton was paid on in 2017 was made to Green & Go, LLC owned and managed by Michael Raymond located in Michigan.  This franchisee entered into a Franchise Agreement to purchase ten franchises with GFL on September 1, 2017 and paid the franchise fee.  This sale resulted in a payment to Cramton of $20,000 which was transferred from the GFL bank account to Cramton's bank account 4 days later on September 5, 2017.  This payment to Cramton directly ties to the franchise sale to Green & Go, LLC and is a commission payment for her labor in making this sale.

The two payments made to Cramton totaling $25,000 were properly reported on Cramton's 2017 W-2 Form from GFL.  GFL and its tax matters manager had the authority to determine the proper tax treatment and classification of GFL's payments under the law.  Cramton cannot dispute who had this authority because the parol evidence rule bars her from offering extrinsic evidence to controvert the unambiguous terms of the GFL operating agreement.  This Court observed in its December 2019 Order that both GFL and Keely would be entitled to summary judgment on Count IV if the $25,000 payment made by GFL to Cramton in 2017 constituted wages for her labor or services.  (Dkt. 247, at 45:16-17).  Even without considering the commission payments Cramton received, she also was paid $9,144 by reason of her employment toward her health insurance premiums, $4,932.90 by reason of her employment as payments for her car and $10,880.50 in employment related

tax gross-ups for a total of $24,957.40 in additional monetary compensation without even considering distributions from ECH for service payments as provided under the Operating Agreement. This additional monetary compensation by itself exceeds the damages Cramton claimed even at the improperly and untimely inflated amount of $18,883. The evidence in the case makes it clear that Cramton is not entitled to additional minimum wage payments.

The only issue Cramton raises under Count IV is not whether she received payments well above the minimum wage for 2017 (she did) nor is it whether those payments were for her labor by reason of her employment, which should be the end of the inquiry. The gravamen of Cramton's claim is that she thinks the $25,000 in payments reported on her W-2 that she actually received from GFL totaling well above the minimum wage (without even considering the rest of her monetary compensation) should be classified and labelled differently. She thinks that the $25,000 in GFL wage payments shown on her W-2 should be classified and labelled as if they were ECO's payments on its promissory note even though it is irrefutable that GFL made the payments and irrefutable that GFL had no obligation to make any payment on any ECO obligation. It is also irrefutable that ECO had insufficient revenues to make any payments on its promissory note and, in fact, did not make any such payments. It is not up to Cramton to decide, whether as an owner of ECH or as an employee of GFL, how GFL labelled, classified or reported the commission payments on the two franchisee sales. Cramton has no right, nor even alleged a right, to compel GFL to classify or label and report on its wage payments in a manner that suits her or allows her to try to avoid taxes.

To support her argument that the $25,000 in GFL wage payments shown on her W-2 should be labelled and treated as though they were non-taxable payments made by ECO on ECO's debt, Cramton contends that a GFL board consent is an agreement that wages would not be paid going forward in 2017 at all or under any circumstances – this is simply

15

not true nor does it reflect what Cramton and Keely actually did.  This is the same consent referencing the $8,949 payment for Cramton's individual SEP retirement account contribution (conveniently ignored by her throughout this lawsuit).  The law in Arizona is clear, parties may legally contract around the default payment requirements of A.R.S. § 23-351.  *Orfaly*, at 1033-34.  An agreement to alter when wage payments become due and payable is legally permissible and it is inconsequential whether Cramton received pay every two weeks or whether she agreed to vary the timing of her payments.  *Id.*

Cramton and Keely agreed that for 2017 they would return to a commission structure similar to the commission structure they had in place for 2015 – the year GFL started doing business.  Like most start-up companies, GFL had cash flow concerns from year to year.  In 2016, regular monthly salary payments were made so that Cramton could obtain financing on the purchase of her second vacation home and for her new car and for her spouse, Laura McCormack's, new car – all acquired by Cramton in 2016 and all in the year of GFL's highest number of new franchisee sales.  In January 2017, Cramton and Keely agreed to return to a commission structure similar to 2015.

Cramton requested that GFL make certain payments to her in 2017 as if ECO made the payment on its promissory note obligation so that Cramton could avoid paying taxes on most of her income.  GFL's in-house accountant, Teresa Mills ("Mills"), advised both Cramton and Keely that GFL could not label the payments it made as if they were ECO payments on ECO's promissory note.  GFL's tax and audit advisors reviewed interim accounting records and recommended adjusting entries to finalize GFL's books and records each year.  Given the advice of Mills, Keely went along with Cramton's request but only contingent upon the approval of GFL's tax and audit advisors at the end of the year.  In early September 2017, Cramton informed Keely that she wanted her commissions paid as wages and she wanted the full amount of her ECO promissory note restored.  Cramton changed her mind and wanted the accounting entries reversed.  In addition, GFL's tax and

audit advisors did not approve the classification of GFL's taxable payments as if they were non-taxable ECO payments on ECO's promissory note and required corrections to GFL's accounting records.

The payments from GFL at issue were classified by the tax matters manager as wages based on the tax and auditor advisor's advice and Cramton's own request that the classification of payments be reversed. GFL made a total of $70,140.89 in taxable payments to Cramton in 2017, the tax matters manager has the authority under the operating agreement to determine the classification of payments and the proper tax reporting and obligations of GFL with respect to those payments. Under Arizona law, the parol evidence rule excludes the admission of evidence that varies from or contradicts the written terms of a contract. Where the language is clear and unambiguous, that language controls, and "it is not within the province of the court to alter, revise, modify, extend, rewrite or remake an agreement." *Shattuck*, at 588. The language of the operating agreement is clear and unambiguous that the tax matters manager has the discretion to determine the character or classification of payments made to members. As such, Cramton does not have a right under the operating agreement to contradict the determinations made by the tax matters manager in contravention of the unambiguous provisions of the operating agreement. Even assuming an employee of a company could possibly have a valid right to contradict the employing company's classifications of payments for the sole purpose of ginning up a minimum wage claim as Cramton has done for three years and counting, the fact is that Cramton also received $24,957.40 in other monetary compensation and distributions that were for service payments that count as monetary compensation for purposes of the Arizona Minimum Wage Act making it clear that GFL more than met the requirements of that act for 2017.

Cramton was an owner responsible for the payment of her own wages and other monetary compensation and distributions for service payments. Cramton's damages of

$18,883 are based on her assertion that she worked 60-80 hours per week.  Cramton never asserted that she worked 60-80 hours per week in her MIDP responses.  *See*, Dkt. 294, Ex. 1, at 33:9-15; Dkt. 175, at 2:28-3:10.  If the "fact" that Cramton worked 60-80 hours per week existed in 2017, it could have been alleged in her Complaint, her Amended Complaint or at least asserted in her MIDP response.  The damages asserted in this case were not mentioned anywhere during fact discovery.  Instead, the damages under Count IV were improperly claimed by Cramton for the first time in her motion for summary judgment.  (Dkt. 142, at 12:5-7 & fn 12).  The Defendants were prejudiced by Cramton raising a new claim for damages after the close of fact discovery during summary judgment pleadings.  Cramton was required to provide a computation of each category of damages claimed by her and a description of the documents or other evidentiary material on which it was based, including materials bearing on the nature and extent of the injuries suffered in her mandatory disclosures.  *See*, General Order 17-08 (B)(5).  Cramton cannot present evidence at trial based on claims of damages and damage computations not alleged in her Amended Complaint and not disclosed in her MIDP.  Rule 37 bars a party from introducing an undisclosed claim or theory of damages at trial unless they can show the failure to disclose was substantially justified or harmless.  *See*, Fed. R. Civ. P. 37(b)(2), (c)(1); *See also*, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Cramton raised a damages calculation and amount of damages substantially increased over the amount disclosed in fact discovery and she did so for the very first time in summary judgment pleadings two years into this lawsuit and long after fact discovery closed – namely that she claims that she worked 60-80 hours per week instead of the 40 hours per week provided in her MIDP.  Cramton has made no argument that even suggests her untimely disclosures of her damages and computation is justified or harmless.  Cramton should not be permitted to assert damages under Count IV based on a computation that exceeds the 40 hours per week and the $14,400 calculation disclosed in her MIDP.

1

2     Cramton had, and continues to have no reasonable basis to assert Count IV with

3     respect to 2017 against GFL or Keely.  Accordingly, Cramton is not entitled to any

4     damages (including multiple damages) or attorneys' fees under A.R.S. § 23-363.

5     By way of background to ECO, S&H was financially unable to complete the

6     buildout of GG51.  Krowne and S&H entered into an agreement pursuant to which S&H

7     assigned its lease for GG51 to Krowne.  In exchange, Krowne executed a promissory note

8     promising to pay S&H $79,946 reflecting S&H's investment in the construction and build

9     out of GG51, but only if Krowne could generate sufficient revenue from sales at GG51 to

10    pay all of its operating expenses arising from the operation of GG51 and sufficient cash

11    reserves to pay all of its taxes, capital expenditures and other operating needs.  Once open,

12    GG51 never generated sufficient revenues to cover all of its operating needs and provide

13    any return of capital investment in the buildout to S&H, Cramton or Keely regardless of

14    whether S&H owned it, Krowne owned it or ECO owned it – it underperformed regardless.

15    ECO was formed for the purpose of acquiring GG2.  GG2 was an underperforming

16    restaurant location just like GG51.  GG2 ultimately was sold by Cramton and Keely to

17    Black & Furr, LLC in September 2017 for $1.  Black & Furr, LLC closed GG2 within 6

18    months of its acquisition.  Instead of acquiring GG2, on October 27, 2017, ECO acquired

19    the assets of Krowne and agreed to relieve both Cramton and Keely of their obligations to

20    provide the ongoing capital contributions needed to keep GG51 afloat.  GG51 operated

21    primarily at a loss.  In the acquisition, ECO entered into a promissory note with Cramton

22    and with Keely similar to the one Krowne provided to S&H.  Like Krowne, ECO would

23    not pay on its promissory notes unless GG51 generated sufficient revenue from sales at

24    GG51 to pay all of its operating expenses arising from its operation, sufficient cash reserves

25    to pay all of its taxes, capital expenditures and other operating needs.  ECO, like Krowne,

26    never generated sufficient revenues at GG51 to pay all of its operating expenses, to

27    establish sufficient cash reserves to pay its taxes, capital expenditures and cover other

28

operating needs to make payments to S&H, Cramton or Keely.  Cramton did not advance any funds to, or on behalf of, ECO and did not deposit any funds in ECO's bank account. If ECO had not absorbed the carrying costs of GG51 when it did, GG51 would have shut down shortly thereafter in early 2017 and both Cramton and Keely would have lost the opportunity to try to make GG51 profitable.

### c.  How many hours Cramton claims she worked for GFL were actually worked for GGS or were not worked at all.

Plaintiff:  the jury will determine, based on the evidence, the hours at trial.  Plaintiff has included a demonstrative exhibit which represents the hours that she estimates she worked and which will be supported by her testimony and the exhibits. All other witnesses lack the foundation for "filings" that were not authored by Plaintiff herself; the best source of evidence.

Defendants' Contentions (GFL and Keely):  Cramton had an ownership interest in, and worked for, multiple companies at all relevant times.  Her working time was divided between GFL, non-defendant GGS and non-party RevSolar.  Cramton claims she is owed "approximately $18,833"[4] in unpaid minimum wages for 2017.  This is only an estimate because Cramton does not know how many hours she worked for GFL.  When calculating her damages under Count IV, she waited until approximately January 2019 to do the estimate and then guessed off the top of her head using a blank calendar.  Cramton failed to make any record whatsoever of the hours she devoted to each separate business venture in 2017.  She failed to clock in or out of the time tracking system used with other Arizona employees.   She was responsible for ensuring that Arizona employees used the time tracking system for hours worked.  She failed to provide an accounting of her time for RevSolar.  If fact, she testified under oath that she has no idea where her body was located

---

[4] See section 1b., Cramton's damages under Count IV should be limited under Rule 37 to a total of the $15,688 for both 2016 and 2017 she disclosed in her MIDP.

while she was working in 2017.  Worse, to prevent GFL from finding out what she actually was doing in 2017, she improperly stole data from GFL's computer, iPhone and iCloud account and then removed the operating system and deleted the data from the computer and iPhone.  Only after GFL's attorneys raised the issue of spoliation did Cramton even admit that she stole a copy of the computer hard drive which contained some of the data she tried to destroy.  When Cramton calculated her purported hours under Count IV in January 2019, she failed to even look at the data she tried to destroy but then admitted she stole from GFL's computer to use that data to reminder herself as to where her body was located on a day to day basis in 2017.

Evidence stolen from GFL and then recovered in this case demonstrates that more than 50% of the hours during the relevant period claimed by Cramton (a total of 1,880 hours which should be limited to 1,440 hours disclosed in her MIDP) were hours worked for GGS alone.  She does not know how many of the 1,880 hours claimed under Count IV are hours actually worked for GGS and it could be more than 50%.  She testified that she included her time spent working at GGS because she believes GGS is a defendant – it is not.  But because Cramton, an owner, failed to record her own actual work hours for GFL (and did so in relation to GGS too) and then when accessing GFL's bank accounts transferred wages to herself that she now claims were insufficient to meet the minimum wage, she thinks she should be permitted to recover damages against others for her very own actions and failures.

In addition, Cramton included in her hours calculations time spent engaged in personal activities that are not compensable under Arizona law, including without limitation, time spent texting and talking on her phone with her friends, family, RevSolar business partners and her lawyers, time she spent hanging out at Adrianne Savone's house, playing poker, in poker tournaments, time at her second vacation home, regularly driving to and from Las Vegas to gamble, and in other personal activities she improperly included

in her hours calculation under Count IV.  Cramton block billed her personal time under Count IV despite the fact she knows she was not at work and that on-call time, if any, is not compensable because she used her personal time for her own purposes.  If the employee can stay home, watch TV, go out to eat, visit family like Adrianne Savone three nights per week and hang out, the time the employee is on-call is not compensable – and that is even assuming she even received any momentary calls, texts or emails while hanging out in her personal activities.  AZ Admin. Code R20-5-1202(22); 29 C.F.R. § 785-17; *McAllister*, at 1180.

The damages Cramton claimed in 2017 are less than the wages she was paid and with at least half of what she did claim based on time that is non-compensable by GFL or Keely, Count IV is without merit.

### d.  Whether Keely was Cramton's "employer" under A.R.S. §23-362(B).

Plaintiff:  Plaintiff claims that Keely was Cramton's employer under A.R.S. §23-362 because she was acting "directly or indirectly in the interest of an employer [here GFL] in relation to an employee," Ms. Cramton.  Keely Newman was an agent of GFL.  Keely directed Plaintiff's tasks and governed over her in a micromanagement fashion. Defendant's Contentions (Keely):  Cramton did not qualify as, and was not, an employee of Keely.  Cramton was an owner and owners, particularly those in closely held companies, do not qualify as employees.  *Wheeler v. Hurdman*, 825 F.2d 257, 277 (10th Cir. 1987), *cert. denied*, 108 S.Ct. 503 (1987)(general partner of an accounting firm was not an "employee" in FLSA action).  *See also Graves v. Women's Prof. Rodeo Ass'n, Inc*., 907 F.2d 71, 72-73 (8th Cir. 1990).  Cramton was an owner who accessed GFL bank accounts as an owner, had economic control over her own wages and made wage payments to herself.  Cramton did not qualify as an "employee" of Keely.  Cramton never received a W-2 from Keely in any year because Keely was never Cramton's employer and specifically, Keely was not Cramton's "employer" under A.R.S. §23-362(B) in December 2016 or at any time in 2017.

22

Cramton cannot carry her burden of proving that Keely was her "employer". Cramton was responsible as an owner for her own activities, work schedule, work conditions, capital contributions to ECH to fund wages, her method of payment, making payments to herself, oversight of employees in Arizona and she maintained all Arizona employment records. Cramton had the power to hire and fire employees in Arizona and set their pay. Cramton was responsible for implementing company policies in Arizona, ensuring all employees clocked in and out of Revel (employee timekeeping system) and submitting all employee hours to Mills for payroll processing. Cramton had access to, and was a company owner and signer on, GFL's bank accounts and made payments from GFL's bank account to herself for her wage payments for labor she provided to GFL. Keely did not track Cramton's daily employment activities, work schedule, daily working environment or conditions and other circumstances while in a different state because she could not oversee those things from California or Florida. Cramton cannot establish that Keely was her "employer" and cannot establish that she was not paid minimum wages by GFL in 2016 or 2017.

Case law interpreting the meaning of "employer" under the FLSA controls because the FLSA and A.R.S. §23-362 define the term in similar ways and no case law specifically under A.R.S. §23-362 addresses the issue. Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the FLSA. *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009). Keely also does not qualify as Cramton's employer under the Ninth Circuit's "economic reality test" which considers several factors including that Cramton supervised and controlled employee work schedules or conditions of employment in Arizona, Cramton determined the rate and method of payment for employees in Arizona, and Cramton maintained employment records in Arizona. *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999). Cramton was an owner. None of these factors were handled by Keely. Accordingly, Keely was not Cramton's employer under

this analysis either.

### e. Whether Cramton was an "employer" under A.R.S. §23-362(B).

Plaintiff: As a minority owner and individual subject to the control of Keely Newman as an agent of Defendants, Plaintiff was not an "employer" of herself.  Otherwise she would have paid herself.

Defendant's Contentions (Keely):

Cramton did pay herself.  Cramton accessed GFL's bank account and paid herself. Keely did not pay her – she paid herself.  Cramton was an owner responsible for all of her daily employment activities, work schedule, working conditions in Arizona, method of payment, making payments to herself and maintenance of all Arizona employment records. Keely lived and worked in California (and then Florida after moving) and made only a few brief trips to Arizona primarily in the first quarter of 2017.  Keely did not track Cramton's daily employment activities, work schedule, daily working environment or conditions and other circumstances while she was in different state.  To the extent Cramton is deemed to be an employee despite not qualifying as such, she was the employer who controlled her work arrangement and conditions, including without limitation, the fact that she had access to, and was a company owner and signer on, GFL's bank accounts and made her own wage payments to herself from GFL's bank accounts.

Cramton qualifies as an "employer" under the Ninth Circuit's "economic reality test" which considers whether Cramton supervised and controlled employee work schedules or conditions of employment, determined the rate and method of payment, and maintained employment records.  *Lambert*, at 1011-12.  Cramton was responsible for all activities in Arizona and she meets the economic reality test.  As an owner, she was an owner responsible for her own wage payments, accessed GFL bank accounts and made wage payments to herself.  As an owner and her own employer responsible for her own wage payments, Cramton is responsible for her own acts or failures to act in relation to recording her own hours and her own wage payments.  As an employer and the owner

responsible for all human resources matters in Arizona, Cramton was responsible for maintaining employment records for all other employees in Arizona and herself, and responsible for ensuring that applicable minimum wage payments were made to herself. As such, Cramton cannot prevail against GFL or Keely.

### f.   Whether Cramton was an "employee" under A.R.S. § 23-362(A).

Plaintiff:  Plaintiff contends that at all times she was an "employee" of GFL and Keely (via the definition of employer) under A.R.S. §23-362(A) and (D).  She was forced to work and subordinate to Keely Newman at all times.  Federal decisions have determined that the term "employee" is to be broadly construed. *Salinas v. Commercial Interiors, Inc.,* 848 F.3d 125, 133 (4th Cir. 2017). "[I]n determining whether a worker is an employee covered by the FLSA, a court considers the 'economic realities' of the relationship between the worker and the putative employer . . . ." *Id.* at 150 (emphasis omitted). Courts consider a number of factors and examine the totality of the circumstances in analyzing employee status. *Id.* "The focal point is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Id.* at 150 (alteration in original) (quotation marks omitted).

"The determination of employee status is very fact intensive," *Herman v. Express Sixty-Minutes Delivery Serv.*, 161 F.3d 299, 305 (5th Cir. 1998), and "a person's title alone should not be dispositive in the analysis[,]" *Harris v. Universal Contr., LLC*, No. 2:13-CV-00253 DS, 2014 U.S. Dist. LEXIS 81105, at *5 (D. Utah June 12, 2014). In *Harris*, the district court squarely addressed the issue of whether a member of a limited liability company can also be an "employee" of that company. After a fact-intensive inquiry, the court granted summary judgment in favor of plaintiff on his FLSA claim, concluding that the members were subject to the company's control and, thus, were "employees" as defined by the FLSA. *Id.* at *13.

Likewise, in *Kehler v. Albert Anderson, Inc.*, No. 16-5318 (JBS/KMW), 2017 U.S. Dist. LEXIS 58826 (D.N.J. Apr. 18, 2017), defendants moved to dismiss plaintiff's FLSA

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that plaintiff's claim must be dismissed because plaintiff alleged that he was an owner, not an "employee." The court concluded that plaintiff sufficiently pleaded that he was an "employee" under the FLSA. *Id.* at *14. In so concluding, the court recognized that "[c]ourts have struggled with characterizing putative owners and partners that also perform work for their companies, like [p]laintiff here, as the economic realities test is generally used to distinguish between employees and independent contractors, not employees and owners." *Id.* at *14-15. The court emphasized the acute vulnerability of minority shareholders in closely held corporations. *Id.* at *15-16.

Defendant's Contentions (Keely): Cramton claims she was "forced to work and subordinate" although she does not mention how she was "forced to work" at all let alone forced to "subordinate." Cramton was responsible as an owner for her own activities, work schedule, work conditions, capital contributions to ECH to fund wages, her method of payment, making payments to herself, oversight of employees in Arizona and she maintained all Arizona employment records. Cramton had the power to hire and fire employees in Arizona and set their pay. Cramton was responsible for implementing company policies in Arizona, ensuring all employees clocked in and out of Revel (employee timekeeping system) and submitting all employee hours to Mills for payroll processing. Cramton had access to, and was a company owner and signer on, GFL's bank accounts and made payments from GFL's bank account to herself for her wage payments for labor she provided to GFL. Keely did not track Cramton's daily employment activities, work schedule, daily working environment or conditions and other circumstances while in a different state because she could not oversee those things from California or Florida. None of these factors were handled by Keely. Accordingly, Keely was not Cramton's employer and Cramton was not an employee of Keely under this analysis either.

Case law interpreting the meaning of "employer" under the FLSA controls because the FLSA and A.R.S. §23-362 define the term in similar ways and no case law specifically under A.R.S. §23-362 addresses the issue.  Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the FLSA.  *Boucher*, at 1091.  Keely also does not qualify as Cramton's employer under the Ninth Circuit's "economic reality test" which considers several factors including that Cramton supervised and controlled employee work schedules or conditions of employment in Arizona, Cramton determined the rate and method of payment for employees in Arizona, and Cramton maintained employment records in Arizona.  *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999).  Cramton was an owner.  None of these factors were handled by Keely.  Accordingly, Keely was not Cramton's employer under this analysis either.

**g.  If liability under Count IV is found, what amount of minimum wages are owed to Cramton.**

Plaintiff:  Plaintiff believes the jury will determine the amount of minimum wages owed to her.  Plaintiff has prepared a demonstrative exhibit demonstrating the hours that she believed she worked, which will be based on exhibits and her testimony.  The court will then treble the amount of minimum wage damages that the jury determines pursuant to Arizona minimum wage law.

Defendants' Contentions (GFL and Keely):  Cramton received wage payments well in excess of the minimum wage requirements under Arizona law during all periods claimed by Cramton.  Cramton is not entitled to any additional minimum wages and suffered no damages under the Arizona Minimum Wage Act at any relevant time. To the extent Cramton can establish that her wages were below the minimum wage in 2016 or 2017 (which she cannot), Cramton cannot recover from GFL or Keely for alleged damages that were caused and contributed to by her own actions, omissions and wrongful conduct.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cramton caused her own failure to track her own hours.  Cramton had the responsibility to ensure that all Arizona employees tracked their hours.  Cramton deleted company data that could be used to recreate her hours worked.  Cramton accessed GFL bank accounts herself to make wage payments to herself.  To the extent Cramton believed her transfers were below the minimum wage, Cramton as an owner caused her own purported damages.  Even assuming liability could be assessed despite the overwhelming evidence to the contrary, Keely's liability is zero because she is not Cramton's employer and Cramton was a member not an employee of Keely.  GFL's liability for 2016 should be zero because Cramton did not work the 160 hours claimed for GFL and because Cramton was paid well above the minimum wage.  Even assuming GFL or Keely can be liable to Cramton for Cramton's own conduct at all, it would be inequitable and offend basic principles of fairness if Cramton was not held minimally to her 18.6% of ownership interest (at that time) for her own acts, failures, omissions and misconduct.  Further, if any liability were found (and none should be found) under Counts VII, IX or X, GFL and Keely would be entitled to a full offset because cash paid on an equity compensation arrangement would also qualify as monetary compensation for purposes of the Arizona Minimum Wage Act.  Cramton has no legitimate basis for multiple or duplicative recovery.

**h. Whether Cramton would be entitled to "Sale Proceeds" upon ECH's asset sale to Kahala.**

Plaintiff:  Plaintiff is entitled to the fair market value of the membership value of ECH at the time that that it was wrongfully taken away from her in October 2016.  Fair market value is based on what a willing buyer would pay a willing seller.  That value is conclusively established by the Kahala sale, which valued ECH at $2.6 million.  Based on Cramton's 18.6% membership interest, she is entitled to damage for the fair market of that interest  -- or $483,600.

<u>Defendants' Contentions</u>:  Fair market value of unvested units subject to the Operating Agreement buyout provisions that a willing buyer would pay a willing seller is zero. Unvested units have no value and Cramton could not even find a willing buyer of unvested units because they were subject to forfeiture.  Cramton had an 18.1% ownership in ECH. She would not under any circumstances have a right to $483,600 regardless of whether she would remain employed or not.  ECH adopted the Eat Clean 2016 Unit Incentive Plan on October 27, 2016 and David Glines was awarded unit options 44,590 unit options to acquire units in ECH in February 2017 resulting in dilution of Cramton's interest to 18.1% - she has admitted as much as have her attorneys.  David Glines was awarded.  The unit options were made retroactively effective to December 31, 2016.  The continued assertion that her interest was 18.6% is a misrepresentation by her and her attorneys.  Cramton admitted that her claim is one based specifically on the Operating Agreement and her claim that the Operating Agreement was violated because she did not receive Sale Proceeds.  (Dkt. 50, at 3:27-4:1). Defendants made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale."  (Dkt. 50, at 4:11-4:12).  Cramton's counsel made a similar representation to Judge Rayes at the Rule 16 scheduling conference when he referenced the fact that Cramton's "big dollar claim" related to the Operating Agreement.  (Dkt. 89, at 12:7-12:17).  As such, Cramton has admitted that this Court need not look any further than the unambiguous language of the Operating Agreement.

The Operating Agreement does not contain any provision for a liquidity event for any member.  Cramton only held restricted units in ECH that were subject to forfeiture if she failed to complete 5 years of employment.  All units of ECH are subject to the Operating Agreement as provided in § 2.1 in addition to the member's joinder agreement which Cramton executed.  The Operating Agreement does not contain a provision giving any member a right to receive payment, capital proceeds or distribution of any of the purchase price that Kahala Brands, Ltd. ("<u>Kahala Brands</u>," and together with its affiliate MTY

Franchising USA, Inc. ("MTY" collectively referred to as "Kahala") paid ECH and its subsidiaries to acquire the Grabbagreen brand ("Sale Proceeds") upon the closing of an asset deal like the Kahala deal.  No provision of the Operating Agreement required Keely to buyout Cramton's units in ECH under any circumstances.  § 3.6 of the Operating Agreement provides that distributions to members will be made in the discretion of the majority member and specifically addresses "Capital Proceeds" stating that payments of capital proceeds (or Sales Proceeds as Cramton labels it) will only be paid in the discretion of the majority member.  Cramton was not a majority member at any time.  On and after January 1, 2017, Keely owned a majority of the units of ECH and was the majority member.  § 9.3(b) of the Operating Agreement expressly required Cramton to complete 5 years of employment to be entitled to any money at all and expressly provided Keely with the option to buyout Cramton's unvested units for $1 if Cramton resigned prior to the completion of the 5 years of employment required of her.  The only wrongful thing that happened here is the wrongful filing of this lawsuit.  The exercise of the buyout option is and was expressly provided under the Operating Agreement at all times.

Cramton has the burden to prove, and has proffered no evidence at all, that she was entitled to receive Sale Proceeds as a result of the closing of the asset sale to Kahala under the terms, conditions and obligations of the Operating Agreement.  Cramton has not cited to this Court a single time any provision of the Operating Agreement providing her with any basis whatsoever to have ever stated to this Court that she had a right to Sale Proceeds.  She is unable to carry her burden of proving that she had such a right and consequently, she is unable to prove causation or damages under Counts VII, IX and X.  Bald and unsupported statements that she would have received Sale Proceeds had she been employed through the closing date directly contradict the unambiguous language of the Operating Agreement and such statements are insufficient to carry her burden of proof of causation and damages and are inadmissible parol evidence.

Even if Cramton had remained employed until the Kahala deal closed on March 15, 2018, Cramton would have no right to Sale Proceeds.  The rights and benefits bargained for under the Operating Agreement do not include a right or benefit to Sale Proceeds, to proceeds of a capital event, to a fair market value buyout by Keely, or to distributions or other payments under the Operating Agreement especially while the units were unvested prior to November 29, 2021 (had she remained employed until then) irrespective of what was said or not said on September 18, 2017 – it does not matter with regard to whether Cramton would receive any money (she would not in any event).   In addition, On September 18, 2017, the Due North Deal was still pending and other potential buyers were interested.

The bargained for rights and benefits specifically limit Cramton's remedies to continued retention of units, and even that right was conditioned on Cramton's continued employment for the mandatory 5-year period set forth in § 9.3(b) of the Operating Agreement.  It is irrefutable that she worked only 10 months of that period and she has admitted that she had no intention of continuing her employment for an additional 4 years, 2 months and 5 days.  It is irrefutable that Cramton voluntarily resigned on September 24, 2017.  It is irrefutable that Keely exercised the buyback option provided under § 9.3(b) of the Operating Agreement on October 30, 2017 – over a month after her resignation.  Keely stated in writing to Cramton:

> "Pursuant to Section 9.3(b) of the Eat Clean Holdings, LLC (ECH) Operating Agreement (OA).  I am notifying you in writing of my request to exercise the right to purchase 100% of the Units you own in ECH for $1.  The closing for the transfer will be tomorrow at 4PM EST.  Also, pursuant to Sections 9.3(b) of the OA, you are obligated to sell 100% of your Units to me for $1.  Please reply that you agree to transfer before the closing time specified herein.
>
> If you do not [sic] your agreement to the transfer by the closing time in this written notice, pursuant to Section 16.7(a) of the OA I, as President, will exercise the power of attorney granted to me by all Members in ECH to effectuate the transfer required from you under Section 9.3(b) of the OA.

31

That required transfer will be reflected in the books and records of ECH immediately after the closing time of 4PM EST October 30, 2017."

§ 9.3(b) contains no exception to Cramton's 5 years of employment requirement without a voluntary resignation, including without limitation, no exception to the employment requirement upon ECH's sale of the Grabbagreen brand.

Kahala expressly provided that no employment would be offered to ECH's owners as part of its asset acquisition of the Grabbagreen brand and ECH's business operations were ongoing. Whether Cramton resigned on September 24, 2017 or on March 15, 2018 the day Kahala purchased the Grabbagreen brand, or on any other date prior to November 29, 2021, Keely would have the right to buyout her units for $1 because Cramton was not given units to work for 10 months or 16 months or until it suited her or until an asset sale of a brand occurred. She was given units to work for 5 years, a requirement she did not intend to fulfill even if she had been on the September Kahala Call herself. The value of the unvested ECH units with a condition that would not be satisfied under November 29, 2021 was zero and, in any event of voluntary resignation, the maximum right to a payment of money was and is $1. Cramton was paid $1. The disputed events of September 18, 2017 are irrelevant under all circumstances on the issue of whether Cramton would receive money (she had no right and would not receive money). Cramton testified she had no intention of completing the 5 years of employment required of her. Keely's buyout right under § 9.3(b) had already been triggered by her resignation from GGS. Keely's conversation with Cramton on September 18, 2017 was not material nor could it result in any change in Cramton's rights or legal position. She is precluded from sustaining Counts VII, IX and X.

ECH was, and continues to be, entitled under its Articles of Organization, the Operating Agreement and the Arizona Limited Liability Company Act, to retain its assets and deploy those assets for any lawful business purpose as permitted under law. ECH was, and continues to be, entitled to apply the terms, conditions and obligations of its Operating

Agreement to determine the rights and benefits actually provided therein to membership units and for the internal operations of the company and allocations between members. The monetary damages claimed by Cramton are not provided for under the Operating Agreement.  Worse, the damages claimed, if awarded to Cramton, would remake the agreement entirely, including without limitation, substantially expand the bargained-for rights and benefits of Cramton based on claims to underlying assets of the company and tort remedies that contradict the bargained-for remedies and risk allocations of the Operating Agreement.  Cramton would essentially have a preferred class of membership units not existing under the Operating Agreement with preferential distribution terms, preferential valuation terms, preferential accounting allocations, rights not a part of the original bargain while eliminating expressly bargained-for or disclaimed provisions on procedures, valuations and limitations on distributions, among other things.

Cramton never asserted that her damages under Counts VII, IX and X were based on the claim that she is entitled to receive Sale Proceeds in her MIDP responses.  *See*, Dkt. 294, Ex. 1, at 33:9-15; Dkt. 175, at 2:28-3:10.  If the "fact" that Cramton is purportedly entitled to Sale Proceeds existed in 2017, it could have been alleged in her Complaint, her Amended Complaint or at least asserted in her MIDP response.  The damages asserted in this case under Counts VII, IX and X were not mentioned.  Instead, the damages under Counts VII, IX and X were improperly claimed by Cramton for the first time in her summary judgment pleadings.  (Dkt. 142, at 12:5-7 & fn 12).  The Defendants have been prejudiced by Cramton raising a new claim for damages after the close of fact discovery during summary judgment pleadings.  Cramton was required to provide a computation of each category of damages claimed by her and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered.  *See*, General Order 17-08 (B)(5).  Cramton cannot present evidence at trial based on claims of damages and damage computations not alleged in her

Amended Complaint in relation to Counts VII, IX and X and not disclosed in her MIDP. Rule 37 bars a party from introducing an undisclosed claim or theory of damages at trial unless they can show the failure to disclose was substantially justified or harmless.  *See*, Fed. R. Civ. P. 37(b)(2), (c)(1); *See also*, *Yeti by Molly*, at 1106.  Cramton changed her theory of damages under Counts VII, IX and X and raised an entirely new theory appearing in summary judgment pleadings two years into this lawsuit and long after fact discovery closed – namely that she claims that she was entitled to Kahala Sale Proceeds instead of the mandatory buyout theory provided in her MIDP.  In fact, only $15,688 under Count IV was disclosed in item 5 as required in her MIDP.  Cramton did not set forth in item 5 of her MIDP, as required, any computation of each category of damages caused by the purported fraud or negligent misrepresentation.  References elsewhere to "value" with no related computation do not satisfy the requirements of item 5 of the MIDP.  Damages not disclosed in item 5 of the MIDP should be barred under Rule 37.  All other damages listed in item 5 of her MIDP expressly state they are "as a result" of Cramton's constructive discharge, a claim now dismissed.  Cramton has made no argument that even suggests her untimely disclosures of her damages and damage computation under Counts VII, IX and X is justified or harmless.  Cramton suffered no damages caused by the Defendants under Counts VII, IX or X because she had no right to receive Kahala Sales Proceeds under the express and unambiguous terms of the Operating Agreement.

**i. Whether Cramton would have remained employed for the required 5 years.**

Plaintiff:  Plaintiff does not need to establish whether she would have remaining employed for any duration of time.  Her claim is based on being wrongfully deprived of her property right to the membership interest.

Defendants' Contentions:  Cramton had no rights to any money or property as a member of ECH.  Here we are talking about unvested membership interests in a limited

34

liability company.  Limited liability companies are creatures of contract and membership interests are contractual rights to the economic interests of the limited liability company governed by the terms, conditions and limitations of the operating agreement, **not** property rights.  *Cleanfish, LLC v. Sims*, 2020 WL 1274991, at *12 (N.D. CA).  The essence of a limited liability company is a contract between members.  Her membership interest was contingent upon 5 years of employment and she must establish she would have satisfied the contingency to show causation and damages.  Cramton admitted that her claim is one based specifically on the Operating Agreement and her claim that the Operating Agreement was violated because she did not receive Sale Proceeds.  (Dkt. 50, at 3:27-4:1).  Defendants made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale." (Dkt. 50, at 4:11-4:12).  As such, Cramton has admitted that this Court need not look any further than the unambiguous language of the Operating Agreement.  The Operating Agreement expressly, unambiguously, unequivocally and irrefutably states that Cramton was required to work 5 years of employment to have any right to any money whatsoever.  Until she became vested on November 29, 2021, we know the value of her units, they were zero and the most she was entitled to receive was $1 upon the exercise of the buyout right.  The unvested units awarded to Cramton were intended to secure Cramton's ongoing employment, working with Keely, for ECH, its subsidiaries and affiliates for 5 years.  The award was made in light of, and immediately following, the terminal diagnosis of her family member in anticipation of the impact that diagnosis would have for Keely and her family.  Reflecting these circumstances, the Operating Agreement clearly and unambiguously required Cramton to remain employed for 5 years, a period that would end on November 29, 2021.  This 5-years of employment requirement contained no exceptions for any reason and provided for no payment of any sort to Cramton prior to the completion of 5 years, including without limitation, no payment of any Sale Proceeds, proceeds from any capital event, mandatory buyout, fair market value or otherwise.  No provision of the

Operating Agreement excused Cramton from her continuing employment requirement.  No provision of the Operating Agreement entitled Cramton to any cash prior to the vesting of the ECH units.  The evidence in this case makes this very clear.  Cramton absolutely has the burden of proving she met the requirements of this condition.  If she did not (and it is irrefutable that she did not), she has no right or entitlement to any payment, other property or assets or to the unvested ECH units and she rightfully was subject to buyout for $1 because she failed to perform the required employment service, abandoned the company, abandoned Keely and materially breached her obligations under the Operating Agreement.

There were two potential buyers that conducted due diligence by that time.  The first was Due North.  The Due North Deal was also an asset acquisition of the Grabbagreen brand and it was fully negotiated, pending in September 2017 but originally set to close in June 2017.  In June 2017, Cramton and her counsel had discussions with Keely to request that Keely make a discretionary payment to Cramton if the Due North Deal closed.  These numerous oral and written communications discussing whether Keely would agree to make a payment to Cramton if the Due North Deal closed because Cramton had no right to a payment at all absent Keely's discretionary agreement and Cramton knew it.  Further, clearly Keely knew that Cramton fully understood that she had no right to money upon the sale of the Grabbagreen brand because it was repeatedly discussed both orally and in writing over a 4-6 week period in relation to the Due North Deal.

Cramton claims she was hanging on to get Sale Proceeds, yet she knew she was not entitled to Sale Proceeds.  In reality, she was hanging on hoping to convince Keely to exercise her discretion to make a payment Cramton otherwise had no right whatsoever to receive.  Nothing Keely allegedly said on September 18, 2017 caused Cramton any damages under Counts VII, IX or X because Cramton had no right to any payment at all.  Cramton knew it, her counsel knew it, Keely knew it, and Keely knew that Cramton and her counsel knew and spent all of June 2017 and into July 2017 negotiating this exact point

36

with respect to the Due North Deal because Cramton and Keely were both set to become employees of Due North if that deal closed.  To the extent any payment could have been made to Cramton from the closing of the Kahala acquisition, it would have been entirely within the discretion of Keely to determine just like it was in the Due North Deal that never closed.  Keely and ECH cannot, as a matter of law, be held liable in tort for fraud or otherwise for not making a completely discretionary payment in relation to unvested units nor can liability lie where Cramton failed to complete the required 5 years of employment.

Cramton suffered no damages caused by the Defendants under Counts VII, IX or X because her interest in the units were unvested and would remain unvested until November 29, 2021, any payment prior to that from ECH was within Keely's discretion.

**j.  Whether ECH made any representation or took any action upon which liability under Counts VII, IX or X can be assessed.**

Plaintiff: At all times relevant, Keely Newman was an agent of ECH acting within the scope of her authority.  Her actions and representations bind ECH.  On September 18, 2017, Keely Newman misrepresented to Cramton that the Kahala sale was off for the purpose of invoking her to resign to invoke the operating agreement's provision to buy her membership interest for $1.  This misrepresentation was accompanied by a pattern of hostile behavior in order to create an environment whether it was not worth it for Cramton to remain with the company.

Defendant's Contentions (ECH):  Keely was the majority member of ECH and only in that capacity did she have authority under § 5.1(h) of the Operating Agreement to cause the sale of the Grabbagreen brand.  Cramton cites to nothing because she has no basis in law or in fact to assert that Keely was acting as an agent of ECH and she has proffered no evidence to refute the fact that Keely sought to sell the Grabbagreen brand as the majority member of ECH.  Keely was not an employee of ECH.  ECH made no representations to Cramton at all and took no actions whatsoever and certainly did not engage in any behavior

let alone "hostile behavior" to prevent Cramton from receiving the benefits of the Operating Agreement and cannot be held liable for the representations of a member.  In her capacity as the majority member, Keely was not an agent of ECH and ECH is not accountable for the purported statements of Keely as a member.  Cramton did not allege that Keely acted as ECH's agent on September 18, 2017 or that ECH was vicariously liable in her Amended Complaint or MIDP and she should be prohibited from slipping in a new theory of liability at trial.  At all relevant times to Counts VII, IX and X, Keely acted in her capacity as the majority member pursuant to her authority as a majority member under § 5.1(h) of the Operating Agreement which provides that any act requiring the approval of the members of ECH could be taken by a majority of the members, including all of the actions identified in §§ 29-681.C and 29-681.D of the Arizona Limited Liability Company Act (§29-601, *et. seq*.).  Which provides:

§ 29-681.C of the Arizona Limited Liability Company Act contains a list of the following actions:

1. Adopt, amend, amend and restate or revoke an operating agreement or authorize a transaction, agreement or action on behalf of the limited liability company that is unrelated to its purpose or business as stated in an operating agreement or that otherwise violates an operating agreement.

2. Issue an interest in the limited liability company to any person.

3. Approve a plan of merger or consolidation of the limited liability company with or into one or more entities as defined in section 29-2109.

4. Authorize an amendment to the articles of organization that changes the status of the limited liability company from or to one in which management is vested in a manager or managers to or from one in which management is reserved to the members.

§ 29-681.D of the Arizona Limited Liability Company Act contains a list of the following actions:

1. Resolve any difference concerning matters connected with the business of the limited liability company.

2. Authorize the distribution of limited liability company cash or property to the members.

3. Authorize the limited liability company to repurchase all or part of any member's interest in the limited liability company from that member.

4. Authorize the filing of articles of termination concerning the limited liability company.

5. Subject to subsection C, paragraph 4 of this section, authorize an amendment to the articles of organization, except that an amendment that merely corrects a false or inaccurate statement in the articles of organization may be filed at any time by a member if management of the limited liability company is vested in one or more managers or by a member if management of the limited liability company is reserved to the members.

Further, actions of the board of managers could be taken in accordance with § 6.1(a) and (b).  Keely was not acting as an agent, employee or board member and Cramton has the burden to establish that Keely was acting in a capacity other than as majority member and has not proffered any evidence to carry that burden.

In addition, on August 4, 2017, Cramton and Greg Ferrell ("Ferrell") had numerous telephone calls together.  Cramton and Ferrell facilitated discussions between Keely and Kahala.  At all relevant times, Ferrell was an area developer for the Grabbagreen brand and the Coldstone Creamery brand with at least 15 years of business relations with Cramton, Kahala, John Wuycheck ("Wuycheck") and Kevin Blackwell of Due North.  Cramton and Ferrell facilitated a discussion between Keely as the majority member and Kahala.  They did not call a meeting of the board of managers nor were either of them able to authorize a conversation in any other capacity by Keely.

**k.  Whether Keely Acted As a Member of ECH in the September Kahala Call.**

39

Plaintiff:  Keely Newman was acting in the course and scope of her role as employee, manager, and member of ECH during the September 2017 phone call with Kahala.  In addition, Keely Newman is personally responsible for her individual tortious conduct.  *See Lombardo v. Albu*, 199 Ariz. 97, 14 P.3d 288 (2000); Restatement (Second) of Agency §§ 348, 350.

Defendants' Contentions (ECH and Keely):  Keely was not an employee of ECH and had no role for ECH.  ECH took no board action to authorize Keely as a board member or otherwise in relation to the Kahala call.  There is absolutely no evidence anywhere in the record to support Cramton's baseless contentions on this point.  At all relevant times to Counts VII, IX and X, Keely acted in her capacity as the majority member pursuant to her authority as a majority member under § 5.1(h) of the Operating Agreement which provides that any act requiring the approval of the members of ECH could be taken by a majority of the members, including all of the actions identified in §§ 29-681.C and 29-681.D of the Arizona Limited Liability Company Act (§29-601, *et. seq.*) (set forth above).  Actions of the board of managers could be taken in accordance with § 6.1(a) and (b) but no actions were taken by the board of managers of ECH to authorize Keely as an officer or board member of ECH to act in relation to the September Kahala Call or enter into any discussions in relation to the sale of the Grabbagreen brand.  ECH had no employees as a holding company.  Keely was not acting as an agent, employee or board member and Cramton has the burden to establish that Keely was acting in a capacity other than as majority member and has not proffered any evidence to carry that burden.

**l.  Whether Defendants purported representations to Cramton prevented her from receiving the benefits of the Operating Agreement.**

Plaintiff: In reliance of Defendants' representation that the Kahala deal fell through, Cramton resigned from her employment.  Because she detrimentally relied on this misrepresentation, she resigned.  Defendants then wrongfully took away her membership

40

right.  Plaintiff seeks the fair market value of what was wrongfully taken.

Defendants' Contentions (ECH and Keely):  The fair market value of unvested membership units is zero.  At maximum, until completing 5 years of employment service on November 29, 2021, upon the exercise of the buyout right, Cramton could obtain only $1 because the units were unvested until that time.  Cramton had a 0% ownership in the Grabbagreen brand and was not entitled to any of the purchase price paid to ECH for the Grabbagreen brand.  The Operating Agreement also does not contain any provision for a liquidity event for any member but did contain required discounts in valuation for lack of marketability and minority interest status of the unvested units.  The maximum value Cramton could possibly have is what a buyer would pay for unvested membership interests subject to forfeiture under the Operating Agreement – which is zero.  Cramton has the burden of proving that a zero value unvested membership interest was somehow worth over $438,000 – a burden she cannot carry.  Cramton had no right or benefit that could be implied in the Operating Agreement to something that the unambiguous language in the Operating Agreement expressly states she had no right or benefit to receive.  This Court has held that the implied covenant of good faith and fair dealing is not a vehicle for creating contractual terms that the parties did not otherwise agree to, it protects the existing terms from subversion.  (Dkt. 247, at 52:19:21; *See*, *11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1024 (D. Ariz. 2017).  Counts VII, IX and X specifically aim to subvert the express, unambiguous and unequivocal provisions of the Operating Agreement.  § 3.6 of the Operating Agreement makes it clear that Cramton was not entitled to Sale Proceeds or cash of any sort or any other part of ECH's assets and certainly not based on the unvested units and is not a bargained for right or benefit for any member.  Cramton claims that she had an implied right to "truthful information" to adequately protect her conditional unvested membership interest.  Cramton has repeatedly admitted she had no intention of completing the required 5 years of employment.  Even if

she was provided "untruthful information" (which did not happen), it would make no difference as to whether she would receive money from a sale of the Grabbagreen brand to Kahala – either way she would not receive money. Given this, even if she manages to prove the information was untruthful (which she will not), it was not a cause in fact or proximate cause of Cramton losing money she would have otherwise received. Further the value of conditional unvested ECH units (like any unvested benefit from any employer) is worth zero. Here, Cramton was given $1. Cramton had no right to receive any money at all beyond that $1 until after November 29, 2021. Cramton cannot prove that she was deprived of monies to which she is entitled or would be entitled if she remained a member of ECH until March 15, 2018.

There is no implied covenant of good faith and fair dealing in the Operating Agreement creating in Cramton a right or reasonable expectation to profit from the value of unvested units, receive Sale Proceeds, ignore the express discount for lack of marketability and minority interest, receive any cash payment at all, a right to a valuation determined in 2018 on ECH's asset not her own unvested units that were and will remain unvested until November 29, 2021 (assuming she had remained employed), a right to a valuation that directly contradicts § 10.1(a) of the Operating Agreement, avoids the application of every accounting provision in the Operating Agreement, a right to a valuation that avoids all expenses and contingent liabilities of ECH, including without limitation, all legal fees, accounting fees, transactions costs, payroll expenses, accrued liabilities, lease expenses, indemnification obligations and all other costs of business operations nor could she have a reasonable expectation that all such fees, costs, liabilities, obligations and expenses would be entirely paid for by Keely. There is no implied covenant of good faith and fair dealing in the Operating Agreement that Cramton had any right or reasonable expectation that Keely would make any discretionary payment at all, including upon the sale of the Grabbagreen brand to Kahala and, Cramton only disclosed she was

harmed by the amount of the "value" of the unvested membership interest which was zero, or at best it was the $1 buyout payment. On the contrary, Keely had a reasonable expectation that the express language of the Operating Agreement would apply and be enforced as written.

Cramton was not prevented from receiving the payments she claims under the Operating Agreement because she had no right to any such payment as a result of the sale of the Grabbagreen brand to Kahala. Cramton could not have a reasonable expectation to receive any payment at all because she resigned before completing the required 5 years of employment. An implied covenant of good faith and fair dealing cannot directly contradict an express contract term. *Snyder v. HSBC Bank, USA, N.A.*, 913 F. Supp. 2d 755, 772 (D. Ariz. 2012). Cramton had no right or benefit to any cash payout from ECH prior to November 29, 2021. Cramton had no right to the forfeited units or the value of those units determined based on the fair market value of the company as of any date she deems most beneficial to herself using whatever methodology she thinks up to benefit herself. Cramton's own sworn testimony has been clear that she had no intention and would not under any circumstance continue working for Keely after March 15, 2018 let alone for another 4 years, 2 months and 5 days beyond September 24, 2017.

Further, ECH was entitled in all events to retain its money and redeploy its money in any lawful manner as well as retain all reserves for contingent liabilities it determined in its sole discretion to be appropriate. In fact, currently a claim is now pending by a franchisee claiming $1 million dollars in relation to which ECH, at all moments in time, had a right to retain Sale Proceeds in reserve to provide for defense costs and to satisfy any liability. Cramton had, and has, no right whatsoever under the Operating Agreement or any law to foist liabilities onto ECH or Keely. This is especially true where the claim hinges on allegations of Cramton's fraud in selling a franchise to that franchisee. ECH had and continues to have the right to reserve funds to address precisely that type of contingent

43

liability.   In fact, the Arizona Limited Liability Company Act prohibits Cramton from absconding with the money needed to address this claim leaving Keely to clean up her mess.   Cramton was not prevented by ECH or Keely from receiving any right or benefit under the Operating Agreement.

### m. Whether Cramton resigned from her employment with GGS.

Plaintiff:  Plaintiff does not believe this is an issue for trial.  This Court has already determined at Summary Judgment that Plaintiff did not "resign" from GGS on September 14, 2017 for purposes of Defendants' legal claims that she had resigned from GGS prior to the phone call.  Plaintiff's position is that GGS sold its assets to a third-party on that date, which is irrelevant to the remaining claims.  Thus, this is not an issue for trial.  To the extent Defendants are able to raise this issue, Plaintiff's position is as stated: that she did not 'resign' but that GGS sold its assets.

Defendants' Contentions (ECH and Keely):  The Court did not grant Defendants summary judgment based on the fact that Cramton resigned from GGS.  (Dkt. 247 at 58:16). Not granting summary judgment does not preclude a party from raising the issue to the trier of fact.  If that were not so, Cramton's whole claim would be out because the Court did not grant her summary judgment either.  On September 14, 2017, GGS sold GG1 and GG3 to Black & Furr, LLC.  On September 15, 2017, GGS sold GG2 to Black & Furr, LLC for $1. Following these two separate sales, GGS **continued operating for at least 6 months thereafter**.  The sale of assets does not end the operation of a company and certainly did not end the operation of GGS.  As such, the sale of assets is not the relevant point of focus. For example, GGS had continuing consulting and support obligations to Black & Furr, LLC. GGS did not cease to exist or cease its activities or fulfilling its obligations the moment it sold assets.  Cramton informed Keely of her resignation on September 14, 2017.  Keely understood and believed that Cramton resigned from GGS on September 14, 2017 and she understood that her buyout rights under § 9.3(b) of the Operating Agreement were triggered.

44

A second triggering event after September 14, 2017 was not necessary for Keely to exercise her buyout rights and Cramton could not suffer any damages under Counts VII, IX or X based on the September 18, 2017 telephone call.  Cramton left work at GGS on September 14, 2017 and never returned to work for GGS, provided no consulting or support to Black & Furr, LLC and failed to assist GGS in fulfilling its remaining obligations.  When an employee leaves work and never returns, the employee has voluntarily resigned.  In addition, on September 24, 2017, Cramton delivered the Resignation Letter that states that Cramton resigned from GFL "and its related entities" which can only mean she resigned from GGS because it was Cramton's only other related employer. Even if the trier of fact reaches the conclusion that Cramton did not resign from GGS until she delivered her Resignation Letter, Cramton resigned from GGS triggering Keely's buyback rights under § 9.3(b) of the Operating Agreement making it impossible under Counts VII, IX and X for Cramton to suffer any damages based on the September 18, 2017 call with Keely.  What Cramton lost by abruptly resigning, stealing company property, deleting company data, failing to cooperate and transition work to others, breaching company confidentiality, contacting franchisees without permission, badmouthing the company and Keely to other constituents, harming the company's ability to do a deal or continue its operations and even astonishingly going to work for a potential buyer, was the façade she needed to maintain to convince Keely to exercise discretion and make a payment to Cramton despite the fact that her units were unvested and she otherwise had no right to a payment from ECH or in relation to Sale Proceeds.  She lost the chance to continue to string Keely along.  After she let the cat out of the bag in terms of her true thoughts and intentions, Keely, of course, exercised her buyback right and there was no way for her to convince Keely to make a discretionary payment.  This is not a cognizable legal loss nor was it caused by anything but Cramton's own actions and misconduct.

1

2       **n. Whether the representations Cramton claims were made on the**

3  **September 18, 2017 about future deals were actually made at all or were facts.**

4           Plaintiff's position:  Plaintiff contends, as she has throughout this litigation, that on

5  September 18, 2017, Keely Newman represented to her that the deal with Kahala was off

6  the table on that date.  Plaintiff understands that Defendants attempt to present a different

7  set of facts.  The trial will ferret out these facts that the Court determined there were

8  competing versions of this call when it denied summary judgment on these claims.  Plaintiff

9  maintains that Keely Newman's representations had nothing to do with "future deals" but

10  that the representations dealt with the then-current status of the Kahala deal.

11           a.      Defendants' Contentions (ECH and Keely):  Keely did not make the

12  statements alleged by Cramton on September 18, 2017.  Tina Griffin ("Griffin"), Keely's

13  assistant, was with Keely at the time Keely spoke to Cramton on September 18, 2017 and

14  will testify as to what Keely did and did not say on that call.  Specifically, Keely did not

15  represent that Kahala would not make future offers to acquire the Grabbagreen brand, or

16  that there would be no "deal" in the future with Kahala, Due North, or any other party.  In

17  fact, Keely told Cramton the opposite of what Cramton is claiming was false.  Keely

18  informed Cramton that Kahala was not willing to purchase the Grabbagreen brand on the

19  Due North Deal terms, but that they could go back to Kahala in a couple days and see if

20  Kahala would be interested in different terms.  The definition of "deal" is an agreement

21  entered into by two or more parties for their mutual benefit and to exist, there must be an

22  offer, acceptance of the offer, consideration, and terms sufficiently specific so that the

23  obligations created by the "deal" can be determined.  The definition of "offer" is a proposal

24  to enter into a contract on the terms contained in the offer.  The definition of "acceptance"

25  is an expression of agreement to the terms of the offer by the person to whom the offer was

26  made.  The definition of "consideration" is the benefit received, or something given up or

27  exchanged, as agreed upon between the parties.  Cramton's claims make no sense on

28

46

multiple levels, one of which is the language she used is her own language, not of Keely's words.  Keely knows a discussion or an offer is not a "deal."

Even if Keely had told Cramton that ECH would not make or accept future offers to sell or acquire the Grabbagreen brand or that no other party would do so, none of this can form the basis of a negligent misrepresentation or fraud claim because it is premised on future conduct.  No claim of relief for misrepresentation can be premised upon a promise of future conduct.  *McAlister v. Cititbank (Arizona)*, 171 Ariz. 207, 215 (App. 1992).  Counts IX and X are based exclusively upon statements concerning future events and not a fact, i.e., that there would be no "deal" in the future with Kahala, Due North or any other party for the sale of the Grabbagreen brand – nor would that be reasonable or justifiable to rely on without any inquiry.  Because the alleged statements relate to future conduct, Cramton's allegations cannot support Counts IX or X.

### o.  Whether the representations Cramton claims were made were true when made.

Plaintiff:  Plaintiff disagrees that this is the correctly stated issue.  The issue for purposes of a negligent misrepresentation or fraud claim is whether the representations made by Keely Newman were "false."  Cramton contends that they were false.  Keely stated the Kahala deal was off the table.  It was not.  The Kahala witnesses have already confirmed as such.

Defendants' Contentions (ECH and Keely):  Truth is an absolute defense to Counts VII, IX and X.  The statements Keely actually made were true.  It is irrefutably true that the then-current status of the so-called "deal" based on the Due North Deal terms was in fact "off the table" as Cramton puts it.  Keely and Kahala never discussed the Due North Deal terms again after September 18, 2017.  Keely told Cramton that Kahala rejected Keely's offer to sell the Grabbagreen brand on the same terms of the Due North Deal – irrefutably true.  Participants in the September Kahala Call confirm that statement is true.

The evidence demonstrates the truth of Keely's representation.  ECH had negotiated the Due North Deal, but the deal had not closed yet.  Keely having pressing issues concerning a family member's terminal cancer diagnosis, had discussions concerning Kahala's potential purchase of the Grabbagreen brand.  Keely considered Kahala as a buyer, but only on the same terms as the Due North Deal with Kahala effectively stepping into Due North's position under the existing contracts.  During the September Kahala Call, Kahala representatives informed Keely on that call that it would not agree to acquire the Grabbagreen brand under the terms of the Due North Deal.  Following that call, Keely provided truthful information to Cramton regarding the discussion, i.e., Kahala would not agree to acquire based on the terms of the Due North Deal.  It is undisputed that Keely never again discussed or negotiated the Due North terms with Kahala.  No matter how Cramton changes the purported representation, it was true when Keely made it on September 18, 2017.  Further, Keely did not provide false or incorrect information to Cramton or fail to disclose material information known to Keely on September 18, 2017 to Cramton.  The inquiry here is not what Kahala knew, it is what Keely knew and the best indicator is the testimony of Griffin and Price because they, like Keely, were not privy to Kahala's internal discussions or intentions and could not foresee the future any more than Keely could.

> **p. Whether the representations Cramton claims were made on the September 18, 2017 telephone call were material.**

Plaintiff:  Plaintiff contends the representations made by Keely Newman were absolutely material; so material that they caused Plaintiff to separate her employment.

Defendants' Contentions (ECH and Keely):  Material representation is defined in Black's Law Dictionary as "a representation to which a reasonable person would attach importance in deciding his or her course of action in a transaction."  Keely, ECH and Cramton were not in a transaction.  Further, none of the alleged representations, let alone

48

the statements actually made by Keely, would be material in influencing a reasonable person to voluntarily resign because whether Kahala ever bought the Grabbagreen brand or not had no relationship whatsoever with the fact that Cramton had no right to Sale Proceeds or cash of any sort from ECH upon the sale of the Grabbagreen brand. The bald assertion that Cramton would get money if Kahala acquired the Grabbagreen brand has no basis in law or in fact and directly contradicts the unambiguous terms of the Operating Agreement. Cramton would be in exactly the same position whether there was a Kahala deal or there was no Kahala deal – either way, she would get no money. Cramton knew this, her attorney knew this, they discussed it with Keely in June and July 2017 in relation to the Due North Deal. No reasonable person would resign after one conversation with Kahala when the Due North Deal, a fully negotiated deal, was still pending. No reasonable person would resign when there were several other potential buyers waiting in the wings if neither Due North or Kahala ultimately bought the brand. The alleged statement about whether Kahala would buy the Grabbagreen brand in the future was not material to whether Cramton should hang on or not – it did not matter what Kahala did or did not do, Cramton was not entitled to anything either way.

Cramton fully understood that she had no right to any money in the event of the sale of the Grabbagreen brand to Kahala. The evidence in this case makes this very clear. There were two potential buyers that conducted due diligence by that time. One was Due North. The Due North Deal was also an asset acquisition of the Grabbagreen brand and it was fully negotiated, pending in September 2017 but originally set to close in June 2017. In June 2017, Cramton and her counsel had discussions with Keely to request that Keely make a discretionary payment to Cramton if the Due North Deal closed. These numerous oral and written communications discussing whether Keely would agree to make a payment to Cramton if the Due North Deal closed occurred <u>because</u> Cramton had no right to a payment at all absent Keely's discretionary agreement. Further, clearly Keely knew that Cramton fully understood that she had no right to money upon the sale of the Grabbagreen brand

because it was repeatedly discussed orally and in writing over a 4-6 week period in relation to the Due North Deal.

By contrast, the September Kahala Call was a conversation and involved no agreements of any sort, only an offer to Kahala that if they could close faster than Due North on the same terms, Keely would sell to Kahala instead of Due North.  A side conversation with Kahala has no connection whatsoever to Cramton's obligations under the Operating Agreement to continue employment for 5 years or her complete lack of any right at all to Sale Proceeds.  Cramton testified under oath that she never contemplated resigning until after September 14, 2017.  Cramton testified that while she was in California she decided that she "couldn't go back" and she "couldn't take it anymore" and told Dana Mavros ("Mavros") there were other buyers but the brand would not sell "any time soon." A reasonable person would not decide to stay employed just because Kahala might one day buy the Grabbagreen brand particularly given that no Sale Proceeds or cash would be distributed to Cramton either way.  In addition, Cramton was a facilitator of the discussions between Keely and Kahala and no reasonable facilitator would abandon all hope after one call without asking anyone a single solitary question – according to her story.

**q. Whether Keely or ECH intended to fraudulently deceive Cramton.**

Plaintiff:  Plaintiff contends Keely (as an agent of ECH) intended for Cramton to rely on her representations and induce her into separating her employment.

Defendants' Contentions (ECH and Keely):  Both Keely and Price (with EKS&H Capital Advisors) left the September Kahala Call with the understanding that Kahala rejected Keely's offer to sell the Grabbagreen brand to Kahala on the same terms and conditions as the Due North Deal, no counteroffer was made and no next steps were discussed.  Defendants provided truthful information to Cramton and had no intention to fraudulently deceive Cramton.  Fraud cannot be predicated upon unfulfilled promises, expressions of intention, or statements concerning the future, without evidence that such were made with the present intent not to perform.  *Spudnuts v. Lane*, 131 Ariz. 424, 426

50

(App. 1982).  The party alleging fraud bears the burden of establishing the intent to deceive. *McAlister*, 171 Ariz. at 214.  Unless Cramton can prove that ECH and Keely intended to deceive her at the time the representation was made, the claim cannot stand.  *Id*.  The underlying policy is that a promise to perform in the future is not a representation which can be shown to be true or false at the time it was made, and therefore, a person has no right to rely on the representation of a fact not in existence. *Denbo v. Badger*, 18 Ariz.App. 426, 428 (1972).

Cramton has not presented any evidence of ECH's or Keely's present fraudulent intent.  Among the myriad of reasons why the purported "fraud" makes no sense at all aside from the unambiguous language of the Operating Agreement is the fact that Keely was not sitting around coming up with a fraud scheme.  Rather, Keely and her family were residents of Florida who evacuated Florida on September 8, 2017 ahead of Hurricane Irma and returned to Florida on September 14, 2017.  Upon her return, Keely devoted her time and attention from September 14, 2017 through September 20, 2017 (i) to clean-up efforts at her home consisting of the removal of downed palm trees and debris, and (ii) to raise funds for charitable relief efforts as well as make arrangements to deliver food and water to the hardest hit communities of Collier and Lee counties in Florida.  She had little involvement with Cramton during that emergency and her attention was on more important matters of helping other people who had just lost everything to the hurricane.

Fraud may not be established by doubtful, vague, speculative, or inconclusive evidence. *Enyart v. Transamerica Inc. Co.*, 195 Ariz. 71, 77 (App. 1998).  Fraud is never presumed and cannot be found to exist on a mere suspicion as to the possibility thereof.  Fraud must be proven by clear and convincing evidence.  The clear and convincing standard requires evidence showing that the truth of Cramton's allegations is "highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).  Cramton does not have clear and convincing evidence that on September 18, 2017, ECH or Keely even made the statements

51

alleged let alone that they somehow knew that Kahala would acquire the Grabbagreen brand in the future but intentionally deceived Cramton by telling her that no future deals would be made for the acquisition of the Grabbagreen brand.  Keely could not have known whether Kahala or some other party would make an offer in the future or if the Due North Deal that was pending would close.

Keely also did not know whether Kahala would be interested in a deal on different terms when she spoke to Cramton.  Circumstances changing at a later time do not change the fact that the Keely's statement was made in good faith.  Further, Keely knew Cramton had no right to Sale Proceeds so there was no reason to try to "dupe" her out of something she never had any right to receive in the first place.  Keely also knew that Cramton was receiving updates directly from Kahala and with direct access and better information, there would be no reason for Keely to think Cramton was not well advised or not able to access any information she wanted to receive.  Keely also understood and believed that Cramton resigned from GGS and her buyout rights had already been triggered.  Keely knew a second triggering event was not required.  Cramton cannot establish that Keely had a present fraudulent intent on September 18, 2017 because no such intent existed and there was nothing that she was entitled to receive that she was "duped" out of by the Defendants.

Cramton's contention also makes no sense considering that Cramton had more direct conversations with Kahala than Keely did.  How could Keely defraud her when Cramton had, and was getting her information directly from Kahala.  Specifically, from August 4, 2017 until submitting her Resignation Letter (defined below), Cramton had direct telephone calls with Wuycheck:  August 4, 2017, August 10, 2017 (twice), September 12, 2017 (twice) and September 22, 2017.  Prior to receiving Cramton's Resignation Letter, Keely had only four calls with Kahala representatives:  August 10, 2017 (with Cramton on the call), August 15, 2017 (Kahala wanted exclusivity and Keely declined because of the pending Due North Deal), August 18, 2017 (Keely informed Kahala she required either non-exclusivity or an

LOI to grant access to Due North data room) and September 18, 2017 (Kahala rejected Keely's offer to sell the Grabbagreen brand to Kahala on the Due North Deal terms).  With greater access to Kahala, it makes no sense that anyone would even think to misrepresent the status of Kahala's interest to Cramton.

**r.  Whether Keely or ECH knew Kahala would be interested in discussing a deal on different terms than the Due North Deal terms.**

Plaintiff:  Plaintiff does not believe this is a separate issue for trial.   Whether Keely knew Kahala would be discussing a deal on different terms is not an element of any claims in this case.   This issue whether Keely knew, or was negligent in knowing, that the statements she made—that the Kahala deal was off the table were false.  Plaintiff believes, based upon the evidence including but not limited to the Kahala witnesses' testimony, that Ms. Newman knew her representations were false and/or was negligent in same that the deal with Kahala had not fallen through.

Defendants' Contentions (ECH and Keely):   To make an intentionally false statement, Keely had to know the purported statement was false.   This is an essential element and Cramton has the burden to prove by clear and convincing evidence not what the Kahala witnesses knew internally at Kahala, but what Keely and Price knew at the end of the September Kahala Call.  Both Keely and Price (with EKS&H Capital Advisors) left the September Kahala Call with the understanding that Kahala rejected Keely's offer to sell the Grabbagreen brand to Kahala on the same terms and conditions as the Due North Deal, no counteroffer was made and no next steps were discussed.  Price was retained because he regularly negotiates sales of a businesses.  He advised Keely in negotiations with Due North and then with Kahala in 2017.  The understanding both Keely and Price had was confirmed by other participants in the call and the only other witness, Griffin.  The inquiry is not what the Kahala witnesses' knew, planned, discussed internally or determined their negotiation strategy to be.  The inquiry is what knowledge did Keely and Price have when the 12-minute

September Kahala Call ended.  It is irrefutable that there were no other communications in which Keely could gain any further insight or special knowledge of Kahala's future intentions nor was there any other communication where she gained knowledge of, or obtained insight into, their internal communications, internally determined negotiating style or strategy.  But the burden is not on Keely to prove her good faith.  The presumption is in favor of honesty.  It is Cramton's burden to overcome that presumption by establishing with clear and convincing evidence that would make it "highly probable" that Keely knew what Kahala would do next.  Cramton has not, and cannot, meet this standard of proof and Count X must fail.

**s.  Whether Keely or ECH intended that Cramton be induced or act upon the alleged statement by resigning and knew Cramton would resign if Kahala would not enter into a deal with ECH.**

Plaintiff:  Plaintiff believes that Keely, as an agent of ECH, did intend for Plaintiff Cramton to act and rely on her representations that the Kahala deal was off the table, and Plaintiff did so resign.  Keely was well aware that Defendants were not paying Plaintiff and were treating Plaintiff so poorly, that she would likely resign if there was no hope of a deal in the works because that would continue to make Plaintiff an indentured servant (which Plaintiff already was) working for free in violation of Arizona's minimum wage laws.

Defendants' Contentions (ECH and Keely):  Cramton was paid $70,140.89 for less than 9 months of service in 2017.  The assertion that Cramton was an indentured servant or working for free is absurd.  To be liable under Counts IX or X, Keely and ECH had to know that Cramton would resign if specifically Kahala would not agree to buy the Grabbagreen brand at that time and they had to intend to induce Cramton into acting or cause Cramton to act upon that information by resigning.  The liability of the maker of a purportedly negligent misrepresentation "is limited to the transaction that he intends, or knows that the recipient intends, to influence."  *Southwest Non-Profit Housing Corp. v. Nowak*, 234 Ariz. 387, 391

54

(App. 2014).  Cramton has the burden to establish that Keely knew that Cramton would resign specifically because Kahala did not agree to a deal on the September Kahala Call. There is no evidence that Keely had that knowledge or knew that telling Cramton what Cramton alleges Keely said would induce or influence Cramton to resign.  This is true even if, as Cramton's evolving story goes, Kahala would never buy the Grabbagreen brand. There is also no evidence that Keely knew she would resign despite the pending Due North Deal and despite discussions with other potential buyers.  Cramton's big decision to resign or not resign made no difference with respect to the fact that Cramton was not entitled to receive Kahala Sale Proceeds under the unambiguous provisions of the Operating Agreement.  Cramton cannot be duped out of something that was not hers to receive.  This is so clear that the story Cramton told in this case is also not believable because of its pointlessness.  It would be pointless to try to induce her to resign.  Cramton had no right to Sale Proceeds whether she resigned or not.  Two conclusions emerge from Cramton's efforts to mislead and misdirect.  First, the supposed motivation for the supposed trickery is hollow – there is nothing there.  Second, Cramton's alleged reason for resigning because she would not get Kahala Sales Proceeds falls flat as well because she would not get Kahala Sales Proceeds under any circumstances under the Operating Agreement and she knew that. Cramton cannot prevail on Counts IX or X.

   **t.  Whether Cramton was ignorant of the fact that the Grabbagreen brand would be sold.**

   Plaintiff:  Plaintiff believes Defendant mischaracterizes this element.  The element requires that the Plaintiff be ignorant of the falsity of the misrepresentation—here that the Kahala deal was off the table—not whether the brand would ever be sold.  Plaintiff contends she was ignorant of the falsity of the statement—that the Kahala deal was not actually off of the table.  She had no reason to question Ms. Newman's statements, relied on them, and separated her employment.  Plaintiff was not on the call regarding the status of the Kahala deal and John Wuychek testified that Plaintiff was shocked when she learned—the day after

her resignation—that the representations were in fact false. In the end, Ms. Newman's statements were false and Ms. Cramton was ignorant of that fact.

<u>Defendants' Contentions (ECH and Keely)</u>: Cramton knew the Grabbagreen brand would be sold. She had no reason to resign knowing the brand would be sold. Cramton claimed in this case that she resigned because there would be no deals in the future with any possible buyer and that she was just hanging on to get sale proceeds. With that as her reason and motivation, it made absolutely no difference who the buyer was and the fact that she knew there were more potential buyers lined up makes it impossible for Cramton to be ignorant of the fact that the Grabbagreen brand would be sold regardless of the buyer. If under the circumstances, the injured party should have reasonably researched more into the representation, a court will not consider the party to be ignorant. *See*, *Fields v. Mitch Crawford's Holiday Motors Co.*, 947 S.W.2d 818, 821, 1997 Mo. App. LEXIS 1125, at *7-8 (Mo. Ct. App. 1997). Cramton's background and knowledge of the circumstances driving Keely's decision to sell the Grabbagreen brand was more than sufficient for Cramton to understand that Keely was going to sell the Grabbagreen brand to Due North, Kahala or one of the others that Keely communicated with in relation to the sale of that brand. A sale would happen regardless of whether the buyer was Kahala or another party, it was just a question of when or who. Cramton's background and knowledge of negotiations and closings of deals in business development and the Due North Deal was more than sufficient for Cramton to have a clear understanding that almost no deal of any consequence is negotiated or made in a single telephone call. As such, Cramton could not have been ignorant of the fact that a single telephone call could not be used to predict the future and certainly not to do so and conclude there was no chance of any sale under the circumstances. Cramton's background and knowledge of Kahala and her relationship to Wuycheck was more than enough for Cramton to have contacted Wuycheck and Kahala directly to obtain any information she wanted with regard to Kahala's intentions. Cramton and Wuycheck are former colleagues who worked together on the Coldstone Creamery brand and she knew him since at least 2001. Cramton, in fact, did contact her long-term personal friend,

56

Wuycheck before resigning.   Any purported representation by Keely about Kahala's intentions could not be fraudulent because Cramton's background and knowledge of the foregoing sufficiently placed Cramton on notice that the Grabbagreen brand would be sold. If, as Cramton claims, all she was doing was hanging around waiting for Sale Proceeds, it made no difference who the buyer was, what mattered was that there was going to be a sale regardless and Cramton possessed sufficient knowledge to know a sale would happen so if, as she claims, her only purpose was to wait for a sale, then she had no reason to decide to resign.

> **u.  Whether Cramton had a right to rely or justifiably relied on ECH's or Keely's purported representations about Kahala in deciding whether to resign.**

Plaintiff:   Plaintiff's position is that she had a right to justifiably rely on Ms. Newman's statements.   She was not involved in the phone call between Ms. Newman and Mr. Wuycheck where the terms of the deal were discussed.   She had to rely on Ms. Newman's representations as to the status of the call and the deal.   And she did so to her detriment when she separated her employment.

Defendants' Contentions (ECH and Keely):   Cramton had repeated direct conversations with Wuycheck, including direct conversations about the level of Kahala's interest in the Grabbagreen brand and status of their consideration of Keely's offer to sell it to them on the same terms as the Due North Deal.   She not only did not have to rely on Keely, she in fact did not rely on Keely.   Rather, she called Wuycheck directly – something she could do at any point in time.   Cramton's alleged reliance on Keely's purported statement that there would be no future deals for the acquisition of the Grabbagreen brand, especially with Kahala, was not reasonable or justified.   *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500 (1982).   Cramton has the burden to establish a right to rely on the alleged false statement or that reliance was reasonable.   *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 316 (1987).   For negligent misrepresentation reliance must be justified.   "Reliance is 'justifiable' only when 'circumstances [are] such to make

it reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation.'" *Philipson & Simon v. Gulsvig*, 154 Cal. App. 4th 347, 364, 64 Cal. Rptr. 3d 504, 517 (Cal. Ct. App. 2007). Here, Cramton cannot show that she reasonably or justifiably relied on the purported statements of Keely on September 18, 2017.

A reasonable person would be put on inquiry in making a decision that could end her ownership rights where the purported statements were entirely inconsistent with the circumstances and where a statement to the effect that there was no chance of any future deals is facially incredible to think that there was no buyer in the world for the Grabbagreen brand – a belief that would lack the basic care and reason that someone in business development and sales would ordinarily apply. It is unreasonable and not justified for Cramton to rely on Keely's purported ability to predict the future as to what deal with a third party would materialize and/or consummate. Cramton knew the terminal cancer diagnosis for Keely's family member had not changed (and could not change short of the discovery of a cure for cancer) and therefore, Cramton knew at all times that Keely wanted to sell the Grabbagreen brand quickly. It would be unreasonable and not justified for Cramton to rely on a sudden representation that there would be no future deals or that there was no chance of a deal. Further, Cramton could have, but failed to, confirm with Keely her plans to sell the Grabbagreen brand prior to making the decision to resign. It was unreasonable and not justified for Cramton to believe at any time that she could hang on and get Sale Proceeds from the sale of the Grabbagreen brand. In order for Cramton to get any cash from ECH, Cramton understood that she would have to convince Keely to voluntarily agree to pay her. Therefore, Cramton's stated basis for deciding to resign is illogical, not justifiable and unreasonable. It is not reasonable or justifiable for Cramton to think her resignation decision was at all related to the unambiguous terms of the Operating Agreement providing that she had no right to Sale Proceeds.

Before resigning, she contacted Wuycheck. She had direct access at any time to Wuycheck. Cramton also communicated several times weekly with accountant Mills and franchise counsel, Antonia Scholtz of Cheng Cohen – the firm that also represented ECH

in the Kahala deal.  She had direct access to Kelli Newman.  She could have confirmed, investigated or received an update about Kahala.  Further, she could always have just gone back to Keely and asked for an update, confirmation or clarification or simply answered Keely's calls after September 18, 2017 but she admitted she deliberately refused to take Keely's calls because she did not want to talk to her.  Cramton's alleged reliance on Keely's oral statements was unreasonable and unjustified.

Absent Keely's voluntary agreement to make a payment to Cramton upon the closing of a deal with Kahala, Cramton only had a right to continue to hold the units awarded to her so long as she remained employed for an additional 4 years, 2 months and 5 days.  The purported statements of Keely on the September 18, 2017 would not induce a resignation because there was no right to receive Kahala Sale Proceeds even if Cramton continued employment through the closing of the Kahala deal unless Keely exercised discretion to make a discretionary payment.   "Actual reliance occurs when a misrepresentation is 'an immediate cause of a plaintiff's conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'" *Engalla*, 15 Cal. 4th at 976, 938 P.2d at 919 (*quoting*, *Spinks v. Clark*, 147 Cal. 439, 444, 82 P. 45, 47 (1905).  Cramton did not enter into a contract or other transaction with Keely based on the alleged statements nor did the decision to resign alter a legal right of Cramton's to Sale Proceeds – either way she had no legal right and for this reason, the purported representations of Keely were not the cause of Cramton losing out on Kahala Sale Proceeds.   Whether Cramton resigned or not based on statements made that day, she had no right to any money whatsoever from the closing of the Kahala deal.  Cramton could not justifiably rely thinking that there were no Sale Proceeds to get if Kahala was not going to buy the Grabbagreen brand because she had actual knowledge that a payment was within Keely's discretion. Cramton's supposed reliance was not reasonable or justifiable.

**v. Whether Defendants' Caused Cramton to suffer any loss or damages claimed under Counts VII, IX and X.**

1

2        Plaintiff:  Plaintiff's position is that here membership interest was wrongfully taken

3   from her.   As a result, she is entitled to the fair market value of that membership as

4   established by the Kahala sale.

5        Defendants' Contentions (ECH and Keely):   The Operating Agreement governing

6   this case is clear, unambiguous and unequivocal.  Cramton admitted that her claim is one

7   based specifically on the Operating Agreement and her claim that the Operating Agreement

8   was violated because she did not receive Sale Proceeds.  (Dkt. 50, at 3:27-4:1).  Defendants

9   made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale." (Dkt.

10  50, at 4:11-4:12).  Cramton's counsel made a similar representation to Judge Rayes at the

11  Rule 16 scheduling conference when he referenced the fact that Cramton's "big dollar

12  claim" related to the Operating Agreement.  (Dkt. 89, at 12:7-12:17).  As such, Cramton

13  has admitted that this Court need not look any further than the unambiguous language of

14  the Operating Agreement.  Cramton held unvested units subject to a buyout right for $1 if

15  Cramton resigned without completing 5 years of employment.  Cramton resigned with 4

16  years, 2 months and 5 days to go before she would vest on November 29, 2021.  The fair

17  market value of unvested units is zero.  The most Cramton could hope to receive prior to

18  November 29, 2021 is $1 upon a buyout.  Cramton was bought out and did receive the $1

19  provided to her under the Operating Agreement.  Cramton had a 0% ownership in the

20  Grabbagreen brand and was not entitled to any of the purchase price paid to ECH for the

21  Grabbagreen brand.  The Operating Agreement also does not contain any provision for a

22  liquidity event for any member or provide her with a right to fair market value upon

23  resignation based on an asset she did not own.  The only wrongful thing here is the filing

24  of this lawsuit.  Cramton was not entitled to Sale Proceeds from the Kahala deal regardless

25  of whether she remained employed or not.  By resigning prior to the closing of the Kahala

26  deal, the Defendants could not cause Cramton to suffer the damages of losing Sale Proceeds

27  she would have no right to receive in any event.  As such, Cramton cannot establish that

28  Defendants caused her to suffer damages by making the purported statements.  Cramton

has not proffered evidence that she had any entitlement to the valuation or the damages she

60

claims under the Operating Agreement.  Cramton had and continues to have no reasonable basis in law or in fact to assert Counts VII, IX or X because she can proffer to this Court or to the Jury no evidence of any damages she suffered or loss of any benefit to which she would be entitled that were caused by the Defendants.  Damages for purported mental, physical and emotional pain and suffering experienced by Cramton was never calculated or disclosed in her mandatory disclosures.  Cramton cannot present evidence about damages at trial based on claims of mental, physical and emotional pain and suffering she purportedly experience but did not disclose in her MIDP in relation to those counts.  Rule 37 bars a party from introducing an undisclosed claim or new theories of damages at trial unless they can show the failure to disclose was substantially justified or harmless.  *See*, Fed. R. Civ. P. 37(b)(2), (c)(1); *See also*, *Yeti by Molly*, at 1106.  Cramton is barred from adding a new claim or theory of damages by Rule 37 and General Order 17-08(A)(4), (8) and (B)(4).  For that reason, Cramton is also not entitled to punitive damages under Count X.  Further, absent evidence of an intent to deceive and an "evil mind" to harm Cramton, she is not entitled to punitive damages.  *Rowe v. Bankers Life & Cas. Co.*, 2008 WL 5156077, at *9 (D. Ariz. Dec. 9, 2008).

**w.  Whether Keely and ECH intended that Cramton rely on the information provided and that they provided it for the purpose specifically of making a decision about whether to resign based on Kahala's intentions.**

Plaintiff:  Plaintiff believes that Keely, as an agent of ECH, intended that Cramton rely on the information she provided to Cramton in her September 18, 2017 telephone call that the Kahala deal was off the table.  Plaintiff believes Keely made such a representation intending for Cramton to rely on it, and resign, given that Cramton was not making any wages, and thus had no incentive to stay on board with the company if there was no deal on the table.  Ms. Newman was well aware of this fact.

Defendants' Contentions (ECH and Keely):  Cramton's beliefs are not evidence sufficient to carry her burden of proof in this case.  Cramton was paid $70,140.89 for less

than 9 months of service in 2017.  There was no actual reason not to "stay on board" if there was no Kahala deal because there was a Due North deal and other potential buyers waiting in the wings.  Cramton's stated reason for resigning is that she was just hanging on waiting for Sale Proceeds – if so, then the incentive she had was to "stay on board" and wait for any one of the potential buyers to negotiate and close on a deal.  Cramton has the burden to establish that Keely and ECH intended Cramton to rely on the purported statements for the purpose of Cramton making an employment decision to resign based on what Kahala intended to do in the future.  On September 18, 2017 there was no transaction between Cramton or either Defendant and no transaction between either Defendant and Kahala. Keely and ECH did not know Cramton was even contemplating resignation from GFL.  No information was given to Cramton for her benefit or guidance in the "transaction" with Kahala specifically even assuming that one telephone conversation during which an offer was rejected could reasonably be considered a transaction or for the purpose of making a decision of whether to resign or not based on Kahala's intentions specifically.  Cramton has not proffered any evidence that Keely knew that Cramton would resign if Kahala specifically did not say on September 18, 2017 that they would one day buy the Grabbagreen brand nor is there any evidence that Keely intended to provide information to Cramton to influence her decision to resign given she had no reason to think one was connected to the other.  It was not foreseeable that Cramton would receive information about Kahala specifically and then resign choosing not stay until another deal was done with Due North or another party even if the buyer was not Kahala.

> **x. Whether Keely and ECH exercised reasonable care in obtaining or communicating information.**

Plaintiff:  Plaintiff believes Keely, as an agent of ECH, did not exercise reasonable care in obtaining or communicating the information from the September 18, 2017 Kahala

call.  According to the Kahala witnesses, the deal was 100% on the table; thus Keely failed to exercise reasonable care when she represented otherwise.

Defendants' Contentions (ECH and Keely):  The inquiry here is not what Cramton purports that the Kahala witnesses knew internally or what Kahala intended internally.  The inquiry is what Keely and Price were told and led to believe on the September Kahala Call. Keely relayed complete, truthful and accurate information to Cramton about the September Kahala Call and her continuing intention to sell the Grabbagreen brand.  Keely had no additional information to provide and did not provide any information for the purpose of Cramton making a decision to resign.  There was no connection between Cramton's decision to resign or not resign, on the one hand, and Cramton's lack of a right to receive Kahala Sale Proceeds, on the other hand.  The information relayed by Keely to Cramton from the September Kahala Call was truthful and complete as confirmed by other participants in the call and Griffin who was present during the call.  Keely exercised reasonable care in obtaining and communicating information to Cramton and she had no reason to know that Cramton intended to use that information to make a decision to resign.

**y. Whether Cramton was at fault and was negligent by resigning on September 24, 2017.**

Plaintiff:     Plaintiff contends she was not contributorily negligent by separating her employment on September 24, 2017.   She had every right to rely on her boss' representations as to the status of the Kahala deal following a call where she was in the dark. Plaintiff also notes this defense is only applicable to Defendants' negligent misrepresentation claim: not Plaintiff's claims for unpaid minimum wages, breach of the implied covenant, or fraud.  Defendants also did not raise this as an affirmative defense and this defense has thus been waived.  E.g. Docket 42, 95.

Defendants' Contentions (ECH and Keely):  This affirmative defense applies to all counts and is set forth in Dkt. 95 at § 174.  Cramton had no right, and in fact did not, rely

on any statements made by Keely.  Rather, Cramton had unfettered access to Wuycheck and in fact, contacted Wuycheck before resigning.  To the extent Cramton could somehow have suffered damages in relation to completely discretionary payments (within Keely's discretion) based on unvested, forfeitable units with respect to which Cramton substantially failed to fulfill her specific obligation of remaining employed for an additional 4 years, 2 months and 5 days, Cramton's damages were caused or contributed to by her own acts, omissions and wrongful conduct and not caused by the Defendants.  If Cramton could suffer the damages claimed in relation to Sales Proceeds (she could not), she caused her own damages by affirmatively inquiring of Kahala directly and just not waiting a few hours to connect on the telephone.  Aside from going directly to Kahala, Cramton had other easily accessible sources of information and she just did not bother.

> **z.  Whether Cramton was at fault for her own alleged harm because of her misconduct following her resignation.**

Plaintiff:   Plaintiff contends she was not contributorily negligent by separating her employment on September 24, 2017.   She had every right to rely on her boss' representations as to the status of the Kahala deal following a call where she was in the dark. Plaintiff also notes this defense is only applicable to Defendants' negligent misrepresentation claim: not Plaintiff's claims for unpaid minimum wages, breach of the implied covenant, or fraud.  *See* A.R.S. § 12-2506.  Defendants also did not raise this as an affirmative defense and this defense has thus been waived.  E.g. Docket 42, 95.

Defendants' Contentions (ECH and Keely):  This affirmative defense applies to all counts and is set forth in Dkt. 95 at § 174.  Cramton had no right, and in fact did not rely on any statements made by Keely.  Rather, Cramton had unfettered access to Wuycheck and in fact, contacted Wuycheck before resigning.   Keely's alleged representations on September 18, 2017 could not have been the cause of Cramton's resignation because before she resigned, Cramton knew and understood she was not entitled to Sale Proceeds from

Kahala or any other buyer unless Keely voluntarily agreed to exercise discretion and cause ECH to make payments.  Keely's decision to exercise her buyout right was made over a month after Cramton's resignation from GGS and then GFL.  After she resigned, Cramton continued to be a member for over a month and during that time, Cramton refused to cooperate in transitioning work to other employees, breached the Operating Agreement, destroyed company property by tampering with and deleting company data from a company computer, iPhone and iCloud account in violation of state and federal anti-computer tampering civil and criminal laws, breached the Key Employee and Confidentiality Agreement, stole company property and data, repeatedly and falsely claimed she had not stolen company property, interfered with franchisees and area developers, badmouthed the company and Keely and interfered with company operations.  To the extent her claims based on discretionary payments within the discretion of Keely is even remotely a legally cognizable claim, it is Cramton's own misconduct aimed at harming Keely and the company is the reason she lost the ability to get Keely to exercise that discretion.  Plaintiff is at fault for her own behavior that resulted in the exercise of the buyback right.

      **aa. If liability were assessed under Counts VII, IX or X, how should damages be calculated.**

      Plaintiff:  Plaintiff's position is that she is entitled to the fair market value of her membership interest as established by the Kahala sale.  This is simply taking  18.6% of the $2.6 million sales proceeds.

      Defendants' Contentions (ECH and Keely):  Cramton's position is without merit and she has no evidence to support it.  Cramton held only an 18.1% interest in relation to ECH when the Grabbagreen brand was sold.  $2.6 million is not the amount of money that ECH received and cannot be a basis for damages.  Cramton is not entitled to fair market value of an asset she never owned.  Cramton misstates the applicable measure of damages.  In addition, Cramton admitted that her claim is one based specifically on the Operating

Agreement and her claim that the Operating Agreement was violated because she did not receive Sale Proceeds. (Dkt. 50, at 3:27-4:1). Defendants made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale." (Dkt. 50, at 4:11-4:12). Cramton's counsel made a similar representation to Judge Rayes at the Rule 16 scheduling conference when he referenced the fact that Cramton's "big dollar claim" related to the Operating Agreement. (Dkt. 89, at 12:7-12:17). As such, Cramton has admitted that this Court need not look any further than the unambiguous language of the Operating Agreement. The Operating Agreement does not provide for this calculation or any such payment under any circumstances. Cramton had no ownership interest or right to the "Kahala sale." The "Kahala sale" does not reflect the fair market value of ECH or the unvested units in ECH Cramton once held. Cramton was not entitled to Sale Proceeds and failed to complete the required 5 years of employment to be entitled to anything under the Operating Agreement.

The measure of damages in this case must be based on Cramton's actual value in her unvested membership interests not the asset of ECH. The actual value of <u>unvested</u> units or a potential <u>discretionary</u> payment of Sale Proceeds she had no right to receive at any relevant point in time was, and is, zero. If an employee has an unvested account balance in a 401(k) plan, for example, that account balance is worth zero to the employee if she resigns prematurely. Cramton's unvested units were worth zero to her because she resigned more than 4 years before completing the required employment period. Cramton had to remain employed for 5 years. She did not do so and she testified under oath she had no intention of doing so. She was not excused from this employment requirement under any provision of the Operating Agreement whether she was employed at the time of the closing of the Kahala acquisition or not. The actual value of her claims under Counts VII, IX and X were at resignation and are now zero. She received $1 for unvested units worth zero. Cramton failed to complete the required 5 years of employment – she completed only 10 months of that period. Cramton has the burden to prove that unvested units and a potential

discretionary payment was worth more than the $1 she received and the burden of proof that the value of ECH's asset was somehow the value of unvested units – it was not. Cramton cannot carry this burden.  Cramton cannot proffer any evidence of the value of unvested units and cannot offer any expert opinion to establish the value of unvested units. Cramton did not suffer compensatory damages under Counts VII, IX or X.

Cramton has failed to provide a calculation of the value she claims of her unvested units in her Amended Complaint or in item 5 of her MIDP in relation to damages under Counts VII, IX and X and should be barred from springing an undisclosed damages calculation in trial.  It appears that she thinks the purchase price Kahala paid ECH for ECH's asset (i.e., the Grabbagreen brand) should be the value she receives not the actual value of her once held unvested units, specifically the unvested ECH units she once held. The price paid by Kahala for the Grabbagreen brand is the money actually received by ECH not the random numbers Cramton has thrown around for three years.  On this point it is important to be specific.  Cramton did not own any interest in the Grabbagreen brand and was not entitled to a payment from Kahala directly even if she remained employed through the closing date.  ECH and its subsidiaries were the sole and exclusive owner of the Grabbagreen brand.  ECH and its subsidiaries had the sole and exclusive right to the purchase price paid by Kahala.  The Kahala acquisition was an asset purchase of the Grabbagreen brand from ECH.  Kahala did not purchase the membership interests in ECH and thus, it made no difference whether Cramton was a member or not on the date of sale. Cramton, even if employed on that date, would not receive any money from Kahala and would only receive money or Sale Proceeds from ECH **if** Keely exercised discretion under the clear and unambiguous provisions of the Operating Agreement.

Further, the value Cramton appears to suggest would not be the value she would get even if we assumed *arguendo* that ECH received the Kahala purchase price and immediately liquidated (which it, in fact, did **not** do).  Even if liquidated Cramton, like

Keely, would be bound to the application of all of the provisions of the Operating Agreement.  Cramton's apparent damages theory, ignores:  (i) the plain language of the Operating Agreement entirely, (ii) the Arizona Limited Liability Company Act entirely, (iii) transaction closing costs such as legal fees, consulting fees and accounting fees, etc. required under the Operating Agreement to be allocated amongst all members, (iv) all expenses of the business, including wage payment obligations for other employees (including the employees who did all the work for the last 6 months before the sale to get the deal done) required under the Operating Agreement to be allocated amongst all members, (v) all debts and obligations of the business, (vi) ECH's right to provide for appropriate reserves against contingent liabilities, taxes and capital expenditures, and (vii) dilution provisions applicable to all members in relation to other unit holders like David Glines.

Cramton's damages calculation, if applied, would place Cramton in a superior and preferred position not only to the other members, but also to creditors.  There is no basis in law or in fact to ignore the Operating Agreement, ignore the law, disregard ECH's rights as an entity entirely by invading all of its underlying assets, provide Cramton with a valuation on her unvested units using the value of ECH's asset rather than her once held unvested units, or provide her with all benefits of ownership with literally no expenses or other applicable obligations or contingent liabilities of the business while foisting all expenses, obligations and contingent liabilities onto ECH and Keely.  Cramton had no right to a valuation that directly contradicts § 10.1(a) of the Operating Agreement or a valuation that is based on an asset that did not belong to her, i.e., the value of the Grabbagreen brand that belonged exclusively to ECH and its subsidiaries. Further, Cramton had no liquidity rights at all and certainly not on unvested units and ECH, in fact, did not liquidate and continues its operations in other business lines it was entitled to develop and operate at all points in time.

1

2          Further, currently a claim is now pending by a franchisee claiming $1 million dollars

3    in relation to which ECH, at all moments in time, had a right to retain Sale Proceeds in

4    reserve to provide for defense costs and to satisfy any liability.  Cramton had, and has, no

5    right whatsoever under the Operating Agreement or any law to foist liabilities onto ECH

6    or Keely.  This is especially true where the claim hinges on allegations of Cramton's fraud

7    in selling a franchise to that franchisee.  ECH had and continues to have a right to reserve

8    funds to address precisely that type of contingent liability.  In fact, the Arizona Limited

9    Liability Company Act prohibits Cramton from absconding with the money needed to

10   address this claim leaving Keely to clean up her mess.  Any recovery possible in this case

11   should be offset by the cost and reserves against this contingent liability in that case as

12   well.  See also discussion on causation and damages in Section D.2.a. and D.2.d. below.

13          Mental, physical and emotional pain and suffering experienced by Cramton was

14   never disclosed in her mandatory disclosures.  Cramton cannot present evidence at trial

15   based on claims of mental, physical and emotional pain and suffering she purportedly

16   experience but did not disclose in her MIDP in relation to those counts.  Rule 37 bars a

17   party from introducing an undisclosed claim or new theories of damages at trial unless they

18   can show the failure to disclose was substantially justified or harmless.  *See*, Fed. R. Civ.

19   P. 37(b)(2), (c)(1); *See also*, *Yeti by Molly*, at 1106.  Cramton is barred from adding a new

20   claim or theory of damages by Rule 37 and General Order 17-08(A)(4), (8) and (B)(4).

21          **bb. Whether Cramton failed to mitigate her damages.**

22   Plaintiff:  Mitigation does not apply.  Short of immediately resigning, Cramton could not

23   have done anything to mitigate the failure to pay minimum wages.  As to the claims related

24   to her membership interest, there was no action that Cramton could have taken that would

25   have recouped the value of her membership interest other than filing this action.

26   Defendants' Contentions:  Cramton had a duty to mitigate her damages and failed to do so.

27   Cramton's claims are barred by her failure to properly and adequately mitigate her

28

69

damages, if she even had any.  Cramton was paid over $70,140.89 – vastly more than minimum wages.  In fact, she received a wage payment of $20,000 just 2 weeks prior to her resignation.  Cramton had numerous options to mitigate.  She could have spoken to Keely on September 25, 2017 and said she wanted to continue to work.  Keely wanted her to continue her employment.  Cramton refused to speak to Keely on September 25, 2017.  Keely had no idea why.  She could have given GFL its property back – intact – as requested in writing by the company.  She also could have given a 2-week notice and transitioned work in the usual manner anticipated from all employees and certainly from the second in command and a continuing member at that time.  She could have resigned and not contacted GFL's franchisees and area developers to cause as much harm as possible – as a member.  She could have refrained from badmouthing and disparaging Keely and the company – as a member.  She could have honored one of the agreements she had with the company – one.  She could have chosen not to materially breach the Operating Agreement.  The buyout was exercised over 5 weeks after her resignation – 5 weeks of misconduct that led to the exercise of the buyout right.  Cramton could have made a lot of better choices to mitigate.

### cc. Whether fees costs and damage are owed to Defendants.

Plaintiff:  Award of attorneys' fees is made at the conclusion of the case in accordance with LRCiv 54.2.   This is not a decision for the jury.   The "successful party" determination must be made based on "totality of the litigation," including the dismissed counterclaims were counterclaimants sought over $1 million in damages.  *Schwartz v. Farmers Ins. Co. of Arizona*, 166 Ariz. 33, 800 P.2d 20 (App. 1990).  The Ninth Circuit has held that A.R.S. § 12-349 does not apply in federal court.  *In re Larry's Apartment, LLC*, 249 F.3d 832, 837-39 (9th Cir. 2001).

Defendants' Contentions:  Defendants suffered substantial harm as a result of Cramton's conduct and their advisors will support the basis for the counterclaims.  Defendants are entitled to reasonable attorneys' fees pursuant to the Operating Agreement under A.R.S.

§§ 12-341.01, 12-349, and other applicable law.  Defendants are entitled to damages pursuant to A.R.S.§ 12-349 and other applicable law for this action being brought without reasonable investigation and in bad faith.  Defendants are entitled to their taxable costs and such other relief deemed just.

3.   The following are the issues of law to be determined:

a.   **Parol Evidence Rule**: Under Arizona law, the parol evidence rule excludes the admission of evidence that varies from or contradicts the written terms of a contract.  The Arizona Supreme Court ruled that the main purpose of contract interpretation is to enforce the intent of the parties.  *Taylor v. State Farm Mutual Automobile Ins. Co.*, 175 Ariz. 148, 152 (1993).  Where the language is clear and unambiguous, that language controls, and "it is not within the province of the court to alter, revise, modify, extend, rewrite or remake an agreement."  *Shattuck v. Precision-Toyota, Inc.*, 115 Ariz. 586, 588 (1977).  The ECH Operating Agreement is unambiguous in providing expressly that Cramton's interest was subject to the condition that Cramton complete 5 years of employment without voluntarily resigning "for any reason," a period that ends on November 29, 2021 – no exceptions.  (*See*, §9.3(b) of the Operating Agreement).  All extrinsic evidence or testimony that would purport to alter, revise, modify, extend, rewrite, remake or eliminate the 5-year employment requirement or any other provision in the Operating Agreement is inadmissible parol evidence that must be excluded.  The ECH Operating Agreement is also unambiguous in providing that no member has any right or entitlement to the proceeds of the sale of any of ECH's assets or capital proceeds.  (*See*, §3.6 of the Operating Agreement).  For example, under §3.6, whether any capital proceeds from the Kahala deal or distributions of ECH assets would occur rests solely and exclusively within the discretion of the majority of the members. Cramton was not a majority.  Thus, any extrinsic evidence or testimony to the effect that Cramton had a right or entitlement to cash, right or entitlement to Kahala sale proceeds or capital proceeds, a mandatory buyout, fair market value, valuation using the Kahala purchase price of ECH's asset and all similar such statements and allegations that

71

have or may be proffered by Cramton contradict the clear and unambiguous terms of the ECH Operating Agreement and are not admissible under the parol evidence rule.

Counts VII, IX and X are based on inadmissible parol evidence. Cramton even admitted that if the Court excludes parol evidence, that "would effectively dispose of Cramton's claims." (Dkt. 279, at 1:28-2:1). Cramton is correct, her claims directly contradict the unambiguous language in the Operating Agreement given that she is seeking money she never had a right to receive and as a result, they are all unsustainable claims. Count VII is a contract claim and Counts IX and X are torts alleging the same contract damages asserted under Count VII. All three assert that Cramton's damages are essentially 18.6% (incorrect percentage) of the purchase price (using an incorrect price) paid by Kahala to ECH (ignoring that ECH is a separate entity entitled to retain its cash and operate its business without invasion of its underlying assets). Cramton admitted that her claim is one based specifically on the Operating Agreement and her claim that the Operating Agreement was violated because she did not receive Sale Proceeds. (Dkt. 50, at 3:27-4:1). Defendants made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale." (Dkt. 50, at 4:11-4:12). Cramton's counsel made a similar representation to Judge Rayes at the Rule 16 scheduling conference when he referenced the fact that Cramton's "big dollar claim" related to the Operating Agreement. (Dkt. 89, at 12:7-12:17). As such, Cramton has admitted that this Court need not look any further than the unambiguous language of the Operating Agreement. Cramton's damages calculation contradicts the unambiguous accounting and tax allocation provisions of the Operating Agreement requiring that expenses, liabilities and contingent liabilities be allocated to all ECH units, including those formerly held by Cramton. She ignores the fact she had no liquidity rights and uses the value of ECH's asset instead of the value of the unvested units she once held. Nothing under the Operating Agreement would provide Cramton with a basis to shift all of the costs, expenses and liabilities of ECH to Keely.

Further, under the unambiguous provisions in the Operating Agreement, Cramton

would also not have a right to Kahala Sale Proceeds if she remained employed until November 29, 2021.  Rather, § 9.3(c) of the Operating Agreement would apply if Cramton worked the required 5 years and then resigned after November 29, 2021.  § 9.3(c) of the Operating Agreement unambiguously requires that fair market value of the units be determined based on an independent, third party appraisal "taking into account the lack of control and the inherent lack of liquidity of non-public minority equity interests."   In addition, the appraised value of the units in accordance with § 10.1(a) would be paid in accordance with Article 11 of the Operating Agreement with a payment of thirty percent (30%) of the determined value and the remainder paid in eighteen (18) equal or substantially equal installments beginning on the first day of the second month after the initial thirty (30%) is paid.  Under the unambiguous provisions of the Operating Agreement, there is no circumstance whatsoever under which Cramton would vest in November 2021 (had she chosen not to voluntarily resign) and get Kahala Sale Proceeds or a valuation of units based on the Kahala purchase price paid in 2018 more than 3 years earlier than the first date Cramton could have vested and had a right to receive the value of the ECH units had she continued her employment.  Cramton's claims, damages and damage computations are based on inadmissible evidence offered to contradict the unambiguous provisions of the Operating Agreement.

Keely has endured three years as a defendant to fraud and negligent misrepresentation claims and suffered meritless and substantial financial and reputational harm based on unvested forfeited units (with more than 4 years of required employment until the vesting date measured from the date of Cramton's resignation) where the damages for both claims are based on a purported right to a payment that is expressly, unequivocally, unambiguously and entirely within Keely's own discretion as the majority of members and where Cramton has provided no citation to a provision in the Operating Agreement, no citation to any law and no facts that support her claim that she was entitled to receive Kahala Sale Proceeds despite the provisions in the Operating Agreement.  This issue of law was

not decided or waived.

b. **Implied Covenant of Good Faith and Fair Dealing**: The unambiguous provisions of § 3.6 of the Operating Agreement limits the circumstances under which members could receive payments from ECH to the exercise of discretion by the majority of members. The rights and benefits bargained for under the Operating Agreement do not include a right or benefit to Sale Proceeds, to proceeds of a capital event, to a fair market value buyout by Keely, or to distributions or other payments of cash under the Operating Agreement. Cramton held unvested units subject to a very specific requirement: she had to work for five (5) years (until November 29, 2021) to get the value of those units. This requirement was imposed because ECH wanted Cramton committed to work for ECH's business lines and for 5 years so she could support the business while Keely divided her time among the business, supporting her spouse who had recently been diagnosed with terminal cancer and taking over essentially full responsibility for their two 6 year old children who were living in a different state than where the Grabbagreen brand was being operated. The benefit and rights sought by Cramton are outside the bargained-for benefits and rights expressly and unambiguously stated in the Operating Agreement. As a matter of law, Count VII must fail because Cramton was not entitled to receive any Kahala Sale Proceeds, profit from any increase in value of the unvested units or any cash whatsoever under § 3.6 of the Operating Agreement and after having completed only 10 months of service. Cramton abandoned the business and Keely with 4 years, 2 months and 5 days of the unambiguous 5-years of employment requirement remaining. This issue of law was not waived. Cramton repeatedly and deliberately misrepresented the terms of the Operating Agreement claiming, without any support, evidence or basis, that she would receive sale proceeds if she did not resign – that is absolutely false.

c. **Economic Loss Rule**: Counts IX and X are barred by the economic loss rule ("ELR") under Arizona law. Arizona courts have long recognized that the ELR applies to tort claims, including fraud and negligent misrepresentation. *Salt River Project Agricultural*

74

*Improvement and Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368 (1984); *Flagstaff Affordable Housing Limited Partnership v. Design Alliance, Inc.*, 223 Ariz. 320 (2010); *Cook v. Orkin Exterminating Co.*, 227 Ariz. 331, 332, ¶4, 335, ¶20, (App. 2011).  The Supreme Court of Arizona in *Flagstaff* as late as 2010 confirmed that the ELR is recognized and applicable to bar torts under Arizona law, including fraud and negligent misrepresentation, using a case-specific approach.  As recently as 2012, Cramton's counsel, Todd Feltus and the law firm of Kercsmar & Feltus PLLC successfully argued on behalf of the Feltus law firm that the ELR barred a fraud claim against it under Arizona law and relied entirely on *Flagstaff* and *Cook*.  *Maricopa Investment Team, LLC and Kercsmar & Feltus PLLC v. Johnson Valley Partners LP.*, 2012 WL 5894849, at *1, ¶¶7-12 (App. 2012)(holding that the ELR barred fraud and misrepresentation claims); *Cook* at 332, ¶4, 335, ¶20.  Arizona state court judges consistently recognize that the ELR applies to bar fraud and negligent misrepresentation claims.  As such, Counts IX and X should be barred in this case.

Having chosen to avail herself of the benefits of member status, she cannot resort to tort remedies, as through misrepresentation and fraud claims here, to obtain a different remedy than what she bargained for when she became a member.  Cramton admitted that her claim is one based specifically on the Operating Agreement and her claim that the Operating Agreement was violated because she did not receive Sale Proceeds.  (Dkt. 50, at 3:27-4:1).  Defendants made it clear that Cramton "was not entitled to any proceeds from the [Kahala] sale."  (Dkt. 50, at 4:11-4:12).  Cramton's counsel made a similar representation to Judge Rayes at the Rule 16 scheduling conference when he referenced the fact that Cramton's "big dollar claim" related to the Operating Agreement.  (Dkt. 89, at 12:7-12:17).  As such, Cramton has admitted that this Court need not look any further than the unambiguous language of the Operating Agreement.  Cramton's effort to subvert and get around the terms of, or rewrite, the Operating Agreement as if she had a right to any cash and as if she suffered damages simply because she says so must fail and efforts to get

around the terms of the Operating Agreement are barred.  Counts IX and X are also barred as a matter of law under the economic loss rule recognized under Arizona law in Arizona courts.  Federal courts are bound to follow the substantive law of the state in which it sits on state claims; consequently, state courts' interpretations of state law are binding on federal courts.   *Sherman v. PremierGarage Systems, LLC*, 2010 WL 3023320, at *4-5 (D. Ariz. 2010), *citing*, *Flagstaff Affordable Housing Limited Partnership v. Design Alliance, Inc.*, 223 Ariz. 320 (2010);  *See*, *also*, *Kercsmar & Feltus PLLC v. Johnson Valley Partners LP.*, 2012 WL 5894849, at *1, ¶¶7-12 (App. 2012).  The District of Arizona held that the economic loss rule applies where the parties had an agreement  to "uphold the expectations of the parties by limiting [the] plaintiff[s] to contractual remedies for loss of the benefit of the bargain" and dismissed a fraud and negligent misrepresentation claims.  *Sherman*, at 669.  Cramton had, and continues to have, no reasonable basis in law or in fact to assert Counts VII, IX or X.  This issue of law was not waived.  Cramton repeatedly and deliberately misrepresented the terms of the Operating Agreement claiming, without any support, evidence or basis, that she would receive sale proceeds if she did not resign – that is absolutely false.

### d. **Causation and Damages /Counts VII, IX and X**:

Cramton is unable to meet her burden of proof with respect to required elements of her claims, including Kahala Sale Proceeds as purported damages under Counts VII, IX and X or that the Defendants caused her to lose Sales Proceeds she purportedly had a right to receive. Cramton has no evidence that unvested units should be valued as she seems to claim.  She has no expert to establish her claimed value.  (See section above on actual value of unvested units). Cramton is also unable to provide this Court with any basis for claiming that she had a right to Kahala Sale Proceeds under the Operating Agreement.  Cramton knew that ECH had other business lines operating and they would continue after the Kahala deal closed. Cramton knew she had no right to Sale Proceeds before she chose to resign.  Defendants ECH and Keely could not cause Cramton to miss out on a Kahala payout resulting in harm under Counts VII, IX or X

where the unambiguous provisions of the Operating Agreement make it perfectly clear that Cramton was not entitled to Sale Proceeds or a Kahala payout. Rather, Cramton was required to work 5-years to be entitled to any money or value in relation to the unvested ECH units. § 9.3(c) of the Operating Agreement would apply if Cramton worked the required 5 years and then resigned after November 29, 2021. Cramton ignores the fact that the value of unvested units is zero. § 9.3(c) of the Operating Agreement unambiguously requires that fair market value of the units be determined based on an independent, third party appraisal "taking into account the lack of control and the inherent lack of liquidity of non-public minority equity interests." In addition, the appraised value of the units in accordance with § 10.1(a) would be paid in accordance with Article 11 of the Operating Agreement with a payment of thirty percent (30%) of the determined value and the remainder paid in eighteen (18) equal or substantially equal installments beginning on the first day of the second month after the initial thirty (30%) is paid. Further, Cramton's damages calculation ignores the provisions of the Operating Agreement requiring that all ECH units be adjusted for all expenses of the business including all transactions costs for the Kahala sale, all expenses, liabilities and contingent liabilities and obligations of the ECH. In no event under the unambiguous provisions of the Operating Agreement would all of the expenses, liabilities and contingent liabilities of ECH be allocated only to Keely's units.

Mental, physical and emotional pain and suffering experienced by Cramton was never disclosed in her mandatory disclosures. Cramton cannot present evidence at trial based on claims of mental, physical and emotional pain and suffering she purportedly experience but did not disclose in her MIDP in relation to those counts. Rule 37 bars a party from introducing an undisclosed claim or new theories of damages at trial unless they can show the failure to disclose was substantially justified or harmless. *See*, Fed. R. Civ. P. 37(b)(2), (c)(1); *See also*, *Yeti by Molly*, at 1106. Cramton is barred from adding a new

claim or theory of damages by Rule 37 and General Order 17-08(A)(4), (8) and (B)(4). This issue was not decided or waived.

Cramton had a duty to mitigate her damages, something she failed to do. Her claims are barred by her failure to properly and adequately mitigate her damages, if she even had any.

e. **Wages under Count IV**

A.R.S. § 23-362 defines "wages" for purposes of the Arizona Minimum Wage Act (§§ 23-362 – 23-365) to include all monetary compensation due to an employee by reason of employment, including an employee's commissions, but not tips or gratuities. This definition includes employer subsidized health insurance premiums, employer paid SEP retirement payment, employer paid employee monthly car payments during employment and employer paid employment tax gross ups – all are forms of monetary compensation due an employee by reason of employment. Monetary compensation means cash or its equivalent due to employee by reason of employment. A.C.C. R20-5-1202. The Arizona Minimum Wage Act was enacted by Arizona voters who approved an initiative in the November 2006 election. As an initiative approved by the voters, the law cannot be amended by the Legislature except to further its purpose and minimum wages are determined under A.R.S. §§ 23-362 – 23-365. All of these additional monetary compensation payments were made to Cramton by reason of her employment with GFL. In addition, any award of damages under Counts VII, IX and X (no damages should be awarded) would entitle GFL to include the full cash value of Cramton's equity compensation as wages under the Arizona Minimum Wage Act in 2017 as well. This issue was not decided or waived. Cramton would like to bar this argument because Count IV is eviscerated by the fact that Cramton was paid so much money in 2016 and 2017. Cramton has no basis to refute this proper definition of wages under the Arizona Minimum Wage Act nor does she have a basis to refute the substantial money she was paid under this definition.

**f. Officer Minimum Wage Claims and Pay Timing**

Courts have rejected minimum wage claims by officers where their salary, when averaged across their total time worked, still payed them above minimum wage. *See*, *Adair v. City of Kirkland*, 185 F.3d 1055, 1063 (9th Cir. 1999), *citing*, *Hensley v. MacMillan Bloedel Containers, Inc*., 786 F.2d 353, 357 (8th Cir. 1986). With an average workweek of more than $3,400 in pay in 2016 and more than $480 in pay in 2017, Cramton received more than the minimum wage. Further, parties may legally contract around the default payment requirements of A.R.S. § 23-351. *Orfaly v. Tucson Symphony Socy.*, 99 P.2d 1033-34 (Ariz. App. 2004). Such an agreement to alter when wage payments become due and payable is legally permissible. *Id*. It is inconsequential whether Cramton received pay every two weeks or she agreed to vary the timing. This issue was not decided or waived.

### g. Plaintiff Failed To State a Claim Upon Which Relief Can Be Granted

Plaintiff failed to state a claim upon which relief can be granted under Counts VII, IX and X. § 9.3(b) of the Operating Agreement required Cramton to remain employed for 5 years to be entitled to any payment of any money which would end on November 29, 2021. § 3.6 of the Operating Agreement provides that all payments prior to that time would be within the discretion of the majority member. Cramton was not entitled to any payment of Sale Proceeds from the Kahala acquisition. The Sale Proceeds were not hers. The Sale Proceeds belonged exclusively to ECH and its subsidiaries. It was not her money. It was not something she had a right to or could compel ECH to pay her. She could not be tricked or duped or defrauded out of something that was not hers. The Defendants could not prevent her from receiving something that she had no right to receive. The Defendants could not cause her damages or harm where the damages and harm she claims would require Keely to make a discretionary payment. Discretionary payments are not rights or benefits that one can compel another to make.

Cramton had no right to Sale Proceeds and therefore, could not suffer pecuniary loss because she did not receive a discretionary payment she had no right to receive, i.e., Sale

Proceeds.  Fraud or negligent misrepresentation is only a legal cause of a pecuniary loss resulting from an action in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.  Here the "loss" was a payment of Sales Proceeds that was completely within Keely's discretion.  Cramton could not resign from employment in reliance on Keely's purported statements and in so doing, convert a discretionary payment within Keely's discretion into a pecuniary loss with respect to which Keely can now somehow be stripped of her discretion and compelled to pay.  Reliance on the purported statements cannot be reasonable where Cramton had no right to the Sale Proceeds and it also cannot cause a pecuniary loss of a discretionary payment Cramton had no right to receive.  Cramton must prove not only that, had she known the truth (which she did), she would not have resigned (she testified she would have resigned before November 29, 2021), but in addition that the purported untruth was in a direct and proximate way responsible for her losing money, i.e., the Sale Proceeds.  This point is very straightforward, Cramton would not receive money or the Sale Proceeds had she not resigned because no such payment was required under § 3.6 of the Operating Agreement.  Further, the person holding the discretion is Keely.  Simply put, there is no "but for" and proximate causation to support Cramton's claims and they must fail as a matter of law.

Defendants did not cause any harm and Cramton did not suffer any damages under Counts VII, IX or X.  As such, Cramton cannot establish the requisite elements of those counts, and with respect to Count X, Cramton certainly cannot establish these necessary elements by clear and convincing evidence nor should her claim for punitive damages even be entertained.  See also, section above on measurement of damages and Section D.2.d. below.  This issue was not decided or waived.

**h.  <u>Cramton's Response</u>**:

Plaintiff:  It is Plaintiff's position that issues of law were determined at summary judgment stage.  Plaintiff does not dispute the legality of the parol evidence rule *per se*, the

implied covenant of good faith and fair dealing (of which no law is cited below by Defendants), the economic loss rule *per se*, or that damages and causation are elements of Plaintiff's claims.  However, the parol evidence rule does not apply as there is no claim for breach of contract remaining in this case.  Similarly, there is no longer any dispute about the economic loss rule as that argument was disposed of at summary judgment.  The court already determined, or Defendants' had the opportunity to argue at summary judgment, whether Defendants' arguments, based on those laws, had merit.  The court found they either (1) did not, or (2) did not make a determination as Defendants waived those issues. This pre-trial memo is not the proper time or place to be making new legal arguments.  The purpose is to narrow the evidence for trial.

Plaintiff disputes that the Arizona minimum wage laws including within their definition of wages "employer subsidized health insurance premiums, employer paid SEP retirement payment, employer paid employee monthly car payments during employment and employer paid employment tax gross ups."  Defendants offer no support for this assertion as there is none. Plaintiff seeks to bar Defendants from making this argument at trial.

As to Defendants' claim that Plaintiff failed to state a claim for relief, this is not a proper issue for trial.  Defendants did not file a motion to dismiss (this standard under Rule 12) and this is not a proper affirmative defense.  *E.g. Hernandez v. Cty. of Monterey*, 306 F.R.D. 279, 290 (N.D. Cal. 2015) (failure to state a claim is not a proper affirmative defense, and this affirmative defense is stricken).

**E.    WITNESS LIST**

Plaintiff's List

1.    Witnesses Who Will be Called at Trial

Defendants general objection:  Defendants object to any witness testifying to events outside of their personal knowledge, and reserves all foundation, relevance, improper character

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

testimony, and all other objections.  Defendants also include the below specific objections to Cramton's witnesses.

a.      Kim Cramton - Ms. Cramton is expected to testify broadly regarding all aspects of her claims and Defendants' and arguments.  She is the Plaintiff in this case.  She has personal knowledge of the events as well as the documents and communications at issue. Plaintiff's disclosures regarding Ms. Cramton are as follows:  Ms. Cramton is a plaintiff in this action.  She has broad knowledge regarding all the allegations in the pleadings, her employment with the Grabbagreen brand, her ownership interest in Eat Clean Holdings, LLC, the wages and other payments she is owed by the Defendants, her constructive discharge from Grabbagreen, her interactions with the Newmans and their exacerbation of Ms. Cramton's medical issues, the scope of the release she signed regarding Gulf Girls Squared, her activities and employment since her constructive termination from Grabbagreen Franchising LLC, her disability, medical condition, and requests for accommodations/leaves of absence, Defendants' joint employment/ownership, broad knowledge about all of her claims and her defenses to the counterclaims, her damages, all of Defendants' counterclaims and her defenses thereto, everything she testified to at her deposition, and all documents and communications she was a party or privy to

**Defendants' Objections**:  Defendants object to Cramton's testimony that exceeds the scope disclosed in her MIDP and further object to any testimony about constructive discharge, purported exacerbation of her medical issues, her disability, her medical condition, requests for accommodations/leaves of absence, joint/employment/ownership – all are irrelevant to the remaining claims and more prejudicial than probative. Defendants' object to the characterization of Defendants conduct as "abuse," "abusive", "fraud," or "fraudulent," etc. as these are conclusory legal statements.

b.      Laura McCormack - Ms. McCormack is Plaintiff's spouse.  She also worked at Grabbagreen.  She is expected to testify broadly regarding Ms. Cramton's minimum wage

claim (and lack of wages) as she has personal knowledge of the hours Plaintiff worked, the wages Plaintiff was not paid (as the two share finances), her communications with Plaintiff surrounding the September 18, 2017 telephone call between Keely Newman and Plaintiff, Plaintiff's damages, including emotional distress damages as she was acutely aware of Plaintiff's emotional distress as her spouse, Plaintiff's claim for punitive damages to the extent Ms. McCormack witnessed Keely Newman's misconduct, and any defenses of which Ms. McCormack has personal knowledge of.  Ms. McCormack has been broadly disclosed as follows:

Ms. McCormack is a counterdefendant in this action.  Ms. McCormack has **broad knowledge regarding all the allegations in the pleadings**, Ms. Cramton's constructive termination from Grabbagreen Franchising LLC, her interactions with the Newmans and their exacerbation of Ms. Cramton's medical issues, her defenses to the counterclaims, Ms. Cramton's disability, Defendants' failure to accommodate Ms. Cramton, the release she signed with Gulf Girl Squared, her and Ms. Cramton's lack of disparagement, and **all documents and communications she was a party or privy to.**

**Defendants' Objections**:  Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about constructive discharge, purported exacerbation of Cramton's medical issues, disability, medical condition, requests for accommodations/leaves of absence, joint/employment/ownership – all are irrelevant to the remaining claims and more prejudicial than probative.  Defendants' object to the characterization of Defendants conduct as "abuse," "abusive", "fraud," or "fraudulent," etc. as these are conclusory legal statements.  This witness had no involvement or personal knowledge with the allegations in Counts IV, VII, IX or X, no involvement with the Operating Agreement, no involvement with discussions involving Kahala and no involvement with the September 18, 2017 telephone call.

c.      John Wuycheck - Mr. Wuycheck is a representative of Kahala and was on a telephone call with Keely Newman right before Keely had the September 18, 2017 telephone call (the call at issue) with Ms. Cramton.  Mr. Wuycheck has broad knowledge regarding the status of the Kahala deal at the time, testified extensively regarding same at his deposition, and is expected to testify regarding the details of the Kahala deal.  His testimony relates to Plaintiff's claims for breach of the implied covenant and fair dealing, fraud, and negligent misrepresentation.   Mr. Wuycheck does not have any personal knowledge of Plaintiff's minimum wage claim.  Mr. Wuycheck has been broadly disclosed as follows:

Mr. Wuycheck is the Senior Vice President of Franchise Development at Kahala Brands. He has knowledge regarding **everything he testified to at his deposition, Kahala's acquisition of Grabbagreen and the status of those negotiations at the time of Ms. Cramton's constructive discharge which relate to Ms. Cramton's Counts V-VIII,** Ms. Cramton's hiring by Kahala, Ms. Cramton's current job responsibilities at Kahala, Ms. Cramton's defenses to Counterclaims I and II, Ms. Cramton's lack of involvement in and knowledge of the Kahala acquisition of Grabbagreen and related negotiations, **and all documents and communications he was a party or privy to**.

**Defendants' Objections**:  Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about Cramton's now dismissed constructive discharge.

d.      Jeff Smit - Mr. Smit is a representative of Kahala and was on a telephone call with Keely Newman right before Keely had the September 18, 2017 telephone call (the call at issue) with Ms. Cramton.  Mr. Smit has broad knowledge regarding the status of the Kahala deal at the time, testified extensively regarding same at his deposition, and is expected to testify regarding the details of the Kahala deal.  His testimony relates to Plaintiff's claims for breach of the implied covenant and fair dealing, fraud, and negligent

84

misrepresentation.  Mr. Smit does not have any personal knowledge of Plaintiff's minimum wage claim.  Mr. Smit has been broadly disclosed as follows:

Mr. Smit is the Chief Operating Officer of Kahala Brands.  He has knowledge has knowledge regarding **everything he testified to at his deposition, Kahala's acquisition of Grabbagreen and the status of those negotiations at the time of Ms. Cramton's constructive discharge which may relate to Ms. Cramton's Counts V-VIII, and all documents and communications he was a party or privy to**.

        **<u>Defendants' Objections</u>**:  Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about Cramton's now dismissed constructive discharge claim.

       e.     Keely Newman - Keely Newman is a Defendant in this case.  She is also expected to testify broadly regarding Plaintiff's claims in this case and Defendants' defenses.

       f.     Teresa Mills (if available) - Ms. Mills is expected to testify extensively regarding Plaintiff's minimum wage claim as she is the individual who authorized payments (or did not make payments) to Plaintiff in 2017, as well as the reasons for those payments.  She also was the individual who made various accounting entries post-Ms. Cramton's departure and this lawsuit.  Ms. Mills has been broadly disclosed as follows:

Ms. Mills is Grabbagreen's in-house accountant.  She has **knowledge regarding the monies paid and owed to Ms. Cramton by the Defendants, Ms. Cramton's minimum wage claim and claim for breach of the promissory note, Grabbagreen's failure to pay wages to Ms. Cramton**, her interactions with the Newmans, Ms. Cramton's interactions with the Newmans, Ms. Cramton's constructive termination from Grabbagreen, Defendants' corporate structure and joint ownership/employment of Ms. Cramton, Defendants' number of employees, the Newmans' treatment of Ms. Cramton, the acquisition of Grabbagreen by Kahala Brands including negotiations related to same, Ms.

Cramton's disability/medical condition and need for time off work to address same, **all topics covered at her deposition, and all documents and communications she was a party or privy to.**

**Defendants' Objections**: Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP.

g.    Jeff Farnell - Jeff Farnell worked closely as a colleague of Ms. Cramton. He has detailed personal knowledge of the hours Plaintiff worked for purposes of her minimum wage claim as he worked closely with Plaintiff for those long hours. He is expected to testify regarding Ms. Cramton's minimum wage claim and any defenses thereto. Mr. Farnell also has knowledge regarding Plaintiff's emotional distress damages as he is a personal friend of Plaintiff's. Mr. Farnell is also expected to testify regarding any communications he had with Plaintiff following her separation regarding the status of the Kahala deal. Mr. Farnell has been broadly disclosed as follows:

Mr. Farnell is the former Director of Operations for Grabbagreen. He has knowledge regarding his interactions with the Newmans, Ms. Cramton's interactions with the Newmans, Ms. Cramton's constructive discharge, **the working conditions that Ms. Cramton experienced at Grabbagreen, the acquisition of Grabbagreen by Kahala Brands and negotiations regarding same, Defendants' corporate structure** and joint ownership/employment of Ms. Cramton, Defendants' number of employees, Ms. Cramton's disability/medical condition and her need to address same, Ms. Cramton's return of all Defendants' property to Defendants after her constructive discharge, Defendants' failure to accommodate Ms. Cramton, Ms. Cramton's lack of disparagement and lack of breach of her non-compete, **all aspects of Ms. Cramton's employment with Defendants, and all documents and communications he was a party or privy to**.

**Defendants' Objections**: Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about his interactions

86

with the Newmans, Cramton's interactions with the Newmans, constructive discharge, working conditions that Cramton experienced, purported exacerbation of Cramton's medical issues, disability, medical condition, requests for accommodations/leaves of absence, Defendants' corporate structure and joint/employment/ownership, Defendants number of employees – all are irrelevant to the remaining claims and more prejudicial than probative. Defendants object to testimony about Cramton's emotional distress because damages for emotional distress are not recoverable under any count and were not disclosed in Cramton's MIDP.  Further, Farnell was no longer Cramton's coworker after Cramton's resignation on September 24, 2017 and none of the testimony Cramton purports to offer about events before September 18, 2017 are relevant in this case. Defendants' object to the characterization of Defendants conduct as "abuse," "abusive", "fraud," or "fraudulent," etc. as these are conclusory legal statements.  Defendants object to testimony about the negotiations of the Kahala acquisition of the Grabbagreen brand because he was not involved in any of the negotiations.  This witness had no involvement with the allegations in Counts IV, VII, IX or X, no involvement with the Operating Agreement, no involvement with discussions involving Kahala and no involvement with the September 18, 2017 telephone call.

h.      Karen Nettleton - Ms. Nettleton worked closely as a colleague of Ms. Cramton.  She has detailed personal knowledge of the hours Plaintiff worked for purposes of her minimum wage claim as she worked closely with Plaintiff for those long hours.  She is expected to testify regarding Plaintiff's minimum wage claim and any defenses thereto. Ms. Nettleton is the former Director of Construction and Design for Grabbagreen. She has knowledge regarding **everything she testified to at her deposition,** her interactions with the Newmans, Ms. Cramton's interactions with the Newmans, Ms. Cramton's constructive discharge, the working conditions that Ms. Cramton experienced at Grabbagreen, the acquisition of Grabbagreen by Kahala Brands, Defendants' corporate structure and joint ownership/employment, Defendants' number of employees, Ms. Cramton's disability and

her need to address same, and all documents and communications she was a party or privy to.

**Defendants' Objections**:  Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about her interactions with the Newmans, Cramton's interactions with the Newmans, constructive discharge, working conditions that Cramton experienced, Cramton's purported disability, Defendants' corporate structure and joint joint/employment/ownership, Defendants number of employees – all are irrelevant to the remaining claims and more prejudicial than probative.  Defendants' object to the characterization of Defendants conduct as "abuse," "abusive", "fraud," or "fraudulent," etc. as these are conclusory legal statements.  Defendants object to testimony about the negotiations of the Kahala acquisition of the Grabbagreen brand because she was not involved in any of the negotiations.  This witness had no involvement with the allegations in Counts IV, VII, IX or X, no involvement with the Operating Agreement, no involvement with discussions involving Kahala and no involvement with the September 18, 2017 telephone call.  Defendants object to testimony about Cramton's emotional distress because damages for emotional distress are not recoverable under any count and were not disclosed in Cramton's MIDP.  Further, Nettleton was no longer Cramton's coworker after Cramton's resignation on September 24, 2017 and none of the testimony Cramton purports to offer about events before September 18, 2017 are relevant in this case.

   i.   Todd Cable - Mr. Cable worked closely as a colleague of Ms. Cramton.  He has detailed personal knowledge of the hours Plaintiff worked for purposes of her minimum wage claim as he worked closely with Plaintiff for those long hours.  He is expected to testify regarding Ms. Cramton's minimum wage claim and any defenses thereto.  Mr. Cable was broadly disclosed as follows:

Mr. Cable is the former Director of Franchise Relations for Grabbagreen.  He has knowledge regarding his interactions with the Newmans, Ms. Cramton's interactions with the

Newmans, Ms. Cramton's constructive discharge, **the working conditions that Ms. Cramton experienced at Grabbagreen**, the acquisition of Grabbagreen by Kahala Brands, Defendants' corporate structure and joint ownership/employment of Ms. Cramton, Defendants' number of employees, Ms. Cramton's disability and her need to address same, Defendants' failure to accommodate Ms. Cramton, Ms. Cramton's lack of disparagement and lack of breach of her non-compete, **all aspects of Ms. Cramton's employment with Defendants, and all documents and communications []he was a party or privy to.**

    **<u>Defendants' Objections</u>**:  Defendants object to testimony that exceeds the scope disclosed in Cramton's MIDP and further object to any testimony about his interactions with the Newmans, Cramton's interactions with the Newmans, constructive discharge, working conditions that Cramton experienced, Cramton's purported disability, Defendants' corporate structure and joint/employment/ownership, Defendants number of employees– all are irrelevant to the remaining claims and more prejudicial than probative.  Defendants' object to the characterization of Defendants conduct as "abuse," "abusive", "fraud," or "fraudulent," etc. as these are conclusory legal statements.  Defendants object to testimony about the negotiations of the Kahala acquisition of the Grabbagreen brand because he was not involved in any of the negotiations.  This witness had no involvement with the allegations in Counts IV, VII, IX or X, no involvement with the Operating Agreement, no involvement with discussions involving Kahala and no involvement with the September 18, 2017 telephone call.  Defendants object to testimony about Cramton's emotional distress because damages for emotional distress are not recoverable under any count and were not disclosed in Cramton's MIDP. Further, Cable was no longer Cramton's coworker after Cramton's resignation on September 24, 2017 and none of the testimony Cramton purports to offer about events before September 18, 2017 are relevant in this case.

    j.  Shelly Hess - Ms. Hess has been disclosed via Plaintiff's Second Supplemental MIDP Responses dated 11/16/18, and also in Plaintiff's written responses to

Defendants' discovery requests.   Ms. Hess is expected to testify regarding Plaintiff's emotional distress damages and within the scope of her disclosure.   She was broadly disclosed as follows:

Ms. Hess is Ms. Cramton's therapist.   She has knowledge regarding the Newmans' treatment of Ms. Cramton, Ms. Cramton's constructive discharge, Ms. Cramton's emotional distress damages, Ms. Cramton's disability, Ms. Cramton's claims for violations of the ADA, Ms. Cramton's need for ADA accommodations, and all documents and communications she was a party or privy to

**Defendants' Objections**:   Defendants object to this witness as not properly disclosed as required by Rule 26 of the Federal Rules of Civil Procedure and the mandatory disclosure rule – Hess is not included as a witness in Cramton's MIDP.   Disclosing a witness to be called at trial for the first time in the pretrial order and long after the close of fact discovery prejudices the Defendants who were not on notice of this witness and did not have the opportunity to take her deposition should be barred under Rule 37.   Hess was not disclosed as an expert and if permitted to give an expert opinion, the Defendants will be prejudiced because they had no opportunity to depose Hess as an expert or retain an expert of their own. Defendants object to testimony about Cramton's emotional distress because damages for emotional distress are not recoverable under any count and were not disclosed in Cramton's MIDP.   Further, this witness has no personal knowledge about the Newmans or the events that Cramton claims in this case and she had no involvement with the allegations in Counts IV, VII, IX or X, no involvement with the Operating Agreement, no involvement with discussions involving Kahala and no involvement with the September 18, 2017 telephone call.   Anything Hess has to say is based entirely on hearsay regarding the storyline Cramton created in 2017.

    2.       Witnesses Who May be Called at Trial

          a.     Kelli Newman

    3.       Witnesses Who Are Unlikely to be Called at Trial

a.     Adrienne Savonne - Ms. Savonne may be called regarding Plaintiff's minimum wage claim, and to rebut Defendants' arguments that Plaintiff was often at Ms. Savonne's house and not working the hours she claims.  Ms. Savonne may also be called to testify regarding any other documents and communications she was a party or privy to.  Ms. Savonne was disclosed in Plaintiff's 8th Supplemental MIDP Response, after Defendants' counsel sent Plaintiff's counsel the following email wishing to add her to Defendants' witness list after the close of discovery (email dated 1/17/19):

Counsel,

It has come to our attention that Adrienne Savone was inadvertently omitted from Section 1 of both parties' final disclosure statements.  Based on the request for production which named Ms. Savone, and the third party discovery requests sent to her, Ms. Savone is certainly a "person likely to have discoverable information relevant" to the parties' claims and defenses.

An updated final disclosure statement is attached to this email and a hard copy will follow by US Mail.

Best,

Jack R. Vrablik

The topics of Ms. Savonne's disclosure are as follows:

Ms. Savone has knowledge regarding Ms. Cramton's constructive termination from Grabbagreen, defense to any claim that Ms. Cramton disparaged Defendants, Ms. Cramton's disability, Defendants' failure to accommodate Ms. Cramton, and all communications and documents she was a party or privy to.

91

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendants' Objections**:  Defendants object to this witness as not properly disclosed as required by Rule 26 of the Federal Rules of Civil Procedure and Cramton's MIDP. Cramton had to actually add her to her MIDP list of witnesses.  She did not and did not disclose any topic that she would be called to testify about and Defendants did not have the opportunity to depose her on the testimony summarized above for the very first time in this pretrial order. Defendants object to testimony about Cramton's emotional distress because damages for emotional distress are not recoverable under any count and were not disclosed in Cramton's MIDP.  Further, Savone was never Cramton's coworker and has no personal knowledge of Cramton's work for GGS or GFL on a daily basis.  Further, it appears Cramton is offering Savone's testimony to rebut Cramton's own sworn testimony where Cramton admitted to spending numerous evenings at Savone's house every week and not working for GFL – to say nothing of all of the written documentation showing Cramton's numerous evenings at Savone's house.  To add Savone to Cramton's witness list to controvert her own sworn testimony should be considered a compelling reason to allow this.

Defendants' List

1.      Witnesses who will be called at trial:

Plaintiff's general objection:  Plaintiff objects to any witness testifying to events outside of their personal knowledge, and reserves all foundation, relevance, improper character testimony, and all other objections.  Plaintiff also includes the below specific objections to Defendants' witnesses.

a.      Shelley DiGiacomo – Ms. DiGiacomo can authenticate the Resignation Letter given that Cramton would not stipulate to its existence and content.  She can also authenticate all other communications she had that are not subject to the attorney-client privilege and all communications and emails with Juliet Peters regarding Cramton and her communications with Defendants and Counterclaimants.  Her involvement in negotiating and drafting the claw back language specifically to Cramton, her knowledge

regarding Keely's intent to sell the business, her role in negotiating an employment agreement on behalf of Cramton with Due North during the period of approximately April 2017 to July 2017 with Due North that would call for Cramton's full-time employment upon the initially scheduled closing date at the end of May 2017 and the nature and extent of her relationship to Framework Legal and Juliet Peters.  The timing of Cramton's resignation and the preparation of her Resignation Letter.

b.     Adams Price - Mr. Price is expected to testify consistent with his affidavit and as to various conversations regarding Kahala's acquisition of the Grabbagreen brand and ECH's desire and intent to sell its assets, including the content and purpose of the September 18, 2017 call with Keely and Kahala, and the subsequent call with Keely.  He may testify as to the sales efforts and timeline in the Due North Deal and as to Keely's ongoing desire to sell the Grabbagreen brand if either the Due North deal or Kahala deals did not close.

c.     Jayson Gitt – Mr. Gitt is expected to testify as to various conversations regarding Kahala's acquisition of the Grabbagreen brand and ECH's desire and intent to sell its assets, including the content and purpose of the September 18, 2017 call with Keely and Kahala, and the subsequent call with Keely.  He may testify as to the sales efforts and timeline in the Due North Deal and as to Keely's ongoing desire to sell the Grabbagreen brand if either the Due North deal or Kahala deals did not close.

d.     Teresa Mills - Ms. Mills can testify regarding Cramton's payments in 2016 and 2017 from GFL.  She will also testify as to Cramton's human resources role in Arizona, including but not limited to, her control over payroll, determination of employee compensation for payroll purposes, determination of hours and payment calculations for payroll purposes and her unfettered access to company bank accounts, including paper checks.  Ms. Mills will testify that Cramton regularly accessed the company bank accounts and paid herself wages from company bank accounts.  Ms. Mills will testify that Cramton

93

requested of the company that her 2017 GFL wages be contingently noted on the books and the records of the company as payments on the ECO note to avoid paying income and payroll taxes, and that Ms. Cramton was forewarned those ECO note journal entries were likely to be disregarded and reversed at the end of the year either by tax counsel or GFL's auditors.   She can also testify as to Keely's managerial style, the interactions and communication between Keely and Cramton during, and the scope of Cramton's employment.   She will also testify as to any relevant accounting and payroll information, and documents and communications she was a party or privy to and the testimony provided in her deposition.

e.    Tina Griffin - Ms. Griffin was a full-time employee of GFL as Keely's assistant and full-time resident in Keely's home/Grabbagreen office from January 2015 until her last day of employment on October 8, 2017.  Ms. Griffin overheard almost all of the telephone calls between Keely, Cramton and other employees during the relevant period. Most importantly, Ms. Griffin was present and heard the call with Kahala and subsequent call with Cramton on September 18, 2017.  Ms. Griffin will testify to what Keely said and did not say to Cramton on September 18, 2017.  Ms. Griffin was also a witness to and in the Keely's home the day Keely received Cramton's resignation and will testify as to Keely's reaction to Cramton's resignation.   Cramton never even attempted to depose Griffin. Defendants would have agreed and stipulated to a deposition after the deadline.  Indeed, other depositions were taken at the end of discovery or after the deadline and the parties agreed on it.  There is absolutely no reason that Cramton did not or could not have taken Griffin's deposition.  Cramton's tactical decision to not take Griffin's deposition should not provide a basis to bar a witness who was disclosed prior to the close of discovery.  Griffin has personal knowledge of what she directly witnessed, observed and heard Keely say on September 18, 2017.  If that is "completely and 100% hearsay" as Cramton puts it in her objection, then everything that Farnell, McCormack, Hess, Savone, Nettleton, Cable,

Wuycheck and other members of Cramton's posse logically is also "completely and 100% hearsay."

Plaintiff's Objection:

Plaintiff objects to this witness as not being timely disclosed.  This witness was not disclosed until the very last day of discovery in this case, preventing Plaintiff from deposing her or issuing any discovery related to her purported testimony.  Her testimony is also, completely and 100% hearsay.  This witness should be barred.

Dana Mavros - Ms. Mavros was a consultant for GFL.  She will testify as to Keely's managerial style, the interactions and communication she witnessed between Keely and Cramton during Cramton's employment.  She has knowledge regarding Cramton's decision to resign from the company without regard to other potential purchasers because no deal would be done soon enough for Cramton.  She can testify to the report she prepared for GFL.  She is expected to testify on any topic and in conformance with her testimony provided in her January 18, 2019 deposition.

f.      Jeff Smit - Mr. Smit is expected to testify in conformance with his deposition testimony and as to the content and purpose of the September 18, 2017 call with Keely, Adams Price and Kahala.  He will testify about the negotiations for and Kahala's purchase of and as to any documents and communications he was a party or privy to.

g.      John Wuycheck - Mr. Wuycheck is expected to testify consistent with his deposition testimony regarding his role at Kahala.  He may testify as to the negotiations for and Kahala's purchase of the Grabbagreen brand.  He may testify as to Cramton's work history, his friendship with Cramton, and his contact with her during Kahala's negotiation with ECH.  He will testify as to the content and purpose of the September 18, 2017 call with Keely, Adams Price and Kahala, his text message and phone conversations with Kim Cramton on September 22, 2017 and at all other times leading up to Cramton's resignation

and the first LOI Kahala offered to ECH.  He is expected to testify regarding any documents and communications he was a party or privy to and consistent with his deposition testimony.

h.    Greg Ferrell - Mr. Ferrell is a franchise area developer for GFL.  He has knowledge regarding his recommendation to Keely that she sell the Grabbagreen brand to Kahala, as opposed to Due North and worked with Cramton to facilitate the discussions between Kahala and ECH.  Mr. Ferrell spoke to Cramton on the day she resigned and has knowledge regarding her decision to resign from the company without regard to all potential purchasers.

i.    Kim Cramton - Ms. Cramton is expected to testify regarding the allegations set forth in the Amended Complaint, pleadings, disclosures, responses to discovery, sworn declarations and in her depositions.  She is expected to testify as to the factual basis of those pleadings, claims and denials and as to the documents, evidence and testimony that she is relying on to support her claims and denials, and her computer tampering and destruction of company data.  Specifically, she will identify and explain her history with and relationship to the parties and witnesses in the case, her work history before and after her relationship to the parties to this dispute and the steps she, her family, friends, allies and agents took to preserve, protect and produce all relevant evidence in the case.  To the extent that evidence was not preserved, protected and produced, she will testify as to why the evidence was not preserved and the steps she took to destroy or withhold the evidence.

She will testify about the documents that she signed acknowledging her duty to protect company property, including confidential, proprietary and trade secret information and testify about her failure to adhere to those agreements.  She will testify regarding the 3rd parties she hired to destroy evidence, her attempts to hide the destruction of evidence, her withholding of relevant evidence in the possession of 3rd party witnesses under subpoena and her attempts to harm Defendants personally and professionally by

disclosing confidential information while sensitive sales negotiations were ongoing.

j.    Adrienne Savone - Ms. Savone is expected to testify regarding her knowledge of Cramton's employment with GGS and GFL and Cramton's reasons for ending her employment with GGS and GFL.  Ms. Savone has knowledge of what Cramton and Laura McCormack told her about Keely, including disparaging remarks made about her.  Ms. Savone has knowledge of the written statements Cramton asked her to review and revise on Cramton's behalf.  Savone assisted Cramton in this litigation by reviewing legal documents and pleadings, discussing the case, evidence and witnesses with Cramton and /or her counsel and participating in production and destruction of ESI.

Plaintiff's Objection:  Relevance and no personal knowledge.  Ms. Savone's personal knowledge described above relates to the counterclaims already dismissed by this Court.

k.    Che Ornealas MD – Dr. Ornelas has knowledge regarding Cramton's aneurysms and all documents and communications he was a party or privy to.  He was the emergency room doctor who prescribed that Cramton could return to light duty work and can testify to Cramton's medical records.

l.    Carl Wilson – Mr. Wilson assisted Cramton in erasing the company's laptop, iPhone and iCloud account and replacing the operating system before she returned them to GFL in September 2017.  Mr. Wilson also created a backup of the emails between between Cramton and Keely before deleting them from the laptop, which he provided to Cramton.

Plaintiff's Objection:  Carl Wilson's only testimony relates to Defendants' claim of spoliation of evidence/counterclaims that Plaintiff somehow wrongfully retained or failed to return confidential company information.  Those claims/arguments have been dismissed.  Mr. Wilson's testimony is thus irrelevant and a waste of time.

2.    Witnesses who may be called at trial:

a.     David Glines - Mr. Glines was a contractor for GFL in charge of IT. Mr. Glines will testify as to Keely's managerial style and the interactions and communication between Keely and Cramton during the scope of Cramton's employment. Mr. Glines participated in the phone conference alleged in Cramton Interrogatory #6 answer to have taken place on a Saturday "in or around April of 2017".  He will confirm that the call took place on Sunday, December 17, 2016, not in April 2017, as Plaintiff claims, and that the call was exclusively related to GGS's business matters, not any of corporate Defendants in this case.  Mr. Glines also has knowledge of and was a witness to many phone calls between Keely and Cramton and can testify to Keely's treatment of Cramton.  Mr. Glines also directly reported to Keely. Mr. Glines will testify to his ownerhips interest in ECH that diluted Cramton's rightfully forfeited unvested units.  He will also testify to her personal observations of the interactions between Cramton and Keely and will testify to the non-abusiveness of Keely as a boss.

Plaintiff's objection:  Relevance.  The events described above have nothing to do with the minimum wage claim or the claims related to the wrongful taking of Ms. Cramton's membership interest.

b.     Juliet Peters - Upon information and belief, and subject to her duties to the attorney-client and work product privileges, Ms. Peters will testify in conformance with her deposition testimony and regarding her history, duties and role as Grabbagreen's Outside General Counsel and her interactions with Grabbagreen's owners, managers officer and directors.  She is also expected to testify regarding her conversations and other communications with the parties and attorneys who are adverse to the Defendants, owners and former managers, including, but not limited to Cramton, Laura McCormack, Shelley DiGiacomo, Todd Feltus, Molly Rogers, Michelle Matheson, Kahala representatives and others related to Cramton.  She is expected to testify regarding her knowledge of Cramton's work history, complaints about Keely, her attempts to set the Defendants up for various

legal claims, her provision of legal advice in breach of her duties to the Defendants and referrals to counsel who would aid Cramton's plan to assert baseless ADA and FMLA claims, and her knowledge related to Cramton's departure from GGS and GFL to work for Kahala in violation of restrictive covenants she drafted.  Ms. Peters is expected to testify as to her personal and professional relationship to GGS and the individual and corporate Defendants sued by Cramton and her attorneys.  She is also expected to testify regarding any documents and communications she was a party or privy to.  Defendants' identification of Ms. Peters does not constitute a waiver of any attorney-client/work product or client confidences or privileges between her and Defendants.

c.    Shelley Hess – Ms. Hess may be called to authenticate Cramton's specific medical records.

d.    Kelli Newman – Ms. Newman may be called to testify about the allegations in the Amended Complaint and Counterclaims, the corporate structure of the entities, that Cramton controlled her schedule and her duties as the senior HR person.  The effect of the Confidential Settlement Agreement and Release with GGS and affiliates.  Information provide to Cramton regarding the plan to sell the Grabbagreen brand.  The negative impact of Cramton's contacts with purchasers of the Grabbagreen brand.   All documents and communications she was privy to.  The testimony provided in her deposition and the testimony provided on topics for the 30(b)(6) deposition of GGS.

e.    Karen Nettleton – Ms. Nettleton is the former Director of Construction and Design for GFL.  She has knowledge regarding her interactions with Keely and Cramton's interactions with Keely.  Ms. Nettleton also has knowledge of and was a witness to many phone calls between Keely and Cramton and can testify to any alleged verbal abuse.  Knowledge of the work culture and environment at Grabbagreen Franchising, LLC.  All documents and communications she was a party to or privy to.  The testimony she provided at her deposition.

3.     Witnesses who are unlikely to be called at trial:

a.     Todd Cable – Mr. Cable has knowledge of Cramton's work schedule, including the frequency of when she worked at home and how she set he own, hour, her HR role.  Mr. Cable also has knowledge of Cramton's work conditions and relationship with Keely.  Knowledge of the work culture and environment at Grabbagreen Franchising, LLC.  Knowledge about ho Cramton violated her confidentiality duties and violated the Confidential Settlement Agreement and Release.  Knowledge of how differences in political believes between Cramton and Keely caused tension.  All documents and communications he was a party or privy to.

b.     Lisa Oak – Conversations with Keely and Cramton regarding the fact that Keely fully intended to sell the business, irrespective of whether Due North or Kahala closed their transactions.  One of the numerous inconsistent versions of Cramton's story about the purported misrepresentation made by Keely includes the additional falsehood that Keely essentially told Cramton that there would be no buyers and no future offers from any party.  Ms. McDonough is certainly relevant to clarify to the jury that everyone that spoke to Keely knew Keely would sell the Grabbagreen brand regardless of which potential buyer ultimately bought it making it irrelevant to Cramton's stated reason for resigning, i.e., that she was just hanging in there to try to get Keely to make a discretionary payout because any such potential buyer would have similarly taken 6 months to negotiation and close and Cramton would have had the same opportunity to try to get Keely to exercise discretion.  Cramton's reliance and decision to resign was not reasonable or justified and Ms. McDonough can make this clear to the trier of fact.

Plaintiff's Objection: This witness' disclosure is as follows:  "Conversations with Keely Newman and Kim Cramton regarding the fact that Keely Newman fully intended to sell the business, irrespective of whether Due North or Kahala  closed their transactions with Grabbagreen."  This information is not relevant to Plaintiff's claim that Ms. Newman's

misrepresentations constituted negligent misrepresentation, fraud, and/or breached the implied covenant of good faith and fair dealing.

c.   Kristine McDonough – Ms. McDonough can testify about conversations with Keely and Cramton regarding the fact that Keely fully intended to sell the Grabbagreen brand, irrespective of whether Due North or Kahala became the ultimate buyer.  One of the numerous inconsistent versions of Cramton's story about the purported misrepresentation made by Keely includes the additional falsehood that Keely essentially told Cramton that there would be no buyers and no future offers from any party.  Ms. McDonough is certainly relevant to clarify to the jury that everyone that spoke to Keely knew Keely would sell the Grabbagreen brand regardless of which potential buyer ultimately bought it making it irrelevant to Cramton's stated reason for resigning, i.e., that she was just hanging in there to try to get Keely to make a discretionary payout because any such potential buyer would have similarly taken 6 months to negotiation and close and Cramton would have had the same opportunity to try to get Keely to exercise discretion. Cramton's reliance and decision to resign was not reasonable or justified and Ms. McDonough can make this clear to the trier of fact.

Plaintiff's Objection: This witness' disclosure is as follows:  "Conversations with Keely Newman and Kim Cramton regarding the fact that Keely Newman fully intended to sell the business, irrespective of whether Due North or Kahala  closed their transactions with Grabbagreen."  This information is not relevant to Plaintiff's claim that Ms. Newman's misrepresentations constituted negligent misrepresentation, fraud, and/or breached the implied covenant of good faith and fair dealing

d.   Scott Eckert – The content and purpose of the September 18, 2017 call with Keely, Price and Kahala.  Subject to confidentiality, the negotiations for and Kahala's purchase of business assets of GFL and certain affiliates.

e.      Renee Mitchell – Subject to confidentiality, Due North's deal timeline and documents and communications related to that negotiated transaction and Cramton's involvement, knowledge and anticipated role.

Plaintiff's Objection:  Defendants' disclosure related to this witness is as follows: "Subject to confidentiality, first potential buyer's deal timeline and documents and communications related to that negotiated transaction and Kim Cramton's involvement, knowledge and anticipated role if that deal had closed."  Another unknown entity's inquiry in purchasing Defendants' business has no relevance to Plaintiff's claims related to the Kahala deal.

f.      Kevin Blackwell - Subject to confidentiality, Due North's deal timeline and documents and communications related to that negotiated transaction and Cramton's involvement, knowledge and anticipated role if that deal closed.

Plaintiff's Objection:  Defendants' disclosure related to this witness is as follows: "Subject to confidentiality, first potential buyer's deal timeline and documents and communications related to that negotiated transaction and Kim Cramton's involvement, knowledge and anticipated role if that deal had closed."  Another unknown entity's inquiry in purchasing Defendants' business has no relevance to Plaintiff's claims related to the Kahala deal

g.      Laura McCormack

h.      Jeff Farnell

i.      Lindsay Warren – Ms. Warren was an employee of GGS, resigned and later in 2017 returned as an employee of ECO.  Ms. Warren has personal knowledge and can testify about Cramton's work schedule, HR role and HR posters hung by Cramton at the worksites.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.

102

j.      Catherine Pearson – Ms. Pearson has personal knowledge of the work done in connection with and done in association with Juliet Peters and Framework Legal. Legal advice provided to Cramton after referral by Juliet Peters and referral of Cramton to Michelle Matheson.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue

k.      Dean Moomey – Mr. Moomey is the husband of Juliet Peters and has information related to communications concerning or relating to Keely, Cramton, Kelli Newman, Laura McCormack, and/or the remaining entity defendants.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.

l.      Andrew Ducruet MD

m.      Dale Ding, MD

n.      Morgan Vanderwall – Ms. Vanderwall is a former GFL independent contract.  She reported to Keely and has personal knowledge of her managerial style and whether she would consider it to be abusive.  She is certainly relevant to rebut the character assassination and disparagement of Keely to the extent the Court allows it to continue to go on, she is certainly relevant to illuminate for the trier of fact that it is only Cramton's Arizona buddies supporting the false abusiveness story and Cramton has listed several irrelevant witnesses she intends to put on for the purpose of improperly assassinating the character and disparagement of Keely despite the fact that all of the ADA claims and the constructive discharge claim were dismissed.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.

o.      Stacy Beeler – Ms. Beeler is the Director of Construction hired to replace Karen Nettleton in Florida.  Ms. Beeler worked with Keely on a daily basis and has

personal knowledge of Keely's managerial style and whether she would consider it to be abusive.  She is certainly relevant to rebut the character assassination and disparagement of Keely to the extent the Court allows it to continue to go on, she is certainly relevant to illuminate for the trier of fact that it is only Cramton's Arizona buddies supporting the false abusiveness story and Cramton has listed several irrelevant witnesses she intends to put on for the purpose of improperly assassinating the character and disparagement of Keely despite the fact that all of the ADA claims and the constructive discharge claim were dismissed.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.  Defendants' disclosure regarding this witness is as follows: "Hired in Florida to replace Karen Nettleton as Director of Construction.  Worked with Keely Newman on daily basis and has knowledge of Keely Newman's managerial style and whether she would consider it to be abusive."  Plaintiff's claim for constructive discharge is no longer at issue.  Additionally, this witness has no knowledge of Ms. Newman's treatment of Ms. Cramton even if the constructive discharge claim were alive.

p.     Joan Alpogianis – Ms. Alpogianis reported to Keely for years and can testify that Keely as a supervisor is not abusive.  She is certainly relevant to rebut the character assassination and disparagement of Keely to the extent the Court allows it to continue to go on, she is certainly relevant to illuminate for the trier of fact that it is only Cramton's Arizona buddies supporting the false abusiveness story and Cramton has listed several irrelevant witnesses she intends to put on for the purpose of improperly assassinating the character and disparagement of Keely despite the fact that all of the ADA claims and the constructive discharge claim were dismissed.

Plaintiff's objection:  this witness has no personal knowledge of the claims or defenses at issue.  Defendants' disclosure regarding this witness is as follows: "Ms. Alpogianis reported to Keely Newman when the two worked at Citigroup from 1997-2002,

and can testify to Keely Newman as a supervisor."  Plaintiff's claim for constructive discharge is no longer at issue.  Additionally, this witness has no knowledge of Ms. Newman's treatment of Ms. Cramton even if the constructive discharge claim were alive.

q.     Sabrina Modder – Ms. Modder reported to Keely while providing services for the Grabbagreen brand, has personal knowledge of all interactions she had with Keely and Cramton, and can testify that Keely is not abusive.  She is certainly relevant to rebut the character assassination and disparagement of Keely to the extent the Court allows it to continue to go on, she is certainly relevant to illuminate for the trier of fact that it is only Cramton's Arizona buddies supporting the false abusiveness story and Cramton has listed several irrelevant witnesses she intends to put on for the purpose of improperly assassinating the character and disparagement of Keely despite the fact that all of the ADA claims and the constructive discharge claim were dismissed.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.

r.     George Huggins -  Mr. Huggins is a franchise area developer and acted as one for GFL.  He has knowledge regarding his recommendation to Keely that she sell the Grabbagreen brand to Kahala as opposed to Due North.  He had knowledge of how Cramton wrongfully spread Keely's spouses medical information with Mr. Ferrell and himself.

s.     Antonia Scholz (and all other attorneys at Cheng Cohen who performed work for GFL and ECH) – Cheng Cohen served as franchise counsel for the Grabbagreen brand and ECH and GFL.  Subject to attorney-client privilege, the attorneys at Chang Cohen have knowledge of the terms of the incomplete acquisition of the Grabbagreen brand by Due North, and the terms of the acquisition by Kahala, including all negotiations regarding the same.  The attorneys at Cheng Cohen also have knowledge of the role Cramton played in the preparation of the FDDs, Cramton's general knowledge of the

structure of GFL, ECH and GGS, and Cramton's ownership interest in ECH and GGS.  All non-privileged documents and communications they were a party or privy to.

Plaintiff's Objection:   Ms. Scholz was Defendants' attorney regarding franchising matters.  She has no personal knowledge of Ms. Cramton and Keely Newman's September 18, 2017 telephone call or Ms. Cramton's minimum wages (unless to a minor extent she was aware that Ms. Cramton was working long hours in her communications with her).  Her testimony would be marginal at best and a waste of time.

t.      Jenny Moody – Ms. Moody is an attorney for Kahala not the Defendants.  She has knowledge regarding the acquisition of the Grabbagreen brand by Kahala and related negotiations, Cramton's employment with Kahala, the use or absence of methods and protocols used to separate Cramton from details regarding Kahala's acquisition of the Grabbagreen brand, and all documents and communications she was a party to or privy to.

Plaintiff's Objection:  Ms. Moody was Defendants' attorney.  She has no personal knowledge of Ms. Cramton and Keely Newman's September 18, 2017 telephone call or Ms. Cramton's minimum wages (unless to a minor extent she was aware that Ms. Cramton was working long hours in her communications with her).  Her testimony would be marginal at best and a waste of time.

u.      Inese Mazarevica – Ms. Mazarevica has personal knowledge of the work culture and environment at GFL and personal knowledge of Keely's managerial style and that it was not abusive.  Ms. Mazarevica is not a part of Cramton's Arizona click and is certainly relevant to rebut the character assassination and disparagement of Keely to the extent the Court allows it to continue to go on, she is certainly relevant to illuminate for the trier of fact that it is only Cramton's Arizona buddies (of which she is not one) supporting the false abusiveness story and Cramton has listed several irrelevant witnesses she intends to put on for the purpose of improperly assassinating the character and disparagement of

Keely despite the fact that all of the ADA claims and the constructive discharge claim were dismissed.

Plaintiff's Objection:  This witness has no personal knowledge of the claims or defenses at issue.

Each party understands that it is responsible for ensuring that the witnesses it wishes to call to testify are subpoenaed.  Each party further understands that any witnesses a party wishes to call must be listed on that party's list of witnesses; the party cannot rely on the witness having been listed or subpoenaed by another party.

**F.     EXHIBIT LIST**

1.     Plaintiff's list of exhibits, and Defendants' objections thereto, are attached as Exhibit 1.[5]

2.     Defendants' list of exhibits, and Plaintiff's objections thereto, are attached as Exhibit 2.

3.     If there are more than 20 exhibits, the parties must email their exhibit lists in Word format, at least five days before trial, to the chambers email address (lanza_chambers@azd.uscourts.gov).

4.     Each party hereby acknowledges by signing this Joint Proposed Final Pretrial Order that any objections not specifically raised herein are waived.

**G.     DEPOSITIONS TO BE OFFERED**

1.     Plaintiff will use the following depositions at trial:

a.   Teresa Mills (if Mills is not available to testify)

Mills, Teresa – December 20, 2018

---

[5]     Consistent with the Court's December 27, 2019 order, Plaintiff has not included a reply to the objections.  To the extent that a reply is necessary, Plaintiff will need additional time to provide her position.  To the extent that a reply is not contemplated in the December 27, 2019 order, Plaintiff objects to any reply asserted by Defendants.

| Page / Line | Objection |
|---|---|
| 9:11 – 9:13 | No objection |
| 32:12 – 34:12 | No objection |
| 35:08 – 35:21 | No objection |
| 36:02 – 36:11 | Assumes facts not in evidence/foundation/vague – 36:06 – 36:11 as to the four entities referenced. |
| 37:17 – 39:19 | No objection |
| 40:18 – 41:20 | 1. Vague – 40:21 – 40:22 as to when the deal closed and the nature of what was sold<br>2. Assumes facts not in evidence/foundation/calls for legal conclusion/vague – 41:04 – 41:09 as to the entities described and when the deals closed and the nature of what was sold in each deal. |
| 41:24 – 42:05 | Assumes facts not in evidence/foundation/vague – 41:24 – 42:05 as to Kahala as a buyer, when the deal closed and the nature of what was sold.  Ms. Mills is not qualified to testify about the nature of the deal. |
| 46:11 – 47:18 | No objection |
| 50:04 – 50:18 | No objection |
| 53:13 – 54:10 | Assumes facts not in evidence/ foundation/relevance – 53:13 – 53:24 as to whether Gulf Girl Squared had an office lease, when it ended and whether Grabbagreen Franchising, LLC leased the same space. |
| 55:16 – 55:25 | Assumes facts not in evidence/foundation/calls for speculation – 55:16 – 55:25 the foundation, authenticity and identify of the document have not been established. |
| 69:17 – 73:16 | Improper opinion/lacks foundation for personal knowledge/calls for speculation/hearsay – 69:24 – 72:07 – Ms. Mills was an accountant in Oregon not a person working in operations or sales in the Arizona office.  She has no direct knowledge of the duties or daily activities of different employees or who they reported to. |
| 73:25 – 75:25 | Foundation/vague – 73:25 – 75:25 as to who these discussions were with, when they occurred, how they occurred, who else was involved and which entity they are talking about. |

| 76:03 – 77:07 | Relevance/ foundation/vague – 76:03 – 76:08 as to who was involved in preparation of the franchise disclosure document and incomplete information and what duties Cramton had. |
|---|---|
| 105:20 – 109:07 | 1.    Relevance/bankruptcy stay – a bankruptcy stay applies to Eat Clean Operations, LLC.  No determinations should be made in this Court about the amount of liability that Eat Clean Operations, LLC may have or has in relation to its promissory note.  The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.<br><br>2.    Relevance/improper opinion/lacks foundation for personal knowledge/calls for a legal conclusion/calls for speculation – 105:20 – 107:05 as to the document referenced, the accounting information described and assignment of loans contingent upon the Due North closing or that an assignment ever happened given that the Due North deal never closed.<br><br>3.    Relevance/assumes facts not in evidence/foundation/calls for a legal conclusion/calls for speculation – 107:06 – 109:07 as to the assignment of the notes contingent upon the closing of the Due North deal, that the Due North never closed, who signed the closing documents, who dated them or that there was no "treatment" of loans by Kahala in the Kahala transaction because the Due North deal never closed. |
| 109:13 – 111:14 | Relevance/foundation and authenticity of document not established/vague – 110:02 – 110:13 as to any accounting entries relating to wage payments made from Grabbagreen Franchising to Cramton. |
| 126:23 – 127:07 | Assumes facts not in evidence/foundation/calls for speculation – No information provided that wages were not going to be paid, that a decision was made, when discussed or what was discussed. |
| 128:03 – 129:03 | Relevance/assumes facts not in evidence/foundation/calls for speculation/vague – 128:07 – 129:03 as to accounting instructions instead of agreement of the owners and all accounting done to track hypothetical wages not relating to any count, including Count IV or damages claimed under Count IV. |
| 129:07 – 132:11 | Relevance – Accounting notes in unaudited interim books or entries tracking agreed upon foregone wages by members is irrelevant to Cramton's claim under Count IV.  Count IV is a minimum wage claim.  Cramton alleged a specified number of hours she claims to have worked for Grabbagreen Franchising and dates on which she allegedly worked to arrive at specified damages using the applicable Arizona minimum wage rate.  No damages based on accounting entries, interim financial statements, adjustments to interim financial statements or offsetting accounting entries were alleged or disclosed |

| | |
|---|---|
| | in Cramton's mandatory disclosure statement based on accounting entries was alleged or disclosed under Count IV and no such information makes it more probable that Cramton's minimum wage claim or the related damages calculation is accurate. |
| 132:15 – 132:17 | No objection |
| 132:22 – 134:17 | 1.   Relevance/bankruptcy stay – a bankruptcy stay applies to Eat Clean Operations, LLC.  No determinations should be made in this Court about the amount of liability that Eat Clean Operations, LLC may have or has in relation to its promissory note.  The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.  2.   Relevance/hearsay/improper opinion/lacks foundation for personal knowledge/calls for speculation – 133:14 – 133:17 and 133:21– 134:17 as to purchases Cramton made on her personal credit card that the witness lacks direct knowledge of but heard that is what she did. |
| 135:15 – 138:23 | No objection |
| 139:02 – 140:23 | 1.   Relevance/bankruptcy stay – a bankruptcy stay applies to Eat Clean Operations, LLC.  No determinations should be made in this Court about the amount of liability that Eat Clean Operations, LLC may have or has in relation to its promissory note.  The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.  2.   Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – Cramton received numerous payments with different characterization.  The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage.  This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case.  Ms. Mills guessed at what "roll over" means, did not roll over the funds discussed and guessed at whether a payment relates to an email. |
| 141:02 – 142:03 | 1.   Relevance/bankruptcy stay – a bankruptcy stay applies to Eat Clean Operations, LLC.  No determinations should be made in this Court about the amount of liability that Eat Clean Operations, LLC may have or has in relation to its promissory note.  The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC. |

| | |
|---|---|
| | 2. Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – Cramton received numerous payments with different characterization. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. Ms. Mills guessed at whether the payments related to an email. |
| 142:07 – 144:07 | Relevance/bankruptcy stay – a bankruptcy stay applies to Eat Clean Operations, LLC. No determinations should be made in this Court about the amount of liability that Eat Clean Operations, LLC may have or has in relation to its promissory note. The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC. |
| 144:11 – 145:16 | 1. The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.<br><br>2. Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – Cramton received numerous payments with different characterization. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. Ms. Mills did not transfer any funds and does not know if the payment relates to the email. |
| 145:20 – 146:18 | 1. The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.<br><br>2. Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – 145:20 – 146:07 as to a payment Cramton received with a different characterization. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. Ms. Mills did not transfer any funds and does not know if the payment relates to the email. |
| 146:22 – 148:01 | 1. The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were |

| | |
|---|---|
| | properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.<br><br>2. Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – Cramton received numerous payments with different characterization. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. Ms. Mills did not transfer any funds and does not know if the payment relates to the email. |
| 148:05 – 149:23 | 1. The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.<br><br>2. Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – 148:05 – 148:24 as to a payment Cramton received with a different characterization and as to 148:25 – 149:04 as to any accounting adjustments made in contemplation of the Due North closing or assignment of loans contingent upon the Due North closing. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. Ms. Mills did not transfer any funds and does not know if the payment relates to the email. |
| 151:14 – 155:03 | Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – 153:05 – 153:16 as to Ms. Mill's opinion regarding reporting forms for partnerships. Ms. Mills is a fact witness not an expert and 153:17 – 155:03 as to who prepared the return for an unidentified company in various years. Who prepared the return for the Defendant entities is irrelevant to every count before the Court. |
| 155:04 – 156:11 | Relevance/improper opinion/lacks foundation for personal knowledge/calls for speculation – Cramton received numerous payments with different characterization. The payment discussed is not one of the two payments Cramton received that were characterized by Grabbagreen Franchising, LLC as wages well in excess of the minimum wage. This payment is irrelevant to Count IV and has no bearing on the proper characterization of the two payments at issue in this case. The issue of whether Grabbagreen Franchising, LLC properly characterized payments to Cramton in an amount equivalent to Cramton's monthly car loan payment on her personal automobile as a taxable distribution instead of a non-taxable lease expense is irrelevant to this case. Grabbagreen Franchising, LLC did not lease a car for Cramton's benefit. |

| | |
|---|---|
| | Cramton did not assert any claim that payments made to her in an amount equivalent to her personal car monthly payment are not taxable nor did she identify this as a part of any damages under any count before this Court. Further, no accounting entries or notes on interim financial statements relating to distributions of money she received in an amount equivalent to her monthly car payment are relevant to any issue before this Court. Nor is it relevant who or what tax professional determined that the monthly payments Cramton received in 2017 for $548.10 were taxable payments that were required, as a matter of law, to be reported as taxable distributions to the IRS and Arizona. |
| 156:15 – 163:02 | Relevance – 157:07 – 157:14 as to whether Quickbooks was used to prepare the ledger and 159:01 – 159:15 as to how Grabbagreen Franchising, LLC characterized payments to Cramton equal to Cramton's monthly car loan payment on her personal automobile as a taxable distribution instead of a non-taxable lease expense. How that monthly payment is characterized in accounting records is irrelevant to this case. Cramton did not assert any claim that payments made to her that equaled her personal monthly car payment are not taxable nor did she identify this as a part of any damages under any count before this Court. Further, no accounting entries or notes on interim financial statements relating to distributions of money she received in an amount equivalent to her monthly car payment are relevant to any issue before this Court. Nor is it relevant why the accounting entry was corrected or who or what tax professional determined that the monthly payments Cramton received in 2017 for $548.10 were taxable payments that were required, as a matter of law, to be reported as taxable distributions to the IRS and Arizona. |
| 163:06 – 163:08 | No objection |
| 163:19 – 164:04 | No objection |
| 169:14 – 169:15 | No objection |
| 169:24 – 179:20 | 1.    The Eat Clean Operations, LLC promissory note is irrelevant to the issue of whether payments made by Grabbagreen Franchising, LLC were properly characterized as wages and related to Cramton's labor or services to Grabbagreen Franchising, LLC.

2.    Relevance/improper opinion – 171:07 – 171:19 as to Ms. Mill's opinion on GAAP accounting for franchisors, the method of income allocation on the 2017 tax return and accounting or tax treatment of unearned revenue for a franchisor are all irrelevant to the issues in this case.

3.    Relevance –171:23 – 179:20 as to any accounting adjustments made in contemplation of the Due North deal closing, assignment of loans contingent upon the Due North deal closing, accounting adjustments because that deal did not close are irrelevant to any count before the Court or Eat Clean Operation, LLC's ability to pay its promissory note are irrelevant to any count before the Court, including specifically Count IV. None of these accounting entries or |

| | |
|---|---|
| | adjustments or the accountant's correction of entries because the Due North deal did not close have any bearing on whether Grabbagreen Franchising, LLC properly characterized the two payments it made to Cramton as wages. |
| 179:24 – 181:15 | No objection |
| 181:20 – 186:20 | Relevance – 185:01 – 186:20 as to how Grabbagreen Franchising, LLC characterized payments to Cramton in an amount equal to Cramton's monthly car payment for her personal vehicle as a taxable distribution instead of a non-taxable lease expense.  How that monthly payment is characterized in accounting records is irrelevant to any count before the Court, including Count IV.  Cramton did not assert any claim that payments made to her in an amount that equaled her personal monthly car payment are not taxable nor did she identify this as a part of any damages under any count before this Court in her mandatory disclosure statement.  The accounting entries are irrelevant.  Nor is it relevant why the accounting entry was entered incorrectly, why is was corrected or who or what tax professional determined that the monthly payments Cramton received in 2017 for $548.10 were taxable payments that were required, as a matter of law, to be reported as taxable distributions (not non-taxable expenses) to the IRS and Arizona or when that determination was made. |
| 186:24 – 197:18 | 1.    Relevance – 186:24 – 191:14 as to how deferred franchise revenue is accounted for or tracked and when it is recognized, the difference between recognized and earned and what happens if a "franchisee falls by the wayside for whatever reason" and that the tracking is a cumulative list and how deferred area developer representative revenue is accounted for and amortized is irrelevant to all counts before the Court.  Cramton did not allege any count based on or related to any accounting records, application of any accounting rules for franchisor businesses, issues relating to revenue recognition, accounting or taxation.  Cramton did not identify any damages she suffered in relation to any count determined based on or relating to these accounting records in her mandatory disclosure rule.  Any undisclosed claims or damages are irrelevant to the counts before this Court. |
| | 2.    Relevance – 191:15 – 195:02 as to financial statements, gift card payable accounting entries, what happened to gift card liabilities and cash, deferred franchise revenue and area representative revenue treated as short-term versus long-term, GAAP rules applicable to a franchisor are all irrelevant to the counts before the Court.  Cramton did not allege any count based on or related to any accounting records, financial statements, or application of any accounting rules for franchisor businesses.  Cramton did not identify any damages she suffered in relation to any count determined based on or relating to these financial statements or accounting entries in her mandatory disclosure rule.  Any undisclosed claims or damages are irrelevant to the counts before this Court. |

| | 3. Relevance – 195:03 – 196:19 as to any accounting adjustments made in contemplation of the Due North deal closing, assignment of loans contingent upon the Due North deal closing, accounting adjustments because that deal did not close are irrelevant to any count before the Court.<br><br>4. Relevance/Vague – 196:20 – 197:18 as to who prepared the 2017 tax returns for an unnamed entity and whether Grabbagreen Franchising, LLC was combined with Eat Clean Holdings, LLC for tax returns is irrelevant to any count in this case. Cramton did not allege a claim based on the tax returns of any entity nor did she disclose a claim or damages based on the tax returns of any entity. |
|---|---|
| 204:25–205:19 | No objection |

b.    Dana Mavros (if Mavros is not available to testify)

| Mavros, Dana – January 18, 2019 | |
|---|---|
| Page / Line | Objection |
| 30:19 – 31:07 | No objection |
| 32:03 – 32:18 | No objection |
| 33:19 – 35:23 [starting with "in May…"] | No objection |
| 39:03 – 39:24 | Relevance – discussion has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 41:22 – 42:03 [ending with "them."] | No objection |
| 43:19 – 44:03 [ending with "would."] | No objection |
| 45:03 – 45:12 | No objection |
| 55:16 – 56:10 | Relevance – email has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 59:16 – 60:01 | Relevance – who she met with has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |

| 72:05 – 72:23 | Relevance/foundation/hearsay – her understanding of McCormack's role has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
|---|---|
| 73:09 – 75:04 | Foundation |
| 93:21 – 93:24 | Relevance – when she travelled has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 96:02 – 96:20 | Relevance – her description of the meeting has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 97:09 – 98:04 [ending with "specifically."] | Relevance – who she met with has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 104:15 – 106:02 | Relevance – who she met with and her coaching have nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 109:11 – 110:03 | Foundation |
| 113:06 – 113:23 [ending with "that's it,…"] | No objection |
| 146:04 – 146:17 | No objection |
| 147:05 – 147:24 | Relevance/foundation/hearsay – her understanding of Cramton's responsibilities has nothing to do with the wage payments Cramton received and no relationship at all to Counts VII, IX or X. |
| 152:19 – 155:17 | No objection |
| 156:10 – 157:13 | No objection |
| 159:09 – 159:20 | No objection |
| 165:01 – 165:12 | No objection |

2.Defendant will use the following depositions at trial:

    a. Teresa Mills (if Mills is not available to testify)

| Mills, Teresa – December 20, 2018 | |
|---|---|
| Page / Line | Objection |
| 9:11 – 9:13 | No objection. |

| 22:04 – 22:09 | No objection. |
|---|---|
| 22:13 – 22:18 | No objection. |
| 22:24 – 23:09 | No objection. |
| 23:15 – 23:21 | No objection. |
| 23:25 – 24:25 | No objection. |
| 29:01 – 29:10 | No objection. |
| 31:18 – 32:05 | No objection. |
| 33:02 – 33:04 | No objection. |
| 36:02 – 36:05 | No objection. |
| 40:18 – 40:20 | No objection. |
| 41:10 – 41:20 | No objection. |
| 42:13 – 43:01 | No objection with the exception of the testimony related to Human Resources issues as irrelevant (42:25-43:1). |
| 45:10 – 46:07 | Objection: relevance, waste of time. |
| 49:23 – 49:24 | No objection. |
| 54:13 – 55:15 | No objection. |
| 56:01 – 56:05 | Object as incomplete.  This excerpt is missing the critical context and questions leading up at 55:16-25.  Ms. Mills testified she reported to Keely Newman. |
| 58:07 – 58:12 | No objection. |
| 72:08 – 73:16 | No objection. |
| 76:22 – 77:07 | |
| 109:13 – 110:01 | No objection. |
| 111.15 – 111:19 | Objection: Testimony without any context is completely confusing and is also irrelevant. |
| 127:02 – 127:07 | No objection. |
| 128:03 – 128:06 | No objection. |
| 133:18 – 133:20 | No objection. |

| 135:15 – 137:01 | |
|---|---|
| 138:16 – 138:23 | No objection. |
| 142:07 – 143:08 | No objection. |
| 166:04 – 166:21* | |
| 169:14 – 169:15 | |
| 169:24 – 170:04 | |
| 170:21 – 171:04 | |
| 174:21 – 175:23* | |
| 200:10 – 201:11 | Objection:  The constructive discharge claim has been dismissed so this testimony is now irrelevant.  Lack of Foundation.  Ms. Mills states she was in the office at most a few times a year. |
| 201:25 – 203:25 | No objection. |
| 204:03 – 204:08 | No objection. |
| 204:25 – 205:23 | No objection. |
| 206:01 – 206:17 | No objection. |
| 206:22 – 208:10 | No objection. |

*Included as related parts to Cramton's proposal.

b.  Dana Mavros (if Mavros is not available to testify)

| Mavros, Dana – January 18, 2019 | |
|---|---|
| Page / Line | Objection |
| 4:07 – 4:08 | No objection, joint |
| 6:01 – 6:03 | No objection, joint |
| 15:20 – 16:18 | No objection, joint |
| 17:08 – 17:19 | No objection, joint |
| 18:08 – 18:20 | No objection, joint |
| 19:20 – 19:09 | Unclear designation as line 20 follows line 9. |

| 19:24 – 20:01 | No objection. |
|---|---|
| 20:04 – 20:24 | No objection |
| 21:01 – 21:12 | No objection. |
| 21:22 – 22:24 | No objection. |
| 22:08 – 22:13 | No objection. |
| 22:16 – 22:19 | No objection. |
| 23:03 – 23:10 | No objection. |
| 24:02 – 24:14 | No objection. |
| 24:18 – 26:18 | No objection. |
| 26:22 – 26:23 | No objection. |
| 27:12 – 27:21 | No objection |
| 28:06 – 28:15 | No objection with the exception of the testimony related to Human Resources issues as irrelevant (42:25-43:1). |
| 29:21 – 31:15 | Objection: relevance, waste of time. |
| 32:03 – 32:18 | No objection. |
| 32:22 – 35:23 | No objection. |
| 42:03 – 43:02 | Object as incomplete.  This excerpt is missing the critical context and questions leading up at 55:16-25.  Ms. Mills testified she reported to Keely Newman. |
| 43:19 – 45:12 | No objection. |
| 58:23 – 59:04 | No objection. |
| 64:14 – 65:20 | Objection:  Testimony without any context is completely confusing and is also irrelevant. |
| 70:13 – 71:03 | No objection. |
| 72:24 – 73:08 | Objection: Testimony without any context is completely confusing and is also irrelevant. |
| 86:07 – 87:05 | No objection. |
| 88:19 – 91:02 | No objection. |
| 98:04 – 98:07 | No objection. |

119

| | |
|---|---|
| 99:14 – 100:21 | Objection.  The entire testimony is based on an exhibit that is hearsay as it is an accounting entry, after the fact, made in response to litigation and in order to address the claims in this litigation.  It is inadmissible. |
| 106:05 – 107:16 | No objection. |
| 113:06 – 115:12 | No objection. |
| 115:17 – 115:22 | |
| 116:01 – 116:03 | Objection.  The entire testimony is based on an exhibit that is hearsay as it is an accounting entry, after the fact, made in response to litigation and in order to address the claims in this litigation.  It is inadmissible. |
| 125:01 – 127:18 | Objection.  The entire testimony is based on an exhibit that is hearsay as it is an accounting entry, after the fact, made in response to litigation and in order to address the claims in this litigation.  It is inadmissible. |
| 128:08 – 128:21 | Objection.  The entire testimony is based on an exhibit that is hearsay as it is an accounting entry, after the fact, made in response to litigation and in order to address the claims in this litigation.  It is inadmissible. |
| 129:04 – 134:18 | |
| 135:19 – 136:03 | Objection:  The constructive discharge claim has been dismissed so this testimony is now irrelevant.  Lack of Foundation.  Ms. Mills states she was in the office at most a few times a year. |
| 136:09 – 137:15 | No objection. |
| 138:03 – 138:22 | No objection. |
| 139:15 – 141:20 | No objection. |
| 142:03 – 142:14 | No objection. |
| 142:20 – 143:11 | No objection. |
| 144:02 – 146:17 | No objection. |
| 148:01 – 150:09 | Objection:  testimony is hearsay, irrelevant, and lack of foundation. |
| 151:05 – 151:12 | Objection:  testimony is hearsay, irrelevant, and lack of foundation |
| 152:07 – 156:07 | No objection. |

| 156:10 – 158:04 | Objection: Foundation and hearsay. Ms. Mavros was not a party to the Keely/Cramton call and she has no personal knowledge about the status of the deal. |
|---|---|
| 158:14 – 159:01 | Objection: Lack of foundation. Ms. Mavros confirmed in this testimony that she had no personal knowledge of these facts. All based on hearsay. |
| 159:09 – 159:20 | No objection. |
| 161:03 – 161:11 | Objection: Lack of foundation. Ms. Mavros confirmed in this testimony that she had no knowledge of these facts. All based on hearsay. |
| 161:24 – 162:11 | Objection. Hearsay. Lack of Foundation. No ability to clarify or cross examine the witness as to the incorrect date of the phone call as Ms. Cramton did not resign on 9/18 but did so on 9/24. FRE 403 – confusing to the jury as obviously incorrect date. |
| 165:01 – 165:14 | No objection. |
| 176:14 – 177:03 | Objection: Relevance. This testimony relates to Defendants' counterclaim that Plaintiff breached her non-competition agreement. That claim has been dismissed. |
| 181:14 – 181:18 | Objection: Lack of Foundation, irrelevant. The testimony here establishes nothing, other than the fact that a conversation did not exist about something irrelevant to this lawsuit. |

c.  Karen Nettleton (if Nettleton is not available to testify)

| Nettleton, Karen – December 5, 2018 | |
|---|---|
| Page / Line | Objection |
| 4:10 – 4:13 | No objection. |
| 22:20 – 24:25 | Objection, relevance and waste of time. Constructive discharge is no longer at issue. And the financial performance of the stores has nothing to do with this litigation. |
| 25:15 – 25:21 | No objection. |
| 38:13 – 39:25 | Objection, relevance and waste of time. Keely Newman's abuse of Karen Nettleton has nothing to do with this litigation. Karen Nettleton's job search likewise has nothing to do with this litigation. |

| Page / Line | Objection |
|---|---|
| 41:17 – 47:18 | Objection relevance.   Aside from commentary that the Due North deal was pushed (41:21-42:13) and the Kahala deal (46:5-47:8), this excerpt has no relevance. |
| 49:22 – 50:22 | Objection: relevance/hearsay.   This testimony relates to Defendants' claim that Plaintiff went to work for a competitor. That claim has been dismissed. |
| 55:17 – 55:24 | No objection. |
| 56:16 – 57:04 | No objection. |
| 59:06 – 60:15 | No objection. |
| 65:24 – 66:15 | Objection: Defendants' reporting structure is irrelevant to the remaining claims in this case. |
| 68:03 – 68:07 | No objection. |
| 82:12 – 84:25 | Objection; Lack of Foundation/Hearsay/Relevance. |
| 85:19 – 86:02 | No objection. |
| 91:07 – 91:17 | No objection. |
| 96:04 – 97:19 | No objection. |
| 106:19 – 106:24 | Objection:  Relevance/Waste of Time, Improper Character testimony.   Evidence regarding constructive discharge is no longer relevant. |
| 117:11 – 118:14 | Objection: Lack of Foundation.   The testimony clearly establishes lack of knowledge given the testimony is entirely inaccurate. |
| 120:16 – 120:22 | Objection: Lack of Foundation.   The testimony clearly establishes lack of knowledge. |
| 121:18 – 124:22 | Objection: Lack of Foundation.   The testimony clearly establishes lack of knowledge given the testimony is entirely inaccurate. |
| 126:05 – 128:05 | No objection |

d.  Carl Wilson (if Wilson is not available to testify)

| Wilson, Carl – December 4, 2018 | |
|---|---|
| Page / Line | Objection |

122

| 4:10 – 4:12 | This witness' testimony is irrelevant as solely related to Defendants' spoliation of evidence claims, which have been dismissed. |
|---|---|
| 5:21 – 45:17 | This witness' testimony is irrelevant as solely related to Defendants' spoliation of evidence claims, which have been dismissed. |

e. Jeff Smit (if Smit is not available to testify)

| Smit, Jeff – November 30, 2018 | | |
|---|---|---|
| Page / Line | Objection | Cramton's counter-designation |
| 4:09 – 4:10 | | |
| | | 4:21:4:25 |
| 5:01 – 6:07 | | |
| 6:24 – 7:03 | | |
| 8:18 – 8:23 | | |
| 9:10 – 9:20 | | |
| 9:23 – 12:04 | | |
| 12:09 – 12:15 | | |
| 13:20 – 14:05 | | |
| 15:15 – 16:06 | | |
| 16:15 – 17:05 | | |
| 17:22 – 18:06 | | |
| | | 18:07 – 18:18 |
| | | 20:08 – 20:11 |
| 22:11 – 22:19 | | |
| 30:08 – 30:11 | | |
| 34:06 – 34:12 | | |
| | | 40:01 – 42:04 |

f.   John Wuycheck (if Wuycheck is not available to testify)

| Wuycheck, John – November 30, 2018 | | |
|---|---|---|
| Page / Line | Objection | Cramton's counter-designations |
| 6:09 – 6:10 | | |
| 15:10 – 15:12 | | |
| | | 42:14 – 42:22 |
| 43:11 – 43:22 | 43:17 – 43:22 – Answer cut off. | |
| | | 43:17 - 44:01 |
| | | 94:02 – 94:14 |
| | | 106:15 – 107:17 |

Each party hereby acknowledges by signing this Joint Proposed Final Pretrial Order that any deposition not listed as provided herein will be disallowed, absent good cause.

**H.   MOTIONS IN LIMINE**

The parties' motions in limine and responses thereto must be filed as separate pleadings and in accordance with the Order Setting Final Pretrial Conference.

**I.   PENDING MOTIONS**

The following motions, other than motions in limine, are pending before the court: Defendants' Motion to Take Judicial Notice.

**J.   PROCEDURES FOR EXPEDITING TRIAL**

The parties intend to utilize the following tools to expedite the trial:

1.   Editing depositions to limit the amount of time required for presentation;

2.   Using summary exhibits in place of voluminous documentary evidence;

3.   Making stipulations on authenticity and foundation for most exhibits; and

4.   Using the courtroom technology to expedite the presentation of evidence.

124

**K.    ESTIMATED LENGTH OF TRIAL**

Five trial days with time split equally between the parties.

1.5 hours for opening statements and closing arguments

15 hours for Plaintiff's case, including cross-exam of other parties' witnesses

15 hours for Defendants' case, including cross-exam of other parties' witnesses

2 hours for rebuttal

<u>Defendants' Contentions</u>:  Defendants propose the following estimated total length of trial for both parties bearing in mind (1) the sheer volume of false statements Cramton has made in this case and the number of documents that potentially will be necessary to impeach her every time she makes a false statement and (2) the sheer volume of documents and the time it will take Defendants to establish that Cramton misrepresented her hours worked for GFL in 2016 and 2017.  Defendants will be prejudiced if they are not afforded the time it will take to refute her false claim that she was working nearly every waking hour on a day by day basis in 2016 and 2017 for GFL.  Defendants propose:

2.0 hours for opening statements and closing arguments

15 hours for Plaintiff's case, including cross-exam of other parties' witnesses

30 hours for Defendants' case, including cross-exam of other parties' witnesses

5 hours for rebuttal

**L.    JURY DEMAND**

Plaintiff's Position: The parties' Rule 26(f) discovery plan contains the following statement.  "The Parties have requested a jury trial and it is uncontested."  Both parties jointly filed this.  Docket entry 50. Defendants have waived any objections.  Defendants have also not provided (or obtained in discovery) any evidence to establish that this waiver was knowing and voluntary or is otherwise valid in any event. *Massok v. Keller Indus.*, 147

F. App'x 651, 661 (9th Cir. 2005) (e.g. a waiver of the right to a jury trial must be made knowingly and intentionally)*; Cty. of Orange v. United States Dist. Court*, 784 F.3d 520, 526 (9th Cir. 2015). Although there is a compelling interest in the preservation of the freedom to contract, there is an even greater interest in guarding the fundamental right to a jury. *See, Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, (1988).  Since it would be Defendants' burden to show this, and discovery is closed, the jury waivers are invalid. *Breham v. Asset Acceptance, LLC*, No. CV-09-1474-PHX-GMS, 2010 U.S. Dist. LEXIS 50612, at *5 (D. Ariz. Apr. 27, 2010).

Additionally, a jury waiver in an ECO promissory note is not sufficient in scope to establish a waiver of Plaintiff's minimum wage claims.

Defendants' Contention:  A jury trial has been requested.  The Defendants' object to a jury trial because the parties expressly agreed to waive a jury trial with regard to all counts remaining before this Court.  The jury demand should be stricken and the trial should be a bench trial.

Cramton's first contention appears to be that Dkt. 50 dictates all of the positions of the parties to the case.  If so, Cramton is barred from asserting any theory of her case contradicting the fact that her claims under Counts VII, IX and X are entirely based directly on the Operating Agreement.  That is what she said in Dkt. 50 and what her attorney said to Judge Rayes during the scheduling conference.  (Dkt. 50, at 3:27-4:1; Dkt 89, at 12:7-12:17).  But that is a losing argument and Cramton even admitted that if the Court excludes parol evidence (as it should) and enforced the unambiguous terms of the Operating Agreement, that "would effectively dispose of Cramton's claims."  (Dkt. 279, at 1:28-2:1).  She must get this Court to allow her to change her theory of the case, violate the parol evidence rule, make up a new story and controvert her statements in Dkt. 50 or she will lose – as she should.  At bottom, Cramton is arguing for this Court to apply a very restrictive standard to the Defendants while applying no standards and no rules of law to her.  Further,

Cramton again misrepresents this case to the Court.  Defendants asserted Cramton's waiver of jury trial in their answer and affirmative defenses to the Amended Complaint.  (Dkt. 95, at 21, ¶177).  Defendants also asserted Cramton's waiver of a jury trial in their MIDP responses.  It should have been clear that Defendants were seeking to enforce the applicable jury waiver.

Next, Cramton misstates the standards of evaluating a jury waiver in Federal Court.  Under federal law, the right to a jury trial may be waived by a contract that was knowingly and voluntarily executed.  *Vintage Farms, LLC v. Armed Forces Bank NA*, 2017 WL 2775027, at *2 (D. Ariz.).  The federal standard is a constitutional minimum that courts use to protect litigants' Seventh Amendment rights.  *Id*.  If the applicable state law is more protective of the jury trial right than the constitutional minimum, that higher state standard must be met.  *Id*.  Arizona law, however, is arguably less protective than the federal constitutional minimum.  *Id*., *citing*, *Harrington v. Pulte Home Corp*,. 211 Ariz. 241, 249-51 (Ct. App. 2005)(rejecting the proposition that "any waiver of the right to jury trial must be knowingly, voluntarily and intelligently made").  Accordingly, Courts have found that the federal standard applies in Arizona.  *Id*.  Whether a waiver was knowing and voluntary is determined by considering the facts of the case.  *Id*., *citing*, *Palmer v. Valdez*, 560 F.3d 965, 968 (9th Cir. 2009).  District Courts commonly consider the following factors:  (1) whether there was a disparity in bargaining power between the parties, (2) the business acumen of the party opposing the waiver, (3) whether the opposing party had an opportunity to negotiate contract terms, and (4) whether the clause containing the waiver was inconspicuous.  *Id*.  Here, Keely was specifically trying to retain Cramton due to her serious family issues.  The circumstances Keely and her family faced were well known to Cramton and her attorneys.  Keely needed Cramton to stay employed and that is why a retention award was given to Cramton.  Cramton had equal or better bargaining power under the circumstances.  Keely could not go out and replace Cramton easily while attending to her

spouse's illness and assuming primary care of two 6-year old children.  Cramton was the second in command, claimed she was qualified, had the business acumen to be second in command, possessed the experience and knowledge typical of such a role, claims Keely would have no company at all without her, drafted FDDs, sold franchises and did everything (according to her story).  Indeed, Cramton's case is based on the notion that for a mere 10 months of service, she should receive more than $438,000 – a sum vastly exceeding what the typical judge or lawyer makes in 10 months.  It is more than a little dubious to content here that Cramton did not knowingly and voluntarily waive her jury right in relation to the claims before this Court.  Cramton was represented by multiple attorneys and had every opportunity to negotiate these provisions.  Specifically, at a minimum Cramton regularly consulted with attorney Shelley DiGiacomo and attorney Juliet Peters – she also consulted several other attorneys throughout the relevant period.  The provisions are conspicuous, clear, in all capital letters using the same font size as the rest of the agreements and mutual.  The claims before this Court are easily within the scope of the jury waivers at issue.  For all of these reasons, the jury waivers should be found to be effective here.

With regard to Count IV, Cramton bases her claim on the ECO promissory note and alleges that although GFL paid her more than the minimum wage damages she seeks from GFL's revenues and its bank account, the Court should not count those payments as GFL's payment of wages because a completely different entity, ECO had a promissory note with Cramton and she claims the Court should treat GFL's payments as if those payments were ECO payments on the promissory note, that way, Cramton can triple dip on her business partner.  Cramton's claim in Count IV is related to the ECO promissory note which unambiguously states in all caps:

THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT ONE THAT MAY BE WAIVED.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWLINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, THE PARTIES WAIVE ANY RIGHT TO TRIAL BY

JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, **OR IN ANY WAY RELATED TO, THIS AGREEMENT**. (emphasis added).

Counts IV, VII, IX and X all relate to the dealings or the relationship between the parties (ECO was a wholly owned subsidiary of ECH) and involve the Operating Agreement and Cramton seeks the value of ECH's asset as if it were the value of her once held unvested units, i.e., unvested units controlled by the Operating Agreement.   The Operating Agreement unambiguously states in §16.9 in all caps:

NO PARTY TO THIS AGREEMENT OR ANY ASSIGNEE, SUCCESSOR, HEIR, OR PERSONAL REPRESENTATIVE OF A PARTY **SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER AGREEMENTS OR THE DEALINGS OR THE RELATIONSHIP BETWEEN THE PARTIES**.  NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO **NO EXCEPTIONS**.  NO PARTY HERETO HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY HERETO THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES. (emphasis added).

These jury waivers should be found to be effective and enforced.

**M.     PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (BENCH TRIAL ONLY)**

The proposed findings of fact set out above in Defendants' Contentions in Section "D.  Contested Issues and Law" of this Joint Proposed Final Pretrial Order are incorporated as if set forth in this Section M, including the material issues of fact to be tried and decided set forth in Section D.1 and the issues of law to be determined as set forth in Defendants' Contentions in Section D.2 of this Joint Proposed Final Pretrial Order.

**N.     VOIR DIRE, JURY INSTRUCTIONS, AND FORMS OF VERDICT**

129

In the alternative to a bench trial, the parties' proposed jury instructions, proposed voir dire, and proposed forms of verdict must be filed in accordance with the instructions contained in the Order Setting Final Pretrial Conference.

**O.   CERTIFICATIONS**

The undersigned counsel for each of the parties in this this action do hereby certify and acknowledge the following:

1. All discovery has been completed;

2. The identity of each witness has been disclosed to opposing counsel;

3. Each exhibit listed herein is in existence, is numbered, and has been disclosed and shown to opposing counsel;

4. The parties have complied in all respects with the mandates of the Court's Rule 16 Case Management Order and Order Setting Final Pretrial Conference;

5. The parties have made all of the disclosures required by the Federal Rules of Civil Procedure (unless otherwise previously ordered to the contrary); and

6. The parties acknowledge that once this Joint Proposed Final Pretrial Order has been signed and lodged by the parties, no amendments to this Order can be made without leave of Court.

**O.   INFORMATION FOR COURT REPORTER**

The parties must file a "Notice to Court Reporter" one week before trial in accordance with the instructions provided by this Court.

DATED this 22nd day of May, 2020.

**KERCSMAR & FELTUS PLLC**

By:  *s/ Todd Feltus*
    Todd Feltus
    Molly Rogers
    7150 East Camelback Road, Suite 285
    Scottsdale, Arizona 85251

130

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATHESON & MATHESON PLC
Michelle R. Matheson
Emily Armstrong
15300 North 90th Street, Suite 550
Scottsdale, Arizona 85260

*Attorneys for Plaintiff*

NEWMAN LAW, LLC

By: *s/*_____
Kelli Newman
119 Tanglewood Drive
Glen Ellyn, Illinois 60137
*Attorneys for Defendants Eat Clean Holdings, LLC
and Keely Newman*

CRONUS LAW PLLC

By: *s/*_____
Larry J. Cohen
Erin A. Hertzog
2601 East Thomas Road, Suite 235
Phoenix, Arizona 85016
*Attorneys for Defendants Grabbagreen Franchising, LLC;
Eat Clean Holdings, LLC; and Keely Newman*

Based on the foregoing,

**IT IS ORDERED** that this Joint Proposed Final Pretrial Order jointly submitted by the parties is hereby **APPROVED** and **ADOPTED** as the Final Pretrial Order of this Court.

Dated this 27th day of May, 2020.

_____
Dominic W. Lanza
United States District Judge

131