# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton, | No. CV-17-04663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grabbagreen Franchising LLC, et al., | |
| Defendants. | |

In advance of the telephonic motion hearing on September 29, 2020, the Court wishes to provide the parties with its tentative ruling. This is, to be clear, only a tentative ruling. The point of providing it beforehand is to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize their ability to address any perceived errors in the Court's logic. This is not an invitation to submit additional evidence or briefing.

Dated this 17th day of September, 2020.

_____
Dominic W. Lanza
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TENTATIVE RULING

Pending before the Court are four motions filed after the Final Pretrial Conference. First, Plaintiff Kim Cramton ("Cramton") has moved to preclude Defendants Keely Newman ("Keely"), Eat Clean Holdings ("ECH"), and Grabbagreen Franchising, LLC ("GFL") (collectively, "Defendants") from presenting certain damages-related evidence and argument at trial.  (Doc. 320). Second, Defendants have filed a dueling motion to preclude Cramton from presenting certain damages-related evidence and argument at trial. (Doc. 321.)  Third, Defendants have moved to strike Cramton's jury demand.  (Doc. 322.) Fourth, Defendants have moved for reconsideration of certain aspects of last year's summary judgment ruling.  (Doc. 339.)  For the following reasons, the first three motions will be granted in part and denied in part and the fourth motion will be denied.

## BACKGROUND

From September 2014 through September 25, 2017, Cramton worked in various capacities with Defendants to operate the "Grabbagreen" restaurant franchise, which serves healthy fast food and juice.  Cramton also held an 18.6%[1] membership interest in ECH, the entity that owned the Grabbagreen brand.   Soon after Cramton's departure, Keely repurchased Cramton's membership interest for $1, which the ECH Operating Agreement[2] permitted Keely to do if Cramton resigned voluntarily.

One of the key disputed issues in this action is whether Cramton was improperly duped into resigning.  Cramton alleges that she resigned because Keely falsely told her, during a telephone call on September 18, 2017, that a planned sale of Grabbagreen to a third-party acquiror, Kahala Brands Ltd. ("Kahala"), had fallen through and that the Kahala deal was dead.  Keely denies making these statements and contends that Cramton chose to resign for other reasons.

---

[1]     Defendants contend that Cramton's membership interest was 18.1% and that Cramton is "being dishonest" by stating otherwise.  (Doc. 327 at 14 n.3.)  The Court need not resolve this dispute at this time.

[2]     The Operating Agreement, to which Cramton, Keely, and ECH are parties, governs the management, operations, and ownership of, as well as the rights and duties of membership in, ECH.  (Doc. 324-2 at 2-50.)

As it turns out, the Kahala deal wasn't dead. Kahala ended up purchasing the Grabbagreen brand from ECH in March 2018 for $2.6 million. Cramton has now asserted a variety of claims against Defendants, but the big-ticket item is her claim for the fair market value of the membership interest that Keely repurchased for $1, which Cramton claims was actually worth around $500,000 (*i.e.,* 18.6% of the Kahala purchase price).

I.    Procedural History

On December 15, 2017, Cramton initiated this action. (Doc. 1.)

On November 12, 2018, Cramton filed an amended complaint. (Doc. 88.)

On November 29, 2018, Defendants filed an answer to the amended complaint and amended counterclaims. (Doc. 95.)

On March 1, 2019, Cramton filed a motion for summary judgment (Doc. 142) and Defendants filed a motion for partial summary judgment (Doc. 143).

On April 1, 2019, both parties filed responses to the summary judgment motions. (Docs. 158, 159.)

On April 16, 2019, both parties filed replies to the summary judgment motions. (Docs. 171, 172.)

On April 30, 2019, the Court, upon motion, authorized Defendants to reopen Cramton's deposition. (Doc. 175.)

On December 23, 2019, the Court issued a 73-page order addressing a variety of motions, including the parties' cross-motions for summary judgment. (Doc. 247.) That order granted judgment on a number of claims and counterclaims, leaving only the following claims for trial: (1) Cramton's minimum wage claim (Count Four) against Keely and GFL; (2) Cramton's claim for breach of the promissory note (Count Five), limited to the issue of damages, against Eat Clean Operations, LLC ("ECO");[3] and (3) Cramton's claims for implied breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraud (Counts Seven, Nine, and Ten) against Keely and ECH.

---

[3]    On January 31, 2020, ECO filed for bankruptcy. (Doc. 254.) On February 3, 2020, the Court noted that the action was automatically stayed as to ECO. (Doc. 255.)

- 4 -

On January 2, 2020, Defendants filed a motion for reconsideration as to Counts Nine and Ten.  (Doc. 249.)  That motion asserted that "Plaintiff has no right to receive payment of any of the proceeds of ECH's sale of the Grabbagreen Brand to Kahala . . . under the terms of the Operating Agreement."  (*Id*. at 2.)

On January 7, 2020, the Court denied this motion because "Defendants are belatedly attempting to raise an argument they could have raised—but, for whatever reason, chose not to raise—in their summary judgment motion."  (Doc. 251 at 2.)

On May 22, 2020, the parties filed the joint proposed final pretrial order.  (Doc. 303.)

On May 27, 2020, the Court held the Final Pretrial Conference.  (Doc. 309.)  During it, the Court ruled on various motions *in limine* but declined to resolve, on the merits, Cramton's motion *in limine* to exclude portions of Defendants' damages defense.  (*Id*.)  Instead, the Court solicited additional briefing from the parties, "permit[ting] each side to file a motion to exclude the other side's theories and/or evidence bearing on damages."  (*Id*. at 2.)

On June 17, 2020, the parties filed dueling motions to exclude certain aspects of the other side's theory of damages.  (Docs. 320, 321.)  That same day, Defendants filed a motion to strike Cramton's jury demand.  (Doc. 322.)

On July 1, 2020, the parties filed responses to those motions.  (Docs. 324, 325, 326.)

On July 2, 2020, Defendants refiled their response to Cramton's motion to exclude.  (Doc. 327.)

On July 10, 2020, Defendants filed replies in support of their two motions.  (Docs. 330, 331.)

On July 14, 2020, Cramton filed a motion to strike Defendants' damages-related reply.  (Doc. 333.)  That same day, Defendants filed a response to the motion to strike.  (Doc. 334.)

On August 27, 2020, the parties participated in a settlement conference before a magistrate judge but were unable to reach a settlement.  (Doc. 336.)

1        On September 3, 2020, the Court denied Cramton's motion to strike and authorized

2    Cramton to file a reply in support of her motion to exclude.  (Doc. 327.)

3        On September 10, 2020, Cramton filed a reply.  (Doc. 338.)

4        On September 14, 2020, Defendants filed another motion for reconsideration

5    concerning the December 2019 summary judgment ruling.  (Doc. 339.)

6        On September 16, 2020, Defendants filed a motion to strike certain portions of

7    Cramton's damages-related reply.  (Doc. 340.)  That same day, this motion was denied.

8    (Doc. 341.)

9        On September 17, 2020, the Court issued a tentative ruling addressing the four

10   pending motions.  (Doc. 343.)

11       On September 29, 2020, the Court heard oral argument.

12                                    **DISCUSSION**

13   I.    <u>Motions To Exclude Damages-Related Evidence And Argument</u>

14       Defendants seek to preclude Cramton from presenting any evidence or argument

15   that she is entitled to (1) proceeds from ECH's asset sale to Kahala, (2) damages arising

16   from wrongfully taken property, (3) emotional distress damages, and (4) certain minimum

17   wage damages.  (Doc. 321.)  Defendants also seek to preclude Cramton from presenting

18   any other theories based on "new false and previously undisclosed statements" Cramton

19   made during the Final Pretrial Conference.  (*Id.* at 12.)  Cramton, in turn, seeks to "prohibit

20   Defendants from presenting any evidence or argument at trial that: (1) the sale of [ECH]

21   or its assets yielded no proceeds; (2) Plaintiff's remedy is limited to a return of her

22   membership interest; or (3) that the fair market value of Plaintiff's membership interest is

23   subject to any offsets or any adjustments from 18.6% of the Kahala purchase price."  (Doc.

24   320 at 15.)

25       A.    **Legal Standard**

26       The District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP"),

27   which was in effect at all relevant times in this case, provides that each party must, "[f]or

28   each of your claims or defenses, state the facts relevant to it and the legal theories upon

which it is based."  D. Ariz. G.O. 17-08 ¶ B(4).  The MIDP also requires each party to "[p]rovide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered."  *Id.* ¶ B(5).[4]  "The discovery obligations [created by the MIDP] supersede the disclosures required by Rule 26(a)(1) and are framed as court-ordered mandatory initial discovery pursuant to the Court's inherent authority to manage cases."  *Id.* at 1.  *Accord id.* ¶ A(2) ("The responses are called for by the Court, not by discovery requests actually served by an opposing party.").

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The purpose of this rule is to "'give[] teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed."  *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011).

"The party requesting sanctions [under Rule 37] bears the initial burden of establishing that the opposing party failed to comply with the [applicable] disclosure requirements."  *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017).  If the movant makes this showing, "[t]he party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."  *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).  When evaluating substantial justification and harmlessness, courts often consider (1) prejudice or surprise to the other party, (2) the ability of that party to cure the prejudice, (3) the likelihood of disruption of trial, and (4) willfulness or bad faith.  *Silvagni,* 320

---

[4]     Similarly, Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires the disclosure of "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based."

1    F.R.D. at 242.

2        B.    **Defendants' Motion**

3              1.    *Proceeds from Kahala Sale*

4        Defendants argue that Cramton failed to timely disclose her theory that she has a

5    right to a portion of the proceeds from Kahala transaction.  (Doc. 321 at 5-9.)  In response,

6    Cramton argues that her theory is different—she is seeking the fair market value of her

7    membership interest in ECH—and that this theory has been fairly raised throughout the

8    litigation.  (Doc. 325.)  In a footnote, Cramton clarifies: "[T]he damages theory is not that

9    [Cramton] would have received proceeds . . . [but that] the sales price set the fair market

10   value of her membership interest."  (*Id.* at 6 n.4.)

11       The parties are talking past each other.  Cramton is not seeking to recover a portion

12   of the sale proceeds—she is seeking the fair market value of her 18.6% membership interest

13   and merely wishes to proffer the Kahala transaction as a *measure* of that asset's fair market

14   value.   This theory was timely disclosed.   Cramton's MIDP disclosures pertaining to

15   Counts Seven, Nine, and Ten, which Defendants received in April 2018 (*i.e.,* well before

16   the close of discovery), explain that "Cramton has been damaged in the amount of the value

17   of her membership interest (approximately $511,500, based on the sale of the company to

18   Kahala)."  (Doc. 320-9 at 43, 45.)  This is the same argument Cramton presents in the final

19   pretrial order.  Under the heading "Whether Cramton would be entitled to 'Sale Proceeds'

20   upon ECH's asset sale to Kahala," Cramton states: "Plaintiff is entitled to the fair market

21   value of the membership value of ECH at the time that that it was wrongfully taken away

22   from her in October 2016.  Fair market value is based on what a willing buyer would pay

23   a willing seller.  That value is conclusively established by the Kahala sale, which valued

24   ECH at $2.6 million."  (Doc. 310 at 28.)

25       Given this backdrop, one option would be to deny, as moot, Defendants' request to

26   preclude Cramton from presenting the argument that she is entitled to sale proceeds.  As

27   noted, Cramton does not intend to make that argument.  Nevertheless, in an abundance of

28   caution and in light of the fact that Cramton has previously described her damages theory

in an imprecise manner,[5] Defendants' motion will be granted.  The practical effect of this ruling is simply to hold Cramton to the description of her damages theory that she provided in the final pretrial order.  *Cf. United States v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("Unless pretrial orders are honored and enforced, the objectives of the pretrial conference to simplify issues and avoid unnecessary proof by obtaining admissions of fact will be jeopardized if not entirely nullified.").

### 2.    *Wrongfully taken property*

Defendants argue that Cramton's statements in the final pretrial order "reference fair market value of wrongfully taken property for the first time in this lawsuit as the basis for Plaintiff's damages."  (Doc. 321 at 9.)

Not so.  As discussed above, Cramton timely disclosed her theory that the Kahala sale may serve as the benchmark for calculating the fair market value of her membership interest in ECH.  Accordingly, Defendants' request to preclude Cramton from making that argument at trial, as a sanction under Rule 37 based on untimely disclosure, will be denied.

The parties should note, however, that this is only a ruling about the timing and adequacy of Cramton's disclosure efforts.  The parties' briefs also contain some discussion of a substantive issue—whether the March 2018 Kahala sale may, as a matter of Arizona law, function as a proxy for the fair market value of Cramton's membership interest at the time she was deprived of it.  (Doc. 320 at 9-11 [Cramton: "There is no better evidence of the fair market value for the Units than the heavily negotiated sale between Kahala and

---

[5]    In her response to Defendants' motion for summary judgment, Cramton made various statements that suggest she is seeking a portion of the sale proceeds.  (*See, e.g.,* Doc. 159 at 15 ["Cramton was not paid any portion of the sale proceeds, as would be required under the Operating Agreement if she still owned the Units."].)  Although the imprecision of these statements is unfortunate, Cramton clarified beforehand (through her MIDP disclosures) and afterward (through the final pretrial order and her response to Defendants' motion to exclude) that she is not seeking a portion of the sale proceeds.  These inaccurate statements did not, as Defendants assert, provide the "foundation for the Court's analysis in its summary judgment order allowing Counts VII, IX, and X to survive."  (Doc. 321 at 7.)  As discussed in more detail in Part IV *infra*, Defendants did not move for summary judgment based on the invalidity of Cramton's damages theory.

[ECH]. And, in fact, there is no other evidence of the fair market value of the Units other than what Kahala agreed to pay and what [ECH] agreed to take for substantially all of its assets."]; Doc. 321 at 13-16 [Defendants: "No credible valuation expert would testify that there is any willing buyer anywhere in the world that would pay nearly $500,000 for a privately held minority interest in ECH units subject to a $1 buyout right [unless the holder continued working through November 2021] . . . . Without an expert, Plaintiff is unable to prove an indispensable element of damages, *i.e.,* the value of the contingent ECH units she held at the time of the purported misrepresentation."].)

Although this briefing may prove useful during later stages of this case, the substantive merit of Cramton's damages theory is not properly before Court at this time. Neither party moved for summary judgment on the adequacy of Cramton's damages theory and the Court only authorized supplemental briefing on the narrow issue of whether either side should, under Rule 37, be precluded from presenting damages-related evidence and argument at trial due to untimely disclosure. Because Cramton timely disclosed her theory, she will not be precluded from presenting it. Whether that theory is legally sufficient is a different question for a different time.

### 3. *Emotional distress damages*

Defendants argue that Cramton's claim for emotional distress damages is improper because (1) this category of damages was not timely disclosed and (2) Arizona law does not recognize this category of damages for economic torts. (Doc. 321 at 10.)

Defendants' disclosure-related objection lacks merit. The amended complaint includes a claim for "damages for Cramton's emotional distress." (Doc. 88 at 17.) Cramton also identified her psychiatrist as a witness in her second supplemental MIDP disclosure, which stated that the psychiatrist had "knowledge regarding . . . Ms. Cramton's emotional distress damages." (Doc. 325 at 14-15.) Finally, although Cramton didn't add emotional distress damages to the damage computation set forth in her MIDP disclosures, many courts in the Ninth Circuit have held that the failure to include emotional distress damages in a damage computation is not grounds for exclusion under Rule 37. *See, e.g.,*

*Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586, 593 n.1 (D. Nev. 2011) (agreeing that "Rule 26(a)(1)(A)(iii) does not require a computation of general damages for pain and suffering or emotional distress because such damages are subjective and do not lend themselves to computation"); *Creswell v. HCAL Corp.*, 2007 WL 628036, *2 (S.D. Cal. 2007) (same); *Maharaj v. California Bank & Tr.*, 288 F.R.D. 458, 463 (E.D. Cal. 2013) (same, but noting that a failure to request a specific dollar figure prevents a plaintiff from requesting a specific amount of emotional distress damages at trial). *See also Williams v. Trader Publishing Co.*, 218 F.3d 481, 486 & n.3 (5th Cir. 2000) (declining to resolve "whether assigning a dollar figure to emotional distress damage without previously disclosing the figure is in contradiction to Rule 26" but noting that "[s]ince compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)"). The bottom line is that Defendants have long been on notice that Cramton is seeking emotional distress damages in this case.

As for Defendants' argument that Cramton's claim for emotional distress damages fails as a matter of Arizona law, that issue is not properly before the Court. Again, the sole issue on which the Court solicited supplemental briefing was whether either side should be barred from seeking a particular category of damages at trial as a Rule 37 sanction for late disclosure. Defendants cannot use a Rule 37 motion as a backdoor attempt to seek summary judgment on a timely disclosed category of damages. Whether Cramton's claim for emotional distress damages will survive a motion for directed verdict is, again, a different issue for a different time.

### 4.    *Minimum wage damages*

Defendants argue that, because Cramton's MIDP disclosures did not include an assertion that she worked 60-80 hours per week, she should be precluded from making such a claim at trial for purposes of her minimum wage claim. (Doc. 321 at 11.) Cramton responds that Defendants made the same argument after she submitted her motion for summary judgment, at which point they were allowed to reopen her deposition. (Doc. 325

- 11 -

at 8-9.)

Here, Defendants are seeking to use Rule 37 as a "procedural weapon" to achieve "a tactical litigation advantage." *Excel Fortress Ltd. v. Wilhelm*, 2019 WL 2503684, *4 (D. Ariz. 2019). Defendants previously took issue with the timing of Cramton's assertion that she worked 60-80 hours per week. (Doc. 136 at 5-6.) In an effort to eliminate any prejudice arising from this late disclosure, the Court allowed Defendants to reopen Cramton's deposition so they could explore the basis for her expanded estimate of hours worked. (Doc. 175 at 2-3.) If the remedy of additional deposition time was insufficient, Defendants had the responsibility to raise a timely objection rather than lying in wait and complaining on the eve of trial.

### 5. *"Other" new theories*

Defendants argue that "all sorts of new false and previously undisclosed statements were made" by Cramton during the Final Pretrial Conference. (Doc. 321 at 12.) However, most of the allegedly false statements, which Defendants have attempted to summarize in a chart attached to their motion (Doc. 321-1 at 135-37), concern Cramton's "sale proceeds" theory, which Cramton has clarified she will not be pursuing at trial.

Defendants also take issue with Cramton's statement that she was "not aware" of the requirement in the ECH Operating Agreement that she had to work for Defendants for five years. (Doc. 321-1 at 136-37.) The contours of this argument are not entirely clear, but it appears to constitute an objection to the whole of Cramton's lawsuit and a request for dismissal of all claims. The Court declines to revisit its summary judgment order on these murky grounds.

### C. **Cramton's Motion**

Cramton asks the Court to "prohibit Defendants from presenting any evidence or argument at trial that: (1) the sale of [ECH] or its assets yielded no proceeds; (2) Plaintiff's remedy is limited to a return of her membership interest; or (3) that the fair market value of Plaintiff's membership interest is subject to any offsets or any adjustments from 18.6% of the Kahala purchase price." (Doc. 320 at 15.)

1

### 1.   *No Distribution of Kahala Proceeds*

2      As for Cramton's first argument, it's not clear why the nature of the sale to Kahala,

3   and whether it resulted in the distribution of proceeds to any individuals holding a

4   membership interest in ECH, would be relevant at trial.  As discussed above, Cramton is

5   not seeking and cannot seek a portion of the sale proceeds.  Instead, Cramton seeks to argue

6   that the sale to Kahala serves as a proxy for the fair market value of her membership interest

7   in ECH at the time it was wrongfully taken from her.

8      To the extent this information still matters, the record paints a complicated picture

9   concerning the adequacy of Defendants' disclosure efforts.  On the one hand, in a letter to

10   Cramton's counsel dated October 1, 2018, Defendants' then-counsel stated that Cramton

11   merely "owned her units, not the asset sale proceeds," that "[u]nder Section 3.6 of the

12   Operating Agreement, Capital Proceeds may be distributed but only in the discretion of the

13   Majority of the Members," and that "*Keely did not consider or make any such distribution*."

14   (Doc. 327-1 at 102, emphasis added.)  A few weeks later, Defendants' then-counsel wrote

15   a follow-up letter to Cramton's counsel reiterating that "[b]ecause it was an asset sale[,]

16   the 18.6% ownership interest does not evaporate on sale assuming Cramton retained her

17   interest" and "[t]he cash does not go directly to Cramton but to the Company."  (Doc. 327-

18   1 at 105.)  As these letters make clear, Defendants *did* inform Cramton that the sale to

19   Kahala was an asset sale and the resulting proceeds were never distributed to ECH's

20   members.

21      On the other hand, there is no evidence that Defendants ever reiterated these

22   assertions in their MIDP disclosures, which is where they were required to identify all of

23   the facts and legal theories underlying their defenses.  *See* D. Ariz. G.O. 17-08 ¶ B(4).

24   Unlike informal letters, MIDP disclosures "must be signed under oath by the party" and

25   must be "signed under Rule 26(g) by the attorney."  *Id.* ¶ A(3).  There is a strong argument

26   that alluding to a fact in a letter exchanged between counsel during the early stages of a

27   case, but never reiterating or verifying that fact in a party's Rule 26 disclosures, MIDP

28   disclosures, discovery responses, or deposition testimony, is insufficient to satisfy a party's

disclosure obligations under the MIDP.[6]

The facts of this case underscore why this approach was unfortunate.  During the summary judgment hearing in December 2019, defense counsel stated that none of the Kahala sale proceeds had ever been distributed to ECH's members.  This announcement caught the Court and Cramton's counsel by complete surprise, prompting defense counsel to seemingly concede that it hadn't previously been disclosed:

> **Court**:  Let me understand that better.  Because the way I understood the evidence was, in March or somewhere thereabout in 2018, the sale went through for 2.6 odd million dollars.  So you're saying that none of that money has yet been wired?
>
> **Defense counsel**: Absolutely.  It has all been – the only payouts, as I understand it – and I've gone over this, so the representation I am making based upon the authority that I've been given is that the only payout that could possibly have been made which would inure to the benefit of Keely Newman and Miss Cramton is, the company decided to pay the taxes for those people who would show a paper profit and might have to pay taxes as a result of the sale.  But because Miss Cramton did not show the paper profits, she did not have to pay taxes.  But the sale terms were such that nobody is allowed to liquidate their shares. No cash payment has been made to members of –
>
> **Court**: Am I just forgetting something in the volume of papers?  I've never heard this before. Is this in the papers anywhere?
>
> **Defense counsel**: This is not in the papers. . . .
>
> **Court**: . . . I [need] to decide cases based on the things that are briefed to me.  And this is – I've never heard any of this before.
>
> **Defense counsel**: Well, Your Honor, I was not the person that was around when these were being drafted.

---

[6]     Paragraph A(8) of the General Order 17-08, which addresses the supplementation of MIDP disclosures, provides that "[i]f new information is revealed in a written discovery response or a deposition in a manner that reasonably informs all parties of the information, the information need not be presented in a supplemental response."  Although this provision recognizes that some MIDP-complaint disclosures may occur in relatively informal formats, Defendants cannot rely on this provision here—the October 2018 letters were not "written discovery response[s]" or "deposition[s]" and the no-distribution-of-proceeds information was not "new," as it was presumably known to Defendants at the time they prepared their initial MIDP disclosure in April 2018 (Doc. 48).

(Doc. 256 at 79-80.)   Later, defense counsel clarified that "I got this information this morning," which prompted Cramton's counsel to express concerns over the untimeliness of the disclosure.  (*Id.* at 83.)

As it turns out, defense counsel's seeming concession of a late disclosure was inaccurate—predecessor counsel *had* disclosed the absence of a distribution in October 2018, via the two letters discussed above.  The question, then, is whether this informal disclosure effort was adequate under Rule 26 and the MIDP.

In the Court's view, it was insufficient.  One of the MIDP's purposes is to avoid surprise at trial by providing fair notice to each side of the facts and theories underlying the other side's claims and defenses.  Although the Court is unprepared to say that an informal disclosure of facts, accomplished via correspondence between counsel, can never suffice, it is apparent that the October 2018 letters in this case failed to alert Cramton that Defendants would be relying on the absence of distributions as one of the facts supporting their defense.  *Cf. Contech Stormwater Solutions, Inc. v. Baysaver Techs., Inc.*, 534 F. Supp. 2d 616, 624-25 (D. Md. 2008) ("The defendants' initial response failed to adequately provide notice of the basis of the claims . . . [and] defendants, quite simply, failed to supplement their bare boned initial response in a timely fashion in order to permit Contech to formulate a proper defense. . . .  A party is thus not required to plan a defense based on all possible documents or information presented during depositions, but rather must be adequately informed by the opposing party . . . which facts, theories, and documents will likely be relied upon at trial.").

This finding of inadequate disclosure means that, under Rule 37(c)(1), Defendants must be precluded from introducing any evidence at trial concerning the non-distribution of the Kahala sale proceeds "unless the failure was substantially justified or is harmless."  Here, both potential exceptions present a close call.  As for substantial justification, although Defendants should have done a better job of disclosing to Cramton that the Kahala transaction didn't result in the distribution of any proceeds to ECH's members, this fact still was disclosed (albeit via an informal letter instead of via a verified MIDP disclosure).

As for harmlessness, Cramton's clarification that she isn't seeking to collect a portion of the Kahala sale proceeds—instead, she seeks to rely on the Kahala sale as a measure of the fair market value of her membership interest—makes it unclear why it even matters whether the sale proceeds were ultimately distributed to ECH's members.

Given this backdrop, a fair resolution would be to preclude either party from introducing evidence or argument at trial concerning the distribution (or lack thereof) of the Kahala sale proceeds. This information is likely irrelevant, and at a minimum poses significant Rule 403 concerns, in light of Cramton's clarification that she is not seeking a portion of the sale proceeds. And because this information will be excluded for other reasons, there is no need to reach whether Defendants should be precluded from introducing it as a discovery sanction under Rule 37.

2.      *Return Of Membership Interest*

Cramton next seeks to preclude Defendants from arguing that her "remedy is limited to a return of her membership interest." (Doc. 320 at 15.)

This argument is unavailing. Defendants not only disclosed this theory in one of the October 2018 letters[7] but also repeated it in a supplemental MIDP disclosure provided on January 4, 2019, which was within the discovery period (Doc. 86). In that disclosure, Defendants stated that "[u]nder no circumstances, even wrongful termination, does the Operating Agreement require that the terminated member be bought out," that "Keely Newman and ECH did not . . . elect to buy Kim Cramton out," and, "[t]hus, even if Kim Cramton was constructively discharged, . . . *the only potential remedy available to Plaintiff is that Kim Cramton would continue to hold her ownership interest in ECH*." (Doc. 327-1 at 83-84, emphasis added.) Because this theory was timely set forth in an MIDP disclosure, Defendants will not be precluded from advancing it at trial.

…

---

[7]      Specifically, the October 1, 2018 letter stated that "[e]ven assuming you could win under your argument . . . the most [Cramton] would gain would be the right to retain her membership units." (Doc. 327-1 at 102.)

3.     *Fair Market Value Is Less Than 18.6% of Kahala Sale Price*

Last, Cramton seeks to preclude Defendants from presenting any evidence or argument "that the fair market value of Plaintiff's membership interest is subject to any offsets or any adjustments from 18.6% of the Kahala purchase price."  (Doc. 320 at 15.)

This argument presents a close call.  On the one hand, Defendants did disclose this theory in the October 2018 letters.  In the first letter, Defendants' then-counsel took issue with Cramton's valuation methodology, explaining that Cramton's "pro rata analysis of 18.6% of the sale price" was "inaccurate" because it failed to "tak[e] into account a discount for lack of control and a private minority interest,"  which "may be as high as 70%."  (Doc. 327-1 at 102.)  The first letter further stated that "[a] fair market analysis . . . would also [need] to take into account the liabilities and transaction costs left after an asset sale" and "[t]his valuation would [need to be] determined at the time of [Cramton's] resignation, not based on a sale price occurring six months later."  (*Id.*)  The first letter concluded that, after applying these discounts, the fair market value of Cramton's membership interest "may be as low as $126,450, less liabilities."  (*Id.* at 103.)  Meanwhile, in the second letter, Defendants reiterated their position that Cramton's membership interest was subject to "up to a 70% discount on a fair market value appraisal based on a lack of marketability and holding a minority interest," "leading to the number $126,450 by applying simple math," and encouraged Cramton to "verify such discounts by contacting a business valuation consultant."  (*Id.* at 105.)

On the other hand, Defendant have not presented any evidence that they reiterated this theory in their MIDP disclosures.  Nor have Defendants disclosed any witness who will testify about how to calculate the fair market value of Cramton's membership interest (or why such a valuation would need to include discounts based on a lack of control, minority interest, and liabilities and transaction costs).  As discussed in Part I.C.1 above, it is difficult to see how this approach could be deemed compliant with the MIDP's disclosure requirements.

This disclosure failure was not substantially justified or harmless.  Although

Defendants' failure to properly disclose the non-distribution of the Kahala sale proceeds can be understood (if not totally justified) in light of this fact's questionable relevance, the same cannot be said with respect to Defendants' theory of valuation concerning Cramton's membership interest in ECH.  This is one of the key issues in the case.

Cramton argues that, as a sanction for this disclosure failure, Defendants should be precluded from presenting any lay or expert testimony at trial concerning why her membership interest should be valued at something less than 18.6% of the Kahala sale price.  (Doc. 338 at 6 ["Given that [former defense counsel] has not been disclosed as an expert and Defendants have not disclosed any 'business valuation consultant' as an expert witness, these [October 2018] letters are of little import. . . .  [T]his type of business valuation analysis involving marketability and minority discounts must be introduced through qualified expert testimony."]; *id.* at 9 ["Defendants' damages theories would require specialized analysis that cannot be introduced by a lay witness."].)  The Court agrees.  Defendants have not identified any witnesses who might testify on these topics and the time for disclosure has long expired.

This ruling, however, leaves some questions unresolved.  Cramton has not disclosed any of her own witnesses, lay or expert, to testify about how to value her ECH membership interest.  It appears her plan is to simply introduce evidence concerning the terms of the Kahala sale and then have her attorneys attempt to explain, in closing argument, why those terms are sufficient to establish the fair market value of her membership interest.  Defendants argue in their motion papers, with some force, that such evidence will be insufficient as a matter of law to meet Cramton's burden of proof.  Defendants also contend that, irrespective of the adequacy of their disclosure efforts, they retain the right to challenge the sufficiency of Cramton's evidence.  (Doc. 327 at 9 ["Rule 37 does not apply here because . . . the General Order does not require the Defendants to set forth how Plaintiff is unable to carry her burden of proof with respect to essential elements of her claims, and . . . Plaintiff's inability to prove essential elements of her claims is not a defense, it's a failure by Plaintiff to prove her case."].)

The Court agrees with this argument.  Although Cramton seeks to blame Defendants for her decision not to hire a valuation expert (Doc. 338 at 9 ["Cramton has not been able to conduct discovery on these defense theories, nor can she now retain an expert to rebut them . . . ."], this amounts to impermissible burden-shifting.  As the plaintiff, Cramton bears the ultimate burden of proving she was damaged by Defendants' conduct.  Notwithstanding that burden, she chose not to retain an expert to explain how to value her ECH membership interest.  Thus, although Defendants will not be allowed to introduce witness testimony concerning why the fair market value of that membership interest must be discounted, they will be allowed to challenge the legal sufficiency of Cramton's evidence.  Cramton has not identified any authority suggesting that Rule 37 sanctions may include the forfeiture of a defendant's ability to seek a directed verdict.

## III.   Motion To Strike Jury Demand

Defendants move to strike Cramton's jury demand because two different agreements—ECH's Operating Agreement and the promissory note between Cramton and ECO—contain jury waiver provisions.  (Doc. 322.)  Cramton responds that (1) Defendants "waived" the ability to enforce the jury waivers, (2) the waivers are unenforceable, and (3) the waivers don't cover all claims or apply to all Defendants.  (Doc. 324.)

### A.   **Legal Standard**

Rule 39(a) of the Federal Rules of Civil Procedure provides that when a party has properly made a jury demand, "[t]he trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial."  One way a party may lose its right to a jury trial is through a contractual jury waiver.  Under federal law, such waivers are enforceable "as long as each party waived its rights knowingly and voluntarily."  *In re Cty. of Orange*, 784 F.3d 520, 523 (9th Cir. 2015).[8]  As one court has observed: "Agreements waiving the right to trial by

---

[8]     The Ninth Circuit has clarified that "*Erie*'s federalism principle requires federal courts sitting in diversity to import, as the federal rule, state law governing jury trial waivers where . . . state law is even more protective than federal law of the jury trial right."  *County of Orange*, 784 F.3d at 524.  This principle doesn't require the application of a

jury are neither illegal nor contrary to public policy." *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir. 1988).

B.   "**Waiver" Of The Jury Waivers**

Cramton argues that Defendants "waived" the right to seek enforcement of the jury waivers because (1) "Defendants never affirmatively moved to strike [her] jury demand or raise the issue until two and a half years into this lawsuit" and (2) Defendants did not contest her demand for a jury trial in their original answer or in the parties' Rule 26(f) report.  (Doc. 324 at 3, 5.)  Defendants respond that (1) they have sought to enforce the jury waivers since their answer to Cramton's amended complaint, (2) there's no deadline for filing a motion to strike a jury demand, and (3) they should not be held to the representations in the Rule 26(f) report because Cramton's position has also shifted since the early stages of the case.  (Doc. 331 at 1-3.)

As an initial matter, although Cramton frames her argument as a "waiver" claim, it also has elements of a claim of forfeiture or estoppel.  Courts must take care not to conflate these theories.  *See generally United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (quotation omitted); *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 n.6 (11th Cir. 2014) ("It is important to note the difference between three related, but distinct, legal principles: forfeiture, waiver, and estoppel. . . .  Estoppel requires detrimental reliance and exists when the conduct of one party has induced the other party to take a position that would result in harm if the first party's acts were repudiated.") (quotation omitted).

On the merits, the parties have not cited, and the Court's research has not uncovered, any Ninth Circuit precedent addressing the circumstances under which a party may be said to have forfeited or waived its ability to enforce a contractual jury waiver or be estopped

different standard here because Arizona law is not more protective than the federal standard.  *See, e.g., Vintage Farms, LLC v. Armed Forces Bank NA*, 2017 WL 2775027, *2 (D. Ariz. 2017) ("Arizona law . . . is arguably less protective than the federal constitutional minimum.  Accordingly, the federal standard governs.") (citation omitted).

from enforcing such a waiver.  Other Circuits have reasoned that because Rule 39(a)(2) permits a court to strike a jury demand *sua sponte* and provides no deadline for filing a motion to strike, a party may move to strike a jury demand at any time before trial.  *See, e.g.*, *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226 (3d Cir. 2007) ("Because a party may file a motion to strike a jury demand at any time under Rule 39(a), we conclude that DaimlerChrysler did not commit inexcusable delay by filing its motion to strike after the close of discovery."); *United States v. Schoenborn*, 860 F.2d 1448, 1455 (8th Cir. 1988) (affirming grant of motion to strike jury demand where motion was filed "[o]ne week before trial").  *See generally* Jarod S. Gonzalez, *A Tale of Two Waivers: Waiver of the Jury Waiver Defense Under the Federal Rules of Civil Procedure*, 87 Neb. L. Rev. 675, 689 (2009) ("[T]he prevailing view is that, whatever the ground to strike the jury demand, parties may wait until the eve of trial to move to strike a jury demand.").  Indeed, the First Circuit, although "bothered by the lack of notice to the parties and any discussion with the parties by the court prior to its ruling," has upheld a district court's *mid-trial* decision to refuse to allow a jury to adjudicate some claims.  *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 185-88 (1st Cir. 2000).

Given this backdrop, Defendants did not forfeit their ability to oppose Cramton's jury demand by waiting too long to seek relief.  Although the timing of their request was unfortunate—Defendants did not seek to strike Cramton's jury demand until May 2020, 16 months after the close of discovery, when Defendants raised the issue in the parties' joint proposed pretrial order (Doc. 303 at 127-29)—the Court had not yet set a trial date at the time of the request and the scheduling order did not set a deadline for filing a motion to strike a jury demand.  Because Rule 39 does not create its own deadline for filing such a motion, Defendants' request was sufficiently timely.

Cramton next contends that Defendants "waived" their ability to oppose her jury demand because they "did not object . . . in their initial Answer."  (Doc. 324 at 5.)  This argument lacks merit.  Defendants' answer to the original complaint became a nullity when Cramton filed an amended complaint and Defendants filed a new answer to that pleading.

*Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992) ("[A]n amended pleading supersedes the original pleading. . . .  [A]fter amendment the original pleading no longer performs any function and is treated thereafter as non-existent . . . .") (quotations omitted). In the new answer, which is Defendants' operative pleading, Defendants expressly objected to Cramton's jury demand.  (Doc. 95 at 21 ¶ 177.)

Cramton also contends that Defendants "waived" their ability to oppose her jury demand because the parties' Rule 26(f) report, which was filed in April 2018, stated: "The Parties have requested a jury trial and it is uncontested."  (Doc. 50 at 10.)  But the Rule 26(f) report was filed before Cramton filed her amended complaint (Doc. 88) and Defendants filed their new answer (Doc. 95), which, again, made clear that Defendants were opposing her jury demand.  Thus, Cramton had notice throughout the discovery process of Defendants' position.  Additionally, the point of the Rule 26(f) report was simply to assist the Court in creating a scheduling order.  The presence or absence of a jury demand was not discussed during the Rule 16 conference and seemed to have no bearing on the Court's formulation of a schedule.[9]  Under these circumstances, it cannot be said that the passing reference to a jury trial in the Rule 26(f) report amounted to a waiver by Defendants.

Nor should Defendants be estopped from opposing Cramton's jury demand. Although Cramton suggests that Defendants' conduct "effectively preclud[ed]" her from "engaging in discovery" pertaining to the enforceability of the jury waivers (Doc. 324 at 6-7), this argument overlooks that Defendants' operative pleading, which was filed well before the close of discovery, raised an explicit objection to her jury demand.  There is no evidence that Defendants did anything after filing this pleading to suggest that Cramton's jury demand was uncontested.  It is regrettable that Cramton may have misapprehended the significance of Defendants' operative answer, but Defendants did not engage in the sort of affirmative deception required to trigger estoppel.  *Witt*, 772 F.3d at 1279 n.6 ("Estoppel

---

[9]      This case was assigned to a different judge at the time of the Rule 16 conference. (Doc. 82.)

requires detrimental reliance and exists when the conduct of one party has induced the other party to take a position that would result in harm if the first party's acts were repudiated.") (quotation omitted).

## C. **Enforceability Of The Waiver**

As noted, contractual jury waivers are enforceable under federal law "as long as each party waived its rights knowingly and voluntarily." *County of Orange*, 784 F.3d at 523. District courts in the Ninth Circuit commonly consider the following factors when assessing whether a waiver was knowing and voluntary: "(1) whether there was a gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had an opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was inconspicuous." *Phoenix Leasing Inc. v. Sure Broad., Inc.*, 843 F. Supp. 1379, 1384 (D. Nev. 1994) (citation omitted). Although "[t]here is a split among the circuits regarding which party has the burden of proving these factors," and the Ninth Circuit has not spoken on this issue, district courts within the Ninth Circuit typically "plac[e] the burden of proof on the party seeking to enforce the waiver" because this approach "is most in keeping with the strong presumption against the waiver of this Seventh Amendment right." *Breham v. Asset Acceptance, LLC*, 2010 WL 1735147, *2 (D. Ariz. 2010). *See also Phoenix Leasing*, 843 F. Supp. at 1384 ("The [Fourth Circuit] placed the burden on the party seeking enforcement of a prelitigation contractual waiver to prove that consent to the waiver was voluntary and informed. An informal survey indicates the majority of courts having considered this question followed [that] approach . . . .") (citations omitted).

### 1. *Gross disparity in bargaining power*

Defendants argue that, if anything, the bargaining-power factor cuts in their favor because Cramton had more leverage than Keely when the two of them were negotiating the ECH Operating Agreement. (Doc. 322 at 3-4.) Specifically, Defendants contend that Keely was forced to create the Operating Agreement in the face of difficult personal circumstances ("attending to her spouse's [terminal] illness and assuming primary care of

two 6-year old children") that were "well known" to Cramton and that the primary purpose of the Operating Agreement was to ensure Cramton's retention as an employee in light of Keely's circumstances.  (Doc. 322 at 3-4.)  Defendants did not, however, attach any evidence to their motion in an attempt to corroborate these factual assertions.[10]  In response, Cramton argues that the documents in question were presented to her in final form without the chance for negotiation, she did not take Keely's spouse's illness into account, and Defendants have not produced any actual or admissible evidence that she had any bargaining power.  (Doc. 324 at 9.)  In support of these contentions, Cramton submits various pieces of evidence, including a declaration in which she avers that "[n]either the [ECH Operating Agreement] nor the [ECO promissory note] were jointly created documents.  I had no involvement in their creation . . . [and] was also unable to negotiate any aspect of [the two documents].   In fact, with respect to the [ECH Operating Agreement], when presented with the document I was told what my interest in the business would be and the form it would take."  (Doc. 324-4 ¶ 12.)

In general, the bargaining-power "factor does not require that the parties stand on precisely equal footing."  *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1058 (N.D. Cal. 2013) (quotations omitted).  Courts have indicated a "gross disparity" may exist where the party seeking to avoid enforcement of the waiver was "compelled to accept . . . whatever terms it was offered" or was in "difficulty or some form of duress."  *Phoenix Leasing*, 843 F. Supp. at 1385.  Courts are less likely to find a gross disparity when a party "could have walked away from the deal."  *Cannon*, 917 F. Supp. 2d at 1059.

---

[10]      Defendants submitted an array of evidence with their reply, including a declaration from Keely.  (Doc. 331-1.)  This is improper.  "The Ninth Circuit has held that arguments raised for the first time in a reply are waived.  District courts have interpreted this rule to apply to evidence as well."  *Kruszka v. Toyota Motor Corp.*, 2011 WL 9820198, *3 (C.D. Cal. 2011) (citation omitted).  And although a party "may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition," *TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1 (D. Ariz. 2014), the evidence submitted by Defendants is not rebuttal evidence—it is evidence offered in belated support of the factual assertions raised in Defendants' motion.  Accordingly, the Court will not consider this evidence for purposes of evaluating Defendants' motion.

The analysis here is complicated, as an initial matter, by Defendants' failure to submit any evidence in support of their motion. The only evidence properly before the Court is the material attached to Cramton's response, which suggests that Cramton was presented with both documents on a take-it-or-leave-it basis. This is not usually the hallmark of negotiation between two parties with relatively equal bargaining power.

Nevertheless, the circumstances of this case aren't remotely similar to the type of circumstances in which other courts have found a gross disparity of bargaining power, such as where a large, multi-national corporation includes a jury waiver in a standard contract presented on a take-it-or-leave-it basis to a large swath of individuals[11] or where "a multi-national, publicly traded manufacturing and distribution conglomerate with 2016 revenues approaching one billion dollars" includes a one-sided jury waiver in its contract with "a local, family-owned and operated tile retailer" that "remained at all times entirely dependent on continued supply from [the large company] to remain in operation."[12] Here, Cramton was a corporate executive earning a six-figure salary (*see* Part II.C.2 *infra*), the purpose of the ECH Operating Agreement was to give her a substantial ownership share in a closely held business, and she was the *lender* under the ECO promissory note, not the borrower. These are not the type of arrangements that typically lend themselves to a finding of a gross disparity of bargaining power. *See generally Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*, 56 F. Supp. 2d 694, 709 (E.D. La. 1999) ("To invalidate a waiver provision, . . . the bargaining differential must be the kind of 'extreme bargaining disadvantage' or 'gross disparity in bargaining position' that occurs only in certain exceptional situations."). Tellingly, each jury waiver applies bilaterally, binding all parties

---

[11] *See, e.g., Dreiling v. Peugeot Motors of Am., Inc.*, 539 F. Supp. 402, 403 (D. Colo. 1982) ("A constitutional guarantee so fundamental as the right to jury trial cannot be waived unknowingly by mere insertion of a waiver provision on the twentieth page of a twenty-two page standardized form contract. . . . The 1978 Agreement appears to be Peugeot's standardized printed dealer contract, drafted by Peugeot. Obviously, the plaintiffs had little, if any, opportunity to negotiate the provisions.").

[12] *Servicios Comerciales Lamosa, S.A. de C.V. v. De la Rosa*, 328 F. Supp. 3d 598, 622 (N.D. Tex. 2018) (internal quotation marks omitted).

equally.

The bottom line is that, although Defendants' evidentiary failures prevent them from showing that the bargaining-power factor cuts in their favor, it does not cut in Cramton's favor either.  At most, it is neutral.

### 2. *Cramton's business acumen*

Defendants argue that Cramton was an experienced businesswoman because of her long tenure in the restaurant industry, her high rate of pay, the many contracts she negotiated (some of which contained jury waivers), and the fact she routinely sought the advice of her attorneys when making decisions concerning contracts.  (Doc. 322 at 4-5.) Although Defendants again fail to submit any evidence in support of these assertions, they do cross-reference a pair of documents that were filed during earlier stages of the case.  The first cross-referenced document is the amended complaint, in which Cramton alleged that she "is experienced in the franchising business, with years of history in opening and starting new franchises," that she was "successful in [her] role [with Defendants], such that throughout her career with Defendants, she sold approximately 100 new stores and signed 174 agreements to develop," and that she was "eventually promoted . . . to the role of Executive Vice President of Operations & Franchise Development," which carried an annual salary of $135,000.  (Doc. 88 at 4.)  The second cross-referenced document is a declaration that Cramton filed at the summary judgment stage.  (Doc. 173-2 at 56 ¶ 2.)[13]  It states that "[p]rior to joining Grabbagreen, I had experience in the franchising industry with Cold Stone Creamery, Subway, and Wendy[']s."  (*Id.*)

In response, Cramton submits evidence that she did not graduate from college (Doc. 324-4 ¶¶ 1-2) and accuses Defendants of overstating her experience with respect to the negotiation of contracts.  (Doc. 324 at 9-10.)

Jury waivers will be enforced against "well-educated and industrious individuals

---

[13]    This document is identified in Defendants' motion as "Dkt. 159-3, at 56:1-2," but that document was stricken from the record.  (Doc. 167.)  It was later refiled at Doc. 173-2 at 56.

who have shown an appreciable level of sophistication in business transactions." *Aventa Learning, Inc. v. K12, Inc.*, 2011 WL 13100747, *2 (W.D. Wash. 2011) (internal brackets, quotation, and ellipses omitted). *See also Phoenix Leasing*, 843 F. Supp. at 1385 (finding waiver effective where the party opposing waiver was "not a novice but was in fact experienced, professional and sophisticated in business dealings" and "it [could] not be said that [the party] was anything less than competent, and fully able to look out for its interests").

Here, although Cramton lacks a college degree and Defendants did not submit any evidence showing that she was represented by counsel during the negotiations at issue, the amended complaint establishes that she has decades of experience in restaurant franchising and management and eventually rose to a high-ranking executive position that carried a six-figure salary. It would be bizarre to conclude that such an individual is too unsophisticated to be bound by a contract she signed (particularly a contract granting her a 18.6% ownership interest in a closely held entity or a contract memorializing the terms of a $66,527 loan she made to others). This factor weighs strongly in favor of enforcement.

### 3. *Opportunity to negotiate*

Defendants assert, in a portion of their motion lacking any evidentiary citations, that Cramton had the opportunity to negotiate the agreements at issue because she negotiated other agreements with Defendants, often with the aid of counsel. (Doc. 322 at 5-7.) Cramton responds that she did not have the opportunity to negotiate the terms of the Operating Agreement, that Defendants have not presented any evidence of actual negotiation, and that "every attempt made by Plaintiff to negotiate any documents affecting her ownership interest were summarily reject[ed] by Keely." (Doc. 324 at 9, 11-12.)

Defendants' failure to submit any evidence precludes them from meeting their burden of proof with respect to the opportunity-to-negotiate factor. Their effort to shift the burden to Cramton—"Plaintiff offers no written evidence that Keely Newman or Kelli Newman refused to negotiate the ECH Operating Agreement, nor any explanation as to why this agreement would be non-negotiable when no others were non-negotiable" (Doc.

331 at 5)—is improper because they bear the burden of proof.  Accordingly, this factor weighs in Cramton's favor.

### 4. *Conspicuousness of the waiver*

Defendants argue the jury waivers are conspicuous because each appears in a separate paragraph in all capital letters.  (Doc. 322 at 7.)  Cramton's only response is that conspicuousness is not enough to overcome an otherwise inequitable provision.  (Doc. 324 at 12.)

A jury waiver is not considered conspicuous if it is "hidden or buried deep in the contract." *Cannon*, 917 F. Supp. 2d at 1058.  When assessing conspicuousness, courts look to whether the waiver is clearly labeled under a separate heading, what kind of font was used, and where the waiver was placed within the contract.  *Id.  See also Aventa Learning*, 2011 WL 13100747 at *3; *Breham v. Asset Acceptance, LLC*, 2010 WL 1735147, *2 (D. Ariz. 2010).

Here, the jury waivers were conspicuous.  The provision in the ECH Operating Agreement is written in capital letters and appears under a separate heading.  (Doc. 324-2 at 38-39.)  The provision in the ECO promissory note is separately labeled, is written in capital letters, and is located immediately above the signature block.  (Doc.  324-1 at 3.)  Cramton doesn't seem to dispute these provisions are conspicuous.  (Doc. 324 at 12.) Accordingly, this factor weighs in favor of Defendants.

### 5. *Conclusion*

Although Defendants created a relatively weak record by failing to submit any evidence in support of their motion, they still have met their burden of demonstrating that Cramton "waived [her] rights knowingly and voluntarily" under the ECH Operating Agreement and the ECO promissory note.  *County of Orange*, 784 F.3d at 523.  Cramton is an experienced, high-achieving business executive, the jury waivers are bilateral and conspicuous, and the contracts at issue are not adhesion-style consumer contracts.   Even when "indulg[ing] every reasonable presumption against waiver of the jury trial right," *Lutz v. Glendale Union High School*, 403 F.3d 1061, 1064 (9th Cir. 2005) (quotations

omitted), it cannot be said that Cramton's choice to sign the jury waivers was unknowing or involuntary.

### D.   **Scope Of Waivers**

#### 1.   *ECH Operating Agreement*

The jury waiver provision of the ECH Operating Agreement, to which Cramton, Keely, and ECH are parties, provides as follows:

> No party to this agreement . . . shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon or arising out of this agreement or any of the other agreements or the dealings or the relationship between the parties.  No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot or has not been waived.  The provisions of this section have been fully discussed by the parties hereto, and these provisions shall be subject to no exceptions.  No party hereto has in any way agreed with or represented to any other party hereto that the provisions of this section will not be fully enforced in all instances.

(Doc. 324-2 at 38-39, capitalization omitted.)

According to Defendants, this provision covers all of the remaining, non-stayed[14] claims in this action.  (Doc. 322 at 8-9.)  Specifically, as for Counts Seven, Nine, and Ten (the claims against Keely and ECH for the fair market value of Cramton's membership interest), Defendants argue this provision is applicable because (1) each party seeking enforcement is a party to the Operating Agreement and (2) Counts Seven, Nine, and Ten all constitute claims "based upon or arising out of" the Operating Agreement.  As for Count Four (the minimum wage claim against Keely and GFL), Defendants argue that Keely may seek enforcement because she is a party to the Operating Agreement and, although Count Four is not "based on or arising out of" the Operating Agreement, the waiver is "very broad" and also includes a different clause that encompasses claims (such as minimum wage claims) arising from "the dealings or the relationships between the parties."  Finally,

---

[14]   Defendants don't address whether Cramton has waived her right to a jury trial on Count Five, which is her claim against ECO for breach of the promissory note.  That claim has been stayed due to ECO's bankruptcy.

as for GFL, Defendants argue that (1) it may seek direct enforcement of the Operating Agreement's jury waiver, even though it isn't a party to the Operating Agreement, because it is "a wholly-owned subsidiary of ECH and an alleged co-employer of Keely," and alternatively (2) Cramton cannot seek a jury trial on her claim against GFL because she chose to "consolidate" that claim with her claims against Keely and ECH, thereby triggering the provision of the waiver that "[n]o party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot or has not been waived." (*Id.*)

In response, Cramton argues that, as a matter of law, a contractual jury waiver can only encompass claims "related to the subject matter of the agreement containing the waiver." (Doc. 324 at 3-4.)  Applying this principle, Cramton argues that the minimum wage claim in Count Four isn't covered because it's a statutory claim unrelated to the Operating Agreement or the promissory note.  Cramton also notes that GFL isn't a party to either contract.  As for the remaining claims, Cramton acknowledges that Count Seven (breach of the implied duty of good faith and fair dealing) "is tied to the Operating Agreement" but argues that Counts Nine and Ten (negligent misrepresentation and fraud) are not covered because they are based on misrepresentations and the breach of common law duties, not a breach of the Operating Agreement.

Defendants largely have the better side of these arguments.  The problem with Cramton's position is that the legal premise she seeks to invoke—*i.e.,* contractual jury waivers may only encompass claims related to the "subject matter" of the underlying contract—is illusory.  Cramton cites two district court decisions in support of this alleged principle but neither supports her position.

In *Phoenix Leasing*, the waiver provision was worded differently (and less broadly) than the waiver provision in the ECH Operating Agreement.  It covered "any action brought on or with respect to this agreement . . . or any other agreements executed in connection herewith."  843 F. Supp. at 1388.  After conducting a careful textual analysis of this provision, the court held that it encompassed any claim that "would require reference to,

or . . . relates to or pertains to the loan documents covered by the waiver." *Id. Phoenix Leasing* thus undermines Cramton's position in two different ways.  First, it suggests that courts must conduct a careful analysis of a jury waiver's actual text when assessing the waiver's scope (instead of inflexibly applying Cramton's proposed rule that all jury waivers, irrespective of their wording, are limited to claims "related to the subject matter of the agreement containing the waiver").  Second, it confirms that jury waivers need not be construed as having such a subject-matter limitation—as noted, the waiver provision in that case was deemed broad enough to encompass any claim that would "require reference" to the underlying contract.  Here, Cramton tacitly acknowledges that Counts Nine and Ten will "require reference" to the Operating Agreement because it provides the foundation for her theory of damages.  (Doc. 338 at 2-3 ["It is th[e] undisputed acquisition of Cramton's membership interest that will frame the primary damages dispute at trial.  Cramton contends that Keely Newman's September 18, 2017 misrepresentations caused Cramton to resign.  That allowed Newman to exercise her option [under the Operating Agreement] and buy Cramton's membership units in ECH for $1.00."].)

Similarly, in *Okura & Co. (Am.), Inc. v. Careau Grp.*, 783 F. Supp. 482 (C.D. Cal. 1991), the waiver provision was worded differently (and less broadly) than the waiver provision in the ECH Operating Agreement.  It covered "any action, proceeding or counterclaim arising out of or relating to this Agreement or any of the Operative Agreements or the actions of the Lender in the enforcement thereof." *Id.* at 488.  After conducting a careful, fact-bound analysis of a bevy of different claims, counterclaims, and third-party claims, the court concluded that "the jury waiver provisions . . . are valid and applicable to most of the causes of action alleged in the first amended complaint and first amended counterclaim." *Id.* at 491.  For example, the court concluded that "while the seventh and twelfth causes of action would appear at first blush to be unrelated the financing agreement, they do in fact derive from duties allegedly created by the financing agreement." *Id.* at 490.  However, the court also concluded that a handful of claims and counterclaims fell outside the waiver because they were based upon the alleged breach of

"an independent contract that does not contain a jury trial waiver." *Id.* at 489.  *Okura*, in short, does not support (and, if anything, undermines) Cramton's sweeping claim that all jury waivers, irrespective of their actual wording, must be construed as encompassing only claims that are related to the subject matter of the underlying contract.[15]

For these reasons, Cramton has waived her right to a jury trial with respect to Counts Seven, Nine, and Ten.  Cramton doesn't dispute that Keely and ECH, the parties against whom those claims are asserted, have standing to enforce the Operating Agreement's waiver provision and the Court easily concludes that the broad wording of that provision is capacious enough to encompass Counts Seven, Nine, and Ten.  As noted, the waiver covers not only claims "based upon or arising out of this agreement" but also claims "based upon or arising out of . . . the dealings or the relationship between the parties."  Cramton all but concedes this wording is broad enough to encompass Count Seven and Court concludes it encompasses Counts Nine and Ten, too.  Those claims are "based upon or arising out of" the Operating Agreement because it provides the foundation for Cramton's theory of damages on each claim—she contends that Keely and ECH, through their tortious conduct, improperly deprived her of the membership interest she possessed under the Operating Agreement.  And even those claims weren't "based upon or arising out of" the Operating Agreement, they are based upon "the dealings or the relationship between the parties."

Cramton has also waived her right to a jury trial on Count Four as it applies to Keely.  Again, Keely has standing to enforce the Operating Agreement's waiver provision and, although the substance of Count Four (minimum wages) has nothing to do with the subject matter of the Operating Agreement (which was intended "to provide for continuity and harmony in the management and operation of [ECH]" by "set[ting] forth [the parties']

---

[15]     Cramton also overlooks that the Ninth Circuit has previously upheld, albeit in an unpublished decision, a district court's determination that a plaintiff "waived its right to a jury trial on all its claims" where the operative provision was "broadly worded, and nothing in its text suggests that it is limited to disputes arising under the contract."  *Frontline Processing Corp. v. First State Bank of Eldorado*, 389 Fed. App'x 748, 754 (9th Cir. 2010).

agreements regarding the management of [ECH] and the ownership of the Units," *see* Doc. 324-2 at 2), the Operating Agreement's waiver provision doesn't contain a subject matter limitation—instead, it broadly encompasses all claims "based on or arising out of . . . the dealings or the relationship between the parties." It is hard to understand how a claim that Keely failed to pay minimum wages to Cramton could be characterized as something other than a claim arising out of those parties' "dealings" and "relationship." *Cf. Frontline Processing Corp.*, 389 Fed. App'x at 754.

In contrast, Cramton has not waived her right to a jury trial on Count Four as it applies to GFL. GFL is not a party to the Operating Agreement and the waiver provision in that agreement, by its terms, binds only each "party" and that party's assignee, successor, heir, or personal representative. GFL is not Keely's or ECH's assignee, successor, heir, or personal representative. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1166 (9th Cir. 1996) ("[A] jury waiver is a contractual right and generally may not be invoked by one who is not a party to the contract."). Finally, although the Operating Agreement's waiver includes a clause that prohibits the "consolidation" of an "action" in which a jury trial has been waived with an "action" in which a jury trial has not been waived, no such consolidation occurred here. Defendants' position seems to be that Cramton violated this clause by asserting her claim against GFL in the same action in which she asserted her claims against ECH and Keely, but "consolidation" is a term of art under the Federal Rules of Civil Procedure. It occurs when a court joins two different "actions" due to the presence of common questions of law or fact in each. *See* Fed. R. Civ. P. 42(a). That didn't occur here—Cramton didn't initially file separate actions against GFL and Keely/ECH and then seek to have those two actions consolidated.[16]

…

---

[16]     To the extent Defendants intended for the term "consolidation" in the Operating Agreement's waiver provision to have a different and more colloquial meaning, the Court must do its best to assess the plain meaning of the actual contractual language, not some secret interpretation. At a minimum, the term "consolidation" is ambiguous, and "[u]nlike arbitration clauses, courts generally construe jury waivers narrowly." *Paracor,* 96 F.3d at 1166 n.21.

1

2.      *ECO Promissory Note*

2

The jury waiver provision of the ECO promissory note, to which Cramton and ECO

3

are parties, provides as follows:

4

> The parties acknowledge that the right to a trial by jury is a constitutional

5

> right, but one that may be waived.  After consulting (or having had the
> opportunity to consult) with counsel of their choice, knowingly and

6

> voluntarily, and for their mutual benefit, the parties waive any right to trial
> by jury in the event of litigation regarding the performance or enforcement

7

> of, or in any way related to, this agreement.

8

(Doc. 324-1 at 3, capitalization omitted.)

9

Given the conclusions set forth in Part III.D.1 above, little needs to be said about

10

the scope of this provision.  The Court has already concluded that Cramton waived her

11

right to a jury trial as to all non-stayed claims except for the minimum wage claim in Count

12

Four against GFL.  The waiver in the ECO promissory note doesn't cover this claim—GFL

13

is not a party to the ECO promissory note and a contractual jury waiver  "generally may

14

not be invoked by one who is not a party to the contract."  *Paracor,* 96 F.3d at 1166.

15

E.      **Conclusion**

16

Cramton has waived her right to a jury trial on Counts Seven, Nine, and Ten and on

17

Count Four as to Keely.  She retains her right to a jury trial on Count Four as to GFL.

18

Defendants argue that, given this outcome, the Court should "sever Count [Four]

19

against GFL from the rest of the case to seek a jury trial in that instance alone."  (Doc. 322

20

at 8.)  Cramton argues the Court should "try the case together and consider any non-jury

21

claims . . . as being submitted to the jury on an advisory basis."  (Doc. 324 at 4.)

22

Although both parties' suggestions have merit to them, Defendants' proposal is

23

preferable.  This case is already nearly three years old and the COVID-19 pandemic has

24

made it very difficult to schedule civil jury trials.  Severing Cramton's claim against GFL

25

from the remaining claims, and then scheduling the remaining claims for a bench trial as

26

soon as practicable, will ensure that the resolution of the big-ticket claims in this case isn't

27

delayed any longer than necessary—although Cramton seeks economic damages of nearly

28

$500,000, plus unspecified emotional distress damages, on her claims in Counts Seven,

1   Nine, and Ten, she seeks far less via her minimum wage claim against GFL and Keely in
2   Count Four.

3           The Court also finds it unnecessary, in its discretion, to empanel an advisory jury
4   for purposes of the anticipated bench trial.  Utilizing an advisory jury would likely result
5   in delay and would not, in any event, be helpful to the Court.  *See, e.g., Kyei v. Or. Dept.*
6   *of Trans.*, 497 Fed. App'x 711, 713 (9th Cir. 2012) ("We . . . review for abuse of discretion
7   the district court's decision to consult an advisory jury."); *Ollier v. Sweetwater Union High*
8   *Sch. Dist.*, 267 F.R.D. 338, 339 (S.D. Cal. 2010) (denying request for advisory jury
9   "because an advisory jury would add unnecessary expense, time and complexity to a case
10  that has no special factors or extraordinary circumstances present").  Additionally, if
11  Cramton prevails on her minimum wage claim against Keely during the bench trial, this
12  could obviate the need to schedule a later jury trial on the same claim against GFL.

13  IV.    Motion For Reconsideration

14          Defendants previously filed, and the Court previously denied, a motion for
15  reconsideration of the December 2019 summary judgment order.  (Docs. 249, 251.)
16  Undeterred, Defendants have now filed another motion for reconsideration of that order.
17  (Doc. 339.)  Their argument, in a nutshell, is that Cramton's opposition to their summary
18  judgment motion contained "false statements" concerning her entitlement to a portion of
19  the Kahala sale proceeds, which Cramton has since "fully reversed and recanted."  (*Id.* at
20  2-3.)  Defendants argue they were prejudiced by these false statements in two ways: (1)
21  "[t]hese false statements cast Defendants in an unduly harsh and negative light when, in
22  fact, Defendants did nothing wrong and certainly were not the legal cause of any harm"
23  (*id.* at 4); and (2) the Court applied a "Contrary Analysis" when dismissing their "well-
24  founded counterclaims" (*id.* at 5).

25          These arguments lack merit.  As discussed in the order denying Defendants' earlier
26  reconsideration motion, Defendants didn't move for summary judgment on Counts Seven,
27  Nine, or Ten based on the inadequacy of Cramton's fair market value theory.  (Doc. 251 at
28  2-3.)  Indeed, "Defendants seemed to concede at points in their summary judgment briefing

that Cramton *had* sustained financial losses by resigning from the company in September 2017 and thus missing out on the subsequent Kahala acquisition." (*Id.* at 3.) Thus, Cramton's unfortunate mischaracterization of her damages theory in her summary judgment response—which she corrected both beforehand (in her MIDP disclosures) and afterward (in the current briefing and in the final pretrial order) had no bearing on Defendants' affirmative entitlement to summary judgment.

In contrast, Cramton *did* identify the absence of provable damages as one of the bases on which she was seeking summary judgment on Defendants' counterclaims. Accordingly, when Defendants failed to proffer any evidence of damages in response to her motion, the Court ruled in her favor. (Doc. 247 at 62 ["Because Cramton moved for summary judgment on that ground that the Corporate Defendants can't prove any damages associated with this theory, it was incumbent upon the Corporate Defendants to identify some damage-related evidence in their response. They failed to do so—although their response *asserts* they 'incurred considerable expense in attempting to recover deleted information,' they cite no *evidence* in support of this statement."].) This wasn't disparate treatment—the Court simply, and properly, limited its ruling to the claims and arguments actually presented by the parties in their moving papers. *See generally United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. . . . [W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (quotation omitted).

\*\*\*

Accordingly, **IT IS ORDERED** that:

(1)    Cramton's motion to exclude certain damages-related evidence and argument (Doc. 320) is **granted in part and denied in part**.

(2)    Defendants' motion to exclude certain damages-related evidence and argument (Doc. 321) is **granted in part and denied in part**.

(3)    Defendants' motion to strike Cramton's jury demand (Doc. 322) is **granted**

**in part and denied in part**.

(4)     Defendants' motion for reconsideration (Doc. 339) is **denied**.