**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton, | No. CV-17-04663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grabbagreen Franchising LLC, et al., | |
| Defendants. | |

Pending before the Court are four motions filed after the Final Pretrial Conference. First, Plaintiff Kim Cramton ("Cramton") has moved to preclude Defendants Keely Newman ("Keely"), Eat Clean Holdings ("ECH"), and Grabbagreen Franchising, LLC ("GFL") (collectively, "Defendants") from presenting certain damages-related evidence and arguments at trial.  (Doc. 320). Second, Defendants have filed a dueling motion to preclude Cramton from presenting certain damages-related evidence and arguments at trial. (Doc. 321.)  Third, Defendants have moved to strike Cramton's jury demand.  (Doc. 322.) Fourth, Defendants have moved for reconsideration of certain aspects of last year's summary judgment ruling.  (Doc. 339.)  For the following reasons, the first three motions will be granted in part and denied in part and the fourth motion will be denied.

## BACKGROUND

From September 2014 through September 25, 2017, Cramton worked in various capacities with Defendants to operate the "Grabbagreen" restaurant franchise, which serves

healthy fast food and juice.  Cramton also held an 18.6%[1] membership interest in ECH, the entity that owned the Grabbagreen brand.   Soon after Cramton's departure, Keely repurchased Cramton's membership interest for $1, which the ECH Operating Agreement[2] permitted Keely to do if Cramton resigned voluntarily.

One of the key disputed issues in this action is whether Cramton was improperly duped into resigning.  Cramton alleges that she resigned because Keely falsely told her, during a telephone call on September 18, 2017, that a planned sale of Grabbagreen to a third-party acquiror, Kahala Brands Ltd. ("Kahala"), had fallen through and that the Kahala deal was dead.  Keely denies making these statements and contends that Cramton chose to voluntarily resign for other reasons.

As it turns out, the Kahala deal wasn't dead.  Kahala ended up purchasing the Grabbagreen brand from ECH in March 2018 for $2.6 million.  Cramton has now asserted a variety of claims against Defendants, but the big-ticket item is her claim for the fair market value of the membership interest that Keely repurchased for $1, which Cramton claims was actually worth around $500,000 (*i.e.,* 18.6% of the Kahala purchase price).

I.   Procedural History

On December 15, 2017, Cramton initiated this action.  (Doc. 1.)

On November 12, 2018, Cramton filed an amended complaint.  (Doc. 88.)

On November 29, 2018, Defendants filed an answer to the amended complaint and amended counterclaims.  (Doc. 95.)

On March 1, 2019, Cramton filed a motion for summary judgment (Doc. 142) and Defendants filed a motion for partial summary judgment (Doc. 143).

On April 1, 2019, both parties filed responses to the summary judgment motions.

---

[1]     Defendants contend that Cramton's membership interest was 18.1% and that Cramton is "being dishonest" by stating otherwise.  (Doc. 327 at 14 n.3.)  The Court need not resolve this dispute at this time.

[2]     The Operating Agreement, to which Cramton, Keely, and ECH are parties, governs the management, operations, and ownership of, as well as the rights and duties of membership in, ECH.  (Doc. 324-2 at 2-50.)

1  (Docs. 158, 159.)

2      On April 16, 2019, both parties filed replies to the summary judgment motions.

3  (Docs. 171, 172.)

4      On April 30, 2019, the Court, upon motion, authorized Defendants to reopen

5  Cramton's deposition.  (Doc. 175.)

6      On December 23, 2019, the Court issued a 73-page order addressing a variety of

7  motions, including the parties' cross-motions for summary judgment.  (Doc. 247.)  That

8  order granted judgment on a number of claims and counterclaims, leaving only the

9  following claims for trial: (1) Cramton's minimum wage claim (Count Four) against Keely

10 and GFL; (2) Cramton's claim for breach of the promissory note (Count Five), limited to

11 the issue of damages, against Eat Clean Operations, LLC ("ECO");[3] and (3) Cramton's

12 claims for breach of the implied covenant of good faith and fair dealing, negligent

13 misrepresentation, and fraud (Counts Seven, Nine, and Ten) against Keely and ECH.

14     On January 2, 2020, Defendants filed a motion for reconsideration as to Counts Nine

15 and Ten.  (Doc. 249.)  That motion asserted that "Plaintiff has no right to receive payment

16 of any of the proceeds of ECH's sale of the Grabbagreen Brand to Kahala . . . under the

17 terms of the Operating Agreement."  (*Id.* at 2.)

18     On January 7, 2020, the Court denied this motion because "Defendants are belatedly

19 attempting to raise an argument they could have raised—but, for whatever reason, chose

20 not to raise—in their summary judgment motion."  (Doc. 251 at 2.)

21     On May 22, 2020, the parties filed the joint proposed final pretrial order.  (Doc.

22 303.)

23     On May 27, 2020, the Court held the Final Pretrial Conference.  (Doc. 309.)  During

24 it, the Court ruled on various motions *in limine* but declined to resolve, on the merits,

25 Cramton's motion *in limine* to exclude portions of Defendants' damages defense.  (*Id.*)

26 Instead, the Court solicited additional briefing from the parties, "permit[ting] each side to

27

28 [3]     On January 31, 2020, ECO filed for bankruptcy.  (Doc. 254.)  On February 3, 2020, the Court noted that the action was automatically stayed as to ECO.  (Doc. 255.)

- 3 -

1    file a motion to exclude the other side's theories and/or evidence bearing on damages."
2    (*Id*. at 2.)

3         On June 17, 2020, the parties filed dueling motions to exclude certain aspects of the
4    other side's theory of damages.  (Docs. 320, 321.)  That same day, Defendants filed a
5    motion to strike Cramton's jury demand.  (Doc. 322.)

6         On July 1, 2020, the parties filed responses to those motions.  (Docs. 324, 325, 326.)

7         On July 2, 2020, Defendants refiled their response to Cramton's motion to exclude.
8    (Doc. 327.)

9         On July 10, 2020, Defendants filed replies in support of their two motions.  (Docs.
10   330, 331.)

11        On July 14, 2020, Cramton filed a motion to strike Defendants' damages-related
12   reply.  (Doc. 333.)  That same day, Defendants filed a response to the motion to strike.
13   (Doc. 334.)

14        On August 27, 2020, the parties participated in a settlement conference before a
15   magistrate judge but were unable to reach a settlement.  (Doc. 336.)

16        On September 3, 2020, the Court denied Cramton's motion to strike and authorized
17   Cramton to file a reply in support of her motion to exclude.  (Doc. 327.)

18        On September 10, 2020, Cramton filed a reply.  (Doc. 338.)

19        On September 14, 2020, Defendants filed another motion for reconsideration
20   concerning the December 2019 summary judgment ruling.  (Doc. 339.)

21        On September 16, 2020, Defendants filed a motion to strike certain portions of
22   Cramton's damages-related reply.  (Doc. 340.)  That same day, this motion was denied.
23   (Doc. 341.)

24        On September 17, 2020, the Court issued a tentative ruling addressing the four
25   pending motions.  (Doc. 343.)

26        On September 29, 2020, the Court heard oral argument.  (Doc. 344.)

27        …

28        …

**DISCUSSION**

I.    Motions To Exclude Damages-Related Evidence And Arguments

Defendants seek to preclude Cramton from presenting any evidence or argument that she is entitled to (1) proceeds from ECH's asset sale to Kahala, (2) damages arising from wrongfully taken property, (3) emotional distress damages, and (4) certain minimum wage damages.  (Doc. 321.)  Defendants also seek to preclude Cramton from presenting any other theories based on "new false and previously undisclosed statements" Cramton made during the Final Pretrial Conference.  (*Id.* at 12.)  Cramton, in turn, seeks to "prohibit Defendants from presenting any evidence or argument at trial that: (1) the sale of [ECH] or its assets yielded no proceeds; (2) Plaintiff's remedy is limited to a return of her membership interest; or (3) that the fair market value of Plaintiff's membership interest is subject to any offsets or any adjustments from 18.6% of the Kahala purchase price."  (Doc. 320 at 15.)

A.    **Legal Standard**

The District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP"), which was in effect at all relevant times in this case, provides that each party must, "[f]or each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based."  D. Ariz. G.O. 17-08 ¶ B(4).  The MIDP also requires each party to "[p]rovide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered."  *Id.* ¶ B(5).[4]  "The discovery obligations [created by the MIDP] supersede the disclosures required by Rule 26(a)(1) and are framed as court-ordered mandatory initial discovery pursuant to the Court's inherent authority to manage cases."  *Id.* at 1.  *Accord id.* ¶ A(2) ("The responses are called for by

---

[4]    Similarly, Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires the disclosure of "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based."

the Court, not by discovery requests actually served by an opposing party.").

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The purpose of this rule is to "'give[] teeth' to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011).

"The party requesting sanctions [under Rule 37] bears the initial burden of establishing that the opposing party failed to comply with the [applicable] disclosure requirements." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017).  If the movant makes this showing, "[t]he party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless."  *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1246 (9th Cir. 2012).  When evaluating substantial justification and harmlessness, courts often consider (1) prejudice or surprise to the other party, (2) the ability of that party to cure the prejudice, (3) the likelihood of disruption of trial, and (4) willfulness or bad faith.  *Silvagni,* 320 F.R.D. at 242.

## B.   **Defendants' Motion**

### 1.   *Proceeds from Kahala Sale*

Defendants argue that Cramton failed to timely disclose her theory that she has a right to a portion of the proceeds from Kahala transaction.  (Doc. 321 at 5-9.)  In response, Cramton argues that her theory is different—she is seeking the fair market value of her membership interest in ECH—and that this theory has been fairly raised throughout the litigation.  (Doc. 325.)  In a footnote, Cramton clarifies: "[T]he damages theory is not that [Cramton] would have received proceeds . . . [but that] the sales price set the fair market value of her membership interest."  (*Id.* at 6 n.4.)

The parties are talking past each other.  Cramton is not seeking to recover a portion

1    of the sale proceeds—she is seeking the fair market value of her 18.6% membership interest

2    and merely wishes to proffer the Kahala transaction as a measure of that asset's fair market

3    value.   This theory was timely disclosed.   Cramton's MIDP disclosures pertaining to

4    Counts Seven, Nine, and Ten, which Defendants received in April 2018 (*i.e.,* well before

5    the close of discovery), explain that "Cramton has been damaged in the amount of the value

6    of her membership interest (approximately $511,500, based on the sale of the company to

7    Kahala)."  (Doc. 320-9 at 43, 45.)  This is the same argument Cramton presents in the final

8    pretrial order.  Under the heading "Whether Cramton would be entitled to 'Sale Proceeds'

9    upon ECH's asset sale to Kahala," Cramton states: "Plaintiff is entitled to the fair market

10   value of the membership value of ECH at the time that that it was wrongfully taken away

11   from her . . . .  Fair market value is based on what a willing buyer would pay a willing

12   seller.  That value is conclusively established by the Kahala sale, which valued ECH at

13   $2.6 million."  (Doc. 310 at 28.)

14          Given this backdrop, one option would be to deny, as moot, Defendants' request to

15   preclude Cramton from presenting the argument that she is entitled to sale proceeds.  As

16   noted, Cramton does not intend to make that argument.  Nevertheless, in an abundance of

17   caution and in light of the fact that Cramton has previously described her damages theory

18   in an imprecise manner,[5] Defendants' motion will be granted.  The practical effect of this

---

[5]      In her response to Defendants' motion for summary judgment, Cramton made
various statements that suggest she is seeking a portion of the sale proceeds.  (*See, e.g.,*
Doc. 159 at 15 ["Cramton was not paid any portion of the sale proceeds, as would be
required under the Operating Agreement if she still owned the Units."].)  Although the
imprecision of these statements is unfortunate, Cramton clarified beforehand (through her
MIDP disclosures) and afterward (through the final pretrial order and her response to
Defendants' motion to exclude) that she is not seeking a portion of the sale proceeds.
Additionally, Cramton stated at times in her summary judgment response that she is
seeking the fair market value of her lost membership interest, not a portion of the sale
proceeds.  (Doc. 159 at 14 ["Cramton's damages are the loss of 18.6% of a company that
sold all of its assets months later. The only reasonable value for that loss is 18.6% of the
sale price, or approximately $500,000."].)  In any event, and as discussed in more detail in
Part III *infra*, the inaccurate references to sale proceeds did not, as Defendants assert,
provide the "foundation for the Court's analysis in its summary judgment order allowing
Counts VII, IX, and X to survive."  (Doc. 321 at 7.)

ruling is simply to hold Cramton to the description of her damages theory that she provided in the final pretrial order.  *United States v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("Unless pretrial orders are honored and enforced, the objectives of the pretrial conference to simplify issues and avoid unnecessary proof by obtaining admissions of fact will be jeopardized if not entirely nullified.").

### 2. *Wrongfully taken property*

Defendants argue that Cramton's statements in the final pretrial order "reference fair market value of wrongfully taken property for the first time in this lawsuit as the basis for Plaintiff's damages."  (Doc. 321 at 9.)

Not so.  As noted, Cramton's April 2018 MIDP disclosures pertaining to Counts Seven, Nine, and Ten explained that her damages theory was that the Kahala sale serves as the benchmark for calculating the fair market value of her membership interest in ECH, which was wrongfully taken from her.  (Doc. 320-9 at 43, 45.)  Although these disclosures were not free from ambiguity, they were sufficient to place Defendants on notice of Cramton's theory of damages.

The ambiguity stems from the fact that Cramton's April 2018 MIDP disclosures provided a somewhat different description of her damages theory when discussing Count Six, her now-dismissed claim for breach of the operating agreement.  With respect to that claim, Cramton stated that because her departure was not a voluntary resignation, "Section 9.3 of the Operating Agreement does not apply" and "[i]nstead, because Cramton was constructively discharged, Section 9.2 of the Operating Agreement applies and Keely Newman must acquire Cramton's membership interest under the terms of Article 10 and 11 of the Operating Agreement.  Specifically, Ms. Newman must pay Cramton the fair market value of Cramton's membership interest . . . [which is] approximately $511,500, based on the sale of the company to Kahala[]."  (Doc. 320-9 at 42-43.)  Defendants place heavy emphasis on these references to Section 9.2 and Article 10 of the Operating Agreement, which set forth the procedure for buying out the units of a member who had been terminated without cause.  Under those provisions, "[t]he purchase price for each Unit

. . . shall be the fair market value of the Units as of the most recent independent, third-party appraisal . . . *which shall take into account the lack of control and the inherent lack of liquidity of non-public minority equity interests*." (Doc. 324-2 at 27-28, emphasis added.) According to Defendants, these references to Section 9.2 and Article 10 show that Cramton has always acknowledged the fair market value of her membership interest must be discounted to account for the fact that it is an illiquid, minority interest—and, thus, cannot be based on the price Kahala paid for a liquid, majority interest.

Although this is a plausible interpretation of Cramton's damages theory as to Count Six, Cramton did not repeat these references to Section 9.2 and Article 10 when describing her damages theory as to Counts Seven, Nine, and Ten. Again, with respect to those counts, Cramton simply stated that she was deprived of her membership interest and that the membership interest should be valued as 18.6% of the Kahala purchase price. (Doc. 320-9 at 43-45) Although Defendants appear to have assumed that Cramton's description of her theory pertaining to Counts Seven, Nine, and Ten was implicitly subject to the same qualifications as her description of her theory pertaining to Count Six (*i.e.,* the calculation of fair market value must account for the illiquid, minority nature of Cramton's interest), this assumption was misplaced—because Cramton didn't cross-reference Section 9.2 or Article 10 in the portion of her MIDP disclosures pertaining to Counts Seven, Nine, and Ten, it is plausible to interpret that portion of her disclosures as announcing a different damages theory. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted); *Allen v. Honeywell Ret. Earnings Plan*, 382 F. Supp. 2d 1139, 1162 (D. Ariz. 2005) ("It is a fundamental principle of contract interpretation that the expression of one thing is the exclusion of another ('*expressio unius est exlusio alterius*')."). Notably, Counts Nine and Ten are tort claims while Count Six was a contract claim. It makes sense that such claims might give rise to different measures of damages. *Valley Nat'l Bank v. Brown*, 517 P.2d 1256, 1260 (Ariz. 1974) ("The case at

issue . . . was not based on a contract theory but one of tort, and the elements of damages can be different.").

It is unfortunate that Defendants misperceived the nature of Cramton's damages theory as to Counts Seven, Nine, and Ten.  Cramton bears some of the responsibility for this confusion.  Nevertheless, to the extent Defendants were confused about Cramton's theory due to the ambiguities noted above, it was their responsibility to seek clarification from Cramton by engaging in the meet-and-confer process, by propounding additional discovery requests, or, if necessary, by seeking judicial intervention while the discovery process was still ongoing.[6]  Because they failed to do so, and because Cramton's MIDP disclosures pertaining to Counts Seven, Nine, and Ten can plausibly be interpreted as asserting that her lost membership interest should be valued as 18.6% of the Kahala purchase price, Defendants have not met their "initial burden" under Rule 37 "of establishing that the opposing party failed to comply with the [applicable] disclosure requirements." *Silvagni,* 320 F.R.D. at 241.  Accordingly, Defendants' request to preclude Cramton from advancing that damages theory at trial, as a sanction under Rule 37 based on untimely disclosure, will be denied.

The parties should note, however, that this is only a ruling about the timing and adequacy of Cramton's disclosure efforts.  The parties' briefs also contain some discussion of a substantive issue—whether the March 2018 Kahala sale may, as a matter of Arizona law, function as a proxy for the fair market value of Cramton's membership interest at the time she was deprived of it.  (Doc. 320 at 9-11 [Cramton: "There is no better evidence of

---

[6]    Cramton introduced further ambiguity by stating, in the computation-of-damages portion of her April 2018 MIDP disclosures, that she was seeking "[l]ost ownership interest in the Corporate Defendants as a result of Defendants' constructive discharge of Cramton, approximately $511,500.  This figure[] is calculated as 18.6% of the $2.75 million sales price for Grabbagreen announced by [Kahala]."  (Doc. 320-9 at 47.)  By characterizing these damages as arising from a "constructive discharge," Cramton seemed to signal that the damages were arising from Count Six.  Nevertheless, the bottom line is that other portions of the April 2018 disclosures suggested that Counts Seven, Nine, and Ten weren't subject to the limitations applicable to Count Six and Defendants failed to obtain clarification when presented with these ambiguities.

1   the fair market value for the Units than the heavily negotiated sale between Kahala and
2   [ECH].  And, in fact, there is no other evidence of the fair market value of the Units other
3   than what Kahala agreed to pay and what [ECH] agreed to take for substantially all of its
4   assets."]; Doc. 321 at 13-16 [Defendants: "No credible valuation expert would testify that
5   there is any willing buyer anywhere in the world that would pay nearly $500,000 for a
6   privately held minority interest in ECH units subject to a $1 buyout right [unless the holder
7   continued working through November 2021] . . . .  Without an expert, Plaintiff is unable to
8   prove an indispensable element of damages, *i.e.,* the value of the contingent ECH units she
9   held at the time of the purported misrepresentation."].)

10   Although this briefing may prove useful during later stages of this case, the
11   substantive merit of Cramton's damages theory is not properly before Court at this time.
12   Neither party moved for summary judgment on Counts Seven, Nine, or Ten based on the
13   adequacy (or inadequacy) of Cramton's valuation theory and the Court only authorized
14   supplemental briefing on the narrow issue of whether either side should, under Rule 37, be
15   precluded from presenting damages-related evidence and arguments at trial due to untimely
16   disclosure.  Because Cramton timely disclosed her theory, she will not be precluded from
17   presenting it.  Whether that theory is legally sufficient is a different question for a different
18   time.

19                          3.      *Emotional distress damages*

20   Defendants argue that Cramton's claim for emotional distress damages is improper
21   because (1) this category of damages was not timely disclosed and (2) Arizona law does
22   not recognize this category of damages for economic torts.  (Doc. 321 at 10.)

23   Defendants' disclosure-related objection lacks merit.   The amended complaint
24   includes a claim for "damages for Cramton's emotional distress."   (Doc. 88 at 17.)
25   Cramton also identified her counselor as a witness in her second supplemental MIDP
26   disclosure, which stated that the counselor had "knowledge regarding . . . Ms. Cramton's
27   emotional distress damages." (Doc. 325 at 14-15.)  Finally, although Cramton didn't add
28   emotional distress damages to the damage computation set forth in her MIDP disclosures,

many courts in the Ninth Circuit have held that the failure to include emotional distress damages in a damage computation is not grounds for exclusion under Rule 37.  *See, e.g.*, *Jackson v. United Artists Theatre Cir., Inc.*, 278 F.R.D. 586, 593 n.1 (D. Nev. 2011) (agreeing that "Rule 26(a)(1)(A)(iii) does not require a computation of general damages for pain and suffering or emotional distress because such damages are subjective and do not lend themselves to computation"); *Creswell v. HCAL Corp.*, 2007 WL 628036, *2 (S.D. Cal. 2007) (same); *Maharaj v. Cal. Bank & Tr.*, 288 F.R.D. 458, 463 (E.D. Cal. 2013) (same, but noting that a failure to request a specific dollar figure prevents a plaintiff from requesting a specific amount of emotional distress damages at trial).  *See also Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 & n.3 (5th Cir. 2000) (declining to resolve "whether assigning a dollar figure to emotional distress damage without previously disclosing the figure is in contradiction to Rule 26" but noting that "[s]ince compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)").  The bottom line is that Defendants have long been on notice that Cramton is seeking emotional distress damages in this case.[7]

As for Defendants' argument that Cramton's claim for emotional distress damages fails as a matter of Arizona law, that issue is not properly before the Court.  Again, the sole issue on which the Court solicited supplemental briefing was whether either side should be barred from seeking a particular category of damages at trial as a Rule 37 sanction for late disclosure.  Defendants cannot use a Rule 37 motion as a backdoor attempt to seek summary judgment on a timely disclosed category of damages.  Whether Cramton's claim for emotional distress damages will survive a motion for directed verdict is, again, a

---

[7]      During oral argument, Defendants stated that, even if Cramton isn't categorically precluded from seeking emotional distress damages, she should be precluded from asserting any claim for economic damages arising from the cost of her counseling sessions. In response, Cramton acknowledged that she didn't disclose any of the underlying bills and thus conceded that she won't be pursuing such economic damages at trial.  The Court accepts this concession.

different issue for a different time.

### 4. *Minimum wage damages*

Defendants argue that, because Cramton's MIDP disclosures did not include an assertion that she worked 60-80 hours per week, she should be precluded from making such a claim at trial for purposes of her minimum wage claim. (Doc. 321 at 11.) Cramton responds that Defendants made the same argument after she submitted her motion for summary judgment, at which point they were allowed to reopen her deposition. (Doc. 325 at 8-9.)

Here, Defendants are seeking to use Rule 37 as a "procedural weapon" to achieve "a tactical litigation advantage." *Excel Fortress Ltd. v. Wilhelm*, 2019 WL 2503684, *4 (D. Ariz. 2019). Defendants previously took issue with the timing of Cramton's assertion that she worked 60-80 hours per week. (Doc. 136 at 5-6.) In an effort to eliminate any prejudice arising from this late disclosure, the Court allowed Defendants to reopen Cramton's deposition so they could explore the basis for her expanded estimate of hours worked. (Doc. 175 at 2-3.) If the remedy of additional deposition time was insufficient, Defendants had the responsibility to raise a timely objection rather than lying in wait and complaining on the eve of trial.

### 5. *"Other" new theories*

Defendants argue that "all sorts of new false and previously undisclosed statements were made" by Cramton during the Final Pretrial Conference. (Doc. 321 at 12.) However, most of the allegedly false statements, which Defendants have attempted to summarize in a chart attached to their motion (Doc. 321-1 at 135-37), concern Cramton's "sale proceeds" theory, which Cramton has clarified she will not be pursuing at trial.

Defendants also take issue with Cramton's statement that she was "not aware" of the requirement in the ECH Operating Agreement that she had to work for Defendants for five years. (Doc. 321-1 at 136-37.) The contours of this argument are not entirely clear, but it appears to constitute an objection to the whole of Cramton's lawsuit and a request for dismissal of all claims. The Court declines to revisit its summary judgment order on

1   these murky grounds.

2   C.   **Cramton's Motion**

3   Cramton asks the Court to "prohibit Defendants from presenting any evidence or

4   argument at trial that: (1) the sale of [ECH] or its assets yielded no proceeds; (2) Plaintiff's

5   remedy is limited to a return of her membership interest; or (3) that the fair market value

6   of Plaintiff's membership interest is subject to any offsets or any adjustments from 18.6%

7   of the Kahala purchase price."  (Doc. 320 at 15.)

8   1.   *No Distribution of Kahala Proceeds*

9   As for Cramton's first argument, it's not clear why the nature of the sale to Kahala,

10   and whether it resulted in the distribution of proceeds to any individuals holding a

11   membership interest in ECH, would be relevant at trial.  As discussed above, Cramton is

12   not seeking and cannot seek a portion of the sale proceeds.  Instead, Cramton seeks to argue

13   that the sale to Kahala serves as a proxy for the fair market value of her membership interest

14   in ECH at the time it was wrongfully taken from her.

15   To the extent this information still matters, the record paints a complicated picture

16   concerning the adequacy of Defendants' disclosure efforts.  On the one hand, in a letter to

17   Cramton's counsel dated October 1, 2018, Defendants' then-counsel stated that Cramton

18   merely "owned her units, not the asset sale proceeds," that "[u]nder Section 3.6 of the

19   Operating Agreement, Capital Proceeds may be distributed but only in the discretion of the

20   Majority of the Members," and that "*Keely did not consider or make any such distribution*."

21   (Doc. 327-1 at 102, emphasis added.)  A few weeks later, Defendants' then-counsel wrote

22   a follow-up letter to Cramton's counsel reiterating that "[b]ecause it was an asset sale[,]

23   the 18.6% ownership interest does not evaporate on sale assuming Cramton retained her

24   interest" and "[t]he cash does not go directly to Cramton but to the Company."  (Doc. 327-

25   1 at 105.)  As these letters make clear, Defendants *did* inform Cramton that the sale to

26   Kahala was an asset sale and the resulting proceeds were never distributed to ECH's

27   members.

28   On the other hand, there is no evidence that Defendants ever reiterated these

assertions in their MIDP disclosures, which is where they were required to identify all of the facts and legal theories underlying their defenses.  *See* D. Ariz. G.O. 17-08 ¶ B(4).  Unlike informal letters, MIDP disclosures "must be signed under oath by the party" and must be "signed under Rule 26(g) by the attorney."  *Id.* ¶ A(3).  There is a strong argument that alluding to a fact in a letter exchanged between counsel during the early stages of a case, but never reiterating or verifying that fact in a party's Rule 26 disclosures, MIDP disclosures, discovery responses, or deposition testimony, is insufficient to satisfy a party's disclosure obligations under the MIDP.[8]

The facts of this case underscore why this approach was unfortunate.  During the summary judgment hearing in December 2019, defense counsel stated that the Kahala sale proceeds had never been distributed to ECH's members.  This announcement caught the Court and Cramton's counsel by complete surprise, prompting defense counsel to concede that it hadn't previously been disclosed:

> **Court**:  Let me understand that better.  Because the way I understood the evidence was, in March or somewhere thereabout in 2018, the sale went through for 2.6 odd million dollars.  So you're saying that none of that money has yet been wired?
>
> **Defense counsel**:  Absolutely.  It has all been – the only payouts, as I understand it – and I've gone over this, so the representation I am making based upon the authority that I've been given is that the only payout that could possibly have been made which would inure to the benefit of Keely Newman and Miss Cramton is, the company decided to pay the taxes for those people who would show a paper profit and might have to pay taxes as a result of the sale.  But because Miss Cramton did not show the paper profits, she did not have to pay taxes.  But the sale terms were such that nobody is

---

[8]     Paragraph A(8) of the General Order 17-08, which addresses the supplementation of MIDP disclosures, provides that "[i]f new information is revealed in a written discovery response or a deposition in a manner that reasonably informs all parties of the information, the information need not be presented in a supplemental response."  Although this provision recognizes that some MIDP-complaint disclosures may occur in relatively informal formats, Defendants cannot rely on this provision here—the October 2018 letters were not "written discovery response[s]" or "deposition[s]" and the no-distribution-of-proceeds information was not "new," as it was presumably known to Defendants at the time they prepared their initial MIDP disclosure in April 2018 (Doc. 48).

allowed to liquidate their shares. No cash payment has been made to members of –

**Court**: Am I just forgetting something in the volume of papers? I've never heard this before. Is this in the papers anywhere?

**Defense counsel**: This is not in the papers. . . .

**Court**: . . . I [need] to decide cases based on the things that are briefed to me. And this is – I've never heard any of this before.

**Defense counsel**: Well, Your Honor, I was not the person that was around when these were being drafted.

(Doc. 256 at 79-80.)   Later, defense counsel clarified that "I got this information this morning," which prompted Cramton's counsel to express concerns over the untimeliness of the disclosure.  (*Id.* at 83.)

As it turns out, defense counsel's seeming concession of a late disclosure was inaccurate—predecessor counsel *had* disclosed the absence of a distribution via the two October 2018 letters discussed above.  The question, then, is whether this informal disclosure effort was adequate under Rule 26 and the MIDP.

In the Court's view, it was insufficient.  One of the MIDP's purposes is to avoid surprise at trial by providing fair notice to each side of the facts and theories underlying the other side's claims and defenses.  Although the Court is unprepared to say that an informal disclosure of facts, accomplished via correspondence between counsel, can never suffice, it is apparent that the October 2018 letters in this case failed to alert Cramton that Defendants would be relying on the absence of distributions as one of the facts supporting their defense.  *Cf. Contech Stormwater Sols., Inc. v. Baysaver Techs., Inc.*, 534 F. Supp. 2d 616, 624-25 (D. Md. 2008) ("The defendants' initial response failed to adequately provide notice of the basis of the claims . . . [and] defendants, quite simply, failed to supplement their bare boned initial response in a timely fashion in order to permit Contech to formulate a proper defense. . . .  A party is thus not required to plan a defense based on all possible documents or information presented during depositions, but rather must be adequately informed by the opposing party . . . which facts, theories, and documents will likely be relied upon at trial.").

This finding of inadequate disclosure means that, under Rule 37(c)(1), Defendants must be precluded from introducing any evidence at trial concerning the non-distribution of the Kahala sale proceeds "unless the failure was substantially justified or is harmless." As for substantial justification, although Defendants should have done a better job of disclosing to Cramton that the Kahala transaction didn't result in the distribution of any proceeds to ECH's members, this fact was disclosed (albeit via an informal letter). As for harmlessness, Cramton's clarification that she isn't seeking to collect a portion of the Kahala sale proceeds—instead, she seeks to rely on the Kahala sale as a measure of the fair market value of her membership interest—makes it unclear why it even matters whether the sale proceeds were ultimately distributed to ECH's members.

Given this backdrop, a fair resolution would be to preclude either party from introducing evidence or argument at trial concerning the distribution (or lack thereof) of the Kahala sale proceeds. This information is likely irrelevant, and at a minimum poses significant Rule 403 concerns, in light of Cramton's clarification that she is not seeking a portion of the sale proceeds. And because this information will be excluded for other reasons, there is no need to reach whether Defendants should be precluded from introducing it as a discovery sanction under Rule 37.

2.  *Return Of Membership Interest*

Cramton next seeks to preclude Defendants from arguing that her "remedy is limited to a return of her membership interest." (Doc. 320 at 15.)

This argument is unavailing. Defendants not only disclosed this theory in one of the October 2018 letters[9] but also repeated it in a supplemental MIDP disclosure provided on January 4, 2019, which was within the discovery period (Doc. 86). In that disclosure, Defendants stated that "[u]nder no circumstances, even wrongful termination, does the Operating Agreement require that the terminated member be bought out," that "Keely

---

[9]     Specifically, the October 1, 2018 letter stated that "[e]ven assuming you could win under your argument . . . the most [Cramton] would gain would be the right to retain her membership units." (Doc. 327-1 at 102.)

1    Newman and ECH did not . . . elect to buy Kim Cramton out," and, "[t]hus, even if Kim

2    Cramton was constructively discharged, . . . *the only potential remedy available to Plaintiff*

3    *is that Kim Cramton would continue to hold her ownership interest in ECH*."  (Doc. 327-

4    1 at 83-84, emphasis added.)   Because this theory was timely set forth in an MIDP

5    disclosure, Defendants will not be precluded from advancing it at trial.

6                    3.    *Fair Market Value Is Less Than 18.6% of Kahala Sale Price*

7           Last, Cramton seeks to preclude Defendants from presenting any evidence or

8    argument "that the fair market value of Plaintiff's membership interest is subject to any

9    offsets or any adjustments from 18.6% of the Kahala purchase price."  (Doc. 320 at 15.)

10          This argument presents a close call.  On the one hand, Defendants did disclose this

11   theory in the October 2018 letters.  In the first letter, Defendants' then-counsel took issue

12   with Cramton's valuation methodology, explaining that Cramton's "pro rata analysis of

13   18.6% of the sale price" was "inaccurate" because it failed to "tak[e] into account a

14   discount for lack of control and a private minority interest,"  which "may be as high as

15   70%."  (Doc. 327-1 at 102.)  The first letter further stated that "[a] fair market analysis . . .

16   would also [need] to take into account the liabilities and transaction costs left after an asset

17   sale" and "[t]his valuation would [need to be] determined at the time of [Cramton's]

18   resignation, not based on a sale price occurring six months later."  (*Id.*)  The first letter

19   concluded that, after applying these discounts, the fair market value of Cramton's

20   membership interest "may be as low as $126,450, less liabilities."  (*Id.* at 103.)  Meanwhile,

21   in the second letter, Defendants reiterated their position that Cramton's membership

22   interest was subject to "up to a 70% discount on a fair market value appraisal based on a

23   lack of marketability and holding a minority interest," "leading to the number $126,450 by

24   applying simple math," and encouraged Cramton to "verify such discounts by contacting a

25   business valuation consultant."  (*Id.* at 105.)

26          On the other hand, Defendant have not presented any evidence that they reiterated

27   this theory in their MIDP disclosures.  Indeed, the materials submitted to the Court suggest

28   that Defendants' only properly disclosed theory of defense with respect to Counts Seven,

Nine, and Ten was that "the economic loss rule eliminates damages under [those] counts." (Doc. 327-1 at 85, capitalization omitted.)  This is obviously different from the theory that Cramton's damages under those counts must be discounted to account for the minority, illiquid nature of her ownership interest.  Nor have Defendants disclosed any witness who might testify about how to calculate the fair market value of Cramton's membership interest (or why such a valuation would need to include discounts based on a lack of control, minority interest, and liabilities and transaction costs).  As discussed in Part I.C.1 above, it is difficult to see how this approach could be deemed compliant with the MIDP's disclosure requirements.

The next step in the Rule 37 analysis is assessing whether the disclosure failure was substantially justified or harmless.  Although the tentative ruling stated that neither exception was satisfied, Defendants demonstrated during oral argument that their disclosure failure was, in part, substantially justified.  As discussed in Part I.B.2 above, the ambiguities in Cramton's April 2018 MIDP disclosures led Defendants to assume, mistakenly, that all of Cramton's damage claims were subject to Section 9.2 and Article 10 of the Operating Agreement—provisions that require any fair market value calculation to account for the minority, illiquid nature of Cramton's interest.  Although Defendants should have done more to seek clarification from Cramton, their misinterpretation was understandable and helps explain why they didn't reiterate, in their MIDP disclosures, their theory that the fair market value of Cramton's interest had to be discounted.  Thus, the Court concludes that Defendants' failure to disclose this theory of defense was substantially justified.

This finding of substantial justification, however, does not extend to all of Defendants' discovery conduct.  Although it is understandable why Defendants didn't explicitly refer to their discounting *theory* in their MIDP disclosures, Cramton was still entitled to notice of the *witnesses and evidence* on which Defendants would rely to prove that theory at trial.  Unfortunately, Defendants have not disclosed any witness who might testify about why Cramton's membership interest should be valued at something less than

1    18.6% of the Kahala sale price.

2          Cramton argues that, as a sanction for this disclosure failure, Defendants should be

3    precluded from presenting any testimony on this topic at trial.  (Doc. 320 at 2 ["Plaintiff

4    Kim Cramton moves *in limine* to exclude . . . evidence that the fair market value of Eat

5    Clean Holdings is anything other than the value established by the Kahala transaction."];

6    Doc. 338 at 6 ["Given that [former defense counsel] has not been disclosed as an expert

7    and Defendants have not disclosed any 'business valuation consultant' as an expert witness,

8    these [October 2018] letters are of little import. . . .  [T]his type of business valuation

9    analysis involving marketability and minority discounts must be introduced through

10   qualified expert testimony."]; *id.* at 9 ["Defendants' damages theories would require

11   specialized analysis that cannot be introduced by a lay witness."].)[10]  The Court agrees.

12   Defendants have not identified any witnesses who might testify on these topics and the

13   time for disclosure has long expired.

14         This ruling leaves some questions unresolved.  Cramton has not disclosed any of

15   her own witnesses, lay or expert, to testify about how to value her ECH membership

16   interest.  It appears her plan is simply to introduce evidence concerning the terms of the

17   Kahala sale and then have her attorneys attempt to explain, in closing argument, why those

18   terms are sufficient to establish the fair market value of her membership interest.

19   Defendants argue in their motion papers, with some force, that such evidence will be

20   insufficient as a matter of law to meet Cramton's burden of proof.  Defendants also contend

21   that, irrespective of the adequacy of their disclosure efforts, they retain the right to

22   challenge the sufficiency of Cramton's evidence.  (Doc. 327 at 9 ["Rule 37 does not apply

23   here because . . . the General Order does not require the Defendants to set forth how

24

25   _____

     [10]      During oral argument, Defendants asserted that Cramton's request for a witness-
26   preclusion sanction was improper because it was made the first time in her reply.  This
     assertion is inaccurate.  Cramton's motion included a request to exclude any "evidence"
27   that "the fair market value of Eat Clean Holdings is anything other than the value
     established by the Kahala transaction."  (Doc. 320 at 2.)  "Evidence" includes witness
28   testimony.

Plaintiff is unable to carry her burden of proof with respect to essential elements of her claims, and . . . Plaintiff's inability to prove essential elements of her claims is not a defense, it's a failure by Plaintiff to prove her case."].)

The Court agrees with this argument. Although Cramton seeks to blame Defendants for her decision not to hire a valuation expert (Doc. 338 at 9 ["Cramton has not been able to conduct discovery on these defense theories, nor can she now retain an expert to rebut them . . . ."]), this amounts to impermissible burden-shifting. As the plaintiff, Cramton bears the burden of proving she was damaged by Defendants' conduct. Notwithstanding that burden, she chose not to retain an expert to explain how to value her ECH membership interest. Thus, although Defendants will not be allowed to call witnesses to testify about why the fair market value of that membership interest must be discounted, they will be allowed to advance it as a defense theory during trial, to the extent such advancement is possible without witnesses. Additionally, Defendants retain the right to challenge the legal sufficiency of Cramton's evidence. Cramton has not identified any authority suggesting that Rule 37 sanctions may include the forfeiture of a defendant's ability to seek a directed verdict.

II.    Motion To Strike Jury Demand

Defendants move to strike Cramton's jury demand because two different agreements—ECH's Operating Agreement and the promissory note between Cramton and ECO—contain jury waiver provisions. (Doc. 322.) Cramton responds that (1) Defendants "waived" the ability to enforce the jury waivers, (2) the waivers are unenforceable, and (3) the waivers don't cover all claims or apply to all Defendants. (Doc. 324.)

A.    **Legal Standard**

Rule 39(a) of the Federal Rules of Civil Procedure provides that when a party has properly made a jury demand, "[t]he trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." One way a party may lose its right to a jury trial is through a contractual jury waiver. Under federal law, such waivers are enforceable "as long as each

- 21 -

party waived its rights knowingly and voluntarily." *In re Cnty. of Orange*, 784 F.3d 520, 523 (9th Cir. 2015).[11]  As one court has observed: "Agreements waiving the right to trial by jury are neither illegal nor contrary to public policy." *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir. 1988).

### B.  "Waiver" Of The Jury Waivers

Cramton argues that Defendants "waived" the right to seek enforcement of the jury waivers because (1) "Defendants never affirmatively moved to strike [her] jury demand or raise the issue until two and a half years into this lawsuit" and (2) Defendants did not contest her demand for a jury trial in their original answer or in the parties' Rule 26(f) report.  (Doc. 324 at 3, 5.)  Defendants respond that (1) they have sought to enforce the jury waivers since their answer to Cramton's amended complaint, (2) there's no deadline for filing a motion to strike a jury demand, and (3) they should not be held to the representations in the Rule 26(f) report because Cramton's position has also shifted since the early stages of the case.  (Doc. 331 at 1-3.)

As an initial matter, although Cramton frames her argument as a "waiver" claim, it also has elements of a claim of forfeiture or estoppel.  Courts must take care not to conflate these theories.  *United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (quotation omitted); *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 n.6 (11th Cir. 2014) ("It is important to note the difference between three related, but distinct, legal principles: forfeiture, waiver, and estoppel. . . .  Estoppel requires detrimental reliance and exists when the conduct of

---

[11]    The Ninth Circuit has clarified that "*Erie*'s federalism principle requires federal courts sitting in diversity to import, as the federal rule, state law governing jury trial waivers where . . . state law is even more protective than federal law of the jury trial right." *In re Cnty. of Orange*, 784 F.3d at 524.  This principle doesn't require the application of a different standard here because Arizona law is not more protective than the federal standard.  *See, e.g., Vintage Farms, LLC v. Armed Forces Bank NA*, 2017 WL 2775027, *2 (D. Ariz. 2017) ("Arizona law . . . is arguably less protective than the federal constitutional minimum.  Accordingly, the federal standard governs.") (citation omitted).

one party has induced the other party to take a position that would result in harm if the first party's acts were repudiated.") (quotation omitted).

On the merits, the parties have not cited, and the Court's research has not uncovered, any Ninth Circuit precedent addressing the circumstances under which a party may be said to have forfeited or waived its ability to enforce a contractual jury waiver or be estopped from enforcing such a waiver.  Other Circuits have reasoned that because Rule 39(a)(2) permits a court to strike a jury demand *sua sponte* and provides no deadline for filing a motion to strike, a party may move to strike a jury demand at any time before trial.  *See, e.g.*, *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 226 (3d Cir. 2007) ("Because a party may file a motion to strike a jury demand at any time under Rule 39(a), we conclude that DaimlerChrysler did not commit inexcusable delay by filing its motion to strike after the close of discovery."); *United States v. Schoenborn*, 860 F.2d 1448, 1455 (8th Cir. 1988) (affirming grant of motion to strike jury demand where motion was filed "[o]ne week before trial").  *See generally* Jarod S. Gonzalez, *A Tale of Two Waivers: Waiver of the Jury Waiver Defense Under the Federal Rules of Civil Procedure*, 87 Neb. L. Rev. 675, 689 (2009) ("[T]he prevailing view is that, whatever the ground to strike the jury demand, parties may wait until the eve of trial to move to strike a jury demand.").  Indeed, the First Circuit, although "bothered by the lack of notice to the parties and any discussion with the parties by the court prior to its ruling," has upheld a district court's *mid-trial* decision to refuse to allow a jury to adjudicate some claims.  *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 185-88 (1st Cir. 2000).

Given this backdrop, Defendants did not forfeit their ability to oppose Cramton's jury demand by waiting too long to seek relief.  Although the timing of their request was unfortunate—Defendants did not seek to strike Cramton's jury demand until May 2020, 16 months after the close of discovery, when Defendants raised the issue in the parties' joint proposed pretrial order (Doc. 303 at 127-29)—the Court had not yet set a trial date at the time of this request and the scheduling order did not set a deadline for filing a motion to strike a jury demand.  Because Rule 39 does not create its own deadline for filing such a

1    motion, Defendants' request was sufficiently timely.

2        Cramton next contends that Defendants "waived" their ability to oppose her jury

3    demand because they "did not object . . . in their initial Answer." (Doc. 324 at 5.) This

4    argument lacks merit. Defendants' answer to the original complaint became, in most

5    respects, a nullity when Cramton filed an amended complaint and Defendants filed a new

6    answer to that pleading. *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992) ("[A]n

7    amended pleading supersedes the original pleading. . . . [A]fter amendment the original

8    pleading no longer performs any function and is treated thereafter as non-existent . . . .")

9    (quotations omitted). In the new answer, which is Defendants' operative pleading,

10   Defendants expressly objected to Cramton's jury demand. (Doc. 95 at 21 ¶ 177.)

11       Cramton also contends that Defendants "waived" their ability to oppose her jury

12   demand because the parties' Rule 26(f) report, which was filed in April 2018, stated: "The

13   Parties have requested a jury trial and it is uncontested." (Doc. 50 at 10.) But the Rule

14   26(f) report was filed before Cramton filed her amended complaint (Doc. 88) and

15   Defendants filed their new answer (Doc. 95), which, again, made clear that Defendants

16   were opposing her jury demand. Thus, Cramton had notice during the discovery process

17   of Defendants' position. Additionally, the point of the Rule 26(f) report was simply to

18   assist the Court in creating a scheduling order. The presence or absence of a jury demand

19   was not discussed during the Rule 16 conference and seemed to have no bearing on the

20   Court's formulation of a schedule.[12] Under these circumstances, it cannot be said that the

21   passing reference to a jury trial in the Rule 26(f) report amounted to a waiver by

22   Defendants.

23       Nor should Defendants be estopped from opposing Cramton's jury demand.

24   Although Cramton suggests that Defendants' conduct "effectively preclud[ed]" her from

25   "engaging in discovery" pertaining to the enforceability of the jury waivers (Doc. 324 at

26   6-7), this argument overlooks that Defendants' operative pleading, which was filed well

27   ─────────────

28   [12]   This case was assigned to a different judge at the time of the Rule 16 conference.
         (Doc. 82.)

- 24 -

before the close of discovery, raised an explicit objection to her jury demand.  There is no evidence that Defendants did anything after filing this pleading to suggest that Cramton's jury demand was uncontested.  It is regrettable that Cramton may have misapprehended the significance of Defendants' operative answer, but Defendants did not engage in the sort of affirmative deception required to trigger estoppel.  *Witt*, 772 F.3d at 1279 n.6 ("Estoppel requires detrimental reliance and exists when the conduct of one party has induced the other party to take a position that would result in harm if the first party's acts were repudiated.") (quotation omitted).  Additionally, Cramton has not identified, with any precision, the additional discovery she would have pursued had she been aware of Defendants' opposition to her jury demand.  This further undermines any claim of detrimental reliance.[13]

C.   **Enforceability Of The Waiver**

As noted, contractual jury waivers are enforceable under federal law "as long as each party waived its rights knowingly and voluntarily."  *In re Cnty. of Orange*, 784 F.3d at 523.  District courts in the Ninth Circuit commonly consider the following factors when assessing whether a waiver was knowing and voluntary: "(1) whether there was a gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had an opportunity to negotiate contract terms; and (4) whether the clause containing the waiver

---

[13]   During oral argument, Cramton raised a slightly different estoppel theory—she argued that the timing of Defendants' motion resulted in detrimental reliance because it caused her to expend substantial resources preparing proposed jury instructions, motions *in limine*, and other filings that would be unnecessary in a bench trial.  There are several problems with this argument.  First, because the Court could have waited until the eve of trial to address the jury-waiver issue *sua sponte*, the timing of Defendants' request—which, again, came before a trial date had even been set—was permissible.  Second, because Defendants expended their own resources preparing the same filings, this isn't a situation where expenses were foisted onto Cramton in an unfairly one-sided manner.  Third, although the unnecessary expenditure of resources is always regrettable, the preparation of court-ordered joint filings is not the sort of conduct that is typically characterized as "detrimental reliance."  Fourth, as discussed above, Defendants did not engage in any affirmative deception.

was inconspicuous." *Phx. Leasing Inc. v. Sure Broad., Inc.*, 843 F. Supp. 1379, 1384 (D. Nev. 1994) (citation omitted).  Although "[t]here is a split among the circuits regarding which party has the burden of proving these factors," and the Ninth Circuit has not spoken on this issue, district courts within the Ninth Circuit typically "plac[e] the burden of proof on the party seeking to enforce the waiver" because this approach "is most in keeping with the strong presumption against the waiver of this Seventh Amendment right." *Breham v. Asset Acceptance, LLC*, 2010 WL 1735147, *2 (D. Ariz. 2010).  *See also Phx. Leasing*, 843 F. Supp. at 1384 ("The [Fourth Circuit] placed the burden on the party seeking enforcement of a prelitigation contractual waiver to prove that consent to the waiver was voluntary and informed.  An informal survey indicates the majority of courts having considered this question followed [that] approach . . . .") (citations omitted).

### 1.   *Gross disparity in bargaining power*

Defendants argue that, if anything, the bargaining-power factor cuts in their favor because Cramton had more leverage than Keely when the two of them were negotiating the ECH Operating Agreement.  (Doc. 322 at 3-4.)  Specifically, Defendants contend that Keely was forced to create the Operating Agreement in the face of difficult personal circumstances ("attending to her spouse's [terminal] illness and assuming primary care of two 6-year old children") that were "well known" to Cramton and that the primary purpose of the Operating Agreement was to ensure Cramton's retention as an employee in light of Keely's circumstances.  (Doc. 322 at 3-4.)  Unfortunately, Defendants did not attach any evidence to their motion in an attempt to corroborate these factual assertions.[14]

---

[14]     Defendants submitted an array of evidence with their reply, including a declaration from Keely.  (Doc. 331-1.)  This is improper.  "The Ninth Circuit has held that arguments raised for the first time in a reply are waived.  District courts have interpreted this rule to apply to evidence as well."  *Kruszka v. Toyota Motor Corp.*, 2011 WL 9820198, *3 (C.D. Cal. 2011) (citation omitted).  And although a party "may file 'rebuttal' evidence to contravene arguments first raised by the non-moving party in its opposition," *TSI Inc. v. Azbil BioVigilant Inc.*, 2014 WL 880408, *1 (D. Ariz. 2014), the evidence submitted by Defendants is not rebuttal evidence—it is evidence offered in belated support of the factual assertions raised in their motion.  Accordingly, the Court will not consider this evidence for purposes of evaluating Defendants' motion.

In response, Cramton argues that the documents in question were presented to her in final form without the chance for negotiation, that she did not take Keely's spouse's illness into account, and that Defendants have not produced any actual or admissible evidence that she had any bargaining power.  (Doc. 324 at 9.)   In support of these contentions, Cramton submits various pieces of evidence, including a declaration in which she avers that "[n]either the [ECH Operating Agreement] nor the [ECO promissory note] were jointly created documents.  I had no involvement in their creation . . . [and] was also unable to negotiate any aspect of [the two documents].  In fact, with respect to the [ECH Operating Agreement], when presented with the document I was told what my interest in the business would be and the form it would take."  (Doc. 324-4 ¶ 12.)

In general, the bargaining-power "factor does not require that the parties stand on precisely equal footing."  *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1058 (N.D. Cal. 2013) (quotations omitted).  Courts have indicated a "gross disparity" may exist where the party seeking to avoid enforcement of the waiver was "compelled to accept . . . whatever terms it was offered" or was in "difficulty or some form of duress."  *Phx. Leasing*, 843 F. Supp. at 1385.  Courts are less likely to find a gross disparity when a party "could have walked away from the deal."  *Cannon*, 917 F. Supp. 2d at 1059.

The analysis here is complicated, as an initial matter, by Defendants' failure to submit evidence in support of their motion.  The only evidence properly before the Court with respect to the bargaining-power factor is the material attached to Cramton's response, which suggests that Cramton was presented with both documents on a take-it-or-leave-it basis.  This is not usually the hallmark of negotiation between two parties with relatively equal bargaining power.

Nevertheless, the circumstances surrounding the execution of the ECH Operating Agreement and the ECO promissory note aren't remotely similar to the type of circumstances in which other courts have found a gross disparity of bargaining power.  For example, one court found a gross disparity where a multi-national corporation included an inconspicuous waiver in a form contract presented on a take-it-or-leave-it basis to a large

swath of dealers.  *Dreiling v. Peugeot Motors of Am., Inc.*, 539 F. Supp. 402, 403 (D. Colo. 1982) ("A constitutional guarantee so fundamental as the right to jury trial cannot be waived unknowingly by mere insertion of a waiver provision on the twentieth page of a twenty-two page standardized form contract. . . .  The 1978 Agreement appears to be Peugeot's standardized printed dealer contract, drafted by Peugeot.  Obviously, the plaintiffs had little, if any, opportunity to negotiate the provisions.").  Another court found a gross disparity where "a multi-national, publicly traded manufacturing and distribution conglomerate with 2016 revenues approaching one billion dollars" included a one-sided jury waiver in its contract with "a local, family-owned and operated tile retailer" that "remained at all times entirely dependent on continued supply from [the large company] to remain in operation."  *Servicios Comerciales Lamosa, S.A. de C.V. v. De la Rosa*, 328 F. Supp. 3d 598, 622 (N.D. Tex. 2018) (internal quotation marks omitted).

Here, in contrast, Cramton was a highly compensated corporate executive (*see* Part II.C.2 *infra*), the purpose of the ECH Operating Agreement was to give her a substantial ownership share in a closely held business, and she was the *lender* under the ECO promissory note, not the borrower.  (Doc. 324-1 at 2 ["Eat Clean Operations, LLC . . . (the 'Borrower'), promises to pay to the order of Kim Cramton (the 'Lender'), . . . the principal sum of Sixty Six Thousand Five Hundred Twenty Seven Dollars $66,527.00) (U.S.)."].) These are not the type of arrangements that logically lend themselves to a finding of a gross disparity of bargaining power.  *See generally Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*, 56 F. Supp. 2d 694, 709 (E.D. La. 1999) ("To invalidate a waiver provision, . . . the bargaining differential must be the kind of 'extreme bargaining disadvantage' or 'gross disparity in bargaining position' that occurs only in certain exceptional situations.").  Tellingly, each jury waiver applies bilaterally, binding all parties equally.

The bottom line is that, although Defendants' evidentiary failures prevent them from showing that the bargaining-power factor cuts in their favor, it does not cut in Cramton's favor either.  Regardless of whether one side had a modest advantage in bargaining power,

the disparity was not "gross."  Accordingly, this factor is neutral.

### 2.   *Cramton's business acumen*

Defendants argue that Cramton was an experienced businesswoman because of her long tenure in the restaurant industry, her high rate of pay, the many contracts she negotiated (some of which contained jury waivers), and the fact she routinely sought the advice of her attorneys when making decisions concerning contracts.  (Doc. 322 at 4-5.)  Although Defendants again fail to submit any evidence in support of these assertions, they do cross-reference a pair of documents that were filed during earlier stages of the case.  The first cross-referenced document is the amended complaint, in which Cramton alleged that she "is experienced in the franchising business, with years of history in opening and starting new franchises," that she was "successful in [her] role [with Defendants], such that throughout her career with Defendants, she sold approximately 100 new stores and signed 174 agreements to develop," and that she was "eventually promoted . . . to the role of Executive Vice President of Operations & Franchise Development," which carried an annual salary of $135,000.  (Doc. 88 at 4.)  The second cross-referenced document is a declaration that Cramton filed at the summary judgment stage.  (Doc. 173-2 at 56 ¶ 2.)[15]  It states that "[p]rior to joining Grabbagreen, I had experience in the franchising industry with Cold Stone Creamery, Subway, and Wendy[']s."  (*Id.*)

In response, Cramton submits evidence that she did not graduate from college (Doc. 324-4 ¶¶ 1-2) and accuses Defendants of overstating her experience with respect to the negotiation of contracts.  (Doc. 324 at 9-10.)  Additionally, during oral argument, Cramton's counsel made the somewhat remarkable argument that the Court must disregard the factual assertions in the amended complaint (because Cramton didn't personally sign it and because allegations in a complaint are not evidence) and the factual assertions in Cramton's declaration (because those assertions were "puffery").

---

[15]   This document is identified in Defendants' motion as "Dkt. 159-3, at 56:1-2," but that document was stricken from the record.  (Doc. 167.)  It was later refiled at Doc. 173-2 at 56.

Jury waivers in business contracts will be enforced against individuals who "lack . . . formal education" but are "shrewd" and experienced in business matters. *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832-33 (4th Cir. 1986). *See also Phx. Leasing*, 843 F. Supp. at 1385 (finding waiver effective where the party opposing waiver was "not a novice but was in fact experienced, professional and sophisticated in business dealings" and "it [could] not be said that [the party] was anything less than competent, and fully able to look out for its interests").

Here, although Cramton lacks a college degree and Defendants did not submit any evidence showing that she was represented by counsel during the negotiations at issue, the amended complaint establishes that she has decades of experience in restaurant franchising and management and eventually rose to a high-ranking executive position that carried a six-figure salary. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings . . . are considered judicial admissions conclusively binding on the party who made them."). Cramton's declaration, which she cannot now seek to disavow as "puffery," confirms this background. (Doc. 173-2 at 59 ["I [Kim Cramton] declare under penalty of perjury that the foregoing is true and correct."].) It would be bizarre to conclude that such an individual is too unsophisticated to be bound by a contract she signed (particularly a contract granting her a 18.6% ownership interest in a closely held entity or a contract memorializing the terms of a $66,527 loan in which she is the "lender"). This factor weighs strongly in favor of enforcement.

### 3. *Opportunity to negotiate*

Defendants assert, in a portion of their motion lacking any evidentiary citations, that Cramton had the opportunity to negotiate the agreements at issue because she negotiated other agreements with Defendants, often with the aid of counsel. (Doc. 322 at 5-7.) Cramton responds that she did not have the opportunity to negotiate the terms of the ECH Operating Agreement, that Defendants have not presented any evidence of actual negotiation, and that "every attempt made by Plaintiff to negotiate any documents affecting her ownership interest were summarily reject[ed] by Keely." (Doc. 324 at 9, 11-12.)

Defendants' failure to submit evidence precludes them from meeting their burden of proof with respect to the opportunity-to-negotiate factor.  Their attempt to shift the burden to Cramton—"Plaintiff offers no written evidence that Keely Newman or Kelli Newman refused to negotiate the ECH Operating Agreement, nor any explanation as to why this agreement would be non-negotiable when no others were non-negotiable" (Doc. 331 at 5)—is improper because they bear the burden.  Accordingly, this factor weighs in Cramton's favor.

4.    *Conspicuousness of the waiver*

Defendants argue the jury waivers are conspicuous because each appears in a separate paragraph in all capital letters.  (Doc. 322 at 7.)  Cramton's only response is that conspicuousness is not enough to overcome an otherwise inequitable provision.  (Doc. 324 at 12.)

A jury waiver is not considered conspicuous if it is "hidden or buried deep in the contract." *Cannon*, 917 F. Supp. 2d at 1058.  When assessing conspicuousness, courts look to whether the waiver is clearly labeled under a separate heading, what kind of font was used, and where the waiver was placed within the contract.  *Id*.  *See also Breham,* 2010 WL 1735147 at *2.

Here, the jury waivers were conspicuous.  The provision in the ECH Operating Agreement is written in capital letters and appears under a separate heading.  (Doc. 324-2 at 38-39.)  The provision in the ECO promissory note is separately labeled, is written in capital letters, and is located immediately above the signature block.  (Doc. 324-1 at 3.) Cramton doesn't seem to dispute these provisions are conspicuous.  (Doc. 324 at 12.) Accordingly, this factor weighs in Defendants' favor.

5.    *Conclusion*

During oral argument, Cramton asserted that all four of the factors described above must be satisfied before a jury waiver may be deemed valid and enforceable.  Alternatively, Cramton suggested that, if only two factors weigh in Defendants' favor, then Defendants have not met their burden of "51%."

1    These arguments lack merit.  The factors do not form some sort of strict, conjunctive

2    test.  *See, e.g., Phx. Leasing*, 843 F. Supp. at 1384 ("Some of the factors used to determine

3    whether a waiver was knowing and intelligent include . . . ."); *Servicios Comerciales*

4    *Lamosa*, 328 F. Supp. 3d at 619 ("In determining whether a jury-trial waiver was made

5    knowingly, voluntarily, and intelligently, courts in the Fifth Circuit *generally balance* four

6    factors . . . .") (emphasis added).  Instead, they merely provide a non-exclusive list of

7    considerations that courts often consult, and then balance, when deciding the ultimate

8    question of jury-waiver enforceability—whether the decision to sign the waiver was made

9    "knowingly and voluntarily."  *In re Cnty. of Orange*, 784 F.3d at 523.

10    Here, although Defendants created a relatively weak record by failing to submit

11    much evidence in support of their motion, they still have met their burden of demonstrating

12    that Cramton's decision to waive her jury-trial rights under the ECH Operating Agreement

13    and the ECO promissory note was knowing and voluntary.  Cramton is an experienced,

14    high-achieving business executive, the jury waivers are bilateral and conspicuous, there

15    was no gross disparity in bargaining power, and the contracts at issue are not adhesion-

16    style consumer contracts.  Even when "indulg[ing] every reasonable presumption against

17    waiver of the jury trial right," *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1064 (9th

18    Cir. 2005) (quotations omitted), it cannot be said that Cramton's choice to sign the jury

19    waivers was unknowing or involuntary.

20    D.    **Scope Of Waivers**

21          1.    *ECH Operating Agreement*

22    The jury waiver provision of the ECH Operating Agreement, to which Cramton,

23    Keely, and ECH are parties, provides as follows:

24    No party to this agreement . . . shall seek a jury trial in any lawsuit,
     proceeding, counterclaim, or any other litigation procedure based upon or
25    arising out of this agreement or any of the other agreements or the dealings
     or the relationship between the parties.  No party will seek to consolidate any
26    such action, in which a jury trial has been waived, with any other action in
     which a jury trial cannot or has not been waived.  The provisions of this
27    section have been fully discussed by the parties hereto, and these provisions
     shall be subject to no exceptions.  No party hereto has in any way agreed with
28

or represented to any other party hereto that the provisions of this section will not be fully enforced in all instances.

(Doc. 324-2 at 38-39, capitalization omitted.)

According to Defendants, this provision covers all of the remaining, non-stayed[16] claims in this action.  (Doc. 322 at 8-9.)  Specifically, as for Counts Seven, Nine, and Ten (the claims against Keely and ECH for the fair market value of Cramton's membership interest), Defendants argue this provision is applicable because (1) each party seeking enforcement is a party to the Operating Agreement and (2) Counts Seven, Nine, and Ten all constitute claims "based upon or arising out of" the Operating Agreement.  As for Count Four (the minimum wage claim against Keely and GFL), Defendants argue that Keely may seek enforcement because she is a party to the Operating Agreement and, although Count Four is not "based on or arising out of" the Operating Agreement, the waiver is "very broad" and also includes a different clause that encompasses claims (such as minimum wage claims) arising from "the dealings or the relationships between the parties."  Finally, as for GFL, Defendants argue that (1) GFL may seek direct enforcement of the Operating Agreement's jury waiver, even though it isn't a party to the Operating Agreement, because it is "a wholly-owned subsidiary of ECH and an alleged co-employer of Keely," and alternatively (2) Cramton cannot seek a jury trial on her claim against GFL because she chose to "consolidate" that claim with her claims against Keely and ECH, thereby triggering the provision of the waiver that "[n]o party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot or has not been waived."  (*Id.*)

In response, Cramton argues that, as a matter of law, a contractual jury waiver can only encompass claims "related to the subject matter of the agreement containing the waiver."  (Doc. 324 at 3-4.)  Applying this principle, Cramton argues that the minimum

---

[16]    Defendants don't address whether Cramton has waived her right to a jury trial on Count Five, which is her claim against ECO for breach of the promissory note.  That claim has been stayed due to ECO's bankruptcy.

wage claim in Count Four isn't covered because it's a statutory claim unrelated to the Operating Agreement or the promissory note.  Cramton also notes that GFL isn't a party to either contract.  As for the remaining claims, Cramton acknowledges that Count Seven (breach of the implied duty of good faith and fair dealing) "is tied to the Operating Agreement" but argues that Counts Nine and Ten (negligent misrepresentation and fraud) are not covered because they are based on misrepresentations and the breach of common law duties, not a breach of the Operating Agreement.

Defendants largely have the better side of these arguments.  The problem with Cramton's position is that the legal premise she seeks to invoke—*i.e.,* contractual jury waivers may only encompass claims related to the "subject matter" of the underlying contract—is illusory.  Cramton cites two district court decisions in support of this alleged principle but neither supports her position.

In *Phoenix Leasing*, the waiver provision was worded differently than the waiver provision in the ECH Operating Agreement.  It covered "any action brought on or with respect to this agreement . . . or any other agreements executed in connection herewith." 843 F. Supp. at 1388.  After conducting a careful textual analysis of this provision, the court held that it encompassed any claim that "would require reference to, or . . . relates to or pertains to the loan documents covered by the waiver."  *Id.*  *Phoenix Leasing* thus undermines Cramton's position in two different ways.  First, it suggests that courts must conduct a careful analysis of a jury waiver's actual text when assessing the waiver's scope (instead of inflexibly applying Cramton's proposed rule that all jury waivers, irrespective of their wording, are limited to claims "related to the subject matter of the agreement containing the waiver").  Second, it confirms that jury waivers need not be construed as having such a subject-matter limitation—as noted, the waiver provision in that case was deemed broad enough to encompass any claim that would "require reference" to the underlying contract.  Here, Cramton tacitly acknowledges that Counts Nine and Ten will "require reference" to the Operating Agreement because it provides the foundation for her theory of damages.  (Doc. 338 at 2-3 ["It is th[e] undisputed acquisition of Cramton's

1    membership interest that will frame the primary damages dispute at trial.   Cramton

2    contends that Keely Newman's September 18, 2017 misrepresentations caused Cramton to

3    resign.  That allowed Newman to exercise her option [under the Operating Agreement] and

4    buy Cramton's membership units in ECH for $1.00."].)

5        Similarly, in *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482 (C.D.

6    Cal. 1991), the waiver provision was worded differently than the waiver provision in the

7    ECH Operating Agreement.  It covered "any action, proceeding or counterclaim arising

8    out of or relating to this Agreement or any of the Operative Agreements or the actions of

9    the Lender in the enforcement thereof."  *Id.* at 488.  After conducting a careful, fact-bound

10   analysis of a bevy of different claims, counterclaims, and third-party claims, the court

11   concluded that "the jury waiver provisions . . . are valid and applicable to most of the causes

12   of action alleged in the first amended complaint and first amended counterclaim."  *Id.* at

13   491.  For example, the court concluded that "while the seventh and twelfth causes of action

14   would appear at first blush to be unrelated the financing agreement, they do in fact derive

15   from duties allegedly created by the financing agreement."  *Id.* at 490.  However, the court

16   also concluded that a handful of claims and counterclaims fell outside the waiver because

17   they were based upon the alleged breach of "an independent contract that does not contain

18   a jury trial waiver."  *Id.* at 489.  *Okura*, in short, does not support (and, if anything,

19   undermines) Cramton's claim that all jury waivers, irrespective of their actual wording,

20   must be construed as encompassing only claims that are related to the subject matter of the

21   underlying contract.

22       Cramton's position also overlooks that the Ninth Circuit has previously upheld,

23   albeit in an unpublished decision, a district court's determination that a plaintiff "waived

24   its right to a jury trial on all its claims" where the operative provision was "broadly worded,

25   and nothing in its text suggests that it is limited to disputes arising under the contract."

26   *Frontline Processing Corp. v. First State Bank of Eldorado*, 389 Fed. App'x 748, 754 (9th

27   Cir. 2010).[17]  Here, the inference that Keely, ECH, and Cramton intended for their jury

28   _____

[17]        Similarly, in the somewhat analogous context of forum-selection clauses, courts

waiver to encompasses claims beyond those strictly arising under the Operating Agreement is particularly strong because the waiver draws a distinction between claims "based upon or arising out of this agreement" and claims "based upon or arising out of . . . the dealings or relationships between the parties" and specifies that both categories of claims are covered. It would violate basic principles of contract interpretation to construe the latter category as coextensive with the former. *Miller v. Hehlen*, 104 P.3d 193, 197 (Ariz. Ct. App. 2005) ("[W]e must interpret a contract in a way that gives meaning to all its material terms and renders none superfluous.").

For these reasons, Cramton has waived her right to a jury trial with respect to Counts Seven, Nine, and Ten. Cramton doesn't dispute that Keely and ECH, the parties against whom those claims are asserted, have standing to enforce the Operating Agreement's waiver provision and the Court easily concludes that the broad wording of that provision is capacious enough to encompass Counts Seven, Nine, and Ten. As noted, the waiver covers not only claims "based upon or arising out of this agreement" but also claims "based upon or arising out of . . . the dealings or the relationship between the parties." Cramton

---

have upheld the validity of clauses that encompass any claim arising from the parties' "relationship," irrespective of whether the claim arises from the contract containing the clause. *See, e.g., Cascade Promotion Corp. v. AMA Sys., LLC*, 2007 WL 1574544, *1 (N.D. Cal. 2007) (enforcing forum-selection clause under which the parties "consent[ed] to the exclusive jurisdiction of the courts of the State of Maryland, USA for any dispute arising out of their relationship"); John F. Coyle, *Interpreting Forum Selection Clauses*, 104 Iowa L. Rev. 1791, 1804 n.47 (2019) ("The broadest possible version of the forum selection clause is one stipulating the forum for any claim arising out of the parties' relationship. Such a clause will cover claims that are completely unrelated to the contract so long as they relate in some way to the relationship between the parties—as they almost always will."). Additionally, although arbitration clauses arguably should be construed as encompassing only claims that "arise from" the underlying contract, *see Revitch v. DIRECTV, LLC*, __ F.3d __, 2020 WL 5814095, *7-10 (9th Cir. 2020) (O'Scannlain, J., concurring), this limitation is compelled by the text of the Federal Arbitration Act. *See* 9 U.S.C. § 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration *a controversy thereafter arising out of such contract or transaction* . . . shall be valid, irrevocable, and enforceable . . . .") (emphasis added). Cramton has not identified any comparable statute that limits the permissible scope of contractual jury waivers.

all but concedes this wording is broad enough to encompass Count Seven and the Court concludes it encompasses Counts Nine and Ten, too.  There is a strong argument those claims are "based upon or arising out of" the Operating Agreement because it provides the foundation for Cramton's theory of damages on each claim—she contends that Keely and ECH, through their tortious conduct and their invocation of the Operating Agreement's $1 buyout clause, improperly deprived her of the 18.6% membership interest she possessed under the Operating Agreement.  And even those claims aren't "based upon or arising out of" the Operating Agreement, they are based upon "the dealings or the relationship between the parties."

Cramton has also waived her right to a jury trial on Count Four as it applies to Keely.  Again, Keely has standing to enforce the Operating Agreement's waiver provision and, although the substance of Count Four (minimum wages) doesn't arise from the subject matter of the Operating Agreement (which was intended "to provide for continuity and harmony in the management and operation of [ECH]" by "set[ting] forth [the parties'] agreements regarding the management of [ECH] and the ownership of the Units," *see* Doc. 324-2 at 2), the Operating Agreement's waiver provision doesn't contain a subject matter limitation—instead, it broadly encompasses all claims "based on or arising out of . . . the dealings or the relationship between the parties."  It is hard to understand how a claim that Keely failed to pay minimum wages to Cramton could be characterized as something other than a claim arising out of those parties' "dealings" and "relationship."  *Cf. Frontline Processing Corp.*, 389 Fed. App'x at 754.

In contrast, Cramton has not waived her right to a jury trial on Count Four as it applies to GFL.  GFL is not a party to the Operating Agreement and the waiver provision in that agreement, by its terms, binds only each "party" and that party's assignee, successor, heir, or personal representative.  GFL is not Keely's or ECH's assignee, successor, heir, or personal representative.  *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1166 (9th Cir. 1996) ("[A] jury waiver is a contractual right and generally may not be invoked by one who is not a party to the contract.").  Finally, although the Operating Agreement's

waiver includes a clause that prohibits the "consolidation" of an "action" in which a jury trial has been waived with an "action" in which a jury trial has not been waived, no such consolidation occurred here. Defendants' position seems to be that Cramton violated this clause by asserting her claim against GFL in the same action in which she asserted her claims against ECH and Keely, but "consolidation" is a term of art under the Federal Rules of Civil Procedure. It occurs when a court joins two different "actions" due to the presence of common questions of law or fact in each. *See* Fed. R. Civ. P. 42(a). That didn't occur here—Cramton didn't initially file separate actions against GFL and Keely/ECH and then seek to have those two actions consolidated.[18]

### 2.    *ECO Promissory Note*

The jury waiver provision of the ECO promissory note, to which Cramton and ECO are parties, provides as follows:

> The parties acknowledge that the right to a trial by jury is a constitutional right, but one that may be waived. After consulting (or having had the opportunity to consult) with counsel of their choice, knowingly and voluntarily, and for their mutual benefit, the parties waive any right to trial by jury in the event of litigation regarding the performance or enforcement of, or in any way related to, this agreement.

(Doc. 324-1 at 3, capitalization omitted.)

Given the conclusions set forth in Part II.D.1 above, little needs to be said about the scope of this provision. The Court has already concluded that Cramton waived her right to a jury trial as to all non-stayed claims except for the minimum wage claim in Count Four against GFL. The waiver in the ECO promissory note doesn't cover this claim—GFL is not a party to the ECO promissory note and a contractual jury waiver "generally may not be invoked by one who is not a party to the contract." *Paracor*, 96 F.3d at 1166.

---

[18]    To the extent Defendants intended for the term "consolidation" in the Operating Agreement's waiver provision to have a different and more colloquial meaning, the Court must do its best to assess the plain meaning of the actual contractual language, not some secret interpretation. At a minimum, the term "consolidation" is ambiguous, and "[u]nlike arbitration clauses, courts generally construe jury waivers narrowly." *Paracor*, 96 F.3d at 1166 n.21.

E.   **Conclusion**

Cramton has waived her right to a jury trial on Counts Seven, Nine, and Ten and on Count Four as to Keely.  She retains her right to a jury trial on Count Four as to GFL.

Defendants argue that, given this outcome, the Court should "sever Count [Four] against GFL from the rest of the case to seek a jury trial in that instance alone." (Doc. 322 at 8.)  Cramton argues the Court should "try the case together and consider any non-jury claims . . . as being submitted to the jury on an advisory basis." (Doc. 324 at 4.)

Although both parties' suggestions have merit to them, Defendants' proposal is preferable.  This case is already nearly three years old and the COVID-19 pandemic has made it very difficult to schedule civil jury trials.  Severing Cramton's claim against GFL from the remaining claims, and then scheduling the remaining claims for a bench trial as soon as practicable, will ensure that the resolution of the big-ticket claims in this case isn't delayed any longer than necessary—although Cramton seeks economic damages of nearly $500,000, plus unspecified emotional distress damages, on her claims in Counts Seven, Nine, and Ten, she seeks far less via her minimum wage claim against GFL and Keely in Count Four.

The Court also finds it unnecessary, in its discretion, to empanel an advisory jury for purposes of the bench trial.  Utilizing an advisory jury would likely result in delay and would not, in any event, be helpful to the Court.  *See, e.g., Kyei v. Or. Dept. of Trans.*, 497 Fed. App'x 711, 713 (9th Cir. 2012) ("We . . . review for abuse of discretion the district court's decision to consult an advisory jury."); *Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 338, 339 (S.D. Cal. 2010) (denying request for advisory jury "because an advisory jury would add unnecessary expense, time and complexity to a case that has no special factors or extraordinary circumstances present").  Additionally, if Cramton prevails on her minimum wage claim against Keely during the bench trial, this could obviate the need to schedule a later jury trial on the same claim against GFL.

…

…

1

III.    <u>Motion For Reconsideration</u>

2          Defendants previously filed, and the Court previously denied, a motion for

3   reconsideration of the December 2019 summary judgment order.   (Docs. 249, 251.)

4   Undeterred, Defendants have now filed another motion for reconsideration of that order.

5   (Doc. 339.)   Their argument, in a nutshell, is that Cramton's opposition to their summary

6   judgment motion contained "false statements" concerning her entitlement to a portion of

7   the Kahala sale proceeds, which Cramton has since "fully reversed and recanted."   (*Id.* at

8   2-3.)   Defendants argue they were prejudiced by these false statements in two ways: (1)

9   "[t]hese false statements cast Defendants in an unduly harsh and negative light when, in

10  fact, Defendants did nothing wrong and certainly were not the legal cause of any harm"

11  (*id.* at 4); and (2) the Court applied a "Contrary Analysis" when dismissing their "well-

12  founded counterclaims" (*id.* at 5).

13         These arguments lack merit.   As discussed in the order denying Defendants' earlier

14  reconsideration motion, Defendants didn't move for summary judgment on Counts Seven,

15  Nine, or Ten based on the insufficiency of Cramton's valuation evidence.   (Doc. 251 at 2-

16  3.)   Indeed, "Defendants seemed to concede at points in their summary judgment briefing

17  that Cramton *had* sustained financial losses by resigning from the company in September

18  2017 and thus missing out on the subsequent Kahala acquisition."   (*Id.* at 3.)   Thus,

19  Cramton's unfortunate mischaracterization of her damages theory in her summary

20  judgment response—which she corrected both beforehand (in her MIDP disclosures) and

21  afterward (in the current briefing and in the final pretrial order) had no bearing on

22  Defendants' affirmative entitlement to summary judgment.

23         In contrast, Cramton did identify the absence of evidence of damages as one of the

24  bases on which she was seeking summary judgment on Defendants' counterclaims.

25  Accordingly, when Defendants failed to proffer any evidence of damages in response to

26  her motion, the Court ruled in her favor.   (Doc. 247 at 62 ["Because Cramton moved for

27  summary judgment on that ground that the Corporate Defendants can't prove any damages

28  associated with this theory, it was incumbent upon the Corporate Defendants to identify

some damage-related evidence in their response.  They failed to do so—although their response *asserts* they 'incurred considerable expense in attempting to recover deleted information,' they cite no *evidence* in support of this statement."].)  This wasn't disparate treatment.  The Court simply, and properly, limited its ruling to the claims and arguments actually presented by the parties in their moving papers.  *See generally United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. . . .  [W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (quotation omitted).

***

Accordingly, **IT IS ORDERED** that:

(1)    Cramton's motion to exclude certain damages-related evidence and arguments (Doc. 320) is **granted in part and denied in part**.

(2)    Defendants' motion to exclude certain damages-related evidence and arguments (Doc. 321) is **granted in part and denied in part**.

(3)    Defendants' motion to strike Cramton's jury demand (Doc. 322) is **granted in part and denied in part**.

(4)    Defendants' motion for reconsideration (Doc. 339) is **denied**.

…

…

…

…

…

…

…

…

…

…

1         (5)     A telephonic status conference is set for **October 13, 2020 at 10:00 a.m.**  In

2    advance of the status conference, the parties are ordered to meet and confer concerning (1)

3    the identification of mutually agreeable dates in the near future on which the bench trial

4    may commence and (2) the extent to which the previous allocation of trial time—"the Court

5    allocates 20 trial hours to each side, which includes counsels' opening statements, closing

6    arguments and examination of witnesses" (Doc. 309 at 1)—may be reduced now that the

7    trial will be a bench trial.  The parties should be prepared to discuss these topics during the

8    status conference.

9         Dated this 2nd day of October, 2020.

Dominic W. Lanza
United States District Judge