**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton, | No. CV-17-04663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grabbagreen Franchising LLC, et al., | |
| Defendants. | |

The bench trial in this matter took place between May 24-28, 2021.  The Court now issues its findings of fact and conclusions of law.

## LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

The Ninth Circuit has explained that a district court's findings under Rule 52(a) "should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision."  *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972).  With that said, such findings must also "strike an appropriate balance between detail, simplicity, and efficiency. . . .  [E]xcessively long and detailed

findings are not necessary . . . and can even be unhelpful. . . . Ultimately, the trial court's findings should be sufficient to reveal the court's concept of the facts and applicable legal standards without being needlessly elaborate or too wordy." *See* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, at 46-47 (2021). Put another way, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *See* Fed. R. Civ. P. 52, advisory committee's note to 1946 amendment.

## FINDINGS OF FACT

Although this case originally involved a sprawling array of claims and counterclaims (Docs. 88, 95), only a few claims (and none of the counterclaims) survived summary judgment (Doc. 247). Additionally, one of the surviving claims was stayed when a corporate defendant filed for bankruptcy after summary judgment (Doc. 254) and the remaining claims were later found to be covered by a valid, contractual jury waiver (Doc. 345).[1] As a result, only two sets of claims were presented for resolution during the bench trial: *first*, Plaintiff Kim Cramton's ("Cramton") claim against Defendant Keely Newman ("Keely")[2] for violating Arizona's minimum wage laws; and *second*, Cramton's claims for negligent misrepresentation, fraud, and breach of the implied covenant of good faith and fair dealing against Keely and an entity called Eat Clean Holdings, LLC ("ECH").

The factual findings below are grouped into three parts. Part I sets forth some background facts concerning the relationship between Cramton and Keely and resolves some of the broader disputed factual issues in this case. Part II resolves other contested facts bearing on the minimum wage claim. Part III resolves other contested facts bearing on the remaining claims.

…

…

---

[1] One exception is that the minimum wage claim in Count Four against Defendant Grabbagreen Franchising, LLC ("GFL") is not covered by the jury waiver. (Doc. 345 at 37-38.)

[2] Keely's spouse, Kelli Newman ("Kelli"), is also one of the key players in this case. They will be referred to by their first names to avoid confusion, not out of any disrespect.

I.    Background

In 2013, Keely created a healthy fast-food restaurant concept called "Grabbagreen." (Doc. 310 at 1-2 [stipulated facts in Final Pretrial Order].)

In September 2014, Cramton began working for a Grabbagreen-related entity called Gulf Girl Squared, Inc. ("GGS"), whose business purpose was to operate certain Grabbagreen stores in Arizona.  (Doc. 310 at 1; Trial Ex. 393 [employment agreement].) Cramton also performed work for a different Grabbagreen-related entity that came to be known as Grabbagreen Franchising, LLC ("GFL"),[3] whose business purpose was to sell Grabbagreen franchises to third parties across the country.  (Doc. 310 at 2.)  As Cramton explained at trial: "I was working at the stores as well as working on the franchising concept."  (5/24 Tr. 93.)

Over time, Cramton acquired ownership interests in various Grabbagreen-related entities.  Most important, Cramton eventually came to possess an 18.6% membership interest in ECH (Trial Ex. 30 [ECH Operating Agreement, Exhibit A]), which in turn owned GFL and the rights to the Grabbagreen brand (Doc. 310 at 2).  Critically, the ECH Operating Agreement, which came into effect in late 2016, contained a provision specifying that if Cramton voluntarily resigned "for any reason" within the first five years after its effective date, Keely would have "the right but not the obligation" to purchase Cramton's membership units for only $1.  (Trial Ex. 30, § 9.3(b).)

In 2016, Keely and Cramton also formed a partnership to buy out a GFL franchisee who was in the process of building a Grabbagreen store in Phoenix.  (Doc. 310 at 2-3; 5/24 Tr. 97-98.)  To effectuate the buyout, Keely and Cramton formed an entity called Krowne Enterprises, LLC ("Krowne"), of which Keely owned 51% and Cramton owned 49%.  (*Id.*) Afterward, Cramton used $66,527 of her personal funds to cover construction and build-out expenses for the store.  (*Id.*)  In October 2016, an entity called Eat Clean Operations, LLC ("ECO") executed a promissory note under which it was obligated to repay this $66,527 to Cramton.  (Trial Ex. 28 [promissory note].)

---

[3]    GFL's predecessor was Grabbagreen Franchising, Inc. ("GFI").  (Trial Ex. 17.)

As the preceding discussion shows, the business relationship between Cramton and Keely was always complicated and multi-faceted. Beginning in the latter half of 2016, things grew even more complicated. From the Court's vantage point as the finder of fact, there were three interrelated reasons for this change.

The first was the deteriorating financial performance of the Grabbagreen entities. Although one component of the Grabbagreen empire, GFL, was successful in selling franchises and building the Grabbagreen brand, the stores operating under the GGS umbrella experienced a downturn in sales in late 2016. (5/27 Tr. 757-59, 788-89 [Mills]; 5/28 Tr. 951-54 [Keely].) Additionally, the store that Keely and Cramton had acquired via their partnership was unprofitable and ECO was not in a position to make payments on the $66,527 loan owed to Cramton. (5/27 Tr. 774-75 [Mills: "ECO did not have the financial capacity to be paying these loan payments."]; 5/28 Tr. 953 [Keely].) These developments resulted in significant cash flow difficulties and financial pressures. (*See, e.g.*, 5/27 Tr. 757-59; Doc. 408 at 293-94 [Mills deposition testimony: Keely admitted in late 2016/early 2017 that "the company was struggling financially from a cash flow perspective" and was experiencing "financial stress"].) In an ill-fated effort to address these financial difficulties, the decision was made—against the advice of Grabbagreen's accountant, Teresa Mills ("Mills")—to characterize payments made to Cramton after December 2016 as loan repayments from ECO, rather than as wage payments from GFL. (5/27 Tr. 774-75 [Mills: "I expressed strongly that they not do this. I thought that it was a tax avoidance scheme, basically."].) This agreement was memorialized in a written document signed by Cramton. (Trial Ex. 32 ["WHEREAS, the [GFL] Board has determined that it is desirable and in the best interests of the Company to discontinue wage accruals for its officers. . . . RESOLVED, that Company authorizes that all wage accruals for all officers discontinue as of December 31, 2016."].)[4]

---

[4] At trial, the parties disputed the genesis of the plan to stop drawing wages from GFL. Some evidence suggested it was a joint decision between Keely and Cramton, motivated by considerations of tax avoidance and/or by the financial realty that, as GFL's shareholders, they would be the ones required to make the capital calls necessary to fund any salaries. (*See, e.g.,* 5/27 Tr. 775 [Mills trial testimony: "After I expressed my disagreement with this idea, both Kim Cramton and Keely Newman said that this is the

The second factor was the strained interpersonal relationship between Keely and Cramton. As early as mid-2016, Cramton was complaining to her therapist, Shelly Hess, that Keely was "verbally abusive." (5/25 Tr. 329; Trial Ex. 794.) The rift became so apparent to outsiders that Dana Mavros ("Mavros"), a consultant who had originally been retained by Keely to provide business advice (Doc. 408 at 252-55), wrote a lengthy email to Keely and Cramton in February 2017 in which she described "[t]he relationship between the two of you [as] toxic most of the time. You do not listen to each other, you have a hard time treating each other respectfully, and your communication with each other is poor. Although you both will say it's not 'personal' it sounds and it appears to others that you are personally attacking each other and it is not enjoyable to be around the two of you. . . . Your team sees your dysfunctional relationship and it has created a nonproductive negative company culture." (Trial Ex. 720.)[5] It was apparent to the Court, as the finder of fact, that the relationship between Keely and Cramton was dysfunctional. As discussed in more detail below, this negative relationship formed an important backdrop for some of the parties' subsequent decisions.

It should be noted that, during trial, Cramton went beyond describing her relationship with Keely as dysfunctional—she (and her counsel) sought to portray it as a

---

way that they wanted to do it . . . ."]; Doc. 408 at 114 [Mills deposition testimony: "[I]n the beginning Keely and Kim decided they didn't want to take salary payments in 2017 and instead wanted to receive payments on this Eat Clean Operations note."]; Doc. 408 at 210-12 [discussing an "extended conversation" during a "joint conversation" with Keely and Cramton about the plan to "tak[e] the payments as loan payments as opposed to salary"].) Cramton, meanwhile, testified that the wage cessation was a unilateral decision made by Keely and forced on her against her will. (5/24 Tr. 120-22, 128-29.) The Court finds it unnecessary to determine whose version of this particular dispute is more believable because consent wouldn't be a defense to the minimum wage claim even if Cramton did willingly and voluntarily agree to the wage-cessation plan. *See* A.R.S. § 23-364(H) ("No verbal or written agreement or employment contract may waive any rights under this article.").

[5] Mavros provided a similar description of the Cramton/Keely relationship during her deposition testimony, which was admitted at trial. (Doc. 408 at 306 ["[T]heir styles are very different. So Keely gets frustrated and upset with Kim's style and Kim gets frustrated, wounded, upset, with Keely's style. It was clearly a style and communication issue, and the biggest observation and feedback I gave to both of them was they always think the worst of each other first; they don't give each other the benefit of the doubt first, and they're too emotional and there's too much drama . . . ."].) Cramton seemed to agree that "toxic" was an appropriate word to describe her relationship with Keely. (5/24 Tr. 144, 206-07.)

relationship infused with abuse and cruelty. Indeed, the very first words uttered during Cramton's opening statement were "cruelty is what this case is all about" (5/24 Tr. 27), and Cramton again returned to the "Case About Cruelty" theme during closing argument (Doc. 412 at 5). In a related vein, Cramton sought to establish, through her testimony and the testimony of the witnesses she called, that Keely repeatedly belittled her, shouted at her, directed foul language toward her, and peppered her with unreasonable work-related demands during weekends, nights, and vacations. Cramton also sought to establish that she was forced to work without pay throughout 2017. Keely and her witnesses, meanwhile, presented a far different picture of the Cramton/Keely relationship—they generally denied that Keely ever insulted or shouted at Cramton and presented evidence that Cramton herself used foul language from time to time while at work.

From the Court's vantage point as the finder of fact, the truth of the Cramton/Keely relationship fell somewhere in the middle of the parties' somewhat self-serving descriptions. Although some of the Keely's communications to Cramton (in particular, the text chain on September 20, 2017, *see* Trial Ex. 307 at CRA000642-43) were unacceptably crude and demeaning, and although Keely could have been more empathetic and considerate in the wake of Cramton's medical diagnosis in April 2017, Cramton overreached by portraying herself as the victim of cruelty. For example, although it is true that Keely expected Cramton to be available by text on some nights, weekends, and vacations, it must be recalled that Cramton was Keely's business partner, was earning an annual salary of nearly $200,000 at times during her Grabbagreen tenure (5/24 Tr. 93-94; 5/27 Tr. 768), and possessed a substantial equity ownership interest in a closely held small business that was undergoing significant challenges. Under those circumstances, it is not surprising or shocking that Cramton would be expected to monitor her texts and email beyond normal business hours.

As another example, although Cramton repeatedly suggested during her direct testimony that she was forced to work without pay throughout 2017,[6] this was a misleading

---

[6] *See, e.g.,* 5/24 Tr. 167 ("I needed money. I hadn't been paid all year."); *id.* at 170 (Q: "Were you getting paid at this time [September 2017]?" A: "I was not."); *id.* at 210

- 6 -

description of the financial arrangement. In fact, Cramton received over $50,000 between the ECO note repayments, benefit payments, and reimbursements. (Doc. 408 at 139-41; Trial Ex. 340 [summary of disbursements].) Although, as discussed further below, the Court agrees with Cramton that the note repayments did not qualify as wage payments from GFL, this is only due to how the parties chose to classify those payments for tax and accounting purposes. In some ways, this classification decision benefited Cramton, who would not have otherwise received any repayment on the ECO note (because ECO had no independent ability to repay the loan). (5/27 Tr. at 773.) But regardless of how the payments were classified, the bottom line is that Cramton received substantial sums of money in 2017 for her Grabbagreen-related work. Thus, her portrayal of herself as a victim of cruelty who was forced to work for free throughout 2017 was less than fully convincing.

The third key development in the latter part of 2016 was the discovery that Kelli Newman ("Kelli"), Keely's spouse (and, at times, GFL's in-house counsel), had advanced-stage cancer. (5/27 Tr. 841.) Although this development might not appear, at first blush, to have much to do with the Cramton/Keely relationship or the disputed issues in this case, from the Court's perspective it provides important context for some of the events and conduct that ensued. Among other things, Kelli's diagnosis caused Keely to assume increased parental responsibilities as to Keely's and Kelli's young children. (5/27 Tr. at 843-44; 5/28 Tr. 944-46.) As a result, Keely had less time to dedicate to the Grabbagreen business, which she was already struggling to manage remotely from California and then Florida (whereas Cramton and most other workers were based in Arizona). (*Id.*) Critically, these developments helped persuade Keely that it was in her best interest to sell the Grabbagreen business rather than continue attempting to operate it. (5/28 Tr. 908 [Kelli, agreeing that "the ultimate decision to sell [Grabbagreen] so soon came as a result of [her] diagnosis"]; *id.* at 991-92 [same].) As discussed in more detail below, the existence of this

_____

(Q: "You weren't being paid in 2017, correct?" A: "Correct."); *id.* at 226 (Q: "If you're so stretched and not getting paid, why are you still working there?" A: "Because I was working there to try to sell the company and get paid out."); *id.* at 243 (Q: "Were you getting paid [by September 2017]? A: "I wasn't getting paid. No, I hadn't been paid all year.").

plan to sell the business, and Cramton's knowledge of the plan,[7] is important in assessing the reasonableness of some of Cramton's subsequent actions and in assessing Keely's intent.

The first serious potential acquiror of Grabbagreen was a company called Due North Holdings, LLC ("Due North"). (Doc. 310 at 4.) Keely's discussions with Due North began in early 2017 and continued over the ensuing months. (5/28 Tr. 903-04.) This deal nearly came to fruition—a data room was set up, due diligence was completed, and escrow documents were prepared. (*See, e.g.*, 5/26 Tr. 545, 615-17; 5/27 Tr. 690, 888; 5/28 Tr. 968, 999.) The closing date for the Due North deal was initially set in the beginning of June 2017 but was delayed due to unresolved business issues on Due North's end. (Doc. 310 at 4.) The closing date was then rescheduled a few times in June and July 2017 and, as late as August 2017, the deal was thought to be pending. (*Id.*)

As the Due North deal was being negotiated, Keely and Cramton negotiated a side deal called the "Redemption Agreement." (5/24 Tr. 216-19; Trial Exs. 286, 502.) Under the terms of this agreement, Cramton would receive over $500,000 upon the closing of the Due North deal. (*Id.*) Cramton credibly testified at trial that this sum was intended to approximate the value of her 18.6% membership interest in ECH. (5/24 Tr. 215-17.)

Unfortunately, the Due North deal did not close as planned. The holdup was caused by the illness of one of Due North's principals and disputes within the Due North organization. (5/24 Tr. 228-29; 5/28 Tr. 997; Trial Ex. 212 at G065900 [text messages describing arbitration proceeding between Due North principals].)

As the Due North deal was being placed on hold, another potential acquiror named Kahala Brands, Ltd. ("Kahala") entered the picture. Notably, Cramton had longstanding personal relationships with some of the Kahala principals who would be responsible for evaluating the potential deal, including John Wuycheck ("Wuycheck") and Jeff Smit ("Smit"). (5/26 Tr. 540-42 [Cramton had known Wuycheck and Smit since 2005; 5/26

---

[7]     Cramton acknowledged that, as early as February 2017, "we [Cramton and Keely] both wanted out. We both wanted to sell the company." (5/24 Tr. at 206.)

Tr. 552 [Wuycheck previously worked with Cramton for five or six years].)

On August 15, 2017, Keely provided a written offer to sell the Grabbagreen brand to Kahala on the same terms as the Due North deal. (Doc. 310 at 3.) It is important to note the specific nature of this proposal, because it helps explain some of the events that followed. The Grabbagreen-Kahala negotiations unfolded in an unusual fashion. After the Due North deal somewhat unexpectedly failed to close, a Grabbagreen area developer named Greg Ferrell reached out to some of his contacts at Kahala in an effort to gauge their interest in "stepping into" the Due North deal. (5/24 Tr. 231-33; 5/26 Tr. 543-44.) Thus, during the initial stages of the Grabbagreen-Kahala discussions, Kahala was not conducting the usual due diligence processes or considering different potential structures for an acquisition. Instead, it was presented with the binary, yes/no choice of whether it wished to "step into" the Due North deal on the same terms that Due North and Keely had previously negotiated. (5/26 Tr. 528-29, 546-49 [Smit]; *id.* at 557 [Wuycheck]; 5/28 Tr. 974 [Keely].)

As Kahala was considering this proposal, Cramton took affirmative steps to obtain more information about its likelihood of success. Specifically, on September 12, 2017, Cramton left a voicemail message for Wuycheck, her friend at Kahala, in an effort to obtain an update. (5/24 Tr. 237-28; Trial Ex. 307 at CRA000639.) That same day, Wuycheck returned Cramton's call and provided the following update: "He said that the team was out last week with the holiday so they're still crunching numbers and should have a decision by the end of the week or first of next week." (*Id.*) Cramton relayed this information to Keely and explained that she "couldn't really get a read one way or another" on whether Kahala was interested. (*Id.*)

On Monday, September 18, 2017, Keely participated in a pair of phone calls on which many of the disputed issues in this case turn. The first was a relatively short call between two Grabbagreen representatives, Keely and Adams Price ("Price"), an investment banker whom Keely had hired to provide assistance in the sale process (5/26 Tr. 641-42; 5/27 Tr. 681), and two Kahala representatives, Smit and Wuycheck. All four

individuals testified at trial regarding this phone call and the Court carefully listened to their testimony and assessed their credibility. In the Court's view, Price's and Keely's account of the call was credible. Both testified, in essence, that the Kahala representatives rejected the offer to step into the Due North deal and gave no indication that they might be interested in a differently structured deal. (5/27 Tr. 686 [Price, testifying that "Kahala said that they would not step into those terms," that "that was essentially the call," and that when he "walked away from that call, [he was] under the impression that there were [not] any next steps to be taken"]; 5/28 Tr. 974-75 [Keely, testifying that Smit stated "we can't justify the Due North deal and we're not interested in stepping into it" and that the conversation ended in "very awkward" fashion because "you would expect them to come back and say, hey, well, there's a counteroffer. But there was no counteroffer. There was nothing. And it was silent."].)[8] In the immediate aftermath of the call, Price believed there was no possibility of a future Kahala-Grabbagreen deal. (5/27 Tr. 686-87 [Price: "I thought that the project was done and . . . I was convinced at that time that we were through. . . . I didn't think that there was going to be another step."]; 5/28 Tr. 975-76 [Keely: "He [Price] told me he thought it was dead."].)

Later that day, Keely and Cramton spoke on the phone for approximately 10 minutes. At trial, they offered conflicting accounts of what was said during this call. Cramton testified as follows:

Q:  "What did she [Keely] say?"

A:  "She told me that there was no deal. And I asked if there was going to be a deal and she said no, there was no deal. And there was – there was no deal. I believe I asked if there was any deal and she said no, there's no deal."

---

[8]     Smit provided a somewhat different account of the call. He stated that, after rejecting the Due North deal, the Kahala representatives expressed potential interest in a different version of a Grabbagreen acquisition. (5/26 Tr. 531 [Smit: "The only communication was we wouldn't step into the Due North deal *and we would consider looking at it on our own.*"], emphasis added.) Although the Court viewed Smit as an honest and credible witness, it chooses to credit Price's and Keely's testimony on this disputed point—Price was the most disinterested of the witnesses who testified about the September 18 call, having no personal relationship with the parties, and he struck the Court as having a firm recall of the details of the conversation (even if he was less familiar with the specifics of some of the other stages of the Kahala negotiation). In contrast, Wuycheck couldn't "recall specifics" about the September 18 call. (5/26 Tr. 560.)

Q: "Did she say anything specific about the Kahala deal?"

A: "Did she?"

Q: "Yeah."

A: "No, she said there's no deal."

(5/24 Tr. 240-41.) Later, Cramton added that Keely said "the deal" was "not moving forward under any circumstances." (*Id.* at 241-42.)

Keely's account of this call was different. She testified as follows:

Q. "[W]alk through that exchange for me, please."

A. "It was very fast. Kim said, hey, so what happened on the call with Kahala? And I said, well, Kim, they're not going to step into the Due North shoes. I said, I can go back to them in a couple days and see if they're interested in something else. And she said, okay. Thanks. And that was the end of it."

(5/28 Tr. 977. *See also id.* at 1027-28 [same].) In short, both sides agree that Keely accurately informed Cramton that Kahala had rejected the Due North deal. The dispute is over what Keely went on to say about the possibility of a future deal with Kahala on different terms. According to Cramton, Keely stated there was no possibility whatsoever of a future deal, while Kelly contends she openly discussed the possibility of future negotiations.

This factual dispute presents a close call. Cutting in Cramton's favor are the fact that her statements to third parties about the call, in the immediate aftermath of the call, were consistent with her trial testimony; that her demeanor in the immediate aftermath of the call, as observed by third parties, was consistent with that of a person who subjectively believed a Kahala deal was no longer a possibility; and that her ultimate reaction to the call (*i.e.*, resignation) was consistent with such a subjective understanding. The Court also generally found Cramton to be a credible and trustworthy witness. With that said, some of Cramton's claims of abuse and cruelty were, as discussed elsewhere in this order, exaggerated. Additionally, Cramton was never able (at least in the Court's view) to credibly reconcile her claim that the working conditions at Grabbagreen were so outrageous and intolerable that she had no choice but to immediately resign with the

1    statement in her resignation letter (as discussed further below) that she was willing to

2    continue working for Grabbagreen for another month so long as she received a $42,000

3    payment.

4        On the other side of the ledger, the Court generally found Keely to be a credible and

5    trustworthy witness. Additionally, and perhaps most important, the Court was ultimately

6    unpersuaded by Cramton's theory as to why Keely made the alleged false statement about

7    the Kahala deal "not moving forward under any circumstances"—that is, because Keely

8    was attempting to dupe her into resigning. The topic of Cramton's continued employment

9    at Grabbagreen never even came up during the September 18 call. In the Court's view,

10   this undermines any suggestion that Keely's brief comment about the status of the Kahala

11   deal near the end of the call was actually part of a nefarious plot to trick Cramton into

12   resigning. Additionally, although it is true (as Cramton emphasized at trial) that Keely had

13   *some* financial motive to trick her into resigning, Keely's financial motivations were more

14   complicated than Cramton portrayed them to be. At the time of the conversations in

15   question, Keely was located thousands of miles away from Arizona, with young children

16   and a sick spouse, desperately hoping to get a deal to sell Grabbagreen across the finish

17   line. As the defense persuasively argued at trial, the last thing Keely would have wanted

18   to do under those circumstances was lose one of her top managerial employees (and

19   business partner)—among other things, such a departure might spook potential acquirors.[9]

---

[9]    *See, e.g.*, 5/28 Tr. 959 (Keely and Kelli had dinner with Cramton in January 2017 because Keely was "trying to keep [Cramton] happy" and was "fearful that she would leave Gulf Girl Squared"); *id.* at 970-74 (testifying about personal events in August and September 2017, including Hurricane Irma, their evacuation and its aftermath, and Kelli's surgery, and business events such as a GGS SBA loan and "turnover of three stores . . . within 48 hours"); *id.* at 983-84 ("Q. So what happened next after you received [Cramton's resignation] letter? A. Probably the next thing I did was walk in there and show my spouse. And after that I believe I picked up the phone, and Jeff Farnell was the first person that I called. At that point I needed to just understand operationally what was going to happen. And he was her second in command, so he knew how to operate here in the state. . . . And I said, okay, well, are you interested in taking on some more responsibilities? I'll give you $5,000 extra raise right now. He agreed to that. And that made me feel better, because at least I did not have to get on a plane right there at that moment and come to Arizona."); *id.* at 985 (Keely: "I sent [Cramton] a text message, and I said, hey, I need you and I to have a unified message. . . . I'm concerned about there being a ripple effect with them being in the system. I don't want people to start getting concerned and worried. . . . [W]hen the word got out, I had a lot of very concerned franchisees calling me."); *id.* at 986-87 (Keely agreed to Redemption Agreement because "I'm looking at i[t] as if, I keep her over here

- 12 -

For these reasons, the Court rejects, in its role as the finder of fact, the notion that Keely told Cramton on September 18, 2017 that the Kahala deal "not moving forward under any circumstances."

It is important to be precise about the chronology of events that followed the September 18, 2017 calls. The next key development occurred on Wednesday, September 20, 2017, when Keely sent an email to her investment banker, Price, entitled "Thoughts on Kahala." (Trial Ex. 86.) In this email, Keely laid out a strategy for re-engaging with Kahala by proposing a different deal structure than the Due North deal. (*Id.*) Under the proposed new deal structure, Keely would sell "100% equity" for $3.5 million. (*Id.*) This was "[c]onsiderably less" than what Due North had been offering. (5/26 Tr. 643.) Keely did not inform Cramton that she was exploring this option. (5/24 Tr. 248; 5/26 Tr. 646-49.)

On Thursday, September 21, 2017, Price attempted, without success, to touch base with Kahala representatives about the new proposed approach. (Trial Ex. 212 at G065903 [9/21 text message: "Fyi: call into Kahala today. Will let you know when I hear back."].)

On Friday, September 22, 2017, three significant events occurred. First, Cramton arranged for her personal attorney, Shelley DiGiacomo ("DiGiacomo"), to prepare a resignation letter on her behalf. (Trial Exs. 87, 498.) Although this letter was dated September 22, 2017, Cramton did not deliver it that day. Second, Cramton left a voicemail for Wuycheck (who, as noted, had responded almost immediately to Cramton's September 12, 2017 voicemail) for more information. (5/25 Tr. 262, 427 [Cramton]; 5/26 Tr. 561 [Wuycheck].)[10] This time, however, Wuycheck did not respond immediately. (*Id.*) Third,

---

for five years working on new brands, or I keep her over here for three years working on the Grabbagreen brand. And her highest and best use would be at the Grabbagreen brand, because that's what she knows and what she does."); 5/27 Tr. 836 (Kelli's concern with Cramton's resignation was that "Keely really viewed her as a partner and relied on her for quite some time. The company was in a delicate position, particularly in negotiating a transaction. And these buyers often look to the management team, look for that management team to stay intact. And if there's a sudden turnover, it's precarious in that type of situation. Plus the ongoing operations in Arizona would be difficult for Keely to maintain without her."); *id.* at 836-37 (Kelli's observation of Keely was that Cramton's resignation was not welcome and "would put increased stress on managing the business").

[10]     Cramton testified that the purpose of her September 22, 2017 phone call to

- 13 -

Keely separately sent an email to Wuycheck in which she expressed an interest in touching base to "determine [if there] is an interest level in moving forward with Grabbagreen." (Trial Ex. 88; 5/26 Tr. 647-48.) Wuycheck did not immediately respond to that email, either.

On the afternoon on Saturday, September 23, 2017, Cramton sent a text message to Kelli that read as follows: "I would like to talk to you before Monday. Would you be available to talk tomorrow at 9:00 AM PST. Thanks Kim." (Trial Ex. 333.) This text message did not explain why Cramton wanted to talk.

Kelli did not respond to the text message that day. At trial, Kelli credibly testified that the reason she didn't respond was because she was feeling ill from her cancer treatments, didn't know why Cramton was asking to speak with her, and didn't wish to be pulled away from her family activities on a weekend. (5/27 Tr. 856-57, 882-83.)

On Sunday, September 24, 2017 at 7:40 a.m., Cramton sent a text message to Keely that read as follows: "Can you ask Kelli if she received the text I sent yesterday? If not please let me know and I will resend." (Trial Ex. 307 at CRA000643.) Once again, this text message did not explain why Cramton wished to speak with Kelli. Less than an hour later, at 8:23 a.m., Keely responded: "Kelli is not available today." (*Id.*)[11]

It was at this point that Cramton made an eventful decision. Less than 20 minutes after receiving Keely's text message—and without waiting to hear back from Wuycheck—

---

Wuycheck "wasn't really . . . to find out about the deal" and was instead to find out "what happened? What – more of a like, explain to me like how this happened. It didn't make sense to me." (5/25 Tr. 427.)

[11] One of the examples of "cruelty" and "abuse" offered by Cramton was the failure to provide an immediate response to the text message she sent Kelli on the afternoon of Saturday, September 23, 2017. (*See, e.g.*, Doc. 412 at 14 [closing statement, denigrating the failure to respond as "Radio silence"]; 5/25 Tr. 409-10 [discussing deposition testimony characterizing this episode as "abuse"].) From the Court's perspective, this is another example of overreach. As discussed above, Kelli and Keely had no idea why Cramton was texting and certainly didn't know that she was about to submit a resignation letter. (5/27 Tr. 856-57, 882-83.) Additionally, Kelli was spending time with her family on a weekend afternoon while recuperating from cancer treatment. (*Id.*) Kelli and Keely are not mind-readers and the Court's assessment, as finder of fact, is that they did not do anything wrong—let alone engage in abuse and cruelty—by determining that it was permissible to respond to Cramton's cryptic Saturday-afternoon text by the following business day, Monday.

Cramton chose to submit her previously drafted resignation letter. (Doc. 310 at 4; 5/27 Tr. 884; Trial Ex. 423 [resignation letter was submitted at 8:42 a.m. on Sunday, September 24].) The letter stated that Cramton's resignation from GFL and its related entities would be "effective September 25, 2017." (Trial Ex. 87.) In other words, Cramton provided less than 24 hours' notice of her resignation. The letter also stated that Cramton would be willing to continue working for GFL another 30 days, but only if she was paid $42,000. (*Id.*) Finally, the letter noted that "Cramton has drawn no salary from [GFL] or any other Grabbagreen entity since December 2016." (*Id.*)

Upon receipt of the letter, Keely had to scramble to find another employee who was willing to assume Cramton's responsibilities. (5/28 Tr. 983-84.) She ultimately offered a $5,000 raise to that employee as part of the bargain. (*Id.*)

At an unspecified point during the "morning" of Monday, September 25, 2017, Wuycheck called Cramton in response to the voicemail she had left for him the previous Friday. (5/25 Tr. 262-64.) During the ensuing conversation, Wuycheck revealed to Cramton that there was still a possibility that Kahala might be interesting in acquiring Grabbagreen. (*Id.*) Despite learning this information, Cramton took no steps to claw back or otherwise rescind the resignation letter she had sent the previous day. (5/27 Tr. 867-68.)

At 11:57 am on Monday, September 25, 2017—seemingly after the Wuycheck-Cramton phone call, which, as noted, took place that "morning"—Kelli sent a letter to Cramton, on behalf of GFL, accepting Cramton's resignation. (Trial Ex. 312 [cover email]; Trial Ex. 89 [actual letter]; 5/26 Tr. 621 [confirming time sent].) This letter also stated that, because Cramton "voluntarily resigned after being employed for less than five years, Keely Newman has the right to purchase all or any portion of [Cramton's] membership units for $1.00 pursuant to the [ECH] Operating Agreement." (Trial Ex. 89.) Finally, the letter seemed to concede, as Cramton had alleged in her resignation letter, that Cramton hadn't been paid any wages by GFL since December 2016: "Kim . . . elected to receive loan repayments [from ECO] in lieu of certain compensation to avoid paying income tax

on those amounts. For her to choose loan repayments instead of taxable compensation and then claim that she has not been compensated is, at a minimum, dishonest. In any event, Kim is not entitled . . . to demand or unilaterally draw or take a salary or other compensation from Grabbagreen . . . ." (*Id.*)

On September 27, 2017, Cramton (via her attorney, DiGiacomo) sent a letter to GFL and Kelli that was intended to respond to the September 25 letter accepting her resignation. (Trial Ex. 328.) As for the wage payment issue, this letter again asserted that Grabbagreen had been "paying down [the promissory note] this year in lieu of compensation." (*Id.*) As for the statement in the September 25 letter that Cramton's ECH shares were subject to forfeiture, the letter requested a copy of the ECH Operating Agreement so the parties could then "have a productive discussion regarding Ms. Cramton's unpaid wages and equity interests." (*Id.*)

As these letters were being exchanged (and after Cramton's resignation had already been announced and accepted), Keely had still not spoken with anybody at Kahala about the counter-proposal she had authorized Price to begin exploring on September 20. (5/28 Tr. 979-80.)[12] It was not until Thursday, September 28, 2017, that Keely received a substantive response. On that day, Wuycheck wrote a lengthy email to Price in which he expressed formal interest, on behalf of Kahala, in pursuing a new version of a deal to acquire Grabbagreen. (Trial Ex. 93.)[13] Specifically, this email stated that Kahala "would be interested in entering into a non-binding LOI [letter of intent] for $3.25 million cash for Grabbagreen without any employment contract for the current owners." (*Id.*) The email further explained that "[w]e have not conducted a full due diligence yet on the concept as

---

[12]    Keely testified that she received the "first response . . . from [the] earlier communications trying to get [Kahala] back on board" on September 25, but this was "just a voicemail" from Wuycheck to Price, so she still "hadn't connected" with Kahala. (5/28 Tr. 979-80.) However, Wuycheck's email to Price on September 28 appears to indicate that Wuycheck left a voicemail on September 28. (Trial Ex. 93 [Wuycheck: "Sorry I missed you when I called this morning. In the interest of time, I figured I would recap my message to you on email so we can perhaps move this forward."].)

[13]    Keely testified at trial that she couldn't remember if the first substantive response from Kahala occurred on September 28 or 29. (5/28 Tr. 980.) As Trial Exhibit 93 shows, it was the 28th.

our initial dive was to really dig into top level numbers to see if we would be able to justify stepping into the Due North Deal. . . . To answer your question of what is missing in the current data room we just do not know yet as we have not really vetted it yet for the items we would normally conduct due diligence on." (*Id.*)

Meanwhile, the letter exchange between Kelli and Cramton continued. On September 30, 2017, Kelli wrote a response to Cramton's September 27 letter. (Trial Ex. 330.) Once again, this letter seemed to acknowledge that Cramton hadn't received any wages from GFL throughout 2017: "Ms. Cramton and Ms. Newman agreed there would be no payments to owner service providers at the end of 2016 and in 2017. . . . Ms. Cramton of course chose no distributions or salary over making capital contributions . . . ." (*Id.*) This letter again mentioned that Keely had the "right to purchase Ms. Cramton's [ECH] units for $1.00" and concluded with the following: "[H]ad Ms. Cramton resigned in the ordinary manner by dealing directly with Ms. Newman, transitioning company matters in an orderly professional fashion, cooperating in messaging to company constituents and not taking actions to harm the company, we would not be exchanging these letters. I personally am perplexed by how this situation was handled by Ms. Cramton and the allegations now being made." (*Id.*)

Following the delivery of this letter, the Kahala negotiations continued advancing. On October 5, 2017, Wuycheck sent an email to Price in which he expressed further interest, on behalf of Kahala, in exploring a potential Grabbagreen acquisition. (Trial Ex. 97.) Enclosed with the email was a draft letter of intent ("LOI"), which Wuycheck explained was intended "to give the seller a general reference point as to the purchase price which would be subject to change based off of further due diligence and potential negotiations." (*Id.*)

Five days later, on October 10, 2017, Cramton (via DiGiacomo) wrote a response to Kelli's September 30 letter. (Trial Ex. 327.) Among other things, this letter stated that, "[i]n hindsight, it appears that Grabbagreen engaged in deliberate conduct to force Ms. Cramton to resign. This was done to force Ms. Cramton to forfeit her equity on the eve of

a sale." (*Id.*)

The next day, October 11, 2017, Kelli wrote a response to Cramton's October 10 letter. (Trial Ex. 100.) In this letter, Kelli threatened to sue Cramton and demanded damages of $2 million. (*Id.*) In response to the allegation that Cramton had been forced to resign on the eve of a deal, Kelli wrote: "The notion that Ms. Cramton was forced out on the eve of a deal is utter nonsense. We have no idea what 'deal' you are talking about . . . . Let me be imminently [sic] clear, there is not even so much as a signed LOI. Quite clearly Ms. Cramton was not forced out on the eve of a deal. She resigned on vacation away from the office on her own accord." (*Id.*) Finally, this letter again seemed to concede that Cramton hadn't been paid any wages by GFL in 2017: "The notion that Ms. Cramton was not involved in the joint decision to choose no payments . . . . will require your client to commit blatant perjury." (*Id.*)[14]

About two weeks later, on October 23, 2017, Smit (on behalf of Kahala) sent a letter to Keely entitled "Proposed Acquisition of Grabbagreen Business." (Trial Ex. 102.) Enclosed with the letter was a term sheet that called for Kahala to pay $3.25 million for the assets of ECH. (*Id.*)

About a week later, on October 31, 2017, Keely formally exercised her right, under the ECH Operating Agreement, to purchase Cramton's membership units for $1. (Trial Ex. 104.) Keely did so by sending a cover letter and $1 check to Cramton. (*Id.*)

On November 22, 2017, Smit (on behalf of Kahala) sent a revised term sheet to Keely. (Trial Ex. 107.) Under the revised term sheet, the purchase price was reduced to $2.75 million. (*Id.*)

On December 20, 2017, Keely was served with the initial version of the complaint in this lawsuit, which included a minimum wage claim. (Docs. 1, 10.)

On December 21, 2017—the very next day—Keely instructed Mills, Grabbagreen's

---

[14] The Court notes that Kelli's October 11 email was not a model of candor. As discussed above, Kahala sent a draft LOI to Keely on October 5, yet six days later, Kelli was denying that any "deal" was in the works and purported not to understand what Cramton was talking about. Although it may have been literally true for Kelli to deny that there was a "signed LOI" as of October 11, 2017, the other statements in the letter are less defensible.

- 18 -

accountant, to change the Grabbagreen accounting entries previously booked as ECO loan repayments to Cramton. (5/27 Tr. 797-800; Doc. 408 at 157-67.) Keely further instructed Mills to recharacterize $25,000 of those distributions as GFL wage payments. (*Id.*) At the time, Keely did not provide any explanation for where this $25,000 figure came from. (*Id.*) Based on these changes, Cramton was eventually issued a W-2 for 2017 that stated she had received $25,000 in wages from GFL. (*Id.*)

On February 16, 2018, Kahala entered into a formal asset purchase agreement for the assets of ECH. (Trial Ex. 119.) Part 3.1 of the agreement called for an aggregate purchase price of $2.75 million. (*Id.* at G045431.)

On March 13, 2018, the asset purchase agreement was amended to reduce the aggregate purchase price to $2.6 million. (Trial Ex. 120.)

II.    Findings Related To The Wage Claim

Although the parties agree that "[a]t all relevant times, Cramton was employed by GGS and GFL" (Doc. 310 at 3), they disagree as to whether Keely should also be considered Cramton's "employer" (*id.* at 22-27). The legal analysis as to this issue is set forth in the "Conclusions of Law" section below. As predicate factual findings, the Court finds, consistent with the testimony cited below, that Keely was the person responsible for hiring Cramton (5/24 Tr. 90); that Keely served as Cramton's boss (*id.* at 91); that Keely had the authority to set Cramton's salary and the salary of other GFL employees (*id.* at 112-13); that Keely controlled Cramton's schedule, including when Cramton could take vacation time, and the hours Cramton was required to work (*id.* at 134, 160); and that Keely had the authority to reduce Cramton's salary (5/26 Tr. 628).

Another disputed issue is how many hours Cramton worked for GFL in December 2016 and throughout 2017. (Doc. 310 at 7-22.) The Court finds, consistent with Cramton's testimony (5/24 Tr. 131-170, 174-89) and the testimony of Jeff Farnell (5/25 Tr. 431-39), that the hours set forth in Trial Exhibit 132 are accurate. Although Defendants attempted to poke holes in Cramton's showing on this point (by suggesting that she sometimes switched between work- and non-work-related activities on days she claimed to be working

outside normal business hours and/or spent some of her time on GGS-related tasks), they provided no concrete alternative to Cramton's calculations.   At any rate, the Court accepts that Cramton was a hard-working employee who often worked on mornings, nights, and weekends and concludes that her estimate of hours worked for GFL is credible and, if anything, conservative.

To the extent it is not moot in light of the above findings, the Court further finds, consistent with Cramton's testimony, that she was not required to record or otherwise keep track of her GFL-related time.  (5/24 Tr. 169.)   This, in turn, triggers a rebuttable presumption that GFL did not pay the required minimum wage.  *See* A.R.S. § 23-364(D). The Court finds that Keely did not rebut this presumption.

A final disputed issue is the amount of wages that Cramton received from GFL in December 2016 and throughout 2017.  (Doc. 310 at 7-20.)  The Court finds, consistent with Cramton's testimony and the documentary evidence she discussed during her testimony, that Cramton stopped receiving wages from GFL in early December 2016 and did not receive any such wages afterward.  (5/24 Tr. 117-120, 130.)

In a related vein, the Court finds, consistent with Cramton's testimony and the documentary evidence she discussed during her testimony, that the periodic payments Cramton received throughout 2017 were loan repayments on the ECO promissory note, not wage payments from GFL.   (5/24 Tr. 189-200.)[15]   This is true even though the funds happened to come from GFL's bank account.  Although Keely (via Mills) attempted to recharacterize some of the ECO loan repayments as GFL wage payments after Cramton resigned (and caused GFL to issue a W-2 form to that effect), the Court concludes this was nothing more than an ineffective attempt to retroactively change the nature of the loan repayments.   On this point, the Court assigns heavy significance to the fact that the payments were contemporaneously entered in Grabbagreen's accounting system as ECO loan repayments, not GFL wage payments (5/27 Tr. 790-95), and were characterized in

---

[15]    Although the documentary evidence regarding the final $20,000 payment does not specifically characterize it as a loan repayment, the Court easily finds that it was such a payment, as it followed the same pattern as previous payments that were expressly characterized as ECO loan repayments.

contemporaneous text messages and emails as ECO loan repayments, not GFL wage payments (Trial Exs. 38, 41, 42, 54, 56, 62, 64, 307 at CRA000603, 637.)  Indeed, as late as November 2017, Grabbagreen's financial schedules stated that the outstanding balance on the ECO loan (which was, by then, held by ECH) was around $23,000.  (Trial Ex. 119 at G045517.  *See also* Trial Ex. 785 at CRA4648 [September 2017 text message from Mills to Cramton that balance on note was $23,017.12]; 5/24 Tr. 204 [explaining context for text message].)  This is further proof that the earlier payments to Cramton throughout 2017 were ECO loan repayments, not GFL wage payments—otherwise, the loan balance would have never dipped below the original balance of $66,527.  In the Court's view, the contemporaneous treatment of the payments to Cramton as ECO loan repayments provides a far better snapshot into the parties' true intent than any post-lawsuit accounting adjustments that may have been made.  It is also notable that Kelli seemed to concede, in many of the letters she wrote on GFL's behalf during the post-resignation letter exchange with DiGiacomo, that GFL hadn't paid wages to Cramton since December 2016.  Finally, the Court rejects, in its role as finder of fact, the defense's theory that 2017 ECO loan repayments to Cramton were necessarily recharacterized as GFL wage payments in light of the Due North deal's failure to close.

III.    Findings Related To The Remaining Claims

The essential theory underlying Cramton's claims for negligent misrepresentation, fraud, and breach of the implied covenant of good faith and fair dealing is as follows: (1) Keely knew, based on her phone call with the Kahala representatives on the morning of September 18, 2017, that an acquisition by Kahala was still a possibility (even though Kahala had rejected one specific proposal, which was to step into the Due North deal); (2) Keely nevertheless lied about (or, at a minimum, made negligent misrepresentations concerning) that possibility during her phone call with Cramton later that day, by disclaiming any possibility of a future deal; (3) Keely's intent, in making this misrepresentation, was to trick Cramton into resigning, because a voluntary resignation would trigger Keely's right, under § 9.3(b) of the ECH Operating Agreement, to repurchase

Cramton's 18.6% ownership interest for only $1; (4) Keely's motive for embarking on this course of conduct was financial, in that eliminating Cramton's ownership interest would result in more money in her pocket (and would help her recoup some of the money lost from the downward price adjustments to the deal terms over time); (5) Keely intended for Cramton to rely on the false information concerning the status of the Kahala deal; and (6) Cramton acted reasonably by relying on the false information provided by Keely. (Doc. 310 at 46-59, 61-65, 69-70; 5/28 Tr. 1042-62, 1071-76 [Cramton's closing argument].) Additionally or alternatively, Cramton contends that Keely acted improperly in the aftermath of the resignation by choosing, in late October 2017, to exercise her discretionary right under the ECH Operating Agreement to repurchase Cramton's membership units for $1. (5/28 Tr. 1068-71.) Finally, as for damages, Cramton contends that the fair market value of the membership units as to which she was unfairly deprived was $483,600. (Doc. 310 at 28-35, 59-61, 65-69; 5/28 Tr. 1078-82, 1086.)

This backdrop is helpful in framing the issues as to which specific factual findings are necessary. The Court finds that Keely did not make any false statements, or omit or fail to disclose any material information, to Cramton during the September 18, 2017 phone call (or at any point between that phone call and Cramton's resignation). In a related vein, the Court finds that Keely did not intentionally make any false statements to Cramton during the September 18, 2017 phone call (or at any point between that phone call and Cramton's resignation).

The Court also finds that Keely did not intend for Cramton to rely on the statements made during the September 18, 2017 phone call for purposes of deciding whether to resign. As discussed above, the topic of Cramton's continued employment at Grabbagreen did not even come up during the call and the Court rejects the notion that Keely's statements during the call were part of a secret plot to trick Cramton into resigning. In a related vein, the Court finds that Cramton's reliance on Keely's statements in making her decision to resign was unreasonable and unjustified. *See* Restatement (Second) of Torts § 538(1)-(2) ("Reliance upon a fraudulent misrepresentation is not justifiable unless the matter

misrepresented is material. . . . The matter is material if . . . a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.").[16]

Indeed, even if Keely *had* incorrectly told Cramton during the September 18, 2017 phone call that there was no possibility of a future Kahala deal—which, as discussed above, didn't happen—the Court is skeptical that Cramton would be entitled to recovery. At the moment she began her September 18, 2017 phone call with Keely, Cramton knew that multiple sophisticated franchising companies (Due North and Kahala) were giving, or had recently given, serious consideration to spending millions of dollars to purchase assets in which she held an 18.6% ownership interest. Cramton further knew that Keely was strongly motivated to sell, and sell quickly. And Cramton knew that, under the ECH Operating Agreement, she could forfeit her membership interest by voluntarily resigning before a sale. Thus, even if Cramton was led to believe that the Kahala deal had fallen through, it made no sense for her to react to that news by immediately resigning. Keely was still incentivized to sell and Cramton's 18.6% ownership interest in the underlying asset was still quite valuable, even if Kahala was uninterested in purchasing it. The logical reaction, under those circumstances, would have been to hang in there for at least a reasonable period of time to see if another acquiror might enter the picture. *See* Restatement (Second) of Torts § 545A, cmt. b ("Although the plaintiff's reliance on the misrepresentation must be justifiable, . . . [j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. Negligent reliance and action sometimes will not be justifiable, and the recovery will be barred accordingly . . . .").[17]

---

[16] "Absent controlling authority to the contrary," Arizona courts "generally follow the Restatement when it sets forth sound legal policy." *In re Sky Harbor Hotel Props., LLC*, 443 P.3d 21, 23 (Ariz. 2019). Although the Arizona Supreme Court has not adopted this section of the Second Restatement, several decisions by the Arizona Court of Appeals have cited it with approval. *See, e.g.*, *Caruthers v. Underhill*, 287 P.3d 807, 815 (Ariz. Ct. App. 2012).

[17] To be sure, had Cramton been the victim of fraudulent misrepresentation, an

Moreover, Cramton had a personal relationship dating back more than a decade with Wuycheck, one of the Kahala executives who was personally working on the Grabbagreen deal, and Wuycheck had already proved willing—via their communication on September 12, 2017—to share information directly with Cramton about the status of the negotiations. On Friday, September 22, 2017, Cramton again reached out to Wuycheck for information, but this time she didn't receive an immediate response. It is baffling that Cramton chose to submit her resignation letter on Sunday, September 24, 2017, instead of waiting to hear back from Wuycheck. At trial, in response to questioning from the Court on this exact point—"Why didn't you wait to hear back from Mr. Wuycheck before formally resigning?"—Cramton responded that "the biggest thing was, I could not go back there on Monday after my vacation. I couldn't do it. . . . I could not go back to the abuse and to Keely Newman yelling and screaming at me, and just the number of hours I was working, and just . . . couldn't do it." (5/25 Tr. 427-28.) The difficulty with this explanation is that, in her resignation letter, Cramton stated she *was* willing to keep working for another month, so long as she received a $42,000 payment. Thus, Cramton's claim that she "couldn't do it" rings hollow.

Additionally, on the morning of Monday, September 25, 2017, Cramton did hear back from Wuycheck, who informed her that the Kahala deal was still alive. It appears that, at the time of this conversation, Keely had not yet accepted Cramton's resignation offer—the testimony at trial was that the Wuycheck-Cramton conversation occurred during the "morning" of September 25 but the email accepting Cramton's resignation wasn't sent until 11:57 a.m. (a time that typically isn't considered part of the morning). This suggests that some window of time existed for Cramton to attempt to rescind her resignation offer after speaking with Wuycheck, but she never attempted to do so. This inaction further

intentional tort, she generally would not be required to "exercise the care of a reasonable [person] for [her] own protection." Restatement (Second) of Torts § 545A cmt. a. And although negligent reliance may sometimes be justified, such as "when there is a relation of trust and confidence between the parties," which the Court has no doubt existed between Cramton and Keely in their business dealings, the facts and circumstances surrounding Keely's efforts to sell the business—and Cramton's knowledge and involvement in the same—persuade the Court that Cramton's negligent actions taken in reliance on Keely's statements were unjustifiable and would preclude recovery here.

undermines her claim. *Cf.* Restatement (Second) of Torts § 541 ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."); *Dawson v. Withycombe*, 163 P.3d 1034, 1048 (Ariz. Ct. App. 2007) (citing same).

As for Keely's conduct following Cramton's resignation, including her decision on October 31, 2017 to exercise her contractual right under the ECH Operating Agreement to repurchase Cramton's membership units for $1, the Court finds that Keely acted fairly and in good faith and did nothing to prevent Cramton from receiving the benefits of their agreement. The ECH Operating Agreement expressly stated that Cramton could forfeit her membership interest if she voluntarily resigned too soon and that is exactly what happened. Under these circumstances, it cannot be said that Cramton was denied a reasonably expected benefit of the bargain.

Given these conclusions, there is no need to make factual findings as to whether Cramton has proved, with adequate certainty, the fair market value of her membership interest in ECH or the value of her asserted emotional distress damages. There is also no need to make factual findings as to Cramton's claim for punitive damages.

**CONCLUSIONS OF LAW**

I. <u>Wage Claim</u>

Count Four is a claim against Keely for violating the Arizona Minimum Wage Act ("AMWA"), which is codified at A.R.S. § 23-362 *et seq.*, from the period of December 1, 2016 through September 2017. (Doc. 88 ¶¶ 111-18.) Under AMWA, "[a]ny employer who fails to pay the wages . . . required under this article shall be required to pay the employee the balance of the wages . . . owed, including interest thereon, and an additional amount equal to twice the underpaid wages." *Id.* § 23-364(G). Therefore, a threshold issue presented by Cramton's claim is whether Keely qualifies as an "employer."

AMWA defines the term "employer" as "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, *individual* or other entity *acting directly or indirectly in the interest of an*

*employer* in relation to an employee." *Id.* § 23-362(B) (emphases added). Additionally, in the Final Pretrial Order, the parties stipulate that "[t]he Ninth Circuit's 'economic reality' test applies to determine whether an individual or entity constitutes an 'employer,' considering whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Also, it is imperative that she actually exercised one or more of the four control factors listed in this test; mere ability to exercise control is insufficient." (Doc. 310 at 5, internal quotation marks and citation omitted). Applying these standards and in light of the findings of fact set forth above, Keely qualifies as Cramton's employer for purposes of Cramton's work for GFL.

Calculating the amount of minimum wages to which Cramton was entitled under AMWA is a matter of simple arithmetic—multiplying the number of hours worked by the applicable minimum wage. As discussed in Trial Exhibit 132 (which the Court has found to be accurate), Cramton worked 140 hours in December 2016 for GFL (and Keely) and a total of 1,583 hours from January to September 2017 for GFL (and Keely). The parties have stipulated that the applicable minimum wage in December 2016 was $8.05 and the applicable minimum wage throughout 2017 was $10. (Doc. 310 at 4.) Therefore, the minimum wage to which Cramton was entitled during this period was $16,957 ($1,127 for December 2016 and $15,830 for January to September 2017).

The final step in the analysis is determining whether the amount of wages Cramton actually earned during this period from GFL (and Keely) exceeded the minimum wage to which she was entitled. That analysis is straightforward here because, as discussed in the findings of fact, Cramton earned no wages from GFL during the relevant period. The Court also rejects Keely's argument, set forth in the Final Pretrial Order, that the "employer paid health insurance premiums, employer monthly payments for her car, and employer paid tax gross ups" Cramton received during the relevant period qualify as wages under AMWA. (Doc. 310 at 9, 12.) Cramton has not cited any legal authority supporting her

argument on this point and the Court concludes that the aforementioned items constitute non-wage compensation and benefits. *Meyer v. State*, 436 P.3d 511, 516 (Ariz. Ct. App. 2019) ("In the context of the Minimum Wage Act, . . . the word 'benefits' has an associated, but separate meaning from the word 'wages.'  When used together, the only reasonable interpretation is that 'wages' and 'benefits' are complementary parts of employee compensation as a whole.").

Accordingly, as to Count Four, Keely is liable to Cramton for a total of $50,871, which consists of "the balance of the wages . . . owed, including interest thereon, and an additional amount equal to twice the underpaid wages." A.R.S. § 23-364(G).

II.    Remaining Claims

The remaining claims are Cramton's claims against Keely and ECH in Counts Seven, Nine, and Ten for breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraud.  (Doc. 88 ¶¶ 131-37, 146-62.)

As for Count Seven, "[t]he implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.  The duty arises by operation of law but exists by virtue of a contractual relationship." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002).  "[I]f one party exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain, the law of good faith may provide a remedy." *Beaudry v. Ins. Co. of the W.*, 50 P.3d 836, 841 (Ariz. Ct. App. 2002) (internal quotation marks omitted).  As discussed in the findings of fact, Keely acted fairly and in good faith and did nothing to prevent Cramton from receiving the reasonably expected benefits of the ECH Operating Agreement.  Although Kelli's letter of October 11 was not a model of candor, it had no bearing on the propriety of Keely's contractual right to exercise her repurchase option under § 9.3(b) of the Operating Agreement—by the time the letter was sent, Cramton's resignation had already been official for over two weeks and Keely's repurchase right had already vested.  Accordingly, Keely and ECH are entitled to

judgment in their favor on Count Seven.

As for Count Nine, Cramton acknowledged during closing argument that the essential elements of her claim for negligent misrepresentation include, *inter alia*, that (1) Keely and ECH "either provided Cramton with false or incorrect information, or omitted or failed to disclose material information"; (2) Keely and ECH "intended that Cramton rely on information provided and the defendants provided it for that purpose"; and (3) "Cramton's reliance was justified." (Doc. 412 at 35.) As discussed in the findings of fact, none of those elements are satisfied here. Accordingly, Keely and ECH are entitled to judgment in their favor on Count Nine.

Finally, as for Count Ten, Cramton acknowledged during closing argument that the essential elements of her claim for fraud include, *inter alia*, that (1) Keely and ECH "made a misrepresentation to Cramton"; (2) Keely and ECH "knew that the representation was false"; (3) Keely and ECH "intended that Cramton would act upon the representation in the manner reasonably contemplated by the defendants"; and (4) "Cramton's reliance was reasonable and justified under the circumstances." (Doc. 412 at 36.) As discussed in the findings of fact, none of those elements are satisfied here. Accordingly, Keely and ECH are entitled to judgment in their favor on Count Ten.

Dated this 23rd day of June, 2021.

_____
Dominic W. Lanza
United States District Judge