**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kim Cramton, | No. CV-17-04663-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Grabbagreen Franchising LLC, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Kim Cramton's ("Cramton") motion for summary judgment.  (Doc. 440).  For the following reasons, the motion is denied as to Count Four and granted as to Count Five.

### RELEVANT BACKGROUND

The parties are familiar with the background details of this case, so only a brief recap is necessary here.

On December 15, 2017, Cramton initiated this action.  (Doc. 1.)  Cramton later filed an amended complaint, which is her operative pleading.  (Doc. 88.)

On December 23, 2019, the Court issued an order addressing a variety of motions, including the parties' cross-motions for summary judgment.  (Doc. 247.)  This order granted summary judgment on a number of claims and counterclaims, leaving only the following claims for trial: (1) Cramton's minimum-wage claim (Count Four) against Keely Newman ("Keely") and Grabbagreen Franchising LLC ("GFL"); (2) Cramton's claim for breach of the promissory note (Count Five), limited to the issue of damages, against Eat

Clean Operations, LLC ("ECO"); and (3) Cramton's claims for breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraud (Counts Seven, Nine, and Ten) against Keely and Eat Clean Holdings ("ECH").

On January 31, 2020, ECO filed a notice "that on January 29, 2020 it filed a petition for bankruptcy with the United States Bankruptcy Court, Southern District of Florida." (Doc. 254.)  Based on this notice, the Court entered a stay as to Cramton's claim in Count Five against ECO.  (Doc. 255.)

On June 17, 2020, the remaining defendants (Keely, GFL, and ECH) filed a motion to strike Cramton's jury demand, based on the presence of contractual jury waivers appearing in both the ECH operating agreement and the ECO promissory note.  (Doc. 322.)

On October 2, 2020, the Court issued an order that, among other things, granted in part and denied in part the motion to strike Cramton's jury demand.  (Doc. 345 at 21-39.) Specifically, as for Count Four, the Court concluded that Cramton had waived her right to a jury trial as to Keely but not as to GFL.  (*Id.* at 39.)  As for Count Five, the Court did not resolve the waiver issue because "[t]hat claim has been stayed due to ECO's bankruptcy." (*Id.* at 33 n.16.)  Finally, as for Counts Seven, Nine, and Ten, the Court concluded that Cramton had waived her right to a jury trial as to both Keely and ECH.  (*Id.* at 39.)  Given these rulings, and in light of other considerations (including that "the COVID-19 pandemic has made it very difficult to schedule civil jury trials"), the Court then severed Cramton's minimum-wage claim in Count Four against GFL from the remaining unstayed claims and scheduled those claims for a bench trial.  (*Id.*)

On May 24-28, 2021, the bench trial took place.

On June 23, 2021, the Court issued its findings of fact and conclusions of law.  (Doc. 429.)  Those findings and conclusions are summarized as follows:

▪ Count Four (Minimum-Wage Claim Against Keely): As an initial matter, the Court noted that, although the parties stipulated that GFL qualified as Cramton's employer, they disagreed about whether Keely should also be considered Cramton's employer for purposes of the minimum-wage claim.  (*Id.* at 19.)  The Court resolved this issue in

Cramton's favor, concluding that because Keely was the person responsible for hiring Cramton, served as Cramton's boss, had the authority to set Cramton's salary and the salary of other GFL employees, controlled Cramton's schedule, and had the authority to reduce Cramton's salary, "Keely qualifies as Cramton's employer for purposes of Cramton's work for GFL." (*Id.* at 19, 26.)

Turning to the merits of the minimum-wage claim, the Court first ruled in Cramton's favor as to the amount of hours she worked for GFL during the period in question, finding that "Cramton worked 140 hours in December 2016 for GFL (and Keely) and a total of 1,583 hours from January to September 2017 for GFL (and Keely)." (*Id.* at 26.) In reaching this conclusion, the Court rejected, in its role as finder of fact, Keely's attempts "to poke holes in Cramton's showing on this point (by suggesting that she sometimes switched between work- and non-work-related activities on days she claimed to be working outside normal business hours and/or spent some of her time on [tasks associated with a different, non-GFL entity])." (*Id.* at 19-20.)

Next, the Court made findings as to the amount of wages Cramton earned from GFL during the period in question. At trial, Keely proffered evidence suggesting that Cramton had received substantial compensation from GFL, but the Court disagreed in its role as finder of fact, adopting Cramton's position that "the periodic payments Cramton received throughout 2017 were loan repayments on the ECO promissory note, not wage payments from GFL." (*Id.* at 20-21.) This was true, the Court concluded, "even though the funds happened to come from GFL's bank account." (*Id.* at 20.)

Having concluded that Cramton worked a significant number of hours for GFL during the relevant period for no compensation, "[c]alculating the amount of minimum wages to which Cramton was entitled . . . [was] a matter of simple arithmetic—multiplying the number of hours worked by the applicable minimum wage." (*Id.* at 26.) Those minimum wages amounted to $16,957, which became $50,871 after mandatory trebling. (*Id.* at 26-27.) Accordingly, the Court concluded that "as to Count Four, Keely is liable to Cramton for a total of $50,871." (*Id.* at 27.)

▪ Counts Seven, Nine, And Ten (Various Claims Against Keely and ECH): The Court ruled in Keely's and ECH's favor as to these claims.  (*Id.* at 21-25, 27-28.)

On June 28, 2021, the Court issued an order requiring the parties to meet and confer and then file a joint statement setting forth their views about how to proceed on the remaining claims that hadn't been resolved during the bench trial (Count Four against GFL and Count Five against ECO).  (Doc. 430.)

On July 12, 2021, the parties filed the joint statement.  (Doc. 432.)  Among other things, it revealed that ECO's bankruptcy proceeding had ended.  (*Id.*)

On July 26, 2021, the Court issued an order in response to the parties' joint statement.  (Doc. 434.)  As for Count Five, the Court lifted the stay and set a deadline by which Cramton could either file a motion for summary judgment or move to voluntarily dismiss.  (*Id.* at 1-3.)  As for Count Four, the Court addressed the parties' dueling suggestions, found them wanting, and concluded that, "[b]ecause neither side is willing to compromise, it appears the Court is left with no choice but to schedule a jury trial on Count Four." (*Id.* at 3-5.)  However, following the issuance of this order, Cramton sought leave to include briefing related to Count Four in the summary judgment motion she would be filing as to Count Five.  (Doc. 436.)  This request was granted.  (Doc. 437.)

On August 23, 2021, Cramton filed the summary judgment motion.  (Doc. 440.)

On September 7, 2021, GFL and ECO filed a response.  (Doc. 442.)[1]

On September 22, 2021, Cramton filed a reply.  (Doc. 443.)

## DISCUSSION

### I.  Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

---

[1]    GFL and ECO requested oral argument, but this request is denied because the issues are fully briefed and argument would not aid the decisional process.  LRCiv 7.2(f).

1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*  There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.     <u>Count Four</u>

    A.     **Background**

In Count Four, Cramton asserts a minimum-wage claim against GFL and Keely.

As discussed above, the Court previously concluded that Cramton had waived her right to a jury trial on this claim as to Keely (but not GFL) and then severed the claims so the bench trial against Keely could go first.

Following the bench trial, the Court ruled in Cramton's favor, concluding that Cramton had worked 1,723 hours for GFL between December 2016 and September 2017; that Cramton received no wages from GFL for this work (instead, the payments Cramton received during this period were repayments on the ECO note); that the minimum wage to which Cramton was entitled for these unpaid hours was $16,957 (which, after mandatory trebling, amounted to $50,871); and that Keely was individually liable for the resulting award because, under Arizona's minimum wage statute, the definition of "employer" includes not only entities (*i.e.*, GFL) but individual managerial employees of those entities who exercise a sufficient degree of control over other employees' wages and schedules (*i.e.*, Keely).

    B.     **The Parties' Arguments**

Cramton now moves for summary judgment on her minimum-wage claim in Count Four as to GFL.  (Doc. 440 at 2-3.)  The Court construes Cramton's rather terse briefing on this issue, which occupies only a page and a half of her motion, as identifying three reasons why summary judgment should be granted in her favor.  First, Cramton argues (without citing any case law) that, because the parties previously stipulated that GFL served as her employer and the Court found following the bench trial that she did not receive any wages for her work for GFL during the relevant period, it follows that she is entitled to summary judgment on her minimum-wage claim against GFL.  (*Id.*)  Second, Cramton argues (again without citing any case law) that because the Court found following the bench trial that Keely qualified as her employer, "Keely Newman's actions bound GFL as well."  (*Id.* at 3.)  Third, Cramton argues that, because a corporate officer with operational

control over an entity and the entity are considered jointly and severally liable for an award of unpaid wages under the FLSA, it follows that joint-and-several liability should also be the rule under Arizona's minimum wage statute.  (*Id.*)  In support of this argument, Cramton cites *Boucher v. Shaw*, 572 F.3d 1087 (9th Cir. 2009).

GFL opposes Cramton's motion.  (Doc. 442.)  First, GFL argues that any claim for joint-and-several liability as to Count Four has been waived because there is "no mention of joint and several or vicarious liability of GFL, GGS (a non-party) or Keely anywhere in Cramton's pleadings, [MIDP disclosures], or the [joint final pretrial order]."  (*Id.* at 1, 4.) Second, GFL argues that an array of disputed issues of fact—including the amount of hours Cramton worked for GFL and whether the payments that Cramton received during the relevant period should be credited to GFL or ECO—preclude the entry of summary judgment in Cramton's favor on Count Four.  (*Id.* at 1-2, 4-16.)  In a related vein, GFL argues that although the Court may have resolved those disputed issues against Keely and in Cramton's favor during the bench trial, Cramton previously "insisted that GFL's trial be a separate jury trial" and GFL is thus entitled to "a trial to be heard in its own defense." (*Id.* at 4-5.)  Third, GFL argues that Cramton's reliance on cases construing the FLSA is misplaced because "[t]he FLSA does not govern liability under Count IV, rather Arizona law does.  No authority under Arizona law has been cited by Cramton in her motion for the proposition that GFL is jointly and severally liable with Keely.  The default under Arizona law is several liability in general and Arizona law makes it very clear that the Arizona Limited Liability Company Act . . . is controlling here which expressly provides a broad, impervious liability shield for members and managers of a limited liability company."  (*Id.* at 2.)

In reply, Cramton accuses GFL of "improperly attempt[ing] to re-litigate the merits of [her] minimum wage claim . . . after a trial on the merits" and of attempting to "turn the rules of the preclusive effect of prior litigation on their head." (Doc. 443 at 1-2.)  According to Cramton, the summary judgment analysis should be guided by the "notion that if Keely Newman is liable for the failure to pay minimum wage to Cramton, then [GFL] must also

be liable by virtue of being Cramton's undisputed employer." (*Id.* at 2.)  Cramton argues that the application of this principle is compelled not only by the FLSA (which provides guidance when construing Arizona's minimum wage statute), but also by Arizona's joint-and-several liability statute and Arizona's common law of agency.  (*Id.* at 2-4.)  Finally, Cramton contends that GFL's reliance on the Arizona Limited Liability Company Act is misplaced because that statute "makes it explicit that an LLC's managers are its agents, and bind the company."  (*Id.* at 4-5.)

C.     **Analysis**

Cramton's motion for summary judgment on Count Four as to GFL is denied.  As an initial matter, although Cramton places heavy emphasis on the fact that GFL previously stipulated that it served as her "employer," this stipulation only begs the question of whether GFL, in its undisputed role as her employer, failed to pay her a minimum wage in violation of Arizona's minimum wage statute.

On that issue, Cramton seems to contend that, because the Court made factual findings in her favor during the bench trial as to the number of hours she worked for GFL during the relevant period (1,723), the amount of wages she earned from GFL for this work ($0), and whether Keely also served as her "employer" (yes), those findings are now entitled to "preclusive effect" for purposes of her claim in Count Four against GFL.  (Doc. 440 at 2-3; Doc. 443 at 1.)  The difficulty with this argument is that GFL wasn't a party to the bench trial.  Cramton has not identified any authority suggesting that the factual findings made against one defendant during a bench trial are binding against a co-defendant that is entitled to a jury trial on the same issues as part of the same case.  Although the Court, in its role as finder of fact during the bench trial, may have resolved the disputed evidence in Cramton's favor on the issues of how much she worked for GFL, how much she was paid by GFL, and whether Keely qualified as her employer, this outcome should not obscure the fact that the evidence on those points was (and remains) disputed.  It is possible that a different factfinder—in this case, a jury—might reach different

conclusions.[2]

The parties also spill much ink debating whether joint-and-several liability should apply when a corporate officer and corporate entity are both deemed liable for the failure to pay minimum wages.  (Although this is the rule under the FLSA, the parties dispute whether it is also the rule under Arizona's minimum wage statute.)  In the Court's view, this debate is premature.  Courts only address the question of joint-and-several liability after there has been a determination that two or more defendants are liable for the underlying injury.  *Cf. Schmidt v. Ramsey*, 860 F.3d 1038, 1051 (8th Cir. 2017) ("Joint and several liability, after all, does not allow a non-negligent person to be found negligent—it merely allows more than one negligent person to be found legally responsible for 100 percent of a jointly caused injury.").  Cramton is thus attempting to put the cart before the horse—she seeks to hold GFL jointly and severally liable for a damage award imposed against Keely before there has been an adjudication of GFL's liability.

The authorities cited by Cramton do not compel a different conclusion.  In *Boucher v. Shaw*, 572 F.3d 1087 (9th Cir. 2009), the only mention of joint-and-several liability appears in the court's parenthetical summary of *Donovan v. Agnew*, 712 F.3d 1509 (1st

---

[2]    Although the phrase "collateral estoppel" does not appear anywhere in Cramton's motion or reply, it is possible she was attempting to argue that GFL should be estopped from relitigating the factual issues that were resolved in her favor during the bench trial.  To the extent this was Cramton's intended argument, it fails.  Assuming without deciding that Arizona's rules of collateral estoppel would apply in this circumstance, "[c]ollateral estoppel, or issue preclusion, binds a party to a decision on an issue litigated in a previous lawsuit if the following factors are satisfied: (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was entered, (4) resolution of the issue was essential to the decision, and (5) there is common identity of the parties."  *Campbell v. SZL Properties, Ltd.*, 62 P.3d 966, 968 (Ariz. Ct. App. 2003).  As an initial matter, it is not clear that the third element is satisfied here—Cramton's victory over Keely on the minimum-wage claim during the bench trial may not qualify as a "final decision on the merits" because the Court has not yet entered judgment on that claim.  *Cf. Avco Corp. v. Crews*, 76 F. Supp. 3d 1161, 1167-68 (W.D. Wash. 2015) (declining to apply collateral estoppel and impose joint-and-several liability based on a liability finding in a prior case, where the party found liable entered into a settlement before judgment was entered, because "this Court looks for entered judgments, and not rulings concerning fault").  More important, Cramton has not established that the fifth element ("common identity of the parties") is satisfied, as GFL did not participate in the bench trial.  *Campbell*, 62 P.3d at 968 ("Offensive use of collateral estoppel occurs when a plaintiff seeks to prevent the defendant from relitigating an issue the defendant previously litigated unsuccessfully in an action with another party.").

Cir. 1983).  In *Donovan*, in turn, the First Circuit merely observed that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages," before affirming the district court's conclusion that two "corporate officers with a substantial ownership interest in the corporation who are directly involved in decisions affecting employee compensation may be held personally liable for the corporation's failure to pay minimum and overtime wages as required under the FLSA." *Id.* at 1511, 1514.  Notably, the *Donovan* court had no reason to consider whether the corporation should also be held liable for the unpaid wages (let alone whether that liability should be joint and several with the individual officers' liability).  This was because the corporation declared bankruptcy midway through the case, resulting in the dismissal of the claim against it.  *Id.* at 1510.

Meanwhile, the Arizona authorities cited for the first time in Cramton's reply suggest, at most, that when a corporate officer and corporation are both found liable for an injury caused by conduct undertaken by the officer while acting as an agent of the corporation, the two defendants should be deemed jointly and severally liable for the resulting damage award.  *Higgins v. Assmann Elecs., Inc.*, 173 P.3d 453, 459 (Ariz. Ct. App. 2007) ("The jury returned a $400,000 verdict against Assmann [corporation] for wrongful termination and a $300,000 verdict against Meyer [corporate vice president] for the same claim.  The trial court, however, corrected this by holding Assmann and Meyer jointly and severally liable for a $300,000 wrongful termination judgment.  Assmann argues that the trial court abused its discretion by amending the verdict and denying a new trial.  Assmann provides no authority for this argument.  The imposition of a joint and several judgment was appropriate under A.R.S. § 12-2506(D)."); *Warner v. Southwest Desert Images, LLC*, 180 P.3d 986, 991-92 (Ariz. Ct. App. 2008) (where trial court granted summary judgment in the plaintiff's favor on the issue of liability against a corporate officer, the officer was acting as the corporation's agent, and the jury ultimately awarded damages against the corporation, the officer and corporation should be held jointly and

severally liable for the resulting award); A.R.S. § 12-2506(D)(2) ("The liability of each defendant is several only and is not joint, except that a party is responsible for the fault of another person . . . if . . . [t]he other person was acting as an agent or servant of the party."). But again, that is not the scenario here—GFL has not yet been found liable.

Given this backdrop, and because the parties have been unable to agree to an alternative process for resolving the claim, the time has come to schedule a jury trial on Cramton's claim in Count Four against GFL. If the jury renders a verdict in Cramton's favor in the same amount that was awarded following the bench trial, the parties can then address, in post-trial briefing, whether Keely's and GFL's liability should be joint and several.[3] If the jury returns a verdict in Cramton's favor but in a different amount than was awarded following the bench trial, the parties may also need to address how (or whether) the damage awards may be reconciled, as occurred in *Higgins*. And if the jury returns a verdict in GFL's favor, there will be an entirely more complicated issue of inconsistent verdicts that will need to be addressed at that time.

Of course, Cramton may choose to avoid these complications (as well as the time and expense associated with a jury trial) by choosing not to pursue her minimum-wage claim against GFL. Cramton has already prevailed on that claim as to Keely, it is unclear to the Court whether GFL has any assets that might be used to satisfy a future judgment— according to the records cited in Cramton's brief (Doc. 443 at 4), GFL is now an inactive entity—and a jury trial could result in an inconsistent verdict that could, in turn, call into question the validity of Cramton's previous bench-trial victory against Keely. But that is Cramton's choice to make. It appears she was previously given the option to try her minimum-wage claim against GFL as part of the bench trial but declined that offer. (Doc.

---

[3] The Court notes that, although GFL specifically argued in its response that Cramton forfeited her ability to seek joint-and-several liability by failing to disclose that theory of liability in her complaint, her MIDP disclosures, or the final joint pretrial order (Doc. 442 at 1,4 ), Cramton made no effort to address GFL's forfeiture argument in her reply. This omission provides an additional reason to deny summary judgment on the current record— it is not the Court's role, at summary judgment, to hunt through the record to determine whether there was adequate disclosure of the proffered theory of liability (and, if not, to determine *sua sponte* whether there are reasons to overlook the alleged disclosure violation).

1  432 at 8.)  This choice helps account for the current state of affairs.

2  III.  Count Five

3       A.  **Background**

4       In Count Five, Cramton asserts a claim against ECO for breach of contract—

5  specifically, for failure to repay a promissory note.

6       As discussed above, in the December 2019 summary judgment order, the Court

7  granted summary judgment to Cramton on this claim, but only as to liability.  (Doc. 247 at

8  46-47 & n.23.)

9       As for the damages associated with Count Five, the parties took unusual positions

10  in their earlier summary judgment briefing.  Cramton, who might be expected to argue for

11  the largest possible damage award associated with this claim, took the position that

12  although the original balance of the ECO note was $66,527, the "various payments" she

13  received throughout 2017 were ECO note repayments that had the effect of reducing the

14  outstanding balance to $23,017.12.  (Doc. 142 at 10-11.)  Meanwhile, ECO denied that any

15  of the payments Cramton received in 2017 were ECO note repayments—it took the

16  position that all of the payments were GFL wage payments and that the outstanding balance

17  of the note thus remained $66,527.  (Doc. 158 at 8-12.)

18       At any rate, in January 2020, soon after the issuance of the summary judgment

19  ruling, ECO filed a notice indicating that it had filed for bankruptcy.  (Doc. 254.)  In

20  response, the Court imposed a stay as to Count Five.  (Doc. 255.)  The stay remained in

21  place during the bench trial, so Count Five was not resolved as part of that proceeding.

22  Nevertheless, as discussed above, the parties presented extensive evidence during the

23  bench trial about the nature of the payments Cramton received during 2017, and the Court

24  ultimately accepted (in its role as finder of fact) Cramton's position that the payments

25  constituted ECO loan repayments that reduced the outstanding balance on the ECO note to

26  $23,017.12.

27       After the conclusion of the bench trial, the parties informed that Court that ECO's

28  bankruptcy proceeding was complete.  (Doc. 432.)  In response, the Court lifted the stay as

- 12 -

to Count Five.  (Doc. 434.)

B.   **The Parties' Arguments**

Cramton now moves for summary judgment "that the amount of damages for Count Five . . . should be $23,017.12." (Doc. 440 at 2.)  As an initial matter, Cramton argues that the earlier bankruptcy proceeding has no bearing on her ability to pursue summary judgment on Count Five because the entity that filed for bankruptcy was not ECO (*i.e.*, "Eat Clean Operations, LLC")—rather, the bankruptcy petition was filed by a similarly named, but distinct, entity named "ECO, LLC" that "does not have any connection to Eat Clean Operations, LLC." (*Id.* at 3-5.)  Alternatively, Cramton argues that even if ECO was the entity that filed the bankruptcy petition, this would not interfere with her ability to pursue Claim Five now that the bankruptcy stay has been lifted because "only individuals can obtain a discharge" in a Chapter 7 bankruptcy proceeding and ECO "never obtained one in the bankruptcy." (*Id.* at 5-6.)  Cramton also argues that, although ECO has now filed articles of termination, this "dissolution does not exempt it from liability" under A.R.S. § 29-3704(D) because ECO's liability for Count Five was contingent as of the date of dissolution.  (*Id.* at 6-7.)  Finally, Cramton argues that the undisputed evidence establishes that the amount of damages associated with Count Five is $23,017.12. (*Id.* at 7-9.)  Elsewhere, Cramton explains that although she does not actually expect to collect any money from ECO, in part because ECO "conveniently, does not have the assets to pay this Note," she intends to proffer the judgment she hopes to obtain in this case in support of a fraudulent-transfer claim she has asserted in a separate state-court case. (*Id.* 3-4, 9 n.5.)

ECO's response touches upon Count Five in only cursory fashion.  (Doc. 442 at 16-17.)  Notably, ECO does not address Cramton's contention that it wasn't the entity that filed the bankruptcy petition in 2020.  Nor does ECO address Cramton's arguments concerning the non-availability of a discharge to a corporate debtor in a Chapter 7 bankruptcy proceeding, the survival of ECO's debt to Cramton under Arizona law notwithstanding ECO's dissolution, or the lack of factual dispute as to the amount still

owed on the ECO note.  Instead, ECO simply attempts to incorporate, by reference, the legal arguments set forth in the July 2021 joint statement.  Specifically, ECO argues that "Florida law applies to anyone Cramton wants to assert new fictional and harassing claims against" and that "a bankruptcy trustee has the exclusive authority to pursue fraudulent transfer and other 'choses in action' for the benefit of all creditors and Cramton has no standing to pursue purported ECO's transfers."  (*Id.*)

In reply, Cramton emphasizes that ECO failed to respond to most of the arguments set forth in her motion and contends that ECO's arguments about fraudulent-transfer law are irrelevant because they "will be addressed in the state court proceeding."  (Doc. 443 at 5-7.)

C.    **Analysis**

Cramton is entitled to summary judgment on Count Five.  To prevail on a breach-of-contract claim under Arizona law, "the plaintiff has the burden of proving the existence of a contract, breach of the contract, and resulting damages."  *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004).  The Court already decided the first two elements in Cramton's favor in the December 2019 summary judgment ruling, so the only remaining element is damages.

As for the amount of damages, Cramton proffers evidence that the outstanding balance on the ECO note is $23,017.12.  ECO, in turn, makes no effort to dispute this figure.  This alone justifies ruling in Cramton's favor.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").  At any rate, Cramton's calculation is actually favorable to ECO, which previously took the position that none of the payments Cramton received in 2017 were ECO note repayments and that the unpaid balance of the note therefore remained $66,527.  (Doc. 158 at 8-12.) Under these circumstances, ECO can hardly complain about the selection of Cramton's lower figure.

Finally, the few arguments that ECO chooses to raise in its response have no bearing

on Cramton's entitlement to summary judgment on Count Five.  Even assuming that ECO was the entity that filed for Chapter 7 bankruptcy in January 2020, ECO's debt to Cramton was not discharged via the bankruptcy process.  *NLRB v. Better Bldg. Supply Corp.*, 837 F.2d 377, 378-79 (9th Cir. 1988) (emphasizing that "corporations may not discharge their debts in a liquidation proceeding under Chapter 7 of the Code" and rejecting the argument that "[c]orporate debt cannot survive Chapter 7 proceedings").  *Cf. Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1183-84 (N.D. Cal. 2000) ("A corporation that has been liquidated pursuant to Chapter 7 of the Bankruptcy Code does not receive a discharge from debt.  In addition, any dissolution of a corporation must be effectuated under state law, since the Bankruptcy Code does not provide for the dissolution of corporations. . . .  Even if Corinthian has been dissolved, California law provides that a corporation continues to exist even after dissolution for the purposes of . . . causes of action against dissolved corporations.  Therefore, Corinthian's status as 'out of business and inactive' does not insulate it from the present action.").  Additionally, although ECO raises questions about whether Cramton will be able to use a judgment obtained against ECO in this action to obtain relief in a separate fraudulent-transfer action against different entities and individuals, such questions are irrelevant for present purposes—they will be resolved, if at all, at a different time in a different proceeding by a different judge.  For now, it is enough to say that Cramton is entitled to summary judgment on Count Five against ECO in the amount of $23,017.12.

…

…

…

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that Cramton's motion for summary judgment (Doc. 440) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Cramton must file a notice, with one week of the issuance of this order, specifying how she intends to proceed on her claim in Count Four against GFL.

Dated this 14th day of October, 2021.

Dominic W. Lanza
United States District Judge