**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Kim Cramton,

          Plaintiff,

v.

Grabbagreen Franchising LLC, et al.,

          Defendants.

No. CV-17-04663-PHX-DWL

**ORDER**

## INTRODUCTION

Between September 2014 and September 2017, Plaintiff Kim Cramton ("Cramton") worked in various capacities for entities associated with the Grabbagreen healthy fast-food franchise.  In December 2017, Cramton initiated this action by filing a complaint in which she asserted tort, contract, and statutory employment claims against entities and individuals associated with Grabbagreen (together, "Defendants").  Defendants, in turn, asserted an array of counterclaims against Cramton.   Finally, in November 2021, after four years of hard-fought litigation—which included a motion for terminating sanctions based on the destruction of electronically stored information ("ESI"), a finding that Cramton had partially waived the attorney-client privilege by producing a hard drive containing privileged documents to Defendants, litigation over the enforceability of two contractual jury waivers, two rounds of summary judgment briefing, a stay occasioned by a corporate bankruptcy, and a bench trial conducted during the heart of the pandemic in which a former defendant served simultaneously as trial counsel and as a witness—the Court entered

judgment in Cramton's favor on two of her claims, awarding her just over $73,000.

Alas, the entry of judgment did not bring an end to this case but simply served as the impetus for a blizzard of new motions. Now pending before the Court are: (1) three motions for reconsideration (or similar relief) filed by Defendants (Docs. 467, 473, 475), which effectively seek to relitigate most of the key adverse rulings against Defendants over the last four years; (2) the parties' dueling motions to be considered the prevailing party and recover their attorneys' fees and costs, with Defendants seeking an award of nearly $1.1 million (Doc. 481) and Cramton seeking an award of nearly $400,000 (Doc. 483); and (3) Defendants' motion for an award of over $850,000 in sanctions against Cramton and her counsel for pursuing frivolous claims (Doc. 487).

For the reasons that follow, all of Defendants' motions are denied and Cramton's motion for attorneys' fees and costs is granted in part. Specifically, Cramton is awarded $10,236 in attorneys' fees against Defendant Eat Clean Operations LLC ("ECO"), which are the fees that Cramton reasonably expended in pursuit of her successful claim in Count Five against ECO for breach of contract, and $210,820 in attorneys' fees against Defendant Keely Newman ("Keely"), which are the fees that Cramton reasonably expended in pursuit of her successful claim in Count Four against Keely under the Arizona Minimum Wage Act ("AMWA"). Additionally, Cramton is authorized to file a supplemental application for the fees she incurred when responding to Defendants' three reconsideration motions.

## DISCUSSION

I. First Motion For Reconsideration—AMWA Claim (Doc. 467)

A. **Relevant Background**

In Count Four of the operative complaint, Cramton asserted a claim against "All Defendants" for violating AMWA by failing to pay her "for any of her employment services from December 1, 2016 until her [resignation] in September of 2017." (Doc. 88 ¶¶ 111-18.)

In a December 2019 order, the Court concluded that three Defendants—ECO, Eat Clean Holdings, LLC ("ECH"), and Kelli Newman ("Kelli")—were entitled to summary

judgment on Cramton's AMWA claim because none of them qualified as Cramton's "employer" but that Cramton and the remaining two Defendants—Keely and Grabbagreen Franchising, LLC ("GFL")—were not entitled to summary judgment because triable issues of fact existed as to whether GFL and Keely paid any wages to Cramton during the period in question.  (Doc. 247 at 41-46.)

In June 2020, Defendants filed a motion to strike Cramton's jury demand.  (Doc. 322.)

In an October 2020 order, the Court granted Defendants' motion in part.  (Doc. 345 at 21-39.)  On the one hand, the Court found that Cramton had knowingly and voluntarily signed a pair of contractual jury waivers, that Defendants had not forfeited their ability to enforce the jury waivers, and that the waivers were broad enough to encompass Cramton's AMWA claim in Count Four against Keely as well as several of her other remaining claims.  (*Id.*)  On the other hand, the Court held that the waivers were not broad enough to encompass Cramton's AMWA claim in Count Four against GFL.  (*Id.*)  Given these determinations, the Court severed Cramton's AMWA claim against GFL from the remaining claims and set those claims for a bench trial.  (*Id.*)

The scheduling of the bench trial proved difficult in light of the COVID-19 pandemic.  (Docs. 347, 348, 356, 369, 377, 378.)  Finally, in a minute entry issued on December 7, 2020, the Court stated that the bench trial would be held in 2021, ordered the parties to meet-and-confer about an agreeable date, and informed the parties that "[t]he Court's intent is to hold trial in one calendar week, so the parties should attempt to identify three weeks in which they are both available."  (Doc. 378.)

On December 16, 2020, the parties filed a "Joint Notice Regarding Trial Dates." (Doc. 382.)  In this filing, neither side raised any objection to the Court's plan to complete trial in one week.  (*Id.*)  Using the dates proposed by the parties, the Court set the bench trial for May 24-28, 2021.  (Doc. 383.)

Between December 2020 and May 2021, Defendants filed various motions and other documents related to witness matters and trial logistics.  (Docs. 384, 387, 390.)  In

none of those filings did Defendants object to the one-week trial schedule.  (*Id.*)

At the outset of trial on May 24, 2021, the Court "cover[ed] a few housekeeping matters."  (Doc. 421 at 20.)  One of those matters related to "timing."  (*Id.* 20-21.)  On that issue, the Court explained: "[W]e have allocated the entire week for the trial.  My general schedule when I'm in trial is we'll go from 9:00 to 10:30, take a morning break, go from 10:45 to noon.  We'll start up again in the afternoon at 1:30, go until 3:00, take our afternoon break and go from 3:15 until 4:30.  If . . . we have legal matters we need to address, we can address [them] from 1:00 until 1:30, or we can do it in the morning before we start at 9:00.  So following that schedule we will have about 27.5 hours of trial time during the week.  So we had previously discussed allocating that time evenly between the two parties, so I'll be keeping track up here."  (*Id.*)  Neither side objected to this approach or to the time allocations.  (*Id.*)

Throughout the remainder of the bench trial, the Court provided frequent updates to the parties concerning how much time they had used.  (Doc. 422 at 126; Doc. 424 at 117-18; Doc. 426 at 189; Doc. 427 at 99-100, 221; Doc. 428 at 6, 95, 123, 142, 212, 220.)  Neither side ever suggested, in response to any of these reminders, that the time allocations were insufficient.

On May 28, 2021, the parties gave their closing arguments.  (Doc. 428.)  Notably, although Defendants urged the Court to find that Cramton had exaggerated when describing the number of hours she had worked for GFL, Defendants did not identify a lower, alternative figure.  (*Id.* at 1098-1101.)

On June 23, 2021, the Court issued its findings of fact and conclusions of law arising from the bench trial.  (Doc. 429.)  With respect to Cramton's AMWA claim in Count Four against Keely, the Court made factual findings that (1) Keely exercised various modes of control over Cramton's employment with GFL, including serving as Cramton's boss, possessing authority to set Cramton's salary and the salary of other GFL employees, controlling Cramton's schedule, and possessing authority to reduce Cramton's salary; (2) Cramton's testimony as to the amount of hours she worked for GFL in December 2016

(140 hours) and between January 2017 and September 2017 (1,583 hours) was credible; and (3) "the periodic payments Cramton received throughout 2017 were loan repayments on the ECO promissory note, not wage payments from GFL," and thus "Cramton stopped receiving wages from GFL in early December 2016 and did not receive any such wages afterward." (*Id.* at 19-21, 26.)[1]  Based on these factual findings, the Court stated in the "Conclusions of Law" section of the order that Keely qualified as Cramton's employer for purposes of Cramton's work for GFL; that Cramton was entitled to a minimum wage of at least $16,957 under AMWA for the hours she worked for GFL between December 2016 and September 2017; and that Keely was liable for violating AMWA because Cramton did not receive any wages for her work for GFL during the period in question. (*Id.* at 25-27.) With respect to the last point, the Court clarified that the health insurance premiums and car payments paid by GFL on Cramton's behalf during the period in question did not qualify as "wages." (*Id.*)  Because trebling is statutorily required under AMWA, the Court concluded that Keely was liable to Cramton in the amount of $50,871 on Count Four. (*Id.*)

On June 28, 2021, the Court solicited the parties' views as to how to proceed on Cramton's remaining AMWA claim in Count Four against GFL. (Doc. 430.)  After reviewing the parties' joint statement (Doc. 432), the Court initially stated that it was inclined to schedule a jury trial on that claim. (*Id.* at 434 at 3-5.)  However, at Cramton's request (Doc. 436), the Court then authorized Cramton to file a successive motion for summary judgment as to her AMWA claim against GFL. (Doc. 437.)

On October 14, 2021, after considering the parties' briefing (Docs. 440, 442, 443), the Court issued an order denying Cramton's motion for summary judgment as to her AMWA claim against GFL. (Doc. 444 at 6-11.)

On October 26, 2021, Cramton filed a motion to dismiss, with prejudice, her AMWA claim in Count Four against GFL. (Doc. 447.)  GFL later filed an opposition to

---

[1]     The Court also noted that, "[t]o the extent it is not moot in light of the above findings, . . . [Cramton] was not required to record or otherwise keep track of her GFL-related time.  This, in turn, triggers a rebuttable presumption that GFL did not pay the required minimum wage.  *See* A.R.S. § 23-364(D).  The Court finds that Keely did not rebut this presumption." (Doc. 429 at 20.)

1    this motion and a sur-reply further opposing this motion.  (Docs. 449, 453.)

2       On November 23, 2021, the Court issued an order granting Cramton's motion to

3    dismiss her AMWA claim in Count Four against GFL.  (Doc. 454.)  The order explained:

4    "The Court is confronted with an unusual situation—a plaintiff wishes to dismiss all of her

5    claims against a particular defendant with prejudice, but that defendant refuses to accept

6    this unqualified victory and seeks to force the plaintiff to litigate her claims to completion

7    via jury trial.  Tellingly, GFL fails to identify any case denying a dismissal request under

8    analogous circumstances."  (*Id.* at 3.)

9       On November 30, 2021, the Court entered judgment in Cramton's favor.  (Doc.

10   461.)  Among other things, the judgment ordered that Cramton "recover $50,871 from

11   Defendant Keely Newman" but "recover nothing on her claim(s) against . . . GFL."  (*Id.*)

12      On December 27, 2021, Keely filed the first motion now pending before the Court—

13   a motion to alter and amend the Court's findings and judgment with respect to the AMWA

14   claim in Count Four and/or for a new trial on that claim.  (Doc. 467.)

15      On February 14, 2022, Cramton filed an opposition.  (Doc. 498.)

16      On February 22, 2022, Keely filed a reply.  (Doc. 505.)

17      **B.**     **The Parties' Arguments**

18      Keely raises an array of challenges to the Court's factual findings and legal

19   conclusions pertaining to Cramton's AMWA claim in Count Four.  (Doc. 467.)  First,

20   Keely argues that the Court violated "standard statutory construction principles" when

21   concluding that the payments Cramton received in 2017 were ECO loan repayments rather

22   than GFL wage payments.  (*Id.* at 3-5.)  Second, Keely argues that the Court's decision to

23   characterize the payments as ECO loan repayments was the product of an "unalleged

24   contract claim."  (*Id.* at 5-9.)  Keely further argues that the implied contractual analysis

25   was faulty because GFL had no incentive to mischaracterize the wage payments as loan

26   repayments; because any decision to mischaracterize the payments in this fashion was

27   subject to the "condition precedent of approval from GFL's tax advisors," who

28   subsequently declined to provide such approval; because the GFL board resolution did not

exist in December 2016 and does not represent "what the parties actually did"; and because any decision to mischaracterize the wage payments as loan repayments was illegal and thus "clearly void ab initio." (*Id.*) Third, Keely argues that Cramton's testimony concerning the number of hours she worked was inaccurate (and, thus, the Court's reliance on that testimony was misplaced) because Cramton included on-call time that is not compensable under Arizona law. (*Id.* at 9.) Fourth, Keely argues that the Court erred by failing to characterize the $548.10 in monthly car payments as wages. (*Id.* at 9-10.) Fifth, Keely argues that she should not be held liable for any AMWA violation in 2016 for two reasons: (a) AMWA liability must be calculated on an annual basis, and because Cramton received over $180,000 in wages from GFL during the first eleven months of 2016, she cannot assert an AMWA claim for unpaid wages in December 2016; and/or (b) Cramton's testimony as to the number of hours she worked in December 2016 is undermined by evidence that Cramton was performing various "non-work activities" (including recovering from shoulder surgery and working for GGS) during the period in question. (*Id.* at 10-11.) Sixth, Keely argues that because "Cramton failed to notify Keely of Cramton's purported work during every waking hour for GFL," the purported "suffer or permit to work" requirement was not satisfied. (*Id.* at 11-12.) Seventh, Keely argues that she introduced various pieces of evidence at trial that the Court should have viewed as discrediting Cramton's testimony as to the number of hours worked. (*Id.* at 12.) Eighth, in a related vein, Keely argues that, because she instructed Cramton to focus her work on GGS-related matters, "it was impossible for Cramton to work 1,723 hours for GFL" and "Cramton was untruthful with this Court at trial." (*Id.* at 12-13.) Ninth, Keely argues that the Court erred in concluding that the final $20,000 payment to Cramton was an ECO loan repayment that followed the same pattern as previous payments. (*Id.* at 13-14.) Tenth, Keely argues that "[t]he trial limitations imposed on the Defendants deprived Keely of procedural due process and the opportunity to present sufficient evidence on which to base a reliable judgment under Count IV." (*Id.* at 14-16.) Eleventh, Keely argues that the Court erred in finding that Cramton was entitled to a rebuttable presumption under A.R.S. § 23-364(D). (*Id.* at 16-

17.)  Based on these challenges, Keely seeks either an amendment of the court's findings and conclusions or a new trial.  (*Id.* at 17.)

Cramton opposes Keely's motion and argues that she is entitled to the attorneys' fees incurred in preparing her response.  (Doc. 498.)  As an initial matter, Cramton notes that because "Keely has not cited any newly discovered evidence, and there has not been any intervening change in law, Keely's motion will succeed only if this Court committed a clear or manifest error of law."  (*Id.* at 4.)  Cramton contends that Keely cannot meet this standard because all of the arguments raised in her motion are either recycled arguments she unsuccessfully raised during earlier stages of the case or new arguments she is improperly attempting to raise for the first time.  (*Id.* at 4-5.)  More specifically, Cramton argues that the Court properly concluded that the ECO payments on the promissory note were not "wages" under AMWA and instead were paid "by reason of" her status as an ECO noteholder (*id.* at 5-7); that Keely's "contract analysis" arguments are irrelevant because the Court did not apply contract law (*id.* at 6); that the Court did not clearly error in determining that her hours-related testimony was credible (*id.* at 7-8); that Keely's "on-call hours" arguments miss the mark because she already excluded those hours from her summary (*id.* at 8); that Keely's due process challenge to the allocation of time at trial "is a seminal example of an unreasonable and vexatious use of these legal proceedings in bad faith" (*id.* at 9); that the Court properly applied the facts to the law in concluding that Keely qualified as her employer (*id.* at 9-10); that the Court properly determined that the car payments did not qualify as "wages" (*id.* at 10); that the Court properly determined that the $20,000 payment was an ECO loan repayment, not a GFL wage payment (*id.* at 10-11); that all employees in Arizona are entitled to receive a minimum wage for each two-week pay period worked (*id.* at 11); and that the Court properly applied the rebuttable presumption under A.R.S. § 23-364(d) (*id.* at 11-12).

In reply, Keely begins by arguing that the purported payments on the ECO note must be characterized as GFL wage payments because the money came from GFL, GFL had no obligation to make payments on ECO's behalf, and the payments were therefore

made "by reason of" Cramton's employment with GFL and/or were gratuities that qualify as wage payments.  (Doc. 505 at 1-4.)  Next, as for the monthly car payments, Keely contends the only way they could escape characterization as wages is if they were reimbursement for business expenses, but there is no evidence they served this purpose. (*Id.* at 4-5.)  Next, Keely argues that because Cramton's note with ECO was itself invalid, this provides an additional reason why the purported ECO note payments must qualify as GFL wage payments.  (*Id.* at 5.)  Next, Keely seems to argue that the Court erred by considering Trial Exhibit 32—which was admitted by joint stipulation at trial (Doc. 421 at 24)—in the findings of fact because that exhibit was not mentioned in the complaint or in the relevant portions of the Joint Final Pretrial Order.  (Doc. 505 at 6.)  Next, Keely advances various arguments why the GFL board resolution should not be construed as evidence that Cramton stopped receiving GFL wages.  (*Id.* at 6-7.)  Next, Keely reiterates her various challenges to Cramton's credibility and Cramton's testimony regarding the number of hours worked for GFL.  (*Id.* at 7-10.)  Next, with respect to due process, Keely reiterates her position that the allocation of time at trial violated her constitutional rights and also contends that "AMWA is unconstitutionally vague as applied in the unusually harsh manner that it was applied in this case to GFL and Keely." (*Id.* at 10.)  Next, Keely argues that the $20,000 payment to Cramton in September 2017 should be considered wages because it "directly ties to Cramton's work for GFL for closing" a franchise sale. (*Id.* at 11-12.)  Next, Keely argues that she shouldn't be held liable for any AMWA violation in December 2016 in light of the $4,615.39 wage payment at the start of that month.  (*Id.* at 12.)  Finally, Keely argues that Cramton's request for fees is procedurally improper and substantively meritless.  (*Id.* at 12.)

### C.     **Legal Standard**

Keely seeks relief under Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure.  (Doc. 467 at 1.)

Rule 52(b) is implicated here because the challenge arises from the Court's issuance of findings of fact following a bench trial.  Rule 52(b) provides that, "[o]n a party's motion

filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." *Id.* Although the text of Rule 52(b) does not identify the standard for evaluating such a motion, the consensus is that "[p]arties should not use a Rule 52(b) motion to relitigate issues previously decided or introduce new theories, but rather to correct 'manifest legal or factual errors' or to present newly discovered evidence." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, at 51 (2022). *See generally Nat. Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 122 (1st Cir. 1990) ("Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court."); *Crane-McNab v. County of Merced*, 773 F. Supp. 2d 861, 873 (E.D. Cal. 2011) ("[T]he Rule is not intended to serve as a vehicle for a rehearing.").

Meanwhile, Rule 59(e) is implicated here because the Court incorporated its findings and conclusions from the bench trial into a final judgment from which Keely seeks relief. Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." *Id.* Similar to Rule 52(b), although the text of Rule 59(e) does not identify the standard for evaluating such a motion, "the view prevailing in the circuits is that motions to alter or amend the judgment are generally appropriate only in four situations: (1) to correct a manifest error of fact or law; (2) to incorporate newly discovered and previously unavailable evidence; (3) to prevent manifest injustice; and (4) to address an intervening change in controlling law." 2 Gensler, *supra*, Rule 59, at 250. *See generally Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111-12 (9th Cir. 2011) (agreeing that these are the "four basic grounds upon which a Rule 59(e) motion may be granted"). The Ninth Circuit has elaborated that "amending a judgment after its entry remains an extraordinary remedy which should be used sparingly" and that it is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Allstate Ins. Co.*, 634 F.3d at 1111-12 (cleaned up). Thus, Keely's requests for relief under Rules 52(b) and Rule 59(e)

are functionally quite similar. *National Metal Finishing Co.*, 899 F.2d at 122 (noting "the close relationship between Rule 59(e) and Rule 52(b)" and characterizing the relief available under those rules as "so similar").

Finally, to the extent Keely's motion seeks a new trial as an alternative remedy, that request is governed by Rule 59(a), which provides in relevant part that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court" and "may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." *Id.*

D.    **Analysis**

The Court declines to amend its factual findings under Rule 52(b), alter or amend the judgment under Rule 59(e), or grant a new trial under Rule 59(a). In large part, Keely's motion consists of attempting to relitigate the bench trial based on evidence and legal arguments that have always been available to her. For example, the motion repeatedly attacks the credibility of Cramton as a trial witness,[2] which was also a focus of Keely's presentation at trial. This is not, in general, an appropriate way to seek relief under Rules 52(b) and 59(e). *See, e.g.*, *National Metal Finishing Co.*, 899 F.2d at 122 ("Rule 52(b) is not intended to allow parties to rehash old arguments already considered and rejected by the trial court."); *Allstate Ins. Co.*, 634 F.3d at 1111-12 (it is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation"). Nor is the Court persuaded that the ruling in Cramton's favor on the AMWA claim resulted in manifest injustice or that the ruling is against the weight of the evidence. Thus, a point-by-point refutation of the many arguments raised in Keely's motion is unnecessary here. As one court stated under analogous circumstances: "The court is satisfied that the decision as written is the

---

[2]    *See, e.g.*, Doc. 467 at 6 ("The story Cramton told the Court makes no sense . . . ."); *id.* at 12 ("[I]t was impossible for Cramton to work 1,723 hours for GFL – Cramton was untruthful with this Court at trial.").

appropriate expression of its reasoning.  The court gave much thought to its opinion, and while the parties may have written the decision differently, for better or worse, the court will deny the parties' motions to the extent that they seek amendments to the findings of fact." *Crane-McNab,* 773 F. Supp. 2d at 876.

With that said, a few of Keely's arguments warrant a specific response.  As for the attribution of certain testimony to Teresa Mills rather than Dana Mavros (Doc. 467 at 5-6), the Court clarifies that its findings and conclusions did not turn on this attribution and would remain the same even if the testimony were attributed to Mavros.

As for the contention that the Court erred by applying the rebuttable presumption under A.R.S. § 23-364(D) (Doc. 467 at 16), Keely overlooks that the post-trial order specifically found that Cramton's hours-related testimony was credible and accurate *before* addressing the applicability of the presumption and noted that issues related to the presumption were therefore potentially "moot." (Doc. 429 at 19-20.)  At any rate, the Court now clarifies that it would have reached the same findings and conclusions related to the number of hours that Cramton worked even if the presumption were inapplicable in this circumstance.  Accordingly, there is no need to delve further into presumption's applicability.

As for Keely's surprising contention that her state and federal constitutional due process rights were violated by the manner in which the Court structured trial, this is a new argument that Keely failed to raise at any point during the five-month period after the Court announced that the bench trial was scheduled for one week or at any point during the bench trial itself, despite the Court's repeated discussions with the parties during trial about time-allocation issues.  At most, Keely can point to the fact that, during a pre-trial conference in May 2020, the Court rejected the defense's request to be allocated a disproportionate share of the overall time allocated to the parties for trial.  (Doc. 323 at 12-21.)  During this discussion, Keely never asserted that the Court's trial-allocation decisions would violate her due process or other constitutional rights.  Moreover, at the time this discussion took place, the trial was scheduled to be a jury trial on a variety of claims.  It was only after

1    Defendants subsequently filed a motion to strike Cramton's jury demand (which the Court

2    largely granted despite its late timing) that the trial was converted to a bench trial and the

3    scope of the trial was narrowed through the severance of the AMWA claim against GFL.

4    It was those developments that subsequently led the Court to reduce the overall length of

5    trial to one week (Doc. 378), which again did not trigger an objection by either side.  Under

6    these circumstances, the Court finds that Keely has forfeited any due process or other

7    challenge to the time constraints imposed at trial.

8         Alternatively, the challenge fails on the merits.  Keely was allocated ample time to

9    present a defense to the AMWA charge.  The Court also observes that the defense spent

10   portions of its time at trial pursuing issues of questionable relevance.  *Cf. Carbajal v.*

11   *Keefer*, 2018 WL 10246987, *2 (D. Colo. 2018) ("Mr. Carbajal's inability to present all of

12   the testimony he wanted to is a function of decisions that he made during the hearing.  As

13   a result, the Court rejects the argument that the time limitations were unfair or

14   unconstitutional.").  *See generally Amarel v. Connell*, 102 F.3d 1494, 1513 (9th Cir. 1996)

15   ("A district court is generally free to impose reasonable time limits on a trial.  Time limits

16   may be used to prevent undue delay, waste of time, or needless presentation of cumulative

17   evidence.") (citations and internal quotation marks omitted).

18        During oral argument, Keely also asserted that "it's clear [she] acted in good faith

19   and with reasonable grounds to believe that she did not violate the law."  This argument

20   fails because good faith is not a defense to AMWA liability.

21        Finally, as for Cramton's request for the fees and costs associated with drafting her

22   response, it is addressed in Part IV *infra*.

23   II.   <u>Second Motion For Reconsideration—ECO Promissory Note (Doc. 473)</u>

24        A.    **Relevant Background**

25        In Count Five of the operative complaint, Cramton asserted a claim against ECO for

26   breach of a $66,527 promissory note.  (Doc. 88 ¶¶ 119-23.)  The complaint acknowledged

27   that Cramton had received partial payment on the note but alleged that a balance of

28   approximately $23,000, plus interest, remained outstanding.  (*Id.*)

On March 1, 2019, Cramton moved for summary judgment on Count Five, but only as to liability. (Doc. 142 at 10-11.) In a nutshell, Cramton argued that the undisputed evidence showed that the promissory note was valid and that the full $66,527 balance had not been repaid. (*Id.*)

On April 1, 2019, Defendants filed their response to Cramton's summary judgment motion. (Doc. 158.) With respect to Count Five, ECO seemed to acknowledge that the note was backed by adequate consideration. (Doc. 158 at 12 ["ECO issued two promissory notes as consideration for the acquisition [of Krowne, a Grabbagreen franchise co-owned by Keely and Cramton], one in favor of Keely and another in favor of Cramton."].) ECO also conceded that it had failed to fully repay the note. (*Id.* [acknowledging "ECO's nonpayment"].) Nevertheless, ECO argued that summary judgment should be denied on Count Five because "Cramton and Keely agreed that ECO would only make payments on the notes if and only if the store ever generated sufficient cash flow to do so (a circumstance that never transpired)," and thus "under the express terms of the note, no payment has come due." (*Id.*)

On April 16, 2019, Cramton filed a reply in support of her summary judgment motion. (Doc. 171.) As for ECO's contention that the repayment obligation never arose because it was contingent on the certain events that never transpired, Cramton argued this defense failed for three reasons: (1) the repayment obligation was not, in fact, contingent; (2) alternatively, the contingency was met; and (3) further alternatively, the note itself provided that the note would become immediately due upon insolvency or bankruptcy. (*Id.* at 7.) Cramton also stated, in a footnote, that she had provided a demand for payment in a post-resignation letter. (*Id.* at 7 n.5.)

On December 10, 2019, the Court issued a lengthy tentative ruling addressing Cramton's summary judgment motion and several other then-pending motions. (Doc. 238.) The tentative ruling explained that "[t]he point" of providing the ruling before oral argument was "to allow the parties to focus their argument on the issues that seem salient to the Court and to maximize their ability to address any perceived errors in the Court's

logic." (*Id.* at 1.)  With respect to Count Five, the tentative ruling stated that Cramton's motion should be granted.  (*Id.* at 43-44.)  After stating that the parties' arguments concerning when the repayment obligation arose "somewhat miss the mark," the tentative ruling stated that, under A.R.S. § 47-3108(B), the note was "payable on demand." (*Id.*) The tentative ruling further stated that, because Cramton had submitted undisputed evidence showing that she made a demand for payment in her September 2017 resignation letter, the repayment obligation had arisen and ECO had breached this obligation by failing to pay. (*Id.*)

On December 16, 2019, the Court heard oral argument.  (Doc. 256.)  During the portion of the hearing addressing Count Five, the Court asked both sides if they wished to be heard with respect to the analysis in the tentative ruling.  (*Id.* at 69-70.)  Both sides declined this invitation.  (*Id.*)

On December 23, 2019, the Court issued its final order on Cramton's summary judgment motion. (Doc. 247.)  With respect to Count Five, the order adopted the analysis in the tentative ruling.  (*Id.* at 46-47.)

On January 31, 2020, Defendants' counsel filed a notice that "Defendant Eat Clean Operations, LLC ('ECO, LLC') . . . [had] filed a petition for bankruptcy with the United States Bankruptcy Court, Southern District of Florida."  (Doc. 254.)

On February 3, 2020, based on this notice, the Court entered an automatic stay as to ECO.  (Doc. 255.)

On June 28, 2021, following the bench trial, the Court ordered the parties to file a joint notice concerning several matters, including the status of the bankruptcy proceeding. (Doc. 430.)

On July 12, 2021, the parties filed the joint notice.  (Doc. 432.)  Among other things, it reported that the bankruptcy case had closed on June 15, 2021.  (*Id.* at 2.)

On July 26, 2021, the Court issued an order lifting the stay as to ECO and authorizing Cramton to file a summary judgment motion as to the issue of damages on Count Five.  (Doc. 434.)  In response, Cramton filed a motion seeking an award of

$23,017.12.  (Doc. 440.)  The motion later became fully briefed.  (Docs. 442, 443.)

On October 14, 2021, the Court issued an order granting Cramton's motion for summary judgment as to damages on Count Five.  (Doc. 444 at 12-16.)  The Court noted that ECO made no effort to dispute Cramton's proffered evidence, which suggested that the outstanding balance of the note was $23,017.12, and only sought to raise meritless arguments related to bankruptcy law and Cramton's ultimate ability to recover on any judgment entered against ECO.  (*Id.*)

On November 30, 2021, the Court entered judgment in Cramton's favor.  (Doc. 461.)  Among other things, the judgment ordered that Cramton "recover . . . $23,017.12 from [ECO], including post-judgment interest at the rate of 0.21% from the date of this Judgment until paid."  (*Id.*)

On December 28, 2021, ECO filed the second motion now pending before the Court—a motion to alter and amend the judgment on Count Five.  (Doc. 473.)

On February 14, 2022, Cramton filed an opposition.  (Doc. 499.)

On February 22, 2022, ECO filed a reply.  (Doc. 504.)

On April 1, 2022, the Court issued an order requiring supplemental briefing with respect to ECO's motion.  (Doc. 508.)

On April 15, 2022, ECO filed its initial supplemental brief.  (Doc. 509.)

On April 29, 2022, Cramton filed her responsive supplemental brief.  (Doc. 510.)

On May 6, 2022, ECO filed its reply supplemental brief.  (Doc. 511.)

B.     **The Parties' Arguments**

ECO's motion identifies four reasons why the Court should alter or amend the adverse judgment against it on Count Five.  (Doc. 473.)  First, ECO argues that the promissory note underlying Count Five "is unenforceable" for several reasons, including that the complaint mischaracterizes it as an agreement to repay Cramton for a $66,527 loan she made to ECO (when, in fact, there was no loan) and that "to be lawfully payable at all, ECO had to have sufficient profits from its cash flows . . . to pay Cramton under Count V" but ECO's board of managers never agreed to make such a payment.  (*Id.* at 2-4.)  Second,

ECO accuses the Court of committing a due process violation by concluding, in the December 2019 summary judgment order, that A.R.S. § 47-3108 was the applicable statute for evaluating when ECO's repayment obligation arose because Cramton did not cite that statute in her complaint or moving papers. (*Id.* at 4-5.) Third, in a related vein, ECO argues that the evidence proffered by Cramton in her initial summary judgment motion showed that the promissory note was an "exchange agreement," not a "negotiable instrument," and thus Cramton's evidence was insufficient to meet her initial burden of production that a breach had occurred. (*Id.* at 5-7.) Fourth, ECO argues that Cramton's testimony at trial regarding the genesis of the ECO promissory note qualifies as new evidence and also shows she "will say anything to this Court regardless of the number of different versions of purported 'facts' or how contradictory and convoluted her testimony in this case has become." (*Id.* at 7.)

Cramton opposes ECO's motion. (Doc. 499.) As for ECO's first argument, Cramton argues that it is irrelevant whether the consideration for the note was an actual loan of $66,527 or an equity contribution to Krowne—"all that matters is [that] Eat Clean Operations promised to repay Cramton and did not." (*Id.* at 4-5.) Cramton also notes that ECO seemed to concede the adequacy of the consideration in its summary judgment response. (*Id.*) As for ECO's second argument, Cramton contends that ECO "tellingly fail[s] to present any argument that" the Court's reliance on A.R.S. § 47-3108 in the December 2019 summary judgment ruling "was wrong" and only raises a claim of unfair surprise. (*Id.* at 5-9.) Cramton further contends that any claim of unfair surprise fails for two reasons: first, because the Court gave adequate notice by issuing a tentative ruling before oral argument that cited § 47-3108 and then giving ECO a chance to address the statute at oral argument (which ECO declined to do); and second, because any notice issue was harmless in light of the undisputed fact that ECO has since declared bankruptcy and the promissory note expressly provides that the balance becomes due upon insolvency or bankruptcy. (*Id.*) As for ECO's third and fourth arguments, Cramton contends that "other than the apparent subjective belief of counsel, there is no documented legal term of art

under Arizona law for an 'exchange agreement'"; that, accordingly, "[t]here is no way to legally apply the nonexistent concept of an 'exchange agreement' to the failure to pay a promissory note"; that to the extent ECO's argument is an argument over the adequacy of consideration, it fails for various reasons; and that there is no evidence that repayment of the note was contingent on the store being profitable. (*Id.* at 9-12.) Cramton concludes by arguing that, because ECO's motion was only filed to harass and delay, the Court should award her the fees incurred when drafting her response and order ECO's counsel to show cause why they should not be sanctioned under Rule 11 or 28 U.S.C. § 1927. (*Id.* at 12.)

In reply, Cramton first argues that the promissory note does not qualify as a "negotiable instrument" under Arizona law—and, thus, A.R.S. § 47-3108 is inapplicable—because it contains a clause barring Cramton from assigning it to third parties without ECO's consent. (Doc. 504 at 2-3.) Next, ECO argues that the issuance of the tentative ruling before oral argument was insufficient to avoid unfair surprise because the analysis of Count Five was "buried" in the tentative ruling, the ruling was not issued at least 30 days before oral argument, and ECO was not afforded an opportunity to submit supplemental briefing or discover new facts that might support its position. (*Id.* at 3-5.) Next, ECO reiterates its position that, because Cramton admitted at trial that she did not directly loan $66,527 to ECO, the "note is obviously not enforceable." (*Id.* at 5-6.) Next, ECO argues that "the ECO note facially lacks essential terms for the requisite mutual assent and contract formation in order for it even to be possible for this Court to enforce it." (*Id.* at 6-7.) Finally, ECO disputes Cramton's contention that it has taken inconsistent positions during this litigation and argues that Cramton's request for sanctions is procedurally improper in addition to being substantively meritless. (*Id.* at 7-8.)

In the April 1, 2022 order soliciting supplemental briefing, the Court ordered the parties to address, in more detail, ECO's arguments concerning the inapplicability of A.R.S. § 47-3108 and Cramton's arguments regarding harmless error. (Doc. 508.)

In its supplemental brief, ECO does not limit itself to the issues raised in the April 1, 2022 order. Instead, ECO argues that: (1) Cramton's summary judgment motion as to

Count Five was invalid on its face, and thus no response was required, because the motion was "completely devoid of any statement or argument that the ECO note is a 'valid' or 'enforceable' contract or evidence establishing Cramton's false allegations underlying Count V" (Doc. 509 at 3-5); (2) a "facial review of the ECO note" reveals that it is not signed by Cramton, does not impose any obligations on Cramton, and lacks various other details, meaning there are "missing essential terms [that] render the ECO note unenforceable" (*id.* at 5-6); (3) the Court "trampled on the party presentation rule" by "affirmatively set[ting] out to help Cramton by creating the negotiable instrument argument" (*id.* at 6-7); (4) the theory of consideration that Cramton advanced in her summary judgment papers (*i.e.,* the note represents contributions that Cramton made to Krowne) is unsupported by the record and differs from the theory alleged in the complaint (*i.e.,* the note represents funds that Cramton loaned to ECO) (*id.* at 7-9); (5) Cramton's trial testimony further contradicts the allegations pertaining to Count Five set forth in the complaint (*id.* at 9); (6) various pieces of evidence show that Krowne's obligation to repay Cramton was never assumed by ECO (*id.* at 10); (7) the new evidence at trial shows that the ECO note was invalid based on fraud in the inducement (*id.* at 10-11); (8) the ECO note does not qualify as a negotiable instrument, and thus A.R.S. § 47-3108 is inapplicable, because Cramton had no right to transfer or negotiate the note (*id.* at 11-13); and (9) Cramton is not entitled to relief under the alternative theory that ECO's repayment obligation was triggered by insolvency or bankruptcy because (a) Cramton previously argued that the entity that declared bankruptcy was not the same entity as ECO; and (b) the note's provisions regarding insolvency are too ambiguous to be resolved at summary judgment (*id.* at 13-15).

In her responsive supplemental brief, Cramton makes two arguments: (1) the ECO note qualifies as a negotiable instrument under A.R.S. § 47-3104 because it was payable to order, payable on demand, and did not obligate ECO to do anything other than pay money (Doc. 510 at 3-5); and (2) alternatively, any error in applying A.R.S. § 47-3104 was harmless because the note specified that ECO would be considered in default (and thus

obligated to repay the note) if it became insolvent or the subject of a bankruptcy proceeding, the insolvency condition is met because ECO conceded as much in its summary judgment response and disclosed no assets in the January 2020 bankruptcy filing, and the bankruptcy condition is met because, regardless of the precise identity of the entity that *filed* for bankruptcy, ECO was a *subject* of the bankruptcy proceeding (*id.* at 5-7).

In reply, ECO accuses Cramton of conceding and/or not addressing various arguments (Doc. 511 at 1-4); reiterates its position that the note does not qualify as a negotiable instrument (*id.* at 4-6); argues the Court must authorize unspecified additional discovery if Cramton is allowed to pursue a negotiable-instrument argument (*id.* at 6); and asserts that the insolvency/bankruptcy argument does not provide an alternative basis for upholding the summary judgment ruling because there are disputed issues of fact about which entity filed for bankruptcy and the meaning of the insolvency condition (*id.* at 6-7).

### C.    Standard Of Review

As noted in Part I.C above, the "four basic grounds on which a Rule 59(e) motion may be granted" are: (1) to correct a manifest error of fact or law; (2) to incorporate newly discovered and previously unavailable evidence; (3) to prevent manifest injustice; and (4) to address an intervening change in controlling law.  *Allstate Insurance Co.*, 634 F.3d at 1111-12.  "[A]mending a judgment after its entry remains an extraordinary remedy which should be used sparingly."  *Id.*  It is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation."  *Id.*

### D.    Discussion

The Court declines to alter or amend the judgment against ECO on Count Five.

One of ECO's contentions, which it emphasized during oral argument, is that Cramton failed to meet her initial burden of production as to the existence of an enforceable contract when moving for partial summary judgment on Count Five in March 2019.  (Doc. 509 at 3 ["Having failed to carry her burden of producing evidence, ECO had no obligation to come forward to produce evidence to controvert Cramton's bald, unsupported and

baseless allegations. . . .  Cramton moved for summary judgment on Count V arguing only that the ECO note was unpaid.  [Her motion] is completely devoid of any statement or argument that the ECO note is a 'valid' or 'enforceable' contract or evidence establishing Cramton's false allegations underlying Count V was proffered to this Court."].)

This argument is unavailing.  To be sure, because Cramton moved for summary judgment on a claim on which she would bear the burden of proof at trial, she was required to "affirmatively demonstrate that no reasonable trier of fact could find other than for" her. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  But Cramton met that burden by supporting her summary judgment motion with a copy of the promissory note (Doc. 142-6 at 2-3); a declaration in which she authenticated the note, explained its genesis, and explained why it was backed by consideration (Doc. 142-2 at 3 ¶¶ 4-7 [explaining that Cramton and Keely "partnered together to purchase a new Grabbagreen store," that Cramton "invested time and money into the store," that the store was later acquired by ECO, and that "ECO executed a promissory note in favor of me to repay me for the funds I had invested in opening and operating the store"]); and deposition testimony from Kelli, who acknowledged signing the note on behalf of ECO and stated that the note "was consideration for the acquisition of assets of" Krowne (Doc. 142-2 at 44-45).  This evidence was sufficient to meet Cramton's initial burden of demonstrating the existence of an enforceable contract.  *See generally Savoca Masonry Co. v. Homes & Son Const. Co.*, 542 P.2d 817, 819 (Ariz. 1975) ("It is elementary that for an enforceable contract to exist there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained.").

As for ECO's remaining reconsideration arguments, most are purported defenses to Count Five that ECO failed to raise in response to Cramton's March 2019 summary judgment motion.  In fact, some of ECO's new theories are inconsistent with the positions it previously took.  In its April 2019 summary judgment response, ECO offered an extensive discussion of why it agreed to execute the note, even using the term "consideration" to describe what Cramton provided in exchange for the note.  (Doc. 158 at

12 & n.6.)  Similarly, when the Court allowed a second round of summary judgment briefing related to Count Five, ECO failed to raise any arguments concerning the validity or enforceability of the underlying note or the adequacy of the consideration supporting the note.  (Doc. 442 at 16-17.)  Given this backdrop, ECO cannot raise such theories now, for the first time, through the guise of a Rule 59(e) motion.  *Allstate Insurance Co.*, 634 F.3d at 1111-12 (noting that is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation") (citations and internal quotations marks omitted).

Nor does Cramton's trial testimony about the genesis of the ECO note qualify as new evidence that might support a Rule 59(e) challenge.  As Cramton correctly notes in her response, although "[t]here may be a nuanced . . . difference in what constitutes Cramton's consideration . . . what is clear is that Eat Clean Operations owed Cramton money."  (Doc. 499 at 10.)  Additionally, Cramton's trial testimony on this point was consistent with the declaration she submitted in support of her March 2019 summary judgment motion.

As for ECO's contention that the Court erred by relying on A.R.S. § 47-3108, the parties' submissions in response to the call for supplemental briefing demonstrate that any error was harmless.  The bottom line is that ECO executed and then failed to repay a promissory note.  One defense ECO raised during the summary judgment process was whether its obligation to repay the promissory note was ever triggered, such that its undisputed failure to make payments could be characterized as a default.  Although the Court looked to A.R.S. § 47-3108 for purposes of evaluating whether the repayment obligation was triggered, Cramton argued in her summary judgment papers that a different provision gave rise to the repayment obligation—specifically, the third paragraph of the note, which provided that "[i]f the Borrower becomes insolvent or the subject of a voluntary or involuntary proceeding in bankruptcy . . . , then the Lender, upon occurrence of this event (a 'Default'), may at its option and without further notice to the Borrower . . . declare any or all of the Indebtedness to be immediately due and payable."  (Doc. 142-6 at

2.)  If Cramton's initial argument on this point was correct, any error in looking to § 47-3108 was harmless and would not implicate the principle of party presentation.

Cramton's initial argument on this point was, in fact, correct.  In January 2020, counsel for Defendants filed a notice that "Defendant Eat Clean Operations, LLC ('ECO, LLC')" had filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida.  (Doc. 254.)  Based on this filing, the Court entered an automatic stay as to ECO.  (Doc. 255.)  And in a later filing, ECO clarified that it was the entity that had filed for bankruptcy—there had simply been a minor name change.  (Doc. 432 at 4 ["There is only one Eat Clean Operations, LLC ('ECO') . . . .  Under the Kahala asset purchase agreement, ECO was required to change its name, and it did so. . . .  The bankruptcy petition identifies this entity on the first page . . . ."].)  Given this backdrop, ECO's attempt to question whether it was the entity that filed the bankruptcy petition rings hollow—it went out of its way to notify the Court of ECO, LLC's bankruptcy filing (which it had no reason to do if it was unaffected by the proceedings), declined to object when the Court entered an automatic stay as to ECO based on the filing of the bankruptcy notice, and then reiterated that it was the entity that had filed the bankruptcy petition.

At any rate, ECO was, at a minimum, a *subject* of the bankruptcy proceeding that arose after ECO, LLC filed the bankruptcy petition, and being the subject of such a proceeding was alone enough to qualify as a default (and thus trigger an immediate repayment obligation) under the ECO note.  (Doc. 142-6 at 2.)  Under these circumstances, there is no reason to alter or amend the judgment—ECO remains liable to Cramton for $23,017.12, albeit for potentially different reasons than set forth in the December 2019 summary judgment order on liability.

Finally, as for Cramton's request for the fees and costs associated with drafting her response, it is addressed in Part IV *infra*.

III.  <u>Third Motion For Reconsideration—Spoliation Sanctions (Doc. 475)</u>

A.  **Relevant Background**

As discussed in prior orders (Docs. 247, 345, 429), Cramton's central claim in this

case was that Keely duped her into resigning by falsely telling her, during a telephone call on September 18, 2017, that a planned sale of Grabbagreen to Kahala had fallen through and that the Kahala deal was dead.  Cramton resigned shortly after this telephone call.  By resigning, Cramton essentially forfeited an 18.6% ownership interest she held in Grabbagreen.  As it turns out, the Kahala deal wasn't dead—Kahala later purchased the Grabbagreen brand for $2.6 million.  In the complaint, Cramton asserted a variety of tort and contract claims against Defendants in an effort to obtain a share of the sale proceeds. Those claims were set forth in Counts 6-10.  Cramton ultimately lost on all of those claims—some were dismissed at summary judgment and the Court ruled in Defendants' favor on the others following the bench trial.

During the discovery process, Defendants sought to defend against Cramton's resignation-related claims in various ways.  In addition to "disputing Cramton's characterization of what Keely said during the fateful phone call on September 18, 2017," Defendants also took the position "that Cramton had friends within Grabbagreen and Kahala who were secretly feeding her information about Kahala's plans"—a theory that, "if true, would undermine Cramton's suggestion that she detrimentally relied on Keely's purported statement."  (Doc. 247 at 3.)  Defendants further believed that "the evidence of these communications should have been found on Cramton's company-issued computer and cell phone."  (*Id.*)  "Unfortunately, around the time of her departure, Cramton brought both devices to a third-party data vendor in an attempt to have them 'wiped.'"  (*Id.*)

On January 4, 2019, the parties informed the Court of an unresolved discovery dispute concerning these issues.  (Doc. 111.)  As relief, Defendants requested that Cramton be ordered to (1) "produce a hard drive containing the data from the Company Phone as it was backed up to the iCloud around September 24, 2017" and (2) "submit Ms. Cramton's current cell phone to a forensics expert to be searched for only the relevant communications Defendants requested from September 25, 2017, through the end of 2017."  (*Id.* at 3.)

On January 8, 2019, the Court held a hearing to resolve this discovery dispute.  (Doc. 115.)  The Court granted Defendants' request in part, ordering Cramton's "counsel to

attempt to access [Cramton's] old iCloud account.  [Cramton's] counsel shall document all steps taken in seeking to access the account and provide that information to Defense counsel.  If the iCloud account cannot be accessed, and Defense counsel is satisfied that [Cramton's] counsel has made a good-faith attempt to obtain access, the Court will not require any further relief.  If the account can be accessed, [Cramton's] counsel shall review its contents to determine whether it contains any additional texts and emails that were not previously produced and that are responsive to Defendant's previous discovery requests. If so, [Cramton's] counsel shall produce those materials to Defense counsel in order to resolve this issue."  (*Id.*)

On June 14, 2019, the parties informed the Court of further unresolved discovery disputes concerning Cramton's alleged spoliation of evidence.  (Docs. 188, 193, 194.)  As a remedy, Defendants requested "leave to file a Motion for Sanctions."  (Doc. 188 at 1.)

On June 21, 2019, the Court held a hearing to resolve this discovery dispute.  (Doc. 195.)   The Court ultimately granted Defendants' request for leave to file a sanctions motion.  (*Id.*)

On July 22, 2019, Defendants filed the operative version of their sanctions motion. (Doc. 206.)  The motion later became fully briefed.  (Docs. 216, 221.)

In the December 23, 2019 order that resolved the parties' cross-motions for summary judgment, the Court also denied Defendants' motion for sanctions.  (Doc. 247.) As an initial matter, the Court noted that "[a]lthough Defendants place heavy emphasis on the fact that Cramton arranged to have her company-issued computer and cell phone 'wiped' before returning them," "the computer technician from P.C. Guru . . . made a backup of Cramton's hard drive, even though she hadn't requested one, and Cramton produced that hard drive to Defendants after it was discovered midway through this case. Moreover, the evidence shows that Cramton attempted to transfer the complete contents of her company-issued cell phone onto her new cell phone, and Cramton stated in her declaration that she has produced all of the texts with [four specified individuals] that were saved onto her new phone."  (*Id.* at 13-14.)  Given this background, the Court stated that

"unless Defendants can show that some text messages were lost during the hard drive backup process and/or that Cramton's claims about her efforts to retrieve and produce text messages from her phone are inaccurate, Rule 37(e) sanctions are unavailable." (*Id.* at 14.)

On that issue, the Court began by observing that "[t]he process of assessing how much (if any) ESI is missing has been complicated by the fact that Defendants' theories and allegations on this issue have changed over time" and that Defendants "ultimately focused on Cramton's communications with four witnesses—Wuycheck, Farnell, Cable, and Savone—and purported to identify a specific number of missing ESI communications pertaining to each witness." (*Id.*) The Court also noted that Defendants attempted to raise several new arguments and requests in their reply but declined to consider those arguments and requests because they came too late. (*Id.* at 14-15.) The Court acknowledged that this was, "in some respects, an unsatisfying outcome because it remains possible that key ESI may be missing" and further noted that "Cramton is not blameless in this affair because her decision to attempt to wipe her company-issued devices was the catalyst for all of the spoliation-related litigation that has ensued," but the Court concluded that it did "not have the time or resources to allow Defendants to keep advancing new claims and theories in successive briefs and hearings until one eventually prevails." (*Id.* at 16.)

Turning to the four individuals at issue, the Court first addressed whether Defendants had proved that any of Cramton's electronic communications with those individuals were, in fact, missing. (*Id.* at 16-20.) The Court concluded "that Defendants have not proved the existence of any lost Wuycheck text messages but have proved the existence of one lost Farnell text message, three lost Farnell voicemails, and nine lost Cable text messages" and further "assume[d] that 187 Savone text messages are missing." (*Id.* at 20.) Next, the Court addressed whether Cramton had a duty to preserve the missing communications. (*Id.* at 20-23.) The Court concluded that it was only reasonably foreseeable that "one Farnell text message and three Farnell voicemail messages" might be relevant to future litigation. (*Id.* at 23.) Next, the Court addressed whether Cramton had taken reasonable steps to preserve those pieces of missing ESI (no) and whether those

- 26 -

pieces of missing ESI were replaceable (no).  (*Id.* at 23-24.)  Next, the Court addressed whether Defendants suffered prejudice from the loss of those pieces of ESI and concluded they had not.  (*Id.* at 24-26.)  Finally, the Court addressed whether Cramton had acted with the intent to deprive Defendants of the missing ESI and concluded she had not:

> Although Defendants initially accused Cramton of purposefully destroying large volumes of ESI—conduct that might support a finding of intent to deprive—most of the purportedly missing ESI still exists and has now been produced (if belatedly). Additionally, Cramton told the employee at the Verizon store to transfer all of the text messages from her old phone onto her new phone.  Such conduct is inconsistent with an intent to deprive.  Finally, although Cramton hasn't provided a particularly good explanation for why she failed to preserve and produce the one Farnell text message and the three Farnell voicemails, it's unlikely (for the reasons . . . above) that any of these particular materials contained relevant information, and the Court will not infer malicious intent from the loss of a handful of likely-irrelevant bits of ESI in a case where a massive amount of ESI has been produced.

(*Id.* at 26.)  Thus, even though "Cramton's decision to wipe her company-issued cell phone and computer before returning them to Defendants was unfortunate" and it was "understandable why Defendants would view her conduct with deep skepticism," the Court concluded that sanctions under Rule 37(e) were not warranted.  (*Id.* at 26-27.)

The December 2019 order did not mark the end of the parties' litigation concerning the hard drive onto which the contents of Cramton's company-issued computer had been copied.  Before trial, Defendants issued a subpoena to an attorney who had represented Cramton around the time of her resignation in 2017.  That attorney, in turn, moved to quash the subpoena on the ground that any testimony she might provide at trial would be protected by the attorney-client privilege.  (Doc. 370.)  During the ensuing briefing process, Defendants argued, *inter alia*, that because Cramton had voluntarily produced the hard drive to them during the discovery process, and the hard drive contained an array of email communications between Cramton and her attorney, Cramton had waived the privilege with respect to those communications.  (Doc. 384.)

On March 9, 2021, the Court issued an order denying the attorney's motion to quash, concluding that "any privilege was lost when Cramton voluntarily produced the emails to

1    Defendants during the discovery process in this case."  (Doc. 386 at 6.)

2         During the bench trial, Cramton and the former attorney were both questioned about

3    some of the emails that were extracted from Cramton's hard drive.  (*See, e.g.,* Doc. 422 at

4    215-17; Doc. 423 at 51-55, 80; Doc. 427 at 809-15.)

5          On November 30, 2021, the Court entered judgment in Cramton's favor.  (Doc.

6    461.)

7         On December 28, 2021, three Defendants (Keely, ECH, and GFL) filed the third

8    motion now pending before the Court—a "Rule 59 motion to alter or amend judgment on

9    Defendants' motion for spoliation sanctions."  (Doc. 475.)

10        On February 14, 2022, Cramton filed an opposition.  (Doc. 500.)

11        On February 22, 2022, the movants filed a reply.  (Doc. 506.)

12        **B.    The Parties' Arguments**

13        Defendants fault the Court to failing to "address the prejudice to the defense of

14   Count IV" in the December 2019 order denying their request for spoliation sanctions.

15   (Doc. 475 at 1-2.)  According to Defendants, the texts and emails that Cramton destroyed

16   were relevant to the AMWA claim because they would have been useful in undermining

17   Cramton's testimony as to the number of hours she worked for GFL.  (*Id.*)  Defendants

18   further contend that the analysis in the December 2019 order was flawed because it was

19   "materially and substantively inconsistent" with the Ninth Circuit's decision in *Leon v.*

20   *IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006), this Court's subsequent ruling in *Burris*

21   *v. JPMorgan Chase & Co.*, 2021 WL 4627312 (D. Ariz. 2021), and the decision in

22   *Williams v. American College of Education*, 2019 WL 4412801 (N.D. Ill. 2019).  (*Id.* at 2-

23   5.)  Next, Defendants argue that Cramton violated the discovery rules and withheld

24   evidence during earlier stages of this case (*id.* at 5-6) and that the Court improperly shifted

25   the burden onto them when making the challenged rulings (*id.* at 7).  Finally, Defendants

26   dispute that they ever presented evolving theories and ask the Court to either "vacate the

27   ruling on Count IV against Keely" or order an evidentiary hearing.  (*Id.* at 8.)

28        Cramton opposes Defendants' motion.  (Doc. 500.)  According to Cramton, the

motion simply amounts to "rehashing arguments [Defendants] were unhappy were rejected the first time they were raised." (*Id.* at 3-4.)  Cramton also contends that the Court correctly found, in the December 2019 order, that "there was largely no identified missing data or ESI in this matter," that Defendants suffered no prejudice from any missing material, and that "Defendants' argument that there *might* be destroyed evidence is nothing more than an extension of the conspiratorial arguments they have made throughout this litigation." (*Id.* at 4-5.)  As for Defendants' complaints about the lack of a forensic examination, Cramton contends those complaints are "mystifying" because Defendants completed their own forensic analysis and didn't request an evidentiary hearing or forensic examination in their sanctions motion.  (*Id.* at 5.)  Next, Cramton contends that Defendants cannot demonstrate prejudice, let alone manifest injustice, with respect to the two counts on which they lost (Counts Four and Five) because "it is difficult to imagine how a missing text, voicemail, or email could somehow prove that Plaintiff did not work all of the hours she claimed to work, or that she did not have a remaining balance on her promissory note." (*Id.* at 6.)  Next, as for *Leon*, *Burris*, and *Williams*, Cramton contends that they are consistent with the analysis in the challenged orders.  (*Id.* at 6-7.)  Finally, Cramton argues that because Defendants' motion is frivolous and vexatious, she should be awarded the fees and costs she incurred when preparing her response.  (*Id.* at 7-8.)

In reply, Defendants accuse Cramton of committing a felony by attempting to wipe her company-owned devices (Doc. 506 at 2); accuse Cramton of perjuring herself at various points during this case (*id.* at 2-3); reiterate their position that *Leon* and *Williams* support the imposition of sanctions (*id.* at 3); argue that Cramton should have reasonably foreseen that her text messages with Savone since mid-2016 would be relevant to her AMWA claim (*id.* at 3-5); argue that Cramton's spoliation efforts were not limited in the manner described in the December 2019 order (*id.* at 4-5); argue that they never obtained a forensic examination of Cramton's personal phone and accuse Cramton of "procedural gimmickry" in attempting to suggest otherwise (*id.* at 6); argue that any "personal" information of Cramton was necessarily relevant to her claims in this action (*id.* at 6-7);

argue that *Burris* constitutes an intervening change in controlling law (*id.* at 7-8); accuse Cramton's counsel of making false statements (*id.* at 8); and argue that Cramton's "retaliatory request for sanctions" should be denied (*id.* at 8-9).

C.   **Standard Of Review**

As noted in Parts I.C and II.C above, the "four basic grounds on which a Rule 59(e) motion may be granted" are: (1) to correct a manifest error of fact or law; (2) to incorporate newly discovered and previously unavailable evidence; (3) to prevent manifest injustice; and (4) to address an intervening change in controlling law. *Allstate Insurance Co.*, 634 F.3d at 1111-12. "[A]mending a judgment after its entry remains an extraordinary remedy which should be used sparingly." *Id.* It is an "abuse[]" of Rule 59(e) to "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.*

D.   **Analysis**

Defendants' motion consists, in large part, of repeating spoliation-related arguments (or variants thereof) the Court previously rejected or making new arguments they did not, for whatever reason, raise at the appropriate time. But "[m]otions that simply 'rehash' the losing party's failed arguments or that attempt to rescue failed positions by introducing new arguments are routinely and summarily rejected as being outside the proper scope of the limited relief available under Rule 59(e)." 2 Gensler, *supra*, Rule 59, at 251.

Defendants have not, at any rate, demonstrated that the Court's previous spoliation-related rulings were manifestly erroneous, would result in manifest injustice, or are undermined by newly discovered and previously unavailable evidence or an intervening change in controlling law. Although Defendants waste no opportunity to denigrate Cramton's character and accuse her of various crimes, Defendants never come to grips with the fact that Cramton's efforts to wipe her company-issued computer were unsuccessful— the computer technician made a backup copy that was timely produced to Defendants as part of this litigation. Indeed, that production resulted in a partial waiver of Cramton's attorney-client privilege that Defendants exploited to their benefit at trial. It is an

- 30 -

1    understatement to say that these facts are dissimilar from the facts of *Burris* (which does

2    not, at any rate, qualify as an intervening controlling authority), *Leon* (which is not an

3    intervening authority), and *Williams* (which is neither intervening nor controlling).

4        As for Cramton's iPhone, not only does the Court stand by the analysis set out in

5    the earlier rulings,[3] but Defendants have not demonstrated that the allegedly missing ESI

6    would have had any significant impact on the sole claim as to which Defendants now seek

7    relief—the AMWA claim in Count Four.[4]  At bottom, Defendants' theory seems to be that

8    Cramton should have saved and produced every text message she sent to anyone during

9    the eight-month period covering her AMWA claim (*i.e.,* December 2016 through

10   September 2017), no matter how personal the subject matter, because they could have used

11   those text messages to poke holes in Cramton's testimony as to the number of hours she

12   was working for GFL during the period in question.  With the unique vantage point as the

13   trier of fact during the bench trial, the Court can say with confidence that such evidence

14   would not have been successful in impeaching Cramton's hours-related testimony.  (Doc.

15   429 at 20 ["[T]he Court accepts that Cramton was a hard-working employee who often

16   worked on mornings, nights, and weekends and concludes that her estimate of hours

17   worked for GFL is credible and, if anything, conservative."].)

18       Finally, as for Cramton's request for the fees and costs associated with drafting her

19   response, it is addressed in Part IV *infra*.

20           …

21   _____

22   [3]     The December 2019 order mistakenly identified Kelli as the author of a declaration
     submitted by Keely.  (Doc. 247 at 15, citing Doc. 221-1 at 56-63.)  Although Defendants
23   characterize this misattribution as a reversible error (Doc. 475 at 5), the December 2019
     order made clear that the Court was also disregarding the declaration for reasons unrelated
24   to the qualifications of its author—because it was being offered as part of an improper
     attempt to raise a new argument for the first time in a reply.

25   [4]     Tellingly, in their sanctions motion, Defendants excluded Count Four from the list
     of claims they sought to have dismissed as a sanction under Rule 37(e)(1), which is the
26   provision that authorizes dismissal when the loss of ESI is prejudicial to the movant.  (Doc.
     206 at i ["Defendants hereby jointly seek sanctions against [Cramton] in the form of
27   dismissal of Counts I, II, III, V, VI, VII, VIII, and X of [Cramton's] Amended
     Complaint."]; *id.* at 19 [same].)  Instead, Defendants largely focused on why the missing
28   ESI was prejudicial to their defense of Cramton's resignation-related claims (which they
     subsequently prevailed on at summary judgment or trial).

IV.     Cross-Motions For Attorneys' Fees And Costs (Docs. 481, 483)

    A.     **Background**

        1.     Cramton's Claims

In her original complaint, Cramton asserted a variety of claims, including a claim under the Family Medical and Leave Act ("FMLA").  (Doc. 1 ¶¶ 78-90.)  However, Cramton later agreed to voluntarily dismiss her FMLA claim with prejudice.  (Doc. 80.)

In her operative complaint, Cramton asserted 10 claims and named five Defendants (Keely, Kelli, GFL, ECO, and ECH).  (Doc. 88.)  Those claims fell into four categories. First, in Counts One, Two, and Three, Cramton asserted claims under the Americans with Disabilities Act ("ADA") against GFL, ECO, and ECH.  (*Id.* ¶¶ 85-110.)  It is not clear from the record how Cramton valued those claims.  Second, in Count Four, Cramton asserted an AMWA claim against all five Defendants.  (*Id.* ¶¶ 111-18.)  As reflected in the judgment, that claim was ultimately worth $50,871.  (Doc. 461.)  Third, in Count Five, Cramton asserted a claim for breach of the promissory note against ECO.  (Doc. 88 ¶¶ 119-123.)  As reflected in the judgment, that claim was ultimately worth $23,017.12  (Doc. 461.)  Fourth, in Counts Six, Seven, Eight, Nine, and Ten, Cramton asserted retaliation-related tort and contract claims against Keely and ECH.  (Doc. 88 ¶¶ 124-62.)  During the bench trial, Cramton argued that she should receive $483,600 in economic damages based on those claims, as well as up to $250,000 in emotional distress damages and approximately $700,000 in punitive damages.  (Doc. 428 at 191.)

Cramton ultimately prevailed on only two of her claims, the AMWA claim in Count Four against Keely and the contract claim in Count Five against ECO.  (Doc. 461.)  Those two claims were worth $73,888.12 in the aggregate.  (*Id.*)  As for the remaining claims, the FMLA claim in the original complaint was dismissed during the early stages of the case (Doc. 80); the 2019 summary judgment order disposed of the ADA claims in Counts One, Two, and Three, the AMWA claim in Count Four as to Kelli, ECO, and ECH, and two (Counts Six and Eight) of the resignation-related claims (Doc. 247); the remaining three resignation-related claims (Counts Seven, Nine, and Ten) were resolved against Cramton

following the bench trial (Doc. 429 at 27-28); and Cramton voluntarily dismissed her AMWA claim against GFL following the bench trial (Doc. 454).

### 2.    Defendants' Counterclaims

All five Defendants, as well as an additional Grabbagreen-related entity called Gulf Girl Squared ("GGS"), asserted counterclaims against Cramton and Cramton's spouse. (Doc. 95 at 21-29.)  In Counterclaim One, GFL, ECO, and ECH asserted a claim for breach of various contracts (confidentiality, non-compete, and operating agreements).  (*Id.* at 24.) In Counterclaim Two, GFL, ECO, and ECH asserted a tort claim for unfair competition. (*Id.* at 25.)  In Counterclaim Three, GFL, ECO, ECH, Keely, and Kelli asserted a claim for breach of contract (GGS release).  (*Id.* at 25-26.) In Counterclaim Four, GFL, ECO, and ECH asserted a tort claim for wrongful interference with business expectations.  (*Id.* at 26-27.)  This counterclaim was valued at more than $1 million.  (*Id.* ["As a result of Kim Crampton's wrongful interference, GFL, ECO, and ECH assets sold for at least $1,000,000.00 less than the price Counterclaimants GFL, ECO, and ECH would have obtained for the assets but for Kim Crampton's wrongful interference."].)  In Counterclaim Five, GGS asserted a claim for breach of contract (GGS release).  (*Id.*)

In the December 2019 order, the Court granted summary judgment in favor of Cramton and Cramton's spouse as to all of the counterclaims.  (Doc. 247 at 61-72.)

### B.    **The Parties' Arguments**

Each side has filed an affirmative motion for costs and attorneys' fees, a response to the other side's motion, and a reply.  To avoid duplication, the Court will not describe all six briefs in sequential order but instead summarize each side's position.

Keely, GFL, ECH, and ECO ("the moving Defendants") seek to recover nearly $1.1 million in costs and attorneys' fees.  (Docs. 481, 497, 501.)  The moving Defendants contend they should be considered the prevailing/successful parties in this action because (1) they wholly prevailed on the most valuable set of Cramton's claims (the resignation-related claims for which Cramton sought over $1.2 million); (2) they largely prevailed on the FMLA, AMWA, and ADA claims—Cramton sued an array of different entities and

individuals but ultimately recovered only against Keely and only on the AMWA claim; and (3) although Cramton secured a $23,017.12 judgment on her contract claim in Count Five against ECO, she was not the prevailing party as to that claim because she rejected a pair of written settlement offers to pay the full requested amount.  Given this backdrop, the moving Defendants contend they "prevailed on 97% of Cramton's claims," or "88% with the four counterclaims involving certain Defendants."  (Doc. 481 at 6 & n.4.)  The moving Defendants also accuse Cramton of needlessly running up the cost of litigation in various ways, including by making extortionate settlement demands, engaging in discovery misconduct, pursuing certain claims in bad faith, and failing to participate in contractually required mediation.  (Doc. 481 at 6-12; Doc. 497 at 3.)  As for the statutory basis for their fee request, the moving Defendants identify the ADA, the FMLA, the Arizona Civil Rights Act ("ACRA"), and Arizona's fee-shifting statute for contract claims, A.R.S. § 12-341.01(A).  (Doc. 481 at 4-5, 8-11.)  The moving Defendants also defend the size of their fee request (Doc. 481 at 13-17) and contend that Cramton's fee request is inflated (Doc. 497 at 7-17).  Finally, the moving Defendants argue that, to the extent Cramton obtains any recovery, it should be limited to the fees and costs "determined reasonable and necessary for Count IV against Keely."  (Doc. 497 at 6.)  According to the moving Defendants, those costs and fees should be limited to either $1,731.50, or about $18,000, or no more than $45,509.42.  (*Id.* at 18.)

Cramton and her spouse seek to recover nearly $400,000 in costs and attorneys' fees.  (Docs. 483, 492, 503.)  As an initial matter, Cramton contends that AMWA's cost-shifting provision is one-sided, such that she is entitled to recover her fees to the extent she prevailed on her AMWA claim against Keely but cannot be required to pay fees to the remaining Defendants she unsuccessfully sued under AMWA.  (Doc. 483 at 2-5.)  More broadly, Cramton contends that she should be considered the prevailing party for purposes of the entire litigation because she was the "net winner," having prevailed on her AMWA claim in Count Four against Keely, on her contract claim in Count Five against ECO, and on all of the counterclaims asserted against her (for which Defendants "asserted more in

damages . . . than Plaintiff did on her affirmative claims"). (Doc. 483 at 5-6, 15; Doc. 492 at 2-5.) As for the purported settlement offers concerning Count Five, Cramton argues they do not change the prevailing-party calculus because they (1) were not for a sum certain, (3) were subject to certain contingencies, (3) were made before Defendants appeared in this action, (4) did not provide for Cramton's attorneys' fees, and (5) "were conditioned upon Plaintiff proving a release of all claims, which would have included [the] minimum wage claim." (Doc. 492 at 4-7 & n.2.) Cramton also defends the size of her fee request, noting that she has already reduced it by over $340,000 via the "removal of time associated with Plaintiff's unsuccessful claims, time for multiple attorneys attending meetings or conferences, time spent briefing the issue of GFL's joint and several liability under [AMWA], time spent on the defense of the jury trial waiver (and therefore time already spent preparing for aspects unique to a jury trial such as voir dire, statement of the case and instructions), time related to Defendants' separate claims against case witnesses Jeff Farnell, Juliet Peters and Catherine Peterson, and other time determined to be unnecessary or duplicative." (Doc. 483 at 7, 15.) In contrast, Cramton characterizes the moving Defendants' fee request as "grossly excessive." (Doc. 492 at 14-15, 18.)

C.   **Analysis**

In 279 B.C., a king named Pyrrhus led his army into battle against the Romans at Asculum. Although King Pyrrhus prevailed in this battle, his army suffered devastating losses. Such a result has since become known as a Pyrrhic victory, which is defined as "a victory that is not worth winning because so much is lost to achieve it." *Phyrric Victory*, Merriam-Webster, https://www.merriam-webster.com/dictionary/Pyrrhic%20victory (last visited May 27, 2022).

King Pyrrhus has nothing on the parties in this case. After four years of bitter litigation in which each side sought more than $1 million in damages, made six-figure settlement demands, and spent hundreds of thousands (if not millions) of dollars on legal fees, Cramton ultimately obtained a recovery of less than $75,000. Although, as explained below, Cramton is entitled to recover some of her attorneys' fees, nobody truly prevailed.

1        ### 1.    A.R.S. § 12-341.01(A)

2        The analysis begins with A.R.S. § 12-341.01(A), which both sides cite in support of

3   their respective fee requests.  That statute provides in relevant part that "[i]n any contested

4   action arising out of a contract, express or implied, the court may award the successful

5   party reasonable attorney fees."  It is undisputed that this action arose out of a contract—

6   Cramton's claim against ECO in Count Five and several of Cramton's resignation-related

7   claims against Keely and GFL were contract claims, as were several of the moving

8   Defendants' counterclaims against Cramton and Cramton's spouse.  Thus, the first step

9   under § 12-341.01(A) is determining who was "successful."

10       Under Arizona law, "the trial court has substantial discretion to determine who is a

11  'successful party'" for purposes of § 12-341.01.  *Fulton Homes Corp. v. BBP Concrete*,

12  155 P.3d 1090, 1096 (Ariz. Ct. App. 2007).   "The decision as to who is the successful

13  party for purposes of awarding attorneys' fees is within the sole discretion of the trial court,

14  and will not be disturbed on appeal if any reasonable basis exists for it."  *Sanborn v.

15  Brooker & Wake Property Mgmt., Inc.*, 874 P.2d 982, 987 (Ariz. Ct. App. 1994).

16       The "successful party" analysis here is complicated by the fact that Cramton sued

17  five different Defendants under an array of different contract, tort, and employment

18  theories but did not sue each Defendant in each count.  Additionally, those defendants (as

19  well as another entity) asserted contract-based and tort-based counterclaims against

20  Cramton and her spouse.  Under the circumstances, the Court concludes that the most

21  logical approach is to individually evaluate whether Cramton was successful in relation to

22  each Defendant (*i.e.,* Cramton-ECO, Cramton-GFL, Cramton-ECH, Cramton-Keely,

23  Cramton-Kelli).  The Court possesses particularly broad discretion when deciding how to

24  determine the "successful party" in cases involving multiple parties and multiple claims.

25  *See, e.g., Aspen Biotech Corp. v. Wakefield*, 2021 WL 3503399, *18 (Ariz. Ct. App. 2021)

26  ("This court has long held that the superior court is not bound to the net judgment rule in a

27  multi-party, multi-claim case in the exercise of its discretion.  Instead, it may use other

28  tests to determine the parties' relative success concerning the various claims."); *Schwartz*

*v. Farmers Ins. Co. of Ariz.*, 800 P.2d 20, 25 (Ariz. Ct. App. 1990) ("The trial court possesses discretion to determine who is the successful party in multiple-party litigation and in cases where there are multiple-parties as well as multiple-claims."); *Pioneer Roofing Co. v. Mardian Constr. Co.*, 733 P.2d 652, 664 (Ariz. Ct. App. 1986) ("Given the third-party posture of this litigation and its multiple claims and parties, we hold that the trial court's method of determining who was the 'successful party' as to each claim was not an abuse of discretion.").

With that backdrop in mind, to the extent Cramton and a particular Defendant each pursued affirmative claims for relief against each other, one approach for deciding which side was successful would be to apply the "net winner" test. *Ayala v. Olaiz*, 776 P.2d 807, 809 (Ariz. Ct. App. 1989) ("In cases involving various competing claims, counterclaims and setoffs all tried together, the successful party is the net winner.").[5]  Additionally, "in a case involving multiple claims and varied success," the court may "apply a 'percentage of the success' or a 'totality of the litigation' test." *Berry v. 352 E. Virginia, L.L.C.*, 228 Ariz. 9, 261 P.3d 784, 788 (Ariz. Ct. App. 2011) (citation omitted).  "Under the totality of the litigation rule, . . . [t]here are no strict factors, rather the trial court is afforded discretion in reviewing the totality of the litigation." *Medical Protective Co. v. Pang*, 25 F. Supp. 3d 1232, 1240 (D. Ariz. 2014).

Starting with the "net winner" test, the only contract claim on which Cramton prevailed was her claim in Count Five against ECO, which resulted in a judgment in her favor of $23,017.12.  Because ECO did not prevail on any of its contract-based counterclaims against Cramton, it follows that Cramton was a net winner in relation to

---

[5]    *See also Vortex Corp. v. Denkewicz*, 334 P.3d 734, 745 (Ariz. Ct. App. 2014) ("Both sides in this litigation brought claims arising from their contractual relationships, and both prevailed on some of their claims, with damages awarded.  In fact, both sides sought large sums of money from the other and both fell significantly short of their financial goals in the litigation.  For cases involving claims and counterclaims in which both sides receive a favorable judgment in part, our supreme court has applied the 'net judgment' approach, by which the 'prevailing party' for attorneys' fees purposes is the party that, when both sides are awarded judgments, is awarded a greater amount than the other party.  Because each side recovered less than the amounts sought, we conclude the net judgment rule is applicable.") (citations omitted).

ECO.

This is true despite Cramton's rejection of the settlement offers concerning Count Five.  Under A.R.S. § 12-341.01(A), "[i]f a written settlement offer is rejected and the judgment finally obtained is equal to or more favorable to the offeror than an offer made in writing to settle any contested action arising out of a contract, the offeror is deemed to be the successful party from the date of the offer and the court may award the successful party reasonable attorney fee."  The first settlement offer, made in September 2017, was for ECO to "agree to a 24-month repayment schedule for the remaining balance of the ECO Note in exchange for" various items of consideration, including "a full release" of all of Cramton's other claims.  (Doc. 481-6 at 14.)  This offer was insufficient to undermine Cramton's successful-party status.  Not only did not fail to specify the amount that ECO would actually pay (it only offered to satisfy "the remaining balance" on the ECO note, which the parties disputed), but the $73,888.12 "judgment finally obtained" by Cramton was more favorable than what Cramton would have received under the offer (*i.e.,* only the disputed balance owed on the ECO note, which Cramton valued at $23,017.12 and which Defendants valued at $66,527, with no additional recovery against Keely due to the "full release").  Similarly, the second settlement offer, made in January 2018, potentially called for "ECO to repay Ms. Cramton's outstanding loan," but only if Cramton "release[d]" all other claims and dismissed the complaint with prejudice.  (Doc. 481-6 at 28.)  Once again, this was insufficiently specific as to the actual amount being offered and less favorable to Cramton than the "judgment finally obtained."

As for three of the remaining Defendants (GFL, ECH, and Kelli), there was no net winner—Cramton lost on all of her contract-based claims against those Defendants, who in turn lost on all of their contract-based counterclaims against Cramton.

As for the remaining Defendant (Keely), the analysis is complicated by the fact that Cramton's AMWA claim in Count Four was not a contract claim.  Accordingly, there is a strong argument that Cramton's award of $50,871 on Count Four does not count for purposes of the "successful party" analysis under § 12-341.01.  *Ramsey Air Meds, L.L.C.*

*v. Cutter Aviation, Inc.*, 6 P.3d 315, 318 (Ariz. Ct. App. 2000) ("A tort claim does not come within the attorneys' fee statute by being interwoven with an unsuccessful contract claim."). Additionally, because the Court is separately analyzing Cramton's entitlement to fees under the fee-shifting provisions of AMWA, it would be anomalous to allow the AMWA claim to separately drive the fee-entitlement analysis under § 12-341.01. *Cf. Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 212 P.3d 853, 861 (Ariz. Ct. App. 2009) (citing other Arizona cases for the proposition that "where attorney fees award [are] affirmed under one theory, [there is] no need to reach arguments pertaining to [an] alternative theory"). If Count Four were excluded for either of these reasons, there would be no net winner between Cramton and Keely because each lost on all of her contract-based affirmative claims. *General Cable Corp. v. Citizens Utilities Co.*, 555 P.2d 350, 354 (Ariz. Ct. App. 1976) ("[W]here . . . the trial court has denied relief to both parties, we find that neither party is the 'successful party' under the provisions of § 12-341.").[6]

The "percentage of the success" and "totality of the litigation" tests produce similar outcomes. Cramton obtained 100% of what she sought from ECO. Thus, in relation to ECO, Cramton was a successful party no matter which test is used. As for the remaining Defendants, Cramton sought more than $1 million in damages from them while they sought more than $1 million in damages on their counterclaims. The parties' settlement demands were consistent with these large requests. Cramton made pre-lawsuit settlement demand of $850,000 (Doc. 481-6 at 18) and, according to Kelli, "the demand [was] unwaveringly at or about $750,000 for the entire 4 years" that followed (Doc. 481-2 ¶ 21). Meanwhile, in a November 2018 letter, Defendants agreed to enter into a mutual release of claims with Cramton, but only if Cramton made a $150,000 settlement payment to them. (Doc. 492-1 at 73.) Later, in August 2020, Defendants increased their demand: "Cramton pays $250,000 to Defendants . . . in exchange for a mutual release of all claims between the

---

[6]     Although Cramton's spouse avoided liability as to the contract-based counterclaims asserted against her, she did not assert any contract claims that might lend themselves to a "net winner" analysis. Additionally, it is unclear whether Cramton's spouse expended any funds on her defense that would not have been independently spent defending Cramton.

1   parties, inclusive of fees and costs." (*Id.* at 81.)  It there were ever a case to find that the

2   "totality of the litigation" test failed to produce a successful party (apart from Cramton in

3   relation to ECO), this would be it.  Any victory was Phyrric.

4          Because Cramton was the successful party in relation to ECO (no matter what test

5   is used), she may be entitled to the attorneys' fees she incurred when pursuing her claim in

6   Count Five.  However, "there is no presumption that a successful party should be awarded

7   attorney fees under § 12-341.01." *Motzer v. Escalante*, 265 P.3d 1094, 1095 (Ariz. Ct.

8   App. 2011).  "The legislature used the phrase 'may award' in authorizing the trial judge to

9   award a successful contract litigant reasonable attorney's fees.  The natural import of this

10  phrase is to vest discretion in the trial court to determine the circumstances appropriate for

11  the award of fees." *Associated Indem. Corp. v. Warner*, 694 P.2d 1181, 1184 (Ariz. 1985).

12  The factors Arizona courts have identified as "useful" in determining whether to award

13  fees pursuant to § 12-341.01 include (1) the merits of the claim or defense of the

14  unsuccessful party; (2) whether the litigation could have been avoided or settled; (3)

15  whether assessing fees would cause extreme hardship; (4) whether the successful party

16  prevailed with respect to all relief sought; (5) whether the legal question was novel or had

17  been previously adjudicated; and (6) whether an award would discourage other parties with

18  tenable claims or defenses from litigating them.  *Id.*

19         Having carefully considered those factors, the Court concludes than an award of

20  fees and costs would be appropriate here with respect to Cramton's pursuit of her contract

21  claim in Count Five against ECO.[7]  Notably, Cramton only seeks to recover the $10,256 in

22  attorneys' fees related to Count Five that she incurred during the final stages of the case

23  following the bench trial.  (Doc. 483 at 16; Doc. 483-2 ¶ 14.)  Particularly when viewed

24  _____

25  [7]     In the tentative order issued before oral argument, the Court concluded that Cramton
        should not be awarded any attorneys' fees under § 12-341.01.  However, during oral
26      argument, Cramton's counsel identified reasons why Cramton should be deemed a
        successful party in relation to ECO and be awarded the fees associated with Count Five.
27      Upon further consideration, and after re-reviewing the *Wakefield*, *Schwartz*, and *Pioneer
        Roofing* decisions cited above (which address the broad discretion of trial courts to
        determine which parties were successful in relation to each other during multi-party, multi-
28      claim litigation), the Court concludes that Cramton's arguments on these points have merit
        and has changed the tentative order accordingly.

through this lens, ECO's defenses to the claim were not meritorious, litigation could not have been avoided, there has been no suggestion that assessing fees against ECO would cause extreme hardship (indeed, it is unclear whether Cramton will be able to recover on any fee award against ECO given the bankruptcy proceedings), Cramton received 100% of what she sought, the legal questions were not particularly novel, and an award would not have an impermissible deterrent effect.  The Court also agrees that Cramton should be allowed under § 12-341.01(A) to recover the costs and fees associated with responding to ECO's motion for reconsideration as to Count Five and the Court's call for supplemental briefing as to Count Five, because such fees were necessary to preserve Cramton's success.[8]  Accordingly, within 14 days of the issuance of this order, Cramton may file a request for those additional fees and costs.

In contrast, even if Cramton and her spouse could be considered "successful parties" in relation to the remaining Defendants for purposes of § 12-341.01(A) (or even if those Defendants could somehow be considered be considered "successful parties" in relation to Cramton), the Court would decline in its discretion to award any attorneys' fees and costs pursuant to § 12-341.01(A).  Cramton's large settlement demands contributed to the parties' inability to avoid litigation and any success Cramton achieved was quite modest with respect to the overall relief sought (at least as to the non-ECO and -AMWA claims). *Cf. Motzer*, 265 P.3d at 1096 ("[T]he court could find Motzer was the successful party and still deny fees under the *Associated Indemnity* factors.").  Additionally, because Cramton is receiving a fee award pursuant to AMWA, this provides another reason to decline to award fees under § 12-341.01 apart from the fee award against ECO.  Meanwhile, the moving Defendants' counterclaims uniformly lacked merit, their conduct also contributed to the parties' inability to avoid litigation, and they ended up losing on all of their counterclaims.

…

---

[8]  This makes it unnecessary to resolve Cramton's alternative claim (Doc. 499 at 12) that she is entitled to recover her post-trial briefing fees related to Count Five under 28 U.S.C. § 1927 and Rule 11.

1

2.   Civil Rights Statutes

2     Some of Cramton's claims arose under civil rights statutes that have their own fee-

3 shifting provisions.  As noted, Cramton voluntarily dismissed an FMLA claim and then

4 had three ADA claims—which were pleaded in the complaint, in the alternative, as ACRA

5 claims (Doc. 88 at 10-12)—rejected at summary judgment.  The moving Defendants point

6 to their uniform success in defending against those claims as one reason why they should

7 receive a fee award.  (Doc. 481 at 8-10.)

8     As an initial matter, and as Cramton correctly notes in her response (Doc. 492 at 9),

9 the moving Defendants may not seek fees based on their successful defense of Cramton's

10 FMLA claim because the fee-shifting provision of that statute operates in a one-sided

11 fashion—it only authorizes an award of fees to a successful plaintiff.   29 U.S.C.

12 § 2617(a)(3) ("The court in such an action shall, in addition to any judgment awarded to

13 the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other

14 costs of the action to be paid by the defendant.").  *See, e.g.*, *Rains v. Newmont USA Ltd.*,

15 2015 WL 5665599, *2 (D. Nev. 2015) ("[T]he FMLA's counsel-fee provision provides for

16 fees only for a plaintiff who prevails against a defendant . . . [and] does not carry over to a

17 prevailing defendant in an action brought under the FMLA."); *Peak v. Forever Living

18 Prods. Int'l, Inc.*, 2011 WL 13174334, *8 (D. Ariz. 2011) ("FMLA and FLSA . . . have

19 mandatory one-way fee-shifting provisions, requiring that a defendant pay a reasonable

20 attorney's fee to a prevailing plaintiff, but not the other way around.").

21     In contrast, the moving Defendants may potentially recover fees based on their

22 successful defense of the Cramton's ADA/ACRA claims.  However, "it is much more

23 difficult for prevailing defendants to recover fees in civil rights cases than it is for

24 prevailing plaintiffs.  Defendants may recover attorneys' fees only 'upon a finding that the

25 plaintiff's action was frivolous, unreasonable, or without foundation, even though not

26 brought in subjective bad faith.'"  *Advocates for Individuals with Disabilities, LLC v.

27 MidFirst Bank*, 2018 WL 3545291, *4 (D. Ariz. 2018) (quoting *Christianburg Garment

28 Co. v. EEOC*, 434 U.S. 412, 421 (1978)).  "In considering what constitutes a claim that is

1   frivolous, unreasonable or groundless, it is important that a district court resist the

2   understandable temptation to engage in post hoc reasoning by concluding that, because a

3   plaintiff did not ultimately prevail, his action must have been unreasonable or without

4   foundation." *C.W. v. Capistrano Unified Sch. Dist.*, 784 F.3d 1237, 1245 (9th Cir. 2015)

5   (citation omitted).

6         The moving Defendants are not entitled to fees under this standard because

7   Cramton's ADA/ACRA claims were not frivolous, unreasonable, or without foundation.

8   Although the Court ultimately ruled against Cramton on those claims at summary

9   judgment, the adverse ruling presented a fairly close call that required extensive analysis

10   (Doc. 247 at 33-41) and was reached only after the Court solicited supplemental briefing

11   from Cramton following oral argument (Docs. 242, 243).

12                 3.    <u>AMWA</u>

13         AMWA provides that "[a] prevailing plaintiff shall be entitled to reasonable

14   attorney's fees and costs of suit."  A.R.S. § 23-364(G).  This provision is similar to the

15   FMLA's fee-shifting provision in that it operates in a one-sided fashion.  Thus, because

16   Cramton prevailed on her AMWA claim in Count Four against Keely, she is entitled to

17   recover her reasonable attorneys' fees and costs associated with that claim, even though

18   she did not prevail on her AMWA claim against the remaining Defendants or on most of

19   her non-AMWA claims. *Cf. Mesa Airlines, Inc. v. Davis*, 2021 WL 710191, *2 (Ariz. Ct.

20   App. 2021) (unpub.) ("AMWA's fee provision does not . . . refer[] to prevailing in the

21   'action' as a whole, potentially including other claims unrelated to the asserted minimum

22   wage violations.  Instead, it simply requires a fee award in favor of the 'prevailing plaintiff'

23   in the context of enforcing the provisions of the AMWA itself.  That is, 'prevailing' on the

24   AMWA claim alone (regardless of the employee's success on other claims) constitutes

25   'prevailing' for purposes of § 23-364(G).").

26         Because the fee-shifting provision of AMWA uses the word "shall" (as contrasted

27   with § 12-341.01(A)'s use "may"), a fee award is mandatory rather than discretionary.

28   With that said, Cramton's recovery must be limited to the "reasonable" fees and costs

incurred in pursuing her AMWA claim against Keely. Determining what is reasonable in this case is challenging because the evidence bearing on Cramton's AMWA claim was intertwined with the evidence bearing on her other claims. For example, the evidence bearing on the number of hours that Cramton worked for GFL, which was relevant to her AMWA claim, was also relevant to her unsuccessful resignation-related claims because one of her theories as to those claims was that Keely forced her to work under such grueling, inhumane conditions that she had no choice but to resign once she was led to believe the Kahala deal was dead. (*See, e.g.*, Doc. 428 at 181 [Cramton's closing argument: "[T]hey made the conditions so intolerable for Kim Cramton that she really had no choice but to leave once it was clear that [the Kahala deal was dead]—no pay, no sale, cruel work environment."]; *id.* at 190 ["The evidence is overwhelming that Miss Cramton was lied to about there not being a sale, and that she relied on that fraudulent statement to her detriment. The Newmans made Miss Cramton work for them for no pay. They . . . just ma[de] the conditions so unbearable so that all it took was one lie that a sale was not going to happen for them . . . ."].) As another example, the parties' extensive litigation over allegations of discovery misconduct implicated all of Cramton's claims, not just her AMWA claim.

For these reasons, the Court concludes that Cramton's request for $222,792.40 in attorneys' fees associated with her AMWA claim against Keely (Doc. 483 at 16)[9] must be

---

[9] Cramton's motion also includes a request to recover non-taxable costs of $32,030.82. (Doc. 483 at 16-17; Doc. 503 at 9.) This request is denied. First, although the motion asserts that Cramton "has included, in an abundance of caution, a comprehensive summary of all costs incurred in the action as part of this Motion" (Doc. 483 at 17 n.8), no such summary was enclosed as an attachment to the motion or provided in either of the accompanying declarations from counsel. The Court thus does not know how the requested sum of $32,030.82 was computed. (Although a few of the documents attached to counsel's declarations appear to relate to cost disbursements (Doc. 483-1 at 16, 38, 44), those costs do not come close to $32,030.82.) This approach violates LRCiv 54.1(e)(3), which provides that a party moving for attorneys' fees and non-taxable expenses must include an "itemized account of the time expended and expenses incurred" and must identify, "[i]n a separate portion of the itemized statement, . . . each related non-taxable expense with particularity. . . . Failure to itemize and verify costs may result in their disallowance by the court." Second, in a related vein, Cramton has not explained which of the unspecified $32,030.82 in non-taxable costs are attributable to her successful claims in Counts Four and Five (and, thus, might be recoverable under AMWA or § 12-341.01). During oral argument, Cramton argued that any imprecision in this area should be excused in light of the Clerk of Court's failure to timely resolve the parties' dueling

1    reduced.  Although the Court appreciates Cramton's efforts to exclude litigation activities

2    that were related wholly to non-AMWA claims (Doc. 483-1 ¶ 20; Doc. 483-2 ¶ 13-21), the

3    request still includes, to an unreasonable degree, entries for time spent on tasks attributable

4    both to the AMWA claim and to other unsuccessful claims.  Although some of the time

5    spent on these tasks is properly recoverable under § 23-364(G), not all of it is necessarily

6    recoverable—the overlay of the non-AMWA claims resulted in the tasks taking longer than

7    they otherwise would have taken.[10]

8        In the tentative ruling issued before oral argument, the Court stated that, "[i]n the

9    absence of a proposal from either party on how to account for this duplication," a reduction

10   from $222,792.40 to $150,000 would be sufficient to account for the duplication.

11   However, during oral argument, Cramton's counsel identified a better and more tailored

12   solution.  Counsel suggested that, because two of Cramton's attorneys (Ms. Matheson and

13   Ms. Armstrong) worked nearly exclusively on Cramton's statutory employment claims,

14   while Cramton's remaining attorney (Mr. Feltus) focused most of his efforts on Cramton's

15   commercial and contractual claims, any reduction for duplication should be confined to

16   Mr. Feltus's portion of the AMWA-related fee request.

17       The Court agrees that this approach makes sense.  Ms. Matheson's declaration

18   explains that her firm "jointly represented Ms. Cramton along with attorneys from" Mr.

19   Feltus's firm and, "[a]lthough not subject to black and white precision, the firms'

20   representation was roughly divided between Plaintiff's statutory employment claims under

21   the Arizona Minimum Wage Act, the Americans with Disabilities Act and the Family

---

23   requests to recover their *taxable* costs and objections thereto (Docs. 464, 465, 472, 474),
24   but it is unclear how this delay could have interfered with Cramton's ability to properly
     itemize and seek reimbursement for her non-taxable costs, as she was required to do.

25   [10]    For purposes of a fee request under A.R.S. § 12-341.01, trial courts have "significant
     discretion to award fees in a matter intertwined with another matter for which it may not
26   grant attorney's fees," with the caveat that "[a]ttorney's fees should not be allowed on
     unsuccessful separate and distinct claims that could have been litigated separately."  *City
27   of Cotttonwood v. James K. Fann Contracting, Inc.*, 877 P.2d 284, 294 (Ariz. Ct. App.
     1994).  It is unclear whether the same rule governs fee requests under A.R.S. § 23-364(G).
28   But even if it does, having *discretion* to award fees for intertwined work is not the same
     thing as being *required* to award fees for intertwined work and the Court concludes that
     some reduction is necessary here.

Medical Leave Act . . . and Plaintiff's commercial and contractual claims and Defendants' commercial and contractual counterclaims." (Doc. 483-1 ¶ 2.) Ms. Matheson's declaration further establishes that, due to the manner in which she reduced or eliminated various time entries (including all "entries involving Ms. Cramton's unsuccessful claims under the Family Medical Leave Act and the Americans with Disabilities Act"), her firm's request for a total in $144,838 in AMWA-related fees reflects only the subset of fees that "were reasonable and necessary under the circumstances in this case" to prevail on the AMWA claim. (*Id.* ¶¶ 20-21.) In light of this showing, the Court agrees that the $144,838 portion of Cramton's AMWA-related fee request attributable to Ms. Matheson's firm need not be further reduced.

As for the remaining portion of the fee request—the $77,954.50 in AMWA-related fees attributable to Mr. Feltus's firm (Doc. 483-2 ¶ 21)—the associated billing entries indicate that this figure is composed of $17,954.50 in fees for work on "Exclusively Minimum Wage" tasks and $60,000 in fees for work on "Intertwined" tasks (Doc. 483-2 at 91). The Court concludes that the $17,954.50 sum need not be further reduced but the $60,000 figure remains too high—although it has already been reduced by Mr. Feltus in various ways (Doc. 483-2 ¶¶ 16-21), the Court remains concerned that the overlay of the non-AMWA claims resulted in these tasks taking longer than they otherwise would have taken. Again, it must be recalled that Cramton sought over $1 million based on the commercial and contractual claims on which Mr. Feltus's firm focused and only $50,871 on the AMWA claim that was intertwined in certain ways with those other claims. The Court concludes that a reduction from $60,000 to $30,000 would be sufficient to account for this variable. *Cf. Lexington Ins. Co. v. Scott Homes Multifamily Inc.*, 2016 WL 5118316, *17 (D. Ariz. 2016) ("The Court is free to exercise this discretion as there is no precise rule or formula for determining how to reduce an award for time spent on unsuccessful claims under Arizona law.") (cleaned up). All told, this means that Cramton reasonably incurred $192,792.50 in attorneys' fees in pursuit of her AMWA claim.

Given this reduction, Defendants' remaining objections to the AMWA-related

portions of Cramton's fee request are unavailing.  For example, although Defendants note that Cramton's recovery on her AMWA claim represented only a small fraction of the overall recovery she sought in this case (Doc. 497 at 4, 7-8), Defendants fail to explain why this sort of comparison would be relevant in assessing the reasonableness of the fees that Cramton incurred when pursuing her AMWA claim.  Cramton fully prevailed on that claim—she sought $50,871 at trial and received 100% of that amount in the final judgment.  The analysis might be different if Cramton were seeking fees incurred for litigating all of her claims, but the $192,792.50 figure avoids such overlap.

Defendants also suggest that "[l]itigation on Count[] IV . . . was superfluous and easily could have been avoided." (Doc. 497 at 7.)  This is a puzzling assertion that is belied by the record.  As discussed above, Defendants' initial settlement offers to Cramton only pertained to Count Five (the ECO claim) and would have required Cramton to release all other claims, including the AMWA claim, without recovery.  Later, Defendants' settlement posture became even more aggressive—they eventually demanded that Cramton write them a check for $250,000 in order to resolve all claims and counterclaims.  And even now, more than four years after the case began, Defendants continue to attack the legal and factual sufficiency of the AMWA claim through voluminous Rule 59(e) motions.  Given this backdrop, the litigation over the AMWA claim could not have been easily avoided— Cramton was forced to litigate the claim and is thus statutorily entitled to the reasonable fees she incurred in the process.  True, Cramton did not make a targeted effort to settle the AMWA claim without regard to her other, bigger-ticket claims, but nothing about how Defendants litigated this case suggests that such a targeted settlement effort would have been successful.

The Court also disagrees with Defendants' contention that the AMWA claim was a "simple, limited and routine" claim that "one lawyer needed only months . . . to settle" and that Cramton therefore acted unreasonably by "assign[ing] 4 lawyers" to pursue the claim. (Doc. 497 at 4, 10-12.)  It is an understatement to say that Defendants have aggressively defended against all of Cramton's claims in this action, including the AMWA claim.

Defendants have also been represented by many more attorneys over the course of this case than Cramton.  (Doc. 481-2 ¶¶ 2, 5, 10, 13-14 [noting that, over the course of this case, Defendants were represented by three attorneys from Bryan Cave, four attorneys from Tiffany Bosco, three attorneys from Cronus Law, one attorney from Cohen Law, and one attorney from Newman Law].)  Under these circumstances, the Court will not penalize Cramton for retaining a smaller team of skilled attorneys who were able to achieve success on her behalf.

In a related vein, Defendants have not established that Cramton's attorneys failed to exercise billing judgment when litigating the AMWA claim, engaged in duplicative work, are seeking reimbursement for tasks unrelated to the AMWA claim, or are seeking reimbursement for clerical work.  (Doc. 497 at 10-15.)  Most of Defendants' arguments on these topics are conclusory—for example, Defendants assert that "Cramton's billing records contain numerous entries with secretarial tasks that should have been deducted by Cramton's counsel" (Doc. 497 at 15) but do not identify any of the purportedly offending entries.  Other arguments are internally inconsistent—although Defendants characterize all of the spoliation-related litigation as relevant only to Cramton's resignation-related claims (Doc. 497 at 12-15), one of Defendants' Rule 59(e) motions seeks the reversal of the judgment in Cramton's favor on Count Four based on purported errors in the Court's spoliation analysis (Doc. 475).  At any rate, the Court is satisfied that a fee award of $192,792.50 would result in compensation only for work on the AMWA claim that was reasonable, non-duplicative, and consistent with billing judgment.

Defendants' final set of objections concern the reasonableness of the hourly rates charged by Cramton's counsel and, relatedly, whether the fee request exceeds what Cramton's attorneys would have otherwise been entitled to receive under their fee agreement with Cramton.  (Doc. 497 at 4, 8-9.)  Those objections lack merit.  Cramton's fee agreement called for a blended hourly and contingent fee under which Cramton would pay an hourly rate of $400 to partners, an hourly rate of $275 to associate and contract attorneys, and an hourly rate of $160 to paralegals, with these hourly fees representing "a

contingent fee which shall not become due unless and until the matter is resolved in [Cramton's] favor." (Doc. 483-1 at 11.) Although Defendants assert that this matter was not "resolved in [Cramton's] favor" because she received far less than she originally sought, Defendants fail to cite any authority in support of their position and the Court is unpersuaded—Phyrric though the victory may have been, this action was resolved in Cramton's favor when the Court entered judgment in her favor on several of her claims and on all of the counterclaims. Thus, Cramton's fee request does not exceed what she otherwise would be required to pay under the fee agreement. The agreed-to rates in the fee agreement are also reasonable for the quality work that Cramton's experienced attorneys performed in this case. *See, e.g., Orman v. Central Loan Admin. & Reporting*, 2020 WL 919302, *2 (D. Ariz. 2020) ("Other courts within this district have determined that a reasonable rate 'for highly skilled, experienced, and regarded lawyers' involved in 'complex, high-dollar commercial litigation' can range as high as $552 per hour. Similarly, reasonable associate rates approved in this district have reached $280 per hour.") (citations omitted).

Finally, another touchstone of reasonableness that has guided the Court's analysis here is that an award of $192,792.50 for Cramton's attorneys' work on the successful AMWA claim, which generated a recovery of just over $50,000, would resemble other fee awards that have been upheld the Ninth Circuit in comparable cases. *See, e.g., Avila v. L.A. Police Dep't*, 758 F.3d 1096, 1105 (9th Cir. 2014) (upholding $579,400 fee award in $50,000 FLSA action); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1473 (9th Cir. 1983) (upholding $100,000 fee award in $18,455 FLSA action).

For these reasons, Cramton is entitled to a fee award of $192,792.50 based on her successful pursuit of an AMWA claim against Keely. Additionally, Cramton is entitled to the recover the $18,027.50 in fees she expended in support of her fee application. (Doc. 503 at 9.)[11] This brings the total award to $210,820.

---

[11]     In the tentative ruling, the Court concluded this fee request should be reduced by 50% because it included unsuccessful briefing related to Cramton's request for fees under A.R.S. § 12-341.01. Because the Court has now concluded that Cramton's request for fees under § 12-341.01 should be granted in part, there is no need for a 50% reduction.

Finally, Cramton is also entitled to recover the fees and costs she reasonably incurred when responding to Defendants' AMWA- and spoliation-related Rule 59 motions. (Docs. 467, 475.)  This is because both motions sought the reversal of the judgment in Cramton's favor on Count Four.  Accordingly, within 14 days of the issuance of this order, Cramton may file a request for those additional fees and costs.

V.       Defendants' Motion For Sanctions (Doc. 487)

         A.       **The Parties' Arguments**

The final post-judgment motion is Defendants' motion for sanctions against Cramton and Cramton's counsel.  (Doc. 487.)  Defendants argue that nearly all of Cramton's losing claims in this action—specifically, the FMLA claim in the original complaint, the ADA claims in Counts One, Two, and Three, the AMWA claim in Count Four as asserted against ECH, ECO, and Kelli, and several of the resignation-related claims against ECH and Keely—"were based on legal or factual contentions so weak as to constitute objective evidence of frivolousness, improper purpose and recklessness." (*Id.* at 2.)  Thus, Defendants seek sanctions under 28 U.S.C. § 1927 and the Court's inherent authority.  (*Id.* at 2-4.)  According to Defendants, the cost of defending against Cramton's groundless and frivolous claims was more than $850,000.  (*Id.* at 16.)

Cramton opposes Defendants' motion on a variety of grounds.  (Doc. 493.)  As an initial matter, Cramton argues that the motion is untimely because the deadline for filing post-trial fee motions was January 13, 2022 but Defendants did not file their motion until January 26, 2022.  (*Id.* at 2-3.)  Separately, Cramton argues that the motion repeatedly conflates the standard for liability under 28 U.S.C. § 1927 (which only authorizes an award of sanctions against counsel) and pursuant to the Court's inherent authority.  (*Id.* at 3-4.)  Next, Cramton argues that, regardless of the applicable standard, sanctions are not warranted because none of the challenged claims were frivolous or groundless or asserted in subjective bad faith.  (*Id.* at 4-8.)  Finally, Cramton argues that the fee request may amount to improper double-dipping because "Defendants provide no cognizable explanation to the court of how their request in this motion for $864,223.81 in monetary

1   sanctions can be aligned with the $1,033,041 in fees and $24,672.20 in costs separately

2   requested by Defendants in their [other] motion for fees and costs."  (*Id.* at 8-9.)

3       In reply, Defendants dispute that they have conflated the liability standards, dispute

4   that they are double-dipping, advance additional reasons why the challenged claims should

5   be considered groundless and frivolous and asserted in bad faith, and argue that their

6   motion was not untimely because "the Motion . . . is brought pursuant to 28 U.S.C. § 1927

7   and the Court's inherent authority and not under Rule 54" and "[n]o local rule or case was

8   cited as holding that a motion brought pursuant to the Court's inherent authority is subject

9   to the time limitations of Rule 54."  (Doc. 502.)

10      B.   **Discussion**

11      Defendants' sanctions motion is denied.

12      As an initial matter, the motion is likely untimely.  The starting point for the analysis

13  is Rule 54 of the Federal Rules of Civil Procedure.  Rule 54(d)(2) sets forth various

14  procedures governing motions for attorneys' fees.  Under subdivision (d)(2)(B), the general

15  rule is that, "[u]nless a statute or a court order provides otherwise," a motion for attorneys'

16  fees must "be filed no later than 14 days after the entry of judgment" and must "specify the

17  judgment and the statute, rule, or other grounds entitling the movant to relief."  However,

18  subdivision (d)(2)(E) creates an exception to this general rule, explaining that the

19  aforementioned requirements "do not apply to a claim for fees and expenses as sanctions

20  for violating these rules or as sanctions under 28 U.S.C. § 1927."

21      Here, Defendants are seeking sanctions under two different sources of authority: (1)

22  the Court's inherent authority; and (2) 28 U.S.C. § 1927.  As for the former, there is a

23  strong argument that Defendant's request is subject to the time limitations imposed by Rule

24  54(d)(2)(B).  This is because a request for sanctions pursuant to the Court's inherent

25  authority is a request based on "other grounds," as specified in Rule 54(d)(2)(B), and does

26  not fall within either of the exceptions enumerated in Rule 54(b)(2)(E) (*i.e.,* a request based

27  on a violation of the Federal Rules of Civil Procedure or under 28 U.S.C. § 1927).  *See,*

28  *e.g., Hill v. Clark*, 2012 WL 13018385, *4 (N.D. Ga. 2012) ("The reference to 'other

grounds' arguably encompasses the court's inherent power.  Moreover, the rule provides only two exceptions to the 14-day deadline. . . .  The fact that the rule contains an exclusion from the 14-day deadline for a motion for attorney's fees under § 1927 and under the federal rules, but does not contain any other exclusionary language, strongly implies that Rule 54 applies to a motion seeking attorney's fees under the court's inherent power.").

Accordingly, any request for sanctions pursuant to the Court's inherent authority was due within 14 days of entry of judgment "unless . . . a court order provides otherwise." *See* Fed. R. Civ. P. 54(b)(2)(B).  Here, the 14-day deadline would have been December 13, 2021, because judgment was entered on November 30, 2021 (Doc. 461), but the Court extended that deadline at the parties' joint request to January 13, 2022. (Docs. 462, 463.)  Nevertheless, the current motion was not filed until January 26, 2022.  (Doc. 487.)  This was untimely and Defendants do not offer any explanation for why they missed the deadline.  This alone provides a basis for denying Defendants' request for inherent-authority fees.  *In re Veritas Software Corp. Securities Litig.*, 496 F.3d 962, 972-73 (9th Cir. 2007) ("Failure to comply with the time limit in Rule 54 is a sufficient reason to deny a motion for fees absent some compelling showing of good cause.").

To the extent Defendants are seeking fees under 28 U.S.C. § 1927, the procedural requirements and deadlines created by Rule 54(d)(2)(B) do not apply.  This is because, as noted, subdivision (d)(2)(E) expressly exempts motions under § 1927 from subdivision (d)(2)(B)'s requirements.  *Hill*, 2012 WL 13018385 at *7 ("A motion for attorney's fees pursuant to § 1927 is specifically exempted from the Rule 54 deadline.") (citations omitted).  But a finding that Rule 54(d)(2)(B) was inapplicable does not end the analysis—it simply means the Court must find some other standard for evaluating the timeliness of Defendants' request for fees under § 1927.

On that score, although § 1927 itself does not create any deadlines, the Court finds it notable that, in a joint motion filed on December 13, 2021, the parties requested "an order to extend the deadlines for the parties to submit their respective Memoranda in Support of their forthcoming motions for an award of attorney fees and non-taxable costs from

1   December 14, 2021 to January 13, 2022 so that the parties have sufficient time to complete

2   the details of their respective submissions." (Doc. 462.) The Court construed this as a

3   request to set a deadline for the submission of *all* requests for attorneys' fees and costs—

4   including, by implication, any request for attorneys' fees and costs under 28 U.S.C. § 1927.

5   (Doc. 463.) This was an eminently reasonable deadline for Defendants to file a sanctions

6   request under § 1927—it was six weeks after the entry of judgment—and Defendants'

7   failure without explanation to comply with the court-ordered deadline provides grounds

8   for denying their § 1927 sanctions request without regard to Rule 54(d)(2). Although such

9   a delay might not, in a different case, be viewed as unreasonable enough to justify the

10   denial of a § 1927 sanctions motion on untimeliness grounds, the unique chronology here—

11   where Defendants filed one voluminous sanctions motion on the January 13, 2022 deadline

12   (Doc. 481) but then delayed, without explanation, their filing of a separate sanctions motion

13   based on the Court's inherent authority and § 1927 until about two weeks later—supports

14   a finding of unreasonable delay. *Home Gambling Network, Inc. v. Piche*, 2015 WL

15   1734928, *19 (D. Nev. 2015) ("Though the Ninth Circuit has not commented on the issue

16   of timeliness in the context of § 1927 sanctions, other courts have held that § 1927 motions

17   must be made within a 'reasonable time' or 'as expeditiously as possible' after the entry of

18   judgment, and should not be 'unnecessarily or unreasonably delayed.'") (citations

19   omitted).

20        Alternatively, even if Defendants' motion were timely in whole or in part, the Court

21   would deny it on the merits for the reasons stated in Cramton's response. Although

22   Cramton may have lost on the claims at issue, Defendants have not established an

23   entitlement to sanctions under the standards applicable under § 1927 and the Court's

24   inherent authority.

25        …

26        …

27        …

28        …

Accordingly,

**IT IS ORDERED** that:

1.      Defendants' Rule 52 and Rule 59 motion pertaining to Count Four (Doc. 467) is **denied**.

2.      Defendants' Rule 59 motion pertaining to Count Five (Doc. 473) is **denied**.

3.      Defendants' Rule 59 motion pertaining to spoliation sanctions (Doc. 475) is **denied**.

4.      Defendants' motion for attorneys' fees and costs (Doc. 481) is **denied**.

5.      Defendants' motion for sanctions pursuant to 28 U.S.C. § 1927 and inherent authority (Doc. 487) is **denied**.

6.      Cramton's amended motion for attorneys' fees and costs (Doc. 483) is **granted in part and denied in part**.  Cramton is awarded $210,820 in attorneys' fees payable by Defendant Keely Newman and is awarded $10,256 in attorneys' fees payable by Defendant Eat Clean Operations LLC.

7.      Cramton is also authorized to file a supplemental application for the fees she incurred when responding to Defendants' reconsideration motions (Docs. 467, 473, and 475) and when responding to the order soliciting supplemental briefing on one of those motions (Doc. 508).  Such application must be filed within 14 days of the issuance of this order.

Dated this 27th day of May, 2022.

_____
Dominic W. Lanza
United States District Judge